UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION


JERRY BLASINGAME,                     )
                                      )
        Plaintiff,                    ) CASE NO:
                                      ) 1:19-CV-2047-SCJ
-vs-                                  )
                                      )
                                      )
OFFICER T. GRUBBS #6416,              )
and CITY OF ATLANTA/                  )
ATLANTA POLICE DEPARTMENT,            )
                                      )
        Defendants.                   )
_____)



            VIDEOTAPED DEPOSITION OF OFFICER JON GRUBBS

                   (Pages 1 through 246 )

                   (Via Video Conference)




               Thursday, January 28, 2021

                 (9:00 a.m. to  4:10 p.m.)




               Stenography Reported By:

               Kendra B. James, RDR, CRR

            Georgia Certified Court Reporter

OFFICER JON  GRUBBS
January 28, 2021

```
1                      APPEARANCES

2


3   On Behalf of the Plaintiff:

4       JOHNSON LAW
        VEN JOHNSON, ESQUIRE (via video conference)
5       MADELINE SINKOVICH, ESQUIRE (via video conference)
        SOLOMON RADNER, ESQUIRE (via video conference)
6       535 Griswold Street
        Suite 2632
7       Detroit, Michigan 48226
        313-324-8300
8       vjohnson@venjohnsonlaw.com

9


10  On Behalf of the Defendant:

11      CITY OF ATLANTA LAW DEPARTMENT
        STACI MILLER, ESQUIRE (via video conference)
12      KELLI HOOPER, ESQUIRE (via video conference)
        55 Trinity Ave SW,
13      Suite 1790
        Atlanta, Georgia 30303
14      404-330-6402
        sjmiller@atlantaga.gov

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   INDEX OF PROCEEDINGS

 2

 3   Deposition of OFFICER JON GRUBBS

 4

 5                                                   Page

 6   Examination by MR. JOHNSON               5, 240

 7   Examination by MS. MILLER                   235

 8   Certificate of Reporter                     246

 9

10   Exhibits

11   1    Call for Service                       58

12   2    GBI Report                            152

13   3    Grady EMS Run Sheet                   168

14   4    Photographs                           172

15   5    Incident Report                       188

16   6    Supplemental Incident Report         209

17   7    Obstruction Citation                 215

18   8    Panhandling Citation                 217

19   9    Solicitation Warrant                 221

20   10   Obstruction Warrant                  224

21

22

23

24

25
```

OFFICER JON  GRUBBS
January 28, 2021

1                    OFFICER JON GRUBBS,

2    having been first duly sworn, was examined and testified

3    as follows:

4              MR. JOHNSON:  And we're all set on the video as

5    well.

6              THE COURT REPORTER:  I'm not sure about video

7    recording, Mr. Radner.

8              MR. RADNER:  Let's go off the record for a

9    second.

10             THE COURT REPORTER:  Okay.

11             MR. RADNER:  Thank you.

12                  (Whereupon, a discussion was held off the

13                  record.)

14             MR. JOHNSON:  Okay.  Sorry, folks.  I thought we

15   ordered it.  They did not get one, so we will be moving

16   forward.  Thank you.

17             Madam Court Reporter, ready when you are.

18             THE COURT REPORTER:  I'm ready.

19             MR. JOHNSON:  Thank you.

20             Officer's already been sworn, correct?

21             THE COURT REPORTER:  Yes, he has.

22             MR. JOHNSON:  Thank you.

23             Let the record reflect this is the deposition of

24   Officer J. Grubbs taken pursuant to notice and will be

25   used for all purposes allowed under the Federal Rules of

OFFICER JON  GRUBBS
January 28, 2021

1   Civil Procedure and the federal rules of evidence.

2           I do want to indicate that we noticed the

3   deposition as video according to our notice.  But

4   apparently, there was a glitch between us and the court

5   reporting service, so there is no videographer and we

6   will be moving forward without one.

7           Any objection to that, Counsel?

8           MS. MILLER:  No.

9           MR. JOHNSON:  Thank you.

10                       CROSS EXAMINATION

11  BY MR. JOHNSON:

12      Q.   Officer Grubbs, good morning.

13      A.   Oh, good morning, sir.

14      Q.   My name is Ven Johnson, sir.  I represent

15  Mr. Blasingame in this incident and lawsuit.

16           Before we get started, just want to make sure we

17  have a general understanding of the deposition format.

18  Have you ever given a deposition before in any other

19  matter, sir?

20      A.   No, I have not.

21      Q.   Okay.  But you have testified live in a

22  courtroom setting?

23      A.   I have.

24      Q.   A number of times?

25      A.   That is correct.

OFFICER JON  GRUBBS
January 28, 2021

1      Q.    Okay.  So I'll take it that the question/answer

2   format, you're pretty familiar with.  Correct, sir?

3      A.    Yes, sir.

4      Q.    And I do want to make sure that I'm referring to

5   you by your proper rank.  Is it officer, sir, still?

6      A.    Officer.  That is correct.

7      Q.    Thank you.

8           Just like in a courtroom setting, Officer,

9   obviously, you know the importance, of course, of the

10   oath that you've already agreed to, correct?

11      A.    That is correct.

12      Q.    Thank you, sir.

13           And then also without a judge or a jury, we're

14   going to be doing pretty much the same thing we would do

15   in court.  Okay?

16      A.    Okay.

17      Q.    In other words, question/answer format and I

18   think that suffices in view of your past experiences.  Do

19   you agree?

20      A.    I do.

21      Q.    Thank you, sir.

22           A little bit different, but it can happen in

23   live courtroom testimony as well.  But in a deposition if

24   your counsel wants to voice an objection, she's certainly

25   entitled to do that at the conclusion of my question.

OFFICER JON  GRUBBS
January 28, 2021

 1  And likewise, if she asks you questions, me of her.

 2         If you see or sense that's going to happen, if

 3  you kindly would pause in order for her to say what she

 4  wants to say on the record.  And then likely, she'll give

 5  you an instruction, either answer the question or not,

 6  and we'll go from there.  Okay?

 7         THE COURT REPORTER:  Mr. Johnson, I believe we

 8  might have a videographer on now.

 9         THE VIDEOGRAPHER:  Yeah, I apologize, sir.  I

10  just got notification on this.  Do you want this as a

11  video depo, Mr. Johnson?

12         MR. JOHNSON:  Yes, please.

13         THE VIDEOGRAPHER:  Okay.  If you could just give

14  me one second just so I can fill out some quick

15  paperwork.  Just one second, please.  Thank you.

16         MR. JOHNSON:  Thank you.

17         We're off the record, correct?

18         THE COURT REPORTER:  Yes, we're off the record.

19               (Whereupon, a recess was taken.)

20         THE VIDEOGRAPHER:  Okay.  I apologize once

21  again.  If everyone can stand by, I'll get us on the

22  record.  Stand by, please.

23         We're here in the matter of -- excuse me.  We

24  are now on the record.  Participants should be aware that

25  this proceeding is being recorded.  And as such, all

OFFICER JON   GRUBBS
January 28, 2021

1   conversations held will be recorded unless there is a

2   request and agreement to go off the record.

3          Private conversations and/or attorney-client

4   interaction should be held outside the presence of this

5   remote interface.  For the purpose of treating a witness

6   on a video recording, the witness is being spotlighted

7   and all video screens are on speaker view.  We ask that

8   the witness not remove the spotlight setting during this

9   deposition as it may cause other participants to appear

10  on a final video.

11         For anyone who doesn't want the witness video to

12  take up the large part of your screen, you may click the

13  gallery view button in the upper right corner of this

14  remote depo interface.

15         This is remote video recording deposition of

16  Joe (sic) Grubbs being taken by counsel for the

17  plaintiff.  Today is January 28th, 2021 and the universal

18  time is 1419.  My name is Shawn Capron, video technician

19  on behalf of U.S. Legal Support located remotely.  I am

20  not related to any party in this action, nor am I

21  financially interested in the outcome.

22         At this time, our court reporter Kendra James on

23  behalf of U.S. Legal Support, please enter the statement

24  for this remote proceeding into the record.

25         THE COURT REPORTER:  Pursuant to Article 8.B. of

OFFICER JON  GRUBBS
January 28, 2021

1   the rules and regulations of the Board of Court Reporting

2   of the Judicial Council of Georgia, I make the following

3   disclosure.

4           ,I Kendra James, am a Georgia certified court

5   reporter.  I am here as an independent contractor for

6   U.S. Legal Support, Inc.  U.S. Legal Support, Inc. was

7   contacted by the office of U.S. Legal Support, Inc. to

8   provide court reporting services for this deposition.

9   The firm will not be taking the deposition under any

10  contract that is prohibited at O.C.G.A. 15-14-37 (a) and

11  (b).

12          U.S. Legal Support, Inc. has an agreement to

13  provide court reporting services with U.S. Legal Support,

14  Inc., the terms of which are as follows:  any and all

15  special rates and/or services are available to all

16  parties involved in this litigation.

17          Mr. Grubbs, would you please raise your right

18  hand.

19                      JON GRUBBS,

20  having been first duly sworn, was examined and testified

21  as follows:

22          THE COURT REPORTER:  Will you please state your

23  name for the record, please.

24          THE WITNESS:  Jon Grubbs.

25          MR. JOHNSON:  Officer Grubbs, we've already done

OFFICER JON  GRUBBS
January 28, 2021

1  this what I'll call the preamble.

2           And, Ms. Miller, any objection, that we'll just

3  rely on what we've already done and start moving forward

4  with the deposition now that we have the videographer?

5           MS. MILLER:  No objection.

6           MR. JOHNSON:  Thank you.

7                 CONTINUED DIRECT EXAMINATION

8  BY MR. JOHNSON:

9      Q.   Officer Grubbs, no problem from your end, sir?

10     A.   No, sir.

11     Q.   I appreciate you.  Thank you.  All right.

12          Officer Grubbs, can you tell me -- where do you

13  currently work?

14     A.   I'm currently employed with the City of Atlanta

15  Police Department currently assigned to the Zone 5 field

16  investigations team.

17     Q.   How long have you been employed by the ATL PD,

18  sir?

19     A.   Seven years.

20     Q.   So this being about early 2021, you got there

21  sometime in 2014, give or take?

22     A.   December 2013, sir.

23     Q.   Did you get there straight out of the academy?

24     A.   Yes, sir.

25     Q.   So you did -- were you employed by any other

OFFICER JON  GRUBBS
January 28, 2021

1  police agencies before you went to Atlanta?

2      A.   No, I was not.

3      Q.   What academy did you attend, sir, please?

4      A.   Atlanta Police Academy.

5      Q.   And when was -- from when to when was that?

6  Ballpark, please, Officer Grubbs.

7      A.   I started the academy ballpark probably around

8  June of 2014 and I graduated December of 2014.

9      Q.   So you were actually already employed by Atlanta

10  Police Department while you were at the academy; is that

11  how it worked for you?

12      A.   Yes, sir.

13      Q.   Okay.  Thanks.

14          And you got out of the academy in  just a --

15  we're obviously today, Officer Grubbs, going to be talk

16  about a number of topics, but one of them I'm guessing is

17  not surprising to you will be the Use of Force Continuum.

18  You're familiar with that phrase obviously.

19      A.   Yes, sir.  I am.

20      Q.   Did you begin learning about the Use of Force

21  Continuum even in the academy, Officer?

22      A.   Yes, sir.

23      Q.   Okay.  In the academy, were you trained, that

24  you can recall, about the use of body cams?

25      A.   Not in the academy, no.

OFFICER JON  GRUBBS
January 28, 2021

1     Q.    Okay.

2     A.    And that is due to the fact that when I was in

3   the academy, we did not have body cameras.

4     Q.    And in -- just in a review of stuff, I think I

5   saw something where body cams kind of came into Atlanta

6   Police Department sometime in the 2014 time frame.

7          Is that somewhat consistent with your

8   familiarity?

9     A.    Not with my familiarity, no.

10    Q.    Okay.  All right.  When did you start wearing

11  one?

12    A.    I believe I started wearing a body camera maybe

13  sometime in mid to late 2017.

14    Q.    '17.  Okay.

15         So literally the year before the events we're

16  going to talk about here on July 10, 2018.

17    A.    Okay.  Yeah.

18    Q.    Does that sound about right?

19    A.    That sounds about right.

20    Q.    Like what, the fall of 2017, something like

21  that?

22    A.    I would estimate fall of 2017.

23    Q.    Okay.  We talked about the Use of Force

24  Continuum in the academy.  Did you learn at all about the

25  use of on-dash cameras at all for patrol vehicles in the

OFFICER JON  GRUBBS
January 28, 2021

 1    academy?

 2         A.   We learned about that mainly in field training.

 3         Q.   Okay.  In the academy, were you trained at all

 4    relative to the use of Tasers or otherwise known as

 5    conductive electrical -- I can't read my own writing --

 6    weapon -- there it is -- CEW?

 7         A.   Yes, I was.

 8         Q.   And just for purpose of today, Officer Grubbs,

 9    so that I'm not saying that mouthful.  You want me to

10    call it a Taser; you want me to call it CEW?  What do you

11    call it?

12         A.   I refer to it as a Taser.

13         Q.   Thank you.

14              So I'll take it, in the academy, were you

15    trained on how to use a Taser?

16         A.   I was.

17         Q.   And when to use a Taser?

18         A.   That is correct.

19         Q.   And as part of the Use of Force Continuum that

20    we talked about that you even learned in the academy --

21    I'll take it, you were trained the circumstances of when

22    you can and when you can't use a Taser.

23         A.   That is correct, sir.

24         Q.   All right.  When -- when we're talking about

25    even in the academy -- and I -- and forgive me because if

OFFICER JON  GRUBBS
January 28, 2021

1   you ask me about law school -- the difference being,

2   Officer, my law school was 30 some years ago.  I don't

3   remember anything.  So if you don't, tell me you don't.

4        But do you recall at all learning in the academy

5   at least generalities about the Atlanta Police

6   Department's pol- -- written policies and procedures as a

7   whole?

8        A.   For the most part, yes.

9        Q.   Okay.  So for example, when I asked you about

10  use of force training in the academy, do you remember

11  reading the ATL Police Department policies and procedures

12  on use of force as part of that training?

13       A.   I remember reading it, yes.

14       Q.   Okay.  Same question about the city's written

15  policies and procedures about a use of the Taser as well.

16       A.   Yes, sir.

17       Q.   Okay.  And do you remember -- you may not be.

18  But do you remember being trained relative in the academy

19  about the city's Taser training about not supposed to use

20  it on elderly folks?

21       A.   I do recall that part of the SOP.

22       Q.   Okay.  And SOP meaning standard operating

23  procedure or what does SOP mean?

24       A.   Standard operating procedure.  That is correct,

25  sir.

OFFICER JON  GRUBBS
January 28, 2021

1      Q.   Are you aware -- and again, if you're not tell

2  me, please, Officer.  Are you aware of any changes to the

3  use of force policy as a whole -- and I know that's a big

4  chunk.

5           But are you aware of any changes to the use of

6  force policy from the time of the academy until the time

7  of July 10, 2018 that we're going to talk about today?

8      A.   No, I am not.

9      Q.   How about specifics as it relates to the use of

10  the Taser; are you aware of any changes to that written

11  policy in that time frame?

12      A.   No, sir.

13      Q.   Okay.  To the best of your knowledge, Officer

14  Grubbs, who is kind of the head honcho -- who's the

15  person in charge of implementing, changing, or making the

16  decision about those policies?

17      A.   Those would normally be a combination of the

18  command staff and the training academy as long as they

19  get their guidance from Georgia POST as well.

20      Q.   Georgia POST is what?

21      A.   That's the Police Officers Standards and

22  Training organization which licenses all officers in the

23  State of Georgia.

24      Q.   Did you -- or have you received any direct

25  training from Georgia POST from the time of the academy

OFFICER JON  GRUBBS
January 28, 2021

1  until even today?

2      A.    Not due -- yes, I have.  I received training

3  from Georgia POST.

4      Q.    And can you tell me when for the first time, to

5  the best of your memory?

6      A.    The first training was maybe around 2015.

7      Q.    Okay.  You go there, they come to you?  Where --

8  how did that work?

9      A.    This particular training was held at Georgia

10  Tech University.

11      Q.    Sure.

12          Do you remember what was covered, the topics, if

13  you will?

14      A.    This particular training was a death

15  investigations course.

16      Q.    Okay.  Anything to do with the use of Taser?

17      A.    No.

18      Q.    Or a body cam, slash, on-dash camera?

19      A.    No, sir.

20      Q.    Or use of force?

21      A.    No, sir.

22      Q.    Okay.  Next time you went to Georgia POST -- let

23  me just go to the topics I just asked you about, use of

24  force, Taser, body cam, slash, on-dash camera.

25          Any training that you got directly from Georgia

OFFICER JON  GRUBBS
January 28, 2021

1    POST on those topics?

2        A.    No, sir.

3        Q.    The chief officer, if you will, that's in charge

4    of the Atlanta Police Department today is who?

5        A.    I believe that is Interim Chief Rodney Bryant.

6        Q.    B-r-y-a-n-t?

7        A.    That is correct.

8        Q.    And who was the chief before Chief Bryant?

9        A.    That would have been Chief Erika Shields.

10       Q.    When did she leave, to the best of your memory?

11       A.    I believe she left the department in July or

12   August of 2020.

13       Q.    Right.

14             And was that right after the shooting of the --

15   of the gentleman at the...

16       A.    At the Wendy's, yes.  That is correct.

17       Q.    Wendy's.  Thank you.

18             And I certainly do not want to refer to him as

19   the gentleman at the Wendy's.  Remind me of his name,

20   please.

21       A.    I believe it was Mr. Rayshard Brooks.

22       Q.    And then I'll take it that -- has Mr. -- or

23   Chief Bryant -- Interim Chief Bryant been in place then

24   from the time that Chief Shields left, sir?  To the best

25   of your knowledge.

OFFICER JON  GRUBBS
January 28, 2021

1     A.   To the best of my knowledge, yes, sir.

2     Q.   Thank you.

3          Do you know when Chief Shields took that

4   position roughly, Officer Grubbs?

5     A.   It was in the neighborhood of -- to the best of

6   my knowledge, maybe around 2017.

7     Q.   Okay.

8     A.   I'm not a hundred percent sure on that, though.

9     Q.   I appreciate that.

10         The date we're going to be talking about today

11  obviously is July 10, 2018.  So at the time of the

12  incident that you were involved with, with

13  Mr. Blasingame, was Chief Shields in charge at that time?

14    A.   I do believe that she was, sir.

15    Q.   Okay.  To the best of your knowledge, was she

16  the person, in essence, who was in charge of implementing

17  the policies and procedures if you had to choose one

18  person?

19    A.   Yes, sir.  I would say so.

20    Q.   All right.  In the academy, Officer Grubbs, do

21  you remember discussing various cases -- and I mean by

22  that a lawsuit or a criminal matter -- where the use of

23  force was discussed and some cases may have been utilized

24  for you folks to discuss and understand the law, if you

25  will?

OFFICER JON  GRUBBS
January 28, 2021

1      A.    I do remember some cases that were discussed.

2      Q.    Okay.  Do you have any memory at all of a case

3 that's called Tennessee versus Garner where an officer

4 shot an escaping person from a -- some type of a breaking

5 and entering in the middle of the back?

6      A.    I do recall that case, yes.

7      Q.    And -- and do you recall, generally speaking, in

8 Tennessee versus Garner that the United States Supreme

9 Court said that under the circumstances that existed in

10 that situation, that was not something that was allowed

11 to occur?

12     A.    I don't recall the specific details of the court

13 ruling --

14     Q.    Okay.

15     A.    -- at this moment, but...

16     Q.    Just as a general rule, would you agree with me

17 that shooting somebody in the back is generally speaking

18 not something that you would attempt to do?

19          MS. MILLER:  Objection.

20          But you can answer.

21          THE WITNESS:  Generally speaking, I would agree

22 with that.

23     Q.    (By Mr. Johnson)  Okay.  Obviously, everything

24 depends on the circumstances, correct, Officer Grubbs?

25     A.    Yes, sir.

OFFICER JON   GRUBBS
January 28, 2021

1      Q.   And are you aware as part of maybe even from the

2   academy -- if you don't and -- we're going to get into

3   the policies and procedures a little bit later.

4          But do you remember basically learning in the

5   academy, being specifically taught, that under most

6   circumstances, an officer would not and should not shoot

7   somebody fleeing in the middle of the back?

8      A.   I do.

9      Q.   In essence without belaboring the point, a big

10   broad overview.  Because if they're running away from

11   you, assuming that they're not shooting at you or

12   otherwise, that they're less of a threat?

13      A.   Yes.  That is correct.

14      Q.   Do you remember being trained, even in the

15   academy, that in Tennessee versus Garner, that one of

16   the -- we call it holdings, h-o-l-d-i-n-g -- one of the

17   holdings in the case is that an officer under the law is

18   required to give a verbal warning to a suspect before

19   utilizing deadly force if feasible?

20          MS. MILLER:  Objection.

21          But you can -- you can answer.

22          THE WITNESS:  I do not recall that specifically

23   from the academy.

24      Q.   (By Mr. Johnson)  Okay.  I'll take it, that is a

25   rule that you're familiar with?

OFFICER JON  GRUBBS
January 28, 2021

1      A.   I am familiar with it more as if it can be done.

2  But it is not a requirement for us to do.

3      Q.   Okay.  Are you familiar that, under United

4  States federal law before utilizing deadly force, that an

5  officer must give a verbal warning if it's feasible to do

6  so without placing himself or others in danger?

7      A.   No, sir.  I'm not familiar with that under

8  federal law.

9      Q.   Okay.  No one has ever trained you from the date

10  of the academy through even today with the Atlanta Police

11  Department that under the law, you must give a suspect a

12  verbal warning in feasible as long -- before utilizing

13  deadly force as long as it doesn't put you or others in

14  imminent risk of danger?

15      A.   I --

16           MS. MILLER:  Same objection.

17           But you can answer that.

18           THE WITNESS:  No, I am not familiar with that

19  under federal law.

20      Q.   (By Mr. Johnson)  Yes, sir.

21           But I'm saying you never heard that, that's the

22  law from anybody that was training you by way of the

23  Atlanta Police Department.

24      A.   I have heard of that under a -- more the

25  umbrella of it being a policy if feasible.  I was not

OFFICER JON  GRUBBS
January 28, 2021

1    aware of it being part of federal law.

2         Q.   Okay.  I'll take it, that very thing that I've

3    now mentioned two or three times about the giving the

4    verbal warning, you understand that that, even as of

5    July 10 2018, was, in fact, the policy and procedure of

6    Atlanta Police Department.

7         A.   Yes.

8         Q.   When you got out of the academy and first

9    started working for the police department as a graduated

10   cadet, if you will -- so late 20- -- what did we say?

11        A.   That would be like --

12        Q.   Yeah.

13             What did you do -- what was your assignment, if

14   you would, please, Officer Grubbs?

15        A.   Upon being sworn in as a police officer, my

16   first assignment was to field training in which I rotated

17   through Zone 4, Zone 2, and Zone 5 for the field

18   operations division.

19        Q.   And the zones that we're talking about, is that

20   like a particular area of the City of Atlanta?

21        A.   Yes, sir.  Specific geographic areas.

22        Q.   Okay.  And on July 10, 2018, were -- was that

23   considered Zone 2, 4, or 5?

24        A.   The specific incident location was Zone 3.

25        Q.   Zone 3.  Okay.

OFFICER JON  GRUBBS
January 28, 2021

1           As part of your field training, were you a

2    patrol officer?  What -- what else -- what else can you

3    tell me about what you were doing initially upon

4    graduation?

5       A.   Upon being sworn in was a field training

6    officer.  I was assigned to specific field training

7    officers or FTOs in those specific geographic zones

8    for -- I guess, you could classify it as further

9    on-the-job training.

10      Q.   Yes, sir.

11           And what kind of -- what -- how would you

12   describe what you were doing other than in field

13   training?

14      A.   You know, so actually, putting pen to paper.

15   Actually executing real-life traffic stops, responding to

16   real-life calls for service, making real physical

17   arrests, citations, and such.

18      Q.   Okay.  And then if you will, let's progress kind

19   of to the next step.  When did you kind of finish, if you

20   will, field training in Zones 2, 4, and 5 roughly,

21   please, sir?

22      A.   That would have been 12 weeks roughly -- yeah,

23   roughly 12 to 14 weeks after being sworn in.  And from

24   that point on, I was assigned to Zone 5 morning watch as

25   a patrol officer.

OFFICER JON  GRUBBS
January 28, 2021

1    Q.   And about morning watch, tell me what that

2  means.

3    A.   That's just a night shift.  That's the overnight

4  hours.

5    Q.   Well, being from Detroit and the car plants, we

6  call it the graveyard shift.

7    A.   Uh-huh.

8    Q.   Was that kind of what the newer officers got or

9  that's just kind of what you got?

10   A.   Most new officers go to a evening or afternoon

11  shift or a morning watch.

12   Q.   Okay.

13   A.   That's what most new officers do.

14   Q.   And you were doing patrol; like, you had a

15  patrol vehicle and so forth?

16   A.   Yes, sir.  A patrol vehicle responding to calls

17  for service.

18   Q.   Yes, sir.

19        How long did you do that, please?

20   A.   I was on morning watch for a little over a year.

21   Q.   Okay.  That takes us into 2016 sometime,

22  correct, Officer Grubbs?

23   A.   Yes, sir.

24   Q.   And then when -- what -- what -- if you can --

25  the best you can kind of help us out, a month, if you

OFFICER JON  GRUBBS
January 28, 2021

```
1   will.  What month of 2016 did you go on to the next

2   assignment?  Roughly, please, sir.

3        A.   I would say maybe February --

4        Q.   Okay.

5        A.   -- of 2016, I went to the midtown crime

6   suppression unit.

7        Q.   Midtown I can figure out.  Crime suppression

8   unit means what?

9        A.   That is just a type of patrol officer that is

10  engaging in more proactive enforcement for criminal

11  activities and trafficking enforcement.

12       Q.   Okay.  Can you help me to better understand the

13  first part of that when you say "more active"?

14       A.   Not responding to regular calls for service --

15       Q.   Okay.

16       A.   -- traffic accidents, noise complaints, things

17  of that sort.

18       Q.   Okay.

19       A.   Specifically being there for emergency calls and

20  then engaging in that proactive enforcement.

21       Q.   Okay.  So the emergency calls, that could be

22  even non-potential criminal activity just where there's a

23  911 call, someone's injured, and you go.

24       A.   Yes, sir.

25       Q.   All right.  Were you -- are you -- you're CPR
```

OFFICER JON  GRUBBS
January 28, 2021

 1  obviously; CPR trained, right, sir?

 2      A.   Yes, sir.  CPR, first aid, AED.

 3      Q.   And then did you learn that in the academy?

 4      A.   Yes, sir.  I did.

 5      Q.   Were you certified in any of that before the

 6  academy?

 7      A.   I was.

 8      Q.   When did you first become certified in CPR or

 9  any type of emergency first aid, please?

10      A.   Probably around 2005 would be my first

11  certifications.

12      Q.   All right.  I'll go back into that when we kind

13  of finish the resume, if you would.

14           So you were doing the -- from February 2016

15  roughly, the crime support unit and the patrol officer,

16  you did that for how long before the next kind of move,

17  if you would, please, Officer Grubbs?

18      A.   I did that through the summer of 2016.

19      Q.   Okay.

20      A.   And then probably around August or September of

21  2016, I went back to morning watch patrol.

22      Q.   Okay.  What zone?

23      A.   Zone 5 still.

24      Q.   How long did you do that?

25      A.   I stayed there until around January of 2017.

OFFICER JON  GRUBBS
January 28, 2021

1      Q.   Okay.  And when -- and then went on where then?

2      A.   I went to a larceny from automobile unit.

3      Q.   How long did you do that?

4      A.   I stayed there till -- let's see.  Maybe around

5  May or June of 2017.

6      Q.   Okay.  Then where'd you go?

7      A.   Back to the midtown crime suppression unit.

8      Q.   How long there that time?

9      A.   I stayed there until April of 2018.

10     Q.   So almost a year, correct?

11     A.   That is correct.

12     Q.   So in April of 2018, where did you go?

13     A.   I was assigned to the Zone 5 field

14  investigations team.

15     Q.   And "field investigation" means what?

16     A.   That is just -- it's similar to a crime

17  suppression unit --

18     Q.   Okay.

19     A.   -- but more focusing on undercover operations,

20  things of that sort.

21     Q.   Okay.  How long did you remain in that position

22  roughly?

23     A.   I am still currently in that position.

24     Q.   So from -- you've been in that position from

25  April of '18 through the present time.

OFFICER JON  GRUBBS
January 28, 2021

1      A.   That is correct.

2      Q.   Going on three years here, if my math is okay.

3   Correct?

4      A.   Yes, sir.

5      Q.   That's obviously, then, what you were doing --

6   or at least that's where you were assigned to as of

7   July 10, 2018.

8      A.   That is correct, sir.

9          MR. JOHNSON:  I apologize, folks, but I need a

10  two-minute bathroom break.  I'm going to fill it up with

11  coffee.  So be right back.  Thank you very much.  Off the

12  record.

13         THE VIDEOGRAPHER:  We're going off the record.

14  Universal time is 1447.  We're now off the record.

15              (Whereupon, a recess was taken.)

16         THE VIDEOGRAPHER:  All right.  Stand by, please.

17         We are now back on the record.  The universal

18  time is 1455.

19      Q.   (By Mr. Johnson)  Officer Grubbs, what year did

20  you graduate high school?

21      A.   2008.

22      Q.   Do you go on to college?

23      A.   I did.

24      Q.   All right.  Did you get a degree?

25      A.   I'm still working at it, actually.  But I did do

OFFICER JON  GRUBBS
January 28, 2021

1   five.

2       Q.   Okay.  You did five years?

3       A.   Yes, sir.

4       Q.   What did you study?

5       A.   Criminal justice and sociology.

6       Q.   How close are you to a degree?

7       A.   Three credits.

8       Q.   Were you -- did you work at all during high

9   school?

10      A.   I did.

11      Q.   College?

12      A.   No, sir.  Not in college.

13      Q.   How about after college, but before going to the

14  academy in 2013?

15      A.   No, sir.

16      Q.   Okay.  So -- five years.  So it's '13 -- so

17  2013-ish, you apparently left college.

18      A.   I left college the summer of 2012, I believe.

19      Q.   Then -- and then what did you do?

20      A.   I went back home.

21      Q.   And what did you do professionally?

22      A.   I was not working at the time.

23      Q.   Okay.  All right.  In terms of home, in a state?

24      A.   Michigan.

25      Q.   Is that where you grew up?

OFFICER JON  GRUBBS
January 28, 2021

1      A.    Yes, it is.

2      Q.    Detroit area?

3      A.    Ann Arbor.

4      Q.    Okay.  So you knew what I was talking about when

5  I was talking about the snow earlier after the record.

6      A.    Very well.

7      Q.    No wonder you're in ATL, Officer Grubbs.  I hear

8  you.  All right.

9           So then when did you go back to -- or when did

10  you go to Atlanta, then, for the first time after coming

11  back home in 2012?

12      A.    I began the recruiting process for Atlanta

13  police sometime in early 2013.

14      Q.    I wrote down that you finished the academy,

15  what, in December of 2013 and then started at --

16  somewhere around after being sworn in late 2013 or

17  January 2014.  Does that sound right?

18      A.    I was hired in December of 2013 --

19      Q.    Okay.

20      A.    -- and I graduated the academy in December of

21  2014.

22      Q.    All right.  Oh, I see you -- you did your

23  undergraduate studies at Western.

24      A.    That is correct.

25      Q.    Then I was -- well, you're much younger than me.

OFFICER JON  GRUBBS
January 28, 2021

1  I was -- I went to Kalamazoo College.  So you know where

2  that is.

3      A.   Right next door.

4      Q.   Yes, sir.  All right.

5           To be fair, you never completed your degree at

6  Western, correct?

7      A.   That is correct.

8      Q.   Do you remember telling the folks in the

9  application that you did get your degree from Western?

10     A.   Yes.

11     Q.   Why -- why did you lie on your application,

12  Officer?

13     A.   I'm sorry?

14     Q.   Why did you lie to them and tell them you got a

15  degree in criminal justice when you didn't?

16     A.   On which application?

17     Q.   Your application with Atlanta.

18     A.   On my application, I believe it's listed that I

19  attended there.  I don't recall ever saying that I had a

20  degree.

21     Q.   Okay.  So if it says, "Was degree awarded,

22  yes/no," and you wrote, "Yes," you would agree with me

23  that that's not true.

24     A.   I would.

25     Q.   Were there any disciplinary problems in college?

OFFICER JON  GRUBBS
January 28, 2021

1    A.   I received -- I went before a student dean at

2  one point.

3    Q.   For what?

4    A.   A roommate dispute.

5    Q.   Did you receive any discipline?

6    A.   Not that I recall.

7    Q.   Were you ever suspended or kicked out of school?

8    A.   No.

9    Q.   Was it kind of always in your -- back of your

10  mind, Officer Grubbs, that you wanted to be a police

11  officer?

12    A.   Yes.

13    Q.   Where do you think that comes from?

14    A.   Family.

15    Q.   You have family who are police officers?

16    A.   Yes, and retired.

17    Q.   Okay.  What agencies?

18    A.   Atlanta police, Detroit police, Michigan State

19  Police.

20    Q.   Any military service?

21    A.   For me?

22    Q.   Yes, sir.

23    A.   No, sir.

24    Q.   Have you ever been convicted of any crimes?

25    A.   No, sir.

OFFICER JON  GRUBBS
January 28, 2021

1      Q.   After working for the Atlanta Police Department,

2   have you ever been disciplined at any time for any

3   reason?

4      A.   Yes.

5      Q.   What's the first time you've ever been

6   disciplined by the Atlanta Police Department?

7      A.   I do not recall what the first time was.

8      Q.   Can you tell me what it was about?

9      A.   The first time may have been some type of

10  written reprimand.  I don't recall what the first time

11  was.

12     Q.   You don't remember what the circumstances were

13  about?

14     A.   I do not.

15     Q.   Okay.  How about the second time or the next

16  time?

17     A.   No, sir.

18     Q.   You didn't -- you have no other discipline or

19  you don't have any memory of what -- there was a second

20  one, you don't recall what it was?

21     A.   I don't recall what the second would have been.

22     Q.   Was it a written reprimand?

23     A.   It's possible.  I just don't -- I don't recall.

24     Q.   Is there a third?

25     A.   There could be.  I don't know.

OFFICER JON  GRUBBS
January 28, 2021

1    Q.   Were you ever disciplined as a result of the

2  events that we're going to be talking about, July 10,

3  2018?

4    A.   No, sir.  I have not received any discipline.

5    Q.   Have you ever received any type of

6  commendations?

7    A.   Yes, I have.

8    Q.   How many?

9    A.   Around eight, I believe.

10   Q.   Did you receive any type of commendations for

11  anything to do with the events of July 10, 2018?

12   A.   No, sir.

13   Q.   On July 10, 2018, Officer Grubbs, I think these

14  events took place somewhere in the early afternoon

15  somewhere around 2:30, 2:35.  Does that sound about

16  right?

17   A.   That sounds correct, sir.

18   Q.   Can you tell us, if you would please, what --

19  what was your -- what was your shift that day?

20   A.   That day would have most likely been 10:00 a.m.

21  to 8:00 p.m.

22   Q.   And based on what you told us, you were working

23  Zone 5 as part of the field investigation folks, correct?

24   A.   That is correct.

25   Q.   At any time before July 10, 2018, had you ever

OFFICER JON  GRUBBS
January 28, 2021

1  had any interaction that you're aware with

2  Jerry Blasingame?

3      A.    Not that I'm aware of.

4      Q.    Are you aware of anybody else that had

5  interaction at all with Jerry Blasingame before that day?

6      A.    No, sir.

7      Q.    Before that day of July 10 of 2018, had you ever

8  been involved as part of your police duties, Officer

9  Grubbs, with folks that you suspected and/or otherwise

10  may have learned to be suffering from mental illness?

11      A.    I do believe so, yes.

12      Q.    Folks that may have been, to the best of your

13  knowledge, homeless?

14      A.    Yes, sir.

15      Q.    Folks who, to the best of your knowledge,

16  whether you believed or otherwise knew, might have had

17  some problem with drugs or alcohol?

18      A.    Yes, sir.

19      Q.    Okay.  I'll take it, any one of those topics --

20  mental illness, homelessness, drugs and alcohol -- for a

21  police officer even on for about three, four years of

22  yourself as -- as you were then back in July of 2018,

23  those are pretty common things that you come into contact

24  with.

25      A.    Yes, sir.

OFFICER JON  GRUBBS
January 28, 2021

1      Q.   And I know that you're aware and I'm sure you'll

2   agree that even those folks -- I mean, they -- they

3   obviously have the same rights as anybody that doesn't

4   have those issues in their lives.

5      A.   Of course.

6      Q.   In your experience, then, in the ATL police

7   department, did you officers have any particular names or

8   name that you called folks who were suspected to be

9   mentally ill?

10     A.   Not that I am aware of.

11     Q.   Okay.  And let me give you an example.  Here in

12  the City of Detroit, the DPD officers were -- refer to

13  those folks as "mentals."

14          Have you ever heard of that name or any other

15  name associated with folks who are suspected to be or

16  have -- may suffer from mental illness?

17     A.   No, sir.

18     Q.   How about folks who are homeless or suspected to

19  be homeless; did you have -- was there any type of a name

20  that was associated with that?

21     A.   No, sir.

22     Q.   How about folks who panhandled or otherwise

23  begged for money; was there any particular name that you

24  were aware of that Atlanta police officers referred to

25  those folks as?

OFFICER JON  GRUBBS
January 28, 2021

1      A.    Just panhandlers.

2      Q.    Okay.  How about folks who were suspected to

3  have issues with drugs or alcohol; was there any name or

4  names that were typically used to describe those folks?

5      A.    No, sir.

6      Q.    At any time from when you started with ATL, even

7  through today, have you ever just discharged your firearm

8  in the course and in the scope of your duties?  Other

9  than for training obviously.

10      A.    No, sir.

11      Q.    How about your Taser; at any time other than

12  July 10, 2018 after you had been working as a sworn

13  officer through today, have you utilized your Taser in

14  the line of duty?

15      A.    Yes, I have.

16      Q.    Are you aware of how many times you've used your

17  Taser?

18      A.    I am not.

19      Q.    Do you believe it's more than ten?

20      A.    I'm not sure of the exact number.  I know that

21  it has been a number of times.

22      Q.    Had you used your Taser in the line of duty at

23  any time before July 10 of 2018?

24      A.    Yes, sir.  I had.

25      Q.    Okay.  In -- after you started as a sworn

OFFICER JON  GRUBBS
January 28, 2021

1    officer in late '13 or early 2014, when do you recall

2    receiving a Taser for the first time?

3        A.   I had received my Taser in the training academy

4    is when it was issued to me.

5        Q.   Okay.  And I'll take it, then, you received more

6    training, then, after the academy.

7        A.   Yes, sir.

8        Q.   Can you tell me again from, let's say, early

9    2014 when you first were sworn as an officer until July

10   of 2018 -- so what is that, just about four years, four

11   and a half years -- were you given training -- specific

12   training on the use of Tasers in that time period?

13       A.   Yes, I was.

14       Q.   Are you able to tell me, Officer Grubbs, like,

15   was it one or more times per year that you did?

16       A.   I believe it would be once per year.

17       Q.   And typically, during -- for that Taser training

18   once per year, who would give you that training?

19       A.   Actually, correction on that also, sir.  So that

20   would -- probably between that time period would have

21   been five times that I received additional training.  And

22   that training is normally conducted by the training

23   academy staff.

24       Q.   From Atlanta PD training staff?

25       A.   Yes, sir.

OFFICER JON  GRUBBS
January 28, 2021

1      Q.   Okay.  Not necessarily from Taser International

2  themselves?

3      A.   No, sir.

4      Q.   Okay.  And I want to better understand your

5  answer.  You think that you had been -- received after

6  the academy as you're a sworn officer, like,

7  approximately five more Taser trainings, if you will,

8  from January of 2014 until July 10, 2018.  Did I

9  understand that right?

10     A.   That is correct.

11     Q.   Okay.  Are you looking for something to refresh

12  your memory on that?

13     A.   No, sir.  Just -- that was my training

14  recollection.

15     Q.   Okay.  Do you have any papers in front of you?

16     A.   Just a notepad.

17     Q.   Okay.  Is there anything now on that notepad or

18  stuff that -- that's just there for you to take notes?

19  Or what is -- what -- what's that on the notepad?

20     A.   Just notes and a couple of dates.

21     Q.   Okay.  What are those notes from?

22     A.   Just from today.

23     Q.   During the deposition itself?

24     A.   Yes.  I have a couple of specific dates and your

25  name.

OFFICER JON  GRUBBS
January 28, 2021

1    Q.    Okay.  Did you have any notes or those dates

2    written down on that paper before the deposition?

3    A.    No.

4    Q.    Tell me the dates you wrote down just so I know

5    what we're talking about.

6    A.    July 10th, 2018 --

7    Q.    Yes, sir.

8    A.    -- 9/21/2018, and January 3rd, 2019.

9    Q.    Okay.  July 10, 2018, we've had -- obviously,

10   that's the date of the incident with Mr. Blasingame.

11   Correct?

12   A.    That is correct.

13   Q.    September 21 2018, what's the significance of

14   that date, about two months or so after the incident with

15   Mr. Blasingame?

16   A.    That was my statement to internal affairs.

17   Q.    Okay.  Was that the first time you'd given --

18   given them a statement?

19   A.    Yes, it was.

20   Q.    Okay.  And January 3, 2019, what's the

21   significance of that date?

22   A.    That was when I was returned to full duty.

23   Q.    I'll take it, you were suspended with pay at or

24   about the time of the incident on July 10, 2018?

25   A.    That is correct.

OFFICER JON  GRUBBS
January 28, 2021

1      Q.    And then you would have been returned to duty,

2   then, you said 1/3/19.  So you were suspended, then,

3   through really 1/2/19, correct?

4      A.    Yes, sir.

5      Q.    So just shy of seven months.  Does that sound

6   about right?

7      A.    That sounds correct, sir.

8      Q.    What did you do for those seven months while you

9   were suspended with pay in terms of your employment, sir?

10     A.    I was assigned to administrative duties.

11     Q.    And the -- like what?

12     A.    Taking reports over the phone, fleet management,

13  things of that sort.

14     Q.    Okay.  And since your reinstatement January 3,

15  2019, you have not suffered any other type of discipline

16  or anything else as a result of this incident, as we've

17  previously discussed, correct?

18     A.    No, sir.

19     Q.    So there is no ongoing investigation through the

20  present time relative to these events, is there?

21     A.    I can't speak to that specifically.

22     Q.    Okay.  Well, seems to me you'd know, wouldn't

23  you, Officer Grubbs?

24     A.    Is there still an ongoing investigation with

25  internal affairs?  I'm not a hundred percent sure.  You'd

OFFICER JON  GRUBBS
January 28, 2021

1  have to ask them.

2      Q.    Okay.  Who do you think is in charge of that

3  investigation from internal affairs?

4      A.    I do not know.

5      Q.    Okay.  Well, I guess -- is it your belief, then,

6  that internal affairs to this date is continuing to

7  investigate that even though you've already been

8  reinstated in full?

9      A.    I'm -- honestly do not know, sir.  I have not

10  received a disposition from internal affairs and nor have

11  I received any further contact from internal affairs.

12     Q.    What's "disposition" mean?

13     A.    Disposition reference their investigation for

14  this incident.

15     Q.    You mean like a report?

16     A.    Yeah, if you'd like to call it that.  A report

17  as to their findings.

18     Q.    So you're saying through the present time,

19  despite the passage of over two and a half years, you've

20  not received any type of a report -- an official report

21  from internal affairs about their investigation into you.

22     A.    That is correct.

23     Q.    And is that something that you understand that

24  internal affairs is supposed to give you if a report --

25  an investigation is completed?

OFFICER JON  GRUBBS
January 28, 2021

1      A.    That is my understanding.  Yes, sir.

2      Q.    Well, have you asked anybody about why it is you

3  haven't got that report?

4      A.    I have.

5      Q.    Who?

6      A.    I have had contact with a Detective Clayton, a

7  Sergeant Dean.

8      Q.    What did they tell you?

9      A.    That it was still going through the chain of

10  command.

11      Q.    When's the last time you had contact with either

12  one of those folks or anybody else from internal affairs

13  to try to figure out what -- where that process is?

14      A.    I had contact with both of those individuals

15  maybe within the last week or two.

16      Q.    Well, to the best of your knowledge -- and I

17  know you're not an internal affairs guy.  But at least

18  from your understanding, one of the goals of an internal

19  investigation is to figure out whether you violated the

20  policy and procedure of the department as you understand

21  it, correct?

22      A.    That is correct, sir.

23      Q.    So it seems to me after two and a half years,

24  you would like to think that that would be done by now,

25  right?

OFFICER JON  GRUBBS
January 28, 2021

1      A.    That is correct.

2      Q.    And from your perspective, I'm guessing you know

3  that there's supposed to be -- there is, in fact, a

4  policy and procedure on how much time that's supposed to

5  take under normal circumstances.  Correct?

6      A.    That is also correct.

7      Q.    What is your understanding of that time frame?

8      A.    My understanding a general citizen's complaint

9  is supposed to be dispositioned within 180 days.

10      Q.    Which is six months, right?

11      A.    That is correct.

12      Q.    Six months from July 10, 2018 is January 10,

13  2019.  So they're way past that, right?

14      A.    Yes, sir.

15      Q.    I mean, from your perspective, I'll take it,

16  Officer Grubbs, you think that should be done by now.

17  Right?

18      A.    I would -- I would be in agreeance with that.

19  Yes, sir.

20      Q.    Have you filed any type of grievance or anything

21  with a union or anybody to try to push that along?

22      A.    I have not.

23      Q.    Are you aware of any other internal affairs

24  investigation relative to any other officer that's taken

25  this long ever in Atlanta Police Department history?

OFFICER JON  GRUBBS
January 28, 2021

1    A.   I know that there have been officers that have

2    been under investigation for significantly longer periods

3    of time.

4    Q.   Okay.  As long as you?

5    A.   Longer, sir.

6    Q.   Okay.  Did they involve use of force in

7    situations like you?

8    A.   I do believe so.

9    Q.   Well, so you sit here two and a half years later

10   and you don't know if your own department is taking the

11   position or not as to whether you violated their own

12   policies and procedures.

13   A.   That is correct, sir.

14   Q.   So let's just say when -- there's -- that it --

15   that one or two things that could happen.  A, the

16   internal affairs completely clears you of all vio- -- any

17   alleged violations.  That's one possibility, right?

18   A.   Yes, sir.

19   Q.   The other possibility is that they could say --

20   or find that you violated one or more of the policies,

21   correct?

22   A.   That is correct.

23   Q.   Are you aware of -- I mean, the events of that

24   day obviously existed because we talked about two and a

25   half month -- years ago, right?

OFFICER JON  GRUBBS
January 28, 2021

1      A.    Yes, sir.

2      Q.    So nothing's changed since that date, right?

3      A.    That is correct.

4      Q.    And you wrote your report about what happened at

5  or about that day.  We'll go over that report in a

6  minute.  But you did it right then, right?

7      A.    That is correct.

8      Q.    The next time that you ever gave any type of

9  information exactly about what happened and so forth,

10  would that have been that 9/21/18 internal affairs

11  statement that you referenced?

12      A.    That is correct.

13      Q.    So we got the report on the day of or so.  We

14  got the IA statement on -- two months later 9/21.  You

15  haven't given any other statement other than this

16  deposition here today?

17      A.    No, sir.

18      Q.    Obviously, you've never been formally charged

19  with any criminal law violation as a result of this,

20  correct?

21      A.    That is correct.

22      Q.    Okay.  So I guess my question to you is -- I'm

23  guessing your -- nothing's changed since the date of this

24  incident, right?

25      A.    Not much.  That is correct, sir.

OFFICER JON  GRUBBS
January 28, 2021

1      Q.    Either you did or you didn't violate the policy,

2  right?

3      A.    Yep.  That is correct.

4      Q.    All right.  And if you did violate one or more

5  of the policies, it would certainly be, from your

6  perspective, only right and fair to give you notice of

7  that in writing so you know what they claim you did

8  wrong.

9      A.    Yes, sir.  That is correct.

10     Q.    And likewise, it would only be fair to you --

11  and actually the other officers on the force.  So if they

12  think you did one -- or violated one or more of these

13  policies, the other officers and you would learn as to

14  what the department thinks you did wrong, right?

15     A.    Yes, sir.  That's correct.

16     Q.    That would help you and/or others -- maybe

17  not -- not saying that you did anything wrong for

18  purposes of my question.

19          But that would give you and the other officers

20  valuable information as to what to do or not do in future

21  circumstances, agreed?

22     A.    Yes, sir.

23     Q.    Perfect example.  If the department takes the

24  position in the internal affairs investigation Officer

25  Grubbs that 65 years of age, therefore, qualified

OFFICER JON  GRUBBS
January 28, 2021

1   Mr. Blasingame as an elderly individual, first and

2   foremost, you wouldn't have any bone to pick with that

3   conclusion, would you?

4          MS. MILLER:  Objection.

5          But you can answer.

6          THE WITNESS:  No, sir.

7     Q.   (By Mr. Johnson)  Okay.  Well, they say he's 65;

8   he's elderly.  Policy says don't use Taser on elderly.

9   That would certainly be important information for you and

10   the other officers who are out there on the street to

11   know that the department says you shouldn't have Tasered

12   Mr. Blasingame for that reason, agreed?

13          MS. MILLER:  Objection.

14          But you can answer.

15          THE WITNESS:  I would agree.

16     Q.   (By Mr. Johnson)  And I could go through other

17   policy and procedure violations.  If they -- and so for

18   example -- let me just do it.

19          If they find -- the internal affairs, if they

20   were to find -- that means hypothetically -- that you

21   violated the use of force policy and procedure as it

22   pertains to these events, it would be important for you

23   and the other officers on the street to know that so that

24   you could apply that knowledge and try to make sure it

25   never happened again to somebody else, agreed?

OFFICER JON   GRUBBS
January 28, 2021

 1      A.   I would agree with that.

 2           MS. MILLER:  Objection.

 3           But you can answer.

 4      Q.   (By Mr. Johnson)  Same question as it relates to

 5  the body cam.  If they find -- if -- that if -- if they

 6  were to find that you violated that policy and procedure,

 7  certainly it would be pertinent information for you and

 8  the others who have body cams to know that, right?

 9           MS. MILLER:  Same objection.

10           But you can answer.

11           THE WITNESS:  Yes, sir.

12      Q.   (By Mr. Johnson)  Same thing about use of

13  on-dash camera, right?

14           MS. MILLER:  Same objection.

15           But you can answer.

16           THE WITNESS:  Yes, sir.

17      Q.   (By Mr. Johnson)  So I mean, it -- from your

18  perspective, Officer Grubbs, for a police officer who is

19  even now currently out on the street, them dragging their

20  feet and not getting this done over two and a half years

21  ain't helping anybody out there being a responsible

22  police officer trying to understand and enforce the

23  policy and procedures of the ATL, agreed?

24           MS. MILLER:  Objection.

25           But you can answer.

OFFICER JON  GRUBBS
January 28, 2021

1           THE WITNESS:  I would agree with that.

2      Q.   (By Mr. Johnson)  Has anybody from the Atlanta

3  Police Department told you that you did anything wrong as

4  it pertains to these events of July 10, 2018?

5      A.   No, sir.

6      Q.   At any time before July 10, 2018 -- pardon me --

7  had you personally, Officer Grubbs, ever arrested an

8  individual for panhandling?

9      A.   Yes, sir.

10      Q.   How many times?

11      A.   I'm not sure.

12      Q.   More than once?

13      A.   Yes, sir.

14      Q.   You think more than ten times?

15      A.   Yes, sir.

16      Q.   Do you believe that's a problem in the Atlanta

17  area?

18      A.   Yes, sir.  It is.

19      Q.   Can you tell me, from your view, why is that a

20  problem?  What's wrong with folks who don't have any

21  money or a job asking other folks for money?

22      A.   Well, under O.C.G.A. 40-6-97, it's illegal.

23      Q.   O.G.A. --

24      A.   It's under numerous city ordinances.

25      Q.   Okay.  O.G.A. -- give me that again.

OFFICER JON  GRUBBS
January 28, 2021

1      A.   It's 40-6-97.  It's pedestrian soliciting ride

2   or business.

3      Q.   Yep.  "No person shall stand in a roadway for

4   the purpose of soliciting a ride."  That's A.

5   You're familiar with that?

6      A.   Yes, sir.  I am.

7      Q.   You don't think Mr. Blasingame was looking for a

8   ride that day, do you?

9      A.   I can't speak to that specifically.

10     Q.   To be fair, you don't know either way, do you?

11     A.   Based on my observations, I believed he was

12  soliciting monetary contributions; not a ride.

13     Q.   Yes, sir.

14          But you never had the opportunity to actually

15  interview him, agreed?

16     A.   That is correct.

17     Q.   So what he was actually intending to do, you

18  don't know, right?

19     A.   That is correct.

20     Q.   All right.  Sub B, "Except as provided in code

21  section 40-6-97.1, no person shall stand on a highway for

22  the purpose of soliciting employment, business, or

23  contributions from the occupant of any vehicle."

24          Is that kind of the one you were talking about?

25     A.   That is correct, sir.

OFFICER JON  GRUBBS
January 28, 2021

1      Q.    All right.  So at least from what you saw and

2    then again obviously, what you did see, you thought the

3    contributions was the part that my client may have

4    violated.

5      A.    That is correct, sir.

6      Q.    Okay.  And are you aware of -- and you may not.

7    It -- what's -- as you understand it as the officer on

8    the street enforcing this particular code section, what's

9    the problem with someone asking an occupant of a vehicle

10   for money?

11     A.    Oh, well, we've had numerous times -- and this

12   is my professional experiences with that -- of passing

13   motorists being harassed, persons attempting to make

14   entry into their vehicles, as well as the traffic hazard

15   portion of soliciting monetary contributions of folks

16   being hit by cars or causing traffic accidents.

17     Q.    Okay.  Sub C of that same law, No person shall

18   stand on or in proximity to a street or highway for the

19   purpose of soliciting the watching or guarding of any

20   vehicle while parked or about to be parked on a street or

21   highway.

22           And I'll take it, you don't think that's what

23   was going on here.  Right?

24     A.    No, sir.

25     Q.    To the best of your knowledge, the law that we

OFFICER JON  GRUBBS
January 28, 2021

1  were just discussing, Officer Grubbs, is a non-violent

2  crime, agreed?

3       A.   Yes, sir.

4       Q.   And it certainly is a misdemeanor?

5       A.   Yes, sir.  That is correct.

6       Q.   So from a criminal law standpoint even as you

7  understand it, enforcing the law, it is -- it is

8  certainly not a serious felony type crime; is it?

9       A.   That is correct, sir.

10      Q.   I'll take it, there has been occasions, Officer

11  Grubbs, before July 10 of 2018 where you've see folks

12  panhandling and you didn't arrest them.

13      A.   That is correct.

14      Q.   And that's part of your discretion as a police

15  officer.

16      A.   That is correct.

17      Q.   Have you ever had any type of a physical

18  altercation with a panhandler who you came into contact

19  with as part of your job duties there in Atlanta?

20      A.   Yes, sir.  I have.

21      Q.   How many times?

22      A.   I'm not sure.

23      Q.   More than one?

24      A.   Yes, sir.

25      Q.   More than ten?

OFFICER JON GRUBBS
January 28, 2021

1      A.   I'm not sure if it's that many, but certainly

2  more than one time.

3      Q.   Have you ever used, other than on

4  Jerry Blasingame, a Taser on a person that you believed

5  to be panhandling or otherwise soliciting and violating

6  the law that we were just discussing?

7      A.   I don't believe so, but I'm not 100 percent

8  sure.

9      Q.   Okay.  When -- on July 10, 2018, you told us you

10  think you started around 10:00 a.m. that morning.

11         Do you folks have any type of a -- like, a daily

12  log or anything, Officer Grubbs, that you're supposed to

13  keep that tells you kind of what -- what you did during

14  the course of your shift?

15      A.   We do.

16      Q.   What is it called?

17      A.   We have a computer-aided dispatch system which

18  logs activity --

19      Q.   And that --

20      A.   -- and we'll do a hard-copy log commonly

21  referred to as a blue sheet.

22      Q.   Blue, b-l-u-e, sheet?

23      A.   Yes, sir.

24      Q.   Why is it called blue sheet, if you know?

25      A.   It's just a blue piece of paper.

OFFICER JON  GRUBBS
January 28, 2021

```
1        Q.   And you're required to complete those every day
2    that you're on duty?
3        A.   Yes, sir.
4        Q.   And they give kind of a general overview of the
5    events of that day?
6        A.   Yes, sir.
7        Q.   And if you make an arrest, it's recorded on
8    that?
9        A.   Yes, sir.
10       Q.   Have you seen the blue sheet for July 10, 2018,
11   Officer Grubbs?
12       A.   I have not.
13       Q.   I'll take it, you don't have that available to
14   you right now?
15       A.   No, sir.
16            MR. JOHNSON:  Ms. Miller, I don't think we have
17   those.  Can we kindly get those, please?
18            MS. MILLER:  Sure.  I don't have it either, but
19   I'll find it for you if we have it.
20            MR. JOHNSON:  Thank you, ma'am.  I'll write that
21   down and remind you in writing, but I appreciate it.
22   Thank you.
23       Q.   (By Mr. Johnson)  So let me ask you this,
24   Officer Grubbs.  If I were to ask counsel to produce
25   your -- I'll call it -- blue sheets in general, but
```

OFFICER JON  GRUBBS
January 28, 2021

1    specifically also on July 10, 2018, is that something at

2    least you would know what I mean?

3        A.   Yes, sir.  I do know what you mean.

4        Q.   Okay.  In terms of -- I'll call it daily

5    paperwork -- and I know using the word "paper" may not

6    necessarily be paper because it's computer.

7             But other than the blue sheet, Officer Grubbs,

8    what else did you, as of July of 2018, kind of complete

9    during the course of the day that would show us your

10   activities, again, other than the blue sheet and, for

11   example, a police report that you would complete about

12   something?

13       A.   As I stated previously, sir, the dispatch

14   records show every event or call for service that I may

15   have been a part of, as well as any copies of arrest

16   tickets or citations.

17       Q.   Is the -- the call for service that you were

18   just talking about, is that -- or the dispatch record, is

19   that different from the blue sheet itself?

20       A.   Yes, sir.  That is the record that's generated

21   by the communications division.

22       Q.   Got it.

23            I'm looking at a document that I'll share with

24   you shortly, Officer Grubbs, printed date 7/10/18,

25   Atlanta Police Department call for service and it gives

OFFICER JON  GRUBBS
January 28, 2021

1    an incident number 181911254.  Is that the very type

2    document that you're just describing?

3        A.   It sounds like it.

4        Q.   Okay.

5            MR. JOHNSON:  Mr. Radner, can you share that

6    with Officer Grubbs.

7                   (Whereupon, a document was presented.)

8            MR. RADNER:  This is the call for service.  I

9    don't have a Bates stamp for this, but let me know if you

10   can find it.  It looks like this (indicating).

11           THE WITNESS:  Okay.

12           MR. JOHNSON:  Maddie's going to try to put it up

13   on the shared screen.

14           THE WITNESS:  Thank you.

15           MR. JOHNSON:  Tell me when you -- if you can

16   find that, Maddie.

17           MS. SINKOVICH:  All right.  I believe I've got

18   it.  Give me one second.

19           MR. JOHNSON:  Thank you.  If you can...

20           MS. SINKOVICH:  Can you see it?

21           MR. RADNER:  Yeah, that's it.

22           MR. JOHNSON:  Can you...

23           MS. SINKOVICH:  What do I need to do?

24           MR. JOHNSON:  That's -- that's good.

25       Q.   (By Mr. Johnson)  All right.  Officer Grubbs,

OFFICER JON  GRUBBS
January 28, 2021

1    I'm showing you what we're going to mark as Exhibit 1,

2    this call for service dated 7/10/18.

3                    (Whereupon, a document was presented for

4                    review by the witness.)

5         Q.   (By Mr. Johnson)  Can you read that, sir?

6         A.   Yes, sir.  I can.

7         Q.   All right.  And this is that -- the dispatch

8    document that you were describing a few minutes ago?

9         A.   That is correct.

10        Q.   As we work our way down the document about a

11   third of the way down where it says "call information,"

12   date is 7/10/18.  Call type or description is 54,

13   suspicious person.  Do you see that?

14        A.   That is correct.

15        Q.   Is that the information that you were given

16   about who you now know to be Mr. Blasingame on July 10,

17   2018?

18        A.   That was the information that I provided to the

19   dispatcher.

20        Q.   Got it.

21             So I take it, when you first saw Jerry --

22   Mr. Blasingame, you were not responding to a call about

23   him, were you?

24        A.   No, sir.  I was not.

25        Q.   Okay.  What were you -- when you first saw him,

OFFICER JON  GRUBBS
January 28, 2021

1  what were you doing?

2      A.   I was on patrol.

3      Q.   And when you first saw him, where were you,

4  please?

5      A.   Specifically, I was at I-20 eastbound at I-75/85

6  northbound ramp.

7      Q.   So you were actually on the ramp itself?

8      A.   Yes, sir.

9      Q.   And in relation to your vehicle, were you in the

10 right-hand lane?

11     A.   I do not recall exactly what travel lane,

12 whether it was one or two that we were in.

13     Q.   Okay.  When you first saw Jerry, what was he

14 doing?

15     A.   When I first observed Mr. Blasingame, he was on

16 the left shoulder which would be the northern-most side

17 of the roadway.  He was on the shoulder and approaching

18 vehicles.  I believe it was the number one travel lane.

19     Q.   And did you see his hands?

20     A.   I saw his hands.  Yes, sir.

21     Q.   What were his hands doing when you first saw

22 them?

23     A.   I believe one hand, he was holding a piece of

24 paper and -- while making some type of hand motions

25 towards vehicles.

OFFICER JON  GRUBBS
January 28, 2021

1       Q.    Could you read what the paper said?

2       A.    I could not.

3       Q.    When you looked at the paper -- and I'll take

4    it, what -- on your previous experience, you've seen

5    folks panhandling who've used signs, paper, something in

6    the past?

7       A.    That is correct.

8       Q.    Somehow asking for -- some folks ask for money

9    on that sign?

10      A.    That is correct, sir.

11      Q.    I'm sure you've seen other ones where they

12   describe something to do with their circumstances?

13      A.    Yes, sir.  That is also correct.

14      Q.    Homeless, no money, ex-vet, who knows.

15   Whatever.  But you've seen those signs yourself in your

16   experience?

17      A.    Yes, sir.

18      Q.    All right.  The hand -- or the paper in his left

19   hand?

20      A.    I don't recall what hand it was.

21      Q.    Hand motion.  Tell me about the motion you saw.

22   Can you -- can you show me with your hands.

23      A.    (Indicating.)  It was a waving motion.  And then

24   sometimes there's motions from (indicating) like, the

25   waist area to their mouth.  It was motions consistent

OFFICER JON  GRUBBS
January 28, 2021

1  with that.

2      Q.   Okay.  So I'll take it, when you showed us --

3  luckily we're on video, but the lawyers have to try to

4  put words to the hand motion.  The first one, it looks

5  like you were literally waving, like, hi.

6      A.   Yes, sir.

7      Q.   All right.  And then the other motion that I

8  think I saw, you go from the waist up to your mouth.  It

9  kind of looked like in some way that some might use to

10 show somebody that they want food or eating.

11     A.   Yes, sir.

12     Q.   Okay.  At least when you saw that and you saw

13 the sign, Officer Grubbs, you kind of surmised that

14 Mr. Blasingame was trying to get money to eat.

15     A.   Yes, sir.

16     Q.   Or panhandling.

17     A.   Yes, sir.

18     Q.   You did not see a gun in his hand?

19     A.   I did not see a firearm.  That's correct.

20     Q.   You did not see any type of a weapon in his

21 hand?

22     A.   That is correct.

23     Q.   Or anywhere on his body?

24     A.   That is also correct.

25     Q.   You didn't see him in any way trying to hurt

OFFICER JON  GRUBBS
January 28, 2021

1   somebody?

2       A.   That is correct.

3       Q.   You didn't see him, like, intentionally running

4   in front of traffic as if he was trying to hurt himself?

5       A.   That is correct.

6       Q.   It looked like to you -- and again, I understand

7   you didn't know for sure -- but based on your experience

8   not just as a police officer, but as a person in the real

9   world, he was trying to get money to get something to

10  eat.

11      A.   Yes, sir.

12      Q.   How was he dressed?

13      A.   I don't recall the specific clothing that he was

14  wearing.

15      Q.   All right.  Was he an African American; was he a

16  black gentleman?

17      A.   Yes, it was a black man.

18      Q.   Did it appear to you that he was older?

19      A.   It appeared that he was a adult male.

20      Q.   Okay.  Well, obviously, not just an adult male,

21  but he was 65 years of age.

22           Did you surmise, when you looked at him, that he

23  was an older male?

24      A.   I had not made that determination.

25      Q.   Okay.  Did you see his face?

OFFICER JON GRUBBS
January 28, 2021

1      A.   I briefly saw his face.  Yes, sir.

2      Q.   He had a baseball cap on?

3      A.   I don't recall.

4      Q.   Do you remember what that baseball cap said on

5   it, if anything?

6      A.   No, sir.

7      Q.   But again, you were able to see his face,

8   correct?

9      A.   Briefly.  Yes, sir.

10      Q.   In terms of his size, being an experienced

11   police officer, what did you think it was?

12      A.   He looked, you know, maybe in the neighborhood

13   of -- of 5-10 to 6 foot.  I -- I'm not exactly sure,

14   though.

15      Q.   Weight?

16      A.   Not exactly sure.  I would say at least 160

17   pounds.

18      Q.   What's your height and weight, sir?

19      A.   I am 5-5, 160.

20      Q.   It's fair to say that Jerry was not --

21   Mr. Blasingame was not dressed in, like, a -- in a suit

22   and tie type fashion.

23      A.   No, sir.  He was not.

24      Q.   And when you looked at his clothes and his

25   overall appearance, did you believe or at least consider

OFFICER JON  GRUBBS
January 28, 2021

1  the fact that he might be homeless?

2      A.   I considered it was a possibility.

3      Q.   Did you ever see any car actually stop, slow

4  down, and give him money?

5      A.   I did not witness that.

6      Q.   Did you see him interfere with traffic such that

7  there was ever any type of an impact caused by him?

8      A.   Not directly that I witnessed.

9      Q.   Okay.  Well, that's a -- with all due respect,

10  you didn't see it, did you?

11      A.   I did not see him physically impede the path of

12  a vehicle.

13      Q.   Okay.  And you have no information whatsoever

14  that Mr. Blasingame, at -- at or about that time, caused

15  an accident, did you?

16      A.   No, sir.

17      Q.   All right.  And how many times -- how many

18  automobiles, tru- -- and trucks, whatever -- how many

19  vehicles did you see that went passed him where he had

20  that paper in one hand and was waving and then putting

21  his hand up to his mouth, like, for food did you see

22  before you had any interaction with him whatsoever?

23      A.   It was several vehicles.  I'm not sure of the

24  exact count.

25      Q.   You say "several."  So more than one?

OFFICER JON  GRUBBS
January 28, 2021

1      A.   Yes, sir.

2      Q.   Less than ten?

3      A.   It's possible.  I just -- I didn't get a vehicle

4  count.  It was heavy traffic conditions.

5      Q.   Okay.  Do you know the day of the week?  Officer

6  Grubbs, do you know the day of the week it was?  Sorry.

7      A.   No, I do not recall what day of the week that

8  was.

9      Q.   Let me pull up my handy-dandy calendar.  Sorry.

10          7/10/18, at least according to my calendar,

11  would be a Tuesday.  Does that at all ring a bell?

12     A.   I have no reason to dispute that.

13     Q.   Okay.  Tuesday, 2:30-ish in the afternoon in

14  July in Atlanta.  Any particular special things going on

15  that you were aware of in that area, events in other

16  words?

17     A.   At that particular time, no, sir.

18     Q.   Is that area pretty heavily traveled, though,

19  during that time frame in general?

20     A.   Yes, sir.

21     Q.   So when you saw what you saw, despite the

22  several vehicles, you never saw Jerry -- Mr. Blasingame

23  threaten anybody, did you?

24     A.   I did not.

25     Q.   Other than doing what you described, was he

OFFICER JON GRUBBS
January 28, 2021

1   acting in any other way -- or any way that you thought

2   was indicative of somebody being under the influence of

3   drugs or alcohol?

4       A.   I can't speak to whether he was under the

5   influence of drugs or alcohol.

6       Q.   Okay.  What you saw at that time, you didn't

7   know whether he was or he wasn't, correct?

8       A.   That is correct.

9       Q.   But the fact of the matter he was not engaging

10  in activities so much that -- that you thought that

11  the level of suspicion of drugs and alcohol intoxication

12  were necessarily coming into play, correct?

13      A.   That is correct.

14      Q.   Same thing.  When you saw what he was doing, did

15  it at all raise your level of suspicion as to whether he

16  was, in fact, mentally ill?

17      A.   I had not made any assumptions or determinations

18  as to his mental status.

19      Q.   Okay.  And same series of questions.  You don't

20  know either way whether or not he was or he wasn't

21  mentally ill, correct?

22      A.   That is correct.

23      Q.   But there was nothing bizarre or unusual about

24  the way in which he was acting or responding other than

25  having the paper and doing the hand gesture you talked

OFFICER JON  GRUBBS
January 28, 2021

1    about that raised your level of suspicion that he was.

2       A.   That is correct.

3       Q.   When you saw -- I already asked you that.

4            I asked you about his clothing and you said at

5    least you don't know whether he was a homeless person,

6    but based on what you saw, that was at least a

7    consideration.  Did I -- did I paraphrase that right?

8       A.   Yes, sir.  That is correct.

9       Q.   All right.  Thanks.  Okay.

10           Do you know if Officer Shelley, S-h-e-l-l-e-y,

11   was in that general vicinity at the time when you first

12   saw Mr. Blasingame?

13      A.   He was the driver of the patrol car.  Yes, he

14   was.

15      Q.   So you -- you were there when -- both -- the two

16   of you were in the vehicle together?

17      A.   That is correct.

18      Q.   All right.  Do you remember actually any

19   vehicle -- because you told me you didn't see him get --

20   Jerry get -- Mr. Blasingame get any money, right?

21      A.   That is correct.

22      Q.   Did you ever see any vehicle that, like,

23   considerably slowed down, like, to almost stop or even a

24   stop to give him money?  Did you see that at all either?

25      A.   I don't recall specifically.

OFFICER JON  GRUBBS
January 28, 2021

1     Q.   All right.  Did you have a discussion at all

2  with Officer Shelley about what you were seeing

3  Mr. Blasingame do?

4     A.   I believe we had a brief discussion as to what

5  we had observed and what we thought was occurring.

6     Q.   Okay.  Who said -- who said something first, you

7  or Shelley?

8     A.   I don't recall who viewed Mr. Blasingame first.

9     Q.   Okay.  What do you recall stated in the car

10  after you first recall seeing Blasingame?

11     A.   I recall something possibly to the effect of

12  there is a male subject on the left shoulder.  It looks

13  like he's soliciting.

14     Q.   Okay.

15     A.   That may have come from me or it may have come

16  from Officer Shelley.  I'm not exactly sure.

17     Q.   Okay.  So again, from your vantage point in the

18  car, Jerry would have been -- Blasingame would have been

19  off to your left?

20     A.   That is correct.

21     Q.   But on that same ramp that you've already

22  described.

23     A.   Yes, sir.

24     Q.   So I know Shelley was driving the car.  What did

25  he do after you -- after there was that -- those words

OFFICER JON  GRUBBS
January 28, 2021

1   that you just shared with us were spoken, what happened?

2   What did he do with the car?

3       A.   He remained in the vehicle still.

4       Q.   Okay.  Did he pull over?

5       A.   I don't believe so.

6       Q.   How did you get out of the car?

7       A.   I exited the vehicle via the passenger side.

8       Q.   But what -- I'll take it, the car was not

9   moving.

10      A.   Yeah, I would assume he was stopped.  Yes, sir.

11      Q.   What -- did he turn on his lights and siren?

12      A.   I'm not sure what equipment was or wasn't

13  activated.

14      Q.   Do you have any recollection of Officer Shelley

15  having his lights and sirens on?

16      A.   I do not.

17      Q.   Do you remember Officer Shelley using the

18  intercom to speak to my client at all?

19      A.   I do not.

20      Q.   When -- do you remember Officer Shelley then

21  pulling over the shoulder?  Did he get -- was he heading

22  in the travel lane?

23           Where did he stop enough for you to get out of

24  the car and the passenger door?

25      A.   I believe -- whichever travel lane that we were

OFFICER JON  GRUBBS
January 28, 2021

1    in, I believe he stopped the vehicle in the travel lane.

2    At which time, I exited the vehicle shortly thereafter.

3        Q.   Okay.  You would agree with me in -- but in

4    other words, he -- it's not like Jerry was jumping out in

5    front of your car making you guys stop.  Right?

6        A.   No, sir.  That did not happen.

7        Q.   All right.  So Officer Shelley apparently

8    stopped in a travel lane that otherwise is intended for

9    travel to keep on moving, right?

10       A.   Yes, sir.

11       Q.   In other words, if somebody else other than a

12   police officer did that, it would be, technically

13   speaking, obstructing traffic.

14       A.   Depending on the circumstances, that is correct.

15       Q.   Well, if there -- there wasn't a car or a person

16   immediately in front of Shelley's vehicle, you would

17   agree with me, if we took out of the equation the police

18   vehicle, it would be obstructing traffic.

19       A.   Generally speaking.  Yes, sir.  It would.

20       Q.   Okay.  And you'd agree with me that even as a

21   police officer such as Officer Shelley, he's supposed to

22   abide by all traffic signals, laws, et cetera, unless

23   he's got lights and sirens on, agreed?

24       A.   Yes, sir.

25       Q.   Okay.  And he didn't do that.

OFFICER JON  GRUBBS
January 28, 2021

1      A.   I can't speak to if the rear emergency lights of

2  the vehicle were activated.  That's -- I just don't know.

3      Q.   Okay.  If they weren't on, he, in essence, was

4  obstructing traffic as well, agreed?

5      A.   Yes, sir.

6      Q.   All right.  So you got out of the vehicle and

7  went around which side of the car?

8      A.   I do not recall whether I ran to the front of

9  the vehicle or to the rear of the patrol vehicle.

10     Q.   Okay.  How close was our client to the roadway

11 or at least the side of the road?

12     A.   From my vantage point, he appeared to be pretty

13 close to the traffic lane.

14     Q.   Do you know what a fog line is?

15     A.   I do, sir.

16     Q.   Do you remember on the left-hand side -- in

17 other words, on Shelley's side of the vehicle -- whether

18 the fog line is yellow or white or what have you there?

19     A.   I don't recall if it's yellow or white.

20     Q.   Okay.  Was my client at least on the shoulder of

21 the road as opposed to being in the travel lane?

22     A.   I believe he was on the shoulder directly next

23 to the painted line.

24     Q.   Thank you.

25          When you got out on foot, do you remember

OFFICER JON  GRUBBS
January 28, 2021

1    Shelley doing anything -- well, obviously, he had to keep

2    the vehicle at least stopped if you were to walk around

3    it at least in the front, right?

4        A.    Yes, sir.

5        Q.    Do you remember going in front versus back?

6        A.    I do not.

7        Q.    Do you remember Shelley pulling the vehicle

8    forward at all while you were still on foot?

9        A.    I do not.

10       Q.    Okay.  When you got out of the car, I'll take

11   it, you continued and looked at my client?

12       A.    That is correct.

13       Q.    What did he do when he saw you get out of --

14   did -- did he see you get out of the car, to the best of

15   your knowledge?

16       A.    To the best of my knowledge, he did see the car

17   and me.

18       Q.    Okay.  Did you get -- did you have eye contact

19   with him, Officer Grubbs?

20       A.    I saw him.  I didn't have direct -- I can't

21   remember if I, you know, looked directly in his eyes.

22   But I did see him clearly.

23       Q.    And do you think it -- when you were looking at

24   him, did it appear to you, at least, that he was looking

25   at you, too?

OFFICER JON  GRUBBS
January 28, 2021

1       A.   Yes, sir.

2       Q.   I'll take it, so you -- you believe that he had

3   the ability to see that you were a police officer and a

4   police vehicle?

5       A.   I do.

6       Q.   You were in -- you're obviously in your police

7   uniform, right?

8       A.   Yes, sir.

9       Q.   It looks like it -- is that a black shirt --

10  short sleeve shirt or is it blue?  I'm sorry.

11      A.   I believe that I -- I believe I'm wearing a

12  black shirt.

13      Q.   Okay.  I can see the Atlanta PD -- police on the

14  back.  Does it also say that on the front --

15      A.   It's a --

16      Q.   -- of that?

17      A.   Yes, sir.

18      Q.   All right.  Yep.  I see it.  It could be it just

19  says "police" in the front.

20           Does that sound about right?

21      A.   Yes, sir.  The Atlanta police badge is on the

22  left breast.

23      Q.   Yes, sir.

24      A.   You have police in large yellow letters across

25  the center.

OFFICER JON  GRUBBS
January 28, 2021

1    Q.    Yes, sir.

2    A.    The patch -- the Atlanta police patch on the

3  right breast.

4    Q.    Yes, sir.

5    A.    And I believe that's the configuration of the

6  front of the vest.

7    Q.    And if I could see -- in one of the photos we'll

8  talk about later.  It looks like there's a body cam --

9  camera somewhere between the L and the I of police on the

10  front of your vest.  Does that sound about right?

11    A.    That sounds about right.  Yes, sir.

12    Q.    All right.  This Exhibit 1 call for service

13  document and the suspicious person identification here,

14  did you actually dis -- call dispatch before you got out

15  of the car?

16    A.    No, sir.  That was made after the incident had

17  occurred.

18    Q.    Okay.  So at no time before you get out of

19  the -- got out of the car did you call anybody and let

20  them know that you were getting out of the car and having

21  an interaction with somebody.

22    A.    No, sir.

23    Q.    Is that correct?

24    A.    That is correct.

25    Q.    It was a bad question.  Sorry, Officer Grubbs.

OFFICER JON  GRUBBS
January 28, 2021

1            MR. JOHNSON:  All right.  Guys, give me another

2    two minutes at least unless somebody needs some more

3    time.  I just need to run to the restroom.  Sorry.

4            THE VIDEOGRAPHER:  Going off the record.

5    Universal time is 1603.  We're now off the record.

6                    (Whereupon, a recess was taken.)

7            THE VIDEOGRAPHER:  Stand by please.

8            We're now back on the record.  The universal

9    time is 1610.

10    Q.    (By Mr. Johnson)  So, Officer Grubbs, you get

11    out of the car -- you exit, obviously, the passenger

12    door.  You don't remember going around the front or the

13    back.

14            But clearly it's your intent -- and you did

15    cross through the lane of travel to go toward -- if

16    you're sitting in the car, to the left to at least go

17    over toward my client, right?

18    A.    That is correct.

19    Q.    All right.  And I'll take it -- was it your

20    intent, then, to arrest him?

21    A.    We hadn't discussed our enforcement action at

22    that time.

23    Q.    Okay.  So when you were going over towards him,

24    you were not necessarily going to arrest him, correct?

25    A.    That is correct.

OFFICER JON  GRUBBS
January 28, 2021

1    Q.   But it certainly was your intent to detain him

2  in order to at least talk to him and see what's going on.

3    A.   That is correct.

4    Q.   And I wouldn't call it a traffic stop because

5  he's not in a vehicle.  But, in essence, to detain him is

6  pretty much the same thing, right?

7    A.   We would classify it as a suspicious person

8  stop.

9    Q.   Okay.  Thank you.

10        Pursuant to your training, after getting out of

11  the vehicle, you kept your eyes on my client just to make

12  sure you could see what he was doing.

13    A.   That is correct.

14    Q.   And that would include his hands.

15    A.   That is correct.

16    Q.   Because the -- obviously, you've been trained

17  and you, even that day, employed that training.  You

18  wanted to make sure he wasn't reaching for a firearm.

19    A.   That is correct.

20    Q.   Or any weapon, for that matter.

21    A.   That is correct.

22    Q.   And to be fair, you didn't see him reach for or

23  pull out any firearm or weapon of any kind, did you?

24    A.   That is correct, sir.

25    Q.   In fact, at no time that day did you ever see my

OFFICER JON  GRUBBS
January 28, 2021

```
 1   client reach for or otherwise have a firearm or any

 2   weapon, correct?

 3       A.   Correct.

 4       Q.   So to the best of your knowledge, based on your

 5   training and experience -- although you always keep in

 6   the back of the -- your mind that he might be armed,

 7   you saw no evidence that he was armed that day, agreed?

 8       A.   That is correct, sir.

 9       Q.   All right.  And while you're getting out of the

10   vehicle, did you have any conversation with

11   Mr. Blasingame whatsoever?

12       A.   I did not.

13       Q.   Did he say anything to you?

14       A.   I do not believe so.

15       Q.   Okay.  So if -- let me put it this way.  You

16   have no memory of him saying anything to you, correct?

17       A.   That is correct.

18       Q.   Therefore, if he didn't say anything to you, he

19   did not verbally threaten you in any regard, did he?

20       A.   That is correct.

21       Q.   Didn't swear at you?

22       A.   No, sir.

23       Q.   Didn't, like, threaten any type of bodily harm

24   or anything to you?

25       A.   That is correct.
```

OFFICER JON  GRUBBS
January 28, 2021

1      Q.   Didn't call you names?

2      A.   I do not believe so.

3      Q.   Didn't swear at you that you heard?

4      A.   That is correct.

5      Q.   So while you're watching him, trying to approach

6   him, what does he do first that you saw?

7      A.   Mr. Blasingame appeared to have viewed me and at

8   that time, began to flee on foot.

9      Q.   Okay.  And when you say "flee on foot," he's

10  somewhere between the side of the road and the -- or the

11  edge of the ro- -- actual asphalt or roadway and the

12  stripe that we talked about in the road, correct?

13     A.   He was in the shoulder area --

14     Q.   Right.

15     A.   -- so he ran between the stripes and the

16  barrier.

17     Q.   Right.

18          That -- that -- the metal barrier?

19     A.   At the point -- the first point I viewed him, he

20  was next to a combination of a fence and concrete barrier

21  that turns into just the metal vehicle barrier.

22     Q.   Okay.  Officer Grubbs, I went through the photos

23  today and I didn't see any that showed the area where my

24  client was first standing.

25          Do you remember, you or any other -- do you

OFFICER JON  GRUBBS
January 28, 2021

1  remember seeing any investigative -- investi- -- well, I

2  can't say that word today.

3        Did you ever see any -- recall photographs in

4  the investigation that show the area where he was

5  originally?

6     A.   I have not seen any photographs in reference to

7  this investigation.

8     Q.   Not even the ones where you're standing next to

9  a guardrail where it comes through to the point where the

10 incident occurred?

11    A.   I have not seen any photos that were taken by

12 anybody.

13    Q.   Okay.  Do you know who took the photos?

14    A.   I believe photos were taken by Atlanta police

15 crime scene technicians.

16    Q.   Okay.

17    A.   I believe the GBI may have taken photographs as

18 well.

19    Q.   What's GBI?

20    A.   It's the Georgia Bureau of Investigation.

21    Q.   Who's that?

22    A.   That is a separate state police investigative

23 agency for the entire State of Georgia.  So our

24 equivalent of the Michigan State Police.

25    Q.   I was going to go there.  Thank you.

OFFICER JON  GRUBBS
January 28, 2021

1          Do they -- does the GBI -- to the best of your

2    knowledge, Officer Grubbs, do they investigate every

3    police use of force interaction with the public?

4        A.   They invest- -- to my knowledge, they

5    investigate most, if not almost all, of serious

6    officer-involved incidents in the state.

7        Q.   Okay.  Is that -- as you know -- as you're

8    aware -- you may not be.

9          Is that pursuant to some type of a law or that's

10   just how Atlanta chooses to do it?  Or do you know?

11       A.   I don't know.  That's just the procedure that's

12   been used for the last few years now.

13       Q.   Okay.  So when my client then sees you and

14   begins to move, I'll take it, at some point, he ends up

15   turning his back towards you to exit off of the roadway

16   toward the -- what I'll call the metal guardrail.

17       A.   That is correct.

18       Q.   And forgive me that -- because I haven't gotten

19   down there yet and I'm going to.

20          But if -- if you were to estimate from the side

21   of the road -- in other words, where the actual asphalt,

22   slash, cement road ends, the shoulder -- until that metal

23   guardrail where it exists, where it's located -- are you

24   able to give me a ballpark and how many feet that is?

25       A.   Are you saying from the travel distance from

OFFICER JON  GRUBBS
January 28, 2021

1    where I viewed Mr. Blasingame to the point where he went

2    over the metal vehicle barrier?

3         Q.   Yeah.

4              The -- the -- would it -- if I use the term

5    "guardrail," do you know what I mean?

6         A.   Yes, sir.

7         Q.   All right.  So -- and I -- and I'm going to show

8    you some photographs, Officer Grubbs.  And it -- it shows

9    you standing next to a guardrail with a little bit of

10   foliage.

11             So I'll show you where -- you -- you have a

12   general recollection of what I'm talking about, right?

13        A.   Yes, sir.  I do.

14        Q.   Okay.  So what I'm trying to say is before --

15   because my client ultimately stepped over the guardrail,

16   did he not, and entered that little forest area?

17        A.   He did.

18        Q.   Okay.  So what I'm trying to understand is -- so

19   I don't have a picture; I'm sorry -- is -- is if we were

20   to measure the side where the roadway actually ends to

21   the point where my client's got over the top of the

22   guardrail, I just want to know a ballpark how many feet

23   that is.

24        A.   I would estimate five feet.

25        Q.   Oh, okay.

OFFICER JON  GRUBBS
January 28, 2021

1      A.    From the -- the point of the roadway over to

2   where the guardrail would have been --

3      Q.    Okay.

4      A.    -- I would estimate about five feet.

5      Q.    Okay.  So in other words, since we know he was

6   actually on the shoulder of the road near the stripe,

7   from where he was standing from where you first saw him

8   until the guardrail that he ultimately went over.

9      A.    Uh-huh.

10     Q.    It -- it was 10, 15 feet ballpark.

11     A.    Somewhere in that possibly.

12     Q.    How about this; not a significantly far

13  distance, agreed?

14     A.    Yeah, I would agree with that.

15     Q.    All right.  So I'll take it, when you saw my

16  client turn his back to you, registered in your mind he's

17  trying to avoid interaction with you.

18     A.    Uh-huh.  That is correct.

19     Q.    Okay.  In other words, he's trying to get away

20  from you.

21     A.    That is correct.

22     Q.    All right.  By the time he got to the guardrail,

23  since it's only the number of feet that we've been

24  talking about, still no -- still no conversation, if you

25  will, between you and Mr. Blasingame at all, right?

OFFICER JON  GRUBBS
January 28, 2021

1      A.    That is correct.  The only -- I had yelled at

2  him to stop.  That was the only verbal communications

3  that had occurred.

4      Q.    And that -- that's a pretty important thing to

5  do, isn't it, Officer?

6      A.    If it can be done.  Yes, sir.

7      Q.    Right.

8            Meaning that -- but apparently it could be

9  because you just told me you did, right?

10     A.    Yes, sir.  That is correct.

11     Q.    And you'd agree that "stop" coming from you in

12  that circumstance is an order.

13     A.    I would.

14     Q.    Okay.  And I'll take it, that's the -- you don't

15  remember my client saying anything in response to that.

16     A.    I do not.

17     Q.    And so far that's the one and only word that

18  I've heard that you said to him whatsoever is "stop"?

19     A.    That is correct.

20     Q.    And that is the first and only thing you said to

21  him before he got over the guardrail?

22     A.    That is correct.

23     Q.    How close was he to the guardrail before you

24  said, "Stop"?  Or at -- not before, but when you said,

25  "Stop"?  Sorry.

OFFICER JON   GRUBBS
January 28, 2021

1        A.   I would estimate fairly close.  I would say

2   within eight feet of where the point that he crossed over

3   the guardrail.

4        Q.   Okay.  Were you a weightlifter at the time?

5        A.   I was.

6        Q.   Because just looking at you at -- and I didn't

7   mean this in any disrespectful way, of course.

8             You're a broad guy, your shoulders.  It's very

9   evident to me in the photos that you're a strong guy.  Is

10  that relatively fair characterization?

11       A.   I might try to maintain a level of physical

12  fitness.

13       Q.   Well said.

14            You've got on your utility belt, right?

15       A.   Yes, sir.

16       Q.   We talked about the camera in the front between

17  the L and I, right?

18       A.   Yes, sir.

19       Q.   Take me from, if you would, your utility belt --

20  are you right-handed or left-handed?

21       A.   I'm right-handed, sir.

22       Q.   Take me around the belt starting at noon, so

23  right in front, and take me around your belt, then, with

24  your right hand going in a clockwise scenario if you

25  would, please, sir.

OFFICER JON  GRUBBS
January 28, 2021

1        A.    Going over near the one (indicating) -- and this

2   is at the time.  It's changed slightly, I believe.

3        Q.    That -- got you.

4        A.    Going over towards the one- to two o'clock

5   position, at that time I most likely would have had a

6   canister of pepper spray.

7        Q.    Okay.

8        A.    Immediately over that towards the three o'clock

9   position would be my firearm.

10       Q.    What did you have?

11       A.    Which at the time and currently is a Glock 17 --

12       Q.    Okay.

13       A.    -- .09-millimeter pistol equipped with a

14   tactical light.

15       Q.    Okay.

16       A.    Directly behind that towards the four o'clock

17   position would be a ASP, A-S-P, expanding baton.

18       Q.    Sir.

19       A.    And directly behind that towards the six o'clock

20   position, I had two pairs of department-issued handcuffs.

21   Moving over to your seven- and eight o'clock positions

22   (indicating), I believe I had a small tactical style

23   flashlight.

24            And directly in front (indicating) of that would

25   have been my department-issued portable radio.  And in

OFFICER JON  GRUBBS
January 28, 2021

1  front of that towards the ten- to eleven o'clock position

2  would have been the Taser X2.  And directly in front of

3  that would be two extra magazines of ammunition.

4       And I believe that is all the equipment at that

5  time that I carried.

6     Q.   Thank you, sir.

7       But I'm -- when we put some photos up of you by

8  the guardrail in these photos, I think it's -- they have

9  some pretty good views of the belt.  So if there's

10  anything that you want to add or change or whatever, just

11  let me know that.  Okay?  Thank you, sir.  Okay.

12       Relative to the use of the on-dash camera in

13  the -- in the patrol unit, was that something solely

14  within Shelley's control or is that something that you

15  could operate as well?

16    A.   That particular vehicle was not equipped with a

17  dash camera.

18    Q.   Do you remember the number of the vehicle?

19    A.   I believe that was patrol car 31013.

20    Q.   Had you ever driven it before?

21    A.   I had.

22    Q.   Any particular reason why Shelley was that day,

23  not you?

24    A.   We normally alternated driving.

25    Q.   Like every day?

OFFICER JON  GRUBBS
January 28, 2021

1      A.    Yeah, you know, every -- every other -- we were

2   on a four-day work rotation, so I would drive two days,

3   he would drive two days.

4      Q.    How long had you been partnered up with Shelley?

5      A.    Since April of that year and then we had worked

6   together previously.

7      Q.    Okay.  So you knew him and he knew you.

8      A.    Yes, sir.

9      Q.    And I said "Shelley."  I hope you don't -- I --

10  I do -- if you want me to say Officer Shelley, I'll be

11  happy to do it.  I did not mean any disrespect.

12     A.    Shelley's fine.  Yeah, that's -- that's fine

13  with me, sir.

14     Q.    When -- so your -- your memory is no on-dash

15  camera on that patrol unit --

16     A.    --

17     Q.    -- 31013?

18     A.    Yes, sir.  That is correct.

19     Q.    Pretty hard to turn on an on-dash camera if

20  there's not one that exists in the vehicle, agreed?

21     A.    Agreed.

22     Q.    All right.  I'll take it, you do agree that if

23  there was an on-dash camera, the policies and procedures

24  of Atlanta at the time required it to be utilized.

25     A.    Yes, sir.

OFFICER JON  GRUBBS
January 28, 2021

1      Q.   Now, we started talking a while ago and I kind

2  of got off track -- sorry -- about you getting the Taser

3  equipment for the first time.  Do you remember that?

4      A.   Yes, sir.  I do.

5      Q.   You told me you got it right there even in the

6  academy.

7      A.   That is correct.

8      Q.   And then we talked a little bit about the

9  approximate five different training periods that you had

10  even up to the time of 7/10/18.

11      A.   That is correct.

12      Q.   Do you have a memory of when you got your

13  on-body camera for the first time?

14      A.   As I stated previously, I don't recall the exact

15  date.  I believe it was in 2017, but I'm not a hundred

16  percent sure.

17      Q.   You think you had it for a full year at the time

18  of this incident in July of 2018?

19      A.   It may have been around a full year.  I'm not

20  exactly sure, though.

21      Q.   Do you remember, when you first got them,

22  getting any training on how to use them?

23      A.   Yes.

24      Q.   Tell me about that training, if you would.

25      A.   My best memory of that training, it occurred at

OFFICER JON GRUBBS
January 28, 2021

1    an unknown date and time as to what the device was and

2    how it operated.

3        Q.   Okay.  Did you have it on -- like, when they

4    first were training you how to turn it on and all that,

5    did you have like, a unit on you or they were just

6    showing you a unit on themselves first?

7        A.   I believe it was some type of a PowerPoint

8    presentation.

9        Q.   Okay.  And was it done by APD or was it done by

10   an outside agency, if you know, or company?

11       A.   I believe it was done by APD.

12       Q.   And then ultimately, you were given one and yet

13   you learned how to turn it on?

14       A.   Yes.  That's correct.

15       Q.   And like we were just talking about for

16   somewhere around -- give or take about a year before

17   these events.

18       A.   Yes, sir.

19       Q.   And then when you were trained on how to use

20   them, I'll take it, they also reviewed with you the A --

21   the SOPs that applied to the use of the on-body camera.

22       A.   To the best of my knowledge, yes.

23       Q.   Now, back in 2017 when you all were getting your

24   training, I'm sure like any other profession, Officer

25   Grubbs, did you ever talk about with any of your other

OFFICER JON  GRUBBS
January 28, 2021

1  officers about having to wear that stuff?

2       A.   Yes, sir.

3       Q.   What was your opinion about it?

4       A.   I didn't have a particularly negative opinion of

5  the cameras.

6       Q.   Okay.  Other officers may have not -- may have

7  had a negative opinion that you heard?

8       A.   Yes, sir.

9       Q.   Did you, at least as part of -- you said you

10  didn't necessarily have a negative view.  So were you

11  positive about it?

12            In other words, did you think to yourself that

13  hey, this could be really good for me.  I wear it.  It'll

14  show everything that happens and I do it -- I do it

15  right.  I do it by the book and it's going to help me.

16       A.   Yes, sir.

17       Q.   When they were training you, how would you

18  describe the administration or the training officers --

19  singular or plural -- attitude towards you folks using

20  those?  Was it positive, negative; how would you describe

21  it?

22       A.   I would say positive and professional.

23       Q.   Okay.  And likewise, did they give you the view

24  that hey, this could really help you in situations?

25       A.   Yes.  I believe so.

OFFICER JON  GRUBBS
January 28, 2021

1      Q.    And then obviously, you knew, I'm sure, whether

2   they said it or not, it could really hurt you if you --

3   if someone did stuff that wasn't by the book.

4      A.    Yes, sir.

5      Q.    Up until June of 2018, Officer Grubbs, had you

6   ever been, as far as you know, the subject of any type of

7   a citizen's complaint about the use of force or the way

8   that someone -- you dealt with somebody?

9      A.    Yes, sir.  I can -- yeah.

10      Q.    You can what?  Go ahead and finish your answer,

11   please.

12      A.    I can just recall one instance.

13      Q.    Okay.  And can you tell me what -- what it was

14   regarding; can you recall?

15      A.    An arrest of a suspicious person.

16      Q.    Okay.  What do you remember about that?

17      A.    I believe the individual made a complaint that I

18   used unreasonable force during the course of his arrest.

19      Q.    Do you remember what that person was arrested

20   for?

21      A.    I don't remember the specific charges.

22      Q.    Do you remember there being more than one or

23   just one?

24      A.    Just one that I can recall.

25      Q.    If -- as part of the personnel file of the

OFFICER JON  GRUBBS
January 28, 2021

1   documents that we have in this case, part of the GBI

2   file, if there was a -- an incident that described on

3   August 17, 2016 where you arrested an individual for

4   failing to use a marked and accessible crosswalk, does

5   that ring a bell to you?

6        A.   Yes, sir.

7        Q.   Can you tell me off the top of your head why did

8   you arrest someone for failure to use a marked and

9   accessible crosswalk?

10       A.   I believe I had probable cause for an arrest and

11  I believed that that was the most appropriate course of

12  action.

13       Q.   Don't you remember what the person did?

14       A.   I believe -- from what you're stating, it was

15  not using a crosswalk.  And if I remember the incident

16  correctly, the individual was extremely non-compliant and

17  uncooperative --

18       Q.   Okay.

19       A.   -- with my investigation.

20       Q.   Okay.  Did the individual -- other than not use

21  a crosswalk, does that suggest to you or do you have a

22  memory of them cross- -- in other words, trying to cross

23  a road without using a crosswalk that was nearby?

24       A.   I'm sorry, sir.  Can you repeat your question.

25       Q.   Happy to.

OFFICER JON  GRUBBS
January 28, 2021

1            On the August 17, 2016 incident -- I don't have

2     a police report in front of me.  Mr. Radner's over here

3     shuffling papers, so he might find one, but I don't have

4     one.

5            So I'm just asking, do you remember a person

6     that was crossing the road somewhere, like, in the middle

7     of the road and didn't use a crosswalk, that you saw?

8        A.   I do.  I vaguely remember the incident that

9     you're referring to.

10       Q.   Okay.  Male person?

11       A.   It was a male subject.

12       Q.   White, black, brown, what?

13       A.   I believe he was a black male.

14       Q.   And you -- was he doing anything else that you

15    thought was wrong other than not using a crosswalk?

16       A.   I did not witness any other criminal violations

17    at that time.

18       Q.   Okay.  So what -- you were trying to, I'll call,

19    approach him, detain him about the crosswalk and he

20    apparently resisted arrest?

21       A.   Something to that effect.  I would have to

22    review the report to really give you a accurate synopsis

23    of that.

24       Q.   Fair enough.

25            Do you remember deploying your Taser that day?

OFFICER JON  GRUBBS
January 28, 2021

1      A.    I don't believe he was Tased.

2      Q.    Okay.  It talks about you took him to the

3 ground, the individual placed in handcuffs and detained.

4 Does that sound about right?

5      A.    It sounds about right.

6      Q.    "Individual sustained minor injuries."

7            Do you have any memory of him being injured?

8      A.    I remember that he made a medical complaint.  I

9 don't recall exactly what the complaint was.

10     Q.    Okay.  "The individual filed a complaint.  The

11 complaint was not sustained and no action was taken."

12           Is that consistent with your memory of what

13 happened?

14     A.    Yes, sir.

15     Q.    Can you tell me, based on the way things worked

16 at APD, when a complaint would come in like the one we

17 just talked about August 16, 17, 2016, the year before

18 this -- or two years before this event, how does that get

19 processed through the department, as far as you

20 understand?

21     A.    My best knowledge of complaints is that

22 complaints can be filed directly with internal affairs by

23 phone, e-mail, or in person.  Complaints can also be

24 filed with patrol supervisors from a citizen.

25     Q.    Do you remember how that one was filed, how it

OFFICER JON  GRUBBS
January 28, 2021

1  came in?

2      A.    I do not.

3      Q.    I'll take it as of July 10, 2018, you had, in

4  the course of your career, taken a number of people down

5  to the ground in just terms of detaining them,

6  handcuffing them, and processing them.

7      A.    Yes, sir.

8      Q.    You are certainly aware of taking somebody down

9  to the ground even like what you did in August of 2016,

10  that people can get injured by that.

11      A.    Yes, sir.

12      Q.    And I'll take it, that's something that you --

13  you obviously hope doesn't happen.  Correct?

14      A.    That is correct.

15      Q.    But when you are utilizing force and in the

16  event if they are resisting, you have to be cognizant

17  that taking them to the ground could injure them,

18  correct?

19      A.    That is correct.

20      Q.    And then depending on some -- how hard someone

21  gets taken to the ground, what part of their body hits

22  what on the ground, obviously, you're aware and were

23  aware that someone could be seriously injured and even

24  killed doing that.

25      A.    That is correct.

OFFICER JON  GRUBBS
January 28, 2021

1      Q.    Therefore, it's incumbent on you obviously to do

2  your best to make sure that doesn't happen.

3      A.    That is correct.

4      Q.    But when you're taking someone to the ground or

5  they're otherwise going to the ground, there's a lot of

6  unknown factors, if you will, that go into kind of what

7  happens when they hit the ground, right?

8      A.    That is correct.

9      Q.    So I'll take it, you don't want to take them to

10  the ground unless you have to.

11     A.    That is correct.

12     Q.    Rather detain them standing up.

13     A.    Yes, sir.

14     Q.    And therefore, without the use of any force if

15  you can do so.

16     A.    That is always preferable.

17     Q.    Okay.  And in that particular type of a

18  situation no use of force always preferable, you'd rather

19  use no force than any force at all?

20     A.    Yes, sir.

21     Q.    And part of the -- even the Use of Force

22  continuum teaches you that.  If you could use no force

23  whatsoever and simply use your voice, if you will, or

24  your presence, that's the way to do it.

25     A.    Yes, sir.

OFFICER JON  GRUBBS
January 28, 2021

1      Q.    And you always try to use as little or no force

2  as possible before you go up the use of force, continue

3  to use force?

4      A.    Yes, sir.

5      Q.    You exhaust the options going from none to some

6  or all the way up to deadly force if you can, correct?

7      A.    Yes, sir.

8      Q.    That's exactly how you were trained.

9      A.    Yes, sir.  That is correct.

10     Q.    And you even did that even on July 20 --

11  July 10, 2018, right?

12     A.    That is correct.

13     Q.    Okay.  So plain and simple relative to the body

14  cams, Officer Grubbs, you knew as part of that training,

15  let alone on July 10, 2018, that you were supposed to

16  have the body cam on in buffering mode at all times,

17  correct?

18     A.    That is correct.

19     Q.    All right.  How -- tell me, if you would -- on

20  the unit that you were wearing, do you know what it was

21  even called on July 10, 2018?

22     A.    What the body camera device was called?

23     Q.    Yes, sir.  You know, the make, model, whatever

24  the heck it was.

25     A.    It was Axon.  It may have been the Body 2

OFFICER JON  GRUBBS
January 28, 2021

1  device.  I -- I'm not exactly sure.  But it was -- the

2  brand was Axon, A-x-o-n.

3       Q.   Thank you.

4            And is that -- was that the very one that you

5  were trained on?

6       A.   Yes, it was.

7       Q.   All right.  So in order for you to turn that

8  unit on to make it go into -- what does "buffering mode"

9  mean?

10      A.   Well, sir, to just give you a quick synopsis of

11 the device.  On top of the device there's a toggle

12 switch.  That toggle switch goes back and forth.  On one

13 end it would be off.  Upon switching it over, the device

14 is turned on and placed in a buffering mode, which it

15 records -- I believe at the time, it was two-minute

16 cycles of video and then it erases itself, starts over.

17      Q.   So by "buffering mode," it's on at all times.

18      A.   It's on, but not recording.  Yes, sir.

19      Q.   Okay.  And when you say "two-minute cycles,"

20 tell me what you understood that to mean.

21      A.   So if we were on this video call right now --

22      Q.   Yes, sir.

23      A.   -- two minutes from now whatever we've --

24 whatever the camera has seen --

25      Q.   Right.

OFFICER JON  GRUBBS
January 28, 2021

1      A.   -- we delete it and another two minutes would

2    start.

3      Q.   Thank you.  Okay.

4           So it's always on and always recording

5    something --

6      A.   (Whereupon, the witness nods head

7    affirmatively.)

8      Q.   -- right?

9      A.   Correct.

10     Q.   But unless you do something else to it to put it

11   in some other mode, it's not going to keep whatever was

12   on there.

13     A.   That is correct.

14     Q.   All right.  And that is part of the policies and

15   procedures in effect as of July 10, 2018, when there's a

16   situation that you are going to have interaction with

17   somebody that you are going to detain, the policies and

18   procedures required you to turn on the equipment; in

19   other words, not just buffering mode, right?

20     A.   Yes, to record.

21     Q.   Okay.  And tell me -- you obviously didn't do

22   that here, correct?

23     A.   That is correct.

24     Q.   And to be fair and 100 percent honest, that is

25   in direct violation of the policy and procedures of the

OFFICER JON  GRUBBS
January 28, 2021

1   body cam at the time, July 10, 2018, correct?

2        A.    That is correct.

3        Q.    Okay.  So tell me if you're in the car, the

4   patrol vehicle, right before you got out and exited the

5   vehicle and went over toward my client, was your body cam

6   in the buffering mode?

7        A.    It was not.

8        Q.    So it was completely off?

9        A.    It was completely off.  Yes, sir.

10       Q.    Why?

11       A.    From that time prior to the incident occurring,

12   I believe we had just come from the jail and I had taken

13   a bathroom break.  And I believe while in the bathroom, I

14   turned the camera completely off and inadvertently, I

15   just failed to turn it back on into the buffering mode.

16       Q.    Okay.  What time were you guys at the jail?

17       A.    I'm not exactly sure.  I would have to look at

18   the records for that.

19       Q.    The blue sheet?

20       A.    That may have been on the blue sheet.

21       Q.    Okay.  What were you doing at the jail?

22       A.    I believe we were booking in another arrestee.

23       Q.    Okay.  So you get out of the jail and -- I mean,

24   do you know -- and -- and I don't mean to be silly, but

25   let's talk about the bathroom break.

OFFICER JON  GRUBBS
January 28, 2021

1           Under the policies and procedures since you had

2    the camera on, were you supposed to leave it on even for

3    the bathroom break?

4        A.    I don't recall exactly if there was a

5    specific -- I believe there is a subsection in there that

6    you can turn it off, but I'm not a -- I'm not a hundred

7    percent sure.

8        Q.    Okay.  The fact of the matter is if we could

9    skip over a bathroom break, when you got back into the

10   car, at the very least, it was supposed to be on in the

11   buffering mode.

12       A.    That is correct.

13       Q.    When you then got in the car, you see my client,

14   and you're thinking about getting out of the vehicle

15   pursuant to the policies and procedures that you're now

16   going to get out and go on foot, do a foot pursuit,

17   you're supposed to again turn it on fully for it to

18   record, correct?

19       A.    That is correct.

20       Q.    And obviously, you didn't do that either, did

21   you?

22       A.    That's correct.

23       Q.    All right.  Now, how about Shelley; did Shelley

24   have his body camera on at the jail as far as you know?

25       A.    At the jail, I'm not sure.

OFFICER JON  GRUBBS
January 28, 2021

1      Q.   Okay.  Did he have his on in the car on buffer

2  switch -- the buffer mode?

3      A.   I -- I'm not sure.  You would have to ask him.

4      Q.   I will.  Do it tomorrow.

5           When -- when -- how about when he was getting

6  out of the car; do you know if he turned his on?

7      A.   I do not know.

8      Q.   Okay.  I mean, to be fair, both of you were

9  supposed to have them on, right?

10     A.   That is correct.

11     Q.   And neither -- as far as you know, neither one

12 of you did.

13     A.   I know that I didn't.  I just can't speak to the

14 status of his camera.

15     Q.   When you come -- Officer Grubbs, you talk to

16 Shelley.  You know he didn't have it on, don't you?

17     A.   I don't know that.

18     Q.   Okay.  Have you ever talked to him about that?

19     A.   About his specific camera, no.

20     Q.   Yes, sir.

21          You would agree with me that if you would have

22 had your body camera on, as you were required to do under

23 the policies and procedures, we'd have a lot more

24 information than we have about the events between you and

25 my client on July 10, 2018, right?

OFFICER JON  GRUBBS
January 28, 2021

1      A.   I would agree.

2      Q.   Is it your sworn testimony, sir, that you did

3  not have that body camera on at all that day?  Oh.

4  Sorry.  Relative to my client's interaction and incident?

5  Sorry.  I apologize.

6      A.   Yes.  That is correct.  For the incident, it was

7  not activated.

8      Q.   But at no time did you or anybody that you're

9  aware of engage in something to do with this recording

10  that -- in other words, that there was a recording that

11  now they erased or somehow got rid of?

12      A.   That is correct.

13      Q.   You would agree with me that -- if it

14  hypothetically happened, that it did record and somebody

15  then somehow got rid of that footage, you agree with me

16  that that would be obstructing justice and destroying

17  evidence.

18      A.   I would.

19      Q.   Then you would agree that's a very serious

20  offense.

21      A.   I would.

22      Q.   And you'd -- you would -- nor anybody that you

23  know of engaged in that relative to your camera, correct?

24      A.   That is correct.

25      Q.   Thank you.

OFFICER JON  GRUBBS
January 28, 2021

1              To the best of your knowledge, Officer Grubbs,

2    did you make it known as part of this investigation to

3    your supervisors, including internal affairs and GBI,

4    that you didn't have your body camera on?

5         A.   I believe I stated that in my internal affairs

6    statement.

7         Q.   Did you admit that the policies and procedures

8    of the department required you to have it on, that you

9    violated the policy?

10        A.   I did not make any admission.  I just merely

11   stated facts.

12        Q.   Okay.  You don't recall anybody asking you if

13   you admit that you violated that policy procedure?

14        A.   I'm sure that that question was asked if the

15   camera was on during the internal affairs interview.

16        Q.   I guess here's where I'm going.  If internal

17   affairs' entire job is to figure out whether you violated

18   policy and procedures -- you admit you didn't have your

19   camera on, you admit that there's a policy that requires

20   you to have the camera on -- it shouldn't take them two

21   and a half years to conclude you violated the policy and

22   procedures about not having your camera on, agreed?

23             MS. MILLER:  Objection.

24             Sir, you can answer.

25             THE WITNESS:  Okay.  I agree and -- that it

OFFICER JON  GRUBBS
January 28, 2021

1  should not take two and a half years.

2      Q.   (By Mr. Johnson)  Okay.  And if it turns out

3  that Officer Shelley didn't have his camera on either,

4  likewise, that would be a violation of that same policy.

5      A.   Yes, sir.

6      Q.   Are you aware -- and again, sir, you may not be.

7  Are you aware -- sorry.  Looking through my notes.  I

8  want -- I want to cite to you the actual agency.  Forgive

9  me.  I'll do it -- I'll start all over in a minute.

10              (Whereupon, the plaintiff's attorney

11              reviewed documents.)

12      Q.   (By Mr. Johnson)  The Atlanta Citizen Review

13  Board, ACRB, who's that, if you know?

14      A.   That's a group of citizens.  It's a independent

15  civilian entity.

16      Q.   Okay.  If we have information in this case that

17  in 2014, the Atlanta City Council authorized the police

18  department to purchase 1,200 body-worn cameras and video

19  storage from Taser International for $5.6 million, are

20  you aware of that generally as being true?

21      A.   I was -- you know, I just heard information here

22  and there.  I don't know the specifics of that deal.

23      Q.   Okay.  Were you aware -- maybe you are not --

24  that at least -- that one of the goals of the department

25  in doing that was to try to increase the effective

OFFICER JON  GRUBBS
January 28, 2021

1    management and enforcement and, in essence, to generally

2    change the police culture as it interacted with the

3    general public?

4        A.   Yes, sir.  I would say so.

5        Q.   And I know we've -- I certainly need to tell

6    you, Officer Grubbs, a black male that even as -- last

7    year, the transparency of interactions with police and so

8    forth, even you as a cop on the street, you get that,

9    right, that's important?

10       A.   I do.

11       Q.   Is it your testimony, Officer Grubbs, that at no

12   time before getting out of that vehicle or even anywhere

13   on -- after getting out of the vehicle on July 10, 2018,

14   that at no time did you intentionally turn off your

15   on-body camera?

16       A.   That is correct.

17       Q.   Are you familiar -- famil- -- do it again.

18            Are you familiar with the City of Atlanta's

19   Auditor's Office?  Do you know who that is?

20       A.   I am not familiar with that particular office

21   here.

22       Q.   Were you aware at any time, even through the

23   present time, of that office or at least any I'll call it

24   city agency determining that the Atlanta police officers

25   were not using body-worn cameras as intended and that the

OFFICER JON  GRUBBS
January 28, 2021

1    officers failed to capture two-thirds of the dispatch

2    calls from November 27, '17 through May 2018?

3         A.    I'm not aware of that.

4         Q.    Have you ever heard anything about that

5    whatsoever?

6         A.    I can recall maybe some type of memorandum at

7    some point stating that officers needed to use their

8    cameras more, but...

9         Q.    And if it's true that between November of 2017

10   through May of 2018 -- and I know it's not lost in here

11   these events that we're talking about today is July of

12   2018.  So that's, you know, a couple of months after that

13   time span, correct?

14        A.    Yes, sir.

15        Q.    So if from November of 2013 through May of

16   2018 -- that's two months in 2017 and another five, so

17   seven-month period of time -- if the Atlanta police

18   officers as a whole failed to capture two-thirds of the

19   dispatch calls during that time frame, that is a

20   significant, significant number of calls missed, right?

21        A.    I would say so.

22        Q.    And it certainly shows a failure of those folks

23   to follow what was already in place as policies and

24   procedures to have them on, if that's true, correct?

25        A.    Yes, sir.

OFFICER JON  GRUBBS
January 28, 2021

1    Q.   And that would certainly suggest to you, Officer

2    Grubbs, that if two-thirds of dispatch calls were not

3    being recorded suggest to you that it's a little bit more

4    than just maybe someone forgetting, don't you think?

5    A.   It's possible.  I can't speak to the mindset of

6    our whole department.

7    Q.   Agreed.

8         But just with -- if that number is correct,

9    two-thirds of calls missed in seven months certainly

10   is consistent and, I think, highly suggestive that

11   officers were intentionally not doing it.  Don't you

12   agree?

13        MS. MILLER:  Objection.  You can answer.

14        THE WITNESS:  I believe that that could signal a

15   possible issue in policy or training with officers.

16   Q.   (By Mr. Johnson)  Do you remember at any time

17   from May of 2018 through -- I know it's only two months,

18   July 10 of 2018 -- do you remember at that point in time

19   getting any type of an internal memorandum, speech,

20   lecture, anything from administration of the department

21   saying we've now got evidence that guys and gals out

22   there are not turning your cameras on, you need to do

23   this every day or you're going to be disciplined?

24   A.   I don't recall any specific communication

25   between that time period.

OFFICER JON  GRUBBS
January 28, 2021

1      Q.   If it's true that in that same time span, there

2   are -- two-thirds of dispatch calls were not being

3   recorded and if people are not being disciplined for it,

4   that's a pretty big signal by management administration

5   that don't worry if you don't abide by that policy and

6   procedure, isn't it?

7           MS. MILLER:  Objection.

8           You can answer to the extent you can.

9           THE WITNESS:  I can't speak to the mindset of

10   the command staff.

11      Q.   (By Mr. Johnson)  Okay.  But as a line officer,

12   as a guy out there on the streets every day, if it's

13   known by administration that two-thirds of the calls

14   aren't being recorded, the fact of the matter is the

15   message to you guys -- to you -- is apparently that's not

16   a big deal to administration.

17      A.   That message was never communicated to me, that

18   I can recall.

19      Q.   Okay.  Not -- maybe not expressly, but how about

20   through lack of action, sir?

21           MS. MILLER:  Objection.

22           But you can answer.

23           THE WITNESS:  I'm not really sure how to answer

24   that.

25      Q.   (By Mr. Johnson)  Okay.  Let's do this, Officer.

OFFICER JON  GRUBBS
January 28, 2021

 1   Let's say that in May of 2018, that folks in the police

 2   department were aware that two-thirds of the calls for

 3   that seven-month period from November 2017 to May 2018

 4   had missed turning their camera on and that every single

 5   one of those officers that did that got disciplined for

 6   it.  That would be a lot of officers getting disciplined,

 7   wouldn't it?

 8        A.   Two-thirds?  Yeah, that would be a lot.

 9        Q.   I mean, any -- any -- without just guessing,

10   picking a number, even a -- an estimate, how many

11   dispatch calls from November '17 to May of 2018 -- I

12   mean, there has to be thousands, don't you think?

13             MS. MILLER:  Objection.

14             You can answer if you know.

15             THE WITNESS:  I don't have a specific number on

16   that.  That's something you would have to ask the

17   communications division.  But it's a lot I'm sure.

18        Q.   (By Mr. Johnson)  So if all of sudden in May

19   2018, you became aware that officers out there were being

20   disciplined for failure to turn their camera on, it

21   certainly would send a message to you and other officers

22   I better make sure this thing's on, right?

23             MS. MILLER:  Objection.

24             You can answer.

25             THE WITNESS:  It may.

OFFICER JON   GRUBBS
January 28, 2021

1    Q.   (By Mr. Johnson)  And to be fair, if those

2    officers or any officers were being disciplined as a

3    result of that, it might have been a little extra of a

4    reminder for you two months later to make sure yours was

5    on, on the day of this incident?

6          MS. MILLER:  Objection.

7          You can answer.

8          THE WITNESS:  It's possible.

9    Q.   (By Mr. Johnson)  Going back to July 10, 2018

10   now, my client is -- has his back to you and he is within

11   a few feet of the guardrail.  And that's when you said

12   you said -- or you told him stop.

13   A.   That is correct.

14   Q.   But he did not stop.

15   A.   That is correct.

16   Q.   Now, my client, as I told you earlier today, I

17   want you to assume was a 65-year-old man.  I'll take it,

18   he probably wasn't exactly what I would say --

19   characterized as sprinting away from you, was he?

20   A.   He was running.

21   Q.   Okay.  Are you going to tell me that he hurdled

22   this steel guardrail or did he step over it?

23   A.   He got over it in a fairly quick manner.  I

24   can't remember if he hopped, jumped, hurdled.

25   Q.   And you know what I mean by "hurdles," right?

OFFICER JON  GRUBBS
January 28, 2021

1      A.    Yes.

2      Q.    In other words, he had to lift one leg up and

3   put -- swing it over top and then the other leg up and

4   over the top, correct?

5      A.    Correct.

6      Q.    That's what he did.

7      A.    In some manner.

8      Q.    Right.

9      A.    That's correct.

10      Q.    And I'll take it, when he was doing that,

11   obviously, his back is still somewhat towards you.

12      A.    That is correct.

13      Q.    But still even as in him going over the

14   guardrail, you did not see him reach for any weapon or

15   ever have any weapon in his hand.

16      A.    That is correct.

17      Q.    You didn't hear him say anything to you at all.

18      A.    That is correct.

19      Q.    That's -- no verbal threats, swear words,

20   anything, nothing.

21      A.    No verbal communication.

22      Q.    It just looked to you like he was trying to get

23   away.

24      A.    That is correct.

25      Q.    Straight up, Officer Grubbs, have you ever been

OFFICER JON  GRUBBS
January 28, 2021

1    chased by somebody that you didn't know?

2        A.    Not that I can recall in any recent memory.

3        Q.    Okay.  And as a police officer, I'll take it,

4    you've had foot pursuits before?

5        A.    Yes, sir.

6        Q.    And ultimately, talked with folks.  I'm sure

7    you, like many folks -- police officers say, like, "Why

8    did you run?"

9        A.    Yes, sir.

10       Q.    Okay.  And there's a variety of reasons for

11   running, right?  Some -- but not so good and others may

12   be better excuses.  But you and I can agree, right,

13   that -- that you've heard them, right, the excuses?

14       A.    Yes, sir.

15       Q.    But one of them I'm sure you've heard before is

16   that they were -- didn't know that you were a police

17   officer.  You've heard people say that.

18       A.    Many times.

19       Q.    And you may not believe it, but you've heard

20   them say that?

21       A.    Yep.  That is correct.

22       Q.    And -- and I'll take it, that if -- if you're

23   running after somebody and you are 5-foot-5 and shall we

24   say a very strong, athletic build, it might cause some

25   people to be afraid, whether you're a police officer or

OFFICER JON  GRUBBS
January 28, 2021

1  not, right?

2       A.   I suppose that's possible.

3       Q.   Had you ever crossed over that guardrail before?

4       A.   I had not.

5       Q.   Had Officer Shelley, to the best of your

6  knowledge?

7       A.   I'm not sure.

8       Q.   Okay.  I'll take it, you knew -- without knowing

9  the exact terrain or anything, you knew that over that

10  guardrail and through that wooded area, ultimately was

11  another ramp?

12       A.   I was aware of the location of that ramp.

13       Q.   So in other words, where my client's standing,

14  in essence, he's in between two different ramp areas.

15       A.   That is correct.

16       Q.   So you told us that the ramp that he was on

17  before -- we've already mentioned it, all the numbers and

18  stuff.  But the ramp that he was heading towards, what's

19  that one?

20       A.   When he was fleeing, the ramp that he was

21  heading towards would have been the on-ramp for I-20

22  eastbound at Windsor Street.

23       Q.   And what's the W word you said?

24       A.   Windsor Street.

25       Q.   Windsor.  W-i-n-d-s-o-r?

OFFICER JON  GRUBBS
January 28, 2021

1     A.    Yeah, Windsor Street Southwest.

2     Q.    Thank you.  Okay.  Got it.

3           So at least in terms of where he was going,

4    right, you could clearly see when you were on -- you were

5    in pursuit after him, right?

6     A.    Yes, sir.

7     Q.    Were you running, too?

8     A.    I was running, yes.

9     Q.    Okay.  So you knew that he -- that there --

10   there were woods right there, correct?  You could see

11   that before he even got to it.

12    A.    Yes, sir.

13    Q.    And then you were generally aware of the

14   location of that other ramp you just described.

15    A.    Yes, sir.

16    Q.    All right.  Fair to say, Officer Grubbs, that

17   your training that you were given by Atlanta Police

18   Department, you were exercising that training even as you

19   were on foot pursuing my client, correct?

20    A.    Yes, sir.

21    Q.    Okay.  And as part of that training, you

22   certainly knew at that time that if he's on foot running

23   away from you and you are chasing behind him, not a smart

24   thing to do if you are truly afraid for your life that he

25   has a weapon, agreed?

OFFICER JON  GRUBBS
January 28, 2021

1      A.    Possibly.  Yes, sir.

2      Q.    In other words, you wouldn't want to run after

3  somebody who's got a weapon that could turn around and

4  use it against you, right?

5          MS. MILLER:  Objection.

6          But you can answer.

7          THE WITNESS:  That is all dependent on specific

8  circumstances.

9      Q.    (By Mr. Johnson)  Yep.

10          And in these circumstances, you're own -- when

11  you were running after him, you were -- always in the

12  back of your mind pursuant to your training, you have to

13  be concerned that he might have a weapon, right?

14      A.    That is correct.

15      Q.    But the fact of the matter is had you seen one

16  by then or be -- if you were truly concerned that he had

17  one and that he was likely to use it, you would not have

18  been running right behind him.

19          MS. MILLER:  Objection.

20          But you can answer.

21          THE WITNESS:  That would all depend on if he had

22  a weapon and what that specific weapon was.

23      Q.    (By Mr. Johnson)  But we know that didn't happen

24  here is my point.

25      A.    No.  That did not happen here.

OFFICER JON  GRUBBS
January 28, 2021

1     Q.    Right.

2           You were not running after him with him running

3     away from you in fear of your life at this time, were

4     you?

5     A.    No, I was not in fear of my life.

6     Q.    And other than him fleeing on foot and trying to

7     evade arrest at that particular point in time, he was in

8     no way any type of a fleeing felon, was he?

9     A.    Not to my knowledge, no.

10    Q.    Okay.  And at -- at this time -- at no time when

11    he was going over the guardrail were you worried about

12    that he was trying to get away to go hurt somebody else.

13    A.    I had no information of that at that time.

14    Q.    Nor did you think, when he's going over the

15    guardrail, that he was trying to intentionally hurt

16    himself in any way.

17    A.    I did not believe so.

18    Q.    Okay.  Plain and simple, you thought he was

19    trying to get away.

20    A.    Yes, sir.

21    Q.    And as part of your training, experience

22    obviously, one of the things that you've got to take into

23    consideration -- and I'm sure you did that day -- was the

24    nature of the alleged offense for which you were pursuing

25    him, right?

OFFICER JON  GRUBBS
January 28, 2021

1     A.    That is correct.

2     Q.    And clearly the severity of the crime of

3  panhandling is pretty low, isn't it?

4     A.    That is correct.

5     Q.    And at most, if you will, what you were seeing,

6  my client's actions were consistent with somebody that

7  you felt was elderly, potentially homeless, begging for

8  money; in other words, a non-violent misdemeanor.

9          MS. MILLER:  Objection.

10          You can answer.

11          THE WITNESS:  Every part except elderly.

12    Q.    (By Mr. Johnson)  Okay.  You didn't think he

13  looked elderly at age 65.

14    A.    I had not made a determination as to what his

15  age may or may not have been.

16    Q.    He certainly didn't look like a young man that

17  was immediately aggressive towards you and putting you at

18  risk.

19    A.    No.

20          MS. MILLER:  Objection, asked and answered.

21          But you can answer.

22    Q.    (By Mr. Johnson)  Not only did my client never

23  threaten or otherwise verbally or physically threaten

24  you, he never did that to Officer Shelley either, did he?

25    A.    No.

OFFICER JON  GRUBBS
January 28, 2021

1     Q.   So when he was running away and getting over

2   that guardrail, he was not, at that time, constituting

3   what you considered to be an active threat to you or

4   others.

5     A.   No, sir.  But I'm sure as you've read and that

6   was indicated in the report, once I began to gain ground

7   on him and he had hopped over the meadow area there of

8   the guardrail, that he did swing at me.

9     Q.   Okay.  Well, we're going to get to that.

10          Swinging at you is a big deal, isn't it?

11    A.   It can be.  Yes, sir.

12    Q.   Just like you say "stop" to somebody and they

13  don't stop.  Big deal.

14    A.   Yes, sir.  It can definitely become a big deal.

15    Q.   Not something that you would typically not

16  remember, right?

17    A.   I'm sorry.  Remember what?

18    Q.   If someone swung at you, whether it's their arm,

19  their legs, or anything, that's not something that you as

20  a police officer are going to forget.

21    A.   That is correct.

22    Q.   And certainly something you'd want to put in a

23  police report.

24    A.   That is correct.

25    Q.   And if you told other people about what

OFFICER JON  GRUBBS
January 28, 2021

1   happened, you would expect other people to remember -- to

2   a police officer -- that this person swung at me or

3   otherwise tried to hurt me.

4        A.   Yes, sir.

5             MS. MILLER:  Objection.

6             But you can answer.

7             MR. JOHNSON:  I apologize to you for

8   interrupting, Counsel.  Please go ahead.

9             MS. MILLER:  I was just putting an objection on

10  the record, but -- but Mr. -- Officer Grubbs can answer.

11            MR. JOHNSON:  Thank you.  I believe he already

12  answered.  Court reporter can you tell me, please.

13            THE WITNESS:  I -- I answered, sir.

14            THE COURT REPORTER:  Yes, it was, "Yes, sir."

15            MR. JOHNSON:  Okay.  Thank you.

16       Q.   (By Mr. Johnson)  Swinging at a police officer

17  like you or otherwise intentionally trying to kick,

18  swing, punch, push, whatever under certain circumstances

19  can be a felony, can't it?

20       A.   Yes, sir.  It can.

21       Q.   And it certainly can be a threat to you, can't

22  it?

23       A.   Yes, sir.

24       Q.   And again, something you know that you need to

25  report in a police statement about -- an official police

OFFICER JON   GRUBBS
January 28, 2021

1    statement about what happened.  It's certainly not

2    something you'd forget about.

3         A.   Yes, sir.  That is correct.

4         Q.   Same thing.  If a person like my client ignored

5    your commands, that's an important thing to include in an

6    official police report, isn't it?

7         A.   Yes, sir.  It is.

8         Q.   So you would expect -- as it relates to the

9    events involved in this instance, you would expect that

10   anybody that's going to be dealing with a review of this

11   situation, that they would know and record that you said,

12   "Stop"; my client didn't.  Right?

13        A.   Yes, sir.

14        Q.   And you would expect them to record and state

15   and know that my client allegedly swung at you, right?

16        A.   That is correct.

17        Q.   That's small details to leave out, agreed?

18   Correct?

19        A.   Yes, sir.

20        Q.   So my client gets to the guardrail.  And I want

21   you to kindly tell me when he is going over the guardrail

22   with one leg at a time as you've described, how close

23   were you to him when he was doing that?

24        A.   As Mr. Blasingame was making his way over the

25   guardrail, I had caught up with him pretty significantly

OFFICER JON  GRUBBS
January 28, 2021

1  and was almost able to reach out and grab him.

2       Q.   Okay.

3       A.   And at that time, he had already made his full

4  body over the guardrail.

5       Q.   Okay.  And I didn't get that last part.

6            What did he swing at you?

7       A.   It was one of his arms.

8       Q.   Left arm or right arm?

9       A.   I'm not 100 percent sure at this point in time.

10      Q.   Did he still have that piece of paper in his

11  hand that he -- that you saw on the roadway?

12      A.   I'm not sure.

13      Q.   So if his back is to you getting one leg over,

14  then the other leg over, help me to better understand.

15  Because when I think of someone swinging at me, it

16  typically involves them facing me.

17      A.   I believe he had turned around slightly and it

18  may have been his right arm that had made that swinging

19  type motion.

20      Q.   Okay.  And when you say a swing type motion, can

21  you show me.

22      A.   I believe it came from -- like this

23  (indicating).  It was that type of a motion.

24      Q.   So in essence, he had his arm relatively

25  straight, came from above, an extension out from his

OFFICER JON  GRUBBS
January 28, 2021

1  shoulder, and then brought it toward the front of his

2  body toward you?

3      A.   That is correct.

4      Q.   And did any part of his arm or hand touch you?

5      A.   No, it did not.

6      Q.   So I'll take it, you -- did you step back and

7  avoid it?  What did you do?

8      A.   It gave me a brief moment of pause.

9      Q.   Okay.  So what did you do?

10      A.   At that time, I continued to observe

11  Mr. Blasingame fleeing down the small dirt path --

12      Q.   Okay.

13      A.   -- towards the Windsor Street on-ramp.

14      Q.   Okay.  And I'll take it, then, you continued to

15  pursue him.

16      A.   At that time, I had stopped my pursuit.

17      Q.   Okay.  And what did you do?

18      A.   At that time, I drew my Taser and I deployed my

19  Taser at Mr. Blasingame.

20      Q.   When you deployed your Taser, were you still on

21  the road side of the guardrail or were you over top of

22  the guardrail and into the woods already?

23      A.   I believe I may still have been on the other

24  side of the guardrail towards the road, but I'm not a

25  hundred percent sure.

OFFICER JON  GRUBBS
January 28, 2021

1    Q.   So you claim that my client swung at you.  You

2  stayed on the same side of the guardrail, pulled out your

3  Taser, deployed the Taser all from the area of that

4  guardrail?

5    A.   That is correct.

6    Q.   You did not, that you recall, go over top of the

7  guardrail into the woods and Taser him while you were

8  actually in the woods?

9    A.   That is correct.

10    Q.   You did not give him a verbal warning of any

11  kind from the time that you even be- -- thought of or did

12  deploy the Taser until you deployed the Taser, did you?

13    A.   I did not give any verbal warning.

14    Q.   And you obviously had the time to do it.  You

15  just didn't do it.

16    A.   I did not give a verbal warning.

17    Q.   You had the time to do it, had you chosen to.

18  But you didn't do it.

19    A.   It was a very quickly evolving situation and --

20    Q.   Yes, sir.

21    A.   -- I did not give a verbal warning.

22    Q.   Right.  I understand that.

23         Back to my question.  You didn't give a

24  verbal --

25    A.   I do not believe I had time.

OFFICER JON  GRUBBS
January 28, 2021

1     Q.   Okay.  Well, now you just changed your answer.
2  Which one is it?
3     A.   I do not believe I had the time and I did not
4  give a verbal warning.
5     Q.   You did not give a verbal warning, sir.  But
6  that has nothing to do with the fact that -- but if you
7  gave a verbal warning, that it was somehow going to
8  endanger yourself.  Agreed?
9          MS. MILLER:  Objection.
10          But you can answer if you understand the
11  question.
12          THE WITNESS:  Mr. Johnson, if you want to repeat
13  your -- your baseline question again --
14          MR. JOHNSON:  Okay.
15          THE WITNESS:  -- and maybe I can give you a
16  better answer.
17     Q.   (By Mr. Johnson)  Thank you, sir.
18          We could agree you did not give a verbal warning
19  before you deployed the Taser, correct?
20     A.   That is correct.
21     Q.   Okay.  Now, the fact of the matter is no one
22  forced you to deploy your Taser; that was your choice,
23  correct?
24     A.   That is correct.
25     Q.   You could have left your Taser in your pocket,

OFFICER JON  GRUBBS
January 28, 2021

1   continued to go after him on foot.

2        A.   That is correct.

3        Q.   You could have hopefully caught up to him,

4   right?

5        A.   That is correct.

6        Q.   And then you could have tried to use your hands

7   and/or anything else to detain him and go from there.

8        A.   That is correct.

9        Q.   You didn't try any of that.  You are the one

10  that went from no physical interaction to Taser, correct?

11       A.   That is correct.

12       Q.   We can agree that if my client is running away

13  from you, had you been in fear for -- we already

14  established you were not in fear of your life at the time

15  you deployed the Taser, correct?

16       A.   That is correct.

17       Q.   All right.  But had you been in fear even not of

18  your life but of your safety, you didn't have to have any

19  interaction.  You could have just let him run.

20            MS. MILLER:  Objection.

21            THE WITNESS:  That is --

22            MS. MILLER:  Objection.

23            But you can answer.

24            THE WITNESS:  That is correct.

25       Q.   (By Mr. Johnson)  Okay.  The simple fact is that

1   you were trying to stop him from getting away in the

2   quickest way you could without using your firearm.

3        A.    Yes, sir.

4        Q.    How far do those probes shoot?

5        A.    I believe the Tasers at the time had a range

6   of -- I think an effective range of up to 25 feet.  I'm

7   not ex- -- 100 percent sure of that.

8        Q.    Okay.  When you shot the Taser -- the fact that

9   you didn't give a verbal warning, did -- has nothing to

10   do with you thought you were putting yourself or somebody

11   else in harm's way if you were to give them that verbal

12   warning.

13        A.    That is correct.

14        Q.    When you shot the Taser, could you even see the

15   hill?

16        A.    I saw the slight decline in the trail.

17        Q.    Are you aware of how many feet it is from the

18   guardrail down to the metal box that I'm going to assume

19   is some type of electrical type box?

20        A.    No, I'm not.

21        Q.    Do you know what that metal box is?

22        A.    My guess is it's some type of traffic control

23   device for GDOT.

24        Q.    Okay.  And obviously it's looks like a kind of a

25   locker type thing, right, big rectangle, right, with a

OFFICER JON  GRUBBS
January 28, 2021

1   handle?

2        A.   That is correct.

3        Q.   And it's on top of some type of a concrete slab?

4        A.   That is correct.

5        Q.   Had you ever heard in your career, Officer

6   Grubbs, about people being injured and/or killed by the

7   use of Tasers?

8        A.   In training, yes.

9        Q.   And I'll take it, that depending on the

10  situation, Tasers can be considered deadly force?

11       A.   We consider them to be a less lethal weapon.

12  They could result in serious injury or death.

13       Q.   Okay.  You know, I forgot to mention that --

14  we -- we talked about your -- your belt.  As opposed to

15  shooting the Taser, you could have gone over top of the

16  guardrail, we talked about and used, potentially nothing

17  if possible.  We don't know, right?

18       A.   Yes, sir.

19       Q.   You could have used that baton that's on the

20  right hip area?

21       A.   Yes, sir.

22       Q.   And at that particular point in time if he

23  resisted, you had your pepper spray still available;

24  right?

25       A.   That is correct.

OFFICER JON  GRUBBS
January 28, 2021

1      Q.    And then we work our way around the belt.

2  Obviously if you could get him down or even put his hands

3  behind his back voluntarily, you had your cuffs?

4      A.    That is correct.

5      Q.    And no doubt you knew that when you deployed the

6  Taser that Mr. Blasingame was -- had his back turned

7  toward you, correct?

8      A.    Yes, sir.

9      Q.    So you shot at and intended to shoot him in the

10  back?

11      A.    I did.

12      Q.    And I'll take it you said you used the Taser

13  many times -- or multiple times before and I'll take it,

14  you've seen people -- when they get Tased, you've seen

15  them fall to the ground.

16      A.    Yes, sir.

17      Q.    And much like folks who are taken to the ground,

18  folks who fall to the ground, there's always the

19  potential for them being injured when they fall.

20      A.    Yes, sir.

21      Q.    By hitting the ground in a particular way,

22  correct?

23      A.    That is correct.

24      Q.    You know that by using the Taser, it certainly

25  can debilitate somebody's legs and that's part of the

OFFICER JON  GRUBBS
January 28, 2021

1    reason for using it, so they can't get away?

2        A.   That is correct.

3        Q.   And when you take somebody's legs away while

4    they're walking or running, that could cause them to fall

5    to the ground hard, can't it?

6        A.   Yes, sir.

7        Q.   And if there's objects in the area, that can

8    cause them to fall to the ground and hit objects,

9    correct?

10       A.   That is correct.

11       Q.   And as we talked about before today, there's

12   always that possibility -- in other words, we call it

13   foreseeable -- that they can sustain serious injury

14   and/or death by hitting those things in a particular way.

15       A.   Yes, sir.

16            MS. MILLER:  Objection.

17            But you can answer.

18       Q.   (By Mr. Johnson)  So when you deployed -- when

19   you -- when you used the Taser, you could see that there

20   was, in fact, a decline; in other words, there was a

21   little bit of a hill there that went down.

22       A.   I could view a slight decline.  Yes, sir.

23       Q.   So that meant that you knew that if you hit

24   Mr. Blasingame in the back with the Taser, that he

25   conceivably could fall down that hill.

OFFICER JON  GRUBBS
January 28, 2021

1        A.    It was a possibility.

2        Q.    Can you tell me -- Officer Grubbs, tell me the

3   name, if you have one, of the one or more officers from

4   ATL who trained you that it was acceptable to shoot

5   somebody in the back with a Taser while they're running

6   away from you?

7        A.    I can't give you any specific names.

8        Q.    Did anybody from the Atlanta Police Department

9   ever tell you that you shouldn't shoot people in the back

10  with a Taser while they're running away from you?

11       A.    No, sir.  I was just advised as to what the

12  policy was and what exceptions were in the policy.

13       Q.    In fact, would you agree, Officer Grubbs, that a

14  reasonably prudent officer in that very position that you

15  were in at the split second before you deployed your

16  Taser would know that it would be unreasonable to utilize

17  that force with someone running away from you who is at

18  that point in time being investigated for a --

19  non-violent misdemeanor?

20            MS. MILLER:  Objection.

21            But you can answer.

22            THE WITNESS:  I can't see that, sir.  I can only

23  give you my mindset at the time.

24       Q.    (By Mr. Johnson)  You do not agree that it was

25  unreasonable use of force at that time?

OFFICER JON  GRUBBS
January 28, 2021

1      A.   I do not think it was unreasonable.

2      Q.   Are you aware that other officers in your

3   position would be -- could take the -- could reasonably

4   take that position, that it is unreasonable.  It's

5   excessive force.  Shouldn't do it.

6      A.   I have not heard that from anybody, so...

7      Q.   Okay.  I mean, do you -- do you believe that

8   somebody could look at that and be a reasonably prudent

9   officer and determine shouldn't use that amount of force

10  at that time like that?

11     A.   It's possible.

12     Q.   At the time on July 10, 2018, you were familiar

13  with the fact that the Taser -- this is pursuant to the

14  policy -- "shall not be deployed on subjects actively

15  running on foot from officers."  Were you aware of that?

16     A.   I was.

17     Q.   But that's exactly what you did.

18     A.   That is correct.

19     Q.   So 4.4.8, I'll read the whole thing.  "The

20  CEW" -- we've already talked about.  That's the Taser,

21  right?

22     A.   Yes, sir.

23     Q.   "Shall not be deployed against handcuffed

24  sub- -- subjects" -- well, we can agree my client was not

25  handcuffed, right?

OFFICER JON  GRUBBS
January 28, 2021

```
 1      A.   That is correct, sir.

 2      Q.   "Subjects actively running on foot from

 3 officers."  That's exactly what my client was doing.

 4      A.   That is correct.

 5      Q.   There are other -- I'll read the rest.  "Visibly

 6 pregnant women."  We can agree my client was not a

 7 visibly pregnant woman.

 8      A.   I don't believe he was.

 9      Q.   It says -- it does say in part of the policy

10 "the elderly," right?

11      A.   That is correct.

12      Q.   And I'll take it, you would agree with me a

13 65-year-old man is elderly.

14      A.   I would agree.

15      Q.   "Small children" doesn't apply, right?

16      A.   That is correct.

17      Q.   "Or visibly frail persons."  Did he look frail

18 to you or no?

19      A.   He did not look frail to me.

20      Q.   Okay.  "Unless exigent circumstances exist that

21 endanger the safety of the officer, suspect, or third

22 party."  You're familiar with that?

23      A.   Yes, sir.  I am.

24      Q.   Well, we've already been through this and you've

25 already agreed that when you shot the Taser -- when you
```

OFFICER JON  GRUBBS
January 28, 2021

1    deployed the Taser, you were not endangered because my

2    client was running away from you, correct?

3        A.   That is correct.

4        Q.   And you already agreed that you didn't think my

5    client was trying to hurt himself, so he wasn't -- he's

6    the suspect.  He wasn't endangering his own safety, to

7    the best of your knowledge.

8        A.   That is correct.

9        Q.   Or any third party, correct?

10       A.   I believe that he could have posed a danger to

11   traveling vehicles.

12       Q.   Okay.  But at the -- when you shot him, he's

13   nowhere near those vehicles.  You didn't know where he

14   was going to go, did you?

15       A.   He was heading that direction.

16       Q.   I understand.

17            But, Officer Grubbs, you're not going to really

18   tell me under oath, are you, that you shot my client in

19   the back with a Taser while he's running away from you

20   because you aware -- you were concerned for the safety of

21   the drivers on the roadway?

22       A.   That is exactly what I'm saying.

23       Q.   You don't think that's unreasonable?

24       A.   No, sir.  I don't given that many people that

25   flee in highway areas commonly reenter the highway.

OFFICER JON  GRUBBS
January 28, 2021

1      Q.   So I'll take it, you don't think you violated

2  that standard, 4.4.8?

3      A.   No, sir.  I don't think so.

4      Q.   Are you aware that that's one of the things that

5  GBI was investigating?

6      A.   I'm not aware as to what their specific probe

7  investigated.

8      Q.   Okay.  Were you aware that that's one of the

9  things that IA was investigating?

10      A.   I assume so.

11      Q.   Well, I -- we've talked about the potential for

12  people being injured when they fall.  At -- and have you

13  ever heard the term "an uncontrolled fall"?

14      A.   Yes, sir.  I have.

15      Q.   And that's certainly what can happen and

16  you know can happen and apparently did happen here after

17  my client was hit with the Taser.

18      A.   Yes, sir.

19      Q.   And you would agree that a reasonably -- a

20  reasonable police officer in your very position, right

21  before deploying the Taser, should consider the

22  environment; in other words, the -- where this -- the

23  person is standing.

24      A.   Yes, sir.

25      Q.   Okay.  Obviously, if somebody gets the Ta- --

OFFICER JON  GRUBBS
January 28, 2021

1  gets hit with a Taser and there's a hill that they're on,

2  it certainly could fall -- cause them to fall.

3       A.   I consider that is a possibility.

4       Q.   After the Taser was deployed, what did you see?

5       A.   I saw Mr. Blasingame fall forward.

6       Q.   And then what did you see?

7       A.   That is all that I saw and so I made my way down

8  the trail.

9       Q.   And then when you got down the trail, what did

10 you see?

11      A.   Mr. Blasingame was lying in a face-down manner

12 next to the traffic control box on top of a small slab of

13 concrete.

14      Q.   Was he moving when you got to him?

15      A.   No, he was not.

16      Q.   Did you ever see him move that you considered to

17 be voluntarily on his own?

18      A.   No.

19      Q.   Did you leave him face down on the ground like

20 the way it was when you first found him?

21      A.   When I first found him, yes.

22      Q.   Did you ever turn him over?

23      A.   Yes.  At some point.

24      Q.   You didn't turn him over right away, did you?

25      A.   I don't believe so.

OFFICER JON  GRUBBS
January 28, 2021

1    Q.   Why not?

2    A.   No particular reason.  I just didn't turn him

3    over right away.

4    Q.   Before you turned him over, were you able to see

5    the pool of blood underneath his head and face?

6    A.   Yes, I was.

7    Q.   So you knew -- or you suspected -- excuse me --

8    that he was injured.

9    A.   I did.

10   Q.   You didn't know if he was unconscious when he

11   was faced down, did you?

12   A.   I did not.

13   Q.   But you assumed that that was a possibility.

14   A.   At that time, he appeared to be unresponsive to

15   verbal stimuli.

16   Q.   Okay.  So you understood that he might be

17   unconscious.

18   A.   That is correct.

19   Q.   And although he was still face down, you saw the

20   blood, you knew that he might have sustained a head

21   injury.

22   A.   That was a possibility.

23   Q.   And you know that if someone sustains a head

24   injury, depending on the circumstances, it can be a

25   life-threatening event?

OFFICER JON   GRUBBS
January 28, 2021

 1      A.    I do.

 2      Q.    And immediate first aid is what's best for

 3   somebody in any type of a traumatic situation, but

 4   especially a head injury.

 5      A.    Yes, sir.  I would agree with.

 6      Q.    And yelling at somebody who's unconscious to

 7   keep breathing really doesn't help much medically, does

 8   it?

 9      A.    I would suppose not.

10      Q.    Okay.  Under the law as a police officer, my

11   client, when you got over to him, was clearly being

12   detained, wasn't he?

13      A.    Yes, sir.  I would say he was in custody.

14      Q.    Thank you.

15            When did he get in custody in your mind?

16      A.    When I had made contact with him.

17      Q.    By way of your Taser?

18      A.    I would say he was in custody when I had made

19   contact with him down near the box.

20      Q.    Okay.

21      A.    Had been in police custody at that point.

22      Q.    So without any question, my client was injured

23   in the course of you placing him into custody.

24      A.    I believe so.

25      Q.    Had he not been placed into custody -- we don't

OFFICER JON  GRUBBS
January 28, 2021

1  know -- obviously, no one has a crystal ball.

2          But the likelihood is he certainly wouldn't have

3  been injured in the way in which he was injured, to the

4  best of our knowledge.

5          MS. MILLER:  Objection.

6          But you can answer if you know.

7          THE WITNESS:  I suppose that's a possibility.

8      Q.   (By Mr. Johnson)  Had he not been taken to the

9  emergency room, your anticipation is you were going to

10  arrest him and take him to jail.

11     A.   Yes, sir.  If he was uninjured, yes.

12     Q.   And had it -- had he been uninjured, at least

13  from your knowledge, and then after you took him into

14  custody, took him to jail, found out that he was injured,

15  depending on the circumstances, then he might end up

16  going to the hospital.

17     A.   That is correct.

18     Q.   Okay.  And that -- and you understand that

19  that's part what a police officer does.  Has to evaluate

20  the physical injuries and if it looks like an immediate

21  medical emergency, you have an obligation to get aid to

22  my client.  You know that?

23     A.   Absolutely.

24     Q.   When he was down on the ground, you were

25  concerned that he was not breathing; hence, you kept

OFFICER JON  GRUBBS
January 28, 2021

1  saying to him, "Keep breathing," right?

2      A.   I was con- -- I believe at one point, I could

3  see that he was breathing, but they were very agonal,

4  shallow respirations.

5      Q.   And agonal, a-g-o-n-a-l, you know what that

6  means?

7      A.   Yes, sir.

8      Q.   Agonal breaths is what they call the person's

9  last breaths often right before they die; you know that,

10  don't you?

11      A.   I do.

12      Q.   So you saw him face down and heard him having

13  agonal breaths.  You had to at least be concerned that he

14  was in a position of potentially dying.

15      A.   I was.

16      Q.   And yet at that time, you did not render him

17  immediate medical care, did you?

18      A.   I immediately were very -- I -- I don't -- I

19  don't know the exact timeline, but shortly after the

20  Tasing event had occurred, I made the radio call for

21  medical assistance.

22      Q.   Okay.  Back to my question.  You, even as of the

23  time that you were concerned he had agonal breaths at

24  that time, did not have at all even -- I'll call it touch

25  him by way of trying to render him first aid, did you?

OFFICER JON  GRUBBS
January 28, 2021

1      A.    I had -- I did not touch him immediately.  That

2  is correct.

3      Q.    You understand as part of your first aid and CPR

4  training that one of the things that we try to do is to

5  try -- if we can, is to get somebody in a position that

6  allows them to breathe as easily as possible.  You know

7  that.

8      A.    That is correct.

9      Q.    And that's often on their back as opposed to

10  face down where their diaphragm and lungs are not allowed

11  to expand as much as if -- as if we are on our back.

12      A.    That is correct.

13      Q.    But you didn't go roll him over right away and

14  put him on his back, did you?

15      A.    I did not roll him over right away.

16      Q.    Did anybody train you, Officer Grubbs, that in

17  an officer-involved shooting or use of force event not to

18  give CPR or immediate training -- or aid right away?

19      A.    Every situation has its own set of

20  circumstances.

21      Q.    Are you finished with your answer?

22      A.    Yes, sir.

23      Q.    Have you or have you not ever learned from any

24  person from Atlanta Police Department that in an

25  officer-involved use of force where somebody may be

OFFICER JON  GRUBBS
January 28, 2021

1    seriously injured, that you might want to consider not

2    rendering immediate aid?  Have you ever heard that ever

3    from anybody in Atlanta?

4        A.    We are trained to administer aid when it's

5    possible.  It -- as soon as possible.

6        Q.    Okay.  You did not do that here, did you?

7        A.    I believe that I did.  My rendering aid was

8    getting help to him, in part, as soon as I could.

9        Q.    Okay.  At some point in time, you rolled him

10   over onto his back.

11       A.    That is correct.

12       Q.    We don't know when that was because your

13   camera's not on at that point.

14       A.    That's correct.

15       Q.    When did you turn your camera on?

16       A.    At some point during the incident, I went to hit

17   the record button and I realized that the device was off.

18       Q.    When in the incident did you first turn on your

19   body camera?

20       A.    I'm not sure how many minutes had elapsed before

21   that occurred.

22       Q.    Do you remember turning it on after you Tasered

23   him.

24       A.    Yes, I do.

25       Q.    And after you saw him on the ground.

OFFICER JON   GRUBBS
January 28, 2021

1      A.   At some point, yes, on the ground.

2      Q.   But then you turned it off?

3      A.   (No response.)

4      Q.   Right.

5      A.   I don't exactly recall.  It's the -- if it went

6   off, it went off.  I'm not sure.

7      Q.   It doesn't go off without you turning it off,

8   does it, Officer Grubbs?

9      A.   That toggle switch can be hit and it can

10   inadvertently go off.

11      Q.   Okay.  In this particular case, is it your

12   testimony that it went off for any reason other than you

13   turned it off?

14      A.   I'm not sure.  I don't know why it would have

15   gone off.

16      Q.   The Taser itself obviously has some video that

17   goes along with it as well, correct?

18      A.   That is correct.

19      Q.   Are you aware of anything that you or anybody

20   did to your on-body camera relative to erasing, otherwise

21   getting rid of footage that was there after you turned it

22   on?

23      A.   No, sir.  I am not.

24      Q.   I'm sure it's the same answer, but the same

25   thing with Shelley.  Are you aware of how his blank --

OFFICER JON  GRUBBS
January 28, 2021

1   camera went on for a few moments and then went off?

2        A.   No, sir.

3        Q.   Do you agree, Officer Grubbs, that's a -- kind

4   of an interesting coincidence, don't you think?

5        A.   I haven't seen any of his camera footage, so --

6   and I have not spoken with him about his camera.

7        Q.   Okay.  Your testimony is you called 911 right

8   away.

9        A.   Well, I don't call 911.  But yes, I contacted my

10  dispatcher.

11       Q.   Good point.  Sorry.  That was stupid.  I

12  apologize for the -- that question.  Do it again.

13            Your testimony is you think you called your

14  dispatcher and asked for medical assistance right away.

15       A.   Yes, sir.  Once I had assessed --

16       Q.   You think --

17       A.   -- the situation.

18       Q.   Sorry.

19            You think you did you that within a minute of

20  using the Taser?

21       A.   I do not know what the exact time frame was.

22       Q.   Do you think it was more or less than a minute

23  before you called?

24       A.   I just don't know.  I have never seen the

25  dispatch records for it, so I don't know.

OFFICER JON GRUBBS
January 28, 2021

1      Q.   Did you ever see Officer Shelley ever touch my
2  client?

3      A.   I can't recall.

4      Q.   Are you the one that turned my client over?

5      A.   I am, yes.

6      Q.   Tell me how you did that, please.

7      A.   I'm not exactly sure.  The exact manner from
8  what I can recollect, it -- it -- I turned him over from
9  the head of his body -- or towards the top of his body.

10     Q.   I'll take it, as you came down the hill, you
11 could see my client's head and, if you will, baseball cap
12 kind of right there next to that cement platform,
13 whatever you want to call it.

14     A.   Yes.

15     Q.   And so therefore, my client's head was closer to
16 the upcoming guardrail and that ramp that you were
17 talking about that his feet were?

18     A.   Yes.

19     Q.   Then you would have, therefore, kind of, if you
20 will, gone towards his left shoulder and body to roll it
21 over?

22     A.   That sounds about right.  Yes, sir.

23     Q.   And then once you did that, what did you see?

24     A.   That Mr. Blasingame appeared to be, as I stated
25 previously, unresponsive.  He was still breathing.  He

OFFICER JON  GRUBBS
January 28, 2021

1   did have a pulse.  And that he was bleeding, I believe,

2   from the head area.

3       Q.   And again, based on what you saw, he appeared to

4   be unconscious.

5       A.   Yes, sir.

6       Q.   And obviously, at that point, it appeared to you

7   that he had an open head wound.

8       A.   Of some type.  Yes, sir.

9       Q.   Okay.  When the -- when -- when you actually

10  fired -- deployed the Taser, I'll take it, Jerry was then

11  pretty much on top of the hill?

12      A.   My vantage point, he was still on the small dirt

13  trail.

14      Q.   Okay.  And you can see that's kind of a worn

15  path through there, right?

16      A.   Yes, sir.

17      Q.   Clearly people have gone there before.

18      A.   It appeared that way.

19      Q.   All right.  But again, then, when you actually

20  Tased him, he was on the path, but he was, if you will,

21  at the crest of the hill.

22      A.   My vantage point didn't allow for that.

23      Q.   Okay.  Tell me what you saw.

24      A.   That he was still on the dirt path.

25      Q.   But the dirt path goes down the hill, too.

OFFICER JON  GRUBBS
January 28, 2021

1    A.   Yeah.  I saw that the dirt path had a slight

2   decline.  I did not see anything else that was beyond

3   Mr. Blasingame.

4    Q.   Okay.  And have you been made aware -- you may

5   not, Officer Grubbs.  But did you go to the hospital at

6   all once my client went there?

7    A.   I went to the hospital some weeks later.

8    Q.   Are you aware of the numerous head, skull, and

9   facial fractures that my client suffered?

10    A.   I was never advised of the specific injuries.

11    Q.   Are you aware of his brain bleeds that he had?

12    A.   I --

13        MS. MILLER:  Objection.

14        But you can answer.

15        THE WITNESS:  Other than the general head

16   trauma, I was not aware of the specific injuries.

17    Q.   (By Mr. Johnson)  But -- so if he had actually

18   brain bleeds, you didn't know that per se?

19    A.   I did not.

20    Q.   If he had multiple right rib fractures, you

21   didn't know that?

22    A.   I did not.

23    Q.   If he, in fact, had significant neck injuries

24   requiring surgery, you didn't know that?

25    A.   That's correct.

OFFICER JON  GRUBBS
January 28, 2021

1    Q.   And without any question if those things that I

2  just mentioned to you are true as supported by the

3  medical record, no question he fell extremely hard that

4  day.

5         MS. MILLER:  Objection.

6         But you can answer.

7    Q.  (By Mr. Johnson)  Correct?

8    A.   All I can state is that he fell, yes.

9    Q.   Well -- okay.  If everything that I just said is

10 true, you do not dispute he fell and he fell extremely

11 hard to sustain those types of injuries, right?

12         MS. MILLER:  Objection.

13         But you can answer if you know.

14         THE WITNESS:  He fell.  I did not witness the

15 fall per se.  All I can say is that he did fall.

16    Q.  (By Mr. Johnson)  Okay.  Officer Grubbs, if the

17 injuries that I just outlined to you are, in fact,

18 accurate, you're not saying he sustained them in any

19 other way other than by falling that day due to you

20 Tasing him.

21         MS. MILLER:  Objection.

22         You can answer if you know.

23         THE WITNESS:  I can't state that he sustained

24 all those injuries that day.  I don't know.

25    Q.  (By Mr. Johnson)  Are you denying it?

OFFICER JON  GRUBBS
January 28, 2021

1      A.   I'm saying that I don't know.

2      Q.   Okay.  Well, you think it would be something

3  that you'd want to know?

4           MS. MILLER:  Objection.

5           You can answer.

6           THE WITNESS:  I'm -- I'm now informed, but I did

7  not know at the time.

8      Q.   (By Mr. Johnson)  Okay.  Not my question.

9           When were you first informed of those injuries

10 other than me just me asking you those questions here in

11 2021, two and a half years later?

12     A.   Those specific injuries?

13     Q.   Yes, sir.

14     A.   Right now.

15     Q.   Okay.  My question to you is:  If you -- well,

16 you shot somebody in the back with a Taser and they fell.

17 Apparently, you weren't interested in knowing what his

18 injuries were?

19          MS. MILLER:  Objection.  Is that a question?

20          MR. JOHNSON:  Yeah.

21          THE WITNESS:  I'm not --

22          MS. MILLER:  You can answer.

23          THE WITNESS:  -- I'm not exactly sure how you

24 want me to answer that.

25     Q.   (By Mr. Johnson)  Truthfully.

OFFICER JON   GRUBBS
January 28, 2021

1    A.   I did not know his injuries.  I was never told

2  and I never inquired.

3    Q.   Okay.  Have you sent him any letter, card,

4  anything to try to reach out to him at all?

5    A.   No, sir.  I have not.

6    Q.   Any member of his family, to the best of your

7  knowledge, or anybody on his behalf that you're aware of

8  ever try to contact you in any way?

9    A.   Not that I'm aware of.

10       MR. JOHNSON:  I'm going to run to the restroom,

11  folks, and then I'm going to go through some photographs

12  and videos.

13       THE VIDEOGRAPHER:  Going off the record.

14  Universal time is 1803.  We are now off the record.

15              (Whereupon, a recess was taken.)

16       THE VIDEOGRAPHER:  All right.  Stand by, please.

17       We're now back on the record.  The universal

18  time is 1845.

19       MR. JOHNSON:  All set everybody?

20       THE COURT REPORTER:  Yes.

21       MR. JOHNSON:  Thank you.

22    Q.   (By Mr. Johnson)  Officer Grubbs, a while back

23  we were talking about some other incidents and I just

24  wanted to go through some in your earlier days with the

25  force.

OFFICER JON  GRUBBS
January 28, 2021

1              Incident Number 15-3510493-00.  It's a use of

2      force incident where you apparently -- I think you used

3      the Taser on a subject involved in the arrest at a bus

4      station.  Does that ring any bells?

5          A.   You said that was 2015?

6          Q.   I don't have -- well, the first number is 15.

7      Does that mean to you probably 2015?

8          A.   Yes.

9          Q.   Okay.  Does --

10         A.   On the -- I vaguely remember the incident.  Very

11     vaguely.

12         Q.   What I have -- and this is part of the GBI

13     investigation where they were given access to your

14     personnel file.  And here's what it says.  "APD received

15     a 911 call from the bus station of a criminal trespass

16     because someone was getting onto a bus without a ticket."

17              Does that sound familiar?

18         A.   I have no reason to dispute that.

19         Q.   Okay.  Apparently, this gentleman refused to

20     obey your commands and began to walk away.  Says, "Grubbs

21     deployed his Taser and struck the suspect in the left

22     stomach and left forearm."

23              Does that sound right?

24         A.   If you say it -- say it is.  I have no reason to

25     dispute.

OFFICER JON  GRUBBS
January 28, 2021

1      Q.    I'm not saying it is, but apparently GBI is.

2   And so I'm asking you.

3      A.    Yes.

4      Q.    Okay.  Suspect fell to the ground.  You arrested

5   him.  It looks like you were cleared of -- in terms of no

6   violations.  Does that sound right?

7      A.    That part does.  Yes, sir.

8      Q.    2016 --

9           MS. MILLER:  Mr. Johnson?  I'm sorry.

10           MR. JOHNSON:  Yes.

11           MS. MILLER:  Will you be introducing this

12   document for the record?

13           MR. JOHNSON:  No.  I didn't -- but if you want

14   me to, I will.  I don't -- I wasn't going to, but I'm

15   happy to if you want me to.

16           MS. MILLER:  Sure.  I mean, I just can't see

17   what you're looking at, so I don't know what is actually

18   on that document.

19           MR. JOHNSON:  Okay.  Happy to.  Let's call this

20   Exhibit 2 and it's entitled "Georgia Bureau of

21   Investigation Region 10 Investigative Summary."  On the

22   bottom right, it says "Exhibit 21" and there's five

23   pages.

24           Maddie, can you put that up so Counsel can see

25   it.

OFFICER JON  GRUBBS
January 28, 2021

1           MS. SINKOVICH:  Yes, I can.  I just was going to

2   ask.

3           MR. JOHNSON:  Appreciate it.  Thank you.

4           MS. SINKOVICH:  All right.  Here is the first

5   page and the -- he's reviewing the incident right here

6   (indicating).

7      Q.   (By Mr. Johnson)  So on page 2 of 5, last full

8   paragraph, Officer Grubbs, you want to take a look at

9   that.  That's the incident number that you -- it starts

10  with 15, so we think it's 2015.

11          And without going back through the whole thing,

12  did I generally speaking --

13     A.   No, I'm -- I'm sorry.  I see this is page 2

14  of 5.  Are we able to view page 1 real quick.

15          MS. SINKOVICH:  Sure.

16          THE WITNESS:  Thank you.  Just give me a moment

17  to read over that, please.

18          MR. JOHNSON:  Yep.

19          And for the record, it says on page 1 of 5 at

20  the top, that, "On Wednesday July 25, 2018 at

21  approximately 10:10 a.m., Special Agent Steve McCallum,

22  M-c-C-a-l-l-u-m, was located at the Atlanta Police

23  Department headquarters" -- gives the address -- "for the

24  purpose of reviewing Jon Grubbs's personnel file.  The

25  investigative act was in reference to a request from APD

OFFICER JON  GRUBBS
January 28, 2021

1  to Georgia Bureau of Investigation in order to

2  investigate officer-involved use of force incident

3  resulting in injuries to Jerry Blasingame."

4        Did I read that right, Officer?

5     A.   Yes, sir.

6     Q.   So at least according to this document,

7  Exhibit 2, Atlanta Police Department apparently did ask

8  the GBI to become involved based on what it says, right?

9     A.   That is correct.

10    Q.   Thanks.

11       Page 2 of 5, last paragraph, did I, generally

12  speaking, refer to that appropriately in my questions

13  that we've already gone over?

14    A.   Yes, sir.  I'm clear on that.  Thank you.

15    Q.   Look at page 3 of 5.  At the top it says,

16  "Incident Number 12 -- 16-0903240."  You see the top

17  paragraph I'm talking about, Officer Grubbs?

18    A.   I do.

19    Q.   Thank you.

20       You were arresting a suspect.  "Suspect ran on

21  foot through heavy traffic away from Grubbs.  Suspect

22  took a fighting stance.  Grubbs attempted to grab the

23  suspect.  Suspect pulled away."  You deployed your Taser.

24  Apparently, there -- he had thick clothing, so the Taser

25  didn't take hold.  He pushed off of you.  You tackled

OFFICER JON  GRUBBS
January 28, 2021

1   him, arrested him.

2          And were cleared of any violations, correct?

3   Any --

4      A.   Yes, sir.

5      Q.   -- any -- any memory at all of what that

6   gentleman did that required you to arrest him?

7      A.   No, sir.

8      Q.   Okay.

9      A.   Not specifically.

10     Q.   Next paragraph down, same page 3 of 5.  Incident

11  16-1470052.  You were assisting another officer with the

12  arrest of a suspect of a stolen automobile.  He refused

13  to obey commands.  You attempted to get him out of the

14  vehicle.  You deployed your Taser.  He fell to the

15  ground.

16         After the first cycle, suspect still refused to

17  obey commands.  You delivered second cycle.  Suspect

18  refused to comply.  You delivered two knee strikes to the

19  suspect's back.  And then you got him handcuffed and

20  cleared all charges, right?

21     A.   That is correct.

22     Q.   Next incident, bottom of page 3 to top of

23  page 4, 16-0910406.  Suspect fled on a bicycle.  You were

24  ordered to stop.  You pushed the suspect off of the bike.

25  Suspect hit the ground.  Grubbs was able to detain the

OFFICER JON  GRUBBS
January 28, 2021

1    suspect without incident.  The suspect refused medical

2    treatment.  And use of force, you were cleared, right?

3        A.   Yes, sir.

4        Q.   Any memory of the bike incident, what that guy

5    did?

6        A.   I have a vague memory of the incident.  I

7    believe he was stopped for traffic violations in a high

8    drug and crime area, at which time the suspect fled from

9    officers.

10       Q.   Okay.  So you got him for a traffic violation

11   when you arrested him.  I'll take it, no drugs?

12       A.   I cannot remember if he was a wanted subject or

13   he had any type of narcotics on his person.  I would have

14   to look at that report.

15       Q.   Okay.  Well, to be fair, if he had any of that

16   going on, that would likely be put that in your personnel

17   file as well, right?

18       A.   Possibly.  I'm not sure.

19       Q.   All right.  Still page 4 of 5, next incident

20   date (sic) is 15253061.  The suspect busted through the

21   officers and damaged the front door at a Holiday Inn

22   hotel.  Chased the subject.  You Tasered him, it looks

23   like, twice and he fell to the ground.  And you were

24   cleared of all charges; am I right?

25       A.   Yes, sir.

OFFICER JON  GRUBBS
January 28, 2021

1    Q.   Do you have memory at all what the gentleman

2  did?

3    A.   I believe it was a criminal trespass suspect on

4  PCP.

5    Q.   Oh.  Okay.  What's a -- what's a record of

6  counseling?

7    A.   That's like a written warning --

8    Q.   Okay.

9    A.   -- essentially.

10   Q.   You rudely interrupted radio traffic and shouted

11  on the radio.  Any memory of that?

12   A.   Yes.

13   Q.   What happened?

14   A.   I believe it was in reference to a prowler or a

15  burglary in progress.  And I yelled at somebody to get

16  off the radio because I needed to get on the radio, so...

17   Q.   (Laughing)  Sorry.  I didn't mean to laugh.

18   A.   Oh, no.  That's -- you know.

19   Q.   You were -- you were trying to get through to --

20  to -- obviously to arrest somebody to do your job and

21  apparently, other folks were chatting.

22   A.   We have multiple channels you can chat on aside

23  from the main dispatch channel.

24   Q.   Amen.  Understood loud and clear.  All right.

25       Oh, here's -- I love this one.  September 8th,

OFFICER JON  GRUBBS
January 28, 2021

1  2016, you got a record of counseling because you left a

2  patrol car with an empty tank of gas.

3      A.   Oh, yep, I remember that.

4      Q.   Apparently, it's your job to fill it up if you

5  use it during the day?

6      A.   Yeah.  That was really just a difference of

7  opinion and -- and -- with, you know, other officers.

8      Q.   Understood.  All right.  That's all the

9  questions I have for that.  Thank you.

10          MR. JOHNSON:  Let's go back to Exhibit 1,

11  please, Maddie, the call for service.

12          And while we're pulling that up, please,

13  Ms. Miller, did you happen to get that blue sheet for us?

14          MS. MILLER:  I don't have it yet, but it has

15  been requested.

16          MR. JOHNSON:  Thank you very much, ma'am.  I

17  appreciate it.

18          MS. SINKOVICH:  The call for service is on the

19  screen.

20          MR. JOHNSON:  Thank you.

21      Q.   (By Mr. Johnson)  Officer, this is Exhibit 1,

22  two pages, but we're on page 1, a call for service.  Do

23  you have that in front of you?

24      A.   Yes, sir.  I do.

25      Q.   When we were beginning to discuss this, I put

OFFICER JON  GRUBBS
January 28, 2021

1    aside because I think you told me earlier that this

2    was -- you called in and this was aft-  -- really

3    generated after the incident.  Correct?

4        A.   Yes, sir.  I believe so.

5        Q.   Thank you.

6             The call-taker is B. Battle, B-a-t-t-l-e.

7    That's just -- is that just a dispatcher person, correct?

8        A.   Yes, that would be the Zone 5 dispatcher on at

9    that time.

10       Q.   And -- and can you tell me -- basically, this is

11   the document that gets produced to kind of -- you called

12   them to let them know there was an incident?

13       A.   Yes, sir.

14       Q.   Anything else that it's designed for, as far as

15   you know?

16       A.   Really not much, I guess, that I could elaborate

17   on unless you have, you know, specific questions as to

18   each section.

19       Q.   Okay.  I'm going to go through them, but I just

20   wanted to know from your perspective, this document,

21   it -- what's it really used for other than kind of just

22   confirming, if you will, that you had a reported

23   incident, if you will?

24       A.   Yes, sir.  I would agree with that,

25   documentation purposes.

OFFICER JON  GRUBBS
January 28, 2021

1        Q.   Okay.  About a third of the page down on page 1,

2   it says, "Caller information" and then next to source,

3   s-o-u-r-c-e, it says, "self-initiate."

4            Do you have any idea what that means?

5        A.   To the best of my knowledge, that means it was a

6   self-initiated call by an officer.

7        Q.   Thank you.

8            We're at the next couple lines down, it says,

9   "Police 181911170."  That's just the incident number?

10       A.   Yes, sir.  That -- yeah, that is one of the

11   computer-aided dispatch numbers for that incident.

12       Q.   Okay.  Underneath that the title is, "Incident

13   Times" and then it says, "E-911 arrived at 14:38:05."  Do

14   you know what E-911 means?

15       A.   Emergency 911.

16       Q.   And what does that mean?

17       A.   If a citizen calls 911, in that time block, that

18   will be the first time that appears.

19       Q.   Got it.

20            And so there's no time there, so does that mean

21   that no one called 911?

22       A.   That would be my assumption due to it being a

23   self-initiated call.

24       Q.   Okay.  And do you see anything on this document,

25   at least so far, that says what time you called in?

OFFICER JON  GRUBBS
January 28, 2021

1      A.   My call-in time would appear to be 1438 and five

2  seconds.

3      Q.   So where it says arrived 14:38:05, you think

4  that's your call-in time?

5      A.   Yes, sir.

6      Q.   Any idea -- and I don't know that you would --

7  that's 2:38 p.m., of course, correct?

8      A.   That is correct.

9      Q.   But do you have any idea in terms of calibration

10 at -- of the time and all of that stuff whether that's

11 accurate?

12     A.   I would assume so.  I have no reason to believe

13 that it's not accurate.

14     Q.   Thank you.

15          The incident title above that lists as -- it

16 says, "Received," has that same time, that 2:38 and five

17 seconds as well, correct?

18     A.   Yes, sir.

19     Q.   And then dispatch, next to that to the right, is

20 again the same time.

21     A.   That is correct.

22     Q.   And dispatch -- who's dispatch, if you know?

23     A.   Normally, those two times will be the same for

24 self-initiated calls.

25     Q.   Do you think this is when you called in and --

OFFICER JON  GRUBBS
January 28, 2021

1   and -- after the incident and asked for the ambulance?

2       A.   I believe so.

3       Q.   Underneath that it says, "Primary unit 5575."

4            Who's that?

5       A.   That is me.

6       Q.   Is that a -- is that the car or is that just --

7   that's your --

8       A.   That is my -- that's my radio number.

9       Q.   Radio number.  Okay.

10      A.   That's what I would be referred to on the radio.

11      Q.   Is 5575?

12      A.   Yes, sir.

13      Q.   Okay.  And then where -- it lists your name and

14  the 6416.  Is that your badge number?

15      A.   That is my department ID number.

16      Q.   Okay.  Do you know why under "Officer 2," that

17  Officer Shelley's not listed there?

18      A.   I do not know why.

19      Q.   The SEC units and there's four different numbers

20  there.  Any idea what those pertain to?

21      A.   That's secondary units.

22      Q.   Okay.

23      A.   The first unit is a beat car.

24      Q.   3506 is a beat car?

25      A.   Yep.  For beat 506 in Zone 5.

OFFICER JON  GRUBBS
January 28, 2021

1    Q.   Do you know who that is or was?

2    A.   I do not.

3    Q.   And then 5578, what's that?

4    A.   That is Officer Shelley.

5    Q.   5593?

6    A.   That is Sergeant Aaron Zorn -- or Lieutenant

7    Aaron Zorn now.

8         THE COURT REPORTER:  Can you spell that for the

9    record, please.

10        THE WITNESS:  A-a-r-o-n, Z-o-r-n.

11   Q.   (By Mr. Johnson)  And what was his relationship

12   to these events?  Is he a supervisor or something?

13   A.   He was my supervisor.

14   Q.   And then 7334?

15   A.   That is a crime scene unit.

16   Q.   Do you know who that is?

17   A.   I do not know who the technician was.

18   Q.   Then underneath that is a bunch of numbers and

19   information pertaining to unit, u-n-i-t, times.  And of

20   course, you told us that Unit 5575 is you.

21        So that first time that's listed there, do you

22   know -- under CMD where it says "S-I," do you have any

23   idea what that means?

24   A.   I do not know what those -- what that particular

25   column is referring to.

OFFICER JON  GRUBBS
January 28, 2021

1    Q.   Okay.  And again, we got the same time, what we

2    talked about, about 2:38 p.m. and five seconds.  In

3    remarks, "I-20 eastbound I-75, hyphen, 85 northbound."

4         Would that be your called-in location?

5    A.   Yes, sir.  That was the location that was given.

6    Q.   All right.  I think I wrote down that you told

7    me 5593 was Lieutenant Zorn.  And it looks like he -- his

8    times are somewhere around 2:39.

9         Any idea what those numbers mean?

10   A.   Those may have been him copying the call,

11   acknowledging the call.

12   Q.   Got it.

13        5575 -- oh, that's you again.  So where it says

14   2:41:40 -- oh, let me go back.

15        Your number of 5575 and then under CMD, it says

16   "R-L."  Know what that is?

17   A.   I do not.

18   Q.   Then the time to the right of that is 2:41, so

19   2:41 p.m. and 40 seconds.  Then it has you on I-75/-85

20   Northbound Expressway southwest, I-20 Eastbound

21   Expressway southwest.  Any idea what that pertains to?

22   A.   I do not.  On -- my best guess would be it's

23   just me communicating with the dispatcher in some

24   fashion.

25   Q.   Okay.  Are there -- I guess I'm dating myself by

OFFICER JON  GRUBBS
January 28, 2021

1   calling them tapes, Officer Grubbs.  But is that -- are

2   there recordings of this going back and forth that you're

3   aware of?

4       A.   I'm not aware of recordings, but my guess is

5   there are.

6       Q.   Okay.  I'm on page 2 of Exhibit 1, please, sir.

7       A.   Okay.  I see that.

8       Q.   The last entry for that first string of numbers

9   5575, at U under CMD says "R-T."  Any idea what that

10  means?

11      A.   No, sir.

12      Q.   Then it lists 4:05 p.m. and 28 seconds.  And I'm

13  not even going to read all of those letters and numbers,

14  but the thing I do see there is "Blasingame."

15           Do you have any idea that number next that

16  starts with X-2, M as in Mary, D as in David, A-W, et

17  cetera what all that means?

18      A.   I have no idea.  Best guess is it's just some

19  kind of dispatch code that I'm not aware of.

20      Q.   Okay.  Thank you.

21           Do you know who 7334 is?

22      A.   That is a crime scene unit.

23      Q.   Okay.  Going now to under CAD narrative, do you

24  have any idea what that means?

25      A.   That's the computer-aided dispatch narrative.

OFFICER JON   GRUBBS
January 28, 2021

1      Q.   Okay.  So that first line at 2:38:05 when we

2   know you called in, according to this document at least,

3   user ID being 7192, do you know who that is?

4      A.   That looks like it's probably the dispatcher's

5   ID number.

6      Q.   Okay.  Other remarks, "Patient" -- it says "P-T

7   not conscious.  Unit advised subject not conscious on the

8   20 eastbound ramp to I" -- it looks like 75 right on the

9   next -- on the second line below?

10      Thank you.

11         "I-75.  Blackwell copied."  Who's Blackwell?

12      A.   If you slide over in -- you'll see the word

13   S-U-P-V.  That's supervisor.  So most likely that's a

14   communication supervisor copying the call.

15      Q.   Okay.  Thank you.

16         The -- if you go down the times underneath that,

17   that starts, of course, at 2:38:28.  Other than locations

18   of folks, do you understand any of those words, letters?

19         Under ATL, that I can figure out, but is this --

20   is this at all meaningful to you?

21      A.   Yes, sir.  Most of it is.

22      Q.   Would you tell me.

23      A.   These are the codes that are used in every

24   computer-aided dispatch.  City, ATL, Atlanta.  RD and

25   beat are the same thing.  It's 304.  This occurred on

OFFICER JON  GRUBBS
January 28, 2021

1    304's beat in Zone 3.  If you see where it says

2    "Type 20," to me that means a Taser was deployed.

3        Q.    Ah.  How about two lines above that, C-A, 05,

4    and 03?  Mean anything?

5        A.    I'm not sure what 05 means.  03 probably means

6    Zone 3.

7        Q.    Okay.  And then where it says "D-H-P-T"?

8        A.    I'm not familiar with that particular code.

9        Q.    Okay.  How about "Type," t-y-p-e, "2-0-T"?

10       A.    That is a code for a Taser being deployed.

11       Q.    Okay.  Now, if we look to left of that, it says

12   "2:40:09."  Do you see that?

13       A.    Yes, sir.  I do.

14       Q.    Any idea what -- what's that means?  I know

15   2:40, but why -- it's, like, two minutes later from the

16   initial call after the events.  Is this just you letting

17   them know that you deployed your Taser?

18       A.    It may be and it may be just when the dispatcher

19   entered that into the call.

20       Q.    Okay.  And so it's -- so where it says "Type

21   2-0-T" and then the number 54.  So Taser and what does

22   the 20 or the 54 mean, if you know?

23       A.    The 20-T.  The 20-T specifically means a Taser

24   being deployed.  And then the 54 is a code for a

25   suspicious person.

OFFICER JON  GRUBBS
January 28, 2021

1      Q.   Okay.  Got it.

2      A.   And that would be the call type, if you will.

3      Q.   Thank you, sir.

4           Next line where it says L-O-C, like, is that

5    location?

6      A.   Yes, sir.

7      Q.   And then a couple more lines down, I see Grady.

8    I know that's the hospital where my client was taken.  Do

9    you know if that's what that means?

10     A.   On -- that most likely means when the Grady EMS

11   unit was on scene.

12     Q.   So we see Grady O-S for on scene.  You think

13   that's at 2:48.

14     A.   That's what it looks like.  Yes, sir.

15     Q.   You're good, Officer Grubbs.  I'm looking at the

16   Grady EMS run sheet on page 3 of 7.

17          MR. JOHNSON:  So let's -- we'll mark the EMS run

18   sheet as Exhibit 3.

19               (Whereupon, Plaintiff's Exhibit No. 3 was

20               marked for identification.)

21     Q.   (By Mr. Johnson)  So Exhibit 3 Grady EMS run, do

22   you see page 3 of 7 in the bottom paragraph --

23          MS. SINKOVICH:  It's not on the screen at the

24   moment.

25          MR. JOHNSON:  Okay.

OFFICER JON  GRUBBS
January 28, 2021

1          MS. SINKOVICH:   Okay.

2      Q.   (By Mr. Johnson)  that the call came in at 2:38

3  and then when I go down, it looks like they dispatched at

4  2:39 and en route 2:39.  On scene at 2:46 -- just like

5  you told me -- and 2 seconds.

6          So there's a whopping two-second difference

7  between the dispatch and their records.  So pretty

8  consistent.  Thank you for telling me that.  Appreciate

9  it.

10          Do you remember them being on scene at all?

11     A.   I do.

12     Q.   It says that they came on scene, at least on

13  their run sheet -- so Exhibit 3, page 3 -- that they were

14  on scene at 14:46:02, so 2:46 p.m. and 2 seconds and they

15  got to the patient at 2:48 even.

16          Do you have any idea what took them 2 minutes to

17  get there?

18     A.   I believe myself or Officer Shelley -- I cannot

19  remember which -- we had made contact with them on the

20  ramp.  And I can only assume that that slight delay may

21  have been them getting their equipment ready --

22     Q.   Okay.

23     A.   -- and making their way down to the actual

24  scene.

25     Q.   Do you have a memory of talking to the folks

OFFICER JON  GRUBBS
January 28, 2021

1  with the Grady EMS?

2      A.   I do have a memory of speaking with the

3  paramedics.

4      Q.   What did you tell them?

5      A.   I informed them that Mr. Blasingame had fled

6  from us.  That he was Tased.  That he was unresponsive.

7  And that's about all I can remember.

8      Q.   Okay.  Did you tell him that he took a -- that

9  he, quote, made a swing type motion towards you?

10     A.   I don't remember if I specifically told them

11  that or not.

12     Q.   If their report does not say anything about him

13  making a swinging type motion at you or anything to do

14  with a punch or anything at all, would you take issue

15  with that?

16     A.   I would not.

17     Q.   Okay.  In other words, it's simply possible that

18  you didn't mention that to them.

19     A.   That's possible.

20     Q.   Going back to Exhibit 1, the call for service at

21  the 3:39 and 10 mark, "R-I related" and it has another

22  long number.  Any idea what that means?

23     A.   And I'm sorry.  What are you looking at

24  specifically, sir?

25     Q.   I apologize.  Back to Exhibit 1.  Oh, I forgot

OFFICER JON  GRUBBS
January 28, 2021

1  you don't have it in front of you.  I apologize.  I

2  forget we're doing it via Zoom.

3          MS. SINKOVICH:  It's on the -- it's on the

4  screen now.

5          MR. JOHNSON:  Thank you.

6      Q.   (By Mr. Johnson)  So on page 2 of Exhibit 1 --

7      A.   Uh-huh.

8      Q.   -- two lines from the bottom at 3:39:10, it

9  says, "R-I related" and it has a number.

10         Do you have any idea what that means?

11     A.   Can we go back to the first page, please, the

12  first page for the calls for service.

13     Q.   Absolutely.

14     A.   If you look under related incident numbers.

15     Q.   Right.  The --

16     A.   You'll see --

17     Q.   -- the first page right?

18     A.   Yep.  You'll see police, sheriff, and fire.

19     Q.   Yes.

20     A.   I believe that's the same number -- the same CAD

21  number for that number.

22     Q.   It's the same CAD number for the police.  It is,

23  yes.  Yeah.

24     A.   So I -- my -- my only assumption or my best

25  guess, sir, would be that there were possibly two

OFFICER JON  GRUBBS
January 28, 2021

1   different computer-aided dispatches created and that the

2   dispatcher in the narrative is just saying that those two

3   calls are the same.

4       Q.   Okay.  Thank you.

5           And then back to that second page of Exhibit 1,

6   the last line at 4:16:27, M and then for F-I-R with a

7   number sign and another number.

8           Can you tell me what that means, if you know?

9       A.   So this incident also generated a response by

10  Atlanta Fire and Rescue.

11      Q.   Yep, that's the -- that's on that related

12  incident number that's on page 1 you just pointed us to.

13      A.   Yep.  So that is their specific computer-aided

14  dispatch number.

15      Q.   Okay.  Thank you.  Okay.

16          Officer Grubbs, I'm going to go through some

17  photos that we got from Atlanta Police Department.

18          MR. JOHNSON:  We're going to mark these photos

19  as Exhibit 4.

20              (Whereupon, Plaintiff's Exhibit No. 4 was

21              marked for identification.)

22      Q.   (By Mr. Johnson)  And then -- I've already asked

23  Maddie to put them in a particular order and I'm going to

24  refer to -- on the bottom right.  And you're talking

25  about a guy with trifocals and I still can't read the

OFFICER JON  GRUBBS
January 28, 2021

1    numbers on some of them because the numbers are so small.

2          But there is a -- what we call a Bates stamp on

3    these photos at the bottom right.  So I'm going to refer

4    to the Bates number.

5          The first one I'm going to talk to you about

6    is -- so this will -- we're going to call the whole group

7    of -- Exhibit 4 and this is --

8          MR. JOHNSON:  No. 232 please, Maddie.

9                (Whereupon, Photograph No. 232 was

10               presented for review by the witness.)

11   Q.   (By Mr. Johnson)  Is that you, sir?

12   A.   Yes, it is.

13   Q.   Do you remember after this incident that the

14   crime unit was taking some photographs?

15   A.   I do remember that they had responded to the

16   scene.

17   Q.   And the fact that you're standing here at the

18   guardrail, is -- are you standing there because that's

19   where you believe that you shot the Taser?

20   A.   Yes, sir.  I believe that was the purpose of

21   this photograph.

22   Q.   Okay.  And did the crime unit tell you where to

23   stand?

24   A.   They may have.  I don't specifically recall.

25   Q.   Okay.  This is one of those photos I talked

OFFICER JON  GRUBBS
January 28, 2021

1    about earlier today about the belt.

2            You want to take a look at that and tell me if

3    anything is different than what we were talking about

4    earlier.

5        A.   Everything appears to be consistent with my

6    previous statement.

7        Q.   Thank you, sir.

8            The next one is 233.

9                    (Whereupon, Photograph No. 233 was

10                   presented for review by the witness.)

11       Q.   (By Mr. Johnson)  It's kind of a closer up over

12   your left shoulder, correct, sir?

13       A.   Yes, sir.

14       Q.   And again, you're still standing at that

15   guardrail.

16       A.   Yes, sir.

17       Q.   All right.  And this is the similar location to

18   where my client went over the guardrail and onto the path

19   that we see kind of in front of your left arm.

20       A.   That is correct, sir.

21       Q.   And that's the area where he was standing when

22   you told us earlier that he made a swinging type motion.

23       A.   That is correct.

24       Q.   All right.  He didn't try to punch you, right?

25       A.   I'm not exactly sure what his intention was.  If

OFFICER JON  GRUBBS
January 28, 2021

1   it was just trying to swat at me to get away or what his

2   exact intention was.

3       Q.   Okay.  But you obviously -- I mean, when I hear

4   swinging type motion, you -- you're certainly familiar

5   with the word "punch."

6       A.   Yes, sir.  I'm familiar with that.

7       Q.   And you didn't use punch because it wasn't a

8   punch.

9       A.   No, sir.  It was an open hand, if I remember

10  correctly.

11      Q.   All right.  And I think you told us that when he

12  made that motion, you were relatively close to him.

13      A.   Yes, sir.

14      Q.   It did not come into contact with your person in

15  any regard.

16      A.   No, sir.

17      Q.   How close do you think you were to him at that

18  time, meaning his chest area to your chest area?

19      A.   I would say within four to five feet --

20      Q.   Okay.

21      A.   -- if I had to guess.

22      Q.   Did you -- did you kind of, if you will, jump at

23  him and try to grab him?

24      A.   I believe at one point, I did try to grab him,

25  but I was unable to do so.

OFFICER JON  GRUBBS
January 28, 2021

1    Q.   So you tried to grab him?

2    A.   It's -- it's possible.  I don't exactly recall

3    100 percent.

4    Q.   Okay.  So -- because I haven't seen anywhere in

5    any report or anything -- so you -- you cannot say that

6    you -- after he made a swinging type motion at you with

7    an open hand, you can't say that you tried to grab him.

8    A.   I can't say that for 100 percent.  No, sir.

9    Q.   All right.  So when that occurred between the

10   two of you -- in other words, when he made the swing type

11   motion -- you believe the guardrail was in between the

12   two of you.

13   A.   Yes, sir.

14            (Whereupon, Photograph No. 234 was

15            presented for review by the witness.)

16   Q.   (By Mr. Johnson)  Picture No. 234, pretty

17   similar view, but just another one from kind of behind

18   the right side of your body.

19   A.   Yes, sir.  That appears to be consistent.

20   Q.   Thank you.

21            And looking around the right side your body, I

22   think -- and your utility belt, no changes from what you

23   told me before, right?

24   A.   That is correct, sir.

25   Q.   Thank you.

OFFICER JON  GRUBBS
January 28, 2021

1          MR. JOHNSON:  Photograph -- oh, boy.  Here we

2     go.  Hold on.  I have to get into what -- the trifocals

3     can't read it, so here we go.  237.  237, please.

4                    (Whereupon, Photograph No. 237 was

5                    presented for review by the witness.)

6          Q.   (By Mr. Johnson)  And I'll take it, that's you

7     standing in the similar area right next to the guardrail

8     like we've seen in the last few; whereas, the camera is

9     on the path and already kind of starting down the hill.

10         A.   That appears to be the view.  Yes, sir.

11         Q.   And then if I look at between the L and the I,

12    do I see part of that body cam?

13         A.   I -- it actually -- if you look closely, it

14    looks like the body camera is actually above the O and

15    the L.

16         Q.   Okay.  Thank you.

17              Is there anything else in between the L and the

18    I?

19         A.   Other than a -- the zipper for the vest.  No,

20    sir.  I don't believe so.

21         Q.   Thank you.

22              Do you see anything on that pathway that has

23    anything to do with this incident?

24         A.   No, sir.  Not that I'm observing.

25         Q.   Okay.  Thank you.

OFFICER JON   GRUBBS
January 28, 2021

1           And again, this is the general position that you

2    were in when you deployed the Taser.

3           A.   Yes, sir.

4           Q.   Okay.

5                MR. JOHNSON:   Photograph 229, please.

6                     (Whereupon, Photograph No. 229 was

7                     presented for review by the witness.)

8           Q.   (By Mr. Johnson)  This is obviously on the other

9    side of the hill, sir?

10          A.   Yes, sir.  That --

11          Q.   Well -- sorry.  Left-hand side of the photograph

12   toward the bottom, I see the yellow and the black.

13   That's the end of a guardrail on the other side of the

14   hill, the downside of the hill.

15          A.   Yes, sir.  I believe so.

16          Q.   And obviously, in a -- kind of like a third of

17   the way into the left margin, that's the  metal, if you

18   will, electrical traffic control box that we've been

19   talking about?

20          A.   Yes, sir.

21          Q.   To the left of that is your medical backpack?

22          A.   That's what it appears to be.

23          Q.   Okay.  To the right of that next to the

24   electrical box is my client's baseball cap?

25          A.   That is correct.

OFFICER JON  GRUBBS
January 28, 2021

 1      Q.   To the right of the baseball cap a little bit

 2   some type of a white object -- that we'll look at

 3   later -- correct?

 4      A.   Yes, sir.  I see that.

 5      Q.   And then we work our way up, if you will, that

 6   little hill there.  You can see the dirt path?

 7      A.   Yes, sir.

 8      Q.   And some type of a -- kind of an edge almost to

 9   it?

10      A.   Yes, sir.

11      Q.   And then to the right of that, that big rock.

12      A.   That is correct.

13      Q.   And obviously, to the left of the rock you can

14   see the path that's the one that my client was on when he

15   was Tased.

16      A.   Correct.

17      Q.   All right.

18           MR. JOHNSON:  All right.  Kindly turn to?

19           MR. RADNER:  214.

20           MR. JOHNSON:  214, please.

21                (Whereupon, Photograph No. 214 was

22                presented for review by the witness.)

23           MR. JOHNSON:  Thank you.

24      Q.   (By Mr. Johnson)  Another picture of a lot of

25   the same thing, but maybe a little bit closer up.

OFFICER JON  GRUBBS
January 28, 2021

1      A.   Yes, sir.  I see it.

2      Q.   Is that a better picture of your back- -- your

3  medical backpack?

4      A.   Yeah, that is my backpack.

5      Q.   You told me it -- you -- you ultimately went to

6  the car at some point and got it, right?

7      A.   Yes, sir.

8      Q.   It appears to be zipped up and closed there,

9  does it not, to you?

10     A.   It does.

11     Q.   Did you take anything out of it?

12     A.   Medical gloves.

13     Q.   Okay.  Anything else?

14     A.   I don't believe so.

15     Q.   Okay.  You see the baseball cap?

16     A.   I do.

17     Q.   Closer to the camera than the baseball cap, can

18  you see what looked to be, like, a little pen, like, a

19  ballpoint pen?

20     A.   Yes, I see that.

21     Q.   We have better closeup and then I'll show it to

22  you shortly.  But do you know how that pen got there?

23     A.   I do not.

24     Q.   Is that pen put there by, like, the crime --

25  I've seen pens used in crime photographs and stuff

OFFICER JON  GRUBBS
January 28, 2021

1  before.  Do you have any reason to believe that that was

2  something they did versus something that was either there

3  and/or my client?

4      A.   I do not.

5      Q.   Okay.

6      A.   Yeah.  I have no information about the pen.

7      Q.   Thank you.

8           To the right of that hat obviously is red blood?

9      A.   That is correct.

10     Q.   To the right of that, is that that white paper

11  that we saw from way back, I think?

12     A.   That is correct.

13     Q.   Anything that you see anywhere kind of going up

14  towards the hill area that kind of jumps out to you as

15  being any particular evidence involved in this incident?

16     A.   No, sir.  I don't see anything of any

17  significance.

18     Q.   Thank you.

19          MR. RADNER:  231.

20          MR. JOHNSON:  231, please.

21              (Whereupon, Photograph No. 231 was

22              presented for review by the witness.)

23     Q.   (By Mr. Johnson)  Just wanted to ask you.  Any

24  idea whose car that is on the bottom left of that

25  photograph?

OFFICER JON  GRUBBS
January 28, 2021

1      A.   I don't know.

2      Q.   Okay.  Remind me again what ramp this is.

3      A.   This is the --

4      Q.   Something to do with Windsor Road.  That I

5  remember.

6      A.   -- this is the Windsor Street Southwest ramp for

7  I-20 eastbound.

8      Q.   Thank you.

9           MR. JOHNSON:  Next picture is 221, please.

10               (Whereupon, Photograph No. 221 was

11               presented for review by the witness.)

12     Q.   (By Mr. Johnson)  Obviously, it's a closeup of

13  my client's baseball cap, sir?

14     A.   Yes, sir.  I see that.

15     Q.   And there appears to be some significant clotted

16  blood kind of in the middle of the bill?

17     A.   Yes, sir.

18     Q.   I can see on the back of the cap a baseball

19  player, so it might be an MLB hat.

20          But does that at all refresh your memory as to

21  what the front of the hat is?

22     A.   I don't recall what emblem was on the front of

23  the hat.

24     Q.   Okay.  Thank you.

25          The pen that's to the right of the hat, same

OFFICER JON  GRUBBS
January 28, 2021

1   question as before.  Any idea where that came from or why

2   it's there?

3        A.   I have no idea.

4        Q.   The stick to the right of that, any particular

5   significance to this photograph; meaning, that it was

6   placed there for a reason versus it was already there?

7        A.   Not to my knowledge.  It has no significance.

8        Q.   In the -- the kind of a pool of blood, is there

9   anything in that area that -- other than being the blood

10  being there that is of significance evidentiary-wise?

11       A.   Not that I see.

12       Q.   Okay.  The piece of paper, it looks like you

13  could start to see some kind of red writing.  It's

14  sticking up from the bottom side of it.

15            Do you have any understanding whether that's the

16  piece of paper that my client was holding that you saw in

17  traffic?

18       A.   It's possible.  I can't speak to that 100

19  percent, though.

20       Q.   Do you remember the white piece of paper, which

21  is what I think you described as it had a writing on

22  it -- whether it had any type of red writing on it versus

23  another color?

24       A.   I don't recall the ink color.

25       Q.   This is a pretty good closeup of that cement

OFFICER JON  GRUBBS
January 28, 2021

1  slab, is it not?

2      A.   Yes, sir.  It is.

3      Q.   When you looked at the cement slab and/or the

4  bottom of the control box there, I'll take it, Officer

5  Grubbs, you -- you've heard of the term "a witness mark"

6  before, have you not?

7      A.   I'm sorry.  What was the term?

8      Q.   Witness mark.

9      A.   Not specifically.  I may have heard of it in

10 another term.

11     Q.   Okay.  Then here's what -- here's what I'll ask

12 you.  When you -- while you were there that day and

13 looked at the area of this control box and cement stand,

14 were you able to see anything on those things that led

15 you to believe that my client struck one versus the

16 other?

17     A.   Based on the observations that I had made, I

18 only felt that Mr. Blasingame had struck the concrete.

19     Q.   Okay.

20          MR. JOHNSON:  222 please, Maddie.

21               (Whereupon, Photograph No. 222 was

22               presented for review by the witness.)

23     Q.   (By Mr. Johnson)  It's a closer up of the hat,

24 Officer Grubbs, correct?

25     A.   Yes, sir.

OFFICER JON   GRUBBS
January 28, 2021

1    Q.   I can now read the emblem of New Era, E-r-a.  Do

2  you see that?

3    A.   Yes, sir.  I do.

4        MR. JOHNSON:  217, please.

5            (Whereupon, Photograph No. 217 was

6            presented for review by the witness.)

7    Q.   (By Mr. Johnson)  In the middle of the blood

8  spatter in between the hat and the white item, it -- it

9  looks to me -- I see something brown and I don't know if

10  that's a sticker or what it is.

11        And all I wanted to ask you is was that

12  something, as far as you know, that was simply there

13  versus something that was placed for any kind of reason?

14    A.   As far as I know, that is something that was

15  already at the location.

16    Q.   Thank you.

17        And again on that -- the paper, you can see kind

18  of white writing coming up underneath.  I said white, but

19  I meant red.  Sorry.

20    A.   Yes, sir.  I see that.

21    Q.   If you look about to the stone to the right of

22  the white paper and it appears to be a red object.  Any

23  idea what that is?

24    A.   No, sir.

25    Q.   Thank you.

OFFICER JON  GRUBBS
January 28, 2021

1          MR. JOHNSON:  Exhibit -- or Page 216.

2                (Whereupon, Photograph No. 216 was

3                presented for review by the witness.)

4      Q.   (By Mr. Johnson)  It looks like a one-dollar

5  bill.  Is that what it looks like to you?

6      A.   Yes, sir.

7      Q.   Do you remember seeing that there?

8      A.   I do not.

9      Q.   Okay.

10          MR. JOHNSON:  215, please, Maddie.

11                (Whereupon, Photograph No. 215 was

12                presented for review by the witness.)

13      Q.   (By Mr. Johnson)  I think I see the one-dollar

14  bill toward the center of the photograph below and right

15  of the stick that's there.  Can you see that, sir?

16      A.   I do, sir.

17      Q.   Okay.  I'll take it, you have no idea how that

18  dollar bill got there?

19      A.   I do not.

20      Q.   Okay.  Is there anything else in terms of

21  evidence of particular relevance that you see in this

22  photo at all?

23      A.   No, sir.

24      Q.   We have photographs that we received from GBI,

25  Officer Grubbs, and they had, among other things in

OFFICER JON  GRUBBS
January 28, 2021

1  there, some evidence markers with those yellow little

2  placards with, like, No. 1 and 2.

3          Have you seen those photographs ever?

4      A.   No, sir.  I have not.

5      Q.   So in terms of what they're denoting for

6  Evidence Markers Nos. 1 and 2, you would have no idea?

7      A.   I have no idea, sir.

8      Q.   Okay.  When you deploy your Taser, the prongs,

9  if you will, come out, correct?

10     A.   That is correct.

11     Q.   And obviously, the metal wires they're attached

12  to?

13     A.   That is correct.

14     Q.   Is there any -- is there anything that gets

15  discharged from the Taser itself other than that; in

16  other words, that would be on the ground per se that you

17  would look for?

18     A.   You may have -- can best describe it on the

19  Taser cartridges, there is a -- small kind of like

20  plastic doors.

21     Q.   Right.

22     A.   Those doors are blown off, so to speak --

23     Q.   Right.

24     A.   -- when the device is deployed.

25     Q.   Okay.

OFFICER JON   GRUBBS
January 28, 2021

1          MR. JOHNSON:  Maddie, could you please put up

2    Officer Grubbs's report, 7/23/18.

3          I'm going to mark that as Exhibit 5, please.

4          MS. SINKOVICH:  Hold on one second.

5              (Whereupon, there was a brief pause in the

6              proceedings.)

7          MS. SINKOVICH:  Can you repeat the document one

8    more time, Ven.

9              (Whereupon, there was a brief pause in the

10             proceedings.)

11         MR. JOHNSON:  Yes.  It is an incident report

12   from City of Atlanta Police Department.  It is Officer

13   Grubbs's narrative report.

14     Q.   (By Mr. Johnson)  While we're getting that,

15   Officer Grubbs, if -- if in the upper right hand corner,

16   it says, "Prepared at July 23, 2018," generally speaking,

17   does that sound about right in terms of when you prepared

18   it?

19     A.   I'd have to see that so I can specifically know

20   what you're referring to.

21     Q.   Okay.  Well, it's -- you only done one report,

22   right?

23     A.   Yes, sir.

24     Q.   Okay.  So do you have a memory of it being 13

25   days after the event that you actually did that report?

OFFICER JON  GRUBBS
January 28, 2021

1      A.   Is it possible I can see exactly what you're

2  looking at?  I just can't speak to it if I don't see it.

3      Q.   Okay.  I'm not -- I'm just asking you about --

4  if that's the date on it.  We're trying to get it for

5  you.

6      A.   Uh-huh.

7      Q.   So I'm happy to show it.  It's going to be

8  Exhibit 5.  But my question is, is does it sound right at

9  all that it was 13 days after the event?

10               (Whereupon, Plaintiff's Exhibit No. 5 was

11               presented for review by the witness.)

12      Q.   (By Mr. Johnson)  There it is.

13           MS. SINKOVICH:  Just let me know if you need me

14  to zoom in.

15           THE WITNESS:  If you could zoom it in just a

16  little bit, that would be great.  Thank you.

17           Oh, okay.  That's good.  Thank you.

18           MR. JOHNSON:  Give me that page.  I don't have

19  that.  Okay.

20           THE WITNESS:  I'm not exactly sure what the

21  "prepared" on that particular date means.  I don't know

22  if that's when the report was approved or when it was

23  sent to central records.  I do believe the report was

24  done and submitted before that date.

25      Q.   (By Mr. Johnson)  Okay.

OFFICER JON  GRUBBS
January 28, 2021

1        MR. JOHNSON:  Maddie, is the thing you have up

2   before Officer Grubbs' two pages?

3        MS. SINKOVICH:  Yes.

4        MR. JOHNSON:  Okay.

5        MS. SINKOVICH:  The narrative's on the second

6   page.

7        MR. JOHNSON:  Okay.  Good.  Will you blow up

8   this first part of the page so I can see it even more

9   because the old man can't see that far.

10       MS. SINKOVICH:  The narrative or the first page?

11       MR. JOHNSON:  First page.

12       MS. SINKOVICH:  Okay.  Here's the time.

13       MR. JOHNSON:  Right there, please.

14   Q.   (By Mr. Johnson)  On page 1 of Exhibit 5,

15   Officer Grubbs, incident is 1811911254-00, correct?

16   A.   That is correct, sir.

17   Q.   Report -- it says, "Report date 7/10/18.  Time

18   is 13 -- 14:38," which is 2:38 p.m., correct?

19   A.   That is correct.  That -- that's correct, sir.

20   Q.   So the report date -- this says it -- at 14:38,

21   but where -- if you look to the right of that, the date

22   of the occurrence is 7/10/18 and the time is 14:35 or

23   2:35.

24       You didn't do this report three minutes after

25   the incident, did you?

OFFICER JON  GRUBBS
January 28, 2021

1      A.    I believe what you're seeing there, sir, is an

2   estimation of when the call or the incident started.

3      Q.    Right.

4      A.    And I believe that is just an estimation of

5   minus three minutes.

6      Q.    Okay.  But you don't think you did this report

7   three minutes after the event, do you?

8      A.    No, no.  No, sir.  That -- that's probably --

9   that -- that's a -- that's a time block of when the

10   incident may have started occurring or we arrived in the

11   area --

12      Q.    Okay.

13         So where it says "report date and time," even

14   though it says July 10th, 2018 at 2:38, that's not

15   representative of the time and date that you did this

16   report, correct?

17      A.    I don't believe so because I was out on the

18   scene at that time.

19      Q.    Right.

20         In fact, on this very page, if you look in the

21   upper right, it says, "Prepared 7/23/18 2:55:19 p.m.,"

22   doesn't it?

23      A.    I see that.  Yes, sir.

24      Q.    Okay.  So under offenses -- oh.  Forgive me.

25         So in the boxes underneath incident info, I see

OFFICER JON  GRUBBS
January 28, 2021

1  "traffic, comma, obstruct police."  Do you see that?

2      A.   Yes, sir.  I do.

3      Q.   And -- and does that pertain to apparently

4  charges at least were initially levied against my client?

5      A.   Yes, sir.

6      Q.   The reporting officer is listed as 6416.  That's

7  you?

8      A.   That is correct.

9      Q.   You?

10         "Offenses, No. 1, 4899 obstruct, hyphen, other

11  offense."  Did I read that right?

12     A.   Yes, sir.

13     Q.   What's that mean?

14     A.   That is probably the -- the -- what I'm trying

15  to think what it's called.  The NCIC offense code for how

16  the incident is being classified.

17     Q.   Okay.  And what is -- what does "obstruct other

18  offense" mean; do you know?

19     A.   Obstruction.  So that can entail any number of

20  things up to and including fleeing from police.

21     Q.   Okay.  Under arrest charge type "P-M," so P as

22  in Paul, M as in Mary.

23     A.   I'm sorry.  Can your assistant scroll down on

24  mine.  I can't see.

25     Q.   Sorry.  Okay.  This is not my assistant.  It's

OFFICER JON  GRUBBS
January 28, 2021

1   my co-counsel, so --

2       A.   Co-counsel.  I apologize.

3       Q.   No -- I just want to make sure I -- I corrected

4   the record because she'll -- she'll kick my butt.

5            Okay.  Here we go.  "Charge type P-M, Section

6   40-6-97."  What does that mean, please, sir?

7            THE WITNESS:  I'm sorry, ma'am.  Could you

8   scroll down just a little bit more.  Thank you.

9            That would be the charge for pedestrian

10  soliciting on roadway.

11      Q.   (By Mr. Johnson)  Okay.  And then underneath

12  that, G-M, Section 16-10-24-A.  What's that?

13      A.   That is the state charge for obstructing law

14  enforcement officer.

15      Q.   Which as you just indicated, can include fleeing

16  police.

17      A.   Yes, sir.

18      Q.   All right.  And so those -- those are the only

19  two charges, at least, in arrest that are listed on this

20  report, right?

21      A.   That is correct.

22      Q.   Thank you.

23           Go to the next page.  It's 2 of 2 of Exhibit 5,

24  please, sir.  Upper right, same thing.  It says, 2/20 --

25  "7/23/18 at 2:55:19 p.m.," correct?

OFFICER JON  GRUBBS
January 28, 2021

1      A.   I see that.  Yes, sir.

2      Q.   All right.  So I mean, to be fair at least in

3  terms of this document so far, it doesn't say approved.

4  It says "prepared" that date, doesn't it?

5      A.   Yes, sir.

6      Q.   Now, if you go all the way to the bottom of this

7  page, page 2 of Exhibit 1, reporting officer, of course,

8  there's your name, correct?

9      A.   That is correct.

10      Q.   And then it says, "Signed date" and it says,

11  "7/17/18," correct?

12      A.   That is correct.

13      Q.   Underneath that, supervisor is Stephens and that

14  signed date is 7/21/18, correct?

15      A.   That is correct.

16      Q.   And who's Stephens?

17      A.   That was another one of my supervisors.

18      Q.   Okay.

19      A.   Sergeant Ryan -- well, Lieutenant Ryan Stephens

20  now.

21      Q.   And other than looking at paperwork and so --

22  and sign off on it, then what was his role with you as it

23  pertains to this incident?

24      A.   He was one of the supervisors that had responded

25  to the scene.

OFFICER JON  GRUBBS
January 28, 2021

1    Q.   And Lieutenant Ryan who?

2    A.   Ryan Stephens.

3    Q.   R-y-a-n?

4    A.   That is correct.

5    Q.   S-t-e -- is it p-h or e-v-e-n-s?  If you know.

6    A.   P-h-e-n-s.

7    Q.   Thank you, sir.

8         The fact that it says signed here on 7/17/18,

9    based on your understanding of the way this form and so

10   forth works, Officer Grubbs, does that mean you think

11   that's the date that you completed and signed your

12   report?

13   A.   Yes, sir.

14   Q.   And that apparently took approximately four days

15   for Stephens to review and/or sign off on it as well?

16   A.   So it appears.

17   Q.   And then you know why -- if that's true, why it

18   says on the top right of both page it's prepared on

19   7/23/18?

20   A.   I don't know.  My only guess would be is that

21   that is when the report was approved by central records.

22   Q.   Okay.

23   A.   I can't speak to that.

24   Q.   Thank you.

25        So if, in fact, you did this report on 7/17,

OFFICER JON  GRUBBS
January 28, 2021

1  that would be a week after the events of, of course,

2  7/10.

3      A.    From -- the report, I do believe from my memory,

4  was pretty much completed before that time.  That is when

5  I actually submitted the report.  I was off.  I came back

6  to work on the 17th.

7      Q.    Okay.  Were you -- is that part of that

8  suspension with pay?

9      A.    That was, in part, due to my off days as to what

10  they were at the time and the officer leave protocol when

11  going through a significant incident.

12     Q.    Okay.

13     A.    So those two happened to go right with each

14  other.

15     Q.    All right.  So if -- did you type this?

16     A.    This report was generated on a computer, yes.

17     Q.    By you?

18     A.    By me.

19     Q.    Did anybody help you?

20     A.    No, sir.

21     Q.    When you actually -- so the words that we see on

22  this document are yours.

23     A.    That is correct.

24     Q.    In fact, right above the signature area that

25  we've just referred to, it says, "The undersigned being

OFFICER JON  GRUBBS
January 28, 2021

1    duly sworn upon his or her oath deposes and states that

2    the foregoing is true, correct, complete, and legible to

3    the best of his or her knowledge and belief."

4            Did I read that right?

5        A.    Yes, sir.

6        Q.    So that's consistent with a sworn document.

7        A.    Yes, sir.

8        Q.    So in terms of when you would have actually

9    typed this document, when do you think you did it?

10       A.    The report was typed that evening -- that

11   evening.

12       Q.    The evening of?

13       A.    Of July 10th, 2018.

14       Q.    Where was it typed?

15       A.    It was typed at my precinct.

16       Q.    So after the events, you ultimately went back to

17   the precinct.

18       A.    That is correct.

19       Q.    Did you have any union officials that came to

20   the scene of the incident?

21       A.    No union officials came to the scene that I'm

22   aware of.

23       Q.    Did you have any union officials that came to

24   the precinct?

25       A.    Yes.  A union attorney did come to the precinct.

OFFICER JON  GRUBBS
January 28, 2021

1     Q.   And did you speak with that union attorney at

2   all before you did this report?

3     A.   I can't remember if it was before or after, but

4   I did speak with an attorney.

5     Q.   Does it sound familiar about someone by the name

6   of Michaels?

7     A.   Yes.

8     Q.   Is -- is Michaels an attorney?

9     A.   Yes, she is.

10     Q.   She.  Sorry.  Well, I didn't say he, so I can't

11   get in trouble for that.

12     A.   No.

13     Q.   All right.  IBPO, International Brotherhood of

14   Police Officers, correct?

15     A.   That is correct.

16     Q.   Attorney Michaels' first name, please.

17     A.   Sandra.

18     Q.   So we know the events took place in the

19   afternoon of the 10th.  Any idea what time you did this

20   report on the computer before you left that day?

21     A.   I do not know what time it was that I initiated

22   the report.

23     Q.   You told us you started your shift at

24   ten o'clock.  What's your normal shift off time?

25     A.   8:00 p.m.

OFFICER JON  GRUBBS
January 28, 2021

1     Q.    Do you remember that you had to stay late that

2  day?

3     A.    I do know I was there past 8:00 p.m.

4     Q.    Okay.  In that first paragraph where we had

5  talked about you and Shelley in the vehicle, "We observed

6  a black male subject standing on the roadway -- there's

7  two the's -- with a white paper sign and was actively

8  approaching passing vehicles."

9          Did I read that right?

10    A.    Yes, sir.

11    Q.    "The male subject appeared to be soliciting for

12  monetary contributions upon a controlled access highway."

13  Correct?

14    A.    That is correct.

15    Q.    And you said "appeared" because just like today,

16  you -- and I appreciate honesty -- said you don't

17  remember ever seeing him actually getting any money.

18  Right?

19    A.    That is correct.

20    Q.    Second paragraph.  "I exited our marked patrol

21  vehicle in police attire, at which time the male later

22  identified as being Mr. Jerry Blasingame" -- and you gave

23  his date of birth -- "fled westbound on foot in heavy

24  traffic conditions."

25    A.    That is correct.

OFFICER JON  GRUBBS
January 28, 2021

1    Q.   Did I read it right?  Okay.

2         The "heavy traffic conditions," he's already on

3    the side of the roadway.  Were you talking about that

4    roadway or the other one on the downside of the hill?

5    A.   The roadway that we were currently on, the

6    shoulder is considered part of the roadway.

7    Q.   Okay.  Thank you.

8         "I yelled, quote, police, end quote.  Quote,

9    stop, end quote.  And chased Mr. Blasingame while

10   crossing traffic in a northerly direction and began to

11   catch up to Mr. Blasingame on the north side of the

12   roadway."

13        Did I read that right?

14   A.   Yes, sir.

15   Q.   All right.  I asked about what you said the day.

16   Today you'd mentioned the "stop" and you didn't say

17   police.  This report says you also said "police," does it

18   not?

19   A.   It does.

20   Q.   And both of those are in quotes?

21   A.   That is correct.

22   Q.   So you're quoting yourself.

23   A.   That is what I stated in quote, yeah,

24   specifically.

25   Q.   Do you believe that you actually said "police"

OFFICER JON  GRUBBS
January 28, 2021

1    or do you think, as you testified to earlier today, that

2    you only said "stop"?

3         A.   I do believe I said "police."  I generated this

4    report shortly thereafter the incident.  And as you

5    stated earlier, we're getting up on three years after.

6         Q.   Yes, sir.  Fair enough.

7              So like anything in life, right, I mean,

8    memories are better at the time you do it than later on.

9    Agreed?

10        A.   Yes, sir.

11        Q.   All right.  And that's one of the reasons why we

12   have reports, true, sir?

13        A.   Yes, sir.

14        Q.   All right.  When you say that you were --

15   "chased Mr. Blasingame while crossing traffic in a

16   northerly direction," does that tell you anything about

17   whether you went around the front or the back of a patrol

18   car?  If it doesn't, tell me.

19        A.    It doesn't.  That action could have occurred

20   either way.

21        Q.   Okay.  Next sentence.  "Shortly after he crossed

22   over a metal," m-e-t-e-a-l -- m-e-t-a-l, "vehicle

23   barrier, that was parallel to a wooded area."

24        A.   Yes, sir.  That's correct.

25        Q.   "Mr. Blasingame was in close proximity and made

OFFICER JON  GRUBBS
January 28, 2021

1  a swinging type motion towards me with his arm after

2  crossing over the barrier and started to proceed down a

3  small dirt path with brush-like vegetation on both

4  sides."

5         Did I read that right?

6     A.   Yes, sir.

7     Q.   All right.  And that metal vehicle barrier,

8  which -- that's the guardrail we've been talking about

9  today.

10    A.   Yes, sir.  That is correct.

11    Q.   Okay.  And again, the "swinging type motion,"

12 those are the words you used in your report, not punched,

13 right?

14    A.   That is correct.

15    Q.   Next sentence.  "Mr. Blasingame was proceeding

16 towards the I-20 Eastbound Expressway southwest on-ramp

17 at Windsor," W-i-n-d-s-o-r, "Street Southwest."

18         That's what it says, right?

19    A.   Yes, sir.

20    Q.   "The roadway possessed vehicles traveling at

21 highway speeds at this time.  I deployed my

22 department-issued Taser."  Right?

23    A.   That's correct, sir.

24    Q.   "I deployed my Taser in an effort to stop

25 Mr. Blasingame from entering another highway area and

OFFICER JON  GRUBBS
January 28, 2021

1   creating a hazard to himself and third-party motorists."

2          Did I read that right?

3      A.   That is also correct, sir.

4      Q.   "Mr. Blasingame went down and made contact with

5   a small concrete slab."

6          First of all -- oh, sorry.  I'll read the whole

7   sentence.

8          "Mr. Blasingame went down and made contact with

9   a small concrete slab that was adjacent to a traffic

10  control box, to which I did not immediately see from

11  where I had engaged Mr. Blasingame due to foliage."

12         Did I read that right?

13     A.   Yes, sir.

14     Q.   So when you say "went down and made contact," in

15  other words, when you Tased him, he fell down and struck

16  that concrete slab.

17     A.   That was my observation.

18     Q.   All right.  "I made contact with him and

19  determined that he was unresponsive with bleeding from

20  the head."

21         So I'll take it, that's when you first went over

22  to him and he's face down.

23     A.   Yes, sir.

24     Q.   "I immediately notified the Zone 5 dispatcher

25  and advised of the Taser deployment and requested Grady

OFFICER JON  GRUBBS
January 28, 2021

1  EMS and fire rescue."

2       A.   That is correct.

3       Q.   "I retrieved my medical bag from the patrol car

4  and continued to monitor Mr. Blasingame breathing and

5  pulse."

6       A.   That's correct.

7       Q.   All right.  It doesn't say anything about

8  turning him over at this point, right?

9       A.   No, sir.

10       Q.   It doesn't say anything about doing any type of

11  resuscitative anything, right?

12       A.   That is correct.

13       Q.   "Grady EMS 609, along with Engine 10 and

14  Truck 10, responded to the location and transported him

15  to Grady Hospital trauma center for further treatment."

16            Did I read that right?

17       A.   That is correct.

18       Q.   Nothing about you turning him over.  Nothing

19  about agonal breaths.  Nothing about any of that so far,

20  agreed?

21       A.   Agreed.

22       Q.   "Supervisor 5593" -- that's Lieutenant Zorn --

23  was "notified and responded to the scene along with crime

24  scene unit 7334."  Correct?

25       A.   That's correct.

OFFICER JON  GRUBBS
January 28, 2021

1    Q.   "The scene photographed from a multitude of

2  angles and with measurements from the guardrail to the

3  concrete slab."

4    A.   That is correct.

5    Q.   Do you remember seeing the measurement?

6    A.   I remember the measurements being taken.

7    Q.   Do you remember ballpark what it was?

8    A.   I do not.

9    Q.   I think I saw something about 23 feet and some

10  odd inches.  Does that sound familiar or no?

11    A.   No, sir.

12    Q.   Did you measure?

13    A.   No, sir.  I did not take any measurements --

14    Q.   Okay.

15    A.   -- that I remember.

16    Q.   Next paragraph.  "Reference this incident,

17  Mr. Blasingame is charged with pedestrian solicit on

18  roadway and obstruction of police."

19         And that's consistent what we read about those

20  charges on the first page, true?

21    A.   That is correct, sir.

22    Q.   "No property was obtained at the scene."

23         Meaning, like, in other words, nothing was taken

24  into evidence from him?

25    A.   That is correct.

OFFICER JON  GRUBBS
January 28, 2021

1    Q.   Well, obviously -- no, you -- we've already been
2    through -- you -- you never found any firearm,
3    no -weapons on him at all?
4    A.   No, sir.
5    Q.   Found no drugs on him at all?
6    A.   I never completed a search of his person, but I
7    have not heard of any weapons or controlled substances
8    being located.
9    Q.   Taken that -- did you take into custody the
10   baseball cap and the white sign?
11   A.   I did not.
12   Q.   Do you know why you didn't?
13   A.   Those were left for evidentiary purposes.  I
14   don't know if they were recovered by crime scene or the
15   GBI.
16   Q.   Okay.  "At the time of the incident, I did not
17   realize that my body camera was not in buffering mode and
18   it was activated immediately after."
19        Did I read that right?
20   A.   That is correct.
21   Q.   Can you tell me, what was it about this incident
22   that somehow jogged your memory to look to see if your
23   body camera was on?
24   A.   After the incident occurred, I remembered
25   hitting my body camera to make sure that it was in the

OFFICER JON  GRUBBS
January 28, 2021

 1  record mode and realized that it wasn't.

 2      Q.   And if you thought about it after the incident,

 3  what do you think -- why you didn't think about it before

 4  you got out of the car?

 5      A.   My time from exiting the car to engaging in the

 6  foot pursuit happened very quickly.

 7      Q.   Okay.

 8      A.   Within ten seconds or less.

 9      Q.   And of course, the next line is, "There's no

10  further information to report at this time."  Correct?

11      A.   That is correct.

12      Q.   There's nothing about you turning off your

13  camera at that time, is there?

14      A.   No, sir.

15      Q.   And if you did turn off your camera, that would

16  be something that you would typically record, right?

17      A.   It's possible to document that, yes.

18      Q.   Well, if you document it and you turned it on

19  and you know that you turned it off within a few seconds

20  after you turned it on, you would typically note that,

21  wouldn't you?

22           MS. MILLER:  Objection.

23           But you can answer.

24           THE WITNESS:  You might notate it.  It's

25  possible.  I did not notate that.

OFFICER JON  GRUBBS
January 28, 2021

1   Q.   (By Mr. Johnson)  Well, I think -- have you

2   looked at the video footage at all?

3   A.   I have seen the video footage.

4   Q.   When did you see it last?

5   A.   I saw the video footage -- I saw pieces of it a

6   couple of days ago.

7   Q.   Okay.  So you know that you turned it off,

8   right?

9   A.   I saw that.

10   Q.   And I don't -- I don't get that.  If you

11   realized you didn't turn it on, then you turn it on, why

12   would you turn it off within a few seconds of turning it

13   on?

14   A.   That may have been accidental.  I'm not sure.

15   Q.   And like just a coincidence that Officer Shelley

16   did the same thing.

17          MS. MILLER:  Objection.

18          You can answer if you know.

19          THE WITNESS:  I can't speak to that.

20   Q.   (By Mr. Johnson)  Other than he should have had

21   it on like you should have had it on.

22          MS. MILLER:  Objection.

23          You can respond.

24          THE WITNESS:  Is that a question?

25   Q.   (By Mr. Johnson)  Yes.

OFFICER JON  GRUBBS
January 28, 2021

 1      A.   I guess, yes.

 2      Q.   On the bottom of the page where it says "Clerk

 3   ID number 2705," we see, "File date 7/23/18, 2:53:39."

 4           Do you see that?

 5      A.   I do.

 6      Q.   I still don't get why that says that and then

 7   even two minutes later, the prepared date on the top.

 8   Any idea why?

 9      A.   As I stated previously, I think that is central

10   records.  I can't speak for sure, though.

11           MR. JOHNSON:  Maddie, do you have the next two

12   pages of the report?

13           MS. SINKOVICH:  I believe so.  Is this it?  If

14   this is a different report...

15                (Whereupon, a document was presented.)

16           MR. JOHNSON:  That's it.  That's it.  Enlarge

17   it --

18           MS. SINKOVICH:  All right.

19           MR. JOHNSON:  -- so I can see it or I can

20   pretend to see it.

21           MS. SINKOVICH:  Yes, I'll supplement.

22           MR. JOHNSON:  I'm going to make this Exhibit 6,

23   please.

24                (Whereupon, Plaintiff's Exhibit No. 6 was

25                presented for review by the witness.)

OFFICER JON  GRUBBS
January 28, 2021

1      Q.   (By Mr. Johnson)  Officer Grubbs, upper

2    left-hand corner, the report date says "8/9/16" -- or

3    "18."  Do you see that?

4      A.   I do.

5      Q.   Okay.  So let me see.  That's -- July 10, the

6    incident.  This is August 9, so literally one day shy of

7    a month after the incident, right?

8      A.   Yes, sir.

9      Q.   Why did you and Ser- -- then Sergeant Zorn go to

10   Grady Hospital?

11     A.   We responded to Grady Hospital to present the

12   copy of charges to Mr. Blasingame.

13     Q.   Why?

14     A.   That's what I was directed to do.

15     Q.   So you did what you were ordered to do.

16     A.   Yes, sir.

17     Q.   Who ordered you to do it?

18     A.   I can't speak to that.  I don't know if that

19   came from my command staff or where it came from.

20     Q.   Did you see him?

21     A.   I did.

22     Q.   Where was he?

23     A.   He was located at Grady Hospital.

24     Q.   Yeah, I got that.

25          Well, I mean, was he in a hospital bed?

OFFICER JON  GRUBBS
January 28, 2021

1      A.    Yes.  It did appear so.

2      Q.    What kind of room was it?  Was he in ICU or

3  where was he in the hospital?

4      A.    I mean, the best I can tell you, it was 7K04.

5  I'm not exactly sure if that was a regular hospital room,

6  post operating, ICU.  I don't know.

7      Q.    If left up to you, you would have never done

8  that, would you?

9          MS. MILLER:  Objection.

10          But you can answer.

11          THE WITNESS:  I can't speak to that.  That's

12  just what I was told to do.

13      Q.    (By Mr. Johnson)  An updated arrest citation was

14  given to Grady detention.  What's an updated arrest

15  citation?

16      A.    Oh, I'm sorry, sir.  I was just reading that

17  real quick.

18      Q.    Sure.  What is an updated arrest citation?

19      A.    I believe -- if memory serves me correct, I

20  believe the charges were just changed from city charges

21  or ordinance violations to state law violations.  I

22  believe that was the only change.

23      Q.    And what was that charge?

24      A.    The original charge of pedestrian soliciting on

25  roadway.  And the only charge that was changed was the

OFFICER JON  GRUBBS
January 28, 2021

1   obstruction of police, which is a city ordinance

2   violation, to the obstruction of police, but the state

3   law violation.

4       Q.   And again, you did that because someone

5   instructed you to make those changes?

6       A.   That is correct.

7       Q.   Who?

8       A.   I do not know.

9       Q.   On this document, the first page of Exhibit 6

10  under offenses, it says, "Offense, 9-M as in Mary,

11  miscellaneous non-crime."

12           What's that mean?

13      A.   That is the -- sorry.  We use a whole new

14  reporting system now.  I haven't seen this reporting

15  system in a while.

16      Q.   Okay.

17      A.   That is the -- I believe the UCR code, the

18  Uniform Crime Reporting code for a information report.

19  And that is something that can be used -- or was used on

20  the old reporting system to update or add information.

21      Q.   When you saw Mr. Blasingame, did you talk to

22  him?

23      A.   Very briefly.

24      Q.   What did you say to him?

25      A.   I identified myself, I believe, as well as what

OFFICER JON  GRUBBS
January 28, 2021

1  our purpose was, and then presented the charges to him.

2      Q.   Were they, like, a ticket?

3      A.   Yes.  There's an arrest copy.

4      Q.   Was he conscious?

5      A.   He appeared to be so.

6      Q.   Did he speak back to you?

7      A.   I can't recall exactly what his exact responses

8  were.  I know there was some type of acknowledgement.

9      Q.   Any other conversation you had?

10     A.   No, sir.  It was very brief.

11     Q.   Did you have any understanding at the time what

12 his physical injuries were?

13          MS. MILLER:  Objection.

14          You can answer.

15          THE WITNESS:  The specific injuries, no.  I've

16 heard that there was a possibility he would be

17 quadriplegic.

18     Q.   (By Mr. Johnson)  Did you at all have a -- any

19 type of a conversation with him where you said you're

20 sorry?

21     A.   No, I did not have any conversation of that

22 magnitude.

23     Q.   Did you ever ask him how he's feeling, how he's

24 doing?

25     A.   No, sir.

OFFICER JON  GRUBBS
January 28, 2021

1      Q.   Do you know how ultimately these charges were

2  dismissed?

3      A.   I do not.

4      Q.   Do you know by whom they were dismissed?

5      A.   I do not.

6      Q.   I take it, you were not consulted about them

7  being dismissed before they actually were dismissed?

8      A.   That is correct.

9      Q.   All right.

10         MR. JOHNSON:  I apologize, folks.  I need to run

11  to the restroom and then I will be finishing up.  Thank

12  you.

13         THE VIDEOGRAPHER:  Going off the record.

14  Universal time is 2015.  We are now off the record.

15              (Whereupon, a recess was taken.)

16         THE VIDEOGRAPHER:  We're now back on the record.

17  The Universal time is 2025.

18      Q.   (By Mr. Johnson)  Officer Grubbs, we found

19  some -- the tickets if you will, the uniform traffic

20  citation summons and accusation forms, but they were

21  signed by Officer Shelley.

22         Do you remember being involved at all in the

23  creation of these tickets?

24      A.   On the original tickets, no, I don't believe I

25  wrote those.

OFFICER JON  GRUBBS
January 28, 2021

1      Q.   Do you have memory of being involved in writing

2  out the second tickets a month later?

3      A.   That's possible.  I'm not a hundred percent

4  sure.

5      Q.   Okay.  Because I haven't seen those.  That

6  doesn't mean they don't exist.

7           Do you remember talking to Shelley on the night

8  of as to why he was doing the uniform traffic citations

9  summons and accusation versus you?

10     A.   I do not remember that conversation.

11     Q.   Okay.  So I -- and if his signature's on it, any

12  reason to think that you have handwriting on it?

13     A.   No.  If you need me to verify that, I'd be more

14  than happy to take a look.

15     Q.   All right.  Let's do it.

16          MR. JOHNSON:  Sorry, Maddie.  Let's do the --

17  there's two tickets.  Let's do the first one, 5339976.

18  We'll mark that as Exhibit 7, please.

19               (Whereupon, a document was presented.)

20     Q.   (By Mr. Johnson)  Now, look at the handwritten

21  citation, please.

22          MR. JOHNSON:  Can you move that down, Maddie,

23  and I can see the number.  That -- the other one, not

24  that one.

25               (Whereupon, a document was presented.)

OFFICER JON  GRUBBS
January 28, 2021

 1          MR. JOHNSON:  Okay.  No.  I mean the other one.

 2          MS. SINKOVICH:  Ven, is this one it?

 3          MR. JOHNSON:  Yes, ma'am.

 4                (Whereupon, Plaintiff's Exhibit No. 7 was

 5                presented for review by the witness.)

 6     Q.   (By Mr. Johnson)  Is that big enough for you to

 7  see, Officer Grubbs?

 8     A.   Yes, sir.  It is.

 9     Q.   Upper right-hand corner, where it says, "Georgia

10  Uniform Traffic Citation Summons and Accusation."

11     A.   That is correct.

12     Q.   "Citation No. 5339976."

13     A.   That is correct.

14     Q.   All right.  The handwriting on the top of this

15  document, is that yours?

16     A.   That is not my handwriting.

17     Q.   Okay.  It lists my client's height as 5-7,

18  weight 165.  Do you see that?

19     A.   I do.

20     Q.   In terms of the bottom signature there, is that

21  Officer Shelley's signature?

22     A.   I believe so.

23     Q.   Okay.  The offense is listed as obstruction,

24  correct?

25     A.   That is correct.

OFFICER JON  GRUBBS
January 28, 2021

1      Q.    Underneath that it says, "Did flee from officer

2    on foot."  Did I read that right?

3      A.    Yes, sir.

4      Q.    And then you go down a few more boxes.  "You are

5    ordered to appear in court to answer this charge on blank

6    date."

7            And then it talks about something to do with

8    July something, but it doesn't have a time and date,

9    right?

10     A.    Yes, sir.  That is correct.

11     Q.    And then we also have the -- that's Exhibit 7?

12           MR. JOHNSON:  Let's go to Exhibit 8, please,

13   Maddie.  That's the next Georgia Uniform Traffic Citation

14   Summons and Accusation.

15                  (Whereupon, Plaintiff's Exhibit No. 8 was

16                  presented for review by the witness.)

17     Q.    (By Mr. Johnson)  You see this -- this is,

18   Officer Grubbs, 5340149.  Do you see that?

19     A.    I do.

20     Q.    Any part of this your handwriting?

21     A.    That does appear to be my handwriting.

22     Q.    Okay.  Is that your signature on the bottom of

23   that?

24     A.    It is.

25     Q.    All right.

OFFICER JON  GRUBBS
January 28, 2021

1           MR. JOHNSON:  Well played, Solomon.

2      Q.   (By Mr. Johnson)  Any idea why Shelley did one

3  and you did one?

4      A.   That's not uncommon for units that ride in

5  two-man cars or two-officer cars.

6      Q.   Okay.  Likewise, you list my client's height as

7  5-foot-7, 165 pounds?

8      A.   Yes, sir.

9      Q.   Underneath that it -- you see those boxes that

10  are checked?

11      A.   Yes.

12      Q.   It says, "Injuries."  It's checked no, isn't it?

13      A.   Yes, sir.

14      Q.   Why?

15      A.   That box relates to vehicle accidents.

16      Q.   Okay.  Well, it says, "Accident, yes or no" and

17  it's checked no, right?

18      A.   It relates to traffic accidents involving

19  vehicles.

20      Q.   Okay.  Well, this whole thing is the Uniform

21  Traffic Citation, right?

22      A.   Uh-huh.

23      Q.   Yes?

24      A.   Yes, sir.  That -- that particular box where

25  you're referring to CDL accident injury fatalities, that

OFFICER JON  GRUBBS
January 28, 2021

1   is a box that we use for traffic accidents specifically

2   involving vehicles.

3       Q.   So you have "pedestrian solicit on roadway,"

4   correct?

5       A.   Yes, sir.

6       Q.   And you say, "Hold sign while standing on

7   on-ramp."  It's what it says.

8       A.   Yes, sir.

9       Q.   And then this document says that my client was

10  supposed to be in court on July 18 at eight o'clock a.m.,

11  right?

12      A.   Yes, sir.

13      Q.   Do you know why it says "jail" on signature?

14      A.   That is what is placed when a subject is taken

15  into custody and not released on what we refer to as a

16  copy of charges.

17      Q.   Okay.  And then again, that's your signature

18  below that?

19      A.   Yes.

20      Q.   All right.  And then, of course, the -- do you

21  have any idea why the citation numbers aren't, like,

22  right next to each other?

23      A.   On the -- I do -- what's the previous citation

24  number?

25      Q.   5339976 and then the 5340149.

OFFICER JON  GRUBBS
January 28, 2021

1    A.   The citations may have come from two different
2  citation books.
3    Q.   I get -- I guess walk -- walk me -- if you have
4  one guy that's being arrested and you're the one that
5  interacted with him --
6    A.   Uh-huh.
7    Q.   -- why wouldn't you do both citations?
8    A.   At times, it is that way and at times when
9  there's multiple citations to be written, multiple
10  charges, whatever the case may be, it is not uncommon for
11  your partner to assist in writing tickets.
12    Q.   You're -- so you're telling me you think you did
13  this citation on the night of the incident.
14    A.   I can't tell you exactly when I did that, if it
15  was the date of the incident or not.  I'm not -- I'm not
16  sure.
17    Q.   Well, that's -- that's what I need to know.
18       Where -- where -- where is -- on this document
19  does it say what day or time this was done by you?
20    A.   It says, "July 10th".
21    Q.   It says, "July 10, 2018 at 1438," which is 2:38,
22  right?
23    A.   That is correct.
24    Q.   Which we know, obviously, you didn't do it then.
25    A.   Uh-huh.

OFFICER JON  GRUBBS
January 28, 2021

1        Q.    Right?

2        A.    Yes, sir.  That is the information in the

3   computer.

4        Q.    Yep.

5        A.    That's what's put.

6        Q.    On the bottom right above your signature, it

7   says, "July 10, 2018," right?

8        A.    It does.

9        Q.    So how would we get to the bottom and figure out

10  exactly what time this was done and -- if you know?

11       A.    As far as I know, it was done that night.

12       Q.    Okay.  If there were affidavits for arrests for

13  both of these charges and these charges only and both of

14  them were done by Shelley as opposed to one done by you

15  and one done by Shelley, why would that be?

16       A.    Are you talking about the EWI warrants?

17       Q.    I'm talking about the affidavit for arrest.

18       A.    I would have to see that document to know

19  specifically what you're talking about.

20       Q.    Okay.

21            MR. JOHNSON:  Maddie, please.

22                 (Whereupon, Plaintiff's Exhibit No. 9 was

23                 presented for review by the witness.)

24            THE WITNESS:  Okay.  The arrest warrants.

25       Q.    (By Mr. Johnson)  Okay.  So let's do --

OFFICER JON  GRUBBS
January 28, 2021

1        MR. JOHNSON:  Maddie, can you make that bigger,

2   please, so I can pretend to read it.  Way bigger.  There

3   we go.

4        THE WITNESS:  Okay, Mr. Johnson.  What was your

5   question?

6        MR. JOHNSON:  Okay.  We're going to mark this

7   document as Exhibit 9.

8        Q.   (By Mr. Johnson)  Can you see within the

9   affidavit of arrest, this one's for the pedestrian

10  soliciting rides?

11       A.   Yes, sir.  I see that.

12       Q.   And then it says -- the affiant says, "Case,

13  Shelley"?

14       A.   I see that as well.

15       Q.   That's -- is that his signature?

16       A.   To the best of my knowledge.

17       Q.   Okay.  Under probable cause it says, "I observed

18  the accused in the roadway collecting money, paren, 120

19  eastbound and I-75 northbound."

20            Did I read that right?

21       A.   Yes, sir.

22       Q.   You never saw that guy collecting money, did

23  you?

24       A.   I did not.

25       Q.   No.  That's what I just asked you.

OFFICER JON  GRUBBS
January 28, 2021

1          Did Shelley ever say that he did and somehow you

2    missed it?

3        A.   I don't recall.  His point of view may have been

4    different.

5        Q.   While he's sitting in the car right next to you?

6        A.   He's in the driver seat, I'm in the passenger

7    seat.  You'd be surprised what you can see and not see.

8        Q.   Okay.  You're not going to tell me that if he

9    saw this guy collect money, that you didn't see the same

10   thing when you're sitting right next to him in a car, are

11   you?  So Officer --

12       A.   I can't speak --

13            MS. MILLER:  Objection.

14            But you can answer.

15            THE WITNESS:  -- I can't speak to exactly what

16   he saw.

17       Q.   (By Mr. Johnson)  All right.  All you can do is

18   talk about what you saw and you didn't see my client

19   actually collecting money, right?

20       A.   That is correct.

21       Q.   Thank you.

22            MR. JOHNSON:  Let's go to the next arrest --

23   affidavit of arrest, please, Maddie.

24       Q.   (By Mr. Johnson).  Let me say this to you

25   before that's -- darn it.

OFFICER JON  GRUBBS
January 28, 2021

1              Did you -- according to the last one -- it's

2     Exhibit 8 -- did you see where Shelley signed it and it

3     says it's done -- it's done on Jan- -- July 10, 2018 at

4     10:18 p.m.?

5          A.   I do see that, sir.

6          Q.   Okay.

7               MR. JOHNSON:  Now we'll go to the next one,

8     please, Maddie.

9                    (Whereupon, Plaintiff's Exhibit No. 10 was

10                    presented for review by the witness.)

11         Q.   (By Mr. Johnson)  This one's for the willful

12    obstruction of law enforcement officers?

13         A.   (No response.)

14         Q.   Is that correct, sir?

15         A.   That is correct.

16         Q.   That's Exhibit 10.

17              This is also Shelley's signature?

18         A.   It appears to be.

19         Q.   Likewise, it says, "On July 10, 2018 at

20    10:18:45," which is the exact same time as the other

21    affidavit, correct?

22         A.   Correct.

23         Q.   This says, underneath the willful obstruction of

24    law enforcement officers, misdemeanor, "Said accused did

25    knowingly and willfully obstruct or hinder K. Shelley and

OFFICER JON  GRUBBS
January 28, 2021

1   J. Grubbs of Atlanta Police Department, a law enforcement

2   officer, in the lawful discharge of the officers'

3   official duties by observe -- observing the accused

4   solicit rides and flee from the presence of officers on

5   the highway into the bushes.  Said -- and this deponent

6   makes this affidavit that a warrant may issue for his

7   slash her arrest."

8           Did I read that right?

9       A.   Yes, sir.

10      Q.   Well, you already told me my client wasn't

11  soliciting a ride.  So that's inaccurate, correct?

12      A.   He did not --

13           MS. MILLER:  Objection.

14           THE WITNESS:  -- was not soliciting a ride.

15      Q.   (By Mr. Johnson)  Thank you.

16           So where it says that "the officers' official

17  duty by observing the accused solicit rides," that's

18  incorrect, true?

19           MS. MILLER:  Objection.

20           But you can answer if you know.

21           THE WITNESS:  Well, sir, what I would say is

22  that may be an incorrect phrasing, but the charge itself,

23  as I'm sure you've seen, encompassed rides or business.

24  They go together in the State of --

25      Q.   (By Mr. Johnson)  Back --

OFFICER JON  GRUBBS
January 28, 2021

 1      A.   -- Georgia here.

 2      Q.   -- back to my question.  What -- this says that,

 3  "The officers'" -- plural -- "official duties by

 4  observing the accused solicit rides."

 5           That statement is false, isn't it?  Yes or no.

 6      A.   I didn't write it --

 7           MS. MILLER:  Objection.

 8           THE WITNESS:  -- so I can't --

 9           MS. MILLER:  Objection.

10           THE WITNESS:  -- speak to that.

11      Q.   (By Mr. Johnson)  I'm not --

12           MS. MILLER:  You can answer.

13      Q.   (By Mr. Johnson)  Well, if -- you didn't see my

14  client solicit a ride that day, did you?  Yes or no,

15  please.

16      A.   Your client was on the highway where he

17  shouldn't have been soliciting rides or business.  That

18  is my answer to your question.

19      Q.   You told me earlier that he was not soliciting a

20  ride.

21      A.   I -- he -- he did not appear to be soliciting a

22  ride.

23      Q.   Thank you.

24           So you didn't see him solicit a ride.  And any

25  statement that said he was soliciting a ride would be

OFFICER JON  GRUBBS
January 28, 2021

1  inconsistent with what you saw.

2      A.   He appeared to be soliciting business, in my

3  opinion.

4      Q.   Thank you.

5           And then it said, of course, "fleeing from

6  presence of officers on the highway into the bushes,"

7  correct?

8      A.   That is correct.

9      Q.   The probable cause listed by Shelley, "The

10 accused was in the roadway soliciting rides," is what it

11 says, right?

12     A.   That's what it says.

13     Q.   Even though you didn't see that.

14     A.   (No response.)

15     Q.   Right?

16     A.   Are you disputing that he wasn't on the roadway?

17     Q.   Are you disputing that he's soliciting a ride?

18 Yes or no.

19     A.   I'm not disputing that he was in the roadway

20 soliciting a ride or business.

21     Q.   He was not soliciting a ride, was he?  Yes or

22 no.

23     A.   I don't know.  Was he?  Ask him.

24     Q.   I'm asking you, Officer Grubbs.  Do you --

25     A.   I just --

OFFICER JON  GRUBBS
January 28, 2021

1    Q.    -- your testimony during that time?

2          MS. MILLER:  I'm going to object to this line of

3    questioning -- Officer Grubbs, please let me finish.

4          And Mr. Johnson as well.

5          I'm going to object to this line of questioning

6    because it has been asked and answered.

7          MR. JOHNSON:  I am entitled to a yes or no

8    answer if I can -- if I can ask a yes or no question.

9    Q.    (By Mr. Johnson)  And the fact of the matter is

10   you did not see my client soliciting a ride, did you?

11   Yes or no.

12   A.    Yes, I saw your client soliciting rides or

13   business.  That's my answer.

14   Q.    I didn't ask you about or business.

15   A.    The charge says "rides or business."  My answer

16   is yes.

17   Q.    Okay.  The probable cause doesn't say anything

18   about business, does it?

19   A.    Okay.  Well, it doesn't, but that's my answer.

20   Q.    That's -- you got to answer my question now.

21   A.    My answer is yes.  He was soliciting rides or

22   business.

23   Q.    Okay.  So he didn't -- was not soliciting a ride

24   only, was he?

25   A.    My answer is yes, Mr. Johnson.

OFFICER JON  GRUBBS
January 28, 2021

1    Q.   I know because you're not going to answer my

2  question truthfully, are you, sir?  Because you know your

3  partner wrote down something that's false.

4         MS. MILLER:  Mr. Johnson, I'm going to object to

5  that.  At this point, you are being very disrespectful to

6  my witness.  So could you please ask a question and then

7  my witness will answer.  And if he's already answered,

8  I'm going to object again as asked and answered.

9         MR. JOHNSON:  I'm not being disrespectful to

10 anybody.  But when I have a sworn affidavit in front of

11 me, which he's already testified is absolutely not what

12 he saw, I get this answer.  Just because there's a sworn

13 document from the partner now doesn't change that.  So

14 if that --

15        MS. MILLER:  That's fine.  And my -- my client

16 has answered that he did not write and author this

17 particular document and he's also --

18        MR. JOHNSON:  It doesn't matter who wrote it.

19        MS. MILLER:  -- he also has answered that he

20 doesn't know what Officer Shelley saw.  So that was his

21 statement.

22        MR. JOHNSON:  I'm not asking that.

23    Q.   (By Mr. Johnson)  "The accused was in the

24 roadway soliciting rides."  The fact of the matter is

25 that is not what you witnessed?  Yes or no.

OFFICER JON  GRUBBS
January 28, 2021

1            MS. MILLER:  Same objection.

2            But you can answer, Officer Grubbs.

3            THE WITNESS:  Mr. Johnson, my answer is yes, I

4    viewed Mr. Blasingame in the roadway.  Understand me,

5    sir, when I say in the roadway soliciting what I believe

6    to be monetary contributions for rides.

7            Your client, sir, fled from me.  I never had a

8    chance to interview him and ask him what he was doing.

9    That is my answer.

10       Q.   Okay.  So he was trying to get a ride, not look

11   for money.

12       A.   Yes, that's what --

13       Q.   Or is or.  You don't -- can't have it both ways.

14   Or is or.

15       A.   Is that a question, sir?

16       Q.   It is.

17            Since you refuse to answer my question, sir,

18   let's go with yours.

19       A.   What is your question, sir?

20       Q.   So then tell me about what ride he was trying to

21   solicit?  Where was he trying to go?

22       A.   I don't know.  You've spoken to him.  I haven't.

23       Q.   You don't want to answer the question, do you?

24       A.   You'd be --

25            MS. MILLER:  He has answered the question.  He

OFFICER JON  GRUBBS
January 28, 2021

 1   said he doesn't know.

 2          MR. JOHNSON:  He hasn't --

 3          MS. MILLER:  Either we can -- we can move on or

 4   we can stay in this circle.  But I think my client has

 5   answered more than once.

 6          MR. JOHNSON:  He has refused three times to

 7   answer a direct question and he wants to throw in words

 8   that I didn't have in the question.  So I can do this all

 9   day until I get my answer.

10          MS. MILLER:  Well, actually, you can't do it all

11   day because we're running up on your seven hours.

12          MR. JOHNSON:  Oh.  That --

13          MS. MILLER:  So he can respond and we can move

14   on or we can stay here and you can get to your seven

15   hours and I ask my questions and you leave.

16          Either way, it's fine.

17          MR. JOHNSON:  But if he's not answering my

18   questions, seven's hours doesn't count and you know that.

19   So you do whatever you want.

20          MS. MILLER:  Okay.  Next question, please.

21      Q.   (By Mr. Johnson)  Who made the affidavit for

22   arrest that my client swung at you?

23      A.   Well, where is the affidavit for it?

24      Q.   Show me any citation or an affidavit for arrest

25   that says my client swung at you.

OFFICER JON  GRUBBS
January 28, 2021

1       A.    I don't have any such document.

2       Q.    He was never charged with that, was he?

3       A.    No, sir.  He was not.  That would encompass

4  normally in the obstruction charge.

5       Q.    If he -- and in the obstruction charge and

6  actually on the ticket itself, which we read together, it

7  said "did flee from officer on foot".  It says nothing

8  about him swinging his arm at you, does it?

9       A.    No, sir.  It does not.

10      Q.    And swinging at an officer could be a felony and

11  not a traffic violation at all, right?

12      A.    That is correct.

13      Q.    He was not charged at all with that, was he?

14      A.    That is correct.

15      Q.    Okay.  Because he never did it, isn't it?

16            MS. MILLER:  Objection.

17            You can answer.

18            THE WITNESS:  He did do it.

19      Q.    (By Mr. Johnson)  And you decided, for some

20  reason, that despite the most serious offense of

21  everything that he did that day, you wouldn't charge him

22  with the one and only felony.

23            MS. MILLER:  Objection.

24            But you can answer.

25            THE WITNESS:  That would have been actually a

OFFICER JON  GRUBBS
January 28, 2021

1   misdemeanor, also.  But no, I didn't charge him with

2   that.

3       Q.   (By Mr. Johnson)  It is by far the most serious

4   of the charges that could have been levied against him

5   that day, wasn't it?

6       A.   I suppose.

7       Q.   Why didn't you charge him, then?  You charged

8   him with trying to solicit a ride.

9            If you charged him with obstructing an officer,

10  why not charge him with that?

11      A.   I used my discretion and levied the charges I

12  felt were appropriate.

13      Q.   So you decided not to do that.

14      A.   That is correct.

15      Q.   So he's never even been formally accused of

16  doing that.

17      A.   No, sir.

18      Q.   And even when you, later on in -- a month later

19  could have brought that charge, you never did.

20      A.   I did not.

21           MR. JOHNSON:  Let's go off the record for one

22  minute, please.  Thank you.

23           THE VIDEOGRAPHER:  Going off the record.

24  Universal time is 2049.  We are now off the record.

25               (Whereupon, a recess was taken.)

OFFICER JON  GRUBBS
January 28, 2021

```
1              THE VIDEOGRAPHER:  Stand by, please.

2              We're now back on the record.  Universal time is

3     2050.

4        Q.   (By Mr. Johnson)  Officer Grubbs, if -- we have

5     no other citation tickets, we have no other affidavits

6     for arrest in this file other than the ones I showed you.

7              Are you able to explain why those wouldn't exist

8     if you went back to the hos- -- to the hospital a month

9     later and took them to my client?

10       A.   I can't speak to that, sir.

11       Q.   Do you think it was either one of the two that

12    you -- that we've already discussed -- Exhibits 7 or 8

13    or 9 and 10 -- that you took to my client when you went

14    there in August?

15       A.   I do not recall.

16       Q.   All right.

17            MR. JOHNSON:  Okay.  Thank you.  I have no more

18    questions right now.  I appreciate it.

19            MS. MILLER:  Thank you.  If we could take a

20    five-minute break and I will have some questions.

21            THE VIDEOGRAPHER:  We're going off the record.

22    Universal time is 2051.  We are now off the record.

23            (Whereupon, a recess was taken.)

24            THE VIDEOGRAPHER:  Stand by, please.

25            We're now back on the record.  The universal
```

OFFICER JON  GRUBBS
January 28, 2021

1    time is 2057.

2                     DIRECT EXAMINATION

3    BY MS. MILLER:

4        Q.   Okay.  Officer Grubbs, thank you again for being

5    here today.  I'll just have a few questions hopefully.

6            So first, I want to ask, do you know whether

7    there's a GBI investigation into this particular matter?

8        A.   I know that there was a GBI investigation that

9    was conducted, yes.

10       Q.   Okay.  And did you participate in that

11   investigation in any way?

12       A.   I participated in the initial investigation,

13   yes.

14       Q.   Okay.  Do you know how long it took for that

15   investigation to conclude or whether it has concluded?

16       A.   I'm not a hundred percent sure as to the status

17   of GBI's investigation.

18       Q.   Okay.  But they have never sent you anything

19   that has indicated that that investigation has concluded.

20       A.   No, ma'am.

21       Q.   Okay.  Do you know whether there is a Fulton

22   County D. -- D.A.'s Office -- District Attorney's Office

23   investigation into this matter?

24       A.   Yes, there was.

25       Q.   Okay.  And did you participate in that

OFFICER JON  GRUBBS
January 28, 2021

1   investigation?

2       A.   No, I did not.

3       Q.   Okay.  Do you know whether that investigation

4   has concluded?

5       A.   That investigation has concluded, yes.

6       Q.   Okay.  And do you know when that investigation

7   concluded?

8       A.   I believe it was in October of 2020.

9       Q.   Okay.  What were your intentions of -- when you

10  approached Mr. Blasingame on July 10th, 2018?

11      A.   To conduct an investigation in reference to him

12  soliciting rides or business on a highway.

13      Q.   Okay.  And after you first saw Mr. Blasingame,

14  did you immediately deploy your Taser?

15      A.   I did not.

16      Q.   Did you deploy your Taser as you were running --

17  as you both were running alongside the highway?

18      A.   No, I did not.

19      Q.   Did you deploy your Taser at Mr. Blasingame at

20  any point before he went over the barrier?

21      A.   No, I did not.

22      Q.   Okay.  When did you first deploy your Taser at

23  Mr. Blasingame relative to when you saw him?

24      A.   The deployment occurred after the swinging type

25  motion and as Mr. Blasingame began to make his way

OFFICER JON  GRUBBS
January 28, 2021

1  towards the Windsor Street on-ramp while still on the

2  dirt path.

3      Q.   Okay.  And why did you deploy your Taser at

4  Mr. Blasingame?

5      A.   I felt that Mr. Blasingame was getting ready to

6  reenter the highway and would create a risk to himself or

7  a third-party motorist.  And it was done in an effort to

8  stop that from happening.

9      Q.   Okay.  Do you know whether Mr. Blasingame

10 tripped and fell before the Taser struck him?

11      MR. JOHNSON:  Object to the form of the

12 question.  Tripped and fell.

13      Q.   (By Ms. Miller)  Okay.  You can answer the

14 question.

15      A.   I do not, but it is a possibility.

16      Q.   Okay.  Do you know if Mr. Blasingame could have

17 fallen without the use of a Taser?

18      A.   It is possible.  It was a dirt trail that, you

19 know, may have possessed some root systems or another

20 type of obstruction that may have caught his foot.

21      Q.   Okay.  And when you first engaged with

22 Mr. Blasingame, could you ascertain his age?

23      A.   I could not.

24      Q.   Okay.  And when Mr. Blasingame began to run from

25 you and jump over the vehicle barrier, did he seem feeble

OFFICER JON  GRUBBS
January 28, 2021

1    to you?

2        A.   He did not.

3            MR. JOHNSON:  Object to the form of the

4    question.  He's never testified that he jumped over.

5            MS. MILLER:  Excuse me.

6            MR. JOHNSON:  In fact, it's to the contrary.

7            MS. MILLER:  Okay.

8        Q.   (By Ms. Miller)  Hurdled over the barrier, as

9    the term was used earlier?

10           MR. JOHNSON:  Which he said --

11       Q.   (By Ms. Miller)  Used the term --

12           MR. JOHNSON:  -- which he said no to, by the

13   way.  But please continue.

14       Q.   (By Ms. Miller)  Did Mr. Blasingame seem feeble

15   to you?

16       A.   He did not seem feeble.

17       Q.   Okay.  Do you know whether Mr. Blasingame was

18   attempting to retrieve a weapon when he went into the

19   wooded area?

20       A.   I do not, but it is a possibility.

21       Q.   Okay.  Do you know if Mr. Blasingame was

22   attempting to solicit help from others as he went into

23   the wooded area?

24       A.   I do not, but it was a possibility as well.

25       Q.   Okay.  At the time that you drew your Taser,

OFFICER JON  GRUBBS
January 28, 2021

```
1   could you see the metal box that was at the bottom of
2   that particular landing?
3       A.   I did not see the box.
4       Q.   Okay.  At what point did you activate your
5   body-worn camera in this incident?
6       A.   That occurred when I had made my way down to
7   Mr. Blasingame.
8       Q.   Okay.  And so there is actual footage of the
9   scene of this particular incident.
10      A.   Yes, ma'am.
11      Q.   And did you activate your body-worn camera
12  immediately when you realized that it was not on?
13      A.   I did.
14      Q.   Did you believe, before activating the body-worn
15  camera, that it was actually recording?
16      A.   I believed it was on in its buffering mode.
17      Q.   And when you realized that it was not on and in
18  the buffering mode, did you turn your body-worn camera
19  on?
20      A.   I did.
21      Q.   Okay.  As it relates to the obstruction charge
22  that Mr. Blasingame was charged with, can you tell me
23  what all that charge included?
24      A.   The obstruction charge was including the fleeing
25  from police.
```

OFFICER JON  GRUBBS
January 28, 2021

1     Q.   Okay.  Did it include the swinging type motion

2  that Mr. Blasingame made towards you?

3     A.   No, it did not.  But as we saw previously, I did

4  not author that particular warrant.

5     Q.   Okay.  And could Officer Shelley -- well, do you

6  know whether Officer Shelley saw the swinging motion

7  towards you?

8     A.   I do not believe so.

9     Q.   Okay.  And at the time that that swinging motion

10  happened, where was Officer Shelley?  If you know.

11     A.   He was attempting to relocate the patrol car.  I

12  believe he had lost sight of us.

13     Q.   Okay.  So after you left the patrol car, when

14  was the next time that you can remember seeing Officer

15  Shelley?

16     A.   I was able to locate Officer Shelley, I believe,

17  after running back up the embankment there.  I remember

18  yelling for him in an effort to try to locate him.

19          MS. MILLER:  Okay.  Those are all of my

20  questions.

21                    RECROSS EXAMINATION

22  BY MR. JOHNSON:

23     Q.   Officer Grubbs, the internal affairs

24  investigation, you told me that they interviewed you.

25  Did they tape your interview?

OFFICER JON  GRUBBS
January 28, 2021

1      A.    The interview was recorded.

2      Q.    Was it video?

3      A.    I believe there is video and audio.  I can't

4   speak to that 100 percent.

5      Q.    Did you have to sign any type of a transcript or

6   any type of a written statement as part of that

7   investigation?

8      A.    I signed a truthfulness statement.

9      Q.    I didn't hear what you said.  Sorry.

10     A.    I signed a truthfulness statement.

11     Q.    What's that mean?

12     A.    Oh, it's just a statement that you will provide

13   factual and honest information.

14     Q.    Okay.  Have you ever seen a transcript of that

15   interview that you gave?

16     A.    I have.

17     Q.    Did -- where -- where is -- where have you seen

18   that transcript?

19     A.    It was e-mailed to me at a unknown date and

20   time.

21     Q.    Approximately how long ago?

22     A.    Maybe upwards of a year ago possibly.  I'm not

23   100 percent sure.

24     Q.    Do you have a copy of that at home?

25     A.    Somewhere around here, I do.

OFFICER JON  GRUBBS
January 28, 2021

1      Q.   Okay.

2           MR. JOHNSON:  Counsel, we have never been given

3     that transcript.  We'd like a copy of it, please, right

4     now.

5           MS. MILLER:  I don't have a copy of it right

6     now, but I can definitely send you a copy of it --

7           MR. JOHNSON:  Okay.

8           MS. MILLER:  -- once I have it.

9           MR. JOHNSON:  Then I obviously reserve the right

10    to take -- or Officer Grubbs' deposition again after we

11    get that.

12     Q.   (By Mr. Johnson)  Officer Grubbs, you are not

13    saying under oath that my client tripped and fell before

14    you Tased him, are you?

15     A.   I'm saying that it's a possibility.

16     Q.   Not my question.

17          When you shot him with the Taser, he was still

18    standing fully up, wasn't he?

19     A.   He was standing.  Is it possible he tripped or

20    fell, yes.

21     Q.   When you shot your Taser, he was standing up

22    running away from you, wasn't he?  Yes or no.

23     A.   He was standing up and running.

24     Q.   Okay.  So at least as of the time that you had

25    Tasered him, he would -- had not tripped and fall- --

OFFICER JON  GRUBBS
January 28, 2021

1  fallen based on what you saw.

2      A.   Not from what I saw from my vantage point.

3      Q.   Tell me, if you had your camera off for the rest

4  of your break in the jail, why did you think it was on if

5  you never turned it back on and you knew you had never

6  turned it back on?

7      A.   I did not know that.  I didn't realize it.

8      Q.   You didn't know that you didn't turn it back on.

9      A.   That is correct.

10     Q.   You forgot to turn it back on.

11     A.   That's correct.

12     Q.   But then there would be no reason for you to

13  think it was on, right?

14     A.   (No audible response.)

15         THE COURT REPORTER:  I couldn't hear you Officer

16  Grubbs.  I'm sorry.

17         THE WITNESS:  (No audible response.)

18         MR. JOHNSON:  Sorry.  We don't -- I guess -- I

19  don't have any audio on you that -- Officer Grubbs, right

20  now.

21         THE WITNESS:  (No audible response.)

22         MR. JOHNSON:  Officer Grubbs, if -- try -- try

23  sounding one more time.

24         THE WITNESS:  (No audible response.)

25         MR. JOHNSON:  Okay.  We obviously are having

OFFICER JON  GRUBBS
January 28, 2021

1  audio trouble with Officer Grubbs.

2          THE VIDEOGRAPHER:  Let me read us off the record

3  real quick if I could.

4          We're going off the record.  Universal time is

5  2109.  We are now off the record.

6                  (Whereupon, a discussion was held off the

7                  record.)

8          MR. JOHNSON:  Okay.  Go back on the record.

9          THE VIDEOGRAPHER:  Stand by, please.

10          We're going back on the record.  Universal time

11  is 2110.

12          MR. JOHNSON:  I know that Officer Grubbs is

13  having audio trouble, but obviously, we've been at this

14  all day anyway.

15          So I would like to get that transcript.  I would

16  like to get the blue sheet and any other obviously

17  investigation documents that we don't have that exist.

18          But other than that, I got no more questions

19  today.  Thank you very much.  Have a good day, Officer.

20  Thank you.

21          THE WITNESS:  Thank you.

22          MS. MILLER:  Thank you.

23          THE VIDEOGRAPHER:  This concludes the videotaped

24  deposition.  We're now going off the record.  Universal

25  record is 2110.  We are now off the record.

OFFICER JON  GRUBBS
January 28, 2021

1   (Whereupon, the deposition concluded at

2          4:10 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

OFFICER JON  GRUBBS
January 28, 2021

1                    C E R T I F I C A T E

2

3    STATE OF GEORGIA,

4    COUNTY OF DEKALB:

5

6         I DO HEREBY CERTIFY THAT THE FOREGOING IS A TRUE AND

7    CORRECT TRANSCRIPT OF THE PROCEEDINGS TAKEN DOWN BY ME IN

8    THE CASE AFORESAID.  THIS CERTIFICATION IS EXPRESSLY

9    WITHDRAWN AND DENIED UPON THE DISASSEMBLY OR PHOTOCOPYING

10   OF THE FOREGOING TRANSCRIPT, OR ANY PART THEREOF, UNLESS

11   SAID DISASSEMBLY OR PHOTOCOPYING IS DONE BY THE

12   UNDERSIGNED CERTIFIED COURT REPORTER AND ORIGINAL

13   SIGNATURE AND SEAL IS ATTACHED THERETO.

14

15        THIS, THE 3RD DAY OF FEBRUARY, 2021.

16

17

18

19

20

21

22

23

24

25

OFFICER JON   GRUBBS
January 28, 2021

**$**

**$5.6**
  105:19

**(**

**(a)**
  9:10
**(b)**
  9:11

**-**

**-weapons**
  206:3

**0**

**03**
  167:4,5
**05**
  167:3,5
**09-millimeter**
  85:13

**1**

**1**
  58:1 74:12
  153:14,19
  158:10,21,22
  160:1 165:6
  170:20,25
  171:6 172:5,
  12 187:2,6
  190:14
  192:10 194:7
**1,200**
  105:18
**1/2/19**
  41:3
**1/3/19**
  41:2

**10**
  12:16 15:7
  18:11 22:5,
  22 28:7
  34:2,11,13,
  25 35:7
  37:12,23
  39:8 40:9,24
  44:12 50:4,6
  53:11 54:9
  55:10 56:1
  58:16 82:10
  95:3 97:11,
  15,21 99:15
  100:1 102:25
  106:13
  108:18 111:9
  132:12
  152:21
  170:21
  204:13,14
  210:5 220:21
  221:7 224:3,
  9,16,19
  234:13
**100**
  54:7 99:24
  122:9 127:7
  176:3,8
  183:18
  241:4,23
**10:00**
  34:20 54:10
**10:10**
  153:21
**10:18**
  224:4
**10:18:45**
  224:20
**10th**
  40:6 191:14
  197:13
  198:19
  220:20
  236:10
**12**
  23:22,23
  154:16

**120**
  222:18
**13**
  29:16 38:1
  188:24 189:9
  190:18
**14**
  23:23
**1419**
  8:18
**1438**
  161:1 220:21
**1447**
  28:14
**1455**
  28:18
**14:35**
  190:22
**14:38**
  190:18,20
**14:38:05**
  160:13 161:3
**14:46:02**
  169:14
**15**
  82:10 151:6
  153:10
**15-14-37**
  9:10
**15-3510493-00**
  151:1
**15253061**
  156:20
**16**
  94:17
**16-0903240**
  154:16
**16-0910406**
  155:23
**16-10-24-A**
  193:12
**16-1470052**
  155:11
**160**
  63:16,19
**1603**

**75:5**
**1610**
  75:9
**165**
  216:18 218:7
**17**
  12:14 85:11
  92:3 93:1
  94:17 107:2
  110:11
**17th**
  196:6
**18**
  27:25 210:3
  219:10
**180**
  44:9
**1803**
  150:14
**1811911254-00**
  190:15
**181911170**
  160:9
**181911254**
  57:1
**1845**
  150:18

**2**

**2**
  22:17,23
  23:20 97:25
  152:20
  153:7,13
  154:7,11
  162:16 165:6
  169:5,14,16
  171:6 187:2,
  6 193:23
  194:7
**2-0-T**
  167:9,21
**2/20**
  193:24
**20**
  97:10 166:8

167:2,22
**20-**
  22:10
**20-T**
  167:23
**2005**
  26:10
**2008**
  28:21
**2012**
  29:18 30:11
**2013**
  10:22 29:14
  30:13,15,16,
  18 107:15
**2013-ish**
  29:17
**2014**
  10:21 11:8
  12:6 30:17,
  21 38:1,9
  39:8 105:17
**2015**
  16:6 151:5,7
  153:10
  214:14
**2016**
  24:21 25:1,5
  26:14,18,21
  92:3 93:1
  94:17 95:9
  152:8 158:1
**2017**
  12:13,20,22
  18:6 26:25
  27:5 88:15
  89:23 107:9,
  16 110:3
**2018**
  12:16 15:7
  18:11 22:5,
  22 27:9,12
  28:7 34:3,
  11,13,25
  35:7,22
  37:12,23
  38:10 39:8

40:6,9,13,24
44:12 50:4,6
53:11 54:9
55:10 56:1,8
58:17 88:18
91:5 95:3
97:11,15,21
99:15 100:1
102:25
106:13
107:2,10,12,
16 108:17,18
110:1,3,11,
19 111:9
132:12
153:20
188:16
191:14
197:13
220:21 221:7
224:3,19
236:10
**2019**
  40:8,20
  41:15 44:13
**2020**
  17:12 236:8
**2021**
  8:17 10:20
  149:11
**2025**
  214:17
**2049**
  233:24
**2050**
  234:3
**2051**
  234:22
**2057**
  235:1
**21**
  40:13 152:22
**2109**
  244:5
**2110**
  244:11,25

214
  179:19,20,21
215
  186:10,11
216
  186:1,2
217
  185:4,5
221
  182:9,10
222
  184:20,21
229
  178:5,6
23
  188:16 205:9
231
  181:19,20,21
232
  173:8,9
233
  174:8,9
234
  176:14,16
237
  177:3,4
25
  127:6 153:20
27
  107:2
2705
  209:3
28
  165:12
28th
  8:17
2:30
  34:15
2:30-ish
  65:13
2:35
  34:15 190:23
2:38
  161:7,16
  164:2 169:2
  190:18

191:14
220:21
**2:38:05**
  166:1
**2:38:28**
  166:17
**2:39**
  164:8 169:4
**2:40**
  167:15
**2:40:09**
  167:12
**2:41**
  164:18,19
**2:41:40**
  164:14
**2:46**
  169:4,14
**2:48**
  168:13
  169:15
**2:53:39**
  209:3
**2:55:19**
  191:21
  193:25

---

**3**

3
  22:24,25
  40:20 41:14
  154:15
  155:10,22
  167:1,6
  168:16,18,
  19,21,22
  169:13
30
  14:2
304
  166:25
304's
  167:1
31013
  86:19 87:17

**3506**
162:24
**3:39**
170:21
**3:39:10**
171:8
**3rd**
40:8

---

**4**

**4**
22:17,23
23:20 155:23
156:19
172:19,20
173:7
**4.4.8**
132:19 135:2
**40**
164:19
**40-6-97**
50:22 51:1
193:6
**40-6-97.1**
51:21
**4899**
192:10
**4:05**
165:12
**4:10**
245:2
**4:16:27**
172:6

---

**5**

**5**
10:15 22:17,
23 23:20,24
26:23 27:13
34:23 153:7,
14,19
154:11,15
155:10
156:19 159:8
162:25 188:3

189:8,10
190:14
193:23
203:24
**5-10**
63:13
**5-5**
63:19
**5-7**
216:17
**5-foot-5**
113:23
**5-foot-7**
218:7
**506**
162:25
**5339976**
215:17
216:12
219:25
**5340149**
217:18
219:25
**54**
58:12
167:21,22,24
**5575**
162:3,11
163:20
164:13,15
165:9
**5578**
163:3
**5593**
163:5 164:7
204:22

---

**6**

**6**
63:13
209:22,24
212:9
**609**
204:13
**6416**
162:14 192:6

**65**
47:25 48:7
62:21 118:13
**65-year-old**
111:17
133:13

---

**7**

**7**
168:16,22
215:18 216:4
217:11
234:12
**7/10**
196:2
**7/10/18**
56:24 58:2,
12 65:10
88:10
190:17,22
**7/17**
195:25
**7/17/18**
194:11 195:8
**7/21/18**
194:14
**7/23/18**
188:2 191:21
193:25
195:19 209:3
**7192**
166:3
**7334**
163:14
165:21
204:24
**75**
166:8
**7K04**
211:4

---

**8**

**8**
217:12,15
224:2 234:12

**8.B**
8:25
**8/9/16**
210:2
**85**
164:3
**8:00**
34:21 198:25
199:3
**8th**
157:25

---

**9**

**9**
210:6 221:22
222:7 234:13
**9-M**
212:10
**9/21**
46:14
**9/21/18**
46:10
**9/21/2018**
40:8
**911**
25:23 144:7,
9 151:15
160:15,17,21

---

**A**

**A-A-R-O-N**
163:10
**a-g-o-n-a-l**
140:5
**A-S-P**
85:17
**A-W**
165:16
**A-X-O-N**
98:2
**a.m.**
34:20 54:10
153:21
219:10

Aaron
  163:6,7
abide
  70:22 109:5
ability
  73:3
able
  38:14 63:7
  80:24 122:1
  137:4 153:14
  155:25
  184:14 234:7
  240:16
above
  122:25
  161:15 167:3
  177:14
  196:24 221:6
absolutely
  139:23
  171:13
  229:11
academy
  10:23 11:3,
  4,7,10,14,
  21,23,25
  12:3,24
  13:1,3,14,
  20,25 14:4,
  10,18 15:6,
  18,25 18:20
  20:2,5,15,23
  21:10 22:8
  26:3,6 29:14
  30:14,20
  38:3,6,23
  39:6 88:6
acceptable
  131:4
access
  151:13
  199:12
accessible
  92:4,9
accident
  64:15
  218:16,25

accidental
  208:14
accidents
  25:16 52:16
  218:15,18
  219:1
accurate
  93:22 148:18
  161:11,13
accusation
  214:20 215:9
  216:10
  217:14
accused
  222:18
  224:24
  225:3,17
  226:4 227:10
  229:23
  233:15
acknowledgeme
nt
  213:8
acknowledging
  164:11
ACRB
  105:13
across
  73:24
act
  153:25
acting
  66:1,24
action
  8:20 75:21
  92:12 94:11
  109:20
  201:19
actions
  118:6
activate
  239:4,11
activated
  69:13 71:2
  103:7 206:18
activating
  239:14

active
  25:13 119:3
actively
  132:14 133:2
  199:7
activities
  25:11 56:10
  66:10
activity
  25:22 54:18
actual
  78:11 80:21
  105:8 169:23
  239:8
add
  86:10 212:20
additional
  38:21
address
  153:23
adjacent
  203:9
administer
  142:4
administratio
n
  90:18 108:20
  109:4,13,16
administrativ
e
  41:10
admission
  104:10
admit
  104:7,13,18,
  19
adult
  62:19,20
advised
  131:11
  147:10 166:7
  203:25
AED
  26:2
affairs
  40:16 41:25
  42:3,6,10,

11,21,24
  43:12,17
  44:23 45:16
  46:10 47:24
  48:19 94:22
  104:3,5,15
  240:23
affairs'
  104:17
affiant
  222:12
affidavit
  221:17 222:9
  223:23
  224:21 225:6
  229:10
  231:21,23,24
affidavits
  221:12 234:5
affirmatively
  99:7
afraid
  113:25
  115:24
African
  62:15
aft-
  159:2
afternoon
  24:10 34:14
  65:13 198:19
age
  47:25 62:21
  118:13,15
  237:22
agencies
  11:1 32:17
agency
  79:23 89:10
  105:8 106:24
Agent
  153:21
aggressive
  118:17
ago
  14:2 45:25
  58:8 88:1

208:6
241:21,22

**agonal**
140:3,5,8,
13,23 204:19

**agree**
6:19 19:16,
21 31:22
36:2 48:15
49:1 50:1
70:3,17,20
82:14 83:11
87:22 102:21
103:1,13,15,
19 104:25
108:12
113:12
125:18
126:12
131:13,24
132:24
133:6,12,14
135:19 138:5
144:3 159:24

**agreeance**
44:18

**agreed**
6:10 47:21
48:12,25
49:23 51:15
53:2 70:23
71:4 77:7
82:13 87:20,
21 104:22
108:7 115:25
121:17 125:8
133:25 134:4
201:9
204:20,21

**agreement**
8:2 9:12

**ahead**
91:10 120:8

**aid**
26:2,9 138:2
139:21
140:25
141:3,18

142:2,4,7

**ain't**
49:21

**alcohol**
35:17,20
37:3 66:3,5,
11

**alleged**
45:17 117:24

**allegedly**
121:15

**allow**
146:22

**allowed**
4:25 19:10
141:10

**allows**
141:6

**alongside**
236:17

**altercation**
53:18

**alternated**
86:24

**ambulance**
162:1

**Amen**
157:24

**American**
62:15

**ammunition**
86:3

**amount**
132:9

**and/or**
8:3 9:15
35:9 47:16
126:7 128:6
130:14 181:3
184:3 195:15

**angles**
205:2

**Ann**
30:3

**answer**
7:5 19:20
20:21 21:17

39:5 48:5,14
49:3,10,15,
25 91:20
104:24
108:13
109:8,22,23
110:14,24
111:7 116:6,
20 118:10,21
120:6,10
125:1,10,16
126:23
130:17
131:21 139:6
141:21
143:24
147:14
148:6,13,22
149:5,22,24
207:23
208:18
211:10
213:14 217:5
223:14
225:20
226:12,18
228:8,13,15,
19,20,21,25
229:1,7,12
230:2,3,9,
17,23 231:7,
9 232:17,24
237:13

**answered**
118:20
120:12,13
228:6 229:7,
8,16,19
230:25 231:5

**answering**
231:17

**anticipation**
139:9

**anybody**
21:22 35:4
36:3 43:2,12
44:21 49:21
50:2 65:23

74:19 79:12
103:8,22
104:12
121:10 131:8
132:6 141:16
142:3 143:19
150:7 196:19
229:10

**anyone**
8:11

**APD**
89:9,11
94:16 151:14
153:25

**apologize**
7:9,20 28:9
103:5 120:7
144:12
170:25 171:1
193:2 214:10

**apparently**
5:4 29:17
70:7 83:8
93:20 109:15
135:16
149:17
151:2,19
152:1 154:7,
24 157:21
158:4 192:3
195:14

**appearance**
63:25

**appeared**
62:19 71:12
78:7 137:14
145:24
146:3,6,18
199:11,15
213:5 227:2

**appears**
160:18 174:5
176:19
177:10
178:22 180:8
182:15
185:22
195:16

224:18
**application**
  31:9,11,16,
  17,18
**applied**
  89:21
**apply**
  48:24 133:15
**appreciate**
  10:11 18:9
  55:21 153:3
  158:17 169:8
  199:16
  234:18
**approach**
  78:5 93:19
**approached**
  236:10
**approaching**
  59:17 199:8
**appropriate**
  92:11 233:12
**appropriately**
  154:12
**approved**
  189:22 194:3
  195:21
**approximate**
  88:9
**approximately**
  39:7 153:21
  195:14
  241:21
**April**
  27:9,12,25
  87:5
**Arbor**
  30:3
**area**
  22:20 30:2
  50:17 60:25
  65:15,18
  78:13,23
  79:4 81:16
  114:10 119:7
  124:3 128:20
  130:7 146:2

156:8 174:21
175:18 177:7
181:14 183:9
184:13
191:11
196:24
201:23
202:25
238:19,23
**areas**
  22:21 114:14
  134:25
**arm**
  119:18
  122:8,18,24
  123:4 174:19
  202:1 232:8
**armed**
  77:6,7
**arms**
  122:7
**around**
  11:7 16:6
  18:6 26:10,
  20,25 27:4
  30:16 34:9,
  15 54:10
  71:7 72:2
  75:12 84:22,
  23 88:19
  89:16 116:3
  122:17 129:1
  164:8 176:21
  201:17
  241:25
**arrest**
  53:12 55:7
  56:15 75:20,
  24 91:15,18
  92:8,10
  93:20 117:7
  139:10 151:3
  155:6,12
  157:20
  192:21
  193:19
  211:13,14,18
  213:3

221:17,24
222:9
223:22,23
225:7
231:22,24
234:6
**arrested**
  50:7 91:19
  92:3 152:4
  155:1 156:11
  220:4
**arrestee**
  100:22
**arresting**
  154:20
**arrests**
  23:17 221:12
**arrived**
  160:13 161:3
  191:10
**Article**
  8:25
**ascertain**
  237:22
**asked**
  14:9 16:23
  43:2 67:3,4
  104:14
  118:20
  144:14 162:1
  172:22
  200:15
  222:25 228:6
  229:8
**asking**
  50:21 52:9
  60:8 93:5
  104:12
  149:10 152:2
  189:3 227:24
  229:22
**asks**
  7:1
**ASP**
  85:17
**asphalt**
  78:11 80:21

**assessed**
  144:15
**assigned**
  10:15 23:6,
  24 27:13
  28:6 41:10
**assignment**
  22:13,16
  25:2
**assist**
  220:11
**assistance**
  140:21
  144:14
**assistant**
  192:23,25
**assisting**
  155:11
**associated**
  36:15,20
**assume**
  69:10 111:17
  127:18
  135:10
  161:12
  169:20
**assumed**
  137:13
**assuming**
  20:11
**assumption**
  160:22
  171:24
**assumptions**
  66:17
**athletic**
  113:24
**ATL**
  10:17 14:11
  30:7 36:6
  37:6 49:23
  131:4
  166:19,24
**Atlanta**
  10:14 11:1,
  4,9 12:5
  14:5 17:4

21:10,23
22:6,20
30:10,12
31:17 32:18
33:1,6 36:24
38:24 44:25
50:2,16
53:19 56:25
65:14 73:13,
21 74:2
79:14 80:10
87:24
105:12,17
106:24
107:17
115:17 131:8
141:24 142:3
153:22 154:7
166:24
172:10,17
188:12 225:1
**Atlanta's**
106:18
**attached**
187:11
**attempt**
19:18
**attempted**
154:22
155:13
**attempting**
52:13
238:18,22
240:11
**attend**
11:3
**attended**
31:19
**attire**
199:21
**attitude**
90:19
**attorney**
105:10
197:25
198:1,4,8,16
**Attorney's**

235:22
**attorney-
client**
8:3
**audible**
243:14,17,
21,24
**audio**
241:3 243:19
244:1,13
**Auditor's**
106:19
**August**
17:12 26:20
92:3 93:1
94:17 95:9
210:6 234:14
**author**
229:16 240:4
**authorized**
105:17
**automobile**
27:2 155:12
**automobiles**
64:18
**available**
9:15 55:13
128:23
**avoid**
82:17 123:7
**awarded**
31:21
**aware**
7:24 15:1,2,
5,10 20:1
22:1 35:1,3,
4 36:1,10,24
37:16 44:23
45:23 52:6
65:15 80:8
95:8,22,23
103:9 105:6,
7,20,23
106:22 107:3
110:2,19
114:12
115:13

127:17
132:2,15
134:20
135:4,6,8
143:19,25
147:4,8,11,
16 150:7,9
165:3,4,19
197:22
**Axon**
97:25 98:2

---

**B**

---

**B-A-T-T-L-E**
159:6
**b-l-u-e**
54:22
**B-R-Y-A-N-T**
17:6
**back**
19:5,17 20:7
26:12,21
27:7 28:11,
17 29:20
30:9,11 32:9
35:22 72:5
73:14 75:8,
13 77:6
80:15 82:16
89:23 98:12
100:15 101:9
111:9,10
112:11
116:12
122:13 123:6
124:23
129:3,6,10
130:24
131:5,9
134:19
140:22
141:9,11,14
142:10
149:16
150:17,22
153:11
155:19

158:10
164:14 165:2
170:20,25
171:11 172:5
181:11
182:18 196:5
197:16
201:17 213:6
214:16
225:25 226:2
234:2,8,25
240:17
243:5,6,8,10
244:8,10
**back-**
180:2
**backpack**
178:21
180:3,4
**bad**
74:25
**badge**
73:21 162:14
**bag**
204:3
**ball**
139:1
**ballpark**
11:6,7 80:24
81:22 82:10
205:7
**ballpoint**
180:19
**barrier**
78:16,18,20,
21 81:2
201:23
202:2,7
236:20
237:25 238:8
**baseball**
63:2,4
145:11
178:24 179:1
180:15,17
182:13,18
206:10

**based**
34:22 51:11
62:7 67:6
77:4 94:15
146:3 154:8
184:17 195:9
243:1

**baseline**
125:13

**basically**
20:4 159:10

**Bates**
57:9 173:2,4

**bathroom**
28:10
100:13,25
101:3,9

**baton**
85:17 128:19

**Battle**
159:6

**be-**
124:11

**beat**
162:23,24,25
166:25 167:1

**bed**
210:25

**began**
30:12 78:8
119:6 151:20
200:10
236:25
237:24

**begged**
36:23

**begging**
118:7

**begin**
11:20

**beginning**
158:25

**begins**
80:14

**behalf**
8:19,23
150:7

**behind**
85:16,19
115:23
116:18 129:3
176:17

**belaboring**
20:9

**belief**
42:5 197:3

**believe**
7:7 12:12
17:5,11,21
18:14 29:18
31:18 34:9
35:11 37:19
38:16 45:8
50:16 54:7
57:17 59:18,
23 63:25
68:4 69:5,25
70:1 71:22
73:2,11 74:5
77:14 78:2
79:14,17
85:2,22
86:4,19
88:15 89:7,
11 90:25
91:17 92:10,
14 93:13
94:1 98:15
100:12,13,22
101:5 104:5
108:14
113:19
117:17
120:11
122:17,22
123:23
124:25 125:3
127:5 132:7
133:8 134:10
136:25
138:24 140:2
142:7 146:1
156:7 157:3,
14 159:4
161:12 162:2

169:18
171:20
173:19,20
175:24
176:11
177:20
178:15
180:14 181:1
184:15
189:23
191:1,4,17
196:3 200:25
201:3 209:13
211:19,20,22
212:17,25
214:24
216:22 230:5
236:8 239:14
240:8,12,16
241:3

**believed**
35:16 51:11
54:4 92:11
239:16

**bell**
65:11 92:5

**bells**
151:4

**below**
166:9 186:14
219:18

**belt**
84:14,19,22,
23 86:9
128:14 129:1
174:1 176:22

**best**
15:13 16:5
17:10,24
18:1,5,15
24:25 35:12,
15 43:16
52:25 72:14,
16 77:4 80:1
88:25 89:22
94:21 96:2
104:1 114:5
134:7 138:2

139:4 150:6
160:5 164:22
165:18
171:24
187:18 197:3
211:4 222:16

**better**
25:12 39:4
110:22
113:12
122:14
125:16
180:2,21
201:8

**bicycle**
155:23

**big**
15:3 20:9
109:4,16
119:10,13,14
127:25
179:11 216:6

**bigger**
222:1,2

**bike**
155:24 156:4

**bill**
182:16
186:5,14,18

**birth**
199:23

**bit**
6:22 20:3
81:9 88:8
108:3 130:21
179:1,25
189:16 193:8

**bizarre**
66:23

**black**
62:16,17
73:9,12
93:12,13
106:6 178:12
199:6

**Blackwell**
166:11

blank
   143:25 217:5
Blasingame
   5:15 18:13
   35:2,5
   40:10,15
   48:1,12 51:7
   54:4 58:16,
   22 59:15
   61:14 63:21
   64:14 65:22
   67:12,20
   68:3,8,10,18
   77:11 78:7
   81:1 82:25
   121:24
   123:11,19
   129:6 130:24
   136:5,11
   145:24 147:3
   154:3 165:14
   170:5 184:18
   199:22
   200:9,11
   201:15,25
   202:15,25
   203:4,8,11
   204:4 205:17
   210:12
   212:21 230:4
   236:10,13,
   19,23,25
   237:4,5,9,
   16,22,24
   238:14,17,21
   239:7,22
   240:2
bleeding
   146:1 203:19
bleeds
   147:11,18
block
   160:17 191:9
blood
   137:5,20
   181:8 182:16
   183:8,9
   185:7

blow
   190:7
blown
   187:22
blue
   54:21,22,24,
   25 55:10,25
   56:7,10,19
   73:10
   100:19,20
   158:13
   244:16
Board
   9:1 105:13
bodily
   77:23
body
   11:24 12:3,
   5,12 16:18,
   24 49:5,8
   61:23 74:8
   95:21 97:13,
   16,22,25
   100:1,5
   101:24
   102:22 103:3
   104:4 122:4
   123:2 142:19
   145:9,20
   176:18,21
   177:12,14
   206:17,23,25
body-worn
   105:18
   106:25
   239:5,11,14,
   18
bone
   48:2
book
   90:15 91:3
booking
   100:22
books
   220:2
bottom
   152:22

155:22
168:22 171:8
172:24 173:3
178:12
181:24
183:14 184:4
194:6 209:2
216:20
217:22
221:6,9
239:1
box
   127:18,19,21
   136:12
   138:19
   178:18,24
   184:4,13
   203:10
   218:15,24
   219:1 239:1,
   3
boxes
   191:25 217:4
   218:9
boy
   177:1
brain
   147:11,18
brand
   98:2
break
   28:10
   100:13,25
   101:3,9
   234:20 243:4
breaking
   19:4
breast
   73:22 74:3
breathe
   141:6
breathing
   138:7 139:25
   140:1,3
   145:25 204:4
breaths
   140:8,9,13,

23 204:19
brief
   68:4 123:8
   188:5,9
   213:10
briefly
   63:1,9
   212:23
broad
   20:10 84:8
Brooks
   17:21
Brotherhood
   198:13
brought
   123:1 233:19
brown
   93:12 185:9
brush-like
   202:3
Bryant
   17:5,8,23
buffer
   102:1,2
buffering
   97:16 98:8,
   14,17 99:19
   100:6,15
   101:11
   206:17
   239:16,18
build
   113:24
bunch
   163:18
Bureau
   79:20 152:20
   154:1
burglary
   157:15
bus
   151:3,15,16
bushes
   225:5 227:6
business
   51:2,22
   225:23

226:17
227:2,20
228:13,14,
15,18,22
236:12
**busted**
156:20
**butt**
193:4
**button**
8:13 142:17

———————

C

**C-A**
167:3
**CAD**
165:23
171:20,22
**cadet**
22:10
**calendar**
65:9,10
**calibration**
161:9
**call**
10:1 13:10,
11 20:16
24:6 25:23
42:16 55:25
56:4,14,17,
25 57:8
58:2,11,12,
22 74:12,14,
19 76:4 78:1
80:16 93:18
98:21 106:23
130:12
140:8,20,24
144:9 145:13
151:15
152:19
158:11,18,22
160:6,23
164:10,11
166:14
167:16,19

168:2 169:2
170:20
173:2,6
191:2
**call-in**
161:1,4
**call-taker**
159:6
**called**
19:3 36:8
54:16,24
97:21,22
144:7,13,23
159:2,11
160:21,25
161:25 166:2
192:15
**called-in**
164:4
**Caller**
160:2
**calling**
165:1
**calls**
23:16 24:16
25:14,19,21
107:2,19,20
108:2,9
109:2,13
110:2,11
160:17
161:24
171:12 172:3
**cam**
16:18,24
49:5 74:8
97:16 100:1,
5 177:12
**camera**
12:12 16:18,
24 49:13
74:9 84:16
86:12,17
87:15,19,23
88:13 89:21
97:22 98:24
100:14
101:2,24

102:14,19,22
103:3,23
104:4,15,19,
20,22 105:3
106:15
110:4,20
142:15,19
143:20
144:1,5,6
177:8,14
180:17
206:17,23,25
207:13,15
239:5,11,15,
18 243:3
**camera's**
142:13
**cameras**
12:3,25 90:5
105:18
106:25 107:8
108:22
**cams**
11:24 12:5
49:8 97:14
**canister**
85:6
**cap**
63:2,4
145:11
178:24 179:1
180:15,17
182:13,18
206:10
**Capron**
8:18
**capture**
107:1,18
**car**
24:5 64:3
67:13 68:9,
18,24 69:2,
6,8,24 70:5,
15 71:7
72:10,14,16
74:15,19,20
75:11,16
86:19 100:3

101:10,13
102:1,6
158:2 162:6,
23,24 180:6
181:24
201:18 204:3
207:4,5
223:5,10
240:11,13
**card**
150:3
**care**
140:17
**career**
95:4 128:5
**carried**
86:5
**cars**
52:16 218:5
**cartridges**
187:19
**case**
19:2,6 20:17
92:1 105:16
143:11
220:10
222:12
**cases**
18:21,23
19:1
**catch**
200:11
**caught**
121:25 126:3
237:20
**caused**
64:7,14
**causing**
52:16
**CDL**
218:25
**cement**
80:22 145:12
183:25
184:3,13
**center**
73:25 186:14

204:15

**central**
189:23
195:21 209:9

**certain**
120:18

**certainly**
6:24 17:18
47:5 48:9
49:7 53:4,8
54:1 76:1
95:8 106:5
107:22
108:1,9
110:21
115:22
118:16
119:22
120:21 121:1
129:24
135:15 136:2
139:2 175:4

**certifications**
26:11

**certified**
9:4 26:5,8

**cetera**
70:22 165:17

**CEW**
13:6,10
132:20

**chain**
43:9

**chance**
230:8

**change**
86:10 106:2
211:22
229:13

**changed**
46:2,23 85:2
125:1
211:20,25

**changes**
15:2,5,10
176:22 212:5

**changing**
15:15

**channel**
157:23

**channels**
157:22

**characterization**
84:10

**characterized**
111:19

**charge**
15:15 17:3
18:13,16
42:2 192:21
193:5,9,13
211:23,24,25
217:5 225:22
228:15
232:4,5,21
233:1,7,10,
19 239:21,
23,24

**charged**
46:18 205:17
232:2,13
233:7,9
239:22

**charges**
91:21 155:20
156:24 192:4
193:19
205:20
210:12
211:20 213:1
214:1 219:16
220:10
221:13
233:4,11

**chased**
113:1 156:22
200:9 201:15

**chasing**
115:23

**chat**
157:22

**chatting**

157:21

**checked**
218:10,12,17

**chest**
175:18

**chief**
17:3,5,8,9,
23,24 18:3,
13

**children**
133:15

**choice**
125:22

**choose**
18:17

**chooses**
80:10

**chosen**
124:17

**chunk**
15:4

**circle**
231:4

**circumstance**
83:12

**circumstances**
13:21 19:9,
24 20:6
33:12 44:5
47:21 60:12
70:14 116:8,
10 120:18
133:20
137:24
139:15
141:20

**citation**
211:13,15,18
214:20
215:21
216:10,12
217:13
218:21
219:21,23
220:2,13
231:24 234:5

**citations**
23:17 56:16
215:8 220:1,
7,9

**cite**
105:8

**citizen**
94:24 105:12
160:17

**citizen's**
44:8 91:7

**citizens**
105:14

**city**
10:14 22:20
36:12 50:24
105:17
106:18,24
166:24
188:12
211:20 212:1

**city's**
14:14,19

**Civil**
5:1

**civilian**
105:15

**claim**
47:7 124:1

**classified**
192:16

**classify**
23:8 76:7

**Clayton**
43:6

**clear**
154:14
157:24

**cleared**
152:5 155:2,
20 156:2,24

**clearly**
72:22 75:14
115:4 118:2
138:11
146:17

clears
  45:16
Clerk
  209:2
click
  8:12
client
  52:3 69:18
  71:10,20
  72:11 75:17
  76:11 77:1
  78:24 80:13
  81:15 82:16
  83:15 100:5
  101:13
  102:25
  111:10,16
  115:19
  118:22
  121:4,12,15,
  20 124:1
  126:12
  132:24
  133:3,6
  134:2,5,18
  135:17
  138:11,22
  139:22
  145:2,4
  147:6,9
  168:8 174:18
  179:14 181:3
  183:16
  184:15 192:4
  219:9 223:18
  225:10
  226:14,16
  228:10,12
  229:15 230:7
  231:4,22,25
  234:9,13
  242:13
client's
  81:21 103:4
  114:13 118:6
  145:11,15
  178:24
  182:13

216:17 218:6
clockwise
  84:24
close
  29:6 71:10,
  13 83:23
  84:1 121:22
  175:12,17
  201:25
closed
  180:8
closely
  177:13
closer
  145:15
  174:11
  179:25
  180:17
  184:23
closeup
  180:21
  182:12
  183:25
clothes
  63:24
clothing
  62:13 67:4
  154:24
clotted
  182:15
CMD
  163:22
  164:15 165:9
co-counsel
  193:1,2
code
  51:20 52:8
  165:19
  167:8,10,24
  192:15
  212:17,18
codes
  166:23
coffee
  28:11
cognizant
  95:16

coincidence
  144:4 208:15
collect
  223:9
collecting
  222:18,22
  223:19
college
  28:22 29:11,
  12,13,17,18
  31:1,25
color
  183:23,24
column
  163:25
combination
  15:17 78:20
come
  16:7 35:23
  68:15 94:16
  100:12
  102:15
  175:14 187:9
  197:25 220:1
comes
  32:13 79:9
comma
  192:1
command
  15:18 43:10
  109:10
  210:19
commands
  121:5 151:20
  155:13,17
commendations
  34:6,10
common
  35:23
commonly
  54:20 134:25
communicated
  109:17
communicating
  164:23
communication
  108:24

112:21
  166:14
communication
s
  56:21 83:2
  110:17
company
  89:10
complaint
  44:8 91:7,17
  94:8,9,10,
  11,16
complaints
  25:16 94:21,
  22,23
complete
  55:1 56:8,11
  197:2
completed
  31:5 42:25
  195:11 196:4
  206:6
completely
  45:16 100:8,
  9,14
comply
  155:18
computer
  56:6 196:16
  198:20 221:3
computer-
aided
  54:17 160:11
  165:25
  166:24
  172:1,13
con-
  140:2
conceivably
  130:25
concerned
  116:13,16
  134:20
  139:25
  140:13,23
conclude
  104:21

235:15

**concluded**
235:15,19
236:4,5,7
245:1

**concludes**
244:23

**conclusion**
6:25 48:3

**concrete**
78:20 128:3
136:13
184:18
203:5,9,16
205:3

**conditions**
65:4 199:24
200:2

**conduct**
236:11

**conducted**
38:22 235:9

**conductive**
13:5

**configuration**
74:5

**confirming**
159:22

**conscious**
166:7 213:4

**consider**
63:25 128:11
135:21 136:3
142:1

**considerably**
67:23

**consideration**
67:7 117:23

**considered**
22:23 64:2
119:3 128:10
136:16 200:6

**consistent**
12:7 60:25
94:12 108:10
118:6 169:8
174:5 176:19

197:6 205:19

**constituting**
119:2

**consulted**
214:6

**contact**
35:23 42:11
43:6,11,14
53:18 72:18
138:16,19
150:8 169:19
175:14
203:4,8,14,
18

**contacted**
9:7 144:9

**continue**
97:2 238:13

**continued**
10:7 72:11
123:10,14
126:1 204:4

**continuing**
42:6

**continuum**
11:17,21
12:24 13:19
96:22

**contract**
9:10

**contractor**
9:5

**contrary**
238:6

**contributions**
51:12,23
52:3,15
199:12 230:6

**control**
86:14 127:22
136:12
178:18
184:4,13
203:10

**controlled**
199:12 206:7

**conversation**
77:10 82:24
213:9,19,21
215:10

**conversations**
8:1,3

**convicted**
32:24

**cop**
106:8

**copied**
166:11

**copies**
56:15

**copy**
210:12 213:3
219:16
241:24
242:3,5,6

**copying**
164:10
166:14

**corner**
8:13 188:15
210:2 216:9

**correct**
4:20 5:25
6:2,6,10,11
7:17 13:18,
23 14:24
17:7,16
19:24 20:13
24:22 27:10,
11 28:1,3,8
30:24 31:6,7
34:17,23,24
39:10 40:11,
12,25 41:3,
7,17 42:22
43:21,22
44:1,5,6,11
45:13,21,22
46:3,7,12,
20,21,25
47:3,9,15
51:16,19,25
52:5 53:5,9,
13,16 58:9,

14 60:7,10,
13 61:19,22,
24 62:2,5
63:8 66:7,8,
12,13,21,22
67:2,8,17,21
68:20 70:14
72:12 74:23,
24 75:18,24,
25 76:3,13,
15,19,21,24
77:2,3,8,16,
17,20,25
78:4,12
80:17 82:18,
21 83:1,10,
19,22 87:18
88:7,11
89:14 95:13,
14,18,19,25
96:3,8,11
97:6,9,12,
17,18 99:9,
13,22,23
100:1,2
101:12,18,
19,22 102:10
103:6,12,23,
24 106:16
107:13,24
108:8
111:13,15
112:4,5,9,
12,16,18,24
113:21
114:15
115:10,19
116:14
118:1,4
119:21,24
121:3,16,18
123:3 124:5,
9 125:19,20,
23,24 126:2,
5,8,10,11,
15,16,24
127:13
128:2,4,25
129:4,7,22,

23 130:2,9,
10 132:18
133:1,4,11,
16 134:2,3,
8,9 137:18
139:17
141:2,8,12
142:11,14
143:17,18
147:25 148:7
154:9 155:2,
21 159:3,7
161:7,8,17,
21 174:12,
20,23 176:24
178:25
179:3,12,16
181:9,12
184:24
187:9,10,13
190:15,16,
18,19 191:16
192:8
193:21,25
194:8,9,11,
12,14,15
195:4 196:23
197:2,18
198:14,15
199:13,14,
19,25 200:21
201:24
202:10,14,23
203:3 204:2,
6,12,17,24,
25 205:4,21,
25 206:20
207:10,11
211:19 212:6
214:8
216:11,13,
24,25 217:10
219:4 220:23
223:20
224:14,15,
21,22 225:11
227:7,8
232:12,14
233:14

243:9,11
corrected
193:3
correction
38:19
correctly
92:16 175:10
Council
9:2 105:17
counsel
5:7 6:24
8:16 55:24
120:8 152:24
242:2
counseling
157:6 158:1
count
64:24 65:4
231:18
County
235:22
couple
39:20,24
107:12 160:8
168:7 208:6
course
6:9 16:15
36:5 37:8
54:14 56:9
84:7 91:18
92:11 95:4
138:23 161:7
163:20
166:17 194:7
196:1 207:9
219:20 227:5
court
4:6,10,17,
18,21 5:4
6:15 7:7,18
8:22,25 9:1,
4,8,13,22
19:9,12
120:12,14
150:20 163:8
217:5 219:10
243:15

courtroom
5:22 6:8,23
covered
16:12
CPR
25:25 26:1,
2,8 141:3,18
create
237:6
created
172:1
creating
203:1
creation
214:23
credits
29:7
crest
146:21
crime
25:5,7 26:15
27:7,16
53:2,8 79:15
118:2 156:8
163:15
165:22
173:14,22
180:24,25
204:23
206:14
212:18
crimes
32:24
criminal
18:22 25:10,
22 29:5
31:15 46:19
53:6 93:16
151:15 157:3
cross
5:10 75:15
92:22
cross-
92:22
crossed
84:2 114:3
201:21

crossing
93:6 200:10
201:15 202:2
crosswalk
92:4,9,15,
21,23 93:7,
15,19
crystal
139:1
cuffs
129:3
culture
106:2
custody
138:13,15,
18,21,23,25
139:14 206:9
219:15
cycle
155:16,17
cycles
98:16,19

_____

D

D-H-P-T
167:7
D.a.'s
235:22
daily
54:11 56:4
damaged
156:21
danger
21:6,14
134:10
darn
223:25
dash
86:17
date
18:10 21:9
40:10,14,21
42:6 46:2,23
56:24 58:12
88:15 89:1
156:20

189:4,21,24
190:17,20,21
191:13,15
194:4,10,14
195:11
199:23
209:3,7
210:2 217:6,
8 220:15
241:19
dated
58:2
dates
39:20,24
40:1,4
dating
164:25
David
165:16
day
34:19,20
35:5,7 45:24
46:5,13 51:8
55:1,5 56:9
65:5,6,7
76:17,25
77:7 86:22,
25 93:25
103:3 108:23
109:12 111:5
117:23
148:4,19,24
158:5 184:12
198:20 199:2
200:15 210:6
220:19
226:14
231:9,11
232:21 233:5
244:14,19
days
44:9 87:2,3
150:24
188:25 189:9
195:14 196:9
208:6
deadly
20:19 21:4,

13 97:6
128:10
deal
105:22
109:16
119:10,13,14
dealing
121:10
dealt
91:8
dean
32:1 43:7
death
16:14 128:12
130:14
debilitate
129:25
December
10:22 11:8
30:15,18,20
decided
232:19
233:13
decision
15:16
decline
127:16
130:20,22
147:2
definitely
119:14 242:6
degree
28:24 29:6
31:5,9,15,
20,21
delay
169:20
delete
99:1
delivered
155:17,18
denoting
187:5
denying
148:25
department
10:15 11:10

12:6 14:11
17:4,11
21:11,23
22:6,9 33:1,
6 36:7 43:20
44:25 45:10
47:14,23
48:11 50:3
56:25 94:19
104:8
105:18,24
108:6,20
110:2 115:18
131:8 141:24
153:23 154:7
162:15
172:17
188:12 225:1
Department's
14:6
department-
issued
85:20,25
202:22
depend
116:21
dependent
116:7
depending
70:14 95:20
128:9 137:24
139:15
depends
19:24
deploy
124:12
125:22 187:8
236:14,16,
19,22 237:3
deployed
123:18,20
124:3,12
125:19
126:15 129:5
130:18
131:15
132:14,23
134:1 136:4

146:10
151:21
154:23
155:14
167:2,10,17,
24 178:2
187:24
202:21,24
deploying
93:25 135:21
deployment
203:25
236:24
depo
7:11 8:14
deponent
225:5
deposes
197:1
deposition
4:23 5:3,17,
18 6:23 8:9,
15 9:8,9
10:4 39:23
40:2 46:16
242:10
244:24 245:1
describe
23:12 37:4
60:12 90:18,
20 187:18
described
65:25 68:22
92:2 115:14
121:22
183:21
describing
57:2 58:8
description
58:12
designed
159:14
destroying
103:16
details
19:12 121:17

detain
  76:1,5 93:19
  96:12 99:17
  126:7 155:25
detained
  94:3 138:12
detaining
  95:5
Detective
  43:6
detention
  211:14
determination
  62:24 118:14
determinations
  66:17
determine
  132:9
determined
  203:19
determining
  106:24
Detroit
  24:5 30:2
  32:18 36:12
device
  89:1 97:22
  98:1,11,13
  127:23
  142:17
  187:24
diaphragm
  141:10
die
  140:9
difference
  14:1 158:6
  169:6
different
  6:22 56:19
  88:9 114:14
  162:19 172:1
  174:3 209:14
  220:1 223:4
direct
  10:7 15:24

72:20 99:25
  231:7 235:2
directed
  210:14
direction
  134:15
  200:10
  201:16
directly
  16:25 64:8
  71:22 72:21
  85:16,19,24
  86:2 94:22
dirt
  123:11
  146:12,24,25
  147:1 179:6
  202:3 237:2,
  18
dis
  74:14
discharge
  225:2
discharged
  37:7 187:15
disciplinary
  31:25
discipline
  32:5 33:18
  34:4 41:15
disciplined
  33:2,6 34:1
  108:23 109:3
  110:5,6,20
  111:2
disclosure
  9:3
discretion
  53:14 233:11
discuss
  18:24 158:25
discussed
  18:23 19:1
  41:17 75:21
  234:12
discussing
  18:21 53:1

54:6
discussion
  4:12 68:1,4
  244:6
dismissed
  214:2,4,7
dispatch
  54:17 56:13,
  18 58:7
  74:14 107:1,
  19 108:2
  109:2 110:11
  144:25
  157:23
  160:11
  161:19,22
  165:19,25
  166:24 169:7
  172:14
dispatched
  169:3
dispatcher
  58:19
  144:10,14
  159:7,8
  164:23
  167:18 172:2
  203:24
dispatcher's
  166:4
dispatches
  172:1
disposition
  42:10,12,13
dispositioned
  44:9
dispute
  32:4 65:12
  148:10
  151:18,25
disputing
  227:16,17,19
disrespect
  87:11
disrespectful
  84:7 229:5,9

distance
  80:25 82:13
District
  235:22
division
  22:18 56:21
  110:17
document
  56:23 57:2,7
  58:3,8,10
  74:13
  152:12,18
  154:6
  159:11,20
  160:24 166:2
  188:7 194:3
  196:22
  197:6,9
  207:17,18
  209:15 212:9
  215:19,25
  216:15 219:9
  220:18
  221:18 222:7
  229:13,17
  232:1
documentation
  159:25
documents
  92:1 105:11
  244:17
doing
  6:14 23:3,12
  24:14 26:14
  28:5 59:1,
  14,21 65:25
  66:14,25
  72:1 76:12
  93:14 95:24
  100:21
  105:25
  108:11
  112:10
  121:23 133:3
  171:2 204:10
  213:24 215:8
  230:8 233:16

dollar
  186:18
door
  31:3 69:24
  75:12 156:21
doors
  187:20,22
doubt
  129:5
downside
  178:14 200:4
DPD
  36:12
dragging
  49:19
dressed
  62:12 63:21
drew
  123:18
  238:25
drive
  87:2,3
driven
  86:20
driver
  67:13 223:6
drivers
  134:21
driving
  68:24 86:24
drug
  156:8
drugs
  35:17,20
  37:3 66:3,5,
  11 156:11
  206:5
due
  12:2 16:2
  64:9 148:19
  160:22 196:9
  203:11
duly
  4:2 9:20
  197:1
duties
  35:8 37:8

41:10 53:19
225:3 226:3
duty
  37:14,22
  40:22 41:1
  55:2 225:17
dying
  140:14

―――――――――

**E**

E-911
  160:13,14
e-mail
  94:23
e-mailed
  241:19
E-R-A
  185:1
e-v-e-n-s
  195:5
earlier
  30:5 111:16
  150:24 159:1
  174:1,4,22
  201:1,5
  226:19 238:9
early
  10:20 30:13
  34:14 38:1,8
easily
  141:6
eastbound
  59:5 114:22
  164:3,20
  166:8 182:7
  202:16
  222:19
eat
  61:14 62:10
eating
  61:10
edge
  78:11 179:8
effect
  68:11 93:21
  99:15

effective
  105:25 127:6
effort
  202:24 237:7
  240:18
eight
  34:9 84:2
  85:21 219:10
either
  7:5 43:11
  47:1 51:10
  55:18 66:20
  67:24 101:20
  105:3 118:24
  181:2 201:20
  231:3,16
  234:11
elaborate
  159:16
elapsed
  142:20
elderly
  14:20 48:1,8
  118:7,11,13
  133:10,13
electrical
  13:5 127:19
  178:18,24
eleven
  86:1
embankment
  240:17
emblem
  182:22 185:1
emergency
  25:19,21
  26:9 71:1
  139:9,21
  160:15
employed
  10:14,17,25
  11:9 76:17
employment
  41:9 51:22
empty
  158:2

EMS
  168:10,16,
  17,21 170:1
  204:1,13
en
  169:4
encompass
  232:3
encompassed
  225:23
end
  10:9 98:13
  139:15
  178:13
  200:8,9
endanger
  125:8 133:21
endangered
  134:1
endangering
  134:6
ends
  80:14,22
  81:20
enforce
  49:22
enforcement
  25:10,11,20
  75:21 106:1
  193:14
  224:12,24
  225:1
enforcing
  52:8 53:7
engage
  103:9
engaged
  103:23
  203:11
  237:21
engaging
  25:10,20
  66:9 207:5
Engine
  204:13
Enlarge
  209:16

OFFICER JON GRUBBS
January 28, 2021

entail
192:19
enter
8:23
entered
81:16 167:19
entering
19:5 202:25
entire
79:23 104:17
entitled
6:25 152:20
228:7
entity
105:15
entry
52:14 165:8
environment
135:22
equation
70:17
equipment
69:12 86:4
88:3 99:18
169:21
equipped
85:13 86:16
equivalent
79:24
Era
185:1
erased
103:11
erases
98:16
erasing
143:20
Erika
17:9
escaping
19:4
essence
18:16 20:9
71:3 76:5
106:1 114:14
122:24

essentially
157:9
established
126:14
estimate
12:22 80:20
81:24 82:4
84:1 110:10
estimation
191:2,4
et
70:22 165:16
evade
117:7
evaluate
139:19
evening
24:10
197:10,11,12
event
56:14 94:18
95:16 137:25
140:20
141:17
188:25 189:9
191:7
events
12:15 34:2,
11,14 41:20
45:23 48:22
50:4 55:5
65:15 89:17
102:24
107:11 121:9
163:12
167:16 196:1
197:16
198:18
everybody
150:19
everyone
7:21
evidence
5:1 77:7
103:17
108:21
181:15

186:21
187:1,6
205:24
evident
84:9
evidentiary
206:13
evidentiary-
wise
183:10
evolving
124:19
EWI
221:16
ex-
127:7
ex-vet
60:14
exact
37:20 64:24
88:14 114:9
140:19
144:21 145:7
175:2 213:7
224:20
exactly
46:9 59:11
63:13,16
68:16 88:20
94:9 97:8
98:1 100:17
101:4 111:18
132:17 133:3
134:22 143:5
145:7 149:23
174:25 176:2
189:1,20
211:5 213:7
220:14
221:10
223:15
EXAMINATION
5:10 10:7
235:2 240:21
examined
4:2 9:20

exceptions
131:12
excessive
132:5
excuse
7:23 137:7
238:5
excuses
113:12,13
executing
23:15
exercising
115:18
exhaust
97:5
Exhibit
58:1 74:12
152:20,22
154:7
158:10,21
165:6
168:18,19,21
169:13
170:20,25
171:6 172:5,
19,20 173:7
186:1 188:3
189:8,10
190:14
193:23 194:7
209:22,24
212:9 215:18
216:4
217:11,12,15
221:22 222:7
224:2,9,16
Exhibits
234:12
exigent
133:20
exist
133:20 215:6
234:7 244:17
existed
19:9 45:24
exists
80:23 87:20

exit
  75:11 80:15
exited
  69:7 70:2
  100:4 199:20
exiting
  207:5
expand
  141:11
expanding
  85:17
expect
  120:1 121:8,
  9,14
experience
  36:6 60:4,16
  62:7 77:5
  117:21
experienced
  63:10
experiences
  6:18 52:12
explain
  234:7
expressly
  109:19
Expressway
  164:20,21
  202:16
extension
  122:25
extent
  109:8
extra
  86:3 111:3
extremely
  92:16 148:3,
  10
eye
  72:18
eyes
  72:21 76:11

———————
        F
———————

F-I-R

172:6
face
  62:25 63:1,7
  136:19
  137:5,19
  140:12
  141:10
  203:22
face-down
  136:11
faced
  137:11
facial
  147:9
facing
  122:16
fact
  12:2 22:5
  44:3 64:1
  66:9,16
  76:25 101:8
  109:14
  116:15
  125:6,21
  126:25 127:8
  130:20
  131:13
  132:13
  147:23
  148:17
  173:17
  191:20
  195:8,25
  196:24 228:9
  229:24 238:6
factors
  96:6
facts
  104:11
factual
  241:13
failed
  100:15
  107:1,18
failing
  92:4

failure
  92:8 107:22
  110:20
fair
  31:5 47:6,10
  51:10 63:20
  76:22 84:10
  93:24 99:24
  102:8 111:1
  115:16
  156:15 194:2
  201:6
fairly
  84:1 111:23
fall
  12:20,22
  129:15,18,19
  130:4,8,25
  135:12,13
  136:2,5
  148:15
fall-
  242:25
fallen
  237:17 243:1
falling
  148:19
false
  226:5 229:3
famil-
  106:17
familiar
  6:2 11:18
  20:25 21:1,
  3,7,18 51:5
  106:17,18,20
  132:12
  133:22
  151:17 167:8
  175:4,6
  198:5 205:10
familiarity
  12:8,9
family
  32:14,15
  150:6

far
  82:12 83:17
  91:6 94:19
  101:24
  102:11 127:4
  159:14
  160:25
  185:12,14
  190:9 194:3
  204:19
  221:11 233:3
fashion
  63:22 164:24
fatalities
  218:25
fear
  117:3,5
  126:13,14,17
feasible
  20:19 21:5,
  12,25
February
  25:3 26:14
federal
  4:25 5:1
  21:4,8,19
  22:1
feeble
  237:25
  238:14,16
feeling
  213:23
feet
  49:20 80:24
  81:22,24
  82:4,10,23
  84:2 111:11
  127:6,17
  145:17
  175:19 205:9
fell
  148:3,8,10,
  14 149:16
  152:4 155:14
  156:23
  203:15
  237:10,12
  242:13,20

felon
  117:8
felony
  53:8 120:19
  232:10,22
felt
  118:7 184:18
  233:12 237:5
fence
  78:20
field
  10:15 13:2
  22:16,17
  23:1,5,6,12,
  20 27:13,15
  34:23
fighting
  154:22
figure
  25:7 43:13,
  19 104:17
  166:19 221:9
file
  91:25 92:2
  151:14
  153:24
  156:17 209:3
  234:6
filed
  44:20 94:10,
  22,24,25
fill
  7:14 28:10
  158:4
final
  8:10
financially
  8:21
find
  45:20 48:19,
  20 49:5,6
  55:19 57:10,
  16 93:3
findings
  42:17
fine
  87:12 229:15

231:16
finish
  23:19 26:13
  91:10 228:3
finished
  30:14 141:21
finishing
  214:11
fire
  171:18
  172:10 204:1
firearm
  37:7 61:19
  76:18,23
  77:1 85:9
  127:2 206:2
fired
  146:10
firm
  9:9
first
  4:2 9:20
  16:4,6 22:8,
  16 25:13
  26:2,8,9,10
  30:10 33:5,
  7,9,10 38:2,
  9 40:17 48:1
  58:21,25
  59:3,13,15,
  21 61:4
  67:11 68:6,
  8,10 78:6,
  19,24 82:7
  83:20 88:3,
  13,21 89:4,6
  136:20,21
  138:2 140:25
  141:3 142:18
  149:9 151:6
  153:4 155:16
  160:18
  162:23
  163:21 165:8
  166:1
  171:11,12,17
  173:5 190:8,
  10,11 198:16

199:4 203:6,
  21 205:20
  212:9 215:17
  235:6
  236:13,22
  237:21
fitness
  84:12
five
  29:1,2,16
  38:21 39:7
  81:24 82:4
  88:9 107:16
  152:22
  161:1,16
  164:2 175:19
five-minute
  234:20
flashlight
  85:23
fled
  155:23 156:8
  170:5 199:23
  230:7
flee
  78:8,9
  134:25 217:1
  225:4 232:7
fleeing
  20:7 114:20
  117:6,8
  123:11
  192:20
  193:15 227:5
  239:24
fleet
  41:12
focusing
  27:19
fog
  71:14,18
foliage
  81:10 203:11
folks
  4:14 14:20
  18:24 28:9
  31:8 34:23

35:9,12,15
  36:2,8,13,
  15,18,22,25
  37:2,4 43:12
  50:20,21
  52:15 53:11
  54:11 60:5,8
  90:19 107:22
  110:1 113:6,
  7 129:17,18
  150:11
  157:21
  166:18
  169:25
  214:10
follow
  107:23
following
  9:2
follows
  4:3 9:14,21
food
  61:10 64:21
foot
  63:13 71:25
  72:8 78:8,9
  101:16 113:4
  115:19,22
  117:6 126:1
  132:15 133:2
  154:21
  199:23 207:6
  217:2 232:7
  237:20
footage
  103:15
  143:21 144:5
  208:2,3,5
  239:8
force
  11:17,20
  12:23 13:19
  14:10,12
  15:3,6
  16:20,24
  18:23 20:19
  21:4,13 45:6
  47:11 48:21

80:3 91:7,18
95:15 96:14,
18,19,21,22
97:1,2,3,6
128:10
131:17,25
132:5,9
141:17,25
150:25 151:2
154:2 156:2

**forced**
125:22

**forearm**
151:22

**foregoing**
197:2

**foremost**
48:2

**foreseeable**
130:13

**forest**
81:16

**forget**
119:20 121:2
171:2

**forgetting**
108:4

**forgive**
13:25 80:18
105:8 191:24

**forgot**
128:13
170:25
243:10

**form**
195:9 237:11
238:3

**formally**
46:18 233:15

**format**
5:17 6:2,17

**forms**
214:20

**forth**
24:15 46:9
98:12 106:8
165:2 195:10

**forward**
4:16 5:6
10:3 72:8
136:5

**found**
136:20,21
139:14
206:2,5
214:18

**four**
35:21 38:10
85:16 162:19
175:19
195:14

**four-day**
87:2

**fractures**
147:9,20

**frail**
133:17,19

**frame**
12:6 15:11
44:7 65:19
107:19
144:21

**front**
39:15 62:4
70:5,16 71:8
72:3,5
73:14,19
74:6,10
75:12 84:16,
23 85:24
86:1,2 93:2
123:1 156:21
158:23 171:1
174:19
182:21,22
201:17
229:10

**FTOS**
23:7

**full**
40:22 42:8
88:17,19
122:3 153:7

**fully**
101:17

242:18

**Fulton**
235:21

**future**
47:20

---

**G**

**G-M**
193:12

**gain**
119:6

**gallery**
8:13

**gals**
108:21

**Garner**
19:3,8 20:15

**gas**
158:2

**gave**
46:8 123:8
125:7 199:22
241:15

**GBI**
79:17,19
80:1 92:1
104:3 135:5
151:12 152:1
154:8 186:24
206:15
235:7,8

**GBI's**
235:17

**GDOT**
127:23

**general**
5:17 19:16
44:8 55:4,25
65:19 67:11
81:12 106:3
147:15 178:1

**generalities**
14:5

**generally**
19:7,17,21
70:19 105:20

106:1 115:13
153:12
154:11
188:16

**generated**
56:20 159:3
172:9 196:16
201:3

**gentleman**
17:15,19
62:16 151:19
155:6 157:1

**geographic**
22:21 23:7

**Georgia**
9:2,4 15:19,
20,23,25
16:3,9,22,25
79:20,23
152:20 154:1
216:9 217:13
226:1

**gesture**
66:25

**getting**
49:20 74:20
76:10 77:9
88:2,22
89:23 101:14
102:5
106:12,13
108:19 110:6
119:1 122:13
127:1 142:8
143:21
151:16
169:21
188:14
199:17 201:5
237:5

**give**
7:4,13 10:21
20:18 21:5,
11 36:11
38:18 42:24
47:6,19
50:25 55:4
57:18 64:4

67:24 75:1
80:24 89:16
90:23 93:22
98:10
124:10,13,
16,21,23
125:4,5,15,
18 127:9,11
131:7,23
141:18
153:16
189:18

**given**
5:18 38:11
40:17,18
46:15 58:15
89:12 115:17
134:24
151:13 164:5
211:14 242:2

**giving**
22:3

**glitch**
5:4

**Glock**
85:11

**gloves**
180:12

**goals**
43:18 105:24

**goes**
98:12 143:17
146:25

**going**
6:14 7:2
11:15 12:16
15:7 18:10
20:2 28:2,
10,13 29:13
34:2 43:9
52:23 57:12
58:1 65:14
72:5 75:4,
12,23,24
76:2 79:25
80:19 81:7
84:24 85:1,4
90:15 96:5

97:5 99:11,
16,17 101:16
104:16
108:23
111:9,21
112:13 115:3
117:11,14
119:9,20
121:10,21
125:7 127:18
134:14,17
139:9,16
150:10,11,13
152:14
153:1,11
156:16
159:19
165:2,13,23
170:20
172:16,18,23
173:3,5,6
181:13 188:3
189:7 196:11
209:22
214:13 222:6
223:8 228:2,
5 229:1,4,8
233:23
234:21
244:4,10,24

**good**
5:12,13
57:24 86:9
90:13 113:11
144:11
168:15
183:25
189:17 190:7
244:19

**grab**
122:1 154:22
175:23,24
176:1,7

**graduate**
28:20

**graduated**
11:8 22:9
30:20

**graduation**
23:4

**Grady**
168:7,10,12,
16,21 170:1
203:25
204:13,15
210:10,11,23
211:14

**graveyard**
24:6

**great**
189:16

**grew**
29:25

**grievance**
44:20

**ground**
94:3 95:5,9,
17,21,22
96:4,5,7,10
119:6
129:15,17,
18,21 130:5,
8 136:19
139:24
142:25 143:1
152:4
155:15,25
156:23
187:16

**group**
105:14 173:6

**Grubbs**
4:1,24 5:12
8:16 9:17,
19,24,25
10:9,12
11:6,15 13:8
15:14 18:4,
20 19:24
22:14 24:22
26:17 28:19
30:7 32:10
34:13 35:9
38:14 41:23
44:16 47:25
49:18 50:7

53:1,11
54:12 55:11,
24 56:7,24
57:6,25
61:13 65:6
72:19 74:25
75:10 78:22
80:2 81:8
89:25 91:5
97:14 102:15
104:1 106:6,
11 108:2
112:25
115:16
120:10 128:6
131:2,13
134:17
141:16 143:8
144:3 147:5
148:16
150:22
151:20 153:8
154:17,21,22
155:25 165:1
168:15
172:16
184:5,24
186:25
188:15
190:15
195:10 210:1
214:18 216:7
217:18 225:1
227:24 228:3
230:2 234:4
235:4 240:23
242:12
243:16,19,22
244:1,12

**Grubbs'**
190:2 242:10

**Grubbs's**
153:24
188:2,13

**guarding**
52:19

**guardrail**
79:9 80:16,

23 81:5,9,
15,22 82:2,
8,22 83:21,
23 84:3 86:8
111:11,22
112:14
114:3,10
117:11,15
119:2,8
121:20,21,25
122:4
123:21,22,24
124:2,4,7
127:18
128:16
145:16
173:18
174:15,18
176:11 177:7
178:13 202:8
205:2

**guess**
23:8 42:5
46:22 104:16
127:22
159:16
164:22,25
165:4,18
171:25
175:21
195:20 209:1
220:3 243:18

**guessing**
11:16 44:2
46:23 110:9

**guidance**
15:19

**gun**
61:18

**guy**
43:17 84:8,9
109:12 156:4
172:25 220:4
222:22 223:9

**guys**
70:5 75:1
100:16
108:21

109:15

―――――――

**H**

**h-o-l-d-i-n-g**
20:16

**half**
38:11 42:19
43:23 45:9,
25 49:20
104:21 105:1
149:11

**hand**
9:18 59:23,
24 60:18,19,
20,21 61:4,
18,21 64:20,
21 66:25
84:24 112:15
122:11 123:4
175:9 176:7
188:15

**handcuffed**
132:23,25
155:19

**handcuffing**
95:6

**handcuffs**
85:20 94:3

**handle**
128:1

**hands**
59:19,20,21
60:22 76:14
126:6 129:2

**handwriting**
215:12
216:14,16
217:20,21

**handwritten**
215:20

**handy-dandy**
65:9

**happen**
6:22 7:2
45:15 70:6
95:13 96:2

116:23,25
135:15,16
158:13

**happened**
46:4,9 48:25
69:1 94:13
103:14 120:1
121:1 157:13
196:13 207:6
240:10

**happening**
237:8

**happy**
87:11 92:25
152:15,19
189:7 215:14

**harassed**
52:13

**hard**
87:19 95:20
130:5 148:3,
11

**hard-copy**
54:20

**harm**
77:23

**harm's**
127:11

**hat**
181:8
182:19,21,
23,25 184:23
185:8

**hazard**
52:14 203:1

**head**
15:14 92:7
99:6 137:5,
20,23 138:4
145:9,11,15
146:2,7
147:8,15
203:20

**heading**
69:21
114:18,21
134:15

**headquarters**
153:23

**hear**
30:7 112:17
175:3 241:9
243:15

**heard**
21:21,24
36:14 78:3
83:18 90:7
105:21 107:4
113:13,15,
17,19 128:5
132:6 135:13
140:12 142:2
184:5,9
206:7 213:16

**heavily**
65:18

**heavy**
65:4 154:21
199:23 200:2

**heck**
97:24

**height**
63:18 216:17
218:6

**held**
4:12 8:1,4
16:9 244:6

**help**
24:25 25:12
47:16 90:15,
24 122:14
138:7 142:8
196:19
238:22

**helping**
49:21

**hence**
139:25

**hey**
90:13,24

**high**
28:20 29:8
156:7

highly
108:10
highway
51:21 52:18,
21 134:25
199:12
202:21,25
225:5 226:16
227:6
236:12,17
237:6
hill
127:15
130:21,25
136:1 145:10
146:11,21,25
177:9 178:9,
14 179:6
181:14 200:4
hinder
224:25
hip
128:20
hired
30:18
history
44:25
hit
52:16 96:7
130:8,23
135:17 136:1
142:16 143:9
155:25
hits
95:21
hitting
129:21
130:14
206:25
hold
154:25 177:2
188:4 219:6
holding
59:23 183:16
holdings
20:16,17

Holiday
156:21
home
29:20,23
30:11 241:24
homeless
35:13 36:18,
19 60:14
64:1 67:5
118:7
homelessness
35:20
honcho
15:14
honest
99:24 241:13
honestly
42:9
honesty
199:16
hope
87:9 95:13
hopped
111:24 119:7
hos-
234:8
hospital
139:16
147:5,7
168:8 204:15
210:10,11,
23,25 211:3,
5 234:8
hotel
156:22
hours
24:4 231:11,
15,18
hundred
18:8 41:25
88:15 101:6
123:25 215:3
235:16
hurdled
111:21,24
238:8

hurdles
111:25
hurt
61:25 62:4
91:2 117:12,
15 120:3
134:5
hyphen
164:3 192:10
hypotheticall
y
48:20 103:14

---

I

I-20
59:5 114:21
164:3,20
182:7 202:16
I-75
164:3 166:11
222:19
I-75/-85
164:19
I-75/85
59:5
IA
46:14 135:9
IBPO
198:13
ICU
211:2,6
ID
162:15
166:3,5
209:3
idea
160:4 161:6,
9 162:20
163:23
164:9,21
165:9,15,18,
24 167:14
169:16
170:22
171:10
181:24

183:1,3
185:23
186:17
187:6,7
198:19 209:8
218:2 219:21
identificatio
n
74:13 168:20
172:21
identified
199:22
212:25
ignored
121:4
ill
36:9 66:16,
21
illegal
50:22
illness
35:10,20
36:16
immediate
138:2 139:20
140:17
141:18 142:2
immediately
70:16 85:8
118:17
140:18 141:1
203:10,24
206:18
236:14
239:12
imminent
21:14
impact
64:7
impede
64:11
implementing
15:15 18:16
importance
6:9
important
48:9,22 83:4

OFFICER JON GRUBBS
January 28, 2021

106:9 121:5

**inaccurate**
225:11

**inadvertently**
100:14
143:10

**inches**
205:10

**incident**
5:15 18:12
22:24 40:10,
14,24 41:16
42:14 46:24
57:1 74:16
79:10 88:18
92:2,15
93:1,8
100:11
103:4,6
111:5
142:16,18
151:1,2,10
153:5,9
154:2,16
155:10,22
156:1,4,6,19
159:3,12,23
160:9,11,12
161:15 162:1
171:14
172:9,12
173:13
177:23
181:15
188:11
190:15,25
191:2,10,25
192:16
194:23
196:11
197:20 201:4
205:16
206:16,21,24
207:2 210:6,
7 220:13,15
239:5,9

**incidents**
80:6 150:23

**include**
76:14 121:5
193:15 240:1

**included**
239:23

**including**
104:3 192:20
239:24

**inconsistent**
227:1

**incorrect**
225:18,22

**increase**
105:25

**incumbent**
96:1

**independent**
9:5 105:14

**indicate**
5:2

**indicated**
119:6 193:15
235:19

**indicating**
57:10 60:23,
24 85:1,22,
24 122:23
153:6

**indicative**
66:2

**individual**
48:1 50:8
91:17 92:3,
16,20 94:3,
6,10

**individuals**
43:14

**influence**
66:2,5

**info**
191:25

**information**
46:9 47:20
48:9 49:7
58:11,15,18
64:13 102:24
105:16,21

117:13 160:2
163:19 181:6
207:10
212:18,20
221:2 241:13

**informed**
149:6,9
170:5

**initial**
167:16
235:12

**initially**
23:3 192:4

**initiated**
198:21

**injure**
95:17

**injured**
25:23 94:7
95:10,23
128:6 129:19
135:12 137:8
138:22
139:3,14
142:1

**injuries**
94:6 139:20
147:10,16,23
148:11,17,24
149:9,12,18
150:1 154:3
213:12,15
218:12

**injury**
128:12
130:13
137:21,24
138:4 218:25

**ink**
183:24

**Inn**
156:21

**inquired**
150:2

**instance**
91:12 121:9

**instructed**
212:5

**instruction**
7:5

**intended**
70:8 106:25
129:9

**intending**
51:17

**intent**
75:14,20
76:1

**intention**
174:25 175:2

**intentionally**
62:3 106:14
108:11
117:15
120:17

**intentions**
236:9

**interacted**
106:2 220:5

**interaction**
8:4 35:1,5
64:22 74:21
80:3 82:17
99:16 103:4
126:10,19

**interactions**
106:7

**intercom**
69:18

**interested**
8:21 149:17

**interesting**
144:4

**interface**
8:5,14

**interfere**
64:6

**Interim**
17:5,23

**internal**
40:16 41:25
42:3,6,10,
11,21,24

43:12,17,18
44:23 45:16
46:10 47:24
48:19 94:22
104:3,5,15,
16 108:19
240:23

**International**
39:1 105:19
198:13

**interrupted**
157:10

**interrupting**
120:8

**interview**
51:15 104:15
230:8 240:25
241:1,15

**interviewed**
240:24

**intoxication**
66:11

**introducing**
152:11

**invest-**
80:4

**investi-**
79:1

**investigate**
42:7 80:2,5
154:2

**investigated**
131:18 135:7

**investigating**
135:5,9

**investigation**
27:15 34:23
41:19,24
42:3,13,21,
25 43:19
44:24 45:2
47:24 79:4,
7,20 92:19
104:2 151:13
152:21 154:1
235:7,8,11,
12,15,17,19,

23 236:1,3,
5,6,11
240:24 241:7
244:17

**investigations**
10:16 16:15
27:14

**investigative**
79:1,22
152:21
153:25

**involve**
45:6

**involved**
9:16 18:12
35:8 121:9
151:3 154:8
181:15
214:22 215:1

**involves**
122:16

**involving**
218:18 219:2

**issue**
108:15
170:14 225:6

**issued**
38:4

**issues**
36:4 37:3

**item**
185:8

---

**J**

**jail**
100:12,16,
21,23
101:24,25
139:10,14
219:13 243:4

**James**
8:22 9:4

**Jan-**
224:3

**January**
8:17 26:25
30:17 39:8
40:8,20
41:14 44:12

**Jerry**
35:2,5 54:4
58:21 59:13
63:20 65:22
67:20 68:18
70:4 146:10
154:3 199:22

**job**
50:21 53:19
104:17
157:20 158:4

**Joe**
8:16

**jogged**
206:22

**Johnson**
4:4,14,19,22
5:9,11,14
7:7,11,12,16
9:25 10:6,8
19:23 20:24
21:20 28:9,
19 48:7,16
49:4,12,17
50:2 55:16,
20,23 57:5,
12,15,19,22,
24,25 58:5
75:1,10
105:2,12
108:16
109:11,25
110:18
111:1,9
116:9,23
118:12,22
120:7,11,15,
16 125:12,
14,17 126:25
130:18
131:24 139:8
147:17
148:7,16,25

149:8,20,25
150:10,19,
21,22 152:9,
10,13,19
153:3,7,18
158:10,16,
20,21 163:11
168:17,21,25
169:2 171:5,
6 172:18,22
173:8,11
174:11
176:16
177:1,6
178:5,8
179:18,20,
23,24
181:20,23
182:9,12
184:20,23
185:4,7
186:1,4,10,
13 188:1,11,
14 189:12,
18,25 190:1,
4,7,11,13,14
193:11
208:1,20,25
209:11,16,
19,22 210:1
211:13
213:18
214:10,18
215:16,20,22
216:1,3,6
217:12,17
218:1,2
221:21,25
222:1,4,6,8
223:17,22,24
224:7,11
225:15,25
226:11,13
228:4,7,9,25
229:4,9,18,
22,23 230:3
231:2,6,12,
17,21 232:19
233:3,21

234:4,17
237:11
238:3,6,10,
12 240:22
242:2,7,9,12
243:18,22,25
244:8,12
**Jon**
4:1 9:19,24
153:24
**judge**
6:13
**Judicial**
9:2
**July**
12:16 15:7
17:11 18:11
22:5,22 28:7
34:2,11,13,
25 35:7,22
37:12,23
38:9 39:8
40:6,9,24
44:12 50:4,6
53:11 54:9
55:10 56:1,8
58:16 65:14
88:18 95:3
97:10,11,15,
21 99:15
100:1 102:25
106:13
107:11
108:18 111:9
132:12
153:20
188:16
191:14
197:13 210:5
217:8 219:10
220:20,21
221:7 224:3,
19 236:10
**jump**
175:22
237:25
**jumped**
111:24 238:4

**jumping**
70:4
**jumps**
181:14
**June**
11:8 27:5
91:5
**jury**
6:13
**justice**
29:5 31:15
103:16

---

**K**

---

**Kalamazoo**
31:1
**keep**
54:13 70:9
72:1 77:5
99:11 138:7
140:1
**Kendra**
8:22 9:4
**kept**
76:11 139:25
**kick**
120:17 193:4
**kicked**
32:7
**killed**
95:24 128:6
**kind**
12:5 15:14
23:11,18,19
24:8,9,25
26:12,16
32:9 51:24
54:13 55:4
56:8 61:9,13
76:23 88:1
96:6 124:11
127:24 144:3
145:12,19
146:14
159:11,21
165:19

174:11,19
175:22
176:17 177:9
178:16 179:8
181:13,14
182:16
183:8,13
185:13,17
187:19 211:2
**kindly**
7:3 55:17
121:21
179:18
**knee**
155:18
**knew**
30:4 35:16
87:7 91:1
97:14 114:8,
9 115:9,22
129:5 130:23
137:7,20
243:5
**know**
6:9 15:3
18:3 23:14
31:1 33:25
36:1 37:20
40:4 41:22
42:4,9 43:17
44:2 45:1,10
47:7 48:11,
23 49:8
51:10,18
54:24 56:2,
3,5 57:9
58:16 62:7
63:12 65:5,6
66:7,20
67:5,10
68:24 71:2,
14 72:21
74:20 79:13
80:7,10,11
81:5,22 82:5
86:11 87:1
89:10 91:6
97:20,23

100:24
101:24
102:6,7,11,
13,16,17
103:23
105:13,21,22
106:5,19
107:10,12
108:17
110:14
111:25
113:1,16
116:23
120:24
121:11,15
127:21
128:13,17
129:24
131:16
134:13
135:16
137:10,23
139:1,6,22
140:5,9,19
141:6 142:12
143:14
144:21,24,25
147:18,21,24
148:13,22,24
149:1,3,7
150:1 152:17
157:18 158:7
159:12,15,
17,20 160:14
161:6,22
162:16,18
163:1,16,17,
22,24 164:16
165:21
166:2,3
167:14,17,22
168:8,9
172:8 180:22
182:1 185:9,
12,14 188:19
189:13,21
192:18
195:5,17,20
198:18,21

199:3
206:12,14
207:19
208:7,18
210:18 211:6
212:8 213:8
214:1,4
219:13
220:17,24
221:10,11,18
225:20
227:23
229:1,2,20
230:22
231:1,18
235:6,8,14,
21 236:3,6
237:9,16,19
238:17,21
240:6,10
243:7,8
244:12
**knowing**
114:8 149:17
**knowingly**
224:25
**knowledge**
15:13 17:25
18:1,6,15
35:13,15
43:16 48:24
52:25 72:15,
16 77:4
80:2,4 89:22
94:21 104:1
114:6 117:9
134:7 139:4,
13 150:7
160:5 183:7
197:3 222:16
**known**
13:4 104:2
109:13

---

**L**

**L-O-C**
168:4

**lack**
109:20
**landing**
239:2
**lane**
59:10,11,18
69:22,25
70:1,8
71:13,21
75:15
**larceny**
27:2
**large**
8:12 73:24
**late**
12:13 22:10
30:16 38:1
199:1
**laugh**
157:17
**Laughing**
157:17
**law**
14:1,2 18:24
20:17 21:4,
8,11,19,22
22:1 46:19
52:17,25
53:6,7 54:6
80:9 138:10
193:13
211:21 212:3
224:12,24
225:1
**lawful**
225:2
**laws**
70:22
**lawsuit**
5:15 18:22
**lawyers**
61:3
**learn**
12:24 26:3
47:13
**learned**
13:2,20

35:10 89:13
141:23
**learning**
11:20 14:4
20:4
**leave**
17:10 101:2
121:17
136:19
196:10
231:15
**lecture**
108:20
**led**
184:14
**left**
17:11,24
29:17,18
59:16 60:18
68:12,19
73:22 75:16
122:8 125:25
145:20
151:21,22
158:1 167:11
174:12,19
178:17,21
179:13
181:24
198:20
206:13 211:7
240:13
**left-hand**
71:16 178:11
210:2
**left-handed**
84:20
**leg**
112:2,3
121:22
122:13,14
**Legal**
8:19,23 9:6,
7,12,13
**legible**
197:2
**legs**

119:19
129:25 130:3
**let alone**
97:15
**lethal**
128:11
**letter**
150:3
**letters**
73:24 165:13
166:18
**letting**
167:16
**level**
66:11,15
67:1 84:11
**levied**
192:4 233:4,
11
**licenses**
15:22
**lie**
31:11,14
**Lieutenant**
163:6 164:7
194:19 195:1
204:22
**life**
115:24
117:3,5
126:14,18
201:7
**life-
threatening**
137:25
**lift**
112:2
**light**
85:14
**lights**
69:11,15
70:23 71:1
**likelihood**
139:2
**likewise**
7:1 47:10
90:23 105:4

218:6 224:19

**line**
37:14,22
71:14,18,23
109:11
166:1,9
168:4 172:6
207:9 228:2,
5

**lines**
160:8 167:3
168:7 171:8

**list**
218:6

**listed**
31:18 162:17
163:21 192:6
193:19
216:23 227:9

**lists**
161:15
162:13
165:12
216:17

**literally**
12:15 61:5
210:6

**litigation**
9:16

**little**
6:22 20:3
24:20 81:9,
16 88:8 97:1
108:3 111:3
130:21
179:1,6,25
180:18 187:1
189:16 193:8

**live**
5:21 6:23

**lives**
36:4

**locate**
240:16,18

**located**
8:19 80:23
153:22 206:8

210:23

**location**
22:24 114:12
115:14
164:4,5
168:5 174:17
185:15
204:14

**locations**
166:17

**locker**
127:25

**log**
54:12,20

**logs**
54:18

**long**
10:17 15:18
21:12,13
24:19 26:16,
24 27:3,8,21
44:25 45:4
87:4 170:22
235:14
241:21

**longer**
45:2,5

**look**
100:17
118:16 132:8
133:17,19
153:8 154:15
156:14
167:11
171:14 174:2
177:11,13
179:2 185:21
187:17
190:21
191:20
206:22
215:14,20
230:10

**looked**
60:3 61:9
62:6,22
63:12,24
72:11,21

112:22
118:13
180:18
184:3,13
208:2

**looking**
39:11 51:7
56:23 72:23,
24 84:6
105:7 152:17
168:15
170:23
176:21 189:2
194:21

**looks**
57:10 61:4
68:12 73:9
74:8 127:24
139:20 152:5
156:22 164:7
166:4,8
168:14 169:3
177:14
183:12 185:9
186:4,5

**lost**
107:10
240:12

**lot**
96:5 102:23
110:6,8,17
179:24

**loud**
157:24

**love**
157:25

**low**
118:3

**luckily**
61:3

**lungs**
141:10

**lying**
136:11

**M**

M-C-C-A-L-L-
U-M
153:22

m-e-t-a-l
201:22

m-e-t-e-a-l
201:22

**Madam**
4:17

**Maddie**
57:16 152:24
158:11
172:23 173:8
184:20
186:10 188:1
190:1 209:11
215:16,22
217:13
221:21 222:1
223:23 224:8

**Maddie's**
57:12

**made**
62:24 66:17
74:16 91:17
94:8 118:14
122:3,18
136:7
138:16,18
140:20 147:4
169:19 170:9
174:22
175:12
176:6,10
184:17
201:25
203:4,8,14,
18 231:21
239:6 240:2

**magazines**
86:3

**magnitude**
213:22

OFFICER JON GRUBBS
January 28, 2021

main
  157:23
maintain
  84:11
make
  5:16 6:4 9:2
  48:24 52:13
  55:7 76:11,
  18 96:2
  97:23 98:8
  104:2,10
  110:22 111:4
  193:3 206:25
  209:22 212:5
  222:1 236:25
makes
  225:6
making
  15:15 23:16
  59:24 70:5
  121:24
  169:23
  170:13
male
  62:19,20,23
  68:12 93:10,
  11,13 106:6
  199:6,11,21
man
  62:17 111:17
  118:16
  133:13 190:9
management
  41:12 106:1
  109:4
manner
  111:23 112:7
  136:11 145:7
margin
  178:17
mark
  58:1 168:17
  170:21
  172:18
  184:5,8
  188:3 215:18
  222:6

marked
  92:4,8
  168:20
  172:21
  199:20
markers
  187:1,6
Mary
  165:16
  192:22
  212:10
math
  28:2
matter
  5:19 7:23
  18:22 66:9
  76:20 101:8
  109:14
  116:15
  125:21 228:9
  229:18,24
  235:7,23
Mccallum
  153:21
meadow
  119:7
mean
  14:23 18:21
  36:2 42:12,
  15 44:15
  45:23 49:17
  56:2,3 81:5
  84:7 87:11
  98:9,20
  100:23,24
  102:8 110:9,
  12 111:25
  132:7 151:7
  152:16
  157:17
  160:16,20
  164:9 167:4,
  22 175:3
  192:13,18
  193:6 194:2
  195:10 201:7
  210:25 211:4
  212:12 215:6

  216:1 241:11
meaning
  14:22 83:8
  175:18 183:5
  205:23
meaningful
  166:20
means
  24:2 25:8
  27:15 48:20
  140:6 160:4,
  5,14 163:23
  165:10,17,24
  167:2,5,14,
  23 168:9,10
  170:22
  171:10 172:8
  189:21
meant
  130:23
  185:19
measure
  81:20 205:12
measurement
  205:5
measurements
  205:2,6,13
medical
  94:8 139:21
  140:17,21
  144:14 148:3
  156:1 178:21
  180:3,12
  204:3
medically
  138:7
member
  150:6
memorandum
  107:6 108:19
memories
  201:8
memory
  16:5 17:10
  19:2 33:19
  39:12 77:16
  87:14 88:12,

  25 92:22
  94:7,12
  113:2 155:5
  156:4,6
  157:1,11
  169:25 170:2
  182:20
  188:24 196:3
  206:22
  211:19 215:1
mental
  35:10,20
  36:16 66:18
mentally
  36:9 66:16,
  21
mentals
  36:13
mention
  128:13
  170:18
mentioned
  22:3 114:17
  148:2 200:16
message
  109:15,17
  110:21
metal
  78:18,21
  80:16,22
  81:2 127:18,
  21 178:17
  187:11
  201:22 202:7
  239:1
Michaels
  198:6,8
Michaels'
  198:16
Michigan
  29:24 32:18
  79:24
mid
  12:13
middle
  19:5 20:7
  93:6 182:16

185:7

**midtown**
25:5,7 27:7

**military**
32:20

**Miller**
5:8 10:2,5
19:19 20:20
21:16 48:4,
13 49:2,9,
14,24 55:16,
18 104:23
108:13
109:7,21
110:13,23
111:6 116:5,
19 118:9,20
120:5,9
125:9
126:20,22
130:16
131:20 139:5
147:13
148:5,12,21
149:4,19,22
152:9,11,16
158:13,14
207:22
208:17,22
211:9 213:13
223:13
225:13,19
226:7,9,12
228:2 229:4,
15,19 230:1,
25 231:3,10,
13,20
232:16,23
234:19 235:3
237:13
238:5,7,8,
11,14 240:19
242:5,8
244:22

**million**
105:19

**mind**
32:10 77:6

82:16 116:12
138:15

**mindset**
108:5 109:9
131:23

**mine**
192:24

**minor**
94:6

**minus**
191:5

**minute**
46:6 105:9
144:19,22
233:22

**minutes**
58:8 75:2
98:23 99:1
142:20
167:15
169:16
190:24
191:5,7
209:7

**miscellaneous**
212:11

**misdemeanor**
53:4 118:8
131:19
224:24 233:1

**missed**
107:20 108:9
110:4 223:2

**MLB**
182:19

**mode**
97:16 98:8,
14,17 99:11,
19 100:6,15
101:11 102:2
206:17 207:1
239:16,18

**model**
97:23

**moment**
19:15 123:8
153:16

168:24

**moments**
144:1

**monetary**
51:12 52:15
199:12 230:6

**money**
36:23 50:21
52:10 60:8,
14 61:14
62:9 64:4
67:20,24
118:8 199:17
222:18,22
223:9,19
230:11

**monitor**
204:4

**month**
24:25 25:1
45:25 210:7
215:2 233:18
234:8

**months**
40:14 41:5,8
44:10,12
46:14
107:12,16
108:9,17
111:4

**morning**
5:12,13
23:24 24:1,
11,20 26:21
54:10

**motion**
60:21,23
61:4,7
122:19,20,23
170:9,13
174:22
175:4,12
176:6,11
202:1,11
236:25
240:1,6,9

**motions**
59:24 60:24,

25

**motorist**
237:7

**motorists**
52:13 203:1

**mouth**
60:25 61:8
64:21

**mouthful**
13:9

**move**
26:16 80:14
136:16
215:22
231:3,13

**moving**
4:15 5:6
10:3 69:9
70:9 85:21
136:14

**multiple**
129:13
147:20
157:22 220:9

**multitude**
205:1

---

**N**

---

**name**
5:14 8:18
9:23 17:19
36:8,14,15,
19,23 37:3
39:25 131:3
162:13 194:8
198:5,16

**names**
36:7 37:4
78:1 131:7

**narcotics**
156:13

**narrative**
165:23,25
172:2 188:13
190:10

narrative's
 190:5
nature
 117:24
NCIC
 192:15
nearby
 92:23
necessarily
 39:1 56:6
 66:12 75:24
 90:10
neck
 147:23
need
 28:9 57:23
 75:3 106:5
 108:22
 120:24
 189:13
 214:10
 215:13
 220:17
needed
 107:7 157:16
needs
 75:2
negative
 90:4,7,10,20
neighborhood
 18:5 63:12
never
 21:21 31:5
 46:18 48:25
 51:14 65:22
 109:17
 118:22,24
 144:24
 147:10
 150:1,2
 206:2,6
 211:7 222:22
 230:7 232:2,
 15 233:15,19
 235:18 238:4
 242:2 243:5

newer
 24:8
night
 24:3 215:7
 220:13
 221:11
nods
 99:6
noise
 25:16
non-compliant
 92:16
non-crime
 212:11
non-potential
 25:22
non-violent
 53:1 118:8
 131:19
noon
 84:22
normal
 44:5 198:24
north
 200:11
northbound
 59:6 164:3,
 20 222:19
northerly
 200:10
 201:16
northern-most
 59:16
Nos
 187:6
notate
 207:24,25
note
 207:20
notepad
 39:16,17,19
notes
 39:18,20,21
 40:1 105:7
nothing's
 46:2,23

notice
 4:24 5:3
 47:6
noticed
 5:2
notification
 7:10
notified
 203:24
 204:23
November
 107:2,9,15
 110:3,11
number
 5:24 11:16
 37:20,21
 57:1 59:18
 82:23 86:18
 95:4 107:20
 108:8
 110:10,15
 151:1,6
 153:9 154:16
 160:9 162:8,
 9,14,15
 164:15
 165:15 166:5
 167:21
 170:22
 171:9,20,21,
 22 172:7,12,
 14 173:4
 192:10 209:3
 215:23
 219:24
numbers
 114:17
 160:11
 162:19
 163:18 164:9
 165:8,13
 171:14 173:1
 219:21
numerous
 50:24 52:11
 147:8

O

O-S
 168:12
O.C.G.A.
 9:10 50:22
O.G.A.
 50:23,25
oath
 6:10 134:18
 197:1 242:13
obey
 151:20
 155:13,17
object
 179:2 185:22
 228:2,5
 229:4,8
 237:11 238:3
objection
 5:7 6:24
 10:2,5 19:19
 20:20 21:16
 48:4,13
 49:2,9,14,24
 104:23
 108:13
 109:7,21
 110:13,23
 111:6 116:5,
 19 118:9,20
 120:5,9
 125:9
 126:20,22
 130:16
 131:20 139:5
 147:13
 148:5,12,21
 149:4,19
 207:22
 208:17,22
 211:9 213:13
 223:13
 225:13,19
 226:7,9
 230:1
 232:16,23

objects
130:7,8
obligation
139:21
observation
203:17
observations
51:11 184:17
observe
123:10 225:3
observed
59:15 68:5
199:5 222:17
observing
177:24
225:3,17
226:4
obstruct
192:1,10,17
224:25
obstructing
70:13,18
71:4 103:16
193:13 233:9
obstruction
192:19
205:18
212:1,2
216:23
224:12,23
232:4,5
237:20
239:21,24
obtained
205:22
obviously
6:9 11:15,18
18:11 19:23
26:1 28:5
36:3 37:9
40:9 45:24
46:18 52:2
62:20 72:1
73:6 75:11
76:16 91:1
95:13,22
96:1 99:21

101:20
112:11
117:22
124:14
127:24 129:2
135:25 139:1
143:16 146:6
157:20 175:3
178:8,16
179:13 181:8
182:12
187:11 206:1
220:24 242:9
243:25
244:13,16
occasions
53:10
occupant
51:23 52:9
occur
19:11
occurred
74:17 79:10
83:3 88:25
140:20
142:21
166:25 176:9
201:19
206:24
236:24 239:6
occurrence
190:22
occurring
68:5 100:11
191:10
October
236:8
odd
205:10
offense
103:20
117:24
192:11,15,18
212:10
216:23
232:20
offenses
191:24

192:10
212:10
office
9:7 106:19,
20,23 235:22
officer
4:1,24 5:12
6:5,6,8 9:25
10:9,12
11:6,15,21
13:8 14:2
15:2,13 17:3
18:4,20
19:3,24
20:6,17 21:5
22:14,15
23:2,6,25
24:22 25:9
26:15,17
28:19 30:7
31:12 32:10,
11 34:13
35:8,21
37:13 38:1,
9,14 39:6
41:23 44:16,
24 47:24
49:18,22
50:7 52:7
53:1,10,15
54:12 55:11,
24 56:7,24
57:6,25
61:13 62:8
63:11 65:5
67:10 68:2,
16 69:14,17,
20 70:7,12,
21 72:19
73:3 74:25
75:10 78:22
80:2 81:8
83:5 87:10
89:24 91:5
97:14 102:15
104:1 105:3
106:6,11
108:1

109:11,25
112:25
113:3,17,25
114:5 115:16
118:24
119:20
120:2,10,16
128:5 131:2,
13,14 132:9
133:21
134:17
135:20
138:10
139:19
141:16 143:8
144:3 145:1
147:5 148:16
150:22 153:8
154:4,17
155:11
158:21 160:6
162:16,17
163:4 165:1
168:15
169:18
172:16
184:4,24
186:25
188:2,12,15
190:2,15
192:6 193:14
194:7 195:10
196:10
208:15 210:1
214:18,21
216:7,21
217:1,18
223:11 225:2
227:24 228:3
229:20 230:2
232:7,10
233:9 234:4
235:4 240:5,
6,10,14,16,
23 242:10,12
243:15,19,22
244:1,12,19
Officer's
4:20

officer-
involved
  80:6 141:17,
  25 154:2
officers
  15:21,22
  23:7 24:8,
  10,13 32:15
  36:7,12,24
  45:1 47:11,
  13,19 48:10,
  23 90:1,6,18
  106:24
  107:1,7,18
  108:11,15
  110:5,6,19,
  21 111:2
  113:7 131:3
  132:2,15
  133:3 156:9,
  21 158:7
  198:14
  224:12,24
  225:4 227:6
officers'
  225:2,16
  226:3
official
  42:20 120:25
  121:6 225:3,
  16 226:3
officials
  197:19,21,23
okay
  4:10,14 5:21
  6:1,15,16
  7:6,13,20
  11:13,23
  12:1,10,14,
  17,23 13:3
  14:9,14,17,
  22 15:13
  16:7,16,22
  18:7,15
  19:2,14,23
  20:24 21:3,9
  22:2,22,25
  23:18 24:12,

  21 25:4,12,
  15,18,21
  26:19,22
  27:1,6,18,21
  28:2 29:2,
  16,23 30:4,
  19 31:21
  32:17 33:15
  35:19 36:11
  37:2,25 38:5
  39:1,4,11,
  15,17,21
  40:1,9,17,20
  41:14,22
  42:2,5 45:4,
  6 46:22 48:7
  50:25 52:6,
  17 54:9 56:4
  57:4,11
  58:25 59:13
  61:2,12
  62:20,25
  64:9,13
  65:5,13
  66:6,19 67:9
  68:6,9,14,17
  69:4 70:3,
  20,25 71:3,
  10,20 72:10,
  18 73:13
  74:18 75:23
  76:9 77:15
  78:9,22
  79:13,16
  80:7,13
  81:14,18,25
  82:3,5,19
  83:14 84:4
  85:7,12,15
  86:11 87:7
  89:3,9 90:6,
  23 91:13,16
  92:18,20
  93:10,18
  94:2,10
  96:17 97:13
  98:19 99:3,
  21 100:3,16,
  21,23 101:8

  102:1,8,18
  104:12,25
  105:2,16,23
  109:11,19,25
  111:21
  113:3,10
  114:8 115:2,
  9,21 117:10,
  18 118:12
  119:9 120:15
  122:2,5,20
  123:9,12,14,
  17 125:1,14,
  21 126:25
  127:8,24
  128:13 132:7
  133:20
  134:12
  135:8,25
  137:16
  138:10,20
  139:18
  140:22
  142:6,9
  143:11 144:7
  146:9,14,23
  147:4 148:9,
  16 149:2,8,
  15 150:3
  151:9,19
  152:4,19
  155:8
  156:10,15
  157:5,8
  159:19
  160:1,12,24
  162:9,13,16,
  22 164:1,25
  165:6,7,20,
  23 166:1,6,
  15 167:7,9,
  11,20 168:1,
  25 169:1,22
  170:8,17
  172:4,15
  173:22,25
  175:3,20
  176:4
  177:16,25

  178:4,23
  180:13,15
  181:5 182:2,
  24 183:12
  184:11,19
  186:9,17,20
  187:8,25
  188:21,24
  189:3,17,19,
  25 190:4,7,
  12 191:6,12,
  24 192:17,
  21,25 193:5,
  11 194:18
  195:22
  196:7,12
  199:4 200:1,
  7 201:21
  202:11
  205:14
  206:16 207:7
  208:7 210:5
  212:16
  215:5,11
  216:1,17,23
  217:22
  218:6,16,20
  219:17
  221:12,20,
  24,25 222:4,
  6,17 223:8
  224:6
  228:17,19,23
  230:10
  231:20
  232:15
  234:17
  235:4,10,14,
  18,21,25
  236:3,6,9,
  13,22 237:3,
  9,13,16,21,
  24 238:7,17,
  21,25 239:4,
  8,21 240:1,
  5,9,13,19
  241:14
  242:1,7,24
  243:25 244:8

older
  62:18,23
on-body
  88:13 89:21
  106:15
  143:20
on-dash
  12:25 16:18,
  24 49:13
  86:12 87:14,
  19,23
on-ramp
  114:21
  123:13
  202:16 219:7
  237:1
on-the-job
  23:9
once
  7:20 38:16,
  18 50:12
  119:6 144:15
  145:23 147:6
  231:5 242:8
one
  4:15 5:6
  7:14,15
  11:16 12:11
  18:17 20:15,
  16 21:9 32:2
  33:20 35:19
  38:15 43:12,
  18 45:15,17,
  20 47:4,12
  51:24 53:23
  54:2 57:18
  59:12,18,23
  61:4 64:20,
  25 74:7
  83:17 85:1
  87:20 89:12
  91:12,22,23,
  24 93:3,4
  94:16,25
  98:4,12
  102:11
  105:24 110:5
  112:2 113:15

114:19
116:15,17
117:22
121:22
122:7,13
125:2,21
126:9 131:3
135:4,8
139:1 140:2
141:4 145:4
157:25
160:10,21
173:5,25
174:8 175:24
176:17
179:14
184:15
188:4,7,21
194:17,24
200:4 201:11
210:6
215:17,23,24
216:1,2
218:2,3
220:4
221:14,15
224:1,7
232:22
233:21
234:11
243:23
one's
  222:9 224:11
one-
  85:4
one-dollar
  186:4,13
ones
  60:11 79:8
  234:6
ongoing
  41:19,24
open
  146:7 175:9
  176:7
operate
  86:15

operated
  89:2
operating
  14:22,24
  211:6
operations
  22:18 27:19
opinion
  90:3,4,7
  158:7 227:3
opportunity
  51:14
opposed
  71:21 128:14
  141:9 221:14
options
  97:5
order
  7:3 76:2
  83:12 98:7
  154:1 172:23
ordered
  4:15 155:24
  210:15,17
  217:5
ordinance
  211:21 212:1
ordinances
  50:24
organization
  15:22
original
  211:24
  214:24
originally
  79:5
outcome
  8:21
outlined
  148:17
outside
  8:4 89:10
overnight
  24:3
overview
  20:10 55:4

| P |
| --- |

p-h
  195:5
P-H-E-N-S
  195:6
P-M
  192:21 193:5
P-T
  166:6
p.m
  191:21
  193:25
p.m.
  34:21 161:7
  164:2,19
  165:12
  169:14
  190:18
  198:25 199:3
  224:4 245:2
page
  153:5,7,13,
  14,19
  154:11,15
  155:10,22,23
  156:19
  158:22 160:1
  165:6
  168:16,22
  169:13
  171:6,11,12,
  17 172:5,12
  186:1 189:18
  190:6,8,10,
  11,14 191:20
  193:23 194:7
  195:18
  205:20 209:2
  212:9
pages
  152:23
  158:22 190:2
  209:12
painted
  71:23

OFFICER JON GRUBBS
January 28, 2021

pairs
  85:20
panhandled
  36:22
panhandler
  53:18
panhandlers
  37:1
panhandling
  50:8 53:12
  54:5 60:5
  61:16 118:3
paper
  23:14 40:2
  54:25 56:5,6
  59:24 60:1,
  3,5,18 64:20
  66:25 122:10
  181:10
  183:12,16,20
  185:17,22
  199:7
papers
  39:15 93:3
paperwork
  7:15 56:5
  194:21
paragraph
  153:8
  154:11,17
  155:10
  168:22
  199:4,20
  205:16
parallel
  201:23
paramedics
  170:3
paraphrase
  67:7
pardon
  50:6
paren
  222:18
parked
  52:20

part
  8:12 13:19
  14:8,12,21
  20:1 22:1
  23:1 25:13
  34:23 35:8
  52:3 53:14,
  19 56:15
  90:9 91:25
  92:1 95:21
  96:21 97:14
  99:14 104:2
  115:21
  117:21
  118:11 122:5
  123:4 129:25
  133:9 139:19
  141:3 142:8
  151:12 152:7
  177:12 190:8
  196:7,9
  200:6 217:20
  241:6
participants
  7:24 8:9
participate
  235:10,25
participated
  235:12
particular
  16:9,14
  22:20 36:7,
  23 52:8
  65:14,17
  86:16,22
  96:17 106:20
  117:7 128:22
  129:21
  130:14 137:2
  143:11
  163:24 167:8
  172:23
  181:15 183:4
  186:21
  189:21
  218:24
  229:17 235:7
  239:2,9

  240:4
parties
  9:16
partner
  220:11
  229:3,13
partnered
  87:4
party
  8:20 133:22
  134:9
passage
  42:19
passed
  64:19
passenger
  69:7,24
  75:11 223:6
passing
  52:12 199:8
past
  6:18 44:13
  60:6 199:3
patch
  74:2
path
  64:11 123:11
  146:15,20,
  24,25 147:1
  174:18 177:9
  179:6,14
  202:3 237:2
pathway
  177:22
patient
  166:6 169:15
patrol
  12:25 23:2,
  25 24:14,15,
  16 25:9
  26:15,21
  59:2 67:13
  71:9 86:13,
  19 87:15
  94:24 100:4
  158:2 199:20
  201:17 204:3

  240:11,13
Paul
  192:22
pause
  7:3 123:8
  188:5,9
pay
  40:23 41:9
  196:8
PCP
  157:4
PD
  10:17 38:24
  73:13
pedestrian
  51:1 193:9
  205:17
  211:24 219:3
  222:9
pen
  23:14
  180:18,19,
  22,24 181:6
  182:25
pens
  180:25
people
  95:4,10
  109:3
  113:17,25
  119:25 120:1
  128:6 129:14
  131:9 134:24
  135:12
  146:17
pepper
  85:6 128:23
percent
  18:8 41:25
  54:7 88:16
  99:24 101:7
  122:9 123:25
  127:7 176:3,
  8 183:19
  215:3 235:16
  241:4,23

OFFICER JON GRUBBS
January 28, 2021

**Perfect**
47:23
**period**
38:12,20
107:17
108:25 110:3
**periods**
45:2 88:9
**person**
15:15 18:16,
18 19:4
51:3,21
52:17 54:4
58:13 62:8
67:5 70:15
74:13 76:7
91:15,19
92:13 93:5,
10 94:23
120:2 121:4
135:23
141:24
156:13 159:7
167:25
175:14 206:6
**person's**
140:8
**personally**
50:7
**personnel**
91:25 151:14
153:24
156:16
**persons**
52:13 133:17
**perspective**
44:2,15 47:6
49:18 159:20
**pertain**
162:20 192:3
**pertaining**
163:19
**pertains**
48:22 50:4
164:21
194:23

**pertinent**
49:7
**phone**
41:12 94:23
**photo**
186:22
**photograph**
173:9,21
174:9 176:14
177:1,4
178:5,6,11
179:21
181:21,25
182:10 183:5
184:21 185:5
186:2,11,14
**photographed**
205:1
**photographs**
79:3,6,17
81:8 150:11
173:14
180:25
186:24 187:3
**photos**
74:7 78:22
79:11,13,14
84:9 86:7,8
172:17,18
173:3,25
**phrase**
11:18
**phrasing**
225:22
**physical**
23:16 53:17
84:11 126:10
139:20
213:12
**physically**
64:11 118:23
**pick**
48:2
**picking**
110:10
**picture**
81:19 176:16

179:24 180:2
182:9
**piece**
54:25 59:23
122:10
183:12,16,20
**pieces**
208:5
**pistol**
85:13
**placards**
187:2
**place**
17:23 34:14
107:23
198:18
**placing**
21:6 138:23
**plain**
97:13 117:18
**plaintiff**
8:17
**plaintiff's**
105:10
168:19
172:20
189:10
209:24 216:4
217:15
221:22 224:9
**plants**
24:5
**plastic**
187:20
**platform**
145:12
**play**
66:12
**played**
218:1
**player**
182:19
**please**
7:12,15,22
8:23 9:17,
22,23 11:3,6
15:2 17:20

22:14 23:21
24:19 25:2
26:9,17
28:16 34:18
55:17 59:4
75:7 84:25
91:11 120:8,
12 145:6
150:16
153:17
158:11,12
163:9 165:6
171:11 173:8
177:3 178:5
179:20
181:20 182:9
184:20 185:4
186:10
188:1,3
190:13
193:6,24
198:16
209:23
215:18,21
217:12
221:21 222:2
223:23 224:8
226:15 228:3
229:6 231:20
233:22
234:1,24
238:13 242:3
244:9
**plural**
90:19 226:3
**pocket**
125:25
**point**
20:9 23:24
32:2 68:17
71:12 78:19
79:9 80:14
81:1,21 82:1
84:2 107:7
108:18
116:24 117:7
122:9 128:22
131:18

136:23
138:21 140:2
142:9,13,16
143:1 144:11
146:6,12,22
175:24 180:6
204:8 223:3
229:5 236:20
239:4 243:2
**pointed**
172:12
**pol-**
14:6
**police**
10:15 11:1,
4,10 12:6
14:5,11
15:21 17:4
21:10,23
22:6,9,15
30:13 32:10,
15,18,19
33:1,6 35:8,
21 36:6,24
44:25 49:18,
22 50:3
53:14 56:11,
25 62:8
63:11 70:12,
17,21 73:3,
4,6,13,19,
21,24 74:2,9
79:14,22,24
80:3 93:2
105:17
106:2,7,24
107:17 110:1
113:3,7,16,
25 115:17
119:20,23
120:2,16,25
121:6 131:8
135:20
138:10,21
139:19
141:24
153:22 154:7
160:9

171:18,22
172:17
188:12
192:1,20
193:16
198:14
199:21
200:8,17,25
201:3 205:18
212:1,2
225:1 239:25
**policies**
14:6,11,15
15:16 18:17
20:3 45:12,
20 47:5,13
87:23 99:14,
17 101:1,15
102:23 104:7
107:23
**policy**
15:3,6,11
21:25 22:5
43:20 44:4
47:1 48:8,
17,21 49:6,
23 99:25
104:9,13,18,
19,21 105:4
108:15 109:5
131:12
132:14 133:9
**pool**
137:5 183:8
**portable**
85:25
**portion**
52:15
**posed**
134:10
**position**
18:4 27:21,
23,24 45:11
47:24 85:5,
9,17,20 86:1
131:14
132:3,4
135:20

140:14 141:5
178:1
**positions**
85:21
**positive**
90:11,20,22
**possessed**
202:20
237:19
**possibility**
45:17,19
64:2 130:12
131:1 136:3
137:13,22
139:7 213:16
237:15
238:20,24
242:15
**possible**
33:23 65:3
97:2 108:5,
15 111:8
114:2 128:17
132:11 141:6
142:5
170:17,19
176:2 183:18
189:1
207:17,25
215:3 237:18
242:19
**possibly**
68:11 82:11
116:1 156:18
171:25
241:22
**post**
15:19,20,25
16:3,22 17:1
211:6
**potential**
129:19
135:11
**potentially**
118:7 128:16
140:14
**pounds**
63:17 218:7

**Powerpoint**
89:7
**preamble**
10:1
**precinct**
197:15,17,
24,25
**preferable**
96:16,18
**pregnant**
133:6,7
**prepared**
188:16,17
189:21
191:21 194:4
195:18 209:7
**presence**
8:4 96:24
225:4 227:6
**present**
27:25 41:20
42:18 106:23
210:11
**presentation**
89:8
**presented**
57:7 58:3
173:10
174:10
176:15 177:5
178:7 179:22
181:22
182:11
184:22 185:6
186:3,12
189:11
209:15,25
213:1
215:19,25
216:5 217:16
221:23
224:10
**pretend**
209:20 222:2
**pretty**
6:2,14 35:23
65:18 71:12

76:6 83:4
86:9 87:19
109:4 118:3
121:25
146:11 169:7
176:16
183:25 196:4

**previous**
60:4 174:6
219:23

**previously**
41:17 56:13
87:6 88:14
145:25 209:9
240:3

**Primary**
162:3

**printed**
56:24

**prior**
100:11

**Private**
8:3

**proactive**
25:10,20

**probable**
92:10 222:17
227:9 228:17

**probably**
11:7 26:10,
20 38:20
111:18 151:7
166:4 167:5
191:8 192:14

**probe**
135:6

**probes**
127:4

**problem**
10:9 35:17
50:16,20
52:9

**problems**
31:25

**procedure**
5:1 14:23,24
22:5 43:20

44:4 48:17,
21 49:6
80:11 104:13
109:6

**procedures**
14:6,11,15
18:17 20:3
45:12 49:23
87:23 99:15,
18,25 101:1,
15 102:23
104:7,18,22
107:24

**proceed**
202:2

**proceeding**
7:25 8:24
202:15

**proceedings**
188:6,10

**process**
30:12 43:13

**processed**
94:19

**processing**
95:6

**produce**
55:24

**produced**
159:11

**profession**
89:24

**professional**
52:12 90:22

**professionally**
29:21

**progress**
23:18 157:15

**prohibited**
9:10

**prongs**
187:8

**proper**
6:5

**property**
205:22

**protocol**
196:10

**provide**
9:8,13
241:12

**provided**
51:20 58:18

**prowler**
157:14

**proximity**
52:18 201:25

**prudent**
131:14 132:8

**public**
80:3 106:3

**pull**
65:9 69:4
76:23

**pulled**
124:2 154:23

**pulling**
69:21 72:7
158:12

**pulse**
146:1 204:5

**punch**
120:18
170:14
174:24
175:5,7,8

**punched**
202:12

**purchase**
105:18

**purpose**
8:5 13:8
51:4,22
52:19 153:24
173:20 213:1

**purposes**
4:25 47:18
159:25
206:13

**pursuant**
4:24 8:25
76:10 80:9
101:15

116:12
132:13

**pursue**
123:15

**pursuing**
115:19
117:24

**pursuit**
101:16 115:5
123:16 207:6

**pursuits**
113:4

**push**
44:21 120:18

**pushed**
154:25
155:24

**put**
21:13 57:12
61:4 77:15
86:7 99:10
112:3 119:22
129:2 141:14
152:24
156:16
158:25
172:23
180:24 188:1
221:5

**putting**
23:14 64:20
118:17 120:9
127:10

Q

**quadriplegic**
213:17

**qualified**
47:25

**question**
6:25 7:5
14:14 46:22
47:18 49:4
74:25 92:24
104:14
124:23

125:11,13
138:22
140:22
144:12
148:1,3
149:8,15,19
183:1 189:8
208:24 222:5
226:2,18
228:8,20
229:2,6
230:15,17,
19,23,25
231:7,8,20
237:12,14
238:4 242:16
question/
answer
6:1,17
questioning
228:3,5
questions
7:1 66:19
149:10
154:12 158:9
159:17
231:15,18
234:18,20
235:5 240:20
244:18
quick
7:14 98:10
111:23
153:14
211:17 244:3
quickest
127:2
quickly
124:19 207:6
quote
170:9 200:8,
9,23
quotes
200:20
quoting
200:22

**R**

R-I
170:21 171:9
R-L
164:16
R-T
165:9
R-Y-A-N
195:3
radio
85:25 140:20
157:10,11,16
162:8,9,10
Radner
4:7,8,11
57:5,8,21
179:19
181:19
Radner's
93:2
raise
9:17 66:15
raised
67:1
ramp
59:6,7 68:21
114:11,12,
14,16,18,20
115:14
145:16 166:8
169:20
182:2,6
ran
71:8 78:15
154:20
range
127:5,6
rank
6:5
rates
9:15
Rayshard
17:21
reach
76:22 77:1

112:14 122:1
150:4
reaching
76:18
read
13:5 58:5
60:1 119:5
132:19 133:5
153:17 154:4
165:13
172:25 177:3
185:1 192:11
197:4 199:9
200:1,13
202:5 203:2,
6,12 204:16
205:19
206:19 217:2
222:2,20
225:8 232:6
244:2
reading
14:11,13
211:16
ready
4:17,18
169:21 237:5
real
23:16 62:8
153:14
211:17 244:3
real-life
23:15,16
realize
206:17 243:7
realized
142:17 207:1
208:11
239:12,17
rear
71:1,9
reason
33:3 48:12
65:12 86:22
130:1 137:2
143:12
151:18,24
161:12 181:1

183:6 185:13
215:12
232:20
243:12
reasonable
135:20
reasons
113:10
201:11
recall
11:24 14:4,
21 19:6,7,12
20:22 31:19
32:6 33:7,
10,20,21,23
38:1 59:11
60:20 62:13
63:3 65:7
67:25 68:8,
9,10,11
71:8,19 79:3
88:14 91:12,
14,24 94:9
101:4 104:12
107:6 108:24
109:18 113:2
124:6 143:5
145:3 173:24
176:2 182:22
183:24 213:7
223:3 234:15
receive
32:5 34:10
received
15:24 16:2
32:1 34:4,5
38:3,5,21
39:5 42:10,
11,20 151:14
161:16
186:24
receiving
38:2
recent
113:2
recess
7:19 28:15
75:6 150:15

214:15
233:25
234:23
**recollect**
145:8
**recollection**
39:14 69:14
81:12
**record**
4:8,13,23
7:4,17,18,
22,24 8:2,24
9:23 28:12,
13,14,17
30:5 56:18,
20 75:4,5,8
99:20 101:18
103:14
120:10
121:11,14
142:17 148:3
150:13,14,17
152:12
153:19 157:5
158:1 163:9
193:4 207:1,
16 214:13,
14,16
233:21,23,24
234:2,21,22,
25 244:2,4,
5,7,8,10,24,
25
**recorded**
7:25 8:1
55:7 108:3
109:3,14
241:1
**recording**
4:7 8:6,15
98:18 99:4
103:9,10
239:15
**recordings**
165:2,4
**records**
56:14 98:15
100:18

144:25 169:7
189:23
195:21
209:10
**recovered**
206:14
**RECROSS**
240:21
**recruiting**
30:12
**rectangle**
127:25
**red**
181:8
183:13,22
185:19,22
**reenter**
134:25 237:6
**refer**
13:12 17:18
36:12 154:12
172:24 173:3
219:15
**reference**
42:13 79:6
153:25
157:14
205:16
236:11
**referenced**
46:11
**referred**
36:24 54:21
162:10
196:25
**referring**
6:4 93:9
163:25
188:20
218:25
**reflect**
4:23
**refresh**
39:11 182:20
**refuse**
230:17

**refused**
151:19
155:12,16,18
156:1 231:6
**regard**
77:19 175:15
**regarding**
91:14
**Region**
152:21
**registered**
82:16
**regular**
25:14 211:5
**regulations**
9:1
**reinstated**
42:8
**reinstatement**
41:14
**related**
8:20 170:21
171:9,14
172:11
**relates**
15:9 49:4
121:8
218:15,18
239:21
**relation**
59:9
**relationship**
163:11
**relative**
13:4 14:18
41:20 44:24
86:12 97:13
103:4,23
143:20
236:23
**released**
219:15
**relevance**
186:21
**relocate**
240:11

**rely**
10:3
**remain**
27:21
**remained**
69:3
**remarks**
164:3 166:6
**remember**
14:3,10,13,
17,18 16:12
18:21 19:1
20:4,14 31:8
33:12 63:4
67:18 69:17,
20 71:16,25
72:5,7,21
75:12 78:25
79:1 83:15
86:18 88:3,
21 91:16,19,
21,22 92:13,
15 93:5,8,25
94:8,25
108:16,18
111:24
119:16,17
120:1 142:22
151:10
156:12 158:3
169:10,19
170:7,10
173:13,15
175:9 182:5
183:20 186:7
198:3 199:1,
17 205:5,6,
7,15 214:22
215:7,10
240:14,17
**remembered**
206:24
**remind**
17:19 55:21
182:2
**reminder**
111:4

remote
  8:5,14,15,24
remotely
  8:19
remove
  8:8
render
  140:16,25
rendering
  142:2,7
repeat
  92:24 125:12
  188:7
report
  42:15,16,20,
  24 43:3
  46:4,5,13
  56:11 93:2,
  22 119:6,23
  120:25 121:6
  156:14
  170:12 176:5
  188:2,11,13,
  21,25
  189:22,23
  190:17,20,24
  191:6,13,16
  193:20
  195:12,21,25
  196:3,5,16
  197:10
  198:2,20,22
  200:17 201:4
  202:12
  207:10
  209:12,14
  210:2 212:18
reported
  159:22
reporter
  4:6,10,17,
  18,21 7:7,18
  8:22,25 9:5,
  22 120:12,14
  150:20 163:8
  243:15
reporting
  5:5 9:1,8,13

192:6 194:7
212:14,18,20
reports
  41:12 201:12
represent
  5:14
representativ
e
  191:15
reprimand
  33:10,22
request
  8:2 153:25
requested
  158:15
  203:25
required
  20:18 55:1
  87:24 99:18
  102:22 104:8
  155:6
requirement
  21:2
requires
  104:19
requiring
  147:24
rescue
  172:10 204:1
reserve
  242:9
resisted
  93:20 128:23
resisting
  95:16
respect
  64:9
respirations
  140:4
respond
  208:23
  231:13
responded
  173:15
  194:24
  204:14,23
  210:11

responding
  23:15 24:16
  25:14 58:22
  66:24
response
  83:15 143:3
  172:9 224:13
  227:14
  243:14,17,
  21,24
responses
  213:7
responsible
  49:21
rest
  133:5 243:3
restroom
  75:3 150:10
  214:11
result
  34:1 41:16
  46:19 111:3
  128:12
resulting
  154:3
resume
  26:13
resuscitative
  204:11
retired
  32:16
retrieve
  238:18
retrieved
  204:3
returned
  40:22 41:1
review
  12:4 58:4
  93:22 105:12
  121:10
  173:10
  174:10
  176:15 177:5
  178:7 179:22
  181:22
  182:11

184:22 185:6
186:3,12
189:11
195:15
209:25 216:5
217:16
221:23
224:10
reviewed
  89:20 105:11
reviewing
  153:5,24
rib
  147:20
rid
  103:11,15
  143:21
ride
  51:1,4,8,12
  218:4
  225:11,14
  226:14,20,
  22,24,25
  227:17,20,21
  228:10,23
  230:10,20
  233:8
rides
  222:10
  225:4,17,23
  226:4,17
  227:10
  228:12,15,21
  229:24 230:6
  236:12
right
  8:13 9:17
  10:11 12:10,
  18,19 13:24
  17:13,14
  18:20 25:25
  26:1,12
  28:11,16,24
  29:23 30:8,
  17,22 31:3,4
  34:16 39:9
  41:6 43:25
  44:10,13,17

45:17,25
46:2,6,24
47:2,4,6,14
49:8,13
51:18,20
52:1,23
55:14 57:17,
25 58:7
60:18 61:7
62:15 64:17
67:7,9,18,20
68:1 70:5,7,
9 71:6 72:3
73:7,18,20
74:3,10,11,
12 75:1,17,
19 76:6 77:9
78:14,17
81:7,12
82:15,22,25
83:7,9
84:14,17,23,
24 87:22
88:5 90:15
94:4,5 96:7
97:11,19
98:7,21,25
99:8,14,19
100:4 101:23
102:9,25
106:9 107:20
110:22
111:25 112:8
113:11,12,13
114:1 115:4,
5,10,16
116:4,13,18
117:1,25
119:16
121:12,15
122:8,18
124:22
126:4,17
127:25
128:17,20,24
132:21,25
133:10,15
135:20
136:24 137:3

140:1,9
141:13,15,18
143:4 144:7,
14 145:12,22
146:15,19
147:20
148:11
149:14
150:16
151:23
152:6,22
153:4,5
154:4,8
155:20
156:2,17,19,
24 157:24
158:8 161:19
164:6,18
166:8
171:15,17
172:24 173:3
174:17,24
175:11
176:9,18,21,
23 177:7
178:23
179:1,11,17,
18 180:6
181:8,10
182:25 183:4
185:21
186:14
187:21,23
188:15,17,22
189:8
190:13,21
191:3,19,21
192:11
193:18,20,24
194:2 195:18
196:13,15,24
197:4 198:13
199:9,18
200:1,13,15
201:7,11,14
202:5,7,13,
18,22 203:2,
12,18 204:7,
8,11,16

206:19
207:16 208:8
209:18 210:7
214:9 215:15
216:14
217:2,9,25
218:17,21
219:11,20,22
220:22
221:1,6,7
222:20
223:5,10,17,
19 225:8
227:11,15
232:11
234:16,18
242:3,5,9
243:13,19
**right-hand**
59:10 216:9
**right-handed**
84:20,21
**rights**
36:3
**ring**
65:11 92:5
151:4
**risk**
21:14 118:18
237:6
**ro-**
78:11
**road**
71:11,21
78:10,12
80:21,22
82:6 92:23
93:6,7
123:21,24
182:4
**roadway**
51:3 59:17
71:10 78:11
80:15 81:20
82:1 122:11
134:21
193:10 199:6
200:3,4,5,6,

12 202:20
205:18
211:25 219:3
222:18
227:10,16,19
229:24
230:4,5
**rock**
179:11,13
**Rodney**
17:5
**role**
194:22
**roll**
141:13,15
145:20
**rolled**
142:9
**room**
139:9 211:2,
5
**roommate**
32:4
**root**
237:19
**rotated**
22:16
**rotation**
87:2
**roughly**
18:4 23:20,
22,23 25:2
26:15 27:22
**route**
169:4
**rudely**
157:10
**rule**
19:16 20:25
**rules**
4:25 5:1 9:1
**ruling**
19:13
**run**
75:3 113:8
116:2 126:19
150:10

168:16,17,21
169:13
214:10
237:24
**running**
20:10 62:3
111:20
113:11,23
115:7,8,22
116:11,18
117:2 119:1
126:12 130:4
131:5,10,17
132:15 133:2
134:2,19
231:11
236:16,17
240:17
242:22,23
**Ryan**
194:19
195:1,2

---

**S**

---

**S-H-E-L-L-E-Y**
67:10
**S-I**
163:22
**s-o-u-r-c-e**
160:3
**S-T-E**
195:5
**S-U-P-V**
166:13
**safety**
126:18
133:21
134:6,20
**Sandra**
198:17
**saying**
13:9 21:21
31:19 42:18
47:17 77:16
80:25 83:15
108:21

134:22 140:1
148:18 149:1
152:1 172:2
242:13,15
**says**
31:21 48:8,
11 58:11
73:19 133:9
151:14,20
152:22
153:19
154:8,15
160:2,3,8,
13,25 161:3,
16 162:3
163:22
164:13,15
165:9 166:6
167:1,7,11,
20 168:4
169:12 171:9
188:16
190:17,20
191:13,14,21
193:24
194:4,10
195:8,18
196:25
200:17
202:18
209:2,6
210:2 212:10
216:9 217:1
218:12,16
219:7,9,13
220:20,21
221:7
222:12,17
224:3,19,23
225:16 226:2
227:11,12
228:15
231:25 232:7
**scenario**
84:24
**scene**
79:15 163:15
165:22

168:11,12
169:4,10,12,
14,24 173:16
191:18
194:25
197:20,21
204:23,24
205:1,22
206:14 239:9
**school**
14:1,2 28:20
29:9 32:7
**scope**
37:8
**screen**
8:12 57:13
158:19
168:23 171:4
**screens**
8:7
**scroll**
192:23 193:8
**search**
206:6
**seat**
223:6,7
**SEC**
162:19
**second**
4:9 7:14,15
33:15,19,21
57:18 131:15
155:17 166:9
172:5 188:4
190:5 199:20
215:2
**secondary**
162:21
**seconds**
161:2,17
164:2,19
165:12
169:5,14
207:8,19
208:12
**section**
51:21 52:8

159:18
193:5,12
**see**
7:2 27:4
30:22 52:2
53:11 57:20
58:13 59:19
61:18,19,20,
25 62:3,25
63:7 64:3,6,
10,11,19,21
67:19,22,24
72:14,16,22
73:3,13,18
74:7 76:2,
12,22,25
78:23 79:3
101:13
112:14
115:4,10
127:14
130:19
131:22
136:4,6,10,
16 137:4
140:3 145:1,
11,23 146:14
147:2
152:16,24
153:13
154:16
160:24
165:7,14
166:12
167:1,12
168:7,12,22
171:16,18
174:19
177:12,22
178:12
179:4,6,14
180:1,15,18,
20 181:13,16
182:14,18
183:11,13
184:14
185:2,9,17,
20 186:13,
15,21 188:19

189:1,2
190:8,9
191:23,25
192:1,24
194:1 196:21
203:10
206:22 208:4
209:3,4,19,
20 210:3,5,
20 215:23
216:7,18
217:17,18
218:9 221:18
222:8,11,14
223:7,9,18
224:2,5
226:13,24
227:13
228:10
239:1,3
**seeing**
68:2,10 79:1
118:5 186:7
191:1 199:17
205:5 240:14
**sees**
80:13
**self-initiate**
160:3
**self-
initiated**
160:6,23
161:24
**send**
110:21 242:6
**sense**
7:2
**sentence**
201:21
202:15 203:7
**separate**
79:22
**September**
26:20 40:13
157:25
**Ser-**
210:9

**Sergeant**
43:7 163:6
194:19 210:9
**series**
66:19
**serious**
53:8 80:5
103:19
128:12
130:13
232:20 233:3
**seriously**
95:23 142:1
**serves**
211:19
**service**
5:5 23:16
24:17 25:14
32:20 56:14,
17,25 57:8
58:2 74:12
158:11,18,22
170:20
171:12
**services**
9:8,13,15
**set**
4:4 141:19
150:19
**setting**
5:22 6:8 8:8
**seven**
10:19 41:5,8
108:9
231:11,14
**seven's**
231:18
**seven-**
85:21
**seven-month**
107:17 110:3
**several**
64:23,25
65:22
**severity**
118:2

**shallow**
140:4
**share**
56:23 57:5
**shared**
57:13 69:1
**Shawn**
8:18
**she'll**
7:4 193:4
**sheet**
54:21,22,24
55:10 56:7,
10,19
100:19,20
158:13
168:16,18
169:13
244:16
**sheets**
55:25
**Shelley**
67:10 68:2,
7,16,24
69:14,17,20
70:7,21
72:1,7 86:22
87:4,9,10
101:23
102:16 105:3
114:5 118:24
143:25 145:1
163:4 169:18
199:5 208:15
214:21 215:7
218:2
221:14,15
222:13 223:1
224:2,25
227:9 229:20
240:5,6,10,
15,16
**Shelley's**
70:16 71:17
86:14 87:12
162:17
216:21
224:17

**sheriff**
171:18
**Shields**
17:9,24
18:3,13
**shift**
24:3,6,11
34:19 54:14
198:23,24
**shirt**
73:9,10,12
**shoot**
20:6 127:4
129:9 131:4,
9
**shooting**
17:14 19:17
20:11 128:15
141:17
**short**
73:10
**shortly**
56:24 70:2
140:19
180:22
201:4,21
**shot**
19:4 127:8,
14 129:9
133:25
134:12,18
149:16
173:19
242:17,21
**shoulder**
59:16,17
68:12 69:21
71:20,22
78:13 80:22
82:6 123:1
145:20
174:12 200:6
**shoulders**
84:8
**shouted**
157:10

**show**
  56:9,14
  60:22 61:10
  79:4 81:7,11
  90:14 122:21
  180:21 189:7
  231:24
**showed**
  61:2 78:23
  234:6
**showing**
  58:1 89:6
**shows**
  81:8 107:22
**shuffling**
  93:3
**shy**
  41:5 210:6
**sic**
  8:16 156:20
**side**
  59:16 69:7
  71:7,11,16,
  17 78:10
  80:20 81:20
  123:21,24
  124:2
  176:18,21
  178:9,11,13
  183:14
  200:3,11
**sides**
  202:4
**sight**
  240:12
**sign**
  60:9 61:13
  172:7 194:22
  195:15 199:7
  206:10 219:6
  241:5
**signal**
  108:14 109:4
**signals**
  70:22
**signature**
  196:24

216:20,21
217:22
219:13,17
221:6 222:15
224:17
**signature's**
  215:11
**signed**
  194:10,14
  195:8,11
  214:21 224:2
  241:8,10
**significance**
  40:13,21
  181:17
  183:5,7,10
**significant**
  107:20
  147:23
  182:15
  196:11
**significantly**
  45:2 82:12
  121:25
**signs**
  60:5,15
**silly**
  100:24
**similar**
  27:16 174:17
  176:17 177:7
**simple**
  97:13 117:18
  126:25
**simply**
  96:23 170:17
  185:12
**single**
  110:4
**singular**
  90:19
**SINKOVICH**
  57:17,20,23
  153:1,4,15
  158:18
  168:23 169:1
  171:3 188:4,

7 189:13
190:3,5,10,
12 209:13,
18,21 216:2
**sir**
  5:13,14,19
  6:2,3,5,12,
  21 7:9 10:9,
  10,18,22,24
  11:3,12,19,
  22 13:23
  14:16,25
  15:12 16:19,
  21 17:2,24
  18:1,14,19
  19:25 21:7,
  20 22:21
  23:10,21
  24:16,18,23
  25:2,24
  26:1,2,4
  28:4,8 29:3,
  12,15 31:4
  32:22,23,25
  33:17 34:4,
  12,17 35:6,
  14,18,25
  36:17,21
  37:5,10,24
  38:7,19,25
  39:3,13 40:7
  41:4,7,9,18
  42:9 43:1,22
  44:14,19
  45:5,13,18
  46:1,17,25
  47:9,15,22
  48:6 49:11,
  16 50:5,9,
  13,15,18
  51:6,13,25
  52:5,24
  53:3,5,9,20,
  24 54:23
  55:3,6,9,15
  56:3,13,20
  58:5,6,24
  59:8,20
  60:10,13,17

61:6,11,15,
17 62:11
63:1,6,9,18,
23 64:16
65:1,17,20
67:8 68:23
69:10 70:6,
10,19,24
71:5,15 72:4
73:1,8,17,
21,23 74:1,
4,11,16,22
76:24 77:8,
22 81:6,13
83:6,10
84:15,18,21,
25 85:18
86:6,11
87:8,13,18,
25 88:4
89:18 90:2,
8,16 91:4,9
92:6,24
94:14 95:7,
11 96:13,20,
25 97:4,7,9,
23 98:10,18,
22 100:9
102:20 103:2
104:24
105:5,6
106:4
107:14,25
109:20
113:5,9,14
115:6,12,15,
20 116:1
117:20
119:5,11,14
120:4,13,14,
20,23 121:3,
7,13,19
124:20
125:5,17
127:3
128:18,21
129:8,16,20
130:6,15,22
131:11,22

132:22
133:1,23
134:24
135:3,14,18,
24 138:5,13
139:11 140:7
141:22
143:23
144:2,15
145:22
146:5,8,16
149:13 150:5
152:7 154:5,
14 155:4,7
156:3,25
158:24
159:4,13,24
160:10
161:5,18
162:12 164:5
165:6,11
166:21
167:13
168:3,6,14
170:24
171:25
173:11,20
174:7,12,13,
16,20 175:6,
9,13,16
176:8,13,19,
24 177:10,
20,24 178:3,
9,10,15,20
179:4,7,10
180:1,7
181:16
182:13,14,17
184:2,25
185:3,20,24
186:6,15,16,
23 187:4,7
188:23
190:16,19
191:1,8,23
192:2,5,12
193:6,17,24
194:1,5
195:7,13

196:20
197:5,7
199:10
200:14
201:6,10,12,
13,24 202:6,
10,19,23
203:3,13,23
204:9
205:11,13,21
206:4 207:14
210:8,16
211:16
213:10,25
216:8 217:3,
10 218:8,13,
24 219:5,8,
12 221:2
222:11,21
224:5,14
225:9,21
229:2 230:5,
7,15,17,19
232:3,9
233:17
234:10
**siren**
69:11
**sirens**
69:15 70:23
**sit**
45:9
**sitting**
75:16 223:5,
10
**situation**
19:10 96:18
99:16 121:11
124:19
128:10 138:3
141:19
144:17
**situations**
45:7 90:24
**size**
63:10
**skip**
101:9

**skull**
147:8
**slab**
128:3 136:12
184:1,3
203:5,9,16
205:3
**slash**
16:18,24
80:22 225:7
**sleeve**
73:10
**slide**
166:12
**slight**
127:16
130:22 147:1
169:20
**slightly**
85:2 122:17
**slow**
64:3
**slowed**
67:23
**small**
85:22 121:17
123:11
133:15
136:12
146:12 173:1
187:19 202:3
203:5,9
**smart**
115:23
**snow**
30:5
**sociology**
29:5
**solely**
86:13
**solicit**
205:17 219:3
225:4,17
226:4,14,24
230:21 233:8
238:22

**soliciting**
51:1,4,12,22
52:15,19
54:5 68:13
193:10
199:11
211:24
222:10
225:11,14
226:17,19,
21,25 227:2,
10,17,20,21
228:10,12,
21,23 229:24
230:5 236:12
**Solomon**
218:1
**somebody's**
129:25 130:3
**someone's**
25:23
**SOP**
14:21,22,23
**SOPS**
89:21
**sort**
25:17 27:20
41:13
**sound**
12:18 30:17
34:15 41:5
73:20 74:10
94:4 151:17,
23 152:6
188:17 189:8
198:5 205:10
**sounding**
243:23
**sounds**
12:19 34:17
41:7 57:3
74:11 94:5
145:22
**source**
160:2
**southwest**
115:1

164:20,21
182:6
202:16,17

span
107:13 109:1

spatter
185:8

speak
41:21 51:9
66:4 69:18
71:1 102:13
108:5 109:9
183:18
187:22 189:2
195:23
198:1,4
208:19
209:10
210:18
211:11 213:6
223:12,15
226:10
234:10 241:4

speaker
8:7

speaking
19:7,17,21
70:13,19
153:12
154:12 170:2
188:16

special
9:15 65:14
153:21

specific
19:12 22:21,
24 23:6,7
38:11 39:24
62:13 91:21
101:5 102:19
108:24
110:15
116:7,22
131:7 135:6
147:10,16
149:12
159:17
172:13

213:15

specifically
20:5,22
25:19 41:21
51:9 56:1
59:5 67:25
155:9 167:23
170:10,24
173:24 184:9
188:19
200:24 219:1
221:19

specifics
15:9 105:22

speech
108:19

speeds
202:21

spell
163:8

split
131:15

spoken
69:1 144:6
230:22

spotlight
8:8

spotlighted
8:6

spray
85:6 128:23

sprinting
111:19

staff
15:18 38:23,
24 109:10
210:19

stamp
57:9 173:2

stance
154:22

stand
7:21,22
28:16 51:3,
21 52:18
75:7 150:16
173:23

184:13
234:1,24
244:9

standard
14:22,24
135:2

Standards
15:21

standing
78:24 79:8
81:9 82:7
96:12 114:13
135:23
173:17,18
174:14,21
177:7 199:6
219:6
242:18,19,
21,23

standpoint
53:6

start
10:3 12:10
99:2 105:9
183:13

started
5:16 11:7
12:12 22:9
30:15 37:6,
25 54:10
88:1 191:2,
10 198:23
202:2

starting
84:22 177:9

starts
98:16 153:9
165:16
166:17

state
9:22 15:23
29:23 32:18
79:22,23,24
80:6 121:14
148:8,23
193:13
211:21 212:2
225:24

stated
56:13 68:9
88:14 104:5,
11 145:24
200:23 201:5
209:9

statement
8:23 40:16,
18 46:11,14,
15 104:6
120:25 121:1
174:6 226:5,
25 229:21
241:6,8,10,
12

states
19:8 21:4
197:1

stating
92:14 107:7

station
151:4,15

status
66:18 102:14
235:16

stay
199:1 231:4,
14

stayed
26:25 27:4,9
124:2

steel
111:22

step
23:19 111:22
123:6

Stephens
194:13,16,19
195:2,15

stepped
81:15

Steve
153:21

stick
183:4 186:15

sticker
185:10

sticking
  183:14
stimuli
  137:15
stolen
  155:12
stomach
  151:22
stone
  185:21
stop
  64:3 67:23,
  24 69:23
  70:5 76:4,8
  83:2,11,18,
  24,25
  111:12,14
  119:12,13
  121:12 127:1
  155:24
  200:9,16
  201:2 202:24
  237:8
stopped
  69:10 70:1,8
  72:2 123:16
  156:7
stops
  23:15
storage
  105:19
straight
  10:23 112:25
  122:25
street
  48:10,23
  49:19 52:8,
  18,20 106:8
  114:22,24
  115:1 123:13
  182:6 202:17
  237:1
streets
  109:12
strikes
  155:18

string
  165:8
stripe
  78:12 82:6
stripes
  78:15
strong
  84:9 113:24
struck
  151:21
  184:15,18
  203:15
  237:10
student
  32:1
studies
  30:23
study
  29:4
stuff
  12:4 39:18
  90:1 91:3
  114:18
  161:10
  180:25
stupid
  144:11
style
  85:22
Sub
  51:20 52:17
sub-
  132:24
subject
  68:12 91:6
  93:11 151:3
  156:12,22
  166:7 199:6,
  11 219:14
subjects
  132:14,24
  133:2
submitted
  189:24 196:5
subsection
  101:5

substances
  206:7
sudden
  110:18
suffer
  36:16
suffered
  41:15 147:9
suffering
  35:10
suffices
  6:18
suggest
  92:21 108:1,
  3
suggestive
  108:10
suit
  63:21
Summary
  152:21
summer
  26:18 29:18
summons
  214:20 215:9
  216:10
  217:14
supervisor
  163:12,13
  166:13,14
  194:13
  204:22
supervisors
  94:24 104:3
  194:17,24
supplement
  209:21
support
  8:19,23 9:6,
  7,12,13
  26:15
supported
  148:2
suppose
  114:2 138:9
  139:7 233:6

supposed
  14:19 42:24
  44:3,4,9
  54:12 70:21
  97:15 101:2,
  10,17 102:9
  219:10
suppression
  25:6,7 27:7,
  17
Supreme
  19:8
sure
  4:6 5:16 6:4
  16:11 18:8
  36:1 37:20
  41:25 48:24
  50:11 53:22
  54:1,8 55:18
  60:11 62:7
  63:13,16
  64:23 68:16
  69:12 76:12,
  18 88:16,20
  89:24 91:1
  96:2 98:1
  100:17
  101:7,25
  102:3 104:14
  109:23
  110:17,22
  111:4 113:6,
  15 114:7
  117:23 119:5
  122:9,12
  123:25 127:7
  142:20
  143:6,14,24
  145:7 149:23
  152:16
  153:15
  156:18 167:5
  174:25
  189:20 193:3
  206:25
  208:14
  209:10
  211:5,18

215:4 220:16
225:23
235:16
241:23
**surgery**
147:24
**surmise**
62:22
**surmised**
61:13
**surprised**
223:7
**surprising**
11:17
**suspect**
20:18 21:11
133:21 134:6
151:21 152:4
154:20,21,23
155:12,16,
17,23,24,25
156:1,8,20
157:3
**suspect's**
155:19
**suspected**
35:9 36:8,
15,18 37:2
137:7
**suspended**
32:7 40:23
41:2,9
**suspension**
196:8
**suspicion**
66:11,15
67:1
**suspicious**
58:13 74:13
76:7 91:15
167:25
**sustain**
130:13
148:11
**sustained**
94:6,11
137:20

148:18,23
**sustains**
137:23
**swat**
175:1
**swear**
77:21 78:3
112:19
**swing**
112:3 119:8
120:18
122:6,20
170:9 176:10
**swinging**
119:10
120:16
122:15,18
170:13
174:22 175:4
176:6 202:1,
11 232:8,10
236:24
240:1,6,9
**switch**
98:12 102:2
143:9
**switching**
98:13
**sworn**
4:2,20 9:20
22:15 23:5,
23 30:16
37:12,25
38:9 39:6
103:2 197:1,
6 229:10,12
**swung**
119:18 120:2
121:15 124:1
231:22,25
**synopsis**
93:22 98:10
**system**
54:17
212:14,15,20
**systems**
237:19

---

**T**

---

**t-y-p-e**
167:9
**Ta-**
135:25
**tackled**
154:25
**tactical**
85:14,22
**take**
6:1 8:12
10:21 13:14,
21 17:22
20:24 22:2
35:19 38:5
39:18 40:23
44:5,15
52:22 53:10
55:13 58:21
60:3 61:2
69:8 72:10
73:2 75:19
80:14 82:15
83:14 84:19,
22,23 87:22
89:16,20
95:3,12 96:9
104:20 105:1
111:17
112:10
113:3,22
114:8 117:22
123:6,14
128:9
129:12,13
130:3 132:3,
4 133:12
135:1 139:10
145:10
146:10 153:8
154:25
156:11
170:14 174:2
177:6 180:11
184:4 186:17
203:21

205:13 206:9
214:6 215:14
234:19
242:10
**taken**
4:24 7:19
8:16 28:15
44:24 75:6
79:11,14,17
94:11 95:4,
21 100:12
129:17 139:8
150:15 168:8
205:6,23
206:9 214:15
219:14
233:25
234:23
**takes**
24:21 47:23
**taking**
9:9 41:12
45:10 95:8,
17 96:4
173:14
**talk**
11:15 12:16
15:7 74:8
76:2 89:25
100:25
102:15 173:5
212:21
223:18
**talked**
12:23 13:20
45:24 66:25
78:12 84:16
88:8 94:17
102:18 113:6
128:14,16
130:11
132:20
135:11 164:2
173:25 199:5
**talking**
13:24 18:10
22:19 30:4,5
34:2 40:5

51:24 56:18
81:12 82:24
88:1 89:15
107:11
145:17
150:23
154:17
169:25
172:24 174:3
178:19 200:3
202:8 215:7
221:16,17,19
**talks**
94:2 217:7
**tank**
158:2
**tape**
240:25
**tapes**
165:1
**Tased**
94:1 129:14
146:20 170:6
179:15
203:15
242:14
**Taser**
13:10,12,15,
17,22 14:15,
19 15:10
16:16,24
37:11,13,17,
22 38:2,3,17
39:1,7 48:8
54:4 86:2
88:2 93:25
105:19
123:18,19,20
124:3,7,12
125:19,22,25
126:10,15
127:8,14
128:15
129:6,12,24
130:19,24
131:5,10,16
132:13,20
133:25

134:1,19
135:17,21
136:1,4
138:17
143:16
144:20
146:10
149:16
151:3,21
154:23,24
155:14
167:2,10,17,
21,23 173:19
178:2 187:8,
15,19
202:22,24
203:25
236:14,16,
19,22 237:3,
10,17 238:25
242:17,21
**Tasered**
48:11 142:22
156:22
242:25
**Tasers**
13:4 38:12
127:5 128:7,
10
**Tasing**
140:20
148:20
**taught**
20:5
**teaches**
96:22
**team**
10:16 27:14
**Tech**
16:10
**technically**
70:12
**technician**
8:18 163:17
**technicians**
79:15
**tell**

10:12 14:3
15:1 16:4
23:3 24:1
31:14 33:8
34:18 38:8,
14 40:4 43:8
50:19 57:15
60:21 88:24
91:13 92:7
94:15 97:19
98:20 99:21
100:3 106:5
111:21
120:12
121:21
131:2,9
134:18 145:6
146:23
159:10
166:22
170:4,8
172:8 173:22
174:2
201:16,18
206:21 211:4
220:14 223:8
230:20
239:22 243:3
**telling**
31:8 169:8
220:12
**tells**
54:13
**ten**
37:19 50:14
53:25 65:2
198:24 207:8
**ten-**
86:1
**Tennessee**
19:3,8 20:15
**term**
81:4 135:13
184:5,7,10
238:9,11
**terms**
9:14 29:23
41:9 56:4

63:10 95:5
115:3 152:5
161:9 186:20
187:5 188:17
194:3 197:8
216:20
**terrain**
114:9
**testified**
4:2 5:21
9:20 201:1
229:11 238:4
**testimony**
6:23 103:2
106:11
143:12
144:7,13
228:1
**thank**
4:11,16,19,
22 5:9 6:7,
12,21 7:15,
16 10:6,11
13:13 17:17
18:2 28:11
55:20,22
57:14,19
71:24 76:9
79:25 86:6,
11 98:3 99:3
103:25 115:2
120:11,15
125:17
138:14
150:21
153:3,16
154:14,19
158:9,16,20
159:5 160:7
161:14
165:20
166:10,15
168:3 169:8
171:5 172:4,
15 174:7
176:20,25
177:16,21,25
179:23

181:7,18
182:8,24
185:16,25
189:16,17
193:8,22
195:7,24
200:7 214:11
223:21
225:15
226:23 227:4
233:22
234:17,19
235:4
244:19,20,
21,22
**Thanks**
11:13 67:9
154:10
**the's**
199:7
**thick**
154:24
**thing**
6:14 22:2
49:12 66:14
76:6 83:4,20
115:24
121:4,5
127:25
132:19
143:25
153:11
165:14
166:25
179:25 190:1
193:24
208:16
218:20
223:10
**thing's**
110:22
**things**
25:16 27:20
35:23 41:13
45:15 65:14
94:15 117:22
130:14
135:4,9

141:4 148:1
184:14
186:25
192:20
**think**
6:18 12:4
32:13 34:13
39:5 42:2
43:24 44:16
47:12 50:14
51:7 52:22
54:10 55:16
61:8 63:11
72:23 86:8
88:17 90:12
108:4,10
110:12
117:14
118:12
122:15 127:6
132:1 134:4,
23 135:1,3
144:4,13,16,
19,22 149:2
151:2 153:10
159:1 161:3,
25 164:6
168:12
175:11,17
176:22
181:11
183:21
186:13 191:6
192:15
195:10 197:9
201:1 205:9
207:3 208:1
209:9 215:12
220:12 231:4
234:11
243:4,13
**thinking**
101:14
**thinks**
47:14
**third**
33:24 58:11
133:21 134:9

160:1 178:16
**third-party**
203:1 237:7
**thought**
4:14 52:2
66:1,10 68:5
93:15 117:18
124:11
127:10 207:2
**thousands**
110:12
**threat**
20:12 119:3
120:21
**threaten**
65:23 77:19,
23 118:23
**threats**
112:19
**three**
22:3 28:2
29:7 35:21
85:8 190:24
191:5,7
201:5 231:6
**throw**
231:7
**ticket**
151:16 213:2
232:6
**tickets**
56:16
214:19,23,24
215:2,17
220:11 234:5
**tie**
63:22
**till**
27:4
**time**
8:18,22 12:6
15:6,11,25
16:4,22
17:24 18:11,
13 27:8,25
28:14,18
29:22 30:10

33:2,5,7,9,
10,15,16
34:25 37:6,
11,23 38:2,
12,20 40:17,
24 41:20
42:18 43:11
44:4,7 45:3
46:8 50:6
54:2 64:14
65:17,19
66:6 67:11
70:2 74:18
75:3,5,9,22
76:25 78:8
82:22 84:4
85:2,5,11
86:5 87:24
88:3,10,13,
17 89:1
93:17 98:15
100:1,11,16
103:8
106:12,14,
22,23
107:13,17,19
108:16,18,25
109:1 115:22
117:3,7,10,
13 119:2
121:22
122:3,9
123:10,16,18
124:11,14,
17,25 125:3
126:14 127:5
128:22
131:18,23,25
132:10,12
137:14
140:16,23,24
142:9 144:21
149:7
150:14,18
156:8 159:9
160:17,18,
20,25 161:1,
4,10,16,20
163:21

164:1,18
175:18 188:8
190:12,17,22
191:9,13,15,
18 196:4,10
198:19,21,24
199:21 201:8
202:21
206:16
207:5,10,13
213:11
214:14,17
217:8 220:19
221:10
224:20 228:1
233:24
234:2,22
235:1 238:25
240:9,14
241:20
242:24
243:23
244:4,10
**timeline**
140:19
**times**
5:24 22:3
37:16,21
38:15,21
50:10,14
52:11 53:21
64:17 97:16
98:17 113:18
129:13
160:13
161:23
163:19 164:8
166:16 220:8
231:6
**title**
160:12
161:15
**today**
8:17 11:15
13:8 15:7
16:1 17:4
18:10 21:10
37:7,13

39:22 46:16
78:23 79:2
107:11
111:16
130:11 174:1
199:15
200:16 201:1
202:9 235:5
244:19
**toggle**
98:11,12
143:9
**told**
34:22 50:3
54:9 67:19
83:9 88:5
111:12,16
114:16
119:25 150:1
159:1 163:20
164:6 169:5
170:10
174:22
175:11
176:23 180:5
198:23
211:12
225:10
226:19
240:24
**tomorrow**
102:4
**top**
81:21 92:7
98:11 112:3,
4 123:21
124:6 128:3,
15 136:12
145:9 146:11
153:20
154:15,16
155:22
195:18 209:7
216:14
**topics**
11:16 16:12,
23 17:1
35:19

**touch**
123:4 140:24
141:1 145:1
**track**
88:2
**traffic**
23:15 25:16
52:14,16
62:4 64:6
65:4 70:13,
18,22 71:4,
13 76:4
127:22
136:12
154:21
156:7,10
157:10
178:18
183:17 192:1
199:24
200:2,10
201:15 203:9
214:19 215:8
216:10
217:13
218:18,21
219:1 232:11
**trafficking**
25:11
**trail**
127:16
136:8,9
146:13
237:18
**train**
141:16
**trained**
11:23 13:3,
15,21 14:18
20:14 21:9
26:1 76:16
89:19 97:8
98:5 131:4
142:4
**training**
13:2 14:10,
12,19 15:18,
22,25 16:2,

6,9,14,25
21:22 22:16
23:1,5,6,9,
13,20 37:9
38:3,6,11,
12,17,18,21,
22,24 39:13
76:10,17
77:5 88:9,
22,24,25
89:4,24
90:17,18
97:14 108:15
115:17,18,21
116:12
117:21 128:8
141:4,18
**trainings**
39:7
**transcript**
241:5,14,18
242:3 244:15
**transparency**
106:7
**transported**
204:14
**trauma**
147:16
204:15
**traumatic**
138:3
**travel**
59:11,18
69:22,25
70:1,8,9
71:21 75:15
80:25
**traveled**
65:18
**traveling**
134:11
202:20
**treating**
8:5
**treatment**
156:2 204:15

trespass
  151:15 157:3
trifocals
  172:25 177:2
tripped
  237:10,12
  242:13,19,25
trouble
  198:11
  244:1,13
tru-
  64:18
Truck
  204:14
trucks
  64:18
true
  31:23 105:20
  107:9,24
  109:1 148:2,
  10 195:17
  197:2 201:12
  205:20
  225:18
truthfully
  149:25 229:2
truthfulness
  241:8,10
try
  43:13 44:21
  48:24 57:12
  61:3 84:11
  97:1 105:25
  126:9 141:4,
  5 150:4,8
  174:24
  175:23,24
  240:18
  243:22
trying
  49:22 61:14,
  25 62:4,9
  78:5 81:14,
  18 82:17,19
  92:22 93:18
  112:22
  117:6,12,15,

19 120:17
127:1 134:5
140:25
157:19 175:1
189:4 192:14
230:10,20,21
233:8
Tuesday
  65:11,13
turn
  69:11 82:16
  87:19 89:4,
  13 98:7
  99:18 100:15
  101:6,17
  106:14
  110:20 116:3
  136:22,24
  137:2
  142:15,18
  179:18
  207:15
  208:11,12
  239:18
  243:8,10
turned
  98:14 100:14
  102:6 122:17
  129:6 137:4
  143:2,13,21
  145:4,8
  207:18,19,20
  208:7 243:5,
  6
turning
  80:15 108:22
  110:4 142:22
  143:7 204:8,
  18 207:12
  208:12
turns
  78:21 105:2
twice
  156:23
two
  22:3 40:14
  42:19 43:15,
  23 45:9,15,

24 46:14
49:20 59:12
67:15 75:2
85:4,20 86:3
87:2,3 94:18
98:23 99:1
104:20 105:1
107:16
108:17 111:4
114:14
149:11
155:18
158:22
161:23
167:3,15
171:8,25
172:2
176:10,12
190:2 193:19
196:13 199:7
209:7,11
215:17 220:1
234:11
two-man
  218:5
two-minute
  28:10 98:15,
  19
two-officer
  218:5
two-second
  169:6
two-thirds
  107:1,18
  108:2,9
  109:2,13
  110:2,8
type
  19:4 25:9
  26:9 33:9
  34:5,10
  36:19 41:15
  42:20 44:20
  46:8 53:8,17
  54:11 57:1
  58:12 59:24
  61:20 63:22
  64:7 77:23

80:9 89:7
91:6 96:17
107:6 108:19
117:8
122:19,20,23
127:19,22,25
128:3 138:3
146:8 156:13
167:2,9,20
168:2 170:9,
13 174:22
175:4 176:6,
10 179:2,8
183:22
192:21 193:5
196:15
202:1,11
204:10
213:8,19
236:24
237:20 240:1
241:5,6
typed
  197:9,10,14,
  15
types
  148:11
typically
  37:4 38:17
  119:15
  122:16
  207:16,20

---

U

---

u-n-i-t
  163:19
U.s.
  8:19,23 9:6,
  7,12,13
UCR
  212:17
Uh-huh
  24:7 82:9,18
  171:7 189:6
  218:22
  220:6,25

**ultimately**
81:15 82:8
89:12 113:6
114:10 180:5
197:16 214:1
**umbrella**
21:25
**unable**
175:25
**uncommon**
218:4 220:10
**unconscious**
137:10,17
138:6 146:4
**uncontrolled**
135:13
**uncooperative**
92:17
**undercover**
27:19
**undergraduate**
30:23
**underneath**
137:5 160:12
162:3 163:18
166:16
185:18
191:25
193:11
194:13 217:1
218:9 224:23
**undersigned**
196:25
**understand**
18:24 22:4
25:12 39:4,9
42:23 43:20
49:22 52:7
53:7 62:6
81:18 94:20
122:14
124:22
125:10
134:16
139:18 141:3
166:18 230:4

**understanding**
5:17 43:1,18
44:7,8
183:15 195:9
213:11
**understood**
98:20 137:16
157:24 158:8
**uniform**
73:7 212:18
214:19 215:8
216:10
217:13
218:20
**uninjured**
139:11,12
**union**
44:21
197:19,21,
23,25 198:1
**unit**
25:6,8 26:15
27:2,7,17
86:13 87:15
89:5,6 97:20
98:8 162:3,
23 163:15,
19,20 165:22
166:7 168:11
173:14,22
204:24
**United**
19:8 21:3
**units**
162:19,21
218:4
**universal**
8:17 28:14,
17 75:5,8
150:14,17
214:14,17
233:24
234:2,22,25
244:4,10,24
**University**
16:10
**unknown**
89:1 96:6

241:19
**unreasonable**
91:18
131:16,25
132:1,4
134:23
**unresponsive**
137:14
145:25 170:6
203:19
**unusual**
66:23
**upcoming**
145:16
**update**
212:20
**updated**
211:13,14,18
**upper**
8:13 188:15
191:21
193:24 210:1
216:9
**upwards**
241:22
**user**
166:3
**utility**
84:14,19
176:22
**utilize**
131:16
**utilized**
18:23 37:13
87:24
**utilizing**
20:19 21:4,
12 95:15

———————————

**V**

———————————

**vague**
156:6
**vaguely**
93:8 151:10,
11

**valuable**
47:20
**vantage**
68:17 71:12
146:12,22
243:2
**variety**
113:10
**various**
18:21
**vegetation**
202:3
**vehicle**
24:15,16
51:23 52:9,
20 59:9
64:12 65:3
67:16,19,22
69:3,7 70:1,
2,16,18
71:2,6,9,17
72:2,7 73:4
76:5,11
77:10 78:21
81:2 86:16,
18 87:20
100:4,5
101:14
106:12,13
155:14
199:5,21
201:22 202:7
218:15
237:25
**vehicles**
12:25 52:14
59:18,25
64:19,23
65:22
134:11,13
199:8 202:20
218:19 219:2
**Ven**
5:14 188:8
216:2
**verbal**
20:18 21:5,
12 22:4 83:2

OFFICER JON GRUBBS
January 28, 2021

112:19,21
124:10,13,
16,21,24
125:4,5,7,18
127:9,11
137:15
**verbally**
77:19 118:23
**verify**
215:13
**versus**
19:3,8 20:15
72:5 181:2
183:6,22
184:15
185:13 215:9
**vest**
74:6,10
177:19
**vicinity**
67:11
**video**
4:4,6 5:3
7:11 8:6,7,
10,11,15,18
61:3 98:16,
21 105:18
143:16
208:2,3,5
241:2,3
**videographer**
5:5 7:8,9,
13,20 10:4
28:13,16
75:4,7
150:13,16
214:13,16
233:23
234:1,21,24
244:2,9,23
**videos**
150:12
**videotaped**
244:23
**view**
6:18 8:7,13
50:19 90:10,
23 130:22

153:14
176:17
177:10 223:3
**viewed**
68:8 78:7,19
81:1 230:4
**views**
86:9
**vio-**
45:16
**violate**
47:1,4
**violated**
43:19 45:11,
20 47:12
48:21 49:6
52:4 104:9,
13,17,21
135:1
**violating**
54:5
**violation**
46:19 99:25
105:4 156:10
212:2,3
232:11
**violations**
45:17 48:17
93:16 152:6
155:2 156:7
211:21
**visibly**
133:5,7,17
**voice**
6:24 96:23
**voluntarily**
129:3 136:17

——————————

**W**

——————————

**W-I-N-D-S-O-R**
114:25
202:17
**waist**
60:25 61:8
**walk**
72:2 151:20

220:3
**walking**
130:4
**want**
5:2,16 6:4
7:10 8:11
13:9,10
17:18 39:4
61:10 81:22
86:10 87:10
96:9 105:8
111:17 116:2
119:22
121:20
125:12 142:1
145:13
149:3,24
152:13,15
153:8 174:2
193:3 230:23
231:19 235:6
**wanted**
32:10 76:18
150:24
156:12
159:20
181:23
185:11
**warning**
20:18 21:5,
12 22:4
124:10,13,
16,21 125:4,
5,7,18
127:9,12
157:7
**warrant**
225:6 240:4
**warrants**
221:16,24
**watch**
23:24 24:1,
11,20 26:21
**watching**
52:19 78:5
**waving**
60:23 61:5
64:20

**way**
21:22 44:13
51:10 58:10,
11 61:9,25
66:1,20,24
77:15 84:7
91:7 94:15
96:24 97:6
117:8,16
121:24
127:2,11
129:1,21
130:14
136:7,20
138:17 139:3
140:25
146:18
148:19 150:8
169:23
178:17 179:5
181:11 194:6
195:9 201:20
220:8 222:2
231:16
235:11
236:25
238:13 239:6
**ways**
230:13
**weapon**
13:6 61:20
76:20,23
77:2 112:14,
15 115:25
116:3,13,22
128:11
238:18
**weapons**
206:7
**wear**
90:1,13
**wearing**
12:10,12
62:14 73:11
97:20
**Wednesday**
153:20

week
  43:15 65:5,
  6,7 196:1
weeks
  23:22,23
  147:7
weight
  63:15,18
  216:18
weightlifter
  84:4
Wendy's
  17:16,17,19
went
  11:1 16:22
  25:5 26:21
  27:1,2 29:20
  31:1 32:1
  64:19 71:7
  78:22 81:1
  82:8 100:5
  126:10
  130:21
  142:16
  143:5,6,12
  144:1 147:6,
  7 174:18
  180:5 197:16
  201:17
  203:4,8,14,
  21 234:8,13
  236:20
  238:18,22
westbound
  199:23
Western
  30:23 31:6,9
whatsoever
  64:13,22
  77:11 83:18
  96:23 107:5
When's
  43:11
where'd
  27:6
whichever
  69:25

white
  71:18,19
  93:12 179:2
  181:10
  183:20
  185:8,18,22
  199:7 206:10
who've
  60:5
whopping
  169:6
willful
  224:11,23
willfully
  224:25
Windsor
  114:22,24,25
  115:1 123:13
  182:4,6
  202:17 237:1
wires
  187:11
witness
  8:5,6,8,11
  9:24 19:21
  20:22 21:18
  48:6,15
  49:11,16
  50:1 57:11,
  14 58:4 64:5
  93:16 99:6
  104:25
  108:14
  109:9,23
  110:15,25
  111:8 116:7,
  21 118:11
  120:13
  125:12,15
  126:21,24
  131:22 139:7
  147:15
  148:14,23
  149:6,21,23
  153:16
  163:10
  173:10
  174:10

  176:15 177:5
  178:7 179:22
  181:22
  182:11
  184:5,8,22
  185:6 186:3,
  12 189:11,
  15,20 193:7
  207:24
  208:19,24
  209:25
  211:11
  213:15 216:5
  217:16
  221:23,24
  222:4 223:15
  224:10
  225:14,21
  226:8,10
  229:6,7
  230:3
  232:18,25
  243:17,21,24
  244:21
witnessed
  64:8 229:25
woman
  133:7
women
  133:6
wonder
  30:7
wooded
  114:10
  201:23
  238:19,23
woods
  115:10
  123:22
  124:7,8
word
  56:5 79:2
  83:17 114:23
  166:12 175:5
words
  6:17 61:4
  65:16 68:25
  70:4,11

  71:17 80:21
  82:5,19
  90:12 92:22
  99:19 103:10
  112:2,19
  114:13 116:2
  118:8
  130:12,20
  135:22
  166:18
  170:17
  176:10
  187:16
  196:21
  202:12
  203:15
  205:23 231:7
work
  10:13 16:8
  29:8 58:10
  87:2 129:1
  179:5 196:6
worked
  11:11 87:5
  94:15
working
  22:9 28:25
  29:22 33:1
  34:22 37:12
works
  195:10
world
  62:9
worn
  146:14
worried
  117:11
worry
  109:5
wound
  146:7
write
  55:20 226:6
  229:16
writing
  13:5 47:7
  55:21

OFFICER JON  GRUBBS
January 28, 2021

183:13,21,22
185:18 215:1
220:11
**written**
14:6,14
15:10 33:10,
22 40:2
157:7 220:9
241:6
**wrong**
47:8,14,17
50:3,20
93:15
**wrote**
30:14 31:22
40:4 46:4
164:6 214:25
229:3,18

---

X

---

**X-2**
165:16
**X2**
86:2

---

Y

---

**yeah**
7:9 12:17
22:12 23:22
42:16 57:21
69:10 81:3
82:14 87:1,
12 91:9
110:8 115:1
147:1 149:20
158:6 160:10
171:23 180:4
181:6 200:23
210:24
**year**
12:15 24:20
27:10 28:19
38:15,16,18
87:5 88:17,
19 89:16

94:17 106:7
241:22
**years**
10:19 14:2
28:2 29:2,16
35:21 38:10,
11 42:19
43:23 45:9,
25 47:25
49:20 62:21
80:12 94:18
104:21 105:1
149:11 201:5
**yelled**
83:1 157:15
200:8
**yelling**
138:6 240:18
**yellow**
71:18,19
73:24 178:12
187:1
**yes/no**
31:22
**young**
118:16
**younger**
30:25

---

Z

---

**Z-O-R-N**
163:10
**zipped**
180:8
**zipper**
177:19
**zone**
10:15 22:17,
23,24,25
23:24 26:22,
23 27:13
34:23 159:8
162:25
167:1,6
203:24

**zones**
22:19 23:7,
20
**zoom**
171:2
189:14,15
**Zorn**
163:6,7
164:7 204:22
210:9