UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION


| | |
|---|---|
| JERRY BLASINGAME, | ) |
| | ) |
| Plaintiff, | ) CASE NO: |
| | ) 1:19-CV-2047-SCJ |
| -vs- | ) |
| | ) |
| | ) |
| OFFICER T. GRUBBS #6416, | ) |
| and CITY OF ATLANTA/ | ) |
| ATLANTA POLICE DEPARTMENT, | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |


DEPOSITION OF STEVE MCCALLUM

(Pages 1 through 141)

(Via Video Conference)


Monday, February 8, 2021

(10:00 a.m. to  1:45 p.m.)


Stenography Reported By:

Kendra B. James, RDR, CRR

Georgia Certified Court Reporter

Steve McCallum
February 08, 2021

```
 1                          APPEARANCES

 2

 3    On Behalf of the Plaintiff:

 4         JOHNSON LAW
           VEN JOHNSON, ESQUIRE (via video conference)
 5         SOLOMON RADNER, ESQUIRE (via video conference)
           MADELINE SINKOVICH, ESQUIRE (via video conference)
 6         535 Griswold Street
           Suite 2632
 7         Detroit, Michigan 48226
           313-324-8300
 8         vjohnson@venjohnsonlaw.com

 9

10    On Behalf of the Defendant:

11         CITY OF ATLANTA LAW DEPARTMENT
           ALISHA MARIE S. NAIR (via video conference)
12         55 Trinity Ave SW,
           Suite 1790
13         Atlanta, Georgia 30303
           404-330-6402
14         amnair@atlantaga.gov
           sjmiller@atlantaga.gov
15

16

17

18

19

20

21

22

23

24

25
```

```
1    INDEX OF PROCEEDINGS

2

3    Deposition of STEVE MCCALLUM

4

5                                                          Page

6    Examination by MR. JOHNSON                         5, 136

7    Examination by MS. NAIR                               125

8    Certificate of Reporter                               141

9

10   Exhibits

11

12   1          GBI Summary                                 17

13

14   (Due to the large size of the exhibits, the link of the

15   exhibits were emailed to the attorneys.)

16

17

18

19

20

21

22

23

24

25
```

Steve McCallum
February 08, 2021

```
 1              THE COURT REPORTER:  This is the deposition of
 2    Steven McCallum.  Pursuant to Article 8.B. of the Rules
 3    and Regulations of the Board of Court Reporting of
 4    Judicial Council of Georgia, I make the following
 5    disclosure.
 6              I, Kendra James, am a Georgia certified court
 7    reporter.  I am here as an independent contractor for
 8    U.S. Legal Support, Inc.  U.S. Legal Support, Inc. was
 9    contacted by the offices of U.S. Legal Support, Inc.
10    Bingham Farms to provide court reporting services for
11    this deposition.  The firm will not be taking this
12    deposition under any contract that is prohibited by
13    O.C.G.A. 15-14-37 (a) and (b).
14              U.S. Legal Support, Inc. has an agreement to
15    provide reporting services with U.S. Legal Support, Inc.
16    Bingham Farms, the terms of which are as follows.  Any
17    and all special rates and/or services are available to
18    all parties involved in this litigation.
19              Mr. McCallum, would you please raise your right
20    hand.
21                        STEVE MCCALLUM,
22    having been first duly sworn, was examined and testified
23    as follows:
24              MR. JOHNSON:  Let the record reflect this is the
25    deposition of Special Agent Steve McCallum taken pursuant
```

Steve McCallum
February 08, 2021

```
1   to notice.  It will be used for all purposes permissible
2   under the federal rules of evidence and the rules of
3   civil procedure.
4                        EXAMINATION
5   BY MR. JOHNSON:
6       Q.   Special Agent McCallum, as they told you right
7   before we started, my name is Ven Johnson.  I represent
8   Mr. Blasingame, along with Solomon Radner in my office
9   and Maddie Sinkovich, who are obviously attending by way
10  of the computer and the Zoom as well.
11           Before we get started, just want to the make
12  sure we have a general understanding of the deposition
13  format.  I'll take it, you've given a deposition before,
14  sir?
15      A.   Not in a civil case like this, no.
16      Q.   Okay.  Obviously, you're familiar with
17  testifying live in a courtroom setting?
18      A.   Correct.
19      Q.   Same rules.  Just no judge, no jury.  So just
20  like you heard me, you swore to tell the truth.  I'll be
21  asking questions and then when I'm done, counsel for the
22  city will ask you questions and kind of go on like we
23  would in court, other -- again, other than the -- no
24  judge, no jury.  Okay?
25      A.   Yes, sir.
```

Steve McCallum
February 08, 2021

```
1       Q.   Thank you.

2            Special Agent McCallum, who are you employed by?

3       A.   Say it again.  I'm sorry.  We cut out.

4       Q.   Who are you employed by?

5       A.   Georgia Bureau of Investigation.

6       Q.   So if I call it GBI, you'll get it, right?

7       A.   Yes, sir.

8       Q.   How long have you been sort of working for GBI?

9       A.   Approximately five years.

10      Q.   And so your title currently is special agent?

11      A.   Correct.

12      Q.   What's that mean in general?

13      A.   It's working as a state investigator, state

14   detective.

15      Q.   "State" meaning what?

16      A.   We are employed by the State of Georgia.

17      Q.   Okay.  Now, in Michigan, we have a state police.

18   We call them troopers, of course, but Michigan State

19   Police.

20      A.   Yeah.

21      Q.   Are you, in fact, the state policing agency

22   for Georgia, sir?

23      A.   We are.  I mean, some states, they separate it.

24   We have troopers which are on the traffic side of things

25   and the GBI is on the investigation side.  Some states
```

Steve McCallum
February 08, 2021

1    combine that -- one agency does both, so we do not.

2        Q.    Thank you.

3              Before working for GBI, where were you employed,

4    sir?

5        A.    I did a short term with the state doing

6    insurance investigations and I was employed with Norcross

7    Police Department prior to that.

8        Q.    Insurance investigation for -- what was your

9    exact title while you were there?

10       A.    I was a special agent there as well.

11       Q.    How long did you do that?

12       A.    That was approximately two years.

13       Q.    And then when you were at Norcross Police

14   Department, is that N-o-r-c-o -- c-r-o-s-s?

15       A.    Yes, correct.

16       Q.    Georgia, sir?

17       A.    Georgia, yes.

18       Q.    How long did you work there?

19       A.    From -- a little over three years.  So I left --

20   yeah, I left the fire department in 2010 and went to

21   Norcross PD.

22       Q.    So before becoming -- being with the police

23   department, you were with the fire department at

24   Norcross.

25       A.    Actually, Gwinnett County.  I was a

Steve McCallum
February 08, 2021

```
1    firefighter-paramedic.
2         Q.   In what county?
3         A.   Gwinnett County.
4         Q.   How long were you with the fire department as
5    well as a paramedic, sir?
6         A.   A little over four years.
7         Q.   How about before that?
8         A.   College, that was it.  Yeah.
9         Q.   Did you get a four-year degree?
10        A.   I did.
11        Q.   From where, please, and when?
12        A.   Georgia College and State University from 2002
13   to 2006.
14        Q.   Degree in?
15        A.   Good old criminal justice.  Yeah.
16        Q.   Should have guessed, but you know.
17        A.   Yeah.  Yeah.
18        Q.   So you -- did you have to get out of college and
19   take -- or go to an academy or -- it looks like you might
20   have gone to the fire academy first?
21        A.   Yeah, I did.  I went to the fire academy first,
22   yes.
23        Q.   And then got your paramedic --
24        A.   Got my paramedic as well, yeah.
25        Q.   And then from there, went to a policing academy
```

Steve McCallum
February 08, 2021

1   in order to join Norcross?

2       A.   I got POST certified in 2010.

3       Q.   When you were working for Norcross Police

4   Department, Special Agent McCallum, what kind of stuff

5   were you doing in particular?

6       A.   I was on patrol and then on crime suppression,

7   on their SWAT or SRT team.  So we did, say, general

8   investigations and patrol on crime suppression unit,

9   so...

10      Q.   Did you -- while you were with Norcross, did you

11  have a Taser?

12      A.   I did.

13      Q.   All three years you were there?

14      A.   Correct.

15      Q.   You ever Tase anybody in the back?

16      A.   I have not.

17      Q.   In terms of your on duty with Norcross, ever use

18  your firearm in the line of duty other than for training?

19      A.   Say again.

20      Q.   When you were with Norcross PD, had you ever

21  used your firearm for any other purpose --

22      A.   I --

23      Q.   -- other than for training?

24      A.   -- no, I have not.

25      Q.   Thank you.

Steve McCallum
February 08, 2021

```
1            Same thing for GBI.  As part of your GBI gear,
2    do you folks carry -- or do you carry a Taser?
3        A.   I do.
4        Q.   What kind?
5        A.   It's a Taser X2.
6        Q.   I'll take it, you got your Taser training, then,
7    from GBI after joining them?
8        A.   I've had it since I've had a Taser.  But yes,
9    they do continual training as well.
10       Q.   All right.  Have you -- as part of the training,
11   do you -- do you folks at GBI -- to the best of your
12   memory, Special Agent McCallum, are you trained at all
13   with materials with Taser International itself?
14       A.   Am I trained with materials from Taser
15   International?
16       Q.   Yes, sir.
17       A.   I'm not aware of where the stuff is from.
18       Q.   Okay.  When -- as you've been with the GBI, as
19   part of your duties, have you ever Tased anybody in the
20   back since you've been at GBI?
21       A.   No.
22       Q.   How about use of your firearm outside of
23   training?
24       A.   No.
25       Q.   Well, let's see.  We're in '21.  So you joined
```

Steve McCallum
February 08, 2021

```
1   GBI ballpark, Special Agent, about 2016?

2        A.   Correct.

3        Q.   So when you got involved with the Blasingame

4   investigation October of what -- pardon me -- July of

5   2018, you'd have been with GBI for somewhere around two

6   years.

7        A.   That looks about correct.

8        Q.   Okay.  As part of your duties with GBI, other

9   than this investigation, have you ever investigated any

10  other use of force that involved the Atlanta Police

11  Department?

12       A.   Yes.

13       Q.   How many times?

14       A.   I can't tell you.  I'd have to look back at my

15  cases.

16       Q.   Can you give me an estimate?

17       A.   I cannot.

18       Q.   You think it's been more than ten?

19       A.   At that point in time three years in, I really

20  can't tell you.  It -- I don't see -- I couldn't tell you

21  unless I go back and look.

22       Q.   How about now?

23       A.   Right now, I still couldn't tell you.  We work

24  numerous use of force and shooting investigations for

25  Atlanta Police Department.
```

Steve McCallum
February 08, 2021

1      Q.   Do you know why that is?

2      A.   Because they request us to work these

3  investigations.

4      Q.   And other than you all obviously are from the

5  same state, is there any overlap in terms of

6  administration and so forth between GBI and Atlanta?

7      A.   No.

8      Q.   So when you all get involved the way that you

9  did in the Blasingame investigation, I'll take it, you

10 believe it to be an independent investigation, sir.

11     A.   Correct.

12     Q.   To the best of your knowledge, when you're

13 involved in a use of force investigation like you were in

14 October -- in July -- don't know why I'm saying October

15 today.

16          So let's go with July 2018.  To the best of your

17 knowledge as part of your investigation, do you

18 understand it to be along the lines of information that

19 could be used in a criminal prosecution?

20     A.   These are criminal investigations that we

21 conduct.

22     Q.   Okay.  And can you tell me in -- by using that

23 term, "criminal" -- obviously, understanding this is a

24 civil case -- what's the difference?  What do you see

25 that the state is in there if you can, please, sir?

Steve McCallum
February 08, 2021

1        A.    You're asking me why I stated that that's the

2   type of investigation; is that what you're asking me?

3        Q.    Yes, sir.

4        A.    We don't investigate anything civil with the

5   GBI, so that's why it's a criminal investigation.  Not

6   meaning that they -- a crime -- that a crime occurred.

7        Q.    Sure.

8        A.    Just meaning that that's the type of

9   investigation that we conduct.

10       Q.    Okay.  To the best of your knowledge, does

11  anybody perform what you understand to be a civil

12  investigation into the use of force for the Atlanta

13  Police Department?

14       A.    No.  I don't know who conducted the civil

15  investigation.

16       Q.    Okay.  Thank you.

17             With respect, sir, to this particular

18  investigation, can you tell me how they differ.

19             From the use of force investigations that you've

20  been involved with, with -- into Atlanta Police

21  Department, do you remember you investigating any other

22  use of Taser other than this one?

23       A.    I have.  I'd have to go back to the dates and

24  see if it was before or after that one.  But I've

25  invest- -- I've investigated other Taser use of force

Steve McCallum
February 08, 2021

1  incidences.

2      Q.   Can you estimate how many before or after

3  just -- that you've done at GBI of Atlanta.  Can you tell

4  me how many you believe there to be approximately.

5      A.   So not a whole lot because those investigations

6  are not requested on a routine basis, if that makes

7  sense.  They -- we do not investigate Taser use of force.

8      Q.   Understood.

9           How many that you've done?

10     A.   A handful.

11     Q.   Five-ish?

12     A.   Ish, yes.

13     Q.   That's a technical legal term up here in

14  Michigan.

15     A.   Yeah.

16     Q.   Sorry.

17     A.   Five -- approximately five.

18     Q.   I -- that was my word, not yours.

19          All right.  To the best of your knowledge, if

20  you know, Special Agent, why -- why not investigate all

21  Tasers?  Why only some?

22     A.   It depends on the department.  I'm not going to

23  give my opinion on as to why that is.  But we also don't

24  have the means to investigate every use of force at the

25  GBI, so -- or for every use of force incident.

Steve McCallum
February 08, 2021

```
1      Q.    Why aren't you going to give your opinion?

2      A.    Say again.  I -- it's not relevant.

3      Q.    You -- okay.  And I guess that's -- that's going

4  to be an important factor for us to discuss on this case.

5            When I go through the reports here of GBI'S

6  investigation into the Blasingame matter, it does not

7  appear, for the most part, that I see opinions.  Is that

8  by design?

9      A.    Correct.  We do not have opinions in any of our

10  use of force investigations.

11     Q.    And why is that?  If you know.

12     A.    We're fact-finders.  We do -- conduct a thorough

13  investigation of that use of force incident.  In these

14  situations, then that investigation's turned over to the

15  D.A.'s Office to make a determination whether or not any

16  crime actually did occur.

17     Q.    Okay.  Do you know that if Atlanta -- City of

18  Atlanta uses your investigation into this incident as

19  part of their internal affairs investigation?

20     A.    I really don't know where that goes.  I couldn't

21  attest to exactly what APD does with the investigation.

22     Q.    Okay.  So in this case as it pertains to your

23  investigation into the Blasingame matter, there are no

24  formal opinions listed by you relative to this matter,

25  correct?
```

Steve McCallum
February 08, 2021

1      A.   Correct.

2      Q.   And I'll take it, then, relative to your

3  involvement in this federal lawsuit, you will not be

4  issuing any opinions for or against anybody -- party or

5  any person in this matter.  Correct?

6      A.   Right.  Correct.

7      Q.   When -- when the call came in, can you tell us

8  who was the person initially in charge of the GBI

9  investigation?

10     A.   You mean initially in charge or who basically

11  assigns the cases is what you're asking me, correct?

12     Q.   That's a better question than mine, so let me do

13  it again.

14          As it pertains to this investigation

15  specifically, who got the call and how did it get

16  assigned, please?  Thank you, sir.

17     A.   The normal procedure would be our special agent

18  in charge, which at the time would have been

19  Cynthia Adkins, I believe.  At the time, it would have

20  been Cynthia Ad- -- Adkins.  Also would have been

21  Rocky Bigham as an assistant special agent in charge or

22  Brian Whidby as an assistant special agent in charge.  I

23  could tell you that -- let's me see on this initial

24  request.  You know we -- we -- hold on.  I can tell you

25  who that was.  Sorry.

Steve McCallum
February 08, 2021

1    Q.    No, you're good.  I appreciate you checking.

2    And just let us know if you don't mind, so counsel and I

3    know when you are checking, what you're looking at to

4    refresh your memory, if you would.

5    A.    I'm looking right now at the initial request

6    summary.  I don't specify in this summary what supervisor

7    contacted me, but it was one of those three supervisors

8    that contacted me to conduct this investigation -- to

9    assign me the case.

10    Q.    And the first page of your investigation,

11    that -- it ultimately was assigned to you, sir?

12    A.    Correct.

13    Q.    Okay.  And is the first page -- can you tell

14    me -- obviously, we've gotten documents that were sent to

15    us presumably by you.

16            But is the first document -- that first

17    paragraph, what is -- what is the first paragraph?  I

18    need to know that I'm on the first -- same first page as

19    you have.

20    A.    All righty.  So our reports are organized by

21    exhibits.  So what you're seeing in front of you is -- if

22    you accurately navigate the report, you look at summary

23    list for the exhibit which is going to list them in the

24    order I've put them.  And any attachments are going to be

25    hyperlinked.

Steve McCallum
February 08, 2021

```
1          So my first summary in there -- or my first

2   exhibit is going to be titled Initial Request.  And to

3   navigate into our report, every investigative act is

4   assigned a summary --

5       Q.   Okay?

6       A.   -- which is then an exhibit number, so...

7       Q.   Okay.  The first thing I have, at least Exhibit

8   1, on Tuesday July 10, 2018 at approximately 5:30 p.m.

9   Is that the right document?

10      A.   Yes, correct.

11      Q.   So in essence, GBI was requested by Atlanta

12  Police Department to conduct investigation into a Taser

13  use of force incident, correct?

14      A.   Correct.  Yes.

15      Q.   And this is your note, obviously, Special Agent

16  Steven McCallum, correct?

17      A.   Correct.

18      Q.   And APD Officer Jon Grubbs Tased

19  Jerry Blasingame who sustained injuries as a result of

20  the incident is what it says, in essence, right?

21      A.   Correct.

22      Q.   Thank you.  Okay.

23          And the fact of the matter that it's assigned to

24  you, is there any -- is there a rotation?  The fact that

25  you got this versus somebody else because of specialty?
```

Steve McCallum
February 08, 2021

1    Is there -- can you help us to understand that at all.

2       A.   Yeah, it -- since it was 5:30 p.m., I'm assuming

3    I was on call.  We have on-call rotations after hours,

4    basically, who gets assigned a case nights and weekends.

5    During the day -- it's kind of on a rotational basis.  I

6    don't schedule the rotation, but the supervisors do,

7    so...

8       Q.   Got it.

9            So then you got the call at about 5:30 p.m. that

10   night?

11      A.   Yeah.

12      Q.   All right.  That's when we can start to roll on

13   the investigation, correct?

14      A.   Correct.

15      Q.   So the next thing that we logically look for,

16   Special Agent McCallum, would be Exhibit 2.

17      A.   Correct.

18      Q.   You see how quick us guys in Detroit are?  Go

19   right to the heart of the matter.  Okay.

20           I have -- Exhibit 2 is a three-page document

21   that starts -- at least on that first page, the first

22   paragraph on Tuesday, July 10, 2018 at approximately

23   6:30 p.m.  Am I at -- is that the right one?

24      A.   Yeah, it should be titled, Case Briefing From

25   Atlanta Police Department Sergeant Aaron Zorn.

Steve McCallum
February 08, 2021

```
 1      Q.   Yeah, all of these are entitled the same.
 2   Either that first document, just the --
 3      A.   Yeah.
 4      Q.   -- Georgia Bureau of Investigation and then
 5   investigative summary on my copy.
 6      A.   Oh, it should say the title.  I don't know what
 7   printout you're looking at.
 8      Q.   Okay.
 9      A.   But I -- that -- but yes, that we're tracking.
10   That's the second report.  I don't know why the title's
11   not there.
12      Q.   That's good?
13           MR. JOHNSON:  Solomon or Maddie, can somebody
14   put at least Exhibit 1, the first page up.
15           MR. RADNER:  Is it -- Exhibit 1 is that the big
16   fat one?
17           MR. JOHNSON:  Yep.
18      Q.   (By Mr. Johnson)  In a shocking twist of fate,
19   Special AgentMcCallum, the old man doesn't know how to do
20   the share documents.  So forgive me that I'm --
21      A.   That's fine.
22           MR. JOHNSON:  Yeah, that's good.
23               (Whereupon, Plaintiff's Exhibit No. 1 was
24                presented.)
25      Q.   (By Mr. Johnson)  Can you see the -- we put it
```

Steve McCallum
February 08, 2021

1   up on the screen, I think, for the --

2       A.   Yeah.

3       Q.   -- Special Agent?

4       A.   Yeah, I can see it.  I can see it.

5       Q.   So the fact that it's not -- doesn't have the

6   title that you talked about, is that the -- okay.  Here's

7   a big question.  Is that a big deal to you?

8       A.   No.

9       Q.   All right.  Cool.

10          I see handwriting or at least initials below

11  your signature line, HDT and BW.  Who's that?

12      A.   Those are the supervisors.  So we approve

13  reports in the system.  They read them, then also approve

14  them.

15      Q.   Okay.

16          MR. JOHNSON:  Let's go to Exhibit 2, please, the

17  following three pages.

18                  (Whereupon, Plaintiff's Exhibit No. 2 was

19                  presented.)

20      Q.   (By Mr. Johnson)  Okay.  I'm showing you what --

21  what is Exhibit 2 now and I just -- I was just starting

22  to read that first page.  Again, despite the -- maybe not

23  having the same topic, if you will, there -- there at the

24  top of the page, if you will.

25      A.   Yes.

Steve McCallum
February 08, 2021

1      Q.   Still the same thing?

2      A.   It's the same report, yeah.  When we generate a

3   report in our case management system, this is how you

4   view it.  I'm just simply viewing the case in our --

5   directly in our management system.  That's all.

6      Q.   Okay.  Cool.  Thank you.

7           So obviously, after you got the initial call --

8   it looks like 6:30 p.m. or so the same day of the

9   incident, Special Agent, July 10, 2018, you ultimately

10  went to APD and met with Sergeant Zorn.

11     A.   Correct.  Right.

12     Q.   I take it, you understood Sergeant Zorn, now

13  Lieutenant Zorn, to be a supervisor of Officer Grubbs?

14     A.   I assume.

15     Q.   Okay.  So further on -- still Exhibit 2 bottom

16  of page 1, on Tuesday, July 10 at 2:00 p.m. -- oh, this

17  is the information, then, that Zorn is giving you about

18  the incident itself?

19     A.   Correct.

20     Q.   Did he tell you how he got this information?

21     A.   No.

22     Q.   All right.  As a seasoned investigator, I take

23  it, your assumption is he spoke with the officers

24  involved?

25     A.   Correct.

Steve McCallum
February 08, 2021

1    Q.   Can he do that?  Even though you're conducting a

2    criminal -- a potential criminal investigation, can you

3    use that information?

4    A.   Yes.  And we have to know what happened.

5    Q.   Yes, sir.  Okay.

6         So at least in terms of the incident -- and this

7    is the -- pretty much the third -- or the largest

8    paragraph.  Let me get right to the incident, please.

9    I'll use your words.

10        "Grubs and Shelley observed a black male, later

11   identified as Blasingame, soliciting at the on-ramp which

12   was a controlled access highway.  When Blasingame saw the

13   officers, he immediately fled on foot up I, dash, 20

14   westbound."

15        "Grubbs pursued Blasingame on foot.  Grubbs

16   jumped a guardrail and followed Blasingame onto a path in

17   the woods between the on-ramps.  Grubbs deployed his

18   Taser one time on the path in the woods striking

19   Blasingame in the back."

20        "The path was steep and thick with vegetation.

21   Blasingame landed head first onto a cement pad at the end

22   of the path.  Blasingame was transported to Grady

23   Hospital where he was in critical condition."

24        Did I at least read that portion of the

25   paragraph correctly, sir?

Steve McCallum
February 08, 2021

1        A.    You did.

2        Q.    Had you ever been to this scene before your

3    investigation, Special Agent?

4        A.    No, I had not.

5        Q.    Obviously, you're probably generally familiar

6    with the roadways.  But were you familiar with anything

7    to do with the -- I'll call it the topography, the way in

8    which the land existed between these two ramps?

9        A.    No, it's a -- it's a very intertwisted -- that

10   specific area is a very intertwisted location with a

11   multitude of ramps there.  So no, I wasn't familiar with

12   that area at all.

13       Q.    Okay.  Again -- so this is what Zorn is giving

14   you on the night of the incident.

15       A.    Correct.

16       Q.    Where he says, "Grubbs and Shelley" observed my

17   client soliciting on the ramp.  Obviously, information he

18   told you.

19       A.    Essentially, yeah.

20       Q.    He did not tell you that only one of the

21   officers thought my client -- or saw my client soliciting

22   money and the other did not?

23       A.    He -- what is in my report is what essentially

24   he told me.

25       Q.    Right.

Steve McCallum
February 08, 2021

1          So if the evidence in this case is contrary to
2    that, that's not what he told you.
3       A.   Correct.
4       Q.   He apparently told you that the Tasing occurred
5    after Grubbs jumped a guardrail and followed my client
6    onto the path in the woods between the ramps.
7       A.   That's right, yes.
8       Q.   He did not tell you that Grubbs shot my client
9    in the back with a Taser before he went up and over the
10   guardrail, did he?
11      A.   No.
12      Q.   He told you that my client landed head first
13   onto the cement pad after being struck with a Taser,
14   correct?
15      A.   Correct.
16      Q.   At no time did he tell you that they suspected
17   that my client somehow tripped and fell on his own
18   without being Tased.
19      A.   Say that again now.
20      Q.   At no time did Zorn tell you that they suspected
21   that my client somehow tripped and fell on his own
22   without, in essence, falling because he was being Tased.
23      A.   He did not tell me that.
24      Q.   At this point, at no time did Grubbs tell you
25   anything about the use for -- of the Taser other than my

1   client was fleeing.

2        A.   Grubbs didn't interview on this investigation.

3        Q.   Good point.  My bad.  Let me do it again.

4             At this time, Zorn did not tell you anything

5   about why my client was Tased, as apparently told to him

6   by Shelley and Grubbs, other than my client was fleeing.

7        A.   No.  Yeah, this is a general case briefing

8   letting me know --

9        Q.   Yes, sir.

10       A.   -- generally what happened.  Correct.

11       Q.   If somebody swung at an officer or tried to

12  assault an officer that led to a Tasing, certainly, it's

13  highly important information to share with an

14  investigator like you.  Agreed?

15       A.   I would assume, yes.

16       Q.   Nowhere did Grubbs -- and I said Grubbs again.

17  Sorry.

18            Nowhere at this time in your report does it

19  indicate that Zorn told you that Grubbs deployed his

20  Taser because he was worried about my client entering

21  traffic, correct?

22       A.   He did not tell me that.

23       Q.   Bottom of page 2, top of page -- or excuse me.

24            Bottom of page 1, top of page 2, Shelley was not

25  a witness -- witness to the incident; he remained in the

Steve McCallum
February 08, 2021

1    patrol vehicle?

2       A.    Yes.

3       Q.    Obviously became a witness to the -- after the

4    incident events, correct?

5       A.    Correct.

6       Q.    All right.  On page 2, top first full paragraph,

7    "Grubbs and Shelley activated their body cameras.

8    Grubbs' body camera was not in buffering mode and only

9    recorded events after the incident."

10           So what does that tell you about his body camera

11   if it's not in buffering mode at the time of the event?

12      A.    I really don't know.  I don't -- I'm not

13   familiar with their system generally.  Basically, his --

14   that's the explanation I was getting as to why his did

15   not record the event.  I couldn't explain what mode that

16   is.

17      Q.    Well, Grubbs -- if the testimony in this case is

18   Grubbs would actually have to hit a switch in order to

19   make his camera go into buffering mode because he had

20   taken it off -- or turned it off earlier, do you have any

21   information to the contrary?

22      A.    I -- so you broke up a little bit on that.  What

23   was that?

24      Q.    Happy to do it again, sir.

25           At least at this point, Zorn did not give you

Steve McCallum
February 08, 2021

1   any information as to why Grubbs had his camera off and

2   not in buffering mode.

3       A.   Correct.  I don't know why that was.

4       Q.   Do you folks have body cameras?

5       A.   We do not.

6       Q.   So I guess what I'm -- what I'm wondering,

7   when Zorn's telling you that Grubbs and Shelley activated

8   their body cameras, did you -- did he tell you when they

9   activated them?

10      A.   He didn't.  He did not.  If I didn't say it in

11  here, I don't recall that he specifically gave me a time

12  as to when they were activated.

13      Q.   Body cameras certainly could be important

14  information for you, can they not, sir?

15      A.   Correct.

16      Q.   I mean, if they're on, you can see whatever

17  there is to see by the way of the camera location of the

18  incident; correct?

19      A.   Correct.

20      Q.   If they're not, then we have to rely on folks

21  who were involved in the incident and/or otherwise

22  eyewitnesses.

23      A.   And evidence.  Correct.

24      Q.   Physical evidence, too, of course.  Yes, sir.

25           You agree with that?

Steve McCallum
February 08, 2021

1      A.    Yes, sir.

2      Q.    "Officer Ryan Steven," S-t-e-v-e-n, "was in

3  possession of Grubbs' Taser and it was in the process of

4  downloading."

5           I'll take it, that's an Atlanta Police

6  Department officer?

7      A.    Correct.

8      Q.    "The crime scene was processed by Zorn and

9  Wilder," W-i-l-d-e-r.

10          Do you know who Wilder is?

11     A.    No, I do not.

12  Officer Steven was in possession of Grubbs' Taser and was

13  in the process of downloading the video and Taser data.

14     Q.    "Wilder took photographs and took measurements

15  at the crime scene.  No evidence was obtained at the

16  crime scene."

17          And that -- I'm -- I'm a little lost on that.

18  Photographs and measurements are certainly evidence.  But

19  I'll take it, you're talking about physical evidence

20  there at the scene.

21     A.    Excuse me.  That -- yeah, that's what I was --

22  that's what I meant to say, physical evidence.  Correct.

23     Q.    Cool.  Okay.

24     A.    Yeah.

25     Q.    Have you ever seen measurements from the scene?

Steve McCallum
February 08, 2021

1       A.   I would assume I have.  I'd have to go back and

2    look at this report.  This is many years ago.

3       Q.   Yes, sir.

4       A.   Do you want me to go look at that?

5       Q.   I will probably ask you that a little later on.

6       A.   Yeah, that's what I figured.

7       Q.   So by "no evidence was obtained at the crime

8    scene," in other words, anything that may have been on

9    the ground or in the area that folks would have assumed

10   or believed to be somehow related to this incident,

11   nothing was apparently kept or filed.

12      A.   Correct.

13      Q.   Did Zorn ever tell you about a dollar bill that

14   was seen on the ground that they thought might be related

15   to this incident?

16      A.   I don't recall.

17      Q.   Okay.  If there's a dollar bill in the crime

18   scene where the -- some officers involved may believe

19   that that was a dollar bill that my client got from a

20   motorist.  Typically speaking, isn't that something that

21   you'd want to see where it was located at the crime scene

22   and have it documented, Special Agent McCallum?

23      A.   Yes.

24      Q.   That's something that -- if Zorn saw and

25   believed that's what it was, the dollar bill, that's

Steve McCallum
February 08, 2021

1   something that you would expect him to record and

2   otherwise turn over to you.

3       A.   Correct.

4       Q.   Apparently, at this time at least, he didn't do

5   it, according to your report.

6       A.   If it's not in the report, no, I don't recall.

7       Q.   Okay.  Thank you.

8            Obviously, you confirmed, a few more paragraphs

9   down, my client did not have any weapons on him at that

10  time?

11      A.   That's correct.

12      Q.   And you requested from Zorn the Taser video and

13  the body camera video obviously, correct?

14      A.   Correct.

15      Q.   From both so you can see whatever there was to

16  be seen, if anything.

17      A.   Right.

18      Q.   But obviously, you can't add some stuff that

19  you're not made aware of --

20      A.   Correct.

21      Q.   -- right?

22           So page 3 of the same exhibit, please.

23               (Whereupon, page 3 of Plaintiff's Exhibit

24               No. 2 was presented.)

25      Q.   (By Mr. Johnson)  "Taser inventory" means what,

Steve McCallum
February 08, 2021

1   please, Special Agent McCallum?

2       A.   Basically, it's the way of saying what Taser was

3   assigned to that officer.  There's a document most people

4   sign, training, things like that just to show what serial

5   number Taser it was assigned to.

6       Q.   Thank you.

7            Taser download documents obviously, correct?

8       A.   Correct.

9       Q.   The incident report, is that a report that's

10  ultimately done by Officer Grubbs?

11      A.   Well, yeah.  It's basically the APD or most

12  police departments, they create their own incident

13  report.  It states date and time, things like that.

14  Yeah, that's the Atlanta -- that's their side of it.  So

15  I request that as well just so I have that information.

16      Q.   Yes, sir.

17           And the CAD detail is what, C-A-D detail?

18      A.   Yeah.  So I didn't -- that's Computer Aided

19  Dispatch detail, so it's times on their dispatch as far

20  as when things happen exactly.

21      Q.   Okay.  And radio traffic, is that audio?

22      A.   That's audio, correct.

23      Q.   Okay.  Use of force policies and procedures of

24  Atlanta police, obviously, you got that from APD?

25      A.   Correct.

Steve McCallum
February 08, 2021

1    Q.   And why did you want that?

2    A.   We get that on all cases.  We just get that on

3  all cases, to be honest, just to see what department --

4  what their policies and procedures are for that

5  particular use of force, whether it could be less lethal

6  or deadly use of force.

7    Q.   Okay.  Obviously, a copy of Grubbs's training

8  file?

9    A.   Uh-huh.

10   Q.   Yes?

11        Review of Grubbs' internal affairs and personnel

12  file?  Why do you do that?

13   A.   That's mainly going to be so we can see and I

14  know everything about that officer prior to any media or

15  any other individual getting that information.  I'm not

16  blind-sided by anything in particular.

17   Q.   Crime scene report and pictures taken by 7334,

18  Wilder?

19   A.   Correct.

20   Q.   What's a crime scene report.

21   A.   Say again.

22   Q.   What is a crime -- what's this crime scene

23  report mean?

24   A.   Well, at that time, I was just wanting

25  everything that they had in pertaining to their

Steve McCallum
February 08, 2021

1  processing of that crime scene when it occurred -- right

2  after it occurred.

3      Q.   And obviously, you asked for a copy of all

4  charges and for the citation.

5      A.   Right.

6      Q.   Did they discuss with you -- did Zorn -- excuse

7  me -- discuss with you at that time potentially other

8  citations or charges?

9      A.   I don't recall.

10      Q.   If -- in a situation like this, if my client was

11  suspected of trying to get money from motorists -- some

12  people call it pandering and others call it begging,

13  whatever -- and therefore, could also charge with running

14  away from a police officer.

15          If there was a swing or a punch or an elbow or

16  any physical contact that was attempted by my client

17  against the officer, wouldn't you agree to expect that

18  information to be shared with you as well at this point

19  as the investigating officer, sir?

20      A.   Say that one more -- sure.  This is a general

21  brief, so whatever he knew at that time.  I'm not aware

22  when he became aware of different things at different

23  times.  I spoke to him this time.

24      Q.   Yes, sir.

25          So again, if there was an attempted assault by

Steve McCallum
February 08, 2021

1   my client of this officer in any way physically --

2   obviously, that's assault and battery -- you would expect

3   to be told that information from the beginning.

4        A.   If he was aware at that time.

5        Q.   Yes, sir.

6        A.   If he knew at that time.

7        Q.   Okay.  Fair enough.

8             If Zorn knew, you expected him to tell you,

9   right?

10       A.   Correct.  Now, this is a -- this is not a

11  transcription of our conversation --

12       Q.   Yes, sir.

13       A.   -- what happened.  So I'm not testifying as to

14  the exact -- we do not record my conversation with that

15  sergeant, so I cannot recall everything that was stated

16  exactly at that point in time.

17       Q.   I know.

18            But to be fair, Special Agent McCallum, he talks

19  to you about my client swinging on a cop, that's

20  something you're not just going to leave out of your

21  report, are you?

22       A.   I would put it in my report.

23       Q.   Thank you, sir.

24            Exhibit 3 is four pages.

25            MR. JOHNSON:  If someone can put that up for us.

Steve McCallum
February 08, 2021

1    Thank you, sir.

2                    (Whereupon, Plaintiff's Exhibit No. 3 was

3                    presented.)

4        Q.   (By Mr. Johnson)  It starts out with, "On

5    Tuesday, July 10, 2018 at approximately 7:07 p.m.,

6    Special Agent McCallum located APD."

7            And now you were interviewing Keith Shelley,

8    correct, sir?

9        A.   Correct.

10       Q.   That interview was audio recorded, correct?

11       A.   Correct.

12       Q.   And in a part of the file that we -- I -- we

13   have that, so thank you for that as well.

14           And then I'll take it, what you do is -- we can

15   see in this report is you give a general overview of what

16   you believe to be the most important things that you got

17   from Shelley, true?

18       A.   Right.  It's not a transcription.  That's

19   essentially what he stated.  I'm not testifying to what

20   he stated.  The audio recording's there as well.

21       Q.   Got it.

22           So what we can do -- and by the way what we have

23   done -- is you can listen to the recording.  We can see

24   your overview.  And if the recording says something

25   different than the overview, you go with the recording,

Steve McCallum
February 08, 2021

1   right?

2       A.   Correct.

3       Q.   I'm already on page 2, the middle.  I'm not

4   going to read everything to you, I promise.

5       A.   All right.

6       Q.   Middle paragraph, "Shelley described the

7   individual as a black male approximately 50 years of

8   age" -- pardon me -- "50 years old with gray hair, later

9   identified as Blasingame."  Correct?

10      A.   You're on -- yes, I'm just looking for that

11  paragraph.

12      Q.   Yeah.  It's the middle paragraph, last sentence.

13           MR. RADNER:  I just highlighted it.

14      Q.   (By Mr. Johnson)  The second to last sentence.

15      A.   I see it.  Yes, correct.

16      Q.   So obviously, you learned that -- or at least

17  from Shelley, he did not see the actual Taser event,

18  correct?

19      A.   Correct.

20      Q.   I'm on page 3.

21           MR. JOHNSON:  I apologize, folks.  Give me one

22  quick minute.  Let me run to the restroom.  I apologize.

23  We'll take a break, please, a quick break.

24                  (Whereupon, a recess was taken.)

25           MR. JOHNSON:  Everybody all ready?

Steve McCallum
February 08, 2021

```
 1              THE WITNESS:  Okay.

 2              MR. JOHNSON:  Okay.

 3              THE COURT REPORTER:  Yes.

 4              MS. NAIR:  Yes.

 5              MR. JOHNSON:  I apologize, Special Agent.

 6         Go back to page 2, if you would, please.

 7                   (Whereupon, page 2 of Plaintiff's Exhibit

 8                   No. 3 was presented.)

 9    Q.   (By Mr. Johnson)  And in the second full

10    paragraph where Shelley was telling you apparently that

11    my client just received some money from a vehicle in the

12    roadway -- and you're welcome to read the rest if you

13    need to for my question.

14         As you're talking to Shelley, you --

15                   (Whereupon, plaintiff's attorneys had a

16                   discussion off the record.)

17    Q.   (By Mr. Johnson)  I take it, Shelley's -- you

18    understood Shelley to be telling you that my client was

19    on the shoulder of the roadway, correct?

20    A.   Yes.

21    Q.   Okay.  Over time --

22    A.   I don't -- let me do -- the person was two lanes

23    over on the left side of the roadway.  Correct.

24    Q.   Okay.

25    A.   Okay.
```

Steve McCallum
February 08, 2021

1    Q.   And then Shelley tells you he recei- -- he

2    had -- the individual, Mr. Blasingame, re- -- just

3    received some money from a vehicle in the roadway, is

4    what it says, right?

5    A.   Correct.

6    Q.   Shelley was about to get onto the bridge of I-75

7    which is all the way up -- because these two roadways

8    split off eventually there, correct?

9         Okay.  Do you understand it?

10   A.   Yes.

11   Q.   So Shelley's in the right lane and then he

12   drives into the gore which -- you learn something new

13   every day, Special Agent.  I didn't know what a gore was.

14        But that's in --

15   A.   Yes.

16   Q.   -- in between the two split-offs, if you will.

17   That cement is just not a traveled --

18   A.   Correct.

19   Q.   -- pavement.

20   A.   It's called a gore.

21   Q.   Okay.  All right.  Then the third paragraph,

22   Shelley's now telling you ultimately about where Grubbs

23   get out of the car and starts to pursue my client,

24   correct?

25   A.   Correct.

Steve McCallum
February 08, 2021

1     Q.    All right.   "Blasingame looked directly at

2    Shelley and immediately took off running up I-20

3    westbound."

4          In other words, he's still on that shoulder

5    area, but he's running up the road to get away from the

6    police vehicle.   Is that what you understood?

7          MS. NAIR:   I apologize.   I'm going to object and

8    ask that counsel not testify in his questions.

9          MR. JOHNSON:   Okay.   I don't testify, ma'am.   I

10   ask questions.   So you're -- got you.   And I guess it's

11   form.

12    Q.   (By Mr. Johnson)   Go ahead if you understand the

13   question.

14    A.    I'm not going to -- I don't -- I don't really

15   feel comfortable testifying to what he should be

16   testifying to.   I'm not going to say what he meant, what

17   he thought, what he assumed, or anything like that.

18   So --

19    Q.    Okay.

20    A.    -- you know, my report stands alone.   In other

21   words, I can't testify to what -- you know, if -- that's

22   something you have to ask him or he can testify to.

23    Q.    Obviously, I have and I want you to assume that

24   he testified exactly what I just said, that my client ran

25   up the side of the roadway away toward the back of their

Steve McCallum
February 08, 2021

1   car -- away from the car.

2          So was that consistent or inconsistent with what

3   he told you?

4       A.   He ran up the way.  That's what I -- that's how

5   I assume -- that's what I assume.

6       Q.   So that would be consistent with what I just

7   laid out to you was his testimony in this case, correct?

8       A.   Correct.

9       Q.   Okay.  At no time did Shelley tell you in this

10  interview about my client's actions.

11         At no time, did he tell you that he was running

12  in or around the roadway, did he?

13      A.   I don't recall.

14      Q.   All right.  It does doesn't say that in your

15  report, does it?

16      A.   It does not say it in my summary.

17      Q.   So after talking about running up I-20

18  westbound, Shelley gets back into his car with Grubbs

19  pursuing on foot, is what Shelley told you, correct?

20      A.   Essentially correct.

21      Q.   Yeah.

22         And then ultimately, that's when he lost sight

23  of my client and Grubbs, correct?

24      A.   Correct.

25      Q.   So again, even looking at the rest of that

Steve McCallum
February 08, 2021

1    paragraph, absolutely no observations were given to you

2    at that time by Shelley that my client was actually

3    running into traffic.  Agreed?

4        A.   I don't recall.  It's not stated in the summary.

5    I'd have to go back and listen to the audio for his exact

6    statements.

7        Q.   Okay.  But it's not anywhere in this summary, is

8    it?

9        A.   It's not in my summary.

10       Q.   Thank you, sir.

11            Going back to page 3 -- one, two, three -- four

12   paragraphs down.  "Grubbs told Shelley something about a

13   Taser and that Blasingame fell and hit his head," is what

14   your report says, correct?

15       A.   That's what it says.

16       Q.   So when you say it's "Grubbs told Shelley

17   something about a Taser," did you ask Shelley what

18   specifically Grubbs said?

19       A.   You'd have to go listen to the audio.  This is

20   essentially a brief synopsis of the interview.

21       Q.   Yes, sir.

22       A.   You'd have to listen to the audio.  So I

23   can't -- I don't recall.

24       Q.   I have.

25            So the fact of the matter is you would want to

1   know everything that Grubbs told Shelley about what led

2   to the actual Tasing itself.  Agreed?

3        A.   Yes.

4        Q.   Like, if there was some act that my client

5   allegedly did that caused or contributed to the decision

6   to Tasing him, that's something that you want to hear

7   from Shelley if Grubbs told him that.

8        A.   Correct.

9        Q.   Okay.  So Grubbs told Shelley something about a

10  Taser and that Blasingame fell and hit his head.  And

11  again, no information coming from Shelley at that time

12  that my client fell for any other reason other than he

13  was Tased, correct?

14       A.   I don't recall.  The purpose of the summary is

15  not for a transcription of the interview.  It's for a

16  guide, for a direction so you can go listen to the audio.

17  I was -- I'm not -- I don't recall the details.  I did

18  not listen to the audio of everything on this case file

19  prior to this deposition.  I do not recall word-for-word

20  what Shelley told me.

21       Q.   Okay.

22       A.   My report does not indicate that right now.

23       Q.   Thank you.

24            If Shelley testified under oath in this case

25  that it was his information directly from Grubbs that my

Steve McCallum
February 08, 2021

1   client fell after being Tased and that's when he hit his

2   head on the cement thing, that would be consistent with

3   what Shelley told you that day.

4       A.   That sounds consistent, yes.

5       Q.   "After the incident, Grubbs and Shelley drove to

6   APD Zone 5.  Grubbs told Shelley something about

7   Blasingame reaching back at him, but Shelley could not

8   remember exactly what Grubbs said after the incident."

9            Did I read that right?

10      A.   You did.

11      Q.   Okay.  So again, other than listening to the

12  tape, which I have, that's all that your record has about

13  what Grubbs told Shelley about, quote, reaching back at

14  him.  Agreed?

15      A.   Agreed.

16      Q.   If Grubbs -- if Shelley would have told you

17  Grubbs told me Blasingame swung at me, you would have

18  written down exactly what Shelley told you, right?

19      A.   No, this is not a transcription.  This is

20  essentially stated.  So this is not a transcription of

21  that interview, so --

22      Q.   Yes.

23      A.   -- it's not word-for-word.

24      Q.   If Shelley would have told you my client took a

25  swing at him and tried to hit him in the face, if Shelley

Steve McCallum
February 08, 2021

1  would have told you that, that's important information to

2  you and you would put it in your report.  Agreed?

3      A.   I agree.

4      Q.   And even though --

5      A.   I'm not trying to play games here, but that's

6  not in the audio.  That's something -- you listen to the

7  audio, he did not tell me that.  I mean, I can go back

8  and listen myself, but -- I'm assuming you're asking me

9  if that's what I would normally put in a summary?

10     Q.   You -- if Shelley told you Grubbs told me he

11 took a swing at me, that would end up in your summary.

12     A.   Okay.  I would assume.  But if you've listened

13 to the audio, I mean, I'm asking you, then, is that what

14 he's stated?

15     Q.   Well, unfortunately, I'm not the witness.

16          And the answer is, "What he said was something

17 about reaching back at him, but Shelley couldn't remember

18 exactly what Grubbs said."

19          So my question to you --

20     A.   That's what I wrote.

21     Q.   Okay.  That's what you wrote and that's what he

22 said.

23          So my question is:  Did you find --

24     A.   Yeah.

25     Q.   -- that to be a little odd?

Steve McCallum
February 08, 2021

1      A.    No.

2      Q.    What does "reaching back" mean?

3      A.    It could mean a lot of things.  This is a highly

4   stressful situation.  He's dealing with traffic on an

5   intersection.  I'm not going to tell you what's going on

6   in his mind.  I've interviewed a lot of officers about

7   incidences and what they perceive at the time and what

8   they focus on may be differently than you think.  So I'm

9   not about to go into what I believe is odd or not odd.  I

10  simply asked them a question.

11     Q.    Right.

12           And you wrote down what he told you.

13     A.    Correct.

14     Q.    Okay.  So you didn't try to come up with any

15  conclusions as to what "reaching back" at him meant;

16  that's the word you used and that's what you wrote down.

17     A.    Correct.

18     Q.    You also wrote down that Shelley apparently

19  could not remember exactly what Grubbs said.

20     A.    At that time.

21     Q.    Right.

22           Even though it was the same day.

23     A.    That's the same day.

24     Q.    Blasingame was obviously unconscious.  Did not

25  say anything after the incident.  Blasingame did not say

```
1    anything on the street before he ran, what your report
2    says, correct?  That's what Shelley apparently told you.
3        A.   That's what he told me.
4        Q.   Nothing in your report, at least through this
5    point in time, says anything about Shelley hearing Grubbs
6    give my client any type of orders.  Agreed?
7        A.   Agreed.
8        Q.   Nothing in this report thus far says anything
9    about Grubbs giving my client a warning before firing the
10   Taser.  Agreed?
11       A.   Agreed.
12            MR. JOHNSON:  Page 4, please.
13               (Whereupon, page 4 of Plaintiff's Exhibit
14               No. 3 was presented.)
15       Q.   (By Mr. Johnson)  Second paragraph about four
16   lines down.  "Shelley activated his body camera during
17   the incident"?
18       A.   Yes.
19       Q.   "Patrol vehicle did not have a dash camera,"
20   correct?  Is what it says.
21            "And Grubbs was wearing a body camera" is what
22   all of these things Shelley is telling you.
23       A.   That's what he's told me, yes.
24       Q.   "Shelley drew a diagram of where he first saw
25   Blasingame, the patrol vehicle's location, and the
```

Steve McCallum
February 08, 2021

1    direction Blasingame ran.  See attached."

2          MR. JOHNSON:  And can I put that up, please, in

3    the diagram.

4          MR. RADNER:  Yep.

5                (Whereupon, Plaintiff's Exhibit

6                No. 2 was again presented.)

7    Q.   (By Mr. Johnson)  Just want to make sure it's

8    the -- the one that I think it is, the one we're talking

9    about is the one that you got from Shelley that day,

10   please, sir.  We marked it in this deposition as

11   Exhibit 2.

12   A.   Yeah, it appears to be the same document.

13   Q.   Thank you, sir.

14                (Whereupon, Plaintiff's Exhibit No. 3 was

15                presented.)

16         MR. JOHNSON:  You can take it.  Thank you.

17                (Whereupon, Plaintiff's Exhibit No. 3 was

18                again presented.)

19   Q.   (By Mr. Johnson)  Exhibit 3, Special Agent

20   McCallum.  In one -- and it looks like just information

21   about Officer Shelley.  But you tell me, please.

22   A.   You broke up a little bit there.  You said?

23   Q.   Exhibit 3, it looks like it's information about

24   Shelley.  But what -- how would you describe this?

25   A.   Oh, hold on.  Let me see what you got here.

Steve McCallum
February 08, 2021

1     Q.    Thank you, sir.

2     A.    What are you -- I'm not sure what you're

3 referencing.  I have a -- the only two exhibits attached

4 to that are the diagram and the audio.

5     Q.    Okay.  I'm showing you this next document.  It

6 says Exhibit 3 on it right now.

7     A.    Oh.  Yes.  Oh, that's just ID data.  Sorry.  All

8 our exhibits are summaries.  So that's Summary No. 3.

9 That's just telling you who I spoke with on that

10 interview.

11     Q.    That's just -- obviously, just pertaining to

12 Shelley.

13     A.    ID data, yes.  So if we talk to multiple people

14 or -- you know, during that incident, all their ID data

15 there is -right underneath that narrative.

16     Q.    Got it.  Thank you, sir.

17           MR. JOHNSON:  Exhibit 4, it looks like

18 two-pages, if someone will put up for you.  Thank you.

19                 (Whereupon, Plaintiff's Exhibit No. 4 was

20                 presented.)

21           THE WITNESS:  Okay.

22     Q.    (By Mr. Johnson)  On Tuesday, July 10, 2018, at

23 7:38 p.m.  And it looks like you're trying to talk to

24 Grubbs and Grubbs did not want to make any statements at

25 that time, correct?

Steve McCallum
February 08, 2021

```
1      A.   Yes, that's correct.

2      Q.   Relatively standard, sir?

3      A.   That is standard -- relatively standard, yes.

4      Q.   So obviously, Grubbs doesn't have to give a

5  statement if he doesn't want to at least at this point.

6      A.   That is correct.

7      Q.   And I'll take it, you let Grubbs know that you

8  were there on behalf of GBI, in the unlikely event he

9  didn't already know, as conducting a criminal

10 investigation into this.

11     A.   Right.

12     Q.   Now, in essence, he then says he doesn't want to

13 make any statement.

14          And then you ultimately apparently saw the union

15 attorney Sandra Michaels there that night, did you not?

16     A.   I -- that's what the report states, yes.

17     Q.   Do you know a Ms. Michaels?

18     A.   Do I know her?  I do not know her personally.

19     Q.   Okay.  You know her professionally -- I mean,

20 you -- if she was in the room, you'd know that that's

21 Sandra Michaels or no?

22     A.   No, I wouldn't -- not -- not right now, I

23 wouldn't know.

24     Q.   Fair enough.  Thank you.

25          So tell me how it works once the officer
```

Steve McCallum
February 08, 2021

1    declines to give an interview to you, then how do you

2    ultimately obtain any information from the officer in

3    that kind of a scenario?

4         A.   Just like any other criminal investigation, we

5    do not.

6         Q.   Okay.  You would talk to the officer's attorney.

7         A.   I would -- oh, yeah.  I would discuss with the

8    attorney.  If they decided they want to speak at a

9    later -- or make a statement at a later point in time, I

10   would then take that statement.

11        Q.   Is that statement in a situation like that

12   considered a Garrity statement?

13        A.   No, it -- it's not really Garrity, no.  Garrity

14   is going to be when you're -- the departments and they're

15   asking you questions about administratively that

16   investigation.  This is not a Garrity issue.

17        Q.   Got it.

18             Garrity would be like the internal affairs if

19   they wanted to talk to him, that would be that type of

20   thing.

21        A.   Correct.  That's a Garrity issue, yeah.

22        Q.   Thank you.

23        A.   Or you'd be under Garrity at that point in time.

24        Q.   Yes, sir.  Thank you.

25        A.   It's not a Garrity.

Steve McCallum
February 08, 2021

1      Q.    Understood.

2            Okay.  You obviously -- I have one, two,

3      three -- four paragraphs down the last sentence.  "Grubbs

4      deployed his Taser via probes, one five-second cycle," is

5      what your report says, correct?

6      A.    Correct.  Yes.

7      Q.    And is that information you would have gotten

8      from the download or how would you know for the one

9      five-second cycle?

10     A.    That is, I believe, what this is -- here, hold

11     on one second.

12     Q.    Sure.

13     A.    At that point, I believe Grubbs told me that

14     when I was collecting his Taser.

15     Q.    Okay.  So you took photos of Grubbs' Taser?

16     A.    Yeah.

17     Q.    The battery, camera were not in the Taser

18     because they were in the process of downloading, correct?

19     A.    Correct.

20     Q.    There was one unspent cartridge in the Taser, so

21     that would --

22     A.    Yeah.

23     Q.    -- that would support what he told you that he

24     just viewed --

25     A.    Yeah.

Steve McCallum
February 08, 2021

1      Q.   -- the one five-second cycle, correct?

2      A.   Correct.

3           MR. JOHNSON:  On page 2, please.

4      Q.   (By Mr. Johnson)  So it looks like you took a

5   photograph of Officer Grubbs, his Taser, and his Glock.

6           And the reason for taking a photograph of the

7   officer that was involved in this incident is what?

8      A.   Just numerous reasons.  That way, any police

9   encounter, I can say what they were wearing at the time

10  as far as what identified them and things of that nature.

11     Q.   Okay.

12     A.   Anything I may have missed, I'll have a photo of

13  his -- on that person.

14     Q.   And obviously, if he had any visible signs of

15  injury, tearing of the clothing, blood dripping, anything

16  like that, that would be important --

17     A.   Yeah.

18     Q.   -- an issue you'd want to document as well,

19  right?

20     A.   Correct.  It would be.

21     Q.   And here there -- here there was none of that,

22  correct?

23     A.   There was none, no.

24     Q.   Okay.  So that's the picture that you took of

25  Officer Grubbs that night?

Steve McCallum
February 08, 2021

```
1     A.    That is.

2     Q.    Thank you.

3           MR. JOHNSON:  Next picture, please.

4                 (Whereupon, another photograph in

5            Plaintiff's Exhibit No. 4 was presented.)

6     Q.    (By Mr. Johnson)  Another picture of him maybe

7  just turning a little sideways?

8     A.    Yes.

9     Q.    And then from behind?

10    A.    Correct, yes.

11    Q.    Okay.  Turning around to the side again.

12          MR. JOHNSON:  Go ahead.

13          MS. NAIR:  Mr. Johnson, are these labeled as

14 exhibits?

15          MR. JOHNSON:  These are -- these are actually in

16 the report, these are photos 0806, 0807, 0808, 0809, and

17 then the Taser is 0810.  And that's obviously dot JPG.

18 These are the attachments if you clip that hyperlink in

19 that report.

20          But for the record, what we're going to do is

21 we're going to print off this entire report and -- with

22 the actual photos after the each of the particular

23 sections, so that someone reading it old school like this

24 old guy could see them, please.  So that's what we'll do.

25          MS. NAIR:  Thank you.  I just want to be clear
```

Steve McCallum
February 08, 2021

1    for the record.

2            MR. JOHNSON:  Yes, ma'am.  I appreciate the

3    clarification.

4            MR. RADNER:  They're all going to be jointly

5    Exhibit 1 in --

6            MR. JOHNSON:  Yeah.

7            MR. RADNER:  -- Exhibit 1, his report.

8        Q.   (By Mr. Johnson)  So it looks like we have the

9    four photos of Officer Grubbs.

10           MR. JOHNSON:  Solomon, can you go to the next

11   photo.

12               (Whereupon, another photograph in

13            Plaintiff's Exhibit No. 4 was presented.)

14       Q.   (By Mr. Johnson)  That's the -- we're now on the

15   photo of his -- Officer Grubbs' Taser, correct?

16       A.   Correct.

17           MR. JOHNSON:  Second photo of the Taser.

18               (Whereupon, another photograph in

19            Plaintiff's Exhibit No. 4 was presented.)

20       Q.   (By Mr. Johnson)  You're now looking at the

21   cartridge -- is that the cartridges in?

22       A.   It's the one unspent and unspent -- unspent

23   cartridge, correct.

24           MR. JOHNSON:  That's three photos.  Go ahead,

25   please.

Steve McCallum
February 08, 2021

1              (Whereupon, another photograph in

2         Plaintiff's Exhibit No. 4 was presented.)

3       Q.   (By Mr. Johnson)   That's the serial number,

4    Photo 4, of the Taser, correct?

5       A.   Correct.

6       Q.   And then obviously, this is relative to the

7    firearm that we don't -- know played no role in this

8    event.  Agreed?

9       A.   That is correct.  Agreed.

10      Q.   So that's a Photo 1 of the firearm.

11           MR. JOHNSON:  Go ahead and just go through each

12   firearm so I can count the number, please.

13              (Whereupon, photographs in

14         Plaintiff's Exhibit No. 4 were presented.)

15      Q.   (By Mr. Johnson)   That's two, three -- so three

16   of the firearm, correct, sir?

17      A.   Correct.

18           MR. JOHNSON:  Sorry.  Solomon just said he

19   somehow skipped over one more, sir.

20           That's okay.  Take your time.  Let's just be

21   sure what's up there so we -- everybody knows what we're

22   talking about.

23              (Whereupon, another photograph in

24         Plaintiff's Exhibit No. 4 was presented.)

25      Q.   (By Mr. Johnson)   Oh, that's the serial number

Steve McCallum
February 08, 2021

1   and so forth on the side, correct?

2       A.   Correct.

3       Q.   All right.

4            MR. JOHNSON:  There must be another one.  Okay.

5   Go for it.  There we go.  It looks like one -- I think I

6   lost count.  I think that's five.

7            MR. RADNER:  Yeah.

8            MR. JOHNSON:  Right.  Any more?

9                 (Whereupon, another photograph in

10            Plaintiff's Exhibit No. 4 was presented.)

11           MR. JOHNSON:  Is that six?

12           MR. RADNER:  That was the sixth, yeah.

13      Q.   (By Mr. Johnson)  And that's -- the sixth,

14   that's the clips, right?

15      A.   That's the magazine, yeah.

16      Q.   Magazine.  Thank you.  Okay.

17      A.   Yes, sir.

18      Q.   Okay.  So total of six?

19      A.   It could be six.  That's what I have.

20      Q.   Thank you, sir.

21           MR. RADNER:  That would be six.

22                (Whereupon, Plaintiff's Exhibit No. 5 was

23                presented.)

24      Q.   (By Mr. Johnson)  Exhibit 5 of your report, sir,

25   documents that on that same day, July 10, 2018, at 8:45

Steve McCallum
February 08, 2021

1   p.m. -- I just -- I don't know what I just said.

2          It looks like you went to the scene to take some

3   photographs.

4      A.    Correct.

5      Q.    Photographs of measurements were taken in

6   reference summary 665649.  That will be another summary,

7   I'm guessing, another exhibit that we'll come up to as we

8   go through the report?

9      A.    Correct.

10     Q.    Thank you.

11         Obviously, you documented no evidence was

12  obtained by APD, correct?

13     A.    Correct.

14     Q.    Thank you.

15         "Sergeant McCallum took multiple photographs at

16  the scene of -- at the incident location.  See attached.

17  There was a reddish stain on a cement pad near an

18  electrical box at the bottom of the path in the woods

19  that led to the I-75 on-ramp."

20         MR. JOHNSON:  Go ahead show that, please.

21              (Whereupon, an unidentified exhibit was

22              presented.)

23     Q.    (By Mr. Johnson)  That's part of the report.

24  This is attachment.

25         MR. JOHNSON:  Let's go.  Got it?

Steve McCallum
February 08, 2021

1    Q.   (By Mr. Johnson)  So we're clicking on the first

2  attachment of the photographs of the incident location

3  and it says it's empty.

4         MR. JOHNSON:  So we'll go to the second one,

5  please.

6              (Whereupon, plaintiff's attorneys

7              conferred off the record.)

8         MR. RADNER:  There's nothing to click here.

9              (Whereupon, an unidentified exhibit was

10             presented.)

11   Q.   (By Mr. Johnson)  So when we -- when we look at

12  the photos -- the attachments where it says "the scene,"

13  that's -- this is what we're seeing, name, size, date,

14  modified with nothing in it.

15   A.   I have 31 photos in my report.  I'm not sure why

16  you don't have them.

17   Q.   Okay.

18         MR. RADNER:  I believe we have them somewhere

19  else, but this particular link is -- leads to nothing.

20         MR. JOHNSON:  So we can work out that later.

21         THE WITNESS:  You can -- the hyperlink sometimes

22  can be funny.  I don't know how you're viewing it.  But

23  it should hyperlink.  I have 31 photos that are attached

24  to mine on this one.

25         MR. JOHNSON:  Got it.  Thank you.

Steve McCallum
February 08, 2021

```
 1          Okay.  Let's go back to the report, please, on

 2   page 1 of 2.

 3                    (Whereupon, an unidentified exhibit was

 4               presented.)

 5     Q.   (By Mr. Johnson)  "Special Agent McCallum

 6   located one AFID on the path in the woods near the

 7   guardrail at the top of the path represented by Placard

 8   No. 1."

 9          What is the AFID?

10     A.   Technically, it's -- I believe it's anti -- like

11   an anti-felon identification.  Basically, it's a --

12   small tags that come out of the Taser cartridge itself

13   when it is deployed.  And they have the serial number to

14   that cartridge on there.

15     Q.   Okay.  So you marked it with, like, a Yellow

16   Placard No. 1.

17     A.   That's what I did, correct.

18     Q.   I'm trying to better understand.  You may not be

19   able to help me without looking at the photos, so I'm

20   pulling photos of what I can find about the placard,

21   Special Agent McCallum.

22          But in terms of this location where you saw

23   this -- where you saw this cartridge, if you will --

24     A.   Yes.

25     Q.   -- from the Taser, can you help me at all in
```

Steve McCallum
February 08, 2021

```
1   terms of the words that you used of how close it was to

2   the guardrail?

3       A.   So I'm -- I'm looking at it myself here real

4   quick.  I'm just opening these images.

5       Q.   Thank you.

6       A.   It takes a little time on my computer on my end,

7   so...

8            MR. RADNER:  I can go through them.

9            THE WITNESS:  I'll have to go through them one

10  by one.

11               (Whereupon, the witness reviewed

12                photographs.)

13           THE WITNESS:  What was your question again?

14      Q.   (By Mr. Johnson)  I'm trying to better

15  understand where the -- this cartridge was that you were

16  describing located at the Placard No. 1.  So I'm going to

17  read it from page 1 of 2 in your report.

18      A.   Uh-huh.

19      Q.   "Special Agent McCallum located one AFID on the

20  path in the woods near the guardrail at the top of the

21  path represented by Placard No. 1."

22      A.   Correct.  I'm looking through -- my computer's

23  just taking a minute.  I got a picture of the AFID.  I'm

24  just trying to find your -- as far as exactly where that

25  was on the path.
```

Steve McCallum
February 08, 2021

1          It was hard to take photographs of that because

2     it was so thick.  So I have the photograph of where it

3     was in relation to the bottom of the path.  I don't think

4     you can physically see the placard from the top of the

5     path through the foliage.  I have a photograph.  I just

6     can't see the placard in it because of all the trees.

7          Q.   Okay.  I -- and I want to understand what you

8     just said in terms of -- when you say "couldn't see the

9     placard," you mean -- not the No. 1?

10         A.   Yeah, that's what I'm looking for.  I can see it

11    in this photograph from the bottom, but you're asking me

12    to look at the placard from the top of the guardrail,

13    correct?

14         Q.   Nope.  I was just trying to find where it's

15    located.

16         A.   Oh.  Okay.  It's -- okay.  Then the photograph

17    right here (indicating) does show it.  I did not take a

18    specific measurement because that AFID did come out all

19    over the place with the Taser.  But it's -- looks like

20    it's kind of above -- you know, there's a grade.  It's

21    hard to tell in pictures the grade, but it's -- looks

22    like it's in the path in the woods.

23         Q.   Got it.  Okay.

24         So in other words, if we were -- just for the

25    reference of both gentlemen at some point -- in other

Steve McCallum
February 08, 2021

1   words, my client and Officer Grubbs -- it's not on the

2   roadway.  You would have to go up and over the guardrail,

3   go down the path, and then that's the area where you saw

4   this AFID, A-F-I-D?

5       A.  Correct.  Yeah, it's in the woods in the path.

6   That's correct.

7       Q.  Okay.  And tell me about, if you would, when you

8   see that it's located where it's located?  In other

9   words, is it -- that is on the path.

10          MR. JOHNSON:  I -- can I take a quick break,

11  please.  My son is in the E.R. and I just want to make

12  sure he's okay.

13          Thank you.

14              (Whereupon, a recess was taken.)

15          MR. JOHNSON:  Sorry everybody.

16              (Whereupon, a discussion was held off the

17              record.)

18          MR. JOHNSON:  All right.  Let's go back on.

19      Q.  (By Mr. Johnson)  In your photos that you took,

20  do you have photos of the yellow No. 1 and 2 placard,

21  Special Agent McCallum?

22      A.  I believe I do.  I was just looking at one of

23  the No. 1 placard.

24      Q.  Okay.  We're having some confusion on our end,

25  so I apologize.  I just want to make sure that I have

Steve McCallum
February 08, 2021

1   what you have so I know what you did versus somebody

2   else.  Thank you.

3       A.   Got you.

4       Q.   Okay.  The fact that you see this AFID, A-F-I-D,

5   in the location that it is, does that suggest to you or

6   not that the deployment of the Taser, if you will, likely

7   took place in the area -- in other words, on the pathway

8   as opposed to on the shoulder of the road area?

9       A.   It's possible --

10      Q.   Can you tell me if --

11      A.   -- it happened on the pathway.

12      Q.   Go ahead.

13      A.   I mean, there are numerous.  I mean, that --

14  they're very, very tiny as you see in the photograph.  So

15  they could be on someone's clothes and fell off.

16           But it's the general vicinity to say that it was

17  in that area, so...

18      Q.   Got it.

19           And if -- I know we're not talking firearm here.

20  But if we had a casing and a firearm, we'd have a similar

21  type discussion.  It might give me some information.  It

22  might not.

23      A.   Yeah, for sure.  Same thing.

24      Q.   Same thing?

25      A.   Right.

Steve McCallum
February 08, 2021

1    Q.   Okay.  Got it.  Thanks.

2         And then, "Special Agent McCallum located the

3    Taser wires on the path in the woods.  The Taser wires

4    began next to the AFID and were represented by Placard

5    No. 2."

6    A.   Correct.

7    Q.   Okay.  Likewise, you found those in the woods as

8    well, correct, sir?

9    A.   Correct.

10   Q.   All right.  Did you ever ask Sergeant Zorn or

11   anybody from APD why they didn't collect this stuff?

12   A.   No, I don't recall that I asked them.

13   Q.   Okay.  Per the APD crime scene report, "The

14   distance between the reddish stains on the ground and the

15   guardrail was 23 feet, 9 inches."  Did I read that right?

16   A.   Yes.  Yes, sir.

17   Q.   Okay.  And forgive me, but the guardrail that

18   apparently both gentlemen went over.

19   A.   Yes, correct.  At the time.

20   Q.   Thank you.

21        How long are the Taser wires?  If you know.

22   A.   Well, it depends on the cartridge.  So 20 -- it

23   could be 25 feet.  They come in different length

24   cartridges.

25   Q.   All right.  Are you familiar with what this one

Steve McCallum
February 08, 2021

1    came with?

2        A.   I don't recall what length that was.

3        Q.   Okay.  Next paragraph, same page, page 1.

4            You're just documenting, obviously, serial

5    number and stuff that you see on the AFID, sir?

6        A.   Correct.

7        Q.   So at least on page 2 on the attachment, you've

8    told us that you had 31 pictures of the scene?

9        A.   Correct.

10       Q.   And then it says, "Photograph of AFID."  That's

11   a closeup?

12       A.   That is, yes.

13       Q.   Just one or more?

14       A.   I'm looking -- yeah, just one photograph.  That

15   was after I -- that -- basically, when I collected it, I

16   put it on another object so you could see -- or attempt

17   to see the serial number.  It's really small on them --

18       Q.   Okay.

19       A.   -- on the AFID.

20       Q.   And then you obviously marked that Taser AFID as

21   a -- with having a particular individual evidence number.

22       A.   I did.

23       Q.   Thank you, sir.  All right.

24            The next page of the report goes to July 11th,

25   2018 at 2:00 p.m.  It looks like you went and checked in

Steve McCallum
February 08, 2021

1   on my client.

2       A.    I did.

3       Q.    Thank you for doing that.

4             He was at Grady Hospital, correct?

5       A.    Correct.

6       Q.    And when you say my client was "in custody at

7   APD," what does that mean as it relates to the hospital?

8       A.    And so it happens -- when you're in the hospital

9   but you're still under arrest, you're -- basically,

10  you're in custody there.  But they -- you're not at the

11  jail.  You're seeking medical attention.  There's an

12  officer there at the door or near the door.

13      Q.    And you may not know this, but I -- if -- my

14  client was obviously in custody, then, when he was Tased

15  and injured, correct, as you understand the evidence?

16      A.    You mean when he was Tased at -- basically,

17  directly after the incident, he was in custody?  Yes,

18  that's how I interpret it.  Correct.

19      Q.    So in other words, he was injured, if you will,

20  while he was in custody.

21      A.    (Whereupon, the witness nods head

22  affirmatively.)

23            MS. NAIR:  Object to form.

24      Q.    (By Mr. Johnson)  Special Agent?

25      A.    Say again.

Steve McCallum
February 08, 2021

1    Q.    My client was then -- as you understand it as

2  part of your investigation, he was injured while he was

3  in custody of the Atlanta Police Department?

4         MS. NAIR:  Objection as to form.

5    Q.    (By Mr. Johnson)  Could you answer, please.

6    A.    I thought it was an objection.  I can't hear.

7  So should I answer this question?

8         MS. NAIR:  You may answer if you know.

9         THE WITNESS:  Okay.  I -- actually, I'm not --

10  I'm not understanding the question.  We'll leave it at

11  that.  You're asking if he was in custody?

12    Q.    (By Mr. Johnson)  Right.  When he was --

13    A.    When you -- Tased?

14    Q.    Yeah, when he was Tased, he was in custody and

15  was injured while he was in custody --

16    A.    That's how I interpret the situation.

17    Q.    Thank you.

18         So when you went and saw him, he was still in

19  the ICU, sir, the intensive care unit.

20    A.    That's correct.

21    Q.    And did you actually get to see him, sir?

22    A.    I did.

23    Q.    He was on a ventilator according to your report.

24    A.    Yes.

25    Q.    All right.  You -- it says you spoke with his

Steve McCallum
February 08, 2021

1   doctor who advised you there's no change in his condition

2   since his arrival.

3           Do you know who his doctor was that you spoke

4   with?

5       A.   I don't.  If I didn't document it there, I don't

6   recall who that was.

7       Q.   Okay.  Your report states, quote, Blasingame had

8   blunt force trauma to the left side of his face and

9   potentially cervical spine fractures.

10          Did I read that right?

11      A.   Correct.

12      Q.   I'll take it, you got that information from my

13  client's physician.

14      A.   At the time, yeah.

15      Q.   It says that you took pictures and they're

16  attached.  None of the family members had visited the

17  hospital.  The hospital did not have a next of kin

18  information.

19          Which would make it pretty hard for folks to --

20  to be there, right?

21      A.   Yeah.

22          MR. JOHNSON:  And then we have photographs,

23  please, the attachments.

24          THE WITNESS:  Yeah, it should be -- let me tell

25  you how many here.  I think three photographs, I believe.

Steve McCallum
February 08, 2021

1              (Whereupon, an unidentified photograph was

2              presented.)

3     Q.   (By Mr. Johnson)  This is a picture of my

4  client's head and face area.  This looks like there's

5  still blood on his face and even on the pillow.

6              Is that what you saw?

7     A.   That is correct.

8              (Whereupon, an unidentified photograph was

9              presented.)

10    Q.   (By Mr. Johnson)  This is another picture pretty

11 much, but a full front-on of his face, sir, correct?

12    A.   Correct.  Correct.

13             (Whereupon, an unidentified photograph was

14             presented.)

15    Q.   (By Mr. Johnson)  Last photo, third, it looks

16 like the left side of his face.

17    A.   Correct.

18    Q.   Thank you.

19             Back to your report.  On July 11, 2018 at

20 3:00 p.m., it looks like you went back to APD to receive

21 the body camera and Taser video.

22    A.   Yes.

23    Q.   Do you see the CD from Sergeant Kramer that

24 contained video from Grubbs's body camera, Shelley's body

25 camera, and video from Grubbs' Taser, correct?

Steve McCallum
February 08, 2021

1       A.    That's correct.

2       Q.    And did you -- you attach those as well?

3       A.    Yeah, they're in -- they're into the case file.

4   Sometimes attachments to the actual case management

5   system with CDs and different things like that is hard.

6   So yes, they were attached to the case file -- the

7   hard -- you know, physical case file.

8       Q.    Yes, sir.

9             Did you review those at the time?

10      A.    I did.

11      Q.    And was there anything in particular of note to

12  you as the investigator?

13      A.    I don't have an opinion on the video.  It stands

14  for itself.

15      Q.    Did you write any notes at that time about your

16  observations of the video?

17      A.    No, I did not.

18      Q.    Did Kramer at all -- did Sergeant Kramer advise

19  you of any type of internal affairs investigation that

20  was going on at this time?

21      A.    I don't recall.

22      Q.    The fact that Grubbs's body camera was not on at

23  the time of the incident, was that at all important for

24  your investigation?

25      A.    I documented that.

Steve McCallum
February 08, 2021

1    Q.   Okay.  Later in the report or did I do something

2    already?

3    A.   I stated that it was in buffering -- well, he

4    told me at the case briefing is why I didn't report the

5    incident.  So that's all I stated.  And that was -- the

6    video was -- like the sergeant stated at the case

7    briefing, it did not record the actual incident.  Just

8    afterwards.

9    Q.   Okay.  So at least from what Grubbs told you, it

10   was in buffering mode, correct?

11   A.   Not Grubbs, but the -- Sergeant Zorn.  Yeah,

12   that's, I believe, when he stated buffering mode.  And

13   I'm not familiar with their particular software programs

14   or cameras, so...

15   Q.   That's where I guess -- so you looked at Grubbs

16   body camera that day.  You had nothing of the incident

17   itself, obviously.

18   A.   That's correct.

19   Q.   All right.  And whether that meant it was

20   completely off versus in buffering mode, I'll take it,

21   you don't know.

22   A.   I don't know exactly why, yeah, the reasons are

23   it didn't capture it.

24   Q.   All right.  Did you hear Grubbs in his body

25   camera, as well as on Shelley's body camera, talk to EMS

Steve McCallum
February 08, 2021

1  folks about why he Tased my client?

2      A.   I don't recall what was stated and I did not

3  review that video today.

4      Q.   Okay.

5      A.   It was quite sometime ago.  I'd have to go back

6  and listen to that or review the video.

7      Q.   Okay.  Would you agree, as an experienced

8  investigator, that when being asked right there at the

9  scene as to why he Tased my client, that would certainly

10 be some of the best evidence that we would have as to why

11 he Tased my client?

12     A.   I'm not -- I'm not understanding if that's a

13 statement or a question.  We have that on video.  I mean,

14 we have that on audio.  So if you have a question about

15 that, it's going to be on -- it's going to be captured on

16 his body camera and Shelley's body camera.

17     Q.   Yes, sir.

18          I'm talking about you as an experienced

19 investigator.  Hearing the words out of somebody's mouth

20 before the authorities come in, before the lawyers get

21 there and are involved, hearing what they say about an

22 incident is certainly -- can be some of the most

23 important information that we have about why somebody did

24 something.  Agreed?

25     A.   It's information that we have on this case.

Steve McCallum
February 08, 2021

1    Q.   But again, as an experienced investigator, the

2    timing of it's pretty important --

3    A.   I don't have anything -- I don't have an

4    opinion.

5    Q.   Okay.  You don't have an opinion as to whether

6    statements made initially before investigators and

7    lawyers are often considered to be more reliable than

8    those after?

9    A.   All statements are documented in the case in

10   this case file on this case, so...

11   Q.   Okay.  So my --

12   A.   So I can --

13   Q.   -- question is did you document -- did you quote

14   anywhere in the report about what those recordings

15   revealed of Grubbs' --

16   A.   Yes.

17   Q.   -- answer to the question?

18   A.   Yes.  The recordings were attached to my case

19   file, so they're in the case file for your review.

20   Q.   Okay.  Now, I'm -- I'm not -- now I'm talking

21   about you summarized your interview with Shelley.

22   A.   Yes.

23   Q.   Is there a summary of what you heard Grubbs say

24   on those videos?

25   A.   No, I didn't summarize that.

Steve McCallum
February 08, 2021

1    Q.   All right.

2    A.   I did not.

3    Q.   Thank you.

4         MR. JOHNSON:  Next report, please.

5              (Whereupon, Plaintiff's Exhibit No. 8 was

6              presented.)

7         MR. RADNER:  Exhibit 8.

8    Q.   (By Mr. Johnson)  Exhibit 8.  Same date July 11,

9    3:12 p.m. It looks like you're getting the Taser from

10   Kramer -- Sergeant Kramer.  Pardon me, sir.

11   A.   That's correct.

12   Q.   "The battery -- and the battery, slash, camera

13   was put back into the Taser to ensure that all data was

14   retained and all items were placed in the same evidence

15   container."  Correct?

16   A.   That's correct.

17   Q.   And therefore, the recording that was on the

18   Taser, you -- that was part of the information we have

19   already just talked about, correct?

20   A.   Right.

21   Q.   I talked about the body cameras, but you also

22   saw and heard --

23   A.   The -- yeah, the Taser attachment used, correct?

24   Q.   Got it.  Okay.  Thank you.

25        So if it was part of the attachments, then the

Steve McCallum
February 08, 2021

1    property records -- APD property receipt that's just for

2    the Taser itself?

3        A.    That's correct.

4        Q.    All right.

5                    (Whereupon, Plaintiff's Exhibit No. 9 was

6                    presented.)

7        Q.    (By Mr. Johnson)  Exhibit 9, it's like the next

8    day July 12, 2018 at 12:20.  It looks like you got

9    documents from Sergeant Zorn.  You received a copy of

10   APD's CAD, C-A-D, related to the incident, a copy of your

11   arrest warrants and citations issued to Blasingame, and a

12   copy of APD's use of force and conducted electrical

13   weapon policy.  And you personally attached those, true?

14       A.    That's correct.

15       Q.    All right.  So let's go to the first attachment.

16   It says, "Other CAD-related to incident 181911254."

17              That's the call for service.  That -- that's

18   kind of the printout and so forth of the dispatch-related

19   thing, sir?

20       A.    That's correct.

21              MR. JOHNSON:  Go ahead.

22              MR. RADNER:  Okay.  That's the --

23              MR. JOHNSON:  Is that the -- was that all the

24   attachments there?

25              MR. RADNER:  Yeah.

Steve McCallum
February 08, 2021

1        Q.   (By Mr. Johnson)   That was -- everything that

2    was attached is what we showed you real quick, I think --

3        A.   All right.

4        Q.   -- Special Agent McCallum.

5        A.   For that one, yeah.   Then there's the other

6    book -- policies and procedures are attached and the

7    citations and the arrest warrant.

8             MR. JOHNSON:   Go to the attachments, the second

9    one.   Thank you.

10                  (Whereupon, attachments from Plaintiff's

11                  Exhibit No. 8 were presented.)

12       Q.   (By Mr. Johnson)   All right.   So this is the --

13   the first SOP.3042 conducted electric weapon policy,

14   correct?

15       A.   Correct.

16       Q.   It says, "Signed 12/14/17" and it was effective

17   December 15, 2017, correct?

18       A.   Yes.

19       Q.   And I'll take it, to the best of your knowledge,

20   was this the CEW policy that was in effect at the time of

21   this incident on July 10, 2018?

22       A.   To the best of my knowledge, yes.

23       Q.   Thank you.

24            MR. JOHNSON:   All the way down, please, Solomon.

25       Q.   (By Mr. Johnson)   I think I can see.   It says

Steve McCallum
February 08, 2021

1    "out of seven pages," but we're going to have to scroll

2    all the way down.

3            MR. RADNER:  All the way down?

4            MR. JOHNSON:  Please, to the seventh page to

5    make sure.  Okay.  Go ahead.  Is there anything after

6    that?

7       Q.   (By Mr. Johnson)  It looks like the next policy

8    that's there is 3010, use of force effective date

9    10/30/13?

10      A.   Yes.  Correct.

11      Q.   Same question.  To the best of your knowledge,

12   was this review of -- pardon me.

13           Was this use of force in effect at the time of

14   the incident, 7/10/18, to the best of your knowledge?

15      A.   Yes, it was.

16                   (Whereupon, plaintiff's attorneys

17                   conferred off the record.)

18           MR. JOHNSON:  Okay.  It looks like again it's

19   seven pages, but we'll go to the bottom.

20           MR. RADNER:  There's 7 of 7.

21           MR. JOHNSON:  Okay.

22           MR. RADNER:  And that's it.

23           MR. JOHNSON:  Okay.

24      Q.   (By Mr. Johnson)  It looks like that's the two

25   you got at that time?

Steve McCallum
February 08, 2021

1      A.    That's correct.

2      Q.    Thank you.

3            MR. JOHNSON:  And then we're going to go to the

4   last attachment, which is the APD citations and arrest

5   warrants, please.

6      Q.   (By Mr. Johnson)  The first one is, of course,

7   the affidavit for arrest, bottom left -- or excuse me,

8   not bottom left.

9            But there's the signature of Officer Shelley and

10  this is for the pedestrian soliciting rides or business,

11  correct, sir?

12     A.    That's correct.

13           MR. JOHNSON:  Put it -- go down, Solomon.  Thank

14  you.  Keep on going, please.  Go ahead.  Keep on going

15  down.

16     Q.   (By Mr. Johnson)  It looks like the next

17  affidavit for arrest is for the willful obstruction of

18  law enforcement officers?

19     A.    That's correct.

20     Q.    Thank you.

21           MR. JOHNSON:  Go ahead and go down.

22     Q.   (By Mr. Johnson)  Then the next looks like a

23  handwritten, like, ticket, citation number -- uniform

24  traffic citation summons and accusation 5340149?

25     A.    Correct.

Steve McCallum
February 08, 2021

1    Q.   That's for the pedestrian solicit on roadways,

2  is what it says, correct?  It's --

3         MR. JOHNSON:  Go down, Solomon.  Thank you.

4    Q.   (By Mr. Johnson)  The next one, citation, is

5  5339976 for obstruction?

6    A.   Right.

7    Q.   "Did flee from officer on foot."  Both, of

8  course, from July 10, 2018.

9    A.   Correct.

10   Q.   I want you to assume that on the bottom of those

11 two citations is a signature.  One of the signatures is

12 Officer Shelley and neither he nor Officer Grubbs believe

13 that the other signature on the second citation belongs

14 to them.

15        Do you have any idea who completed these

16 citations?

17   A.   Actually, at this point in time, I don't.  I'd

18 have to go back and ask APD.

19   Q.   Okay.  Thank you.

20              (Whereupon, plaintiff's attorneys

21              conferred off the record.)

22              (Whereupon, Plaintiff's Exhibit No. 10 was

23              presented.)

24   Q.   (By Mr. Johnson)  Next is Exhibit 10.  It looks

25 like July 12 still, 12:20.  It looks like you took the

Steve McCallum
February 08, 2021

1    Taser battery camera from Sergeant Zorn?

2       A.    Correct.

3       Q.    Marked it as -- obviously, as an exhibit or in

4    the property room, right?

5       A.    This summary actually was by Josh Ellis.  Just

6    to let you know, this is his.

7       Q.    Oh.  I apologize.

8       A.    Yeah, not a problem.  Just letting you know

9    that's -- we can still go over it anyway.

10      Q.    Thank you, sir.

11            How -- how do you know that?  We're not -- I

12   missed that somehow.

13      A.    Where does it say on here?  Just let me see on

14   your printout the way you're viewing it.

15      Q.    Because on the bottom of this, the second --

16      A.    Okay.  The -- yeah, on the case agent.  It's

17   just the way I'm viewing it in the system and it's the

18   way y'all have received -- the way you're viewing this in

19   summary form, I guess you don't see the details of each

20   specific one.  Which, if you go back to the thumb drive

21   or the data that was given you, there's a different way

22   you can look in there.

23            But anyways, yeah, that's what case management

24   is stating.  I remember this as well, so...

25      Q.    Tell me again the name.  I apologize.

Steve McCallum
February 08, 2021

1      A.   Josh Ellis, last name is E-l-l-i-s.

2      Q.   Okay.  So it looks like he got the Taser battery

3   camera.

4      A.   Uh-huh.

5      Q.   The Taser was previously collected so now you're

6   just getting the rest of it.

7      A.   That's correct.

8      Q.   "McCallum previously received a video from APD

9   OPS, Officer Profe- -- or Office of Professional

10  Services."

11          Which is internal affairs basically, right?

12     A.   That's correct.

13     Q.   All right.  "The body -- or battery camera was

14  placed back into the Taser to ensure that all the

15  data" -- okay.

16          This is pretty much what I think your report the

17  day before -- or the day of -- the previous report says

18  you did as well.

19     A.   Yeah, it's similar.

20     Q.   Okay.

21     A.   Yeah, I'm -- you can read here.  It was just

22  they inadvertently activated that remaining cartridge

23  seeing if the Taser was -- you can read the rest of it

24  right there.  That's why this summary was generated.

25     Q.   Okay.  Where does this say that?  I just -- I

Steve McCallum
February 08, 2021

1    apologize to you.

2        A.   It's the second paragraph.  So he wanted to

3    ensure that the internal clock of the Taser had not been

4    reset and he could then conduct his spark testing so the

5    Taser functioned as designed.  "While performing the

6    spark test S.A. Ellis inadvertently activated the

7    remaining cartridge."  And he gave the serial number to

8    that cartridge.

9        Q.   Okay.

10       A.   So we're just documenting -- that now that

11   cartridge is spent, but we're documenting as to why.

12   That was an accidental inadvertent deployment of that

13   during a spark test.

14       Q.   Got it.  So that's -- it's nowhere in Exhibit

15   10.  But Exhibit 11 I think it talks about that.  But --

16       A.   I'm sorry about that.  I may be --

17       Q.   No, you're good.  It's the same date.  It's on

18   there.

19       A.   No, that's it.  That's it.  That's what we're

20   talking about.

21       Q.   Okay.

22       A.   I may have skipped one --

23       Q.   You're --

24       A.   -- on you.

25       Q.   -- you're all good.  Thank you, sir.

Steve McCallum
February 08, 2021

1          But it also says now on the attachment to

2    Exhibit 11 "other Taser log."

3          MR. JOHNSON:  So let's go to that attachment,

4    please.

5          THE WITNESS:  I got you.

6               (Whereupon, Plaintiff's Exhibit No. 11 was

7               presented.)

8    Q.   (By Mr. Johnson)  This is a Taser -- it says,

9    "Evidence, slash, sync, Taser information."  It looks

10   like just a printout, right?  From -- this is from

11   Grubbs's Taser?

12   A.   That's correct.

13         MR. JOHNSON:  All right.  I need a -- I'm going

14   to print a copy of that real quick just so that I can

15   read it, please.  So let's go off the record for a quick

16   minute, please.

17         MS. NAIR:  Let's take a five-minute break --

18         MR. JOHNSON:  Thank you.

19         MS. NAIR:  -- and come back at twelve o'clock.

20               (Whereupon, a recess was taken.)

21         MR. JOHNSON:  Let me know when you're ready,

22   please.

23         THE WITNESS:  I'm back.  Sorry.

24         MR. JOHNSON:  Solomon, can you put on the Taser

25   log up.

Steve McCallum
February 08, 2021

```
 1            MR. RADNER:  One second.

 2            MR. JOHNSON:  I'm going to put up -- or

 3   actually, I'm not.  Solomon will.  Thank you.

 4                  (Whereupon, Plaintiff's Exhibit No. 11 was

 5                  again presented.)

 6       Q.   (By Mr. Johnson)  Special Agent, the Taser

 7   log -- and I'm going to ask you to look at page 73 of 81.

 8       A.   All right.

 9            MR. RADNER:  My main concern is --

10            MR. JOHNSON:  You're okay.

11       Q.   (By Mr. Johnson)  And just to kind of go over

12   the Taser log, is once -- once print out literally

13   probably from wherever the Taser was put into operation

14   and it prints everything out every time it was used and

15   so forth, right?

16       A.   Yeah, those are -- those are smart tests and

17   things like that.  But that's correct.

18       Q.   Yes, sir.

19                  (Whereupon, plaintiff's attorneys

20                  conferred off the record.)

21       Q.   (By Mr. Johnson)  So on 73 toward the bottom of

22   the page, if you look in the far left column --

23                  (Whereupon, plaintiff's attorneys

24                  conferred off the record.)

25       Q.   (By Mr. Johnson)  Look at 2175 then you go over
```

Steve McCallum
February 08, 2021

1   to the next right -- next column.  That's -- looks like

2   July 9, 2018, correct?

3       A.   Correct.

4       Q.   And I'm -- we know this was on July 10, so now

5   I'm going to slide down to the next box 2176.  That's 10

6   July 2018 and it looks like it's at double zero 1428.

7            So military time, that would be midnight, right?

8       A.   Say again.

9       Q.   Midnight, double zero?

10      A.   Oh, yes.  Correct.  On that the first one there

11  the 10th, yeah.

12      Q.   Okay.

13      A.   That's correct.

14      Q.   And then, of course, the next line down, the

15  2177 that's still July 10.  That's -- same thing at

16  midnight.  So there he's obviously arming it and making

17  it safe, right?

18      A.   That's correct.

19      Q.   Next line down, 2178.  All those look like

20  they're right around midnight.  Including 22179, all

21  around midnight, right?

22      A.   Correct.

23      Q.   Okay.  Then 2180, that looks like it gets us to

24  the 2:38:12 p.m. time frame.  Agreed?

25      A.   Agreed.

Steve McCallum
February 08, 2021

1    Q.   All right.  So clearly the Taser went at 2:38,

2    at least according to that timer.  And I'll take it -- do

3    you have any idea as to the accuracy of the local time

4    and so forth of this, sir?

5    A.   I don't.  That's what the -- my computer just

6    froze.  I'm sorry.  That's -- I believe Josh Ellis -- and

7    that's why he turned on the Taser, was to verify the

8    time.  I don't --

9    Q.   Okay.  The --

10   A.   -- I don't believe -- detective, but he said he

11   verified it, so my assumption is it's relatively

12   accurate.

13   Q.   Okay.  So at approximately 2:38 p.m. and 12

14   seconds, that's when apparently the Taser was armed.

15   A.   Correct.

16   Q.   Turn the page onto -- the next page is page 74.

17   At 2:38 p.m. and 12 seconds, trigger was deployed for

18   duration of five seconds according to that document.

19   A.   Correct.

20   Q.   So that's poss- -- probably our incident,

21   correct?

22   A.   Yeah, that's what I was about to look at.  That

23   is -- yes, that's our incident.

24   Q.   Okay.  You mentioned before about the

25   five-second duration and this document proves that,

Steve McCallum
February 08, 2021

1   right, sir?

2       A.   That's correct.

3       Q.   Got it.

4            Then everything else after that obviously being

5   after the incident until you all took over the Taser.

6       A.   That's correct.

7       Q.   Thank you, sir.  Okay.

8            And then the next attachment on Exhibit 11 says

9   "Video spark test."

10           And is that the incident -- the inadvertent

11  incident from the other agent?

12      A.   That's -- that's my -- yes, that's what I

13  assume.  I'm kind of having some technical difficulties.

14  This -- the only thing functioning right now is the Zoom.

15  Let me just get back into the race real quick.

16      Q.   Yes, sir.

17               (Whereupon, there was a brief pause in the

18               proceedings.)

19           THE WITNESS:  All right.

20      Q.   (By Mr. Johnson)  Yes, we're looking for it,

21  too.  Sorry.

22      A.   No problem.

23               (Whereupon, plaintiff's attorneys

24               conferred off the record.)

25           THE WITNESS:  That's in reference to the other

1   summary that Josh Ellis did.

2        Q.   (By Mr. Johnson)  So it looks like the video --

3   it looks like -- I see a carpet.

4        A.   That's -- that's just our carpet over here.

5        Q.   Okay.  Got it.

6             That was accidental or you did that just to test

7   it or what?

8        A.   That's not the first time that's happened.

9   That's accidental.  So the new -- oh, we don't get into

10  why.  But yeah, they spark-tested it.  He was doing a

11  check to verify the time.  Instead of a spark test, he

12  deployed the Taser.

13       Q.   Okay.  Glad it wasn't on me.

14            MR. JOHNSON:  All right.  Let's go to

15  Exhibit 12, please.

16                 (Whereupon, Plaintiff's Exhibit No. 12 was

17                 presented.)

18       Q.   (By Mr. Johnson)  This looks again like -- so

19  July 10, 2018.  Let's see.  Oh, okay.

20            This document looks like a lot similar to one of

21  the first documents that we reviewed.  Can you help me

22  understand what this is?

23       A.   And you were looking at this one right here

24  which is on?

25       Q.   December 12.  Yes, sir.

Steve McCallum
February 08, 2021

1    A.    Let me...

2    Q.    And at the bottom, it does say Special Agent in

3    Charge Assistant Brian Whidby, W-h --

4    A.    Oh.

5    Q.    -- i-d-b-y.

6    A.    No, yeah.  This is an executive synopsis.

7    Sorry.  This is -- this was -- that's the supervisor over

8    this case.  He wrote an executive synopsis on the case.

9    It is a very short synopsis of the investigation.

10   Q.    Okay.  It looks pretty similar to what you wrote

11   way back when on the day -- on the first day of.

12   A.    It is.  It's very similar.  It's -- I would say

13   this one -- this type summary is more for administrative

14   purposes.

15   Q.    Okay.

16             (Whereupon, Plaintiff's Exhibit No. 13 was

17             presented.)

18   Q.    (By Mr. Johnson)  Exhibit 13 then goes to

19   July 16 at 3:15 --

20   A.    Yeah.

21   Q.    -- p.m.  You contacted Jeff Miller director of

22   certification and training division peace officer

23   standards.

24             On that -- you're probably just reviewing

25   Officer Grubbs's certification process and so forth?

Steve McCallum
February 08, 2021

1      A.    That's correct.  His POST standing, Police

2  Officer Standard and Training certification standing.

3      Q.    And they all checked out; he was fully trained

4  and ready to roll.

5      A.    They did.

6                    (Whereupon, Plaintiff's Exhibit No. 14 was

7                    presented.)

8      Q.    (By Mr. Johnson)  Exhibit 14, July 17, 2018.

9  You got a phone call from Wendy Blasingame, Jerry's

10 sister.

11     A.    Correct.

12     Q.    Wendy told you she had not seen Jerry in

13 approximately 20 years.  You briefly explained the

14 incident, told her that Jerry was at Grady Hospital in

15 intensive care and that she would check on Jerry at the

16 hospital.

17     A.    That's correct.

18     Q.    It looks like later on that day, you checked

19 back in with her and she gave you an update on his

20 condition?

21     A.    Correct.

22     Q.    It looks like it -- at least she didn't see him

23 because he was in custody.

24     A.    That's correct.

25     Q.    At least the information she had, he was now

Steve McCallum
February 08, 2021

1    conscious, ambulatory, and talking.

2         A.   That's what she told me.

3         Q.   July 19, 11:30, you went to the hospital and you

4    interviewed Jerry Blasingame?

5         A.   That's correct.  Based on what she told me.

6         Q.   Yes, sir.

7              And then you find, when he got there, that he

8    was unconscious and on a respirator.

9         A.   Correct.

10        Q.   Kind of hard to interview somebody in that

11   condition.

12        A.   It is.

13        Q.   And then you spoke to the doctor saying the

14   condition had never changed.  So apparently perhaps sis

15   did not have the correct information the day before.

16        A.   Yeah.  That's what it looked like.

17        Q.   So he was still in critical condition

18   unconscious and on a respirator, at least when you

19   checked that day, sir.

20        A.   Yes.

21                  (Whereupon, Plaintiff's Exhibit No. 15 was

22                  presented.)

23        Q.   (By Mr. Johnson)  Okay.  Exhibit 15 is July 17,

24   12:20.  It looks you're that -- you're looking at

25   Grubbs's internal affairs file, right?

Steve McCallum
February 08, 2021

1      A.    Yes.

2      Q.    And you go through each one of them?

3      A.    Yeah, I do.  I review their -- or I go through

4  the file, his internal affairs file.

5      Q.    Okay.  Did you put in your report everything

6  that was there?

7      A.    At that time, yeah, everything that was in his

8  internal affairs file.

9      Q.    Thank you.

10              (Whereupon, Plaintiff's Exhibit No. 16 was

11              presented.)

12      Q.   (By Mr. Johnson)  Exhibit 16, still July 17, two

13  o'clock.  It looks like you're looking for the crime

14  scene's report from supervisor Lashantise,

15  L-a-s-h-a-n-t-i-s-e, Porter, P as in Paul, o-r-t-e-r.

16      A.    That's correct.

17      Q.    You got the report and photographs from Ervin,

18  E-r-v-i-n, Wilder -- that's another name we've seen from

19  APD before, correct?

20      A.    Correct.

21      Q.    You said that, "On the day of incident, 7/10/18

22  at 3:29 p.m., Wilder took numerous photographs of the

23  crime scene, took a measurement from the beginning of the

24  path until the reddish stain in the bottom of the path."

25              That's the 23 feet, 9 inches that we've talked

Steve McCallum
February 08, 2021

1    about, right?

2        A.    That's correct.

3        Q.    All right.  And then you have those attached.

4              MR. JOHNSON:  If you can get that.  Solomon?

5                    (Whereupon, plaintiff's attorneys

6                    conferred off the record.)

7                    (Whereupon, Plaintiff's Exhibit No. 16

8                    was presented.)

9        Q.    (By Mr. Johnson)  So the first attachment are

10   just the crime scene photographs that were taken by the

11   APD?

12       A.    Correct.

13             It looks like I've got 30 photographs there, I

14   believe.

15       Q.    Okay.  So from your perspective, there should be

16   31 photographs that you took and 30 photographs that APD

17   took.

18       A.    Yeah, that's correct.

19                    (Whereupon, plaintiff's attorneys

20                    conferred off the record.)

21       Q.    (By Mr. Johnson)  Can you -- well, let me -- let

22   me ask you this.  Looking at this log sheet -- which

23   obviously, I want to make a part of this file.

24             You obviously got involved on July 10, 2018 on

25   the night of, correct, sir?

Steve McCallum
February 08, 2021

1      A.    That's correct.

2      Q.    And we -- you went out and took photos later on

3   that night, which we've already discussed and documented,

4   correct?

5      A.    That's correct. Yes, that's correct.

6      Q.    And the time looks like -- what time you went to

7   the scene to do the photos?

8      A.    Okay.  Then I'm going back to up and -- I -- I

9   went to the scene at 8:45 p.m.

10      Q.    Thank you.  That's what I wanted to know.

11      A.    Yeah.

12      Q.    What exhibit was that; do you remember?  Do you

13   have that?

14      A.    It's going to be -- for you, it should be 5 --

15   it should be Exhibit 5.

16      Q.    So 8:30 -- 8:45 p.m.

17      A.    Correct.

18      Q.    In July.  So in other words, probably still --

19   it would have some daylight to do that, right?

20      A.    Yeah.

21      Q.    All right.  So now we're going back to

22   Exhibit 16.

23      A.    Uh-huh.

24              (Whereupon, Plaintiff's Exhibit No. 16

25              was presented.)

Steve McCallum
February 08, 2021

1      Q.   (By Mr. Johnson)  So we -- when we see all of

2   these photos and the images where it says "date

3   modified," anything before 8:45, which is 8 --

4   probably -- which is 20 something.  I don't know that

5   they're doing that, so it's not military time.

6           But any of those photos taken before

7   eight o'clock at night shouldn't be you, should they?

8      A.   No.  Yeah, it looks like their photographs were

9   taken between 3:15 a.m. and 4:01 p.m.

10     Q.   Right.  Okay.

11          So this sheet that I'm showing you right now,

12  that's not a printout of the photos that you took.

13     A.   That's correct.  That's not.

14     Q.   All right.  Because I'm just telling you, I

15  went -- I'm having a heck of a time trying to find the

16  photos that you took versus what they took.  So I

17  apologize.

18     A.   Yeah.

19     Q.   All right.

20          MR. JOHNSON:  Can you get the other attachment

21  and go back to Exhibit 16, please, Solomon.  And it says,

22  "Other APD crime scene report attachment."

23               (Whereupon, plaintiff's attorneys

24               conferred off the record.)

25          MR. JOHNSON:  So the first page, that's that

Steve McCallum
February 08, 2021

1    same printing -- incident report I think we've seen

2    before.  Keep on rolling, please, Solomon.  One page.

3    We'll go to the next attachment, crime scene incident.

4                    (Whereupon, attachments to Plaintiff's

5                    Exhibit No. 16 were presented.)

6        Q.   (By Mr. Johnson)  Now, this looks like kind of a

7    description of some of the photos, a photo log.

8        A.   It's the photo log.  It's a photo log.

9             MR. JOHNSON:  Solomon, I need that.  Bring it

10   back.

11                   (Whereupon, attachments to Plaintiff's

12                   Exhibit No. 16 were presented.)

13       Q.   (By Mr. Johnson)  Again, photos from APD; not

14   you, sir.

15       A.   That's correct.

16       Q.   Thank you.

17            MR. JOHNSON:  Next.

18                   (Whereupon, attachments to Plaintiff's

19                   Exhibit No. 16 were presented.)

20       Q.   (By Mr. Johnson)  Same thing.  APD description;

21   not yours.

22       A.   That's correct.

23       Q.   Crime scene incident and then this looks like

24   the report may be from the crime scene investigator.

25       A.   That's correct.

Steve McCallum
February 08, 2021

1      Q.    All right.

2            MR. JOHNSON:  Will you roll this up so I can see

3      the bottom, please, Solomon.  Thank you.

4      Q.    (By Mr. Johnson)  There's the measurement, the

5      23 feet, 9 inches we've been talking about, second

6      paragraph from the bottom, sir?

7      A.    That's correct.

8      Q.    All right.  So at least according to this

9      document, Wilder went to the scene twice that -- on the

10     day of the incident.

11     A.    That's what it looks like.

12     Q.    It says "victim and his injuries".  And then --

13     oh, but was unable to do so because he's receiving

14     medical attention.  Then he went back at Zorn's request.

15     It looks like that's when he made the photographs that

16     included Officer Grubbs, at least according to Wilder's

17     report.

18     A.    Yeah, that's correct.  That's what -- the 80

19     Jesse Hill, that's going to be Grady Memorial.  Yeah, he

20     went to the hospital to try to photograph the victim and

21     then he went to the incident location.

22     Q.    Okay.  Got it.  Thank you, sir.

23                  (Whereupon, Plaintiff's Exhibit No. 17

24                  was presented.)

25     Q.    (By Mr. Johnson)  All right.  Going to

Steve McCallum
February 08, 2021

1    Exhibit 17, please, sir.  Still the same day, July 17,

2    2018, 5:02.  "CIA Butler ran a criminal history and

3    public records, et cetera, on Jerry.  That his suspended

4    Georgia driver's license.  He had an 18-cycle criminal

5    history.  See attached for details.  Blasingame was

6    currently on parole.  See attached."

7         I read that relatively correctly?

8    A.   That's correct.

9    Q.   And you do this just to -- you -- the same

10   reason why you looked at Officer Grubbs' --

11   A.   Yes.

12   Q.   -- internal affairs stuff and personnel file and

13   you do -- you do the same for both.

14   A.   Yeah, that's correct.

15   Q.   Appreciate that.  All right.

16        So let's go over to the attachment, please.

17             (Whereupon, attachments to Plaintiff's

18             Exhibit No. 17 were presented.)

19   Q.   (By Mr. Johnson)  In terms of his past offenses

20   and so forth, you didn't list those out.  Obviously,

21   they're attached.  Correct, sir?

22   A.   Yeah, that's correct.

23   Q.   Is there any particular reason why -- was there

24   anything you found particularly important or not or you

25   just attached them and let people come to their own

Steve McCallum
February 08, 2021

1    conclusion?

2        A.   I attach them and let them come to their own

3    conclusion on anything relative to this investigation

4    when they see their criminal history.

5        Q.   Okay.

6                 (Whereupon, plaintiff's attorneys

7                 conferred off the record.)

8            MR. JOHNSON:  All right.  Exhibit 18, please.

9                 (Whereupon, Plaintiff's Exhibit No. 18

10                was presented.)

11       Q.   (By Mr. Johnson)  You -- it looks like the same

12   thing on Grubbs and he didn't have a criminal history.  I

13   just -- he has an active Georgia license.  All right.

14                (Whereupon, Plaintiff's Exhibit No. 19

15                was presented.)

16       Q.   (By Mr. Johnson)  19 looks like -- Exhibit 19,

17   pardon me.  So your report -- it looks like you went --

18   you got the radio traffic.

19       A.   Yeah.

20       Q.   Is that on some kind of a disk, then?

21       A.   It was.  And this one right here let me state

22   how I attached that.

23       Q.   Thank you.

24       A.   The audio was attached to it.  You should have

25   the audio file.  Yeah, I have it here, so it should be

Steve McCallum
February 08, 2021

1   attached.  It is a -- it looks like it's two -- it's two

2   audio files.

3       Q.   Okay.  According to your second paragraph, from

4   2:36 to 2:48 p.m. -- oh, that's when this traffic is.

5       A.   Yeah.  That's the -- that's the radio traffic

6   that was reported --

7       Q.   Okay.

8       A.   -- that I attached to this case file.

9       Q.   Grubbs and Shelley did not initially advise

10  radio that they were out with the subject.

11      A.   Correct.

12      Q.   They didn't say, like, investigating blah, blah,

13  blah, going after, or anything like that.

14      A.   That's correct.

15      Q.   Is that something in a perfect world that's

16  supposed to happen, to the best of your knowledge?

17      A.   When things happen.  I'm not even going to give

18  an opinion.  This is what happened in this case.

19      Q.   Okay.  "The first radio traffic related to this

20  incident occurred at approximately 2:36 p.m."?

21      A.   That's correct.

22      Q.   "When Grubbs advised that he was at I-20

23  eastbound and I-85 north on-ramp because a suspect ran.

24  And Grubbs requested an ambulance, paren, four, paren,

25  and the fire department to his location."

Steve McCallum
February 08, 2021

```
1              What does that "four" mean?

2      A.    The ambulance is a -- you know, like a signal

3  four, so that's what -- that's what he stated on the

4  radio.  Just kind of letting you know what that means.

5      Q.    Okay.

6      A.    Could have done it the reverse way.

7                  (Whereupon, Plaintiff's Exhibit No. 20

8                  was presented.)

9      Q.    (By Mr. Johnson)  Exhibit 20, July 24, 2018.  It

10  looks like you contacted Sandra Michaels regarding doing

11  an interview relative to Grubbs.  And then --

12      A.    That's correct.

13      Q.    -- advice to her client about him making any

14  statements.

15      A.    That's correct.

16      Q.    Again, you followed up.  You tried the night of

17  and this is what you do to see if that's changed.  Right,

18  sir?

19      A.    That's correct.

20      Q.    Thank you.

21                  (Whereupon, Plaintiff's Exhibit No. 21

22                  was presented.)

23      Q.    (By Mr. Johnson)  Exhibit 21 is 7/25 and this is

24  your review of Grubbs's personnel file?

25      A.    That's correct.
```

Steve McCallum
February 08, 2021

1      Q.   Now, on page 2 of 5 and following that, there's

2   some reviews of incident numbers and each one is numbered

3   and each one person has their own separate number.

4           So apparently, these items were in Grubbs's

5   personnel file, but not in the internal affairs file that

6   you saw.  Correct?

7      A.   That is correct.

8                   (Whereupon, Plaintiff's Exhibit No. 22

9                   was presented.)

10     Q.   (By Mr. Johnson)  Exhibit 22 is 7/27.  Got an

11   e-mail from Atlanta Fire Department Sergeant Cortez,

12   C-o-r-t-e-z, last name Stafford, S-t-a-f-f-o-r-d?

13     A.   Correct.

14     Q.   He says contained reports?

15     A.   That's correct.

16          MR. JOHNSON:  Can I see the attachment real

17   quick, please.

18                   (Whereupon, attachments to Plaintiff's

19                   Exhibit No. 22 were presented.)

20     Q.   (By Mr. Johnson)  So the first one is entitled

21   "The Call For Service"?

22     A.   Yes.

23     Q.   All right.  That gives us times and so forth

24   of --

25     A.   That's the times for the fire department side of

Steve McCallum
February 08, 2021

```
 1    things.
 2         Q.   Yes, sir.   Thank you.
 3              MR. JOHNSON:   Next please.
 4                   (Whereupon, attachments to Plaintiff's
 5                   Exhibit No. 22 were presented.)
 6         Q.   (By Mr. Johnson)   What's the second document?
 7         A.   The second document -- well, hold on.   Are you
 8    looking at it right now?
 9         Q.   Yes, sir.
10              MR. JOHNSON:   Roll up to the top, please,
11    Solomon.
12         Q.   (By Mr. Johnson)   All right.
13         A.   Oh, that's an incident number created by the
14    City of Atlanta Fire Department.   So that's just their
15    incident -- of their incident report.
16         Q.   Okay.   Thank you.
17              MR. JOHNSON:   Going back to the attachments,
18    please.
19                   (Whereupon, attachments to Plaintiff's
20                   Exhibit No. 22 were presented.)
21         Q.   (By Mr. Johnson)   The third document is what
22    they call the fire incident report?
23         A.   Kind of redundant.   But yeah, they do, like, a
24    unit report, incident report.   But this one is going to
25    be the -- still on the fire department side.
```

Steve McCallum
February 08, 2021

1      Q.   I see.  Okay.

2           MR. JOHNSON:  Let's go back to the attachments,

3    please.

4                (Whereupon, attachments to Plaintiff's

5                Exhibit No. 22 were presented.)

6      Q.   (By Mr. Johnson)  Next the patient care report

7    for the EMS side of things probably?

8      A.   That's correct.

9           MR. JOHNSON:  Okay.  Go ahead.  Go back.

10               (Whereupon, attachments to Plaintiff's

11               Exhibit No. 22 were presented.)

12     Q.   (By Mr. Johnson)  And that -- it says "T-10 Unit

13   Report."  What's that, Taser?

14     A.   No.  This is still a fire department report.

15   It -- let me scroll -- let me go back real quick.

16     Q.   Well, open the --

17     A.   Yeah, each department kind of has -- the

18   department's going to have multiple reports for the fire

19   side and -- okay.  That's Truck 10; so T-10, you're

20   looking at Truck 10.  So the -- when you have a unit

21   report and says it's E-10, that's Engine 10 --

22     Q.   Got it.

23     A.   -- in a unit report and is T-10 is Truck 10.

24   That's their personnel and unit report as well.

25     Q.   Thank you, sir.

Steve McCallum
February 08, 2021

1      A.    Two -- two apparatuses responding.

2      Q.    Thank you.  Let's go to Exhibit 23 which is

3  8/14/18.

4              (Whereupon, Plaintiff's Exhibit No. 23

5              was presented.)

6      Q.    (By Mr. Johnson)  It looks like you're speaking

7  with Investigator Kindu, K-i-n-d-u, Franklin to request a

8  copy of Grubbs's training file.

9      A.    Correct.

10          MR. RADNER:  Is it 23?

11          MR. JOHNSON:  23, yes.

12     Q.    (By Mr. Johnson)  Which among other things,

13  includes his training on the Taser, sir.

14     A.    That's correct.

15     Q.    All right.  And the last time he was recertified

16  April 25, 2018.

17     A.    Correct.

18              (Whereupon, Plaintiff's Exhibit No. 24

19              was presented.)

20     Q.    (By Mr. Johnson)  Exhibit 24 is August 15.

21  Okay.  You got an e-mail from Zorn, "The approved

22  incident report and use of force report."

23     A.    That's correct.

24          MR. JOHNSON:  So let's go to the attachment, the

25  APD use of force report, please.

Steve McCallum
February 08, 2021

```
 1                    (Whereupon, attachments to Plaintiff's

 2                    Exhibit No. 24 were presented.)

 3        Q.   (By Mr. Johnson)  What is your understanding of

 4    what this document is, sir?

 5        A.   It's Atlanta Police Department's use of force

 6    report.

 7        Q.   And who completes it?

 8        A.   By -- any time the use of force is completed --

 9    I mean, it's a general statement.  I don't work for

10    Atlanta Police Department or know their exact procedures

11    on this.

12             It's the use of force for -- when force is used,

13    these are created and completed by the officer and also

14    the supervisors's approval in most situations.  I would

15    assume this is the same.

16        Q.   Okay.  The information on this report, I'll take

17    it, that you don't know where it comes from.

18        A.   I could only assume.  You'd have to ask APD on

19    specifically where and who and how they got these -- you

20    know, completed this document.

21             MR. JOHNSON:  Can you scroll down to the bottom

22    so I can see who signed off on it.

23             MR. RADNER:  4370.

24        Q.   (By Mr. Johnson)  At least at the bottom of the

25    document, there is no -- I see, you know, ID number and
```

Steve McCallum
February 08, 2021

1    so forth, but I don't see signatures.  Do you?

2        A.   I don't.  It's not on mine; that's not on my

3    attachment.

4            MR. JOHNSON:  All right.  Okay.  Go back to

5    where we were at the top.

6        Q.   (By Mr. Johnson)  Can you tell me, Special Agent

7    McCallum, is this a document normally sent to you by APD?

8        A.   Normally if I am conducting the investigation.

9        Q.   In other words, you ask for it specifically.

10       A.   Yes.

11       Q.   On this document under force used, it says, "Did

12   the officer attempt to de-escalate the situation?"  The

13   box "yes" is checked.  It says, "If yes, please describe.

14   Officer Grubbs identified himself as the police and told

15   the subject to stop running several times."

16           Would you agree that, at least thus far in your

17   report, we've not heard anything from anyone so far in

18   your report making that claim?

19       A.   The only other person that was there was Officer

20   Grubbs and he did not interview.

21       Q.   So you didn't ever hear that from anybody until

22   such time as you saw this report.

23       A.   That would be accurate.

24       Q.   You could only assume that comes from Officer

25   Grubbs.

Steve McCallum
February 08, 2021

1      A.   That's correct.

2      Q.   Okay.  And if he testified under oath at his

3    deposition that he told my client to stop one time,

4    that -- it would be inconsistent with the information

5    that I just read to you.

6      A.   I didn't interview Grubbs so I -- you're reading

7    what I'm reading here.

8      Q.   Yes, sir.

9           That's inconsistent with the testimony that I

10   just set forth for you assuming it's true.  Correct?

11          Correct.  You're seeing the same document I am.

12   I am -- I am not -- I don't know what he said in his

13   disposition -- or deposition.

14     Q.   As it pertains to the body camera, same section.

15     A.   Uh-huh.

16     Q.   It says, "If no, why not?  The body camera was

17   turned on after the incident and was not in buffering

18   mode.  So no usable footage is available."

19          Did I read that right?

20     A.   You did.

21     Q.   Under the CEW, of course, Conducting Electrical

22   Weapon, the APD document says, quote, CEW prongs were

23   deployed making contact in the subject's back.  The

24   accused rolled down an embankment where his head made

25   contact with a slab of concrete causing head trauma.

Steve McCallum
February 08, 2021

1          Did I read that right?

2     A.   That's correct.

3     Q.   Thank you.

4          MR. JOHNSON:  Go ahead to the bottom of that

5     paragraph, please.

6     Q.   (By Mr. Johnson)  And can you tell me, if you

7     know, is this document an internal affairs document?

8     A.   You'd have to ask APD.

9     Q.   Okay.  You have no idea who completed this or --

10    or why.

11    A.   You'd have to ask APD or refer to APD.

12    Q.   Okay.  I'm asking you.  Do you know?

13    A.   Right now, I do not.

14         MR. JOHNSON:  Let's go to the next document.

15              (Whereupon, plaintiff's attorneys

16              conferred off the record.)

17              (Whereupon, attachments to Plaintiff's

18              Exhibit No. 24 were presented.)

19    Q.   (By Mr. Johnson)  The other attach -- other APD

20    incident report -- and we're clicking on it.  It's just

21    being slow to react.  I'm sorry.

22    A.   I understand.

23    Q.   In this document, at least, in the upper

24    right-hand corner says it was done also on August 15,

25    2018, correct?

Steve McCallum
February 08, 2021

1      A.   Correct.

2           MR. JOHNSON:  Go ahead go down, please.  And

3      then stop there.

4      Q.   (By Mr. Johnson)  Under narrative, it at least

5      says -- it appears that this was -- it appears, by the

6      reading of it, this was done by Officer Grubbs.

7      A.   That's correct.

8      Q.   Okay.  Is that -- is this the first time you got

9      this report, or any report for that matter, from Officer

10     Grubbs?

11     A.   That's correct.

12     Q.   So incident on June -- July 10.  This you got on

13     August 15.

14     A.   Correct.

15     Q.   A month and five days later.

16          Based on your experience, is that a normal time,

17     long time, short time?  How do you describe that?

18     A.   I don't have an opinion.

19     Q.   If -- if they had signed it a week and -- if

20     Grubbs signed it a week after the incident and his

21     supervisor four days after that and -- you know, July 21,

22     is there a reason that you're aware of why this wouldn't

23     be sho- -- given to you before this August 15?

24     A.   There was no reason.

25                    (Whereupon, plaintiff's attorneys

Steve McCallum
February 08, 2021

1              conferred off the record.)

2        MR. JOHNSON:  Let's go to Exhibit 25, please.

3             (Whereupon, Plaintiff's Exhibit No. 25

4             was presented.)

5     Q.   (By Mr. Johnson)  That's September 4, 2018,

6   10:00 a.m.  It looks like you got an e-mail from

7   Michael Banja, B as in boy, a-n-j-a.  Who's that, sir?

8     A.   I'm pulling that up right now.

9     Q.   Sorry.

10    A.   That's -- yeah, it's a senior officer for

11  professional department -- professional development unit.

12  So it's with APD.

13    Q.   Right.

14         And what's -- what's the -- if you can tell,

15  what's the importance or not of the Taser documentation

16  you got here?

17    A.   Oh.  This is just saying that the same Taser

18  used in that incident was the Taser that was assigned to

19  Officer Grubbs.

20    Q.   Got it.

21             (Whereupon, plaintiff's attorneys

22             conferred off the record.)

23             (Whereupon, attachments to Plaintiff's

24             Exhibit No. 26 were presented.)

25             (Whereupon, Plaintiff's Exhibit No. 26

Steve McCallum
February 08, 2021

1                      was presented.)

2        Q.   (By Mr. Johnson)  Exhibit 26, September 6, 2018,

3    9:00 a.m.  It looks like you went to try to get an update

4    on Jerry's condition.

5        A.   Correct.

6        Q.   You spoke with his nurse Peter Gordin,

7    G-o-r-d-i-n.  It looks like he showed you some of the

8    charts and reports from August 1, 2018.

9        A.   Correct.

10       Q.   That revealed that my client was a quadriplegic

11   due to a C-3, C-4 injury?

12       A.   That's correct.

13       Q.   He was on a ventilator until a few days ago?

14       A.   Correct.

15       Q.   Apparently, the nurse was not aware of what

16   caused the injury.  He stated that he was told

17   Blasingame -- Blasingame fell down stairs.

18       A.   Correct.

19       Q.   Blasingame did not talk about what happened to

20   any of the staff at the hospital; in other words, what

21   happened on the day of the incident?

22       A.   He -- yes.

23       Q.   He was still in custody but not guarded.

24       A.   That's correct.

25       Q.   "In custody," does that mean he's handcuffed or

Steve McCallum
February 08, 2021

1   anything?

2       A.   No, not -- no.  That's just -- he's technically

3   under arrest, but he's not in any condition where he can

4   flee; therefore, the hospital has him labeled as in

5   custody.  But he doesn't have an officer out front of

6   his -- his room at that time.

7       Q.   Didn't -- did not have an officer in the --

8       A.   No, he didn't.

9       Q.   Thank you, sir.  Okay.

10          It looks you like you went in the room.  You

11  said he was alert and not on a ventilator.  He could

12  briefly speak a few words.  He told you that his family

13  visited him one time.  He could not remember what

14  happened.  He said that he was told by somebody at the

15  hospital that he fell.  He could speak and move his head

16  side to side.

17          Blasingame was not able to fully be interviewed

18  because of his medical status, correct?

19      A.   That's correct, yes.

20      Q.   Did you -- did you read him his rights before

21  you talked to him?

22      A.   And it -- I would have stated that there.  It

23  was more of an assessment to see -- this -- he had just

24  come off a ventilator.  He could barely whisper.  So

25  I didn't -- I knew there wasn't going to be an interview.

Steve McCallum
February 08, 2021

1    So this is kind of a check on him and his status to see

2    if it was possible to interview him.

3        Q.   Okay.

4        A.   I did not Mirandize him.

5        Q.   Thank you, sir.

6             So he could bare -- basically speak at a

7    whisper, correct?

8        A.   Yeah, he -- yeah, he was having a lot of trouble

9    speaking.  He had just come off that ventilator, so...

10       Q.   Sure, for -- it looks like a couple of months.

11       A.   Yeah.  And so he was -- even the brief

12   conversation, he was struggling.

13       Q.   But you obviously asked him if he could remember

14   what happened and he told you he could not.

15       A.   Correct.

16       Q.   I'll take it -- did you tell him anything about

17   what happened?

18       A.   I did not.

19       Q.   Did you see him move his arms or his legs or

20   anything at all that looked inconsistent with someone

21   being a quadriplegic?

22       A.   I didn't see him move.

23       Q.   And from at least my part of the report or my --

24   the report that I have, Special Agent McCallum, I have

25   that's the last page of it.

Steve McCallum
February 08, 2021

1      Do you have anything after that page,

2   September 6, 2018?

3      A.   There's one -- the -- there's one document there

4   that's received at -- I -- I got it around -- on

5   the 13th, I received medical records involving his

6   medical records from Grady.  I don't know if you got that

7   last one there.

8      Q.   I don't.

9           So is that Exhibit, like, 27?

10     A.   Yeah, I -- yes, I believe so, if that's your

11  count.  I believe that's the last one there.

12           (Whereupon, plaintiff's attorneys

13            conferred off the record.)

14     Q.   (By Mr. Johnson)  Well, okay.  There's no

15  exhibit number on it, but -- I didn't know where these

16  went.  So now -- now I do.

17     A.   They -- yeah, okay.  They came a little bit

18  later.  They may not have had a number on it --

19     Q.   I'm going to --

20     A.   -- at the time.  Yeah.

21     Q.   -- I apologize to you.

22     A.   No problem.

23           So that's actually the last report on this case

24  file.  The case was reassigned and the rest of them are

25  going to be case updates.  You know, that's after the

Steve McCallum
February 08, 2021

1    case was turned over to the District Attorney's Office.

2        Q.   Got it.

3        A.   There are no other investigative summaries.

4        Q.   Well, let me -- let me say this to you.  After

5    Exhibit 26, which is that September 2018 document that we

6    just went over --

7        A.   Yeah.

8        Q.   -- you saw Jerry.

9             It looks like there's a document from

10   September 1, 1:41 p.m. where you got a document -- or you

11   got an e-mail from the Fulton County District Attorney's

12   Office, Greg Thomas, that contained Grady EMS reports

13   related to this incident.

14       A.   Oh, that's -- correct.  Yeah, that's the one.

15   That's -- I believe he subpoenaed those documents for me.

16       Q.   Okay.  Should -- so should I put that in your

17   report before Exhibit 26?  Or how do you do that so I

18   just know how you keep it.

19       A.    I would have done it chronological.  That's just

20   me.  It's really not important of where it would come.

21       Q.   Okay.  And then the attachment you have is the

22   Grady EMS worksheet?

23       A.   That's correct.

24       Q.   Okay.

25            MR. JOHNSON:  Get that attachment just so I can

Steve McCallum
February 08, 2021

1    see it, please, Solomon.  Thank you very much.

2                   (Whereupon, plaintiff's attorneys

3                   conferred off the record.)

4         THE WITNESS:  It's probably pretty large, yeah.

5                   (Whereupon, e-mail attachments were

6                   presented.)

7         MR. JOHNSON:  All right.  I've seen these.

8    Thank you.

9         Q.   (By Mr. Johnson)  Let's go back, then, to -- it

10   looks like the next one's on -- I'm going to -- I'm going

11   to put that in my report file.  That September 1, I'm

12   going to put it right before the September 6 Exhibit 26.

13        A.   Sounds good.

14        Q.   Like you, a chronological Virgo boy.

15             All right.  Let's do -- the next one says

16   Thursday, September 26, 10:00 a.m.  You contacted Fulton

17   County District Attorney's Office, Greg Thomas, regarding

18   the status of the current investigation.

19             "Thomas advised the case has been reassigned to

20   Assistant District Attorney Shaneah, S-h-a-n-e-a-h,

21   Jenkins.  Thomas also advised the case is still under

22   review."

23             No other information at that time at least,

24   according to that document, correct?

25        A.   That's correct.

Steve McCallum
February 08, 2021

1    Q.   Then I got another document, not an exhibit, but

2  it -- October 7, 2020, 11:00 a.m.

3    A.   That's going be the -- the case was reassigned

4  at that point.  I had left this unit.  So that's going to

5  be Herman Taylor.  It had -- it was reassigned to him

6  after it was released to the D.A.'s Office.  Those are

7  his summaries and just case updates on the status at the

8  D.A.'s Office.

9    Q.   Okay.  So when did the assignment get reassigned

10  from you?

11   A.   K-3 assignment was on Sept- -- oh, it looks like

12  May 1st.

13   Q.   Of what year?

14   A.   2019.  Sorry.  Yeah.  Oh, actually, yes.  On

15  Wednesday, May 1st, 2019, the case was resigned to S.A.

16  Herman Taylor.

17   Q.   I know what's going on.  Sorry.  I missed the

18  change of the year.  So --

19   A.   Yeah, you did.

20   Q.   -- so your last exhibit, Exhibit 26, is

21  September 6, 2018, which we've just discussed, correct?

22   A.   Yes.  That's where I went, yeah.

23   Q.   Got it.

24        And now -- so, like, what -- gee, three, five --

25  eight months later-ish, the case --

Steve McCallum
February 08, 2021

1      A.    Not.

2      Q.    -- is reassigned to Special Agent Taylor.

3      A.    Yes.  I have on September 13th, I received the

4  documents from Grady EMS.  On November 28th, I myself did

5  a case update status.  And then the case was reassigned

6  on May 1st.

7      Q.    So the Grady EMS we've already talked about.

8      A.    Yes.  That was going to be on September 13th.

9      Q.    Yes, sir.

10     A.    And then I did a case update myself on

11  November 28th of 2018.

12     Q.    Got it.  There it is.

13     A.    And that's -- then the case was reassigned on

14  May 1st --

15     Q.    Got it.

16     A.    -- to S.A. Taylor.

17              (Whereupon, a document was presented.)

18     Q.    (By Mr. Johnson)  So let's go to November 28th,

19  please, 2018.

20     A.    Yes.

21     Q.    You contacted Greg Thomas.  He's with the

22  District Attorney's Office.  And the case was still under

23  review.

24     A.    That's correct.

25     Q.    That's your last official note, it looks like.

Steve McCallum
February 08, 2021

```
 1        A.    It is.  That's correct.

 2        Q.    Then -- yeah, May 1, 2019, case resigned to

 3   Taylor.  Is there a reason why it was reassigned?

 4        A.    That's correct.  I went on a task force with the

 5   DEA and left this unit.  So my cases were reassigned to

 6   other agents.

 7        Q.    Okay.  And then, of course -- at least according

 8   to the file -- September 26, 2019, Taylor got an update

 9   from Thomas.  That's where the case had been reassigned

10   to another D.A.

11              Then it was still under review?

12        A.    Yes.

13        Q.    Yeah, I missed one from January 21, 2019.

14   Sorry.

15        A.    No problem.  Giving a case update.

16        Q.    That's from Taylor just saying that he talked

17   with Greg Thomas and it's still under review?

18        A.    Correct.

19        Q.    I have a July 25, 2019 where Special Agent

20   Taylor contacted the D.A.  Still pending at that time,

21   correct?

22        A.    Correct.

23        Q.    We've already talked about the reassignment to

24   D.A. Thomas.  That's 9/26/19.

25              And then it looks like the next contact, it
```

Steve McCallum
February 08, 2021

```
1   looks like, almost a year later I have October 7, 2020?

2       A.   Correct.

3       Q.   And then they closed the case and said it would

4   not be -- the prosecutor said not be presented to a grand

5   jury.

6       A.   That's correct.

7       Q.   And that the decision was made last week, at

8   least according to this document from Taylor.

9       A.   That's correct.

10      Q.   Okay.  And then the next document, November 13,

11  2020.  And that obviously says it's -- D.A.'s Office

12  closing their file.

13      A.   Correct.

14      Q.   Once the D.A.s closes their file, is your file

15  therefore automatically closed as well?

16      A.   Not automatically, but we will close our case

17  after that.

18      Q.   And it -- was your case closed at that time?

19      A.   It -- I don't exactly know the exact date it was

20  closed.  I'd have to go look at the hard case file.  But

21  it was ready to be closed at that time.

22      Q.   Okay.  And again, whatever the internal affairs

23  does, you have no idea.

24      A.   I do not.

25      Q.   All right.  Has anybody from internal affairs
```

Steve McCallum
February 08, 2021

1    ever asked you to share any part of your report with

2    them?

3        A.    No.

4        Q.    The last time you spoke to anybody about this

5    particular incident officially, would it have been

6    basically when you transferred the report over to

7    Taylor -- or the file?

8        A.    Yes.  That's correct.

9        Q.    So you actually have never spoken with Grubbs

10   personally.

11       A.    I have not.

12       Q.    Other than speaking with Shelley and Zorn

13   personally -- well, there's -- and obviously, you tried

14   talking to Blasingame and apparently he has no memory of

15   the incident, right?

16       A.    To my knowledge.

17       Q.    All right.  So as it relates to this matter, has

18   anybody -- other than when we contacted you and served a

19   subpoena, have you had any contact with the Attorney's

20   Office with the City of Atlanta to talk about this case?

21       A.    The Fulton County -- the Fulton County D.A.'s

22   Office, is that what your question is?

23       Q.    Yeah, sure.

24       A.    No, I haven't talked to anybody else after I --

25       Q.    How about that now from the City of Atlanta

Steve McCallum
February 08, 2021

1    Securities, folks involved in the defense of this case?

2        A.    Oh, no.  I haven't talked to anybody, no.

3              MR. JOHNSON:  All right.  I greatly appreciate

4    your time walking us through this.  Thank you very much.

5              THE WITNESS:  No problem.  Thank you.

6              MR. JOHNSON:  Counsel?

7              MS. NAIR:  (No audible response.)

8              MR. JOHNSON:  Alisha, any questions?

9              MS. NAIR:  (No audible response.)

10             MR. JOHNSON:  Okay.  Sorry.  I apologize.  I

11   didn't mean to interrupt you.  Oh, her mic's not working.

12   That's going to make it hard to question.

13             If you don't mind, Special Agent McCallum, would

14   you mind sending us -- or asking some of your officers to

15   please send us the 31 pictures from you folks?  Because I

16   can't find them.  That you personally took at the scene.

17             THE WITNESS:  Yeah, you can contact open

18   records.  I don't think that -- I'm not going to release

19   it.  Contact them back, let them know.  I'm not -- I'm

20   not sure as to why they didn't transfer over or why that

21   hyperlink -- all the other hyperlinks seem to work.  So

22   I can't tell you why they're not there.  But they should

23   send them out to you.

24             MR. JOHNSON:  Thank you, sir.

25                  (Whereupon, a recess was taken.)

Steve McCallum
February 08, 2021

```
1              MS. NAIR:  Can you all hear me now?

2              THE WITNESS:  Yes.

3              MS. NAIR:  All right.  Good, then.  Okay.

4                           EXAMINATION

5    BY MS. NAIR:

6         Q.   I was just saying I have a few questions.

7              You're not employed by the City of Atlanta; is

8    that correct?

9         A.   That is correct.

10        Q.   Are you employed by Fulton County?

11        A.   I am not.

12        Q.   Your employer is the State of Georgia?

13        A.   That's correct.

14        Q.   When you conduct your investigation, who

15   instructs you to conduct the investigation?

16        A.   My case -- the case was assigned to me by my

17   supervisor at the GBI.

18        Q.   And who are you conducting the investigation

19   for?

20        A.   I'm conducting it for the Atlanta Police

21   Department.

22        Q.   Who do you turn your investigation results over

23   to?

24        A.   I turn the investigation results over to the

25   Atlanta Police Department and also to the Fulton County
```

1   District Attorney's Office.

2       Q.   When you were asked questions about your summary

3   of Officer Zorn, you testified that that interview is not

4   recorded.

5       A.   That's correct.

6       Q.   Why is that interview not recorded, but your

7   other interviews are?

8       A.   That's -- I wasn't exactly interviewing Zorn.  I

9   was getting a case brief trying to get an idea of what

10  happened; therefore, I know what actions I need to take.

11  Zorn was not a witness, if that makes sense, to the

12  investigation.

13      Q.   So you -- would it be fair to state that you are

14  not interviewing Officer Zorn for purposes of fact

15  gathering?

16      A.   I'm trying to find a -- it's -- you could say

17  yes, not spe- -- I'm looking for specific facts, but I

18  need to know what happened.  That way I know to go --

19  who's involved, things like that.  So it's information

20  relative to the case.

21      Q.   Correct.

22           But it would be fair to say that you're not

23  specifically seeking the facts from Officer Zorn; you're

24  seeking to find out information as to where to go to

25  gather the facts --

Steve McCallum
February 08, 2021

1        A.    That's correct.

2        Q.    -- necessary for your investigation.

3        A.    That's correct.

4        Q.    And so the information that is provided in your

5   summary, does that information have to be exhausted?

6        A.    Meaning?  The -- does the information have to be

7   exhausted?  I'm sorry.

8        Q.    Exhausted.  Does it have to contain every detail

9   about the incident?

10       A.    It does not.

11       Q.    Does it normally contain every detail about the

12   incident?

13       A.    It does not.

14       Q.    The investigation summary that you completed for

15   Officer Shelley --

16       A.    Yes.

17       Q.    -- that summary is not a transcript; is that

18   correct?

19       A.    That's correct.

20       Q.    The audio for that investigation is included in

21   your report; is that correct?

22       A.    That's correct.

23       Q.    And the audio is a complete transcription of

24   what actually occurred during your conversation with

25   Officer Shelley; is that correct?

Steve McCallum
February 08, 2021

```
 1       A.    That is correct.

 2       Q.    And so if the information is not included in the

 3   summary, it doesn't mean that that information was not

 4   told to you; is that correct?

 5       A.    That is correct.

 6       Q.    You have to rely on the audio for everything

 7   that was told to you.

 8       A.    That's correct.

 9       Q.    You were asked earlier about a dollar bill --

10       A.    Yes.

11       Q.    -- being found on the scene; is that correct?

12       A.    He was -- he asked me about that, yes.

13       Q.    And you stated that the information about the

14   dollar bill was not included in your investigative

15   summary; is that correct?

16       A.    I did not include that in the investigative

17   summary, correct.

18       Q.    However, you did take pictures from the

19   incident; is that correct?

20       A.    I did.  Correct.

21       Q.    Was the dollar bill that was mentioned in any of

22   the photos that were taken from the scene?

23       A.    Can you give me one minute to look.  Let me look

24   those up real quick, okay?

25             Sorry.  It's downloading now.  I just need to --
```

Steve McCallum
February 08, 2021

1    I'll review these real quick.

2                 (Whereupon, the witness reviewed the

3          files.)

4        Q.   (By Ms. Nair)  And maybe I can help out.  If I

5    can turn your attention to the 9641 image.

6        A.   Okay.

7        Q.   And the 9642 image.

8        A.   My computer is always slow.  You said 96...

9        Q.   41.

10       A.   Where are you getting the 9641?  I don't have --

11       Q.   Let me -- let me share my screen.

12       A.   Okay.

13                (Whereupon, an unidentified photograph

14         was presented.)

15       Q.   (By Ms. Nair)  Do you recognize this photo?

16       A.   I do and I do not believe that's a photo I took.

17   That equipment -- I don't believe that's a photo --

18   that's a photo from APD, to my knowledge.

19       Q.   Okay.

20       A.   Sorry.  I think that's why it's labeled

21   different.  Yeah, that's a photograph from APD.  I have

22   seen their -- I'm looking at my photographs.  I know I

23   saw them.  I don't know why y'all may not have mine.

24       Q.   Okay.  So you didn't --

25       A.   And in reference to that, I'm looking right now

Steve McCallum
February 08, 2021

1   to see if that's in my photographs.  I don't see it in my

2   photographs.

3       Q.   Okay.  So you didn't take this photo.

4       A.   I did not.  That's not my photograph.

5                   (Whereupon, an unidentified photograph

6           was presented.)

7       Q.   (By Ms. Nair)  And you -- you didn't take this

8   photo either.

9       A.   No.  And that would make sense because the

10  equipment's there.  They wouldn't -- they wouldn't leave

11  that.  Must have been --

12      Q.   Okay.

13      A.   -- a APD crime scene photograph.

14      Q.   Okay.

15      A.   So you --

16      Q.   Did you have -- forgive me.  Go ahead.

17      A.   Yeah, I don't have a photograph of the dollar --

18  it -- the dollar bill is not there in my photographs.

19      Q.   Okay.  Did you have an opportunity to review any

20  of the vid- -- of the photographs that I just showed you?

21      A.   I did.  It's just been a long time.  I did

22  review them.

23      Q.   Okay.  Now, did you see the dollar bill in those

24  photographs?

25      A.   I did.

1      Q.   Was that information provided to you by Atlanta

2  Police Department?

3      A.   I don't recall.

4      Q.   I want to turn your attention to a question that

5  was asked about when Mr. Blasingame was in custody.

6           Can you -- did you make a determination as to

7  when Mr. Blasingame was in custody?

8      A.   I would be giving you my opinion on how I

9  interpret the law on that.  I -- the specific moment of

10  in custody was not discussed and I did not interview

11  Grubbs.  If you understand what I mean.  That's going to

12  be a question of generally -- you know, a legal question

13  when he was in custody.

14     Q.   Okay.  Earlier you were asked a specific

15  question, however, about Mr. Blasingame being in custody

16  when he was injured.  Do you recall that testimony?

17     A.   I do.  And -- I do.  That was my opinion that

18  he was in custody.

19     Q.   That he was in custody.

20     A.   That's my opinion, yes.

21     Q.   Can you break that down with your opinion --

22     A.   Did --

23     Q.   -- that you testified to.

24     A.   When he ran from --

25     Q.   When --

Steve McCallum
February 08, 2021

1      A.   Yeah, you want me to explain why I say that?

2      Q.   I want you to first explain when you had the

3  opinion that Mr. Blasingame was in custody, at what

4  point.

5      A.   At the very beginning of my investigation.  As I

6  said --

7      Q.   And at what point during the incident was

8  Mr. Blasingame in custody?

9      A.   In my opinion, that's a legal question.  Meaning

10  when he ran from police and broke the law, technically,

11  he is in custody.  They're -- they're going to execute an

12  arrest.  When you Tase someone or use force, you are

13  seizing that individual.  That's my interpretation of the

14  law.

15          So when he asked if he was in custody when he

16  was Tased, my answer is yes.  That is not an

17  investigative -- I did not get that from the

18  investigation.  That's my interpretation of the law, when

19  he was actually in APD custody.

20      Q.   Okay.  So in your report, you did not make a

21  determination --

22      A.   I did not make a -- that's correct.  I did not

23  make a determination.

24      Q.   Well, let me finish the question just so the

25  record is clear.

Steve McCallum
February 08, 2021

1           In your report, you did not make a determination

2    as to when Mr. Blasingame was in custody.

3      A.   That's correct.

4      Q.   You are only tasked with the -- with finding

5    facts; is that correct?

6      A.   That's correct.

7      Q.   And turning those facts over to different

8    agencies; is that correct?

9      A.   That's correct.

10     Q.   For the agencies to then make a determination as

11   to -- let me take a step back.

12          For the District Attorney's Office to make a

13   determination as to whether or not a crime occurred --

14     A.   That's correct.

15     Q.   -- is that correct?

16     A.   That's correct.

17     Q.   And to assist the Atlanta Police Department in

18   determining whether or not any of the rules were

19   violated.

20     A.   That is correct.

21     Q.   Do either of those agencies ask you to draw an

22   opinion as to anything outside of the facts that you

23   provide?

24     A.   They do not.

25     Q.   So when you testified here today as to your

Steve McCallum
February 08, 2021

1    opinion of custody, that is just based on your general

2    knowledge.

3         A.   Correct.

4         Q.   Okay.  The last thing I want to discuss is your

5    investigation timeline.  You begin your investigation on

6    the date of the incident.  Is that always the case?

7         A.   That's not always the case.

8         Q.   But in this instance, you began your

9    investigation on the date of the incident.

10        A.   That's correct.

11        Q.   Who determines when your investigation is

12   complete?

13        A.   My supervisor.

14        Q.   And until your supervisor informs you that the

15   investigation is complete, do you continue gathering

16   facts?

17        A.   I do.

18        Q.   How -- or what do you use to make the

19   determination as to how to gather the facts?

20        A.   What do I use to let me know what -- in other

21   words -- I'm sorry.  What's the question?

22        Q.   That question might be unclear.  I -- my

23   apologies.

24        A.   Sorry.

25        Q.   How do you gather the facts necessary to

Steve McCallum
February 08, 2021

1   complete your investigation?

2       A.   Well, we -- it's kind of a multitude of things.

3   I mean, everything that's available, whether it be video

4   or interviews.  I have a manual on use of force

5   investigations which is a guide to let us know exactly

6   every aspect that we should be looking for.  Not all of

7   it applies in every case.

8       Q.   And do other individuals continuously bring you

9   information to include in your investigation?

10      A.   They do.

11      Q.   And as they bring you that information, do you

12  update your investigation?

13      A.   I do.

14      Q.   In this instance, how would you know -- or is

15  there an indication of your -- in your report that your

16  supervisor told you that the investigation was complete?

17      A.   There is not a specific indication or summary

18  that it was complete, but everything has to be approved.

19  Although some of these are approved before the case can

20  be released.  So -- upon its release, summaries are

21  approved by a supervisor; so therefore, the case is

22  approved.  It's still in a, you know, open status, but --

23  if that answers your question.

24      Q.   It does.

25           And when you complete your investigation --

Steve McCallum
February 08, 2021

1    A.   The --

2    Q.   -- you then turn it over to the various agencies

3    that we mentioned before.

4    A.   That is correct.

5    Q.   Do you release information before your

6    investigation is complete?

7    A.   It's possible that I do that.  But routinely,

8    no.

9    Q.   Is there any indication that you released

10   information before this investigation was complete?

11   A.   There is not.

12        MS. NAIR:  I have no further questions.

13                       EXAMINATION

14   BY MR. JOHNSON:

15   Q.   Special Agent McCallum, if Officer Grubbs in

16   this case testified under oath in his deposition that my

17   client was in custody even -- he said, I want you to

18   assume, even before he Tased my client -- but for the

19   purpose of my question as of the time of Tasing my

20   client, that would be consistent with what you testified

21   to today, wouldn't it?

22   A.   I can give you my opinion of the law, but that's

23   consistent with my opinion of the law.

24   Q.   Okay.  All right.  So apparently, there is --

25   there are photographs of a one-dollar bill that is in the

Steve McCallum
February 08, 2021

1    area of where my client fell that you could see in the

2    Atlanta Police Department crime scene photo, correct?

3        A.   That's correct.

4        Q.   All right.  And was -- that dollar bill was not

5    there when you got there.

6        A.   It was not.

7        Q.   If it was there, I'll take it, you would have

8    likely noted that and taken it into custody and marked it

9    as evidence.  Right?

10       A.   Yes.

11       Q.   In fact, we've seen many times Atlanta said that

12   they had taken nothing into custody.  Right?

13       A.   They did not take any physical evidence.

14       Q.   Which nothing is nothing, right?

15       A.   That's correct.

16       Q.   So no dollar bill?

17       A.   Correct.

18       Q.   We don't know what happened to it, but they were

19   there and documented until the time you got there.

20       A.   That's correct.

21       Q.   All right.  Would you expect them just to leave

22   it on the ground to just roll around?

23       A.   I don't have any opinion.

24       Q.   You'd expect them to take it into custody and

25   mark it like you would have?

Steve McCallum
February 08, 2021

1      A.    I don't have an opinion.

2      Q.    Well, okay.  In the photos that you have, you

3   saw I know at least one wire from the Taser.  Correct?

4      A.    Correct.

5      Q.    How many wires come out?  Isn't it two?

6      A.    That's correct.

7      Q.    You only found one.

8      A.    I believe so.  I'd have to go refer back.  If

9   that's what my summary states -- my report states, that's

10   correct.

11      Q.    Okay.  And I'll take it, you remember seeing

12   wires in the photographs that APD had taken.  No, I'm not

13   taking you through every one of them, but --

14      A.    Yeah.  No, I do.

15      Q.    Okay.  So they apparently were there and left

16   them there to the point where at least one you found when

17   you got there.

18      A.    That's correct.

19      Q.    All right.  How about probes; do you ever see

20   probes?

21      A.    I don't have them in my report, so I do not -- I

22   do not recall seeing probes.

23      Q.    But you know probes -- clearly, there were

24   probes, if my client got Tased, that landed.  Right?

25      A.    That's correct.

Steve McCallum
February 08, 2021

1   Q.   At some point in time, somebody had to take it

2   out of him unless it's sitting in his back today and we

3   know that's not true.

4   A.   That's correct.

5   Q.   All right.  So you have no information of the

6   probes.

7   A.   I don't.

8   Q.   All right.  And relative to the cartridge that

9   you saw or -- I don't want to put -- use the wrong

10  word -- by that Placard No. 1?

11  A.   Oh, the AFID.  Correct.

12  Q.   AFID.  Obviously, that was there when you got

13  there?

14  A.   That's correct.

15  Q.   You don't remember seeing that in any APD photo,

16  do you?

17  A.   I don't know.  That -- I'll be -- you wouldn't

18  be able to see that in a photograph.

19  Q.   Okay.  Well, we can see it in yours.

20  A.   Yeah, it -- they're very -- they're the size --

21  they're smaller than a pencil head.  They're very, very

22  tiny.

23  Q.   So if you think you found it and APD didn't when

24  they were there at the crime scene taking photos.

25  A.   They didn't document it.  I can't say whether

Steve McCallum
February 08, 2021

1   they found it or did not.

2       Q.   All right.  So other than the dollar bill and

3   that AFID that you saw, was there anything else that you

4   documented that you thought was there at the scene that

5   you don't remember seeing in the APD photos?

6       A.   Not that I recall.

7       Q.   For Placard No. 2, what was near that again?

8       A.   Placard No. 2 of mine, I believe, was the Taser

9   line, the wire.

10      Q.   Okay.

11      A.   Yes.

12      Q.   All right.

13           MR. JOHNSON:  Appreciate it, sir.  Thank you

14   very much.

15           THE WITNESS:  Thank y'all.  Oh, I just -- are

16   we --

17           MS. NAIR:  If I may have one moment.  Just one

18   moment, please.

19           THE WITNESS:  No problem.

20               (Whereupon, there was a brief pause in the

21                proceedings.)

22           MS. NAIR.  Okay.  Thank you for your time today.

23           THE WITNESS:  Thank you.

24           MR. JOHNSON:  Have a good day.

25               (Whereupon, the deposition concluded.)

Steve McCallum
February 08, 2021

```
1                 C E R T I F I C A T E

2


3    STATE OF GEORGIA,

4    COUNTY OF DEKALB:

5


6         I DO HEREBY CERTIFY THAT THE FOREGOING IS A TRUE AND

7    CORRECT TRANSCRIPT OF THE PROCEEDINGS TAKEN DOWN BY ME IN

8    THE CASE AFORESAID.  THIS CERTIFICATION IS EXPRESSLY

9    WITHDRAWN AND DENIED UPON THE DISASSEMBLY OR PHOTOCOPYING

10   OF THE FOREGOING TRANSCRIPT, OR ANY PART THEREOF, UNLESS

11   SAID DISASSEMBLY OR PHOTOCOPYING IS DONE BY THE

12   UNDERSIGNED CERTIFIED COURT REPORTER AND ORIGINAL

13   SIGNATURE AND SEAL IS ATTACHED THERETO.

14

15        THIS, THE 15TH DAY OF FEBRUARY, 2021.

16

17

18

19

20

21

22

23

24

25
```

**(**

**(a)**
  4:13
**(b)**
  4:13

**-**

**-right**
  49:15

**0**

**0806**
  54:16
**0807**
  54:16
**0808**
  54:16
**0809**
  54:16
**0810**
  54:17

**1**

**1**
  18:8 20:14,
  15,23 22:16
  26:24 55:5,7
  56:10 60:2,
  8,16 61:16,
  17,21 62:9
  63:20,23
  66:3 113:8
  117:10
  118:11 121:2
  139:10
**10**
  18:8 19:22
  22:9,16 36:5
  49:22 57:25
  77:21 80:8,
  22,24 83:15
  86:4,5,15

  89:19 94:24
  105:19,20,
  21,23 111:12
**10/30/13**
  78:9
**10:00**
  112:6 118:16
**10th**
  86:11
**11**
  70:19 75:8
  83:15 84:2,6
  85:4 88:8
**11:00**
  119:2
**11:30**
  92:3
**11th**
  66:24
**12**
  76:8 80:25
  87:13,17
  89:15,16,25
**12/14/17**
  77:16
**12:20**
  76:8 80:25
  92:24
**13**
  90:16,18
  122:10
**13th**
  116:5 120:3,
  8
**14**
  91:6,8
**1428**
  86:6
**15**
  77:17 92:21,
  23 106:20
  110:24
  111:13,23
**15-14-37**
  4:13
**16**
  90:19 93:10,

  12 94:7
  95:22,24
  96:21 97:5,
  12,19
**17**
  91:8 92:23
  93:12 98:23
  99:1,18
**18**
  100:8,9
**18-cycle**
  99:4
**181911254**
  76:16
**19**
  92:3 100:14,
  16
**1:41**
  117:10
**1st**
  119:12,15
  120:6,14

**2**

**2**
  19:16,20
  21:16,18,21
  22:15 26:23,
  24 27:6
  31:24 37:3
  38:6,7 48:6,
  11 53:3 60:2
  61:17 63:20
  65:5 66:7
  103:1 140:7,
  8
**20**
  23:13 65:22
  91:13 96:4
  102:7,9
**2002**
  8:12
**2006**
  8:13
**2010**
  7:20 9:2

**2016**
  11:1
**2017**
  77:17
**2018**
  11:5 12:16
  18:8 19:22
  22:9 36:5
  49:22 57:25
  66:25 70:19
  76:8 77:21
  80:8 86:2,6
  89:19 91:8
  94:24 99:2
  102:9 106:16
  110:25 112:5
  113:2,8
  116:2 117:5
  119:21
  120:11,19
**2019**
  119:14,15
  121:2,8,13,
  19
**2020**
  119:2 122:1,
  11
**21**
  10:25
  102:21,23
  111:21
  121:13
**2175**
  85:25
**2176**
  86:5
**2177**
  86:15
**2178**
  86:19
**2180**
  86:23
**22**
  103:8,10,19
  104:5,20
  105:5,11

22179
  86:20
23
  65:15 93:25
  98:5 106:2,
  4,10,11
24
  102:9
  106:18,20
  107:2 110:18
25
  65:23 106:16
  112:2,3
  121:19
26
  112:24,25
  113:2 117:5,
  17 118:12,16
  119:20 121:8
27
  116:9
28th
  120:4,11,18
2:00
  22:16 66:25
2:36
  101:4,20
2:38
  87:1,13,17
2:38:12
  86:24
2:48
  101:4

___

**3**

3
  31:22,23
  35:24 36:2
  37:20 38:8
  42:11 47:14
  48:14,17,19,
  23 49:6,8
30
  94:13,16
3010
  78:8

31
  59:15,23
  66:8 94:16
  124:15
3:00
  70:20
3:12
  75:9
3:15
  90:19 96:9
3:29
  93:22

___

**4**

4
  47:12,13
  49:17,19
  54:5 55:13,
  19 56:2,4,
  14,24 57:10
  112:5
41
  129:9
4370
  107:23
4:01
  96:9

___

**5**

5
  44:6 57:22,
  24 95:14,15
  103:1
50
  37:7,8
5339976
  80:5
5340149
  79:24
5:02
  99:2
5:30
  18:8 19:2,9

___

**6**

6
  113:2 116:2
  118:12
  119:21
665649
  58:6
6:30
  19:23 22:8

___

**7**

7
  78:20 119:2
  122:1
7/10/18
  78:14 93:21
7/25
  102:23
7/27
  103:10
73
  85:7,21
7334
  33:17
74
  87:16
7:07
  36:5
7:38
  49:23

___

**8**

8
  75:5,7,8
  77:11 96:3
8.B
  4:2
8/14/18
  106:3
80
  98:18

81
  85:7
8:30
  95:16
8:45
  57:25 95:9,
  16 96:3

___

**9**

9
  65:15 76:5,7
  86:2 93:25
  98:5
9/26/19
  121:24
96
  129:8
9641
  129:5,10
9642
  129:7
9:00
  113:3

___

**A**

A-F-I-D
  63:4 64:4
a-n-j-a
  112:7
a.m.
  96:9 112:6
  113:3 118:16
  119:2
Aaron
  19:25
able
  60:19 114:17
  139:18
above
  62:20
absolutely
  42:1
academy
  8:19,20,21,

25

**access**
  23:12
**accidental**
  83:12 89:6,9
**accuracy**
  87:3
**accurate**
  87:12 108:23
**accurately**
  17:22
**accusation**
  79:24
**accused**
  109:24
**act**
  18:3 43:4
**actions**
  41:10 126:10
**activated**
  27:7 28:7,9,
  12 47:16
  82:22 83:6
**active**
  100:13
**actual**
  37:17 43:2
  54:22 71:4
  72:7
**Ad-**
  16:20
**add**
  31:18
**Adkins**
  16:19,20
**administratio
n**
  12:6
**administrativ
e**
  90:13
**administrativ
ely**
  51:15
**advice**
  102:13

**advise**
  71:18 101:9
**advised**
  69:1 101:22
  118:19,21
**affairs**
  15:19 33:11
  51:18 71:19
  82:11 92:25
  93:4,8 99:12
  103:5 110:7
  122:22,25
**affidavit**
  79:7,17
**affirmatively**
  67:22
**AFID**
  60:6,9
  61:19,23
  62:18 63:4
  64:4 65:4
  66:5,10,19,
  20 139:11,12
  140:3
**afterwards**
  72:8
**age**
  37:8
**agencies**
  133:8,10,21
  136:2
**agency**
  6:21 7:1
**agent**
  4:25 5:6
  6:2,10 7:10
  9:4 10:12
  11:1 14:20
  16:17,21,22
  18:15 19:16
  21:3 22:9
  24:3 30:22
  32:1 35:18
  36:6 38:5
  39:13 48:19
  60:5,21
  61:19 63:21
  65:2 67:24

  77:4 81:16
  85:6 88:11
  90:2 108:6
  115:24 120:2
  121:19
  124:13
  136:15
**Agentmccallum**
  20:19
**agents**
  121:6
**ago**
  30:2 73:5
  113:13
**agree**
  28:25 34:17
  45:3 73:7
  108:16
**Agreed**
  26:14 42:3
  43:2 44:14,
  15 45:2
  47:6,7,10,11
  56:8,9 73:24
  86:24,25
**agreement**
  4:14
**ahead**
  40:12 54:12
  55:24 56:11
  58:20 64:12
  76:21 78:5
  79:14,21
  105:9 110:4
  111:2 130:16
**Aided**
  32:18
**alert**
  114:11
**Alisha**
  124:8
**allegedly**
  43:5
**ambulance**
  101:24 102:2
**ambulatory**
  92:1

**and/or**
  4:17 28:21
**answer**
  45:16 68:5,
  7,8 74:17
  132:16
**answers**
  135:23
**anti**
  60:10
**anti-felon**
  60:11
**anybody**
  9:15 10:19
  13:11 16:4
  65:11 108:21
  122:25
  123:4,18,24
  124:2
**anyone**
  108:17
**APD**
  15:21 18:18
  22:10 32:11,
  24 36:6 44:6
  58:12 65:11,
  13 67:7
  70:20 76:1
  79:4 80:18
  82:8 93:19
  94:11,16
  96:22 97:13,
  20 106:25
  107:18 108:7
  109:22
  110:8,11,19
  112:12
  129:18,21
  130:13
  132:19
  138:12
  139:15,23
  140:5
**APD's**
  76:10,12
**apologies**
  134:23

apologize
  37:21,22
  38:5 40:7
  63:25 81:7,
  25 83:1
  96:17 116:21
  124:10
apparatuses
  106:1
apparently
  25:4 26:5
  30:11 31:4
  38:10 46:18
  47:2 50:14
  65:18 87:14
  92:14 103:4
  113:15
  123:14
  136:24
  138:15
appears
  48:12 111:5
applies
  135:7
appreciate
  17:1 55:2
  99:15 124:3
  140:13
approval
  107:14
approve
  21:12,13
approved
  106:21
  135:18,19,
  21,22
approximately
  6:9 7:12
  14:4,17 18:8
  19:22 36:5
  37:7 87:13
  91:13 101:20
April
  106:16
area
  24:10,12
  30:9 40:5

63:3 64:7,8,
  17 70:4
  137:1
armed
  87:14
arming
  86:16
arms
  115:19
around
  11:5 41:12
  54:11 86:20,
  21 116:4
  137:22
arrest
  67:9 76:11
  77:7 79:4,7,
  17 114:3
  132:12
arrival
  69:2
Article
  4:2
asked
  34:3 46:10
  65:12 73:8
  115:13 123:1
  126:2 128:9,
  12 131:5,14
  132:15
asking
  5:21 13:1,2
  16:11 45:8,
  13 51:15
  62:11 68:11
  110:12
  124:14
aspect
  135:6
assault
  26:12 34:25
  35:2
assessment
  114:23
assign
  17:9

assigned
  16:16 17:11
  18:4,23 19:4
  32:3,5
  112:18
  125:16
assignment
  119:9,11
assigns
  16:11
assist
  133:17
assistant
  16:21,22
  90:3 118:20
assume
  22:14 26:15
  30:1 40:23
  41:5 45:12
  80:10 88:13
  107:15,18
  108:24
  136:18
assumed
  30:9 40:17
assuming
  19:2 45:8
  109:10
assumption
  22:23 87:11
Atlanta
  11:10,25
  12:6 13:12,
  20 14:3
  15:17,18
  18:11 19:25
  29:5 32:14,
  24 68:3
  103:11
  104:14
  107:5,10
  123:20,25
  125:7,20,25
  131:1 133:17
  137:2,11
attach
  71:2 100:2
  110:19

attached
  48:1 49:3
  58:16 59:23
  69:16 71:6
  74:18 76:13
  77:2,6 94:3
  99:5,6,21,25
  100:22,24
  101:1,8
attachment
  58:24 59:2
  66:7 75:23
  76:15 79:4
  84:1,3 88:8
  94:9 96:20,
  22 97:3
  99:16 103:16
  106:24 108:3
  117:21,25
attachments
  17:24 54:18
  59:12 69:23
  71:4 75:25
  76:24 77:8,
  10 97:4,11,
  18 99:17
  103:18
  104:4,17,19
  105:2,4,10
  107:1 110:17
  112:23 118:5
attempt
  66:16 108:12
attempted
  34:16,25
attending
  5:9
attention
  67:11 98:14
  129:5 131:4
attest
  15:21
attorney
  50:15 51:6,8
  118:20
Attorney's
  117:1,11
  118:17

120:22
123:19 126:1
133:12
**attorneys**
38:15 59:6
78:16 80:20
85:19,23
88:23 94:5,
19 96:23
100:6 110:15
111:25
112:21
116:12 118:2
**audible**
124:7,9
**audio**
32:21,22
36:10,20
42:5,19,22
43:16,18
45:6,7,13
49:4 73:14
100:24,25
101:2
127:20,23
128:6
**August**
106:20
110:24
111:13,23
113:8
**authorities**
73:20
**automatically**
122:15,16
**available**
4:17 109:18
135:3
**aware**
10:17 31:19
34:21,22
35:4 111:22
113:15

─────────

**B**

─────────

**back**

9:15 10:20
11:14,21
13:23 23:19
25:9 30:1
38:6 40:25
41:18 42:5,
11 44:7,13
45:7,17
46:2,15 60:1
63:18 70:19,
20 73:5
75:13 80:18
81:20 82:14
84:19,23
88:15 90:11
91:19 95:8,
21 96:21
97:10 98:14
104:17
105:2,9,15
108:4 109:23
118:9 124:19
133:11 138:8
139:2
**bad**
26:3
**ballpark**
11:1
**Banja**
112:7
**bare**
115:6
**barely**
114:24
**based**
92:5 111:16
134:1
**basically**
16:10 19:4
27:13 32:2,
11 60:11
66:15 67:9,
16 82:11
115:6 123:6
**basis**
14:6 19:5
**battery**
35:2 52:17

75:12 81:1
82:2,13
**began**
65:4 134:8
**begging**
34:12
**begin**
134:5
**beginning**
35:3 93:23
132:5
**behalf**
50:8
**behind**
54:9
**believe**
12:10 14:4
16:19 30:18
36:16 46:9
52:10,13
59:18 60:10
63:22 69:25
72:12 80:12
87:6,10
94:14
116:10,11
117:15
129:16,17
138:8 140:8
**believed**
30:10,25
**belongs**
80:13
**below**
21:10
**best**
10:11 12:12,
16 13:10
14:19 73:10
77:19,22
78:11,14
101:16
**better**
16:12 60:18
61:14
**big**
20:15 21:7

**Bigham**
16:21
**bill**
30:13,17,19,
25 128:9,14,
21 130:18,23
136:25
137:4,16
140:2
**Bingham**
4:10,16
**bit**
27:22 48:22
116:17
**black**
23:10 37:7
**blah**
101:12,13
**Blasingame**
5:8 11:3
12:9 15:6,23
18:19 23:11,
12,15,16,19,
21,22 37:9
39:2 40:1
42:13 43:10
44:7,17
46:24,25
47:25 48:1
69:7 76:11
91:9 92:4
99:5 113:17,
19 114:17
123:14
131:5,7,15
132:3,8
133:2
**blind-sided**
33:16
**blood**
53:15 70:5
**blunt**
69:8
**Board**
4:3
**body**
27:7,8,10

28:4,8,13
31:13 47:16,
21 70:21,24
71:22 72:16,
24,25 73:16
75:21 82:13
109:14,16
**book**
77:6
**bottom**
22:15 26:23,
24 58:18
62:3,11
78:19 79:7,8
80:10 81:15
85:21 90:2
93:24 98:3,6
107:21,24
110:4
**box**
58:18 86:5
108:13
**boy**
112:7 118:14
**break**
37:23 63:10
84:17 131:21
**Brian**
16:22 90:3
**bridge**
39:6
**brief**
34:21 42:20
88:17 115:11
126:9 140:20
**briefing**
19:24 26:7
72:4,7
**briefly**
91:13 114:12
**bring**
97:9 135:8,
11
**broke**
27:22 48:22
132:10

**buffering**
27:8,11,19
28:2 72:3,
10,12,20
109:17
**Bureau**
6:5 20:4
**business**
79:10
**Butler**
99:2
**BW**
21:11

---

**C**

**C-3**
113:11
**C-4**
113:11
**C-A-D**
32:17 76:10
**C-O-R-T-E-Z**
103:12
**c-r-o-s-s**
7:14
**CAD**
32:17 76:10
**CAD-RELATED**
76:16
**call**
6:6,18 16:7,
15 19:3,9
22:7 24:7
34:12 76:17
91:9 103:21
104:22
**called**
39:20
**camera**
27:8,10,19
28:1,17
31:13 47:16,
19,21 52:17
70:21,24,25
71:22 72:16,
25 73:16

75:12 81:1
82:3,13
109:14,16
**cameras**
27:7 28:4,8,
13 72:14
75:21
**capture**
72:23
**captured**
73:15
**car**
39:23 41:1,
18
**care**
68:19 91:15
105:6
**carpet**
89:3,4
**carry**
10:2
**cartridge**
52:20 55:21,
23 60:12,14,
23 61:15
65:22 82:22
83:7,8,11
139:8
**cartridges**
55:21 65:24
**case**
5:15 12:24
15:4,22 17:9
19:4,24
22:3,4 25:1
26:7 27:17
41:7 43:18,
24 71:3,4,6,
7 72:4,6
73:25 74:9,
10,18,19
81:16,23
90:8 101:8,
18 116:23,
24,25 117:1
118:19,21
119:3,7,15,
25 120:5,10,

13,22 121:2,
9,15 122:3,
16,18,20
123:20 124:1
125:16
126:9,20
134:6,7
135:7,19,21
136:16
**cases**
11:15 16:11
33:2,3 121:5
**casing**
64:20
**caused**
43:5 113:16
**causing**
109:25
**CD**
70:23
**CDS**
71:5
**cement**
23:21 25:13
39:17 44:2
58:17
**certainly**
26:12 28:13
29:18 73:9,
22
**certification**
90:22,25
91:2
**certified**
4:6 9:2
**cervical**
69:9
**cetera**
99:3
**CEW**
77:20
109:21,22
**change**
69:1 119:18
**changed**
92:14 102:17

Steve McCallum
February 08, 2021

charge
  16:8,10,18,
  21,22 34:13
  90:3
charges
  34:4,8
charts
  113:8
check
  89:11 91:15
  115:1
checked
  66:25 91:3,
  18 92:19
  108:13
checking
  17:1,3
chronological
  117:19
  118:14
CIA
  99:2
citation
  34:4 79:23,
  24 80:4,13
citations
  34:8 76:11
  77:7 79:4
  80:11,16
city
  5:22 15:17
  104:14
  123:20,25
  125:7
civil
  5:3,15 12:24
  13:4,11,14
claim
  108:18
clarification
  55:3
clear
  54:25 132:25
clearly
  87:1 138:23
click
  59:8

clicking
  59:1 110:20
client
  24:17,21
  25:5,8,12,
  17,21 26:1,
  5,6,20 30:19
  31:9 34:10,
  16 35:1,19
  38:11,18
  39:23 40:24
  41:23 42:2
  43:4,12
  44:1,24
  47:6,9 63:1
  67:1,6,14
  68:1 73:1,9,
  11 102:13
  109:3 113:10
  136:17,18,20
  137:1 138:24
client's
  41:10 69:13
  70:4
clip
  54:18
clips
  57:14
clock
  83:3
close
  61:1 122:16
closed
  122:3,15,18,
  20,21
closes
  122:14
closeup
  66:11
closing
  122:12
clothes
  64:15
clothing
  53:15
collect
  65:11

collected
  66:15 82:5
collecting
  52:14
college
  8:8,12,18
column
  85:22 86:1
combine
  7:1
come
  46:14 58:7
  60:12 62:18
  65:23 73:20
  84:19 99:25
  100:2 114:24
  115:9 117:20
  138:5
comes
  107:17
  108:24
comfortable
  40:15
complete
  127:23
  134:12,15
  135:1,16,18,
  25 136:6,10
completed
  80:15 107:8,
  13,20 110:9
  127:14
completely
  72:20
completes
  107:7
computer
  5:10 32:18
  61:6 87:5
  129:8
computer's
  61:22
concern
  85:9
concluded
  140:25

conclusion
  100:1,3
conclusions
  46:15
concrete
  109:25
condition
  23:23 69:1
  91:20 92:11,
  14,17 113:4
  114:3
conduct
  12:21 13:9
  15:12 17:8
  18:12 83:4
  125:14,15
conducted
  13:14 76:12
  77:13
conducting
  23:1 50:9
  108:8 109:21
  125:18,20
conferred
  59:7 78:17
  80:21 85:20,
  24 88:24
  94:6,20
  96:24 100:7
  110:16
  112:1,22
  116:13 118:3
confirmed
  31:8
confusion
  63:24
conscious
  92:1
considered
  51:12 74:7
consistent
  41:2,6 44:2,
  4 136:20,23
contact
  34:16
  109:23,25
  121:25

123:19
124:17,19
**contacted**
 4:9 17:7,8
 90:21 102:10
 118:16
 120:21
 123:18
**contained**
 70:24 103:14
 117:12
**container**
 75:15
**continual**
 10:9
**continue**
 134:15
**continuously**
 135:8
**contract**
 4:12
**contractor**
 4:7
**contrary**
 25:1 27:21
**contributed**
 43:5
**controlled**
 23:12
**conversation**
 35:11,14
 115:12
 127:24
**Cool**
 21:9 22:6
 29:23
**cop**
 35:19
**copy**
 20:5 33:7
 34:3 76:9,
 10,12 84:14
 106:8
**corner**
 110:24

**correct**
 5:18 6:11
 7:15 9:14
 11:2,7 12:11
 15:9,25
 16:1,5,6,11
 17:12 18:10,
 13,14,16,17,
 21 19:13,14,
 17 22:11,19,
 25 24:15
 25:3,14,15
 26:10,21
 27:4,5 28:3,
 15,18,19,23
 29:7,22
 30:12 31:3,
 11,13,14,20
 32:7,8,22,25
 33:19 35:10
 36:8,9,10,11
 37:2,9,15,
 18,19 38:19,
 23 39:5,8,
 18,24,25
 41:7,8,19,
 20,23,24
 42:14 43:8,
 13 46:13,17
 47:2,20
 49:25 50:1,6
 51:21 52:5,
 6,18,19
 53:1,2,20,22
 54:10 55:15,
 16,23 56:4,
 5,9,16,17
 57:1,2 58:4,
 9,12,13
 60:17 61:22
 62:13 63:5,6
 65:6,8,9,19
 66:6,9 67:4,
 5,15,18
 68:20 69:11
 70:7,11,12,
 17,25 71:1
 72:10,18
 75:11,15,16,

19,23 76:3,
 14,20 77:14,
 15,17 78:10
 79:1,11,12,
 19,25 80:2,9
 81:2 82:7,12
 84:12 85:17
 86:2,3,10,
 13,18,22
 87:15,19,21
 88:2,6 91:1,
 11,17,21,24
 92:5,9,15
 93:16,19,20
 94:2,12,18,
 25 95:1,4,5,
 17 96:13
 97:15,22,25
 98:7,18
 99:8,14,21,
 22 101:11,
 14,21
 102:12,15,
 19,25 103:6,
 7,13,15
 105:8 106:9,
 14,17,23
 109:1,10,11
 110:2,25
 111:1,7,11,
 14 113:5,9,
 12,14,18,24
 114:18,19
 115:7,15
 117:14,23
 118:24,25
 119:21
 120:24
 121:1,4,18,
 21,22 122:2,
 6,9,13 123:8
 125:8,9,13
 126:5,21
 127:1,3,18,
 19,21,22,25
 128:1,4,5,8,
 11,15,17,19,
 20 132:22
 133:3,5,6,8,

9,14,15,16,
 20 134:3,10
 136:4 137:2,
 3,15,17,20
 138:3,4,6,
 10,18,25
 139:4,11,14
**correctly**
 23:25 99:7
**Cortez**
 103:11
**Council**
 4:4
**counsel**
 5:21 17:2
 40:8 124:6
**count**
 56:12 57:6
 116:11
**county**
 7:25 8:2,3
 117:11
 118:17
 123:21
 125:10,25
**couple**
 115:10
**course**
 6:18 28:24
 79:6 80:8
 86:14 109:21
 121:7
**court**
 4:1,3,6,10
 5:23 38:3
**courtroom**
 5:17
**create**
 32:12
**created**
 104:13
 107:13
**crime**
 9:6,8 13:6
 15:16 29:8,
 15,16 30:7,
 17,21 33:17,

20,22 34:1
65:13 93:13,
23 94:10
96:22 97:3,
23,24 130:13
133:13 137:2
139:24
**criminal**
8:15 12:19,
20,23 13:5
23:2 50:9
51:4 99:2,4
100:4,12
**critical**
23:23 92:17
**current**
118:18
**custody**
67:6,10,14,
17,20 68:3,
11,14,15
91:23
113:23,25
114:5 131:5,
7,10,13,15,
18,19 132:3,
8,11,15,19
133:2 134:1
136:17
137:8,12,24
**cut**
6:3
**cycle**
52:4,9 53:1
**Cynthia**
16:19,20

---

**D**

---

**D.A.**
121:10,20,24
**D.a.'s**
15:15 119:6,
8 122:11
123:21
**D.a.s**
122:14

**dash**
23:13 47:19
**data**
29:13 49:7,
13,14 75:13
81:21 82:15
**date**
32:13 59:13
75:8 78:8
83:17 96:2
122:19
134:6,9
**dates**
13:23
**day**
19:5 22:8
39:13 44:3
46:22,23
48:9 57:25
72:16 76:8
82:17 90:11
91:18 92:15,
19 93:21
98:10 99:1
113:21
140:24
**daylight**
95:19
**days**
111:15,21
113:13
**de-escalate**
108:12
**DEA**
121:5
**deadly**
33:6
**deal**
21:7
**dealing**
46:4
**December**
77:17 89:25
**decided**
51:8
**decision**
43:5 122:7

**declines**
51:1
**defense**
124:1
**degree**
8:9,14
**department**
7:7,14,20,23
8:4 9:4
11:11,25
13:13,21
14:22 18:12
19:25 29:6
33:3 68:3
101:25
103:11,25
104:14,25
105:14,17
107:10
112:11
125:21,25
131:2 133:17
137:2
**department's**
105:18 107:5
**departments**
32:12 51:14
**depends**
14:22 65:22
**deployed**
23:17 26:19
52:4 60:13
87:17 89:12
109:23
**deployment**
64:6 83:12
**deposition**
4:1,11,12,25
5:12,13
43:19 48:10
109:3,13
136:16
140:25
**describe**
48:24 108:13
111:17
**described**

37:6
**describing**
61:16
**description**
97:7,20
**design**
15:8
**designed**
83:5
**detail**
32:17,19
127:8,11
**details**
43:17 81:19
99:5
**detective**
6:14 87:10
**determination**
15:15 131:6
132:21,23
133:1,10,13
134:19
**determines**
134:11
**determining**
133:18
**Detroit**
19:18
**development**
112:11
**diagram**
47:24 48:3
49:4
**differ**
13:18
**difference**
12:24
**different**
34:22 36:25
65:23 71:5
81:21 129:21
133:7
**differently**
46:8
**difficulties**
88:13

direction
  43:16 48:1
directly
  22:5 40:1
  43:25 67:17
director
  90:21
disclosure
  4:5
discuss
  15:4 34:6,7
  51:7 134:4
discussed
  95:3 119:21
  131:10
discussion
  38:16 63:16
  64:21
disk
  100:20
dispatch
  32:19
dispatch-
related
  76:18
disposition
  109:13
distance
  65:14
District
  117:1,11
  118:17,20
  120:22 126:1
  133:12
division
  90:22
doctor
  69:1,3 92:13
document
  17:16 18:9
  19:20 20:2
  32:3 48:12
  49:5 53:18
  69:5 74:13
  87:18,25
  89:20 98:9
  104:6,7,21

  107:4,20,25
  108:7,11
  109:11,22
  110:7,14,23
  116:3 117:5,
  9,10 118:24
  119:1 120:17
  122:8,10
  139:25
documentation
  112:15
documented
  30:22 58:11
  71:25 74:9
  95:3 137:19
  140:4
documenting
  66:4 83:10,
  11
documents
  17:14 20:20
  32:7 57:25
  76:9 89:21
  117:15 120:4
doing
  7:5 9:5 67:3
  89:10 96:5
  102:10
dollar
  30:13,17,19,
  25 128:9,14,
  21 130:17,
  18,23 137:4,
  16 140:2
door
  67:12
dot
  54:17
double
  86:6,9
download
  32:7 52:8
downloading
  29:4,13
  52:18 128:25
draw
  133:21

drew
  47:24
dripping
  53:15
drive
  81:20
driver's
  99:4
drives
  39:12
drove
  44:5
due
  113:11
duly
  4:22
duration
  87:18,25
duties
  10:19 11:8
duty
  9:17,18

———————————————

          E

E-10
  105:21
E-L-L-I-S
  82:1
e-mail
  103:11
  106:21 112:6
  117:11 118:5
E-R-V-I-N
  93:18
E.R.
  63:11
earlier
  27:20 128:9
  131:14
eastbound
  101:23
effect
  77:20 78:13
effective
  77:16 78:8

eight
  96:7 119:25
either
  20:2 130:8
  133:21
elbow
  34:15
electric
  77:13
electrical
  58:18 76:12
  109:21
Ellis
  81:5 82:1
  83:6 87:6
  89:1
embankment
  109:24
employed
  6:2,4,16
  7:3,6 125:7,
  10
employer
  125:12
empty
  59:3
EMS
  72:25 105:7
  117:12,22
  120:4,7
encounter
  53:9
end
  23:21 45:11
  61:6 63:24
enforcement
  79:18
Engine
  105:21
ensure
  75:13 82:14
  83:3
entering
  26:20
entire
  54:21

entitled
 20:1 103:20
equipment
 129:17
equipment's
 130:10
Ervin
 93:17
essence
 18:11,20
 25:22 50:12
essentially
 24:19,23
 36:19 41:20
 42:20 44:20
estimate
 11:16 14:2
et
 99:3
event
 27:11,15
 37:17 50:8
 56:8
events
 27:4,9
eventually
 39:8
everybody
 37:25 56:21
 63:15
evidence
 5:2 25:1
 28:23,24
 29:15,18,19,
 22 30:7
 58:11 66:21
 67:15 73:10
 75:14 84:9
 137:9,13
exact
 7:9 35:14
 42:5 107:10
 122:19
exactly
 15:21 32:20
 35:16 40:24
 44:8,18

45:18 46:19
 61:24 72:22
 122:19 126:8
 135:5
EXAMINATION
 5:4 125:4
 136:13
examined
 4:22
excuse
 26:23 29:21
 34:6 79:7
execute
 132:11
executive
 90:6,8
exhausted
 127:5,7,8
exhibit
 17:23 18:2,
 6,7 19:16,20
 20:14,15,23
 21:16,18,21
 22:15 31:22,
 23 35:24
 36:2 38:7
 47:13 48:5,
 11,14,17,19,
 23 49:6,17,
 19 54:5
 55:5,7,13,19
 56:2,14,24
 57:10,22,24
 58:7,21 59:9
 60:3 75:5,7,
 8 76:5,7
 77:11 80:22,
 24 81:3
 83:14,15
 84:2,6 85:4
 88:8 89:15,
 16 90:16,18
 91:6,8
 92:21,23
 93:10,12
 94:7 95:12,
 15,22,24
 96:21 97:5,

12,19 98:23
 99:1,18
 100:8,9,14,
 16 102:7,9,
 21,23 103:8,
 10,19 104:5,
 20 105:5,11
 106:2,4,18,
 20 107:2
 110:18
 112:2,3,24,
 25 113:2
 116:9,15
 117:5,17
 118:12
 119:1,20
exhibits
 17:21 49:3,8
 54:14
existed
 24:8
expect
 31:1 34:17
 35:2 137:21,
 24
expected
 35:8
experience
 111:16
experienced
 73:7,18 74:1
explain
 27:15 132:1,
 2
explained
 91:13
explanation
 27:14
eyewitnesses
 28:22

_____

F

_____

face
 44:25 69:8
 70:4,5,11,16

fact
 6:21 18:23,
 24 21:5
 42:25 64:4
 71:22 126:14
 137:11
fact-finders
 15:12
factor
 15:4
facts
 126:17,23,25
 133:5,7,22
 134:16,19,25
fair
 35:7,18
 50:24
 126:13,22
falling
 25:22
familiar
 5:16 24:5,6,
 11 27:13
 65:25 72:13
family
 69:16 114:12
far
 32:19 47:8
 53:10 61:24
 85:22
 108:16,17
Farms
 4:10,16
fat
 20:16
fate
 20:18
federal
 5:2 16:3
feel
 40:15
feet
 65:15,23
 93:25 98:5
fell
 25:17,21
 42:13 43:10,

Steve McCallum
February 08, 2021

12 44:1
64:15 113:17
114:15 137:1
**figured**
30:6
**file**
33:8,12
36:12 43:18
71:3,6,7
74:10,19
92:25 93:4,8
94:23 99:12
100:25 101:8
102:24 103:5
106:8 116:24
118:11 121:8
122:12,14,20
123:7
**filed**
30:11
**files**
101:2 129:3
**find**
45:23 60:20
61:24 62:14
92:7 96:15
124:16
126:16,24
**finding**
133:4
**fine**
20:21
**finish**
132:24
**fire**
7:20,23 8:4,
20,21 101:25
103:11,25
104:14,22,25
105:14,18
**firearm**
9:18,21
10:22 56:7,
10,12,16
64:19,20
**firefighter-
paramedic**

8:1
**firing**
47:9
**firm**
4:11
**first**
4:22 8:20,21
17:10,13,16,
17,18 18:1,7
19:21 20:2,
14 21:22
23:21 25:12
27:6 47:24
59:1 76:15
77:13 79:6
86:10 89:8,
21 90:11
94:9 96:25
101:19
103:20 111:8
132:2
**five**
6:9 14:17
57:6 87:18
111:15
119:24
**Five-ish**
14:11
**five-minute**
84:17
**five-second**
52:4,9 53:1
87:25
**fled**
23:13
**flee**
80:7 114:4
**fleeing**
26:1,6
**focus**
46:8
**foliage**
62:5
**folks**
10:2,11
28:4,20 30:9
37:21 69:19

73:1 124:1,
15
**followed**
23:16 25:5
102:16
**following**
4:4 21:17
103:1
**follows**
4:16,23
**foot**
23:13,15
41:19 80:7
**footage**
109:18
**force**
11:10,24
12:13 13:12,
19,25 14:7,
24,25 15:10,
13 18:13
32:23 33:5,6
69:8 76:12
78:8,13
106:22,25
107:5,8,12
108:11 121:4
132:12 135:4
**forgive**
20:20 65:17
130:16
**form**
40:11 67:23
68:4 81:19
**formal**
15:24
**format**
5:13
**forth**
12:6 57:1
76:18 85:15
87:4 90:25
99:20 103:23
108:1 109:10
**found**
65:7 99:24
128:11

138:7,16
139:23 140:1
**four**
8:6 35:24
42:11 47:15
52:3 55:9
101:24
102:1,3
111:21
**four-year**
8:9
**fractures**
69:9
**frame**
86:24
**Franklin**
106:7
**front**
17:21 114:5
**front-on**
70:11
**froze**
87:6
**full**
27:6 38:9
70:11
**fully**
91:3 114:17
**Fulton**
117:11
118:16
123:21
125:10,25
**functioned**
83:5
**functioning**
88:14
**funny**
59:22

---

**G**

**G-O-R-D-I-N**
113:7
**games**
45:5

**Garrity**
51:12,13,16,
18,21,23,25
**gather**
126:25
134:19,25
**gathering**
126:15
134:15
**gave**
28:11 83:7
91:19
**GBI**
6:6,8,25 7:3
10:1,7,11,
18,20 11:1,
5,8 12:6
13:5 14:3,25
16:8 18:11
50:8 125:17
**GBI'S**
15:5
**gear**
10:1
**gee**
119:24
**general**
5:12 6:12
9:7 26:7
34:20 36:15
64:16 107:9
134:1
**generally**
24:5 26:10
27:13 131:12
**generate**
22:2
**generated**
82:24
**gentlemen**
62:25 65:18
**Georgia**
4:4,6 6:5,
16,22 7:16,
17 8:12 20:4
99:4 100:13
125:12

**getting**
27:14 33:15
75:9 82:6
126:9 129:10
**give**
11:16 14:23
15:1 27:25
36:15 37:21
47:6 50:4
51:1 64:21
101:17
128:23
136:22
**given**
5:13 42:1
81:21 111:23
**giving**
22:17 24:13
47:9 121:15
131:8
**Glad**
89:13
**Glock**
53:5
**goes**
15:20 66:24
90:18
**going**
14:22 15:1,3
17:23,24
18:2 33:13
35:20 37:4
40:7,14,16
42:11 46:5
51:14 54:20,
21 55:4
61:16 71:20
73:15 78:1
79:3,14
84:13 85:2,7
86:5 95:8,
14,21 98:19,
25 101:13,17
104:17,24
105:18
114:25
116:19,25
118:10,12

119:3,4,17
120:8
124:12,18
131:11
132:11
**good**
8:15 17:1
20:12,22
26:3 83:17,
25 118:13
125:3 140:24
**Gordin**
113:6
**gore**
39:12,13,20
**grade**
62:20,21
**Grady**
23:22 67:4
91:14 98:19
116:6
117:12,22
120:4,7
**grand**
122:4
**gray**
37:8
**greatly**
124:3
**Greg**
117:12
118:17
120:21
121:17
**ground**
30:9,14
65:14 137:22
**Grubbs**
18:18 22:13
23:15,17
24:16 25:5,
8,24 26:2,6,
16,19 27:7,
17,18 28:1,7
32:10 39:22
41:18,23
42:12,16,18

43:1,7,9,25
44:5,6,8,13,
16,17 45:10,
18 46:19
47:5,9,21
49:24 50:4,7
52:3,13
53:5,25 55:9
63:1 72:9,
11,15,24
74:23 80:12
98:16 100:12
101:9,22,24
102:11
108:14,20,25
109:6 111:6,
10,20 112:19
123:9 131:11
136:15
**Grubbs'**
27:8 29:3,12
33:11 52:15
55:15 70:25
74:15 99:10
**Grubbs's**
33:7 70:24
71:22 84:11
90:25 92:25
102:24 103:4
106:8
**Grubs**
23:10
**guarded**
113:23
**guardrail**
23:16 25:5,
10 60:7
61:2,20
62:12 63:2
65:15,17
**guess**
15:3 28:6
40:10 72:15
81:19
**guessed**
8:16
**guessing**
58:7

guide
  43:16 135:5
guy
  54:24
guys
  19:18
Gwinnett
  7:25 8:3

------

**H**

hair
  37:8
hand
  4:20
handcuffed
  113:25
handful
  14:10
handwriting
  21:10
handwritten
  79:23
happen
  32:20
  101:16,17
happened
  23:4 26:10
  35:13 64:11
  89:8 101:18
  113:19,21
  114:14
  115:14,17
  126:10,18
  137:18
Happy
  27:24
hard
  62:1,21
  69:19 71:5,7
  92:10 122:20
  124:12
HDT
  21:11
head
  23:21 25:12
  42:13 43:10

44:2 67:21
  70:4 109:24,
  25 114:15
  139:21
hear
  43:6 68:6
  72:24 108:21
  125:1
heard
  5:20 74:23
  75:22 108:17
hearing
  47:5 73:19,
  21
heart
  19:19
heck
  96:15
held
  63:16
help
  19:1 60:19,
  25 89:21
  129:4
Herman
  119:5,16
highlighted
  37:13
highly
  26:13 46:3
highway
  23:12
Hill
  98:19
history
  99:2,5
  100:4,12
hit
  27:18 42:13
  43:10 44:1,
  25
hold
  16:24 48:25
  52:10 104:7
honest
  33:3

hospital
  23:23 67:4,
  7,8 69:17
  91:14,16
  92:3 98:20
  113:20
  114:4,15
hours
  19:3
hyperlink
  54:18 59:21,
  23 124:21
hyperlinked
  17:25
hyperlinks
  124:21

------

**I**

I-20
  40:2 41:17
  101:22
I-75
  39:6 58:19
I-85
  101:23
i-d-b-y
  90:5
ICU
  68:19
ID
  49:7,13,14
  107:25
idea
  80:15 87:3
  110:9 122:23
  126:9
identificatio
n
  60:11
identified
  23:11 37:9
  53:10 108:14
image
  129:5,7
images
  61:4 96:2

immediately
  23:13 40:2
importance
  112:15
important
  15:4 26:13
  28:13 36:16
  45:1 53:16
  71:23 73:23
  74:2 99:24
  117:20
inadvertent
  83:12 88:10
inadvertently
  82:22 83:6
inches
  65:15 93:25
  98:5
incidences
  14:1 46:7
incident
  14:25 15:13,
  18 18:13,20
  22:9,18
  23:6,8 24:14
  26:25 27:4,9
  28:18,21
  30:10,15
  32:9,12
  44:5,8 46:25
  47:17 49:14
  53:7 58:16
  59:2 67:17
  71:23 72:5,
  7,16 73:22
  76:10,16
  77:21 78:14
  87:20,23
  88:5,10,11
  91:14 93:21
  97:1,3,23
  98:10,21
  101:20 103:2
  104:13,15,
  22,24 106:22
  109:17
  110:20
  111:12,20

112:18
113:21
117:13
123:5,15
127:9,12
128:19 132:7
134:6,9
**include**
128:16 135:9
**included**
98:16 127:20
128:2,14
**includes**
106:13
**Including**
86:20
**inconsistent**
41:2 109:4,9
115:20
**independent**
4:7 12:10
**indicate**
26:19 43:22
**indicating**
62:17
**indication**
135:15,17
136:9
**individual**
33:15 37:7
39:2 66:21
132:13
**individuals**
135:8
**information**
12:18 22:17,
20 23:3
24:17 26:13
27:21 28:1,
14 32:15
33:15 34:18
35:3 43:11,
25 45:1
48:20,23
51:2 52:7
64:21 69:12,
18 73:23,25

75:18 84:9
91:25 92:15
107:16 109:4
118:23
126:19,24
127:4,5,6
128:2,3,13
131:1 135:9,
11 136:5,10
139:5
**informs**
134:14
**initial**
16:23 17:5
18:2 22:7
**initially**
16:8,10 74:6
101:9
**initials**
21:10
**injured**
67:15,19
68:2,15
131:16
**injuries**
18:19 98:12
**injury**
53:15
113:11,16
**instance**
134:8 135:14
**instructs**
125:15
**insurance**
7:6,8
**intensive**
68:19 91:15
**internal**
15:19 33:11
51:18 71:19
82:11 83:3
92:25 93:4,8
99:12 103:5
110:7
122:22,25
**International**
10:13,15

**interpret**
67:18 68:16
131:9
**interpretatio**
**n**
132:13,18
**interrupt**
124:11
**intersection**
46:5
**intertwisted**
24:9,10
**interview**
26:2 36:10
41:10 42:20
43:15 44:21
49:10 51:1
74:21 92:10
102:11
108:20 109:6
114:25 115:2
126:3,6
131:10
**interviewed**
46:6 92:4
114:17
**interviewing**
36:7 126:8,
14
**interviews**
126:7 135:4
**inventory**
31:25
**invest-**
13:25
**investigate**
13:4 14:7,
20,24
**investigated**
11:9 13:25
**investigating**
13:21 34:19
101:12
**investigation**
6:5,25 7:8
11:4,9 12:9,
10,13,17

13:2,5,9,12,
15,18 15:6,
13,18,19,21,
23 16:9,14
17:8,10
18:12 19:13
20:4 23:2
24:3 26:2
50:10 51:4,
16 68:2
71:19,24
90:9 100:3
108:8 118:18
125:14,15,
18,22,24
126:12
127:2,14,20
132:5,18
134:5,9,11,
15 135:1,9,
12,16,25
136:6,10
**investigation**
**'s**
15:14
**investigation**
**s**
7:6 9:8
11:24 12:3,
20 13:19
14:5 15:10
135:5
**investigative**
18:3 20:5
117:3
128:14,16
132:17
**investigator**
6:13 22:22
26:14 71:12
73:8,19 74:1
97:24 106:7
**investigators**
74:6
**involved**
4:18 11:3,10
12:8,13
13:20 22:24

28:21 30:18
53:7 73:21
94:24 124:1
126:19
**involvement**
16:3
**involving**
116:5
**Ish**
14:12
**issue**
51:16,21
53:18
**issued**
76:11
**issuing**
16:4
**items**
75:14 103:4

**J**

**jail**
67:11
**James**
4:6
**January**
121:13
**Jeff**
90:21
**Jenkins**
118:21
**Jerry**
18:19 91:12,
14,15 92:4
99:3 117:8
**Jerry's**
91:9 113:4
**Jesse**
98:19
**Johnson**
4:24 5:5,7
20:13,17,18,
22,25 21:16,
20 31:25
35:25 36:4
37:14,21,25

38:2,5,9,17
40:9,12
47:12,15
48:2,7,16,19
49:17,22
53:3,4 54:3,
6,12,13,15
55:2,6,8,10,
14,17,20,24
56:3,11,15,
18,25 57:4,
8,11,13,24
58:20,23,25
59:1,4,11,
20,25 60:5
61:14 63:10,
15,18,19
67:24 68:5,
12 69:22
70:3,10,15
75:4,8 76:7,
21,23 77:1,
8,12,24,25
78:4,7,18,
21,23,24
79:3,6,13,
16,21,22
80:3,4,24
84:3,8,13,
18,21,24
85:2,6,10,
11,21,25
88:20 89:2,
14,18 90:18
91:8 92:23
93:12 94:4,
9,21 96:1,
20,25 97:6,
9,13,17,20
98:2,4,25
99:19 100:8,
11,16 102:9,
23 103:10,
16,20 104:3,
6,10,12,17,
21 105:2,6,
9,12 106:6,
11,12,20,24
107:3,21,24

108:4,6
110:4,6,14,
19 111:2,4
112:2,5
113:2 116:14
117:25
118:7,9
120:18
124:3,6,8,
10,24 136:14
140:13,24
**join**
9:1
**joined**
10:25
**joining**
10:7
**jointly**
55:4
**Jon**
18:18
**Josh**
81:5 82:1
87:6 89:1
**JPG**
54:17
**judge**
5:19,24
**Judicial**
4:4
**July**
11:4 12:14,
16 18:8
19:22 22:9,
16 36:5
49:22 57:25
66:24 70:19
75:8 76:8
77:21 80:8,
25 86:2,4,6,
15 89:19
90:19 91:8
92:3,23
93:12 94:24
95:18 99:1
102:9
111:12,21
121:19

**jumped**
23:16 25:5
**June**
111:12
**jury**
5:19,24
122:5
**justice**
8:15

**K**

**K-3**
119:11
**K-I-N-D-U**
106:7
**keep**
79:14 97:2
117:18
**Keith**
36:7
**Kendra**
4:6
**kept**
30:11
**kin**
69:17
**kind**
5:22 9:4
10:4 19:5
51:3 62:20
76:18 85:11
88:13 92:10
97:6 100:20
102:4 104:23
105:17 115:1
135:2
**Kindu**
106:7
**knew**
34:21 35:6,8
114:25
**know**
8:16 12:1,14
13:14 14:20
15:11,17,20
16:24 17:2,

Steve McCallum
February 08, 2021

3,18 20:6,
10,19 23:4
26:8 27:12
28:3 29:10
33:14 35:17
39:13 40:20,
21 43:1
49:14 50:7,
9,17,18,19,
20,21 52:8
56:7 58:1
59:22 62:20
64:1,19
65:21 67:13
68:8 69:3
71:7 72:21,
22 81:6,8,11
84:21 86:4
95:10 96:4
102:2,4
107:10,17,
20,25 109:12
110:7,12
111:21
116:6,15,25
117:18
119:17
122:19
124:19
126:10,18
129:22,23
131:12
134:20
135:5,14,22
137:18
138:3,23
139:3,17
**knowledge**
12:12,17
13:10 14:19
77:19,22
78:11,14
101:16
123:16
129:18 134:2
**Kramer**
70:23 71:18
75:10

--------

**L**

--------

**L-A-S-H-A-N-
T-I-S-E**
93:15
**labeled**
54:13 114:4
129:20
**laid**
41:7
**land**
24:8
**landed**
23:21 25:12
138:24
**lane**
39:11
**lanes**
38:22
**large**
118:4
**largest**
23:7
**Lashantise**
93:14
**later-ish**
119:25
**law**
79:18 131:9
132:10,14,18
136:22,23
**lawsuit**
16:3
**lawyers**
73:20 74:7
**leads**
59:19
**learn**
39:12
**learned**
37:16
**leave**
35:20 68:10
130:10
137:21

**led**
26:12 43:1
58:19
**left**
7:19,20
38:23 69:8
70:16 79:7,8
85:22 119:4
121:5 138:15
**legal**
4:8,9,14,15
14:13 131:12
132:9
**legs**
115:19
**length**
65:23 66:2
**lethal**
33:5
**letting**
26:8 81:8
102:4
**license**
99:4 100:13
**Lieutenant**
22:13
**Likewise**
65:7
**line**
9:18 21:11
86:14,19
140:9
**lines**
12:18 47:16
**link**
59:19
**list**
17:23 99:20
**listed**
15:24
**listen**
36:23 42:5,
19,22 43:16,
18 45:6,8
73:6
**listened**
45:12

**listening**
44:11
**literally**
85:12
**litigation**
4:18
**little**
7:19 8:6
27:22 29:17
30:5 45:25
48:22 54:7
61:6 116:17
**live**
5:17
**local**
87:3
**located**
30:21 36:6
60:6 61:16,
19 62:15
63:8 65:2
**location**
24:10 28:17
47:25 58:16
59:2 60:22
64:5 98:21
101:25
**log**
84:2,25
85:7,12
94:22 97:7,8
**logically**
19:15
**long**
6:8 7:11,18
8:4 65:21
111:17
130:21
**look**
11:14,21
17:22 19:15
30:2,4 59:11
62:12 81:22
85:7,22,25
86:19 87:22
122:20
128:23

**looked**
40:1 72:15
92:16 99:10
115:20
**looking**
17:3,5 20:7
37:10 41:25
55:20 60:19
61:3,22
62:10 63:22
66:14 88:20
89:23 92:24
93:13 94:22
104:8 105:20
126:17
129:22,25
135:6
**looks**
8:19 11:7
22:8 48:20,
23 49:17,23
53:4 55:8
57:5 58:2
62:19,21
66:25 70:4,
15,20 75:9
76:8 78:7,
18,24 79:16,
22 80:24,25
82:2 84:9
86:1,6,23
89:2,3,18,20
90:10 91:18,
22 92:24
93:13 94:13
95:6 96:8
97:6,23
98:11,15
100:11,16,17
101:1 102:10
106:6 112:6
113:3,7
114:10
115:10 117:9
118:10
119:11
120:25
121:25 122:1

**lost**
29:17 41:22
57:6
**lot**
14:5 46:3,6
89:20 115:8

---

**M**

**Maddie**
5:9 20:13
**made**
31:19 74:6
98:15 109:24
122:7
**magazine**
57:15,16
**main**
85:9
**make**
4:4 5:11
15:15 27:19
48:7 49:24
50:13 51:9
63:11,25
69:19 78:5
94:23 124:12
130:9 131:6
132:20,22,23
133:1,10,12
134:18
**makes**
14:6 126:11
**making**
86:16 102:13
108:18
109:23
**male**
23:10 37:7
**man**
20:19
**management**
22:3,5 71:4
81:23
**manual**
135:4

**mark**
137:25
**marked**
48:10 60:15
66:20 81:3
137:8
**materials**
10:13,14
**matter**
15:6,23,24
16:5 18:23
19:19 42:25
111:9 123:17
**Mccallum**
4:2,19,21,25
5:6 6:2 9:4
10:12 18:16
19:16 30:22
32:1 35:18
36:6 48:20
58:15 60:5,
21 61:19
63:21 65:2
77:4 82:8
108:7 115:24
124:13
136:15
**mean**
6:12,23
16:10 28:16
33:23 45:7,
13 46:2,3
50:19 62:9
64:13 67:7,
16 73:13
102:1 107:9
113:25
124:11 128:3
131:11 135:3
**meaning**
6:15 13:6,8
127:6 132:9
**means**
14:24 31:25
102:4
**meant**
29:22 40:16
46:15 72:19

**measurement**
62:18 93:23
98:4
**measurements**
29:14,18,25
58:5
**media**
33:14
**medical**
67:11 98:14
114:18
116:5,6
**members**
69:16
**Memorial**
98:19
**memory**
10:12 17:4
123:14
**mentioned**
87:24 128:21
136:3
**met**
22:10
**mic's**
124:11
**Michael**
112:7
**Michaels**
50:15,17,21
102:10
**Michigan**
6:17,18
14:14
**middle**
37:3,6,12
**midnight**
86:7,9,16,
20,21
**military**
86:7 96:5
**Miller**
90:21
**mind**
17:2 46:6
124:13,14

mine
  16:12 59:24
  108:2 129:23
  140:8
minute
  37:22 61:23
  84:16 128:23
Mirandize
  115:4
missed
  53:12 81:12
  119:17
  121:13
mode
  27:8,11,15,
  19 28:2
  72:10,12,20
  109:18
modified
  59:14 96:3
moment
  131:9
  140:17,18
money
  24:22 34:11
  38:11 39:3
month
  111:15
months
  115:10
  119:25
motorist
  30:20
motorists
  34:11
mouth
  73:19
move
  114:15
  115:19,22
multiple
  49:13 58:15
  105:18
multitude
  24:11 135:2

---

N

N-O-R-C-O
  7:14
Nair
  38:4 40:7
  54:13,25
  67:23 68:4,8
  84:17,19
  124:7,9
  125:1,3,5
  129:4,15
  130:7 136:12
  140:17,22
name
  5:7 59:13
  81:25 82:1
  93:18 103:12
narrative
  49:15 111:4
nature
  53:10
navigate
  17:22 18:3
necessary
  127:2 134:25
need
  17:18 38:13
  84:13 97:9
  126:10,18
  128:25
never
  92:14 123:9
night
  19:10 24:14
  50:15 53:25
  94:25 95:3
  96:7 102:16
nights
  19:4
nods
  67:21
Norcross
  7:6,13,21,24
  9:1,3,10,17,
  20

normal
  16:17 111:16
north
  101:23
note
  18:15 71:11
  120:25
noted
  137:8
notes
  71:15
notice
  5:1
November
  120:4,11,18
  122:10
number
  18:6 32:5
  56:3,12,25
  60:13 66:5,
  17,21 79:23
  83:7 103:3
  104:13
  107:25
  116:15,18
numbered
  103:2
numbers
  103:2
numerous
  11:24 53:8
  64:13 93:22
nurse
  113:6,15

---

O

o-r-t-e-r
  93:15
O.C.G.A.
  4:13
oath
  43:24 109:2
  136:16
object
  40:7 66:16
  67:23

objection
  68:4,6
observations
  42:1 71:16
observed
  23:10 24:16
obstruction
  79:17 80:5
obtain
  51:2
obtained
  29:15 30:7
  58:12
obviously
  5:9,16 12:4,
  23 17:14
  18:15 22:7
  24:5,17 27:3
  31:8,13,18
  32:7,24 33:7
  34:3 35:2
  37:16 40:23
  46:24 49:11
  50:4 52:2
  53:14 54:17
  56:6 58:11
  66:4,20
  67:14 72:17
  81:3 86:16
  88:4 94:23,
  24 99:20
  115:13
  122:11
  123:13
  139:12
occur
  15:16
occurred
  13:6 25:4
  34:1,2
  101:20
  127:24
  133:13
October
  11:4 12:14
  119:2 122:1
odd
  45:25 46:9

**offenses**
99:19
**office**
5:8 15:15
82:9 117:1,
12 118:17
119:6,8
120:22
122:11
123:20,22
126:1 133:12
**officer**
18:18 22:13
26:11,12
29:2,6,12
32:3,10
33:14 34:14,
17,19 35:1
48:21 50:25
51:2 53:5,7,
25 55:9,15
63:1 67:12
79:9 80:7,12
82:9 90:22,
25 91:2
98:16 99:10
107:13
108:12,14,
19,24 111:6,
9 112:10,19
114:5,7
126:3,14,23
127:15,25
136:15
**officer's**
51:6
**officers**
22:23 23:13
24:21 30:18
46:6 79:18
124:14
**offices**
4:9
**official**
120:25
**officially**
123:5

**okay**
5:16,24 6:17
10:18 11:8
12:22 13:10,
16 15:3,17,
22 17:13
18:5,7,22
19:19 20:8
21:6,15,20
22:6,15 23:5
24:13 29:23
30:17 31:7
32:21,23
33:7 35:7
38:1,2,21,
24,25 39:9,
21 40:9,19
41:9 42:7
43:9,21
44:11 45:12,
21 46:14
49:5,21
50:19 51:6
52:2,15
53:11,24
54:11 56:20
57:4,16,18
59:17 60:1,
15 62:7,16,
23 63:7,12,
24 64:4
65:1,7,13,17
66:3,18 68:9
69:7 72:1,9
73:4,7 74:5,
11,20 75:24
76:22 78:5,
18,21,23
80:19 81:16
82:2,15,20,
25 83:9,21
85:10 86:12,
23 87:9,13,
24 88:7
89:5,13,19
90:10,15
92:23 93:5
94:15 95:8
96:10 98:22

100:5 101:3,
7,19 102:5
104:16
105:1,9,19
106:21
107:16 108:4
109:2 110:9,
12 111:8
114:9 115:3
116:14,17
117:16,21,24
119:9 121:7
122:10,22
124:10 125:3
128:24
129:6,12,19,
24 130:3,12,
14,19,23
131:14
132:20 134:4
136:24
138:2,11,15
139:19
140:10,22
**on-call**
19:3
**on-ramp**
23:11 58:19
101:23
**on-ramps**
23:17
**once**
50:25 85:12
122:14
**one**
7:1 13:22,24
17:7 19:23
20:16 23:18
24:20 34:20
37:21 42:11
48:8,9,20
52:2,4,8,11,
20 53:1
55:22 56:19
57:4,5 59:4,
24 60:6
61:9,10,19
63:22 65:25

66:13,14
77:5,9 79:6
80:4,11
81:20 83:22
85:1 86:10
89:20,23
90:13 93:2
97:2 100:21
103:2,3,20
104:24 109:3
114:13
116:3,7,11
117:14
118:15
121:13
128:23
138:3,7,13,
16 140:17
**one's**
118:10
**one-dollar**
136:25
**open**
105:16
124:17
135:22
**opening**
61:4
**operation**
85:13
**opinion**
14:23 15:1
71:13 74:4,5
101:18
111:18
131:8,17,20,
21 132:3,9
133:22 134:1
136:22,23
137:23 138:1
**opinions**
15:7,9,24
16:4
**opportunity**
130:19
**opposed**
64:8

OPS
  82:9
order
  9:1 17:24
  27:18
orders
  47:6
organized
  17:20
outside
  10:22 133:22
overlap
  12:5
overview
  36:15,24,25

P

p.m.
  18:8 19:2,9,
  23 22:8,16
  36:5 49:23
  58:1 66:25
  70:20 75:9
  86:24 87:13,
  17 90:21
  93:22 95:9,
  16 96:9
  101:4,20
  117:10
pad
  23:21 25:13
  58:17
page
  17:10,13,18
  19:21 20:14
  21:22,24
  22:16 26:23,
  24 27:6
  31:22,23
  37:3,20
  38:6,7 42:11
  47:12,13
  53:3 60:2
  61:17 66:3,
  7,24 78:4
  85:7,22

87:16 96:25
97:2 103:1
115:25 116:1
pages
  21:17 35:24
  78:1,19
pandering
  34:12
paragraph
  17:17 19:22
  23:8,25 27:6
  37:6,11,12
  38:10 39:21
  42:1 47:15
  66:3 83:2
  98:6 101:3
  110:5
paragraphs
  31:8 42:12
  52:3
paramedic
  8:5,23,24
pardon
  11:4 37:8
  75:10 78:12
  100:17
paren
  101:24
parole
  99:6
part
  10:1,10,19
  11:8 12:17
  15:7,19
  36:12 58:23
  68:2 75:18,
  25 94:23
  115:23 123:1
particular
  9:5 13:17
  33:5,16
  54:22 59:19
  66:21 71:11
  72:13 99:23
  123:5
parties
  4:18

party
  16:4
past
  99:19
path
  23:16,18,20,
  22 25:6
  58:18 60:6,7
  61:20,21,25
  62:3,5,22
  63:3,5,9
  65:3 93:24
pathway
  64:7,11
patient
  105:6
patrol
  9:6,8 27:1
  47:19,25
Paul
  93:15
pause
  88:17 140:20
pavement
  39:19
PD
  7:21 9:20
peace
  90:22
pedestrian
  79:10 80:1
pencil
  139:21
pending
  121:20
people
  32:3 34:12
  49:13 99:25
perceive
  46:7
perfect
  101:15
perform
  13:11
performing
  83:5

permissible
  5:1
person
  16:5,8 38:22
  53:13 103:3
  108:19
personally
  50:18 76:13
  123:10,13
  124:16
personnel
  33:11 99:12
  102:24 103:5
  105:24
perspective
  94:15
pertaining
  33:25 49:11
pertains
  15:22 16:14
  109:14
Peter
  113:6
phone
  91:9
photo
  53:12 55:11,
  15,17 56:4,
  10 70:15
  97:7,8
  129:15,16,
  17,18 130:3,
  8 137:2
  139:15
photograph
  53:5,6 54:4
  55:12,18
  56:1,23 57:9
  62:2,5,11,16
  64:14 66:10,
  14 70:1,8,13
  98:20
  129:13,21
  130:4,5,13,
  17 139:18
photographs
  29:14,18

56:13 58:3,
5,15 59:2
61:12 62:1
69:22,25
93:17,22
94:10,13,16
96:8 98:15
129:22
130:1,2,18,
20,24 136:25
138:12

**photos**
52:15 54:16,
22 55:9,24
59:12,15,23
60:19,20
63:19,20
95:2,7 96:2,
6,12,16
97:7,13
128:22 138:2
139:24 140:5

**physical**
28:24 29:19,
22 34:16
71:7 137:13

**physically**
35:1 62:4

**physician**
69:13

**picture**
53:24 54:3,6
61:23 70:3,
10

**pictures**
33:17 62:21
66:8 69:15
124:15
128:18

**pillow**
70:5

**placard**
60:7,16,20
61:16,21
62:4,6,9,12
63:20,23
65:4 139:10
140:7,8

**place**
62:19 64:7

**plaintiff's**
20:23 21:18
31:23 36:2
38:7,15
47:13 48:5,
14,17 49:19
54:5 55:13,
19 56:2,14,
24 57:10,22
59:6 75:5
76:5 77:10
78:16 80:20,
22 84:6
85:4,19,23
88:23 89:16
90:16 91:6
92:21 93:10
94:5,7,19
95:24 96:23
97:4,11,18
98:23 99:17
100:6,9,14
102:7,21
103:8,18
104:4,19
105:4,10
106:4,18
107:1
110:15,17
111:25
112:3,21,23,
25 116:12
118:2

**play**
45:5

**played**
56:7

**please**
4:19 8:11
12:25 16:16
21:16 23:8
31:22 32:1
37:23 38:6
47:12 48:2,
10,21 53:3
54:3,24

55:25 56:12
58:20 59:5
60:1 63:11
68:5 69:23
75:4 77:24
78:4 79:5,14
84:4,15,16,
22 89:15
96:21 97:2
98:3 99:1,16
100:8 103:17
104:3,10,18
105:3 106:25
108:13 110:5
111:2 112:2
118:1 120:19
124:15
140:18

**point**
11:19 25:24
26:3 27:25
34:18 35:16
47:5 50:5
51:9,23
52:13 62:25
80:17 119:4
132:4,7
138:16 139:1

**police**
6:17,19 7:7,
13,22 9:3
11:10,25
13:13,20
18:12 19:25
29:5 32:12,
24 34:14
40:6 53:8
68:3 91:1
107:5,10
108:14
125:20,25
131:2 132:10
133:17 137:2

**policies**
32:23 33:4
77:6

**policing**
6:21 8:25

**policy**
76:13 77:13,
20 78:7

**Porter**
93:15

**portion**
23:24

**poss-**
87:20

**possession**
29:3,12

**possible**
64:9 115:2
136:7

**POST**
9:2 91:1

**potential**
23:2

**potentially**
34:7 69:9

**presented**
20:24 21:19
31:24 36:3
38:8 47:14
48:6,15,18
49:20 54:5
55:13,19
56:2,14,24
57:10,23
58:22 59:10
60:4 70:2,9,
14 75:6 76:6
77:11 80:23
84:7 85:5
89:17 90:17
91:7 92:22
93:11 94:8
95:25 97:5,
12,19 98:24
99:18
100:10,15
102:8,22
103:9,19
104:5,20
105:5,11
106:5,19
107:2 110:18
112:4,24

113:1 118:6
120:17 122:4
129:14 130:6
**presumably**
17:15
**pretty**
23:7 69:19
70:10 74:2
82:16 90:10
118:4
**previous**
82:17
**previously**
82:5,8
**print**
54:21 84:14
85:12
**printing**
97:1
**printout**
20:7 76:18
81:14 84:10
96:12
**prints**
85:14
**prior**
7:7 33:14
43:19
**probably**
24:5 30:5
85:13 87:20
90:24 95:18
96:4 105:7
118:4
**probes**
52:4 138:19,
20,22,23,24
139:6
**problem**
81:8 88:22
116:22
121:15 124:5
140:19
**procedure**
5:3 16:17
**procedures**
32:23 33:4

77:6 107:10
**proceedings**
88:18 140:21
**process**
29:3,13
52:18 90:25
**processed**
29:8
**processing**
34:1
**Profe-**
82:9
**professional**
82:9 112:11
**professionall
y**
50:19
**programs**
72:13
**prohibited**
4:12
**promise**
37:4
**prongs**
109:22
**property**
76:1 81:4
**prosecution**
12:19
**prosecutor**
122:4
**proves**
87:25
**provide**
4:10,15
133:23
**provided**
127:4 131:1
**public**
99:3
**pulling**
60:20 112:8
**punch**
34:15
**purpose**
9:21 43:14

136:19
**purposes**
5:1 90:14
126:14
**pursuant**
4:2,25
**pursue**
39:23
**pursued**
23:15
**pursuing**
41:19
**put**
17:24 20:14,
25 35:22,25
45:2,9 48:2
49:18 66:16
75:13 79:13
84:24 85:2,
13 93:5
117:16
118:11,12
139:9

---

## Q

**quadriplegic**
113:10
115:21
**question**
16:12 21:7
38:13 40:13
45:19,23
46:10 61:13
68:7,10
73:13,14
74:13,17
78:11 123:22
124:12
131:4,12,15
132:9,24
134:21,22
135:23
136:19
**questions**
5:21,22
40:8,10

51:15 124:8
125:6 126:2
136:12
**quick**
19:18 37:22,
23 61:4
63:10 77:2
84:14,15
88:15 103:17
105:15
128:24 129:1
**quite**
73:5
**quote**
44:13 69:7
74:13 109:22

---

## R

**race**
88:15
**radio**
32:21 100:18
101:5,10,19
102:4
**Radner**
5:8 20:15
37:13 48:4
55:4,7 57:7,
12,21 59:8,
18 61:8 75:7
76:22,25
78:3,20,22
85:1,9
106:10
107:23
**raise**
4:19
**ramp**
24:17
**ramps**
24:8,11 25:6
**ran**
40:24 41:4
47:1 48:1
99:2 101:23
131:24

132:10
**rates**
4:17
**re-**
39:2
**reaching**
44:7,13
45:17 46:2,
15
**react**
110:21
**read**
21:13,22
23:24 37:4
38:12 44:9
61:17 65:15
69:10 82:21,
23 84:15
99:7 109:5,
19 110:1
114:20
**reading**
54:23 109:6,
7 111:6
**ready**
37:25 84:21
91:4 122:21
**real**
61:13 77:2
84:14 88:15
103:16
105:15
128:24 129:1
**reason**
43:12 53:6
99:10,23
111:22,24
121:3
**reasons**
53:8 72:22
**reassigned**
116:24
118:19
119:3,5,9
120:2,5,13
121:3,5,9

**reassignment**
121:23
**recall**
28:11 30:16
31:6 34:9
35:15 41:13
42:4,23
43:14,17,19
65:12 66:2
69:6 71:21
73:2 131:3,
16 138:22
140:6
**recei-**
39:1
**receipt**
76:1
**receive**
70:20
**received**
38:11 39:3
76:9 81:18
82:8 116:4,5
120:3
**receiving**
98:13
**recertified**
106:15
**recess**
37:24 63:14
84:20 124:25
**recognize**
129:15
**record**
4:24 27:15
31:1 35:14
38:16 44:12
54:20 55:1
59:7 63:17
72:7 78:17
80:21 84:15
85:20,24
88:24 94:6,
20 96:24
100:7 110:16
112:1,22
116:13 118:3
132:25

**recorded**
27:9 36:10
126:4,6
**recording**
36:23,24,25
75:17
**recording's**
36:20
**recordings**
74:14,18
**records**
76:1 99:3
116:5,6
124:18
**reddish**
58:17 65:14
93:24
**redundant**
104:23
**refer**
110:11 138:8
**reference**
58:6 62:25
88:25 129:25
**referencing**
49:3
**reflect**
4:24
**refresh**
17:4
**regarding**
102:10
118:17
**Regulations**
4:3
**related**
30:10,14
76:10 101:19
117:13
**relates**
67:7 123:17
**relation**
62:3
**relative**
15:24 16:2
56:6 100:3
102:11

126:20 139:8
**release**
124:18
135:20 136:5
**released**
119:6 135:20
136:9
**relevant**
15:2
**reliable**
74:7
**rely**
28:20 128:6
**remained**
26:25
**remaining**
82:22 83:7
**remember**
13:21 44:8
45:17 46:19
81:24 95:12
114:13
115:13
138:11
139:15 140:5
**report**
17:22 18:3
20:10 22:2,3
24:23 26:18
30:2 31:5,6
32:9,13
33:17,20,23
35:21,22
36:15 40:20
41:15 42:14
43:22 45:2
47:1,4,8
50:16 52:5
54:16,19,21
55:7 57:24
58:8,23
59:15 60:1
61:17 65:13
66:24 68:23
69:7 70:19
72:1,4 74:14
75:4 82:16,
17 93:5,14,

17 96:22
97:1,24
98:17 100:17
104:15,22,24
105:6,13,14,
21,23,24
106:22,25
107:6,16
108:17,18,22
110:20 111:9
115:23,24
116:23
117:17
118:11
123:1,6
127:21
132:20 133:1
135:15
138:9,21

**reported**
101:6

**reporter**
4:1,7 38:3

**reporting**
4:3,10,15

**reports**
15:5 17:20
21:13 103:14
105:18 113:8
117:12

**represent**
5:7

**represented**
60:7 61:21
65:4

**request**
12:2 16:24
17:5 18:2
32:15 98:14
106:7

**requested**
14:6 18:11
31:12 101:24

**reset**
83:4

**resigned**
119:15 121:2

**respect**
13:17

**respirator**
92:8,18

**responding**
106:1

**response**
124:7,9

**rest**
38:12 41:25
82:6,23
116:24

**restroom**
37:22

**result**
18:19

**results**
125:22,24

**retained**
75:14

**revealed**
74:15 113:10

**reverse**
102:6

**review**
33:11 71:9
73:3,6 74:19
78:12 93:3
102:24
118:22
120:23
121:11,17
129:1
130:19,22

**reviewed**
61:11 89:21
129:2

**reviewing**
90:24

**reviews**
103:2

**rides**
79:10

**right**
4:19 5:6 6:6
10:10 11:23
14:19 16:6

17:5 18:9,20
19:12,19,23
21:9 22:11,
22 23:8
24:25 25:7
27:6 31:17,
21 34:1,5
35:9 36:18
37:1,5 39:4,
11,21 40:1
41:14 43:22
44:9,18
46:11,21
49:6 50:11,
22 53:19
57:3,8,14
62:17 63:18
64:25 65:10,
15,25 66:23
68:12,25
69:10,20
72:19,24
73:8 75:1,20
76:4,15
77:3,12 80:6
81:4 82:11,
13,24 84:10,
13 85:8,15
86:1,7,17,
20,21 87:1
88:1,14,19
89:14,23
92:25 94:1,3
95:19,21
96:10,11,14,
19 98:1,8,25
99:15 100:8,
13,21 102:17
103:23
104:8,12
106:15 108:4
109:19
110:1,13
112:8,13
118:7,12,15
122:25
123:15,17
124:3 125:3
129:25

136:24
137:4,9,12,
14,21
138:19,24
139:5,8
140:2,12

**right-hand**
110:24

**rights**
114:20

**righty**
17:20

**road**
40:5 64:8

**roadway**
38:12,19,23
39:3 40:25
41:12 63:2

**roadways**
24:6 39:7
80:1

**Rocky**
16:21

**role**
56:7

**roll**
19:12 91:4
98:2 104:10
137:22

**rolled**
109:24

**rolling**
97:2

**room**
50:20 81:4
114:6,10

**rotation**
18:24 19:6

**rotational**
19:5

**rotations**
19:3

**routine**
14:6

**routinely**
136:7

**rules**
  4:2 5:2,19
  133:18
**run**
  37:22
**running**
  34:13 40:2,5
  41:11,17
  42:3 108:15
**Ryan**
  29:2

**S**

**S-H-A-N-E-A-H**
  118:20
**S-T-A-F-F-O-**
**R-D**
  103:12
**S-T-E-V-E-N**
  29:2
**S.A.**
  83:6 119:15
  120:16
**safe**
  86:17
**Sandra**
  50:15,21
  102:10
**saying**
  12:14 32:2
  92:13 112:17
  121:16 125:6
**says**
  18:20 24:16
  36:24 39:4
  42:14,15
  47:2,5,8,20
  49:6 50:12
  52:5 59:3,12
  66:10 68:25
  69:15 76:16
  77:16,25
  80:2 82:17
  84:1,8 88:8
  96:2,21
  98:12 103:14

  105:12,21
  108:11,13
  109:16,22
  110:24 111:5
  118:15
  122:11
**scenario**
  51:3
**scene**
  24:2 29:8,
  15,16,20,25
  30:8,18,21
  33:17,20,22
  34:1 58:2,16
  59:12 65:13
  66:8 73:9
  93:23 94:10
  95:7,9 96:22
  97:3,23,24
  98:9 124:16
  128:11,22
  130:13 137:2
  139:24 140:4
**scene's**
  93:14
**schedule**
  19:6
**school**
  54:23
**screen**
  21:1 129:11
**scroll**
  78:1 105:15
  107:21
**seasoned**
  22:22
**second**
  20:10 37:14
  38:9 47:15
  52:11 55:17
  59:4 77:8
  80:13 81:15
  83:2 85:1
  98:5 101:3
  104:6,7
**seconds**
  87:14,17,18

**section**
  109:14
**sections**
  54:23
**Securities**
  124:1
**see**
  10:25 11:20
  12:24 13:24
  15:7 16:23
  19:18 20:25
  21:4,10
  28:16,17
  30:21 31:15
  33:3,13
  36:15,23
  37:15,17
  48:1,25
  54:24 58:16
  62:4,6,8,10
  63:8 64:4,14
  66:5,16,17
  68:21 70:23
  77:25 81:13,
  19 89:3,19
  91:22 96:1
  98:2 99:5,6
  100:4 102:17
  103:16 105:1
  107:22,25
  108:1 114:23
  115:1,19,22
  118:1 130:1,
  23 137:1
  138:19
  139:18,19
**seeing**
  17:21 59:13
  82:23 109:11
  138:11,22
  139:15 140:5
**seeking**
  67:11
  126:23,24
**seizing**
  132:13
**send**
  124:15,23

**sending**
  124:14
**senior**
  112:10
**sense**
  14:7 126:11
  130:9
**sentence**
  37:12,14
  52:3
**separate**
  6:23 103:3
**Sept-**
  119:11
**September**
  112:5 113:2
  116:2 117:5,
  10 118:11,
  12,16 119:21
  120:3,8
  121:8
**sergeant**
  19:25 22:10,
  12 35:15
  58:15 65:10
  70:23 71:18
  72:6,11
  75:10 76:9
  81:1 103:11
**serial**
  32:4 56:3,25
  60:13 66:4,
  17 83:7
**served**
  123:18
**service**
  76:17 103:21
**services**
  4:10,15,17
  82:10
**set**
  109:10
**setting**
  5:17
**seven**
  78:1,19

Steve McCallum
February 08, 2021

seventh
  78:4
several
  108:15
Shaneah
  118:20
share
  20:20 26:13
  123:1 129:11
shared
  34:18
sheet
  94:22 96:11
Shelley
  23:10 24:16
  26:6,24 27:7
  28:7 36:7,17
  37:6,17
  38:10,14,18
  39:1,6 40:2
  41:9,18,19
  42:2,12,16,
  17 43:1,7,9,
  11,20,24
  44:3,5,6,7,
  13,16,18,24,
  25 45:10,17
  46:18 47:2,
  5,16,22,24
  48:9,21,24
  49:12 74:21
  79:9 80:12
  101:9 123:12
  127:15,25
Shelley's
  38:17 39:11,
  22 70:24
  72:25 73:16
sho-
  111:23
shocking
  20:18
shooting
  11:24
short
  7:5 90:9
  111:17

shot
  25:8
shoulder
  38:19 40:4
  64:8
show
  32:4 58:20
  62:17
showed
  77:2 113:7
  130:20
showing
  21:20 49:5
  96:11
side
  6:24,25
  32:14 38:23
  40:25 54:11
  57:1 69:8
  70:16 103:25
  104:25
  105:7,19
  114:16
sideways
  54:7
sight
  41:22
sign
  32:4
signal
  102:2
signature
  21:11 79:9
  80:11,13
signatures
  80:11 108:1
signed
  77:16 107:22
  111:19,20
signs
  53:14
similar
  64:20 82:19
  89:20 90:10,
  12
simply
  22:4 46:10

Sinkovich
  5:9
sir
  5:14,25 6:7,
  22 7:4,16
  8:5 10:16
  12:10,25
  13:3,17
  16:16 17:11
  23:5,25 26:9
  27:24 28:14,
  24 29:1 30:3
  32:16 34:19,
  24 35:5,12,
  23 36:1,8
  42:10,21
  48:10,13
  49:1,16 50:2
  51:24 56:16,
  19 57:17,20,
  24 65:8,16
  66:5,23
  68:19,21
  70:11 71:8
  73:17 75:10
  76:19 79:11
  81:10 83:25
  85:18 87:4
  88:1,7,16
  89:25 92:6,
  19 94:25
  97:14 98:6,
  22 99:1,21
  102:18
  104:2,9
  105:25
  106:13 107:4
  109:8 112:7
  114:9 115:5
  120:9 124:24
  140:13
sis
  92:14
sister
  91:10
sitting
  139:2

situation
  34:10 46:4
  51:11 68:16
  108:12
situations
  15:14 107:14
sixth
  57:12,13
size
  59:13 139:20
skipped
  56:19 83:22
slab
  109:25
slash
  75:12 84:9
slide
  86:5
slow
  110:21 129:8
small
  60:12 66:17
smaller
  139:21
smart
  85:16
software
  72:13
solicit
  80:1
soliciting
  23:11 24:17,
  21 79:10
Solomon
  5:8 20:13
  55:10 56:18
  77:24 79:13
  80:3 84:24
  85:3 94:4
  96:21 97:2,9
  98:3 104:11
  118:1
somebody's
  73:19
someone's
  64:15

son
  63:11
SOP.3042
  77:13
sort
  6:8
sounds
  44:4 118:13
spark
  83:4,6,13
  88:9 89:11
spark-tested
  89:10
spe-
  126:17
speak
  51:8 114:12,
  15 115:6
speaking
  30:20 106:6
  115:9 123:12
special
  4:17,25 5:6
  6:2,10 7:10
  9:4 10:12
  11:1 14:20
  16:17,21,22
  18:15 19:16
  20:19 21:3
  22:9 24:3
  30:22 32:1
  35:18 36:6
  38:5 39:13
  48:19 60:5,
  21 61:19
  63:21 65:2
  67:24 77:4
  85:6 90:2
  108:6 115:24
  120:2 121:19
  124:13
  136:15
specialty
  18:25
specific
  24:10 62:18
  81:20 126:17

131:9,14
  135:17
specifically
  16:15 28:11
  42:18 107:19
  108:9 126:23
specify
  17:6
spent
  83:11
spine
  69:9
split
  39:8
split-offs
  39:16
spoke
  22:23 34:23
  49:9 68:25
  69:3 92:13
  113:6 123:4
spoken
  123:9
SRT
  9:7
staff
  113:20
Stafford
  103:12
stain
  58:17 93:24
stains
  65:14
stairs
  113:17
standard
  50:2,3 91:2
standards
  90:23
standing
  91:1,2
stands
  40:20 71:13
start
  19:12
started
  5:7,11

starting
  21:21
starts
  19:21 36:4
  39:23
state
  6:13,15,16,
  17,18,21 7:5
  8:12 12:5,25
  100:21
  125:12
  126:13
stated
  13:1 35:15
  36:19,20
  42:4 44:20
  45:14 72:3,
  5,6,12 73:2
  102:3 113:16
  114:22
  128:13
statement
  50:5,13
  51:9,10,11,
  12 73:13
  107:9
statements
  42:6 49:24
  74:6,9
  102:14
states
  6:23,25
  32:13 50:16
  69:7 138:9
stating
  81:24
status
  114:18 115:1
  118:18 119:7
  120:5 135:22
steep
  23:20
step
  133:11
Steve
  4:21,25

Steven
  4:2 18:16
  29:2,12
stop
  108:15 109:3
  111:3
street
  47:1
stressful
  46:4
striking
  23:18
struck
  25:13
struggling
  115:12
stuff
  9:4 10:17
  31:18 65:11
  66:5 99:12
subject
  101:10
  108:15
subject's
  109:23
subpoena
  123:19
subpoenaed
  117:15
suggest
  64:5
summaries
  49:8 117:3
  119:7 135:20
summarize
  74:25
summarized
  74:21
summary
  17:6,22
  18:1,4 20:5
  41:16 42:4,
  7,9 43:14
  45:9,11 49:8
  58:6 74:23
  81:5,19
  82:24 89:1

Steve McCallum
February 08, 2021

90:13 126:2
127:5,14,17
128:3,15,17
135:17 138:9
**summons**
79:24
**supervisor**
17:6 22:13
90:7 93:14
111:21
125:17
134:13,14
135:16,21
**supervisors**
17:7 19:6
21:12
**supervisors's**
107:14
**support**
4:8,9,14,15
52:23
**supposed**
101:16
**suppression**
9:6,8
**sure**
5:12 13:7
34:20 48:7
49:2 52:12
56:21 59:15
63:12,25
64:23 78:5
115:10
123:23
124:20
**suspect**
101:23
**suspected**
25:16,20
34:11
**suspended**
99:3
**sustained**
18:19
**SWAT**
9:7

**swing**
34:15 44:25
45:11
**swinging**
35:19
**switch**
27:18
**swore**
5:20
**sworn**
4:22
**swung**
26:11 44:17
**sync**
84:9
**synopsis**
42:20 90:6,
8,9
**system**
21:13 22:3,5
27:13 71:5
81:17

---

**T**

---

**T-10**
105:12,19,23
**tags**
60:12
**take**
5:13 8:19
10:6 12:9
16:2 22:12,
22 29:5,19
36:14 37:23
38:17 48:16
50:7 51:10
56:20 58:2
62:1,17
63:10 69:12
72:20 77:19
84:17 87:2
107:16
115:16
126:10
128:18
130:3,7

133:11
137:7,13,24
138:11 139:1
**taken**
4:25 27:20
33:17 37:24
58:5 63:14
84:20 94:10
96:6,9
124:25
128:22
137:8,12
138:12
**takes**
61:6
**taking**
4:11 53:6
61:23 138:13
139:24
**talk**
49:13,23
51:6,19
72:25 113:19
123:20
**talked**
21:6 75:19,
21 93:25
114:21 120:7
121:16,23
123:24 124:2
**talking**
29:19 38:14
41:17 48:8
56:22 64:19
73:18 74:20
83:20 92:1
98:5 123:14
**talks**
35:18 83:15
**tape**
44:12
**Tase**
9:15 132:12
**Tased**
10:19 18:18
25:18,22
26:5 43:13
44:1 67:14,

16 68:13,14
73:1,9,11
132:16
136:18
138:24
**Taser**
9:11 10:2,5,
6,8,13,14
13:22,25
14:7 18:12
23:18 25:9,
13,25 26:20
29:3,12,13
31:12,25
32:2,5,7
37:17 42:13,
17 43:10
47:10 52:4,
14,15,17,20
53:5 54:17
55:15,17
56:4 60:12,
25 62:19
64:6 65:3,21
66:20 70:21,
25 75:9,13,
18,23 76:2
81:1 82:2,5,
14,23 83:3,5
84:2,8,9,11,
24 85:6,12,
13 87:1,7,14
88:5 89:12
105:13
106:13
112:15,17,18
138:3 140:8
**Tasers**
14:21
**Tasing**
25:4 26:12
43:2,6
136:19
**task**
121:4
**tasked**
133:4

**Taylor**
119:5,16
120:2,16
121:3,8,16,
20 122:8
123:7
**team**
9:7
**tearing**
53:15
**technical**
14:13 88:13
**technically**
60:10 114:2
132:10
**tell**
5:20 11:14,
20,23 12:22
13:18 14:3
16:7,23,24
17:13 22:20
24:20 25:8,
16,20,23,24
26:4,22
27:10 28:8
30:13 35:8
41:9,11 45:7
46:5 48:21
50:25 62:21
63:7 64:10
69:24 81:25
108:6 110:6
112:14
115:16
124:22
**telling**
28:7 38:10,
18 39:22
47:22 49:9
96:14
**tells**
39:1
**ten**
11:18
**term**
7:5 12:23
14:13

**terms**
4:16 9:17
12:5 23:6
60:22 61:1
62:8 99:19
**test**
83:6,13 88:9
89:6,11
**testified**
4:22 40:24
43:24 109:2
126:3 131:23
133:25
136:16,20
**testify**
40:8,9,21,22
**testifying**
5:17 35:13
36:19 40:15,
16
**testimony**
27:17 41:7
109:9 131:16
**testing**
83:4
**tests**
85:16
**thank**
6:1 7:2 9:25
13:16 16:16
18:22 22:6
31:7 32:6
35:23 36:1,
13 42:10
43:23 48:13,
16 49:1,16,
18 50:24
51:22,24
54:2,25
57:16,20
58:10,14
59:25 61:5
63:13 64:2
65:20 66:23
67:3 68:17
70:18 75:3,
24 77:9,23
79:2,13,20

80:3,19
81:10 83:25
84:18 85:3
88:7 93:9
95:10 97:16
98:3,22
100:23
102:20
104:2,16
105:25 106:2
110:3 114:9
115:5 118:1,
8 124:4,5,24
140:13,15,
22,23
**Thanks**
65:1
**thick**
23:20 62:2
**thing**
10:1 18:7
19:15 22:1
44:2 51:20
64:23,24
76:19 86:15
88:14 97:20
100:12 134:4
**things**
6:24 32:4,
13,20 34:22
36:16 46:3
47:22 53:10
71:5 85:17
101:17 104:1
105:7 106:12
126:19 135:2
**think**
11:18 21:1
46:8 48:8
57:5,6 62:3
69:25 77:2,
25 82:16
83:15 97:1
124:18
129:20
139:23
**third**
23:7 39:21

70:15 104:21
**Thomas**
117:12
118:17,19,21
120:21
121:9,17,24
**thorough**
15:12
**thought**
24:21 30:14
40:17 68:6
140:4
**three**
7:19 9:13
11:19 17:7
21:17 42:11
52:3 55:24
56:15 69:25
119:24
**three-page**
19:20
**thumb**
81:20
**Thursday**
118:16
**ticket**
79:23
**time**
11:19 16:18,
19 23:18
25:16,20,24
26:4,18
27:11 28:11
31:4,10
32:13 33:24
34:7,21,23
35:4,6,16
38:21 41:9,
11 42:2
43:11 46:7,
20 47:5
49:25 51:9,
23 53:9
56:20 61:6
65:19 69:14
71:9,15,20,
23 77:20
78:13,25

80:17 85:14
86:7,24
87:3,8 89:8,
11 93:7 95:6
96:5,15
106:15 107:8
108:22 109:3
111:8,16,17
114:6,13
116:20
118:23
121:20
122:18,21
123:4 124:4
130:21
136:19
137:19 139:1
140:22
**timeline**
134:5
**timer**
87:2
**times**
11:13 32:19
34:23
103:23,25
108:15
137:11
**timing**
74:2
**tiny**
64:14 139:22
**title**
6:10 7:9
20:6 21:6
**title's**
20:10
**titled**
18:2 19:24
**today**
12:15 73:3
133:25
136:21 139:2
140:22
**told**
5:6 24:18,24
25:2,4,12
26:5,19 35:3

41:3,19
42:12,16
43:1,7,9,20
44:3,6,13,
16,17,18,24
45:1,10
46:12 47:2,
3,23 52:13,
23 66:8
72:4,9
91:12,14
92:2,5
108:14 109:3
113:16
114:12,14
115:14
128:4,7
135:16
**top**
21:24 26:23,
24 27:6 60:7
61:20 62:4,
12 104:10
108:5
**topic**
21:23
**topography**
24:7
**total**
57:18
**tracking**
20:9
**traffic**
6:24 26:21
32:21 42:3
46:4 79:24
100:18
101:4,5,19
**trained**
10:12,14
91:3
**training**
9:18,23
10:6,9,10,23
32:4 33:7
90:22 91:2
106:8,13

**transcript**
127:17
**transcription**
35:11 36:18
43:15 44:19,
20 127:23
**transfer**
124:20
**transferred**
123:6
**transported**
23:22
**trauma**
69:8 109:25
**traveled**
39:17
**trees**
62:6
**trigger**
87:17
**tripped**
25:17,21
**troopers**
6:18,24
**trouble**
115:8
**Truck**
105:19,20,23
**true**
36:17 76:13
109:10 139:3
**truth**
5:20
**try**
46:14 98:20
113:3
**trying**
34:11 45:5
49:23 60:18
61:14,24
62:14 96:15
126:9,16
**Tuesday**
18:8 19:22
22:16 36:5
49:22

**turn**
31:2 87:16
125:22,24
129:5 131:4
136:2
**turned**
15:14 27:20
87:7 109:17
117:1
**turning**
54:7,11
133:7
**twelve**
84:19
**twice**
98:9
**twist**
20:18
**two**
7:12 11:5
24:8 38:22
39:7,16
42:11 49:3
52:2 56:15
78:24 80:11
93:12 101:1
106:1 138:5
**two-pages**
49:18
**type**
13:2,8 47:6
51:19 64:21
71:19 90:13
**Typically**
30:20

---

**U**

**U.S.**
4:8,9,14,15
**Uh-huh**
33:9 61:18
82:4 95:23
109:15
**ultimately**
17:11 22:9
32:10 39:22

41:22 50:14
51:2
**unable**
98:13
**unclear**
134:22
**unconscious**
46:24 92:8,
18
**underneath**
49:15
**understand**
12:18 13:11
19:1 39:9
40:12 60:18
61:15 62:7
67:15 68:1
89:22 110:22
131:11
**understanding**
5:12 12:23
68:10 73:12
107:3
**understood**
14:8 22:12
38:18 40:6
52:1
**unidentified**
58:21 59:9
60:3 70:1,8,
13 129:13
130:5
**uniform**
79:23
**union**
50:14
**unit**
9:8 68:19
104:24
105:12,20,
23,24 112:11
119:4 121:5
**University**
8:12
**unspent**
52:20 55:22

**update**
91:19 113:3
120:5,10
121:8,15
135:12
**updates**
116:25 119:7
**upper**
110:23
**usable**
109:18

————————
**V**
————————

**various**
136:2
**vegetation**
23:20
**vehicle**
27:1 38:11
39:3 40:6
47:19
**vehicle's**
47:25
**Ven**
5:7
**ventilator**
68:23 113:13
114:11,24
115:9
**verified**
87:11
**verify**
87:7 89:11
**versus**
18:25 64:1
72:20 96:16
**vicinity**
64:16
**victim**
98:12,20
**vid-**
130:20
**video**
29:13 31:12,
13 70:21,24,
25 71:13,16

72:6 73:3,6,
13 82:8 88:9
89:2 135:3
**videos**
74:24
**view**
22:4
**viewed**
52:24
**viewing**
22:4 59:22
81:14,17,18
**violated**
133:19
**Virgo**
118:14
**visible**
53:14
**visited**
69:16 114:13

————————
**W**
————————

**W-H**
90:3
**W-I-L-D-E-R**
29:9
**walking**
124:4
**want**
5:11 30:4,21
33:1 40:23
42:25 43:6
48:7 49:24
50:5,12 51:8
53:18 54:25
62:7 63:11,
25 80:10
94:23 131:4
132:1,2
134:4 136:17
139:9
**wanted**
51:19 83:2
95:10
**wanting**
33:24

**warning**
47:9
**warrant**
77:7
**warrants**
76:11 79:5
**way**
5:9 12:8
24:7 28:17
32:2 35:1
36:22 39:7
41:4 53:8
77:24 78:2,3
81:14,17,18,
21 90:11
102:6 126:18
**weapon**
76:13 77:13
109:22
**weapons**
31:9
**wearing**
47:21 53:9
**Wednesday**
119:15
**week**
111:19,20
122:7
**weekends**
19:4
**Wendy**
91:9,12
**went**
7:20 8:21,25
22:10 25:9
58:2 65:18
66:25 68:18
70:20 87:1
92:3 95:2,6,
9 96:15
98:9,14,20,
21 100:17
113:3 114:10
116:16 117:6
119:22 121:4
**westbound**
23:14 40:3

41:18
**Whidby**
 16:22 90:3
**whisper**
 114:24 115:7
**Wilder**
 29:9,10,14
 33:18 93:18,
 22 98:9
**Wilder's**
 98:16
**willful**
 79:17
**wire**
 138:3 140:9
**wires**
 65:3,21
 138:5,12
**witness**
 26:25 27:3
 38:1 45:15
 49:21 59:21
 61:9,11,13
 67:21 68:9
 69:24 84:5,
 23 88:19,25
 118:4 124:5,
 17 125:2
 126:11 129:2
 140:15,19,23
**wondering**
 28:6
**woods**
 23:17,18
 25:6 58:18
 60:6 61:20
 62:22 63:5
 65:3,7
**word**
 14:18 46:16
 139:10
**word-for-word**
 43:19 44:23
**words**
 23:9 30:8
 40:4,21 61:1
 62:24 63:1,9

64:7 67:19
73:19 95:18
108:9 113:20
114:12
134:21
**work**
 7:18 11:23
 12:2 59:20
 107:9 124:21
**working**
 6:8,13 7:3
 9:3 124:11
**works**
 50:25
**worksheet**
 117:22
**world**
 101:15
**worried**
 26:20
**write**
 71:15
**written**
 44:18
**wrong**
 139:9
**wrote**
 45:20,21
 46:12,16,18
 90:8,10

_____

**X**

**X2**
 10:5

_____

**Y**

**y'all**
 81:18 129:23
 140:15
**yeah**
 6:20 7:20
 8:8,15,17,
 21,24 14:15
 19:2,11,24
 20:1,3,22

21:2,4 22:2
24:19 26:7
29:21,24
30:6 32:11,
14,18 37:12
41:21 45:24
48:12 51:7,
21 52:16,22,
25 53:17
55:6 57:7,
12,15 62:10
63:5 64:23
66:14 68:14
69:14,21,24
71:3 72:11,
22 75:23
76:25 77:5
81:8,16,23
82:19,21
85:16 86:11
87:22 89:10
90:6,20
92:16 93:3,7
94:18 95:11,
20 96:8,18
98:18,19
99:14,22
100:19,25
101:5 104:23
105:17
112:10
115:8,11
116:10,17,20
117:7,14
118:4
119:14,19,22
121:2,13
123:23
124:17
129:21
130:17 132:1
138:14
139:20
**year**
 119:13,18
 122:1
**years**
 6:9 7:12,19

8:6 9:13
11:6,19 30:2
37:7,8 91:13
**yellow**
 60:15 63:20

_____

**Z**

**zero**
 86:6,9
**Zone**
 44:6
**Zoom**
 5:10 88:14
**Zorn**
 19:25 22:10,
 12,13,17
 24:13 25:20
 26:4,19
 27:25 29:8
 30:13,24
 31:12 34:6
 35:8 65:10
 72:11 76:9
 81:1 106:21
 123:12
 126:3,8,11,
 14,23
**Zorn's**
 28:7 98:14