IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

KEITH EDWARDS, as guardian and
conservator for Jerry Blasingame,

    Plaintiff,

v.

OFFICER J. GRUBBS # 6416 and
THE CITY OF ATLANTA,

    Defendants.

CIVIL ACTION FILE

No. 1:19-CV-2047-SCJ

## ORDER

This matter appears before the Court on Defendants' Renewed Motion for Judgment as a Matter of Law Pursuant to Federal Rule of Civil Procedure 50(b). Doc. No. [155].[1] Plaintiff filed response briefs in opposition. Doc. Nos. [168];

---

[1] All citations are to the electronic docket unless otherwise noted, and all page numbers are those imprinted by the Court's docketing software.

[169]. Defendants filed reply briefs. Doc. Nos. [175]; [176].[2] The Court rules as follows.

## I.    BACKGROUND

On December 17, 2020, Jerry Blasingame[3] filed an Amended Complaint bringing claims against the City of Atlanta and one of its law enforcement officers, Officer Jon Grubbs, arising out of a tasing incident that caused injury to

---

[2] After Defendants orally moved for judgment under Rule 50(b), the Court (1) ordered Defendants to file a motion on the docket and (2) established a briefing schedule such that Plaintiff was to brief these matters by September 2, 2022, and Defendants were to brief these matters by September 9. The Court also included those instructions in its Order to perfect the record. Doc. No. [154]. Defendants initially followed the Court's instructions by filing a Rule 50(b) motion for both the City of Atlanta and Officer Grubbs. Doc. No. [155] (stating that both Defendants were renewing their motions for judgment as a matter of law under Rule 50). But whereas the City of Atlanta's responsive brief adhered to the Court's instructions (Doc. No. [175]), Officer Grubbs's filing not only included a brief but also was styled as another Rule 50 *motion* (Doc. No. [176]). Officer Grubbs's motion at Doc. No. [176] is duplicative of his motion at Doc. No. [155] and ignores this Court's clear instructions regarding filing the initial motion and providing subsequent *briefing*. Accordingly, the Court will deny the motion at Doc. No. [176] in favor of considering the motion at Doc. No. [155]. The Court will, however, consider the briefing contained in Doc. No. [176].

[3] Mr. Blasingame, the injured party in this action, originally was the named plaintiff. See Doc. No. [52]. After the filing of the Amended Complaint, however, Mr. Blasingame was determined to lack sufficient capacity to make or communicate significant decisions concerning his health and safety. See Doc. No. [113]. As a result, Keith W. Edwards was appointed as Mr. Blasingame's guardian and conservator. Id. The Parties stipulated to Mr. Edwards, in his capacity as Mr. Blasingame's guardian and conservator, replacing Mr. Blasingame as the named plaintiff in this action. Id. Thus, while Mr. Blasingame is the injured individual in this action, Mr. Edwards is the named plaintiff.

Mr. Blasingame. Doc. No. [52]. Count I of the Amended Complaint brought a Fourth Amendment excessive force claim against Officer Grubbs and a municipal liability claim against the City of Atlanta. Id. ¶¶ 29–38. Count II asserted assault and battery claims against Officer Grubbs, and Count III asserted a *respondeat superior* claim against the City of Atlanta. Id. ¶¶ 39–47. Defendants successfully moved for summary judgment on Count III (Doc. Nos. [73]; [84]), and Plaintiff later voluntarily dismissed Count II (Doc. Nos. [146]; [147]). Defendants did not move to dismiss or for summary judgment on Count I, and Officer Grubbs did not make a pre-trial dispositive motion asserting a qualified immunity defense.

Thus, Count I proceeded to a jury trial, which began on August 17, 2022, and ended on August 26 with a verdict against Defendants in the total amount of $100 million. Doc. Nos. [156]; [163]; [166].[4] After Plaintiff rested his case at trial, Defendants moved for judgment as a matter of law under Rule 50(a). See Doc. Nos. [151]; [161]. The Court did not grant either Defendant's motion, and it advised Defendants that it would consider a renewed Rule 50 motion after the

---

[4]  Specifically, the jury found that Plaintiff should be awarded $20 million in compensatory damages and $20 million in punitive damages against Officer Grubbs. Doc. No. [163], 2. The jury also found that Plaintiff should be awarded $60 million in compensatory damages against the City of Atlanta. Id.

close of Defendants' case. See Doc. Nos. [153]; [161]. After the close of evidence and after the jury returned its verdict, Defendants orally renewed their motions for judgment as a matter of law under Rule 50(b). See Docket Entry of Aug. 26, 2022 ("ORAL MOTION for Judgment as a Matter of Law by Officer J. Grubbs, The City of Atlanta."); Doc. No. [154]. The Court instructed Defendants to memorialize those motions with a docket filing, and the Court established a briefing schedule for the motions. See Doc. No. [154]. Plaintiff and Defendants briefed these issues (Doc. Nos. [168]; [169]; [175]; [176]), and these matters are now ripe for the Court's review. The Court will discuss the Parties' arguments in greater depth below. For now, the Court reviews and summarizes the evidence adduced at trial, viewing it in the light most favorable to Plaintiff as the non-moving party. Luxottica Grp., S.p.A. v. Airport Mini Mall, LLC, 287 F. Supp. 3d 1338, 1341 (N.D. Ga. 2017).

On July 10, 2018, at around 2:30 p.m., Officer Grubbs and his partner, Officer Keith Shelley, were in their patrol vehicle near Windsor Street and I-20 in Atlanta when they witnessed Mr. Blasingame on the shoulder of the road. Mr. Blasingame appeared to be panhandling. The officers had not seen him cross the roadway. Officer Grubbs decided to question him regarding his activities. Officer

4

Shelley, who was driving the patrol vehicle, stopped the vehicle across the road from where Mr. Blasingame was standing. While Officer Shelley remained in the vehicle, Officer Grubbs exited the vehicle and approached Mr. Blasingame by crossing the busy roadway. Officer Grubbs conveyed that he wanted to discuss why Mr. Blasingame was on the side of the road. At that point, Mr. Blasingame turned and fled. Officer Grubbs pursued on foot. He ordered Mr. Blasingame to stop, but the suspect continued to flee.[5]

As Officer Grubbs closed in on Mr. Blasingame, Mr. Blasingame navigated over[6] a guardrail. On the side of that guardrail away from the road was a wooded area heavy with brush and foliage. Near where Mr. Blasingame went over the guardrail, the brush opened to a downhill slope. That slope was angled steeply downwards. At the bottom of that slope was a grassy area on which stood a large metal utility box on a concrete pad. On the other side of the grassy area, beyond

---

[5] Because excessive force cases involve fact-specific inquiries, the Court notes here that the evidence at trial showed that Officer Grubbs was around thirty years old and is a former high school track athlete. Mr. Blasingame, on the other hand, was sixty-five years old. Photographic evidence presented at trial showed that Mr. Blasingame was thin and had a graying beard and hair before the above incident occurred.

[6] During this lawsuit, the Parties have disputed whether Mr. Blasingame "hurdled" over the guardrail or simply climbed over it. See Doc. Nos. [75-1] (Officer Grubbs Dep. Tr.), Tr. 111:9–25; [130], 2. After considering relevant testimony and other evidence at trial, the Court declines to state that Mr. Blasingame "hurdled" over the guardrail.

the utility box, was another road near the interstate. Viewing the evidence at trial in the light most favorable to Mr. Blasingame, although Officer Grubbs could not see all the hill in question as these events were unfolding, he was aware that the hill sloped downwards to another road.

By the time Mr. Blasingame was traversing the guardrail, Officer Grubbs had caught up and was attempting to stop the suspect's flight. At that point, Mr. Blasingame moved his arm towards Officer Grubbs in what the officer later testified was a "clearance strike." Based on his testimony at trial, Officer Grubbs was not struck, and he did not feel that Mr. Blasingame's act put him in physical danger.[7] Similarly, at this point, Mr. Blasingame had not verbally responded to Officer Grubbs's demands to stop, and he at no point verbally threatened Officer Grubbs. Moreover, Officer Grubbs did not see Mr. Blasingame with a weapon.

After Mr. Blasingame went over the guardrail, he began heading towards the opening in the brush. Officer Grubbs then drew and discharged his taser at Mr. Blasingame. Although Officer Grubbs had ordered Mr. Blasingame to stop,

---

[7] The Court emphasizes here that while Officer Grubbs has stated in his filings that Mr. Blasingame swung at him (e.g., Doc. No. [96-5], 1), Officer Grubbs's demeanor when testifying at trial conveyed that the swinging motion did not place the officer in danger.

he did not issue a warning regarding the taser. The taser hit its mark, causing Mr. Blasingame to fall and plunge headfirst down the steep slope. Mr. Blasingame's head crashed into the concrete base of the utility box at the bottom of the hill. That impact fractured several bones, including vertebrae, and caused significant bleeding. Officer Grubbs testified that he tased Mr. Blasingame in part because he wanted to prevent the fleeing man from running into traffic below, which Officer Grubbs thought would endanger Mr. Blasingame and others.

After the tasing, Officer Grubbs approached Mr. Blasingame, who lay on the ground breathing but unresponsive. Over the next several minutes, Officer Grubbs radioed in for first responders to provide medical assistance, climbed back up hill to the roadway to inform Officer Shelley of what had occurred, went back down to attend to Mr. Blasingame, and called a supervising officer by phone to advise that supervisor of the tasing incident. Soon thereafter, Mr. Blasingame was transported to a hospital where he was treated for his injuries. Officer Grubbs later brought criminal charges against Mr. Blasingame related to his panhandling activities.

A video recording from the discharged taser shows some of these events from just after the taser was discharged, and a video recording from the body-

worn camera ("BWC") that Officer Grubbs was wearing depicts these events starting from several minutes after the tasing. The BWC recording did not depict the events leading up to and including the tasing because Officer Grubbs had turned off or toggled buttons on the BWC in a way that caused the BWC not to capture the two minutes of buffering mode recording that preceded Officer Grubbs activating the BWC's recording function. The two recordings that were captured depicted several items on the ground near where Mr. Blasingame lay, including his cap, his pen, and a dollar bill.

Through the testimony of several witnesses associated with the City of Atlanta Police Department (the "APD") and expert witnesses Plaintiff retained, the following evidence was adduced at trial concerning certain policies and procedures of the APD. First, officers entering the APD through its academy must undertake training courses involving use of force, including use of force during an arrest. APD officers must also complete training certified by the Georgia Peace Officer's Standards and Training Council. Further, after entering the force, APD officers must complete at least forty hours of in-service training each year, which includes use-of-force training.

Plaintiff presented evidence specific to use of taser policy and customs by or in the APD. For example, Plaintiff showed that APD policy warns against use of tasers when environmental factors such as an elevated position could lead to serious injury or death. Similarly, instructions concerning operating the model of tasers used by the APD warn against using the tasers against certain populations, including the elderly. Plaintiff also presented APD records showing that Officer Grubbs had discharged his taser more than ten times over the course of his career, but Plaintiff did not present evidence contextualizing any of those prior uses of tasers. Moreover, Plaintiff presented no other evidence regarding prior use-of-taser incidents within the APD at large.

Plaintiff's expert witnesses[8] on law enforcement policies and procedures—Dr. Andrew Scott and Chief Tom Tiderington—both testified as to use of BWCs within the APD. Relying on evidence relating to that subject, the experts opined that the APD had a custom or de facto policy of not disciplining officers for failing to use their BWCs when required by official policy. For example, Plaintiff relied

_____

[8]  Several of Plaintiff's fact and expert witnesses testified as to the nature and extent of Mr. Blasingame's injuries and his current quality of life given the quadriparesis that resulted from his injuries. Because the present motions do not concern these witnesses' testimony, the Court does not discuss them in this Order.

on an APD performance audit indicating that BWCs, which per APD policy should not be turned off when officers are on active duty, were recording only around a third of the time. While a witness associated with the APD testified that the usage number might not be accurate because it might erroneously include time when officers were not on active duty, Plaintiff's experts testified that such evidence illustrated a custom of allowing officers to turn off their BWCs without punishment. Those experts further opined that this custom directly allowed or emboldened officers to use excessive force because the mechanism to record officer encounters and thereby deter unnecessary use-of-force incidents was not being used. Thus, the experts opined that this custom constituted deliberate indifference towards allegedly resulting uses of excessive force.

The evidence also showed that the BWCs that the APD uses are placed near officers' chests. When not activated for recording, the BWCs constantly maintain a recording buffer of two minutes. Thus, when an officer activates the BWC's recording function, the saved recording includes not only the events taking place after the recording is activated but also the two minutes prior to the recording function being activated. The audit trail for Officer Grubbs's BWC indicates that after Mr. Blasingame was tased, Officer Grubbs toggled his BWC off and then on,

10

which erased the two-minute buffering period and started recording once the BWC was turned back on and activated for recording.

As for municipal policies or customs related to disciplinary actions against APD officers, the evidence at trial showed that Officer Grubbs was placed on paid administrative leave shortly after the tasing incident; he would remain on leave until January 3, 2019. Both the APD and the Georgia Bureau of Investigation ("GBI") investigated the incident.[9] The APD completed its investigation in June of 2020. Officer Grubbs was later disciplined for his improper use of BWC but was found not to have violated APD policy regarding use of force.[10]

## II.   LEGAL STANDARD

Rule 50(b) of the Federal Rules of Civil Procedure provides that if a "court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the

---

[9] Although at least two law enforcement entities investigated the incident, no entity collected and stored physical evidence from the scene, such as Mr. Blasingame's cap and pen, or the dollar bill on the ground near where Mr. Blasingame had fallen.

[10] Even though evidence relating to those disciplinary measures was relevant and had been requested in discovery, Defendants did not produce such evidence. As a result, Plaintiff first heard about the disciplinary proceedings and discipline of Officer Grubbs during trial. As discussed in Doc. No. [162], the Court issued remedial measures and sanctions to address Defendants' discovery violation.

court's later deciding the legal questions raised by the motion." Fed. R. Civ. P. 50(b). A movant may renew his Rule 50 motion after the jury renders its verdict or the court enters judgment. See id. In ruling on the renewed motion, the court may: (1) allow judgment on the verdict; (2) order a new trial; or (3) direct the entry of judgment as a matter of law. Id.

Under Rule 50, a "party's motion for judgment as a matter of law can be granted at the close of evidence or, if timely renewed, after the jury has returned its verdict, as long as there is no legally sufficient evidentiary basis for a reasonable jury to find" for the non-moving party. Lipphardt v. Durango Steakhouse of Brandon, Inc., 267 F.3d 1183, 1186 (11th Cir. 2001) (cleaned up). "[I]n deciding on a Rule 50 motion a district court's proper analysis is squarely and narrowly focused on the sufficiency of evidence." Chaney v. City of Orlando, Fla., 483 F.3d 1221, 1227 (11th Cir. 2007). The court must draw all reasonable inferences in favor of the nonmoving party. Cleveland v. Home Shopping Network, Inc., 369 F.3d 1189, 1192–93 (11th Cir. 2004); see also McGinnis v. Am. Home Mortg. Servicing, Inc., 817 F.3d 1241, 1254 (11th Cir. 2016) (stating that when a trial court is considering a Rule 50 motion, it must view the evidence in the light most favorable to the non-moving party). The court must consider

"whether the evidence is legally sufficient to find for the party on that issue, regardless of whether the district court's analysis is undertaken before or after submitting the case to the jury." Chaney, 483 F.3d at 1227 (citation and quotations omitted). But where the case has been submitted to the jury, the court must deny the motion and affirm the jury verdict "unless there is no legal basis upon which the jury could have found for [the prevailing party]." Nebula Glass Int'l, Inc. v. Reichhold, Inc., 454 F.3d 1203, 1210 (11th Cir. 2006).

## III.   ANALYSIS

The Court addresses each Defendant's argument separately.

### A.   The City of Atlanta's Rule 50(b) Motion Is Due to Be Granted

The City of Atlanta moved for judgment as a matter of law under Rule 50(a) during trial, which the Court did not grant. Doc. Nos. [151]; [153]; [161]. The City of Atlanta renewed its motion under Rule 50(b) after the close of evidence. Doc. No. [155]. Plaintiff's and the City of Atlanta's briefing are as follows.

In his brief, Plaintiff argues that the City of Atlanta is not entitled to judgment as a matter of law because the evidence at trial was sufficient to permit a reasonable jury to determine that the City had failed to train and supervise its officers regarding BWCs, taser use, and use of force. Doc. No. [168], 15–16.

13

Plaintiff asserts that the performance audit of the APD's use of BWCs shows the City's deliberate indifference to properly train and supervise its officers. See id. at 16, 18. Further, Plaintiff argues that the unrebutted testimony of Julio Reyes, Dr. Andrew Scott, and Tom Tiderington reveals an official policy or custom on the part of the City not to train or supervise its officers. Id. at 17–18.

Plaintiff also argues that the City's failure to properly train and supervise its officers directly caused the violation of Mr. Blasingame's constitutional rights and his resulting injuries. Id. at 16. Plaintiff contends that the expert testimony of Dr. Andrew Scott and Tom Tiderington proves that the City's failure to train and supervise its officers created an environment in which officers "understood that there were no consequences in failing to comply with . . . policy," which in turn increased the "likelihood that officers will use excessive and unconstitutional force." Id. at 18. Plaintiff argues that this testimony satisfies his burden to show that the City, because of deliberate indifference, failed to train or supervise its officers, and that such failure was closely related to Officer Grubbs's use of excessive force in violation of 42 U.S.C. § 1983. Id. at 19.

Further, Plaintiff contends that the City is subject to municipal liability due to its ratification of Officer Grubbs's use of excessive force through its "continued

14

failure to discipline or even effectively investigate" Officer Grubbs. Id. at 22, 24. Plaintiff argues that the City's failure to review the audit trail of Officer Grubbs's BWC or taser until the time of trial, combined with the City's decision to merely place Officer Grubbs on administrative leave following the incident as issue, constitutes ratification. Id. at 22–23.

In its brief, the City of Atlanta contends that it cannot be liable under a Monell claim because no constitutional violation occurred, Plaintiff failed to show a custom or policy of deliberate indifference towards a constitutional right, and no custom or policy caused Mr. Blasingame's injury. Doc. No. [175], 1–2. As to the first argument, the City contends that Officer Grubbs did not use excessive force and instead acted reasonably given that he tased an individual who had been breaking a law, fled from Officer Grubbs, swung at Officer Grubbs, and was running towards another busy roadway. Id. at 3–5. The City argues that under similar circumstances, the Eleventh Circuit has held that use of taser does not constitute excessive force. Id. at 5–6. The City also argues that no constitutional violation resulted from Officer Grubbs turning off his BWC. Id. at 6–7.

As to the custom and policy arguments, the City contends that Plaintiff did not present evidence of an APD custom or policy of excessive force regarding use

15

of taser or evidence of prior complaints concerning excessive force by use of taser. Id. at 7–9. Similarly, the City contends that Plaintiff did not establish a failure to train officers on proper use of tasers because the evidence showed relevant use-of-taser training and did not reveal a deliberate indifference to a need for more training on that issue by, for example, showing a pattern of officers using tasers improperly. Id. at 9–11. The City also argues that Plaintiff failed to show a policy or custom concerning deliberate indifference towards use of BWCs, let alone such a policy that caused Mr. Blasingame's injury. Id. at 11–14.

Plaintiff asserted his claim against the City of Atlanta under 42 U.S.C. § 1983. Doc. No. [52], ¶¶ 29–38. Under a § 1983 "Monell" claim, a plaintiff may vindicate his federal constitutional rights against municipalities. See Monell v. Dep't of Soc. Servs. of N.Y.C., 436 U.S. 658, 690–94 (1978); see also Khoury v. Miami-Dade Cnty. Sch. Bd., 4 F.4th 1118, 1131 (11th Cir. 2021) (discussing Monell claim against a municipality). To succeed on a Monell claim, a plaintiff must show that the "municipality *itself*," through a policy or practice, "cause[d] the constitutional violation." City of Canton v. Harris, 489 U.S. 379, 385 (1989); Monell, 436 U.S. at 694; Khoury, 4 F.4th at 1131 (stating that a municipality can be held liable under § 1983 only if a municipal policy caused a constitutional tort).

16

Moreover, a plaintiff must show that the municipality's practice, policy, or custom that caused the constitutional injury constituted deliberate indifference to the constitutional right that was violated. City of Canton, 489 U.S. at 388–89. A plaintiff must show that the municipality was the "moving force" behind the constitutional injury. Barnett v. MacArthur, 956 F.3d 1291, 1296 (11th Cir. 2020). Further, municipal liability cannot be based on theory of *respondeat superior* or vicarious liability. City of Canton, 489 U.S. at 385; Monell, 436 U.S. at 694.

To establish a municipal custom or policy, a plaintiff must identify (1) "a widespread practice that . . . is so permanent and well settled as to as to constitute a custom," (2) an official, written policy or lack thereof, (3) decision by a final policymaker, (4) inadequate training or a failure to train, (5) failure to monitor or supervise, (6) hiring, or (7) a final policymaker's ratification of a subordinate's unconstitutional act. See City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988) (internal quotations omitted) (custom); McKusick v. City of Melbourne, 96 F.3d 478, 483 (11th Cir. 1996) (policy); Pembaur v. City of Cincinnati, 475 U.S. 469, 480 (1986) (decision by a final policymaker); Connick v. Thompson, 563 U.S. 51, 61 (2011) (failure to train); Greason v. Kemp, 891 F.2d 829, 836–37 (11th Cir. 1990) (failure to monitor); Griffin v. City of Opa-Locka, 261 F.3d 1295, 1313 (11th Cir.

17

2001) (hiring); <u>Matthews v. Columbia Cnty.</u>, 294 F.3d 1294, 1297 (11th Cir. 2002) (ratification). To show such a policy or custom, a plaintiff must show a persistent and widespread practice about which the municipality is at least constructively aware. <u>Khoury</u>, 4 F.4th at 1131. Similarly, "random acts or isolated incidents are insufficient to establish a custom or policy." <u>Id.</u> (citation omitted).

Regarding the City's first argument, the Court finds that there was enough evidence at trial to support the jury's finding that Officer Grubbs used excessive force against Mr. Blasingame. The Court will address that issue in more depth in the next section of this Order. Moving to the City's policy arguments, however, the Court agrees that Plaintiff did not present sufficient evidence to find against the City of Atlanta under a <u>Monell</u> theory.

To put it simply, the evidence adduced at trial did not show a custom or policy that amounted to deliberate indifference towards a constitutional right sufficient to support Plaintiff's <u>Monell</u> claim. Looking first to use of excessive force and tasers, the evidence showed that the APD requires officers to undergo extensive training concerning use of force, which includes training regarding proper use of tasers. The APD maintains an official policy regarding proper use

18

of tasers, which provides guidance about when, where, and against whom an officer generally should not discharge tasers.

Given those adequate and reasonable official policies, Plaintiff had to show a de facto or unofficial policy or custom that permitted officers to use excessive force, and specifically tasers, in a manner that resulted in the particular use of excessive force at issue. Plaintiff failed to do that. For example, Plaintiff did not provide evidence of a widespread or pervasive practice concerning uses of force or tasers. No evidence showed that the APD was on notice of improper uses of tasers, let alone that the APD acted with deliberate indifference toward improper uses of tasers. And the audit trail regarding Officer Grubbs's prior uses of tasers did not show how or why he discharged his taser, or whether his prior uses of taser constituted excessive force. All the evidence showed, then, was the isolated use of a taser by Officer Grubbs against Mr. Blasingame. As the authority cited above provides, such an isolated incident is insufficient to sustain a Monell claim. Because Plaintiff failed to show that the City of Atlanta was the moving force behind Officer Grubbs's use of taser against Mr. Blasingame, the Court finds that there was not sufficient evidence at trial for the jury to find against the City of Atlanta with respect to use-of-force or use-of-taser policies.

19

Similarly, the Court finds that evidence relating to disciplinary measures against Officer Grubbs does not support Plaintiff's <u>Monell</u> claim. Even viewing that evidence in the light most favorable to Plaintiff,[11] the arguably delayed investigation and ultimate disciplinary findings concern an isolated incident and do not show a sufficient pattern to support a <u>Monell</u> claim.

The Court's findings do not end this inquiry, though, because Plaintiff also pursued a <u>Monell</u> theory on the premise that the APD's policies concerning use of BWCs caused the use of excessive force at issue. To be sure, Plaintiff presented evidence concerning improper use of BWCs within the APD. For example, there was conflicting testimony regarding whether officers were adequately trained as to the effect toggling the buttons on the BWC would have on the BWC's recording function. Further, evidence indicated that BWCs were active only a third of the time they were supposed to be active—although Defendants were able to elicit mitigating testimony from an APD witness on that issue. Other evidence showed that officers generally were not disciplined for failing to adhere to BWC policies.

---

[11]  Because the evidence of Officer Grubbs's discipline was the subject of Defendants' discovery violation, the Court considers it only to the extent Plaintiff discusses it in his briefing. <u>See, e.g.</u>, Doc. No. [168], 4–5.

And Plaintiff's experts opined that these shortcomings fostered an environment in which officers understood that BWC policies were not being enforced, which in turn allegedly increased the likelihood that officers would use excessive force. Even considering that evidence in the light most favorable to Plaintiff, however, the Court cannot find that there was sufficient evidence to support a finding that any policies and procedures relating to BWCs *caused* the constitutional violation at issue. For example, while Plaintiff's experts gave broad, conclusory opinions that proper use of BWCs can reduce uses of excessive force, Plaintiff did not show that the APD's failings regarding BWC usage increased uses of excessive force. Thus, even if Plaintiff showed a persistent failure to comply with or enforce the APD's BWC policies, that failure was not shown to have resulted in a widespread use of excessive force. As such, there is a fatal disconnect between the BWC policy or custom and the excessive use of force in this case.

Notably, the only legal authority Plaintiff cites to support this novel theory is an unpublished summary judgment decision from a district court outside the Eleventh Circuit. See Doc. No. [168], 18 n.1 (citing Epps v. City of Denver, No. 1:20-cv-01878-RBJ, 2022 WL 605739 (D. Colo. Mar. 1, 2022)). Of course, that case does not bind this Court. Further, it does not disavow this Court of its view that

21

the causal relationship between use of BWCs and the use of excessive force in this case is too tenuous to support Plaintiff's <u>Monell</u> claim. No Eleventh Circuit court has held otherwise, and the Court has no reason to believe that the Eleventh Circuit would favor such a theory. Accordingly, the Court finds that Plaintiff's BWC <u>Monell</u> theory cannot support the jury verdict against the City of Atlanta.

This Court does not make this decision lightly. Trial by jury is a hallmark of our justice system, a bedrock principle of this country, and is embedded in our Constitution. The judiciary has long deferred to jury verdicts. But the Court must correct a clear error in those rare cases where juries reach a legally unsupportable result. <u>Richardson v. Mason</u>, 956 F. Supp. 2d 1372, 1374–75 (M.D. Ga. 2013). With respect to Plaintiff's <u>Monell</u> claim against the City of Atlanta, the jury did so here.[12] The Court finds that the City of Atlanta's Rule 50(b) motion is due to be granted, and the Court will direct for judgment to be entered in the City's favor.

---

[12]  The Court's jury instruction specific to the <u>Monell</u> claim, to which neither Plaintiff nor Defendants objected, was as follows:

> Plaintiff claims that the City of Atlanta is liable for failing to adequately train and/or supervise its officer—Defendant Officer Jon Grubbs—and that this failure caused Defendant Grubbs to violate Jerry Blasingame's Fourth Amendment right to be free from excessive force.

**B.     Officer Grubbs's Rule 50(b) Motion Is Due to Be Denied**

Officer Grubbs moved for judgment as a matter of law under Rule 50(a) during trial, which the Court did not grant. See Doc. Nos. [153]; [161]. Officer Grubbs renewed his motion under Rule 50(b) after the close of evidence. Doc. No. [155]. Plaintiff's and Officer Grubbs's briefing are as follows.

Plaintiff argues that Officer Grubbs is not entitled to judgment as a matter of law because his use of force against Mr. Blasingame was unreasonable, excessive, and in violation of the Fourth Amendment. Doc. No. [169], 10. Plaintiff

---

> To succeed on this claim, Plaintiff must prove each of the following facts by a preponderance of the evidence:
>   First: That Defendant Officer Grubbs violated Jerry Blasingame's Fourth Amendment right to be free from excessive force;
>   Second: That Defendant Officer Grubbs was not adequately trained in using force and specifically in using a taser;
>   Third: That the City of Atlanta knew based on at least one earlier instance of unconstitutional conduct materially similar to Defendant Officer Grubbs' violation of Jerry Blasingame's constitutional rights that additional training/supervision was needed to avoid the excessive force used from likely recurring in the future: and
>   Fourth: That the City of Atlanta made a deliberate choice not to provide additional training and/or supervision to Defendant Officer Grubbs.

At the very least, the jury's verdict was not supported by evidence concerning the third prong in that charge.

23

argues that, under 11th Circuit precedent, Officer Grubbs firing his taser at Mr. Blasingame on an elevated surface constitutes deadly force. Id. (citing Bradley v. Benton, 10 F.4th 1232, 1240–41 (2021)). Plaintiff argues that the use of deadly force was unreasonable and excessive because Officer Grubbs did not (1) warn before firing his taser, (2) have probable cause to think Mr. Blasingame had committed a crime that involved physical harm, and (3) have probable cause to conclude that Mr. Blasingame posed a threat to others. Id. at 11.

Finally, Plaintiff argues that Officer Grubbs's use of unreasonable and excessive force against Mr. Blasingame violated a clearly established constitutional right to be free from unreasonable search and seizure. Id. at 10, 14. Plaintiff argues that, because of the Bradley decision, Officer Grubbs was aware that his use of deadly force was "obviously unconstitutional." Id. at 15. According to Plaintiff, any attempt to argue otherwise would jeopardize the City's position regarding Officer Grubbs's taser training. Id. at 14.

In his brief, Officer Grubbs argues that he is entitled to qualified immunity. Doc. No. [176], 2, 4. He contends that, because his use of taser was an act within his discretionary authority, Plaintiff must show that the facts demonstrate a violation of Mr. Blasingame's constitutional rights, and that those rights were

24

"clearly established" at the time of the conduct at issue. Id. at 4. Officer Grubbs

argues that Plaintiff failed to do so. Id. at 5.

Officer Grubbs notes that Mr. Blasingame resisted arrest, fled from the

scene, and "used a backwards swinging motion" towards Officer Grubbs during

pursuit. Id. at 6. Officer Grubbs states that because Mr. Blasingame was allegedly

noncompliant and physically threatening, he fired his taser to "avoid harm to

himself, Blasingame, and others" Id. at 7. Officer Grubbs also argues he did not

violate Mr. Blasingame's constitutional rights because, given the circumstances,

firing his taser was reasonable. Id. at 6-7.

Additionally, Officer Grubbs argues that Plaintiff has failed to show that

the constitutional rights allegedly violated were "clearly established" Id. at 9.

Officer Grubbs claims that Plaintiff did not cite a case holding that "employing a

taser one time against a fleeing suspect who is resisting arrest and making

threatening physical gestures towards an officer violates a constitutional right."

Id. Officer Grubbs cites cases in which courts held that using a taser against a

noncompliant suspect did not violate a clearly established constitutional right.

Id. at 9-10. Further, Officer Grubbs argues that Plaintiff has no constitutional right

to BWC recordings. See id. at 2, 8, 10.

25

In sum, Officer Grubbs argues he is entitled to qualified immunity because Plaintiff has failed to show that the conduct at issue violated Mr. Blasingame's clearly established constitutional rights. Id. at 10.

Plaintiff asserted an excessive force claim against Officer Grubbs. Doc. No. [52], ¶¶ 29–37. "The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest." Lee v. Ferraro, 284 F.3d 1188, 1197 (11th Cir. 2002). An officer's "right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Id. (quoting Graham v. Connor, 490 U.S. 386, 396 (1989)). "An officer's use of force is excessive under the Fourth Amendment if the use of force was 'objectively [un]reasonable in light of the facts and circumstances confronting' the officer." Fils v. City of Aventura, 647 F.3d 1272, 1287 (11th Cir. 2011) (quoting Graham, 490 U.S. at 397). Courts assess reasonableness objectively "from the perspective of a reasonable officer on the scene." Graham, 490 U.S. at 396. That "allow[s] for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Id. at 396–97.

Courts considering excessive force claims must "balance the necessity of using some force against the arrestee's constitutional rights." <u>Teal v. Campbell</u>, 603 F. App'x 820, 821 (11th Cir. 2015); <u>see also</u> <u>Graham</u>, 490 U.S. at 396 (stating that when analyzing reasonableness, a court must carefully balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake" (cleaned up)). Factors courts should consider in this analysis include:

> (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; (3) whether he is actively resisting arrest or attempting to evade arrest by flight; (4) the need for the application of force; (5) the relationship between the need and amount of force used; and (6) the extent of the injury inflicted.

<u>Teal</u>, 603 F. App'x at 821. When conducting this analysis, the court should keep in mind that an officer may use force that is "necessary in the situation at hand." <u>Lee</u>, 284 F.3d at 1197.

"A government official faced with a civil rights claim brought pursuant to 42 U.S.C. § 1983 is entitled to raise the affirmative defense of qualified immunity." <u>Simmons v. Bradshaw</u>, 879 F.3d 1157, 1162 (11th Cir. 2018). Qualified immunity typically functions as an immunity from suit and should be decided

well before trial. Id. But when the court is not presented with the opportunity to resolve the question of qualified immunity before trial, the court may consider a qualified immunity defense with a timely Rule 50(a) or 50(b) motion. See Cottrell v. Caldwell, 85 F.3d 1480, 1487 (11th Cir. 1996); Rivera v. Cohen, No. 2:08-CV-195, 2010 WL 11622626, at *2 (M.D. Fla. Mar. 29, 2010) (first considering qualified immunity defense in the context of a Rule 50(a) motion because the defendants had not timely moved for summary judgment to raise that defense).

Officials seeking qualified immunity must first establish that they were acting in their "discretionary authority when the alleged constitutional violation occurred." Lewis v. City of W. Palm Beach, 561 F.3d 1288, 1291 (11th Cir. 2009). The burden then shifts to the plaintiff, who can overcome the qualified immunity defense by showing that (1) the defendant's conduct violated a constitutional right and (2) this right was "clearly established at the time of the alleged violation." Townsend v. Jefferson Cnty., 601 F.3d 1152, 1158 (11th Cir. 2010). A plaintiff can show a violation of a clearly established constitutional right by citing a materially similar case decided by the Supreme Court, the regional circuit court, or the relevant state supreme court, or by showing "that the case fits within that exceptional conduct which so obviously violates the Constitution that prior case

28

law is unnecessary." Teal, 603 F. App'x at 821; see Post v. City of Fort Lauderdale, 7 F.3d 1552, 1557 (11th Cir. 1993) (stating that a plaintiff cannot show that the law is clearly established by relying on general allegations or broad legal truisms).

In excessive force cases, qualified immunity applies unless every reasonable officer in the defendant's position would have concluded that the force used was unlawful. Nolin v. Isbell, 207 F.3d 1253, 1255 (11th Cir. 2000); see also Saunders v. Duke, 766 F.3d 1262, 1267 (11th Cir. 2014) (stating that the court must determine whether the officer's conduct was objectively reasonable given the facts confronting the officer and must not consider such reasonableness with "the 20/20 vision of hindsight").

To start, the Court addresses Officer Grubbs's argument concerning there being no constitutional right to BWC recordings. The Court believes that he misconstrues Plaintiff's legal theory. Plaintiff does not claim a constitutional right to BWC recordings. Rather, Plaintiff's argument goes as follows: Police departments such as the APD require officers to keep their BWCs on to record their actions on duty, which theoretically deters uses of excessive force. But when officers do not properly use their BWCs, that deterrent mechanism vanishes. And if a police department does not enforce its official BWC policies, there arises a de

29

facto policy permitting officers not to use their BWCs, which emboldens officers to use excessive force in the absence of the deterrence mechanism. Plaintiff argues that such a de facto policy caused the excessive force at issue in this case. That theory is not the same as claiming a constitutional right to BWC recordings themselves. And the Court does not understand Plaintiff to be making such an argument. Thus, the Court disregards Officer Grubbs's argument that Plaintiff has no constitutional right to BWC recordings.

Now the Court moves to the Parties' other arguments. First, the Court agrees that Officer Grubbs, who was an on-duty law enforcement officer effecting a seizure, was acting in his discretionary capacity when he tased Mr. Blasingame. Thus, Plaintiff had to show that Officer Grubbs violated Mr. Blasingame's clearly established constitutional rights. The Court finds that there was enough evidence to support the jury's finding that Officer Grubbs violated Mr. Blasingame's clearly established constitutional rights.

Following the instructions of Graham and its progeny, this Court considers whether there was an excessive use of force from the perspective of a reasonable officer facing the circumstances that Officer Grubbs faced. Here, the Court notes that some facts fall in favor of Officer Grubbs. Mr. Blasingame was breaking the

30

law, he ran from an officer who was attempting to apprehend him, and he moved or swung his arm at the pursuing officer. But other evidence supports Plaintiff's case. Mr. Blasingame's unlawful conduct was panhandling, which is not a serious crime. Moreover, it is a crime that did not place anyone in danger. Similarly, the evidence does not show that Mr. Blasingame posed an immediate threat to the safety of Officer Grubbs and others. Although a suspect swinging an arm at an officer typically might raise an inference that the suspect posed a threat, Officer Grubbs made clear during his testimony that he did not feel as though he was in danger during his encounter with Mr. Blasingame, including when the latter made his "clearance strike" at Officer Grubbs. Given the fact-specific nature of this inquiry, the Court takes Officer Grubbs at his word and finds that a reasonable officer in the same position would not have felt an immediate threat of danger. Also, the Court does not find that Mr. Blasingame posed an immediate threat to motorists because there was no non-speculative evidence showing that he intended to run directly onto, rather than along, the road next to the bottom of the hill. With those facts established, it would be reasonable for a jury to determine that there was not a great need for the application of force and that the use of a taser was disproportionate to whatever need for force existed. Also, the

significant extent of the injury inflicted by the use of taser counsels in favor of finding a use of excessive force. Accordingly, under the circumstances, the Court finds that there was enough evidence at trial to support the jury's finding that Officer Grubbs used excessive force and violated Mr. Blasingame's Fourth Amendment rights.

Now, the Court considers whether the constitutional violation at issue was clearly established as a matter of law. After careful consideration, the Court finds that it was. The Court looks to the Eleventh Circuit's decision in <u>Bradley</u> for guidance. There, an individual who had not committed a serious crime fled from a pursuing officer and attempted to climb over a fence to continue evading the officer. 10 F.4th at 1236. That fence was next to an eight-foot-high concrete wall, over which the suspect also attempted to climb. <u>Id.</u> Without warning, the officer discharged his taser at the fleeing suspect. <u>Id.</u> Viewing the evidence in the light most favorable to the non-movant, the facts indicated that the tasing caused the suspect to fall from the elevated height and onto the ground. <u>Id.</u> That impact caused fatal blunt force trauma to the suspect's head and neck. <u>Id.</u> On appeal, the Eleventh Circuit rejected the officer's qualified immunity argument, finding that he used excessive force and violated a clearly established constitutional right by

32

firing his taser without warning at a non-threatening suspect who was atop an elevated surface and precarious position. Id. at 1240–44. The court recognized that while a taser is not inherently a deadly-force weapon, it can be used to apply deadly force in some circumstances. Id. at 1241. The Court determined that the use of taser in that case reasonably could be found to have created a substantial risk of serious bodily harm or death because it was used against an individual on an elevated surface. Id. Also, under the circumstances—including the absence of a threat of serious physical harm, the lack of a preceding serious crime, and the firing of the taser without warning—the court determined that the level of force was unreasonable under the circumstances. Id. at 1241–42. Finally, citing materially similar cases that predated the event at issue, the court determined that the officer had violated a clearly established constitutional right by tasing the suspect when he was on an elevated and precarious surface. Id. at 1242–44.

Following both the teachings of Bradley and the materially similar cases cited therein, the Court finds that Officer Grubbs violated Mr. Blasingame's clearly established Fourth Amendment rights.[13] Officer Grubbs tased a fleeing

---

[13] To be clear, the Court recognizes that a "materially similar" case in this analysis must pre-date the officer's alleged improper conduct. Mercado v. City of Orlando, 407 F.3d

but non-threatening suspect who had not committed a serious crime when that suspect was on an elevated, precarious surface, which made it highly likely that the tasing would result in serious injury or death. Even had the utility box not been at the bottom of the hill, Mr. Blasingame's fall could have resulted in serious injury. The fact that Mr. Blasingame's head slammed into that utility box only worsened an already dangerous fall. Thus, the Court finds that Officer Grubbs used excessive force and violated Mr. Blasingame's clearly established constitutional rights. Officer Grubbs does not enjoy qualified immunity.

Officer Grubbs's case citations do not convince the Court otherwise. He cites Draper v. Reynolds, 369 F.3d 1270 (11th Cir. 2004) for the proposition that an officer may reasonably tase a suspect who refuses to comply with an officer's

---

1152, 1159 (11th Cir. 2005); see also Keating v. City of Miami, 598 F.3d 753, 767 n.6 (11th Cir. 2010) (declining to cite a decision as a materially similar case because that decision was not the law at the time of the incidents at issue). Here, Bradley was issued in 2021, which was after the incidents at issue in this case. Thus, the Court cannot cite Bradley itself as a materially similar case. The Court finds that does not matter, though, because the Bradley court cited numerous cases pre-dating the events at issue here that clearly established that using significant and potentially deadly force against a non-threatening suspect who is on an elevated surface violates that suspect's Fourth Amendment rights. See 10 F.4th at 1242–44 (listing and discussing cases). This Court adopts those citations and the holding in Bradley—it was clearly established when Officer Grubbs tased Mr. Blasingame at the top of what Officer Grubbs recognized to be a steep downward slope that using such force against a fleeing but non-violent suspect violates that individual's Fourth Amendment rights.

verbal commands. But the facts of that case differ because the suspect had been "hostile, belligerent, and uncooperative" for an extended period and repeatedly refused to comply with direct orders. Draper, 369 F.3d at 1278. Moreover, nothing in the facts of that decision indicates that the suspect was tased while on top of an elevated surface. See id. Although Mr. Blasingame fled and was not obeying verbal commands from Officer Grubbs, the Court finds the circumstances to be different here because the lack of a belligerent suspect removes the element of immediate danger that the Draper court homed in on in reaching its decision. See id. (stating that the "use of the taser gun may well have prevented a physical struggle and serious harm to either Draper or Reynolds"). Because such clearly hostile acts were absent here, the Court does not find that Draper compels a finding in Officer Grubbs's favor.[14] The other cases Officer Grubbs cites also do

---

[14] On a related note, the Court takes issue with the altered quotation from Stryker in which Officer Grubbs states that the Eleventh Circuit has "explicitly held—and thus clearly established—that [only] employing a taser on a compliant, nonthreatening suspect violates the Constitution." Doc. No. [176], 2. The insertion of "[only]" is a clear attempt to cabin the realm of unacceptable uses of tasers to those uses against "a compliant, nonthreatening suspect." But just as clearly, the fleeing suspect in Bradley was not compliant. Yet the Eleventh Circuit found that the officer did not enjoy qualified immunity at summary judgment. Thus, from this Court's point of view, Officer Grubbs's altered quotation does not accurately state the law. Moreover, it ignores a binding decision that this Court discussed in detail during trial, and which the Court highlighted as a point of concern. Despite that emphasis, Officer Grubbs not only failed

match the facts of this case, and they do not convince the Court that qualified immunity applies.

Accordingly, the Court finds that because there was evidence to support the jury's finding that Officer Grubbs used excessive force, and because Officer Grubbs does not enjoy qualified immunity, his motion for judgment as a matter of law is due to be denied.

**CONCLUSION**

For the foregoing reasons, the Court: (1) **GRANTS** the City of Atlanta's Renewed Motion for Judgment as a Matter of Law Pursuant to Federal Rule of Civil Procedure 50(b); and (2) **DENIES** Officer Grubbs's Renewed Motion for Judgment as a Matter of Law Pursuant to Federal Rule of Civil Procedure 50(b). Doc. No. [155]. Further, while the Court considered the briefing contained in the filing at Doc. No. [176], the Court **DENIES** that motion for the reasons discussed supra in footnote 2.

The Court **DIRECTS** the Clerk to enter judgment (1) in favor of the City of Atlanta and (2) against Officer Grubbs for the amounts provided in the jury

_____

to cite it in his brief; he provided a statement of law that all but ignores it.

verdict at Doc. No. [163]. The Court further **DIRECTS** the Clerk to **close this case** upon entry of that judgment.

   **IT IS SO ORDERED** this 14th day of September, 2022.

         **/s/ Steve C. Jones**
         **HONORABLE STEVE C. JONES**
         **UNITED STATES DISTRICT JUDGE**