```
 1                 UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF GEORGIA
 2                       ATLANTA DIVISION


 3


 4  KEITH EDWARDS, AS GUARDIAN AND )
    CONSERVATOR FOR JERRY          )
 5  BLASINGAME,                    )
                    PLAINTIFF,     )
 6                                 ) DOCKET NO. 1:19-CV-02047-SCJ
         -VS-                      ) VOLUME 1
 7                                 )
    OFFICER J. GRUBBS AND THE CITY )
 8  OF ATLANTA,                    )
                    DEFENDANTS.    )
 9  _____


10                   TRANSCRIPT OF JURY TRIAL
              BEFORE THE HONORABLE STEVE C. JONES
11                 UNITED STATES DISTRICT JUDGE
                   WEDNESDAY, AUGUST 17, 2022
12
    APPEARANCES:
13
    ON BEHALF OF THE PLAINTIFF:
14
       VERNON R. JOHNSON, ESQ.
15     DARREN MICHAEL TOBIN, ESQ.
       AYANNA D. HATCHETT, ESQ.
16
    ON BEHALF OF THE DEFENDANT:
17
       STACI J. MILLER  ESQ.
18     JAMES E. DEARING, JR.
       HERMISE PIERRE, ESQ.
19


20


21        VIOLA S. ZBOROWSKI, RDR, FAPR, CMR, CRR, RPR, CRC
       OFFICIAL COURT REPORTER TO THE HONORABLE STEVE C. JONES
22                 UNITED STATES DISTRICT COURT
                        ATLANTA, GEORGIA
23                        404-215-1479
                  VIOLA_ZBOROWSKI@GAND.USCOURTS.GOV
24


25
```

1

2                              I N D E X

3

4                         DIRECT    CROSS    REDIRECT    RECROSS

5    VOIR DIRE                17

6    OPENING STATEMENT BY
     MR. JOHNSON             109

7

     OPENING STATEMENT BY
8    MR. DEARING             133

9    JULIO REYES, JR.        146

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (HELD IN OPEN COURT AT 9:30 A.M.)

2          THE COURT:  Well, let me say to everyone, to the 30

3    jurors that we have and also to all of the parties and lawyers,

4    good morning again to you.  I'm happy to have you-all here.  And

5    to the jurors, let me say, on behalf of my colleagues from the

6    United States for the Northern District of Georgia, we want to

7    thank you-all for being here this morning and participating in

8    this case.

9          You know, in America we have a lot of freedoms and a lot

10   of rights dealing with anything from speech, a lot of different

11   matters.  But probably one of the most important rights we have is

12   the right to a jury trial.  And unlike in some other parts of the

13   world, the jury trial is based on having people participate and

14   having people doing certain things.  There's not one person may be

15   appointed by a king or queen that may decide people's property

16   rights or disputes or even freedom.

17         And having a jury trial, though, it is not possible

18   without certain things happening.  People playing certain roles.

19   I have a role in the jury trial, the lawyers have a role in the

20   jury trial.  But probably more important than anything, you-all as

21   potential jurors -- you are the jurors -- have a role in the jury

22   trial.  It is also not possible to have a jury trial without

23   you-all as jurors, people out of the community that will be

24   selected by the parties to decide certain matters that affect

25   their lives, families in a lot of different ways.

1          I had an opportunity to look at a lot of different legal

2 systems in the world, and there are a lot of good legal systems.

3 And I'm not bias, I think, when I say this, the system we have in

4 America, not perfect, but works by far better than anything else.

5 That's why I thought I would start off by thanking you all this

6 morning, because you-all are here and you're participating and

7 you're making sure this right to a jury trial continues.

8          Now, during that, eight of you-all will be selected to

9 hear this case.  This case, I would anticipate, I think will take

10 ten days to try -- maybe a day less, maybe a day more -- somewhere

11 in there.  And you will be asked to do a lot of different things,

12 and you will be called on to do a lot of different things.

13          Let me start off by saying, you notice I don't have on a

14 mask this morning.  I'm constantly talking, and it will be

15 practically impossible to hear me and understand me with a mask

16 on.  I understand we now have a lot of different things that

17 protect a lot of us, regarding the different variants and

18 pandemics.  But I'm going to ask, out of respect -- I know some of

19 you-all have masks on, some of you-all don't, I respect -- as I

20 told some of my externs yesterday, out of respect, I'm going to

21 ask you to wear your mask.  You may say, Judge, I don't want to

22 wear that mask.

23          Sometimes as I've learned in life growing up, as my

24 parents told me, sometimes you have to do things that are not best

25 for you but may be in the best interest of somebody else.  Now, I

1 | was told that as a young man, Mr. Johnson, Mr. Dearing, and now
2 | I'm an old man.  And I believe it even stronger now than I did
3 | when they told me this at eight years old.
4 |        So I understand I'm probably asking you maybe to do
5 | something, and you say, you don't have -- I'm constantly talking.
6 | But you can ask anyone in my office, I have my mask on.  And,
7 | again, I understand that some people will say, I don't want to
8 | wear that mask, Judge.  But out of respect for the person sitting
9 | next to you, I'm going to ask all of the jurors to wear their
10 | mask.
11 |        Now, the lawyers, you will notice, some of them have
12 | masks on, some of them don't.  They are going to be doing a lot of
13 | talking as well, but some of them, when they're not talking, are
14 | not going to have their mask on as well.  We're going to try to
15 | get through this.  My job is to conduct a jury trial.  But my job
16 | is also to look out for you-all's best interest and their best
17 | interest.  And in doing that, I have to be like a shepherd, I have
18 | to make sure everybody is taken care of.
19 |        So I apologize to anybody that says, Judge, I don't want
20 | to wear this mask.  I apologize to you, okay, but I'm going to ask
21 | everybody to wear the mask in the jury pool.
22 |        Now, a couple of things I'm going to tell you this
23 | morning again.  Probably in about 20 minutes, I will start asking
24 | you questions and the lawyers will start asking you questions.
25 | The questions we ask you are not meant to embarrass you or put you

1  on the spot or get involved in your personal business.  There are

2  certain things they need to know or would need to know in order to

3  select a jury.  If they ask you a question you don't feel

4  comfortable answering at all from the pool, just raise your hand

5  and say, Judge, I would rather answer that question privately.  No

6  problem whatsoever.  We'll bring you up and take you in the jury

7  room and allow you to answer those privately.

8         Again, we're not here to embarrass you or put you on the

9  spot.  But it is very important that you answer the questions

10  completely.  That you don't sit there and say, well, maybe I

11  should tell them this.  No, I won't tell them.  Let me give you an

12  example of what I'm talking about.

13         If you have a non-refundable airplane ticket for you to

14  take a trip within the next ten days, you need to tell me.  About

15  six months ago -- was it six months ago, Ms. Wright -- we had a

16  jury trial.  A gentleman sat right where that lady right there in

17  the brown sweater is sitting, beige sweater.  And we went through

18  the whole jury selection.  He was selected.  And then just before

19  opening statements he said, Judge, I promised my wife and my kids

20  I was going to take them to Disney World and that's going to

21  happen two days from now.  And the trial was an eight-day trial.

22         Well, guess what happened?  He lucked out, because he

23  was not going to be allowed to go to Disney World.  His wife and

24  kids maybe were going to go.  It worked out the -- things worked

25  out where the case worked out where he could go to Disney World,

```
 1   let's put it this way.  He didn't tell us.  Tell me.

 2           Don't wait until I select you to find out that you have

 3   surgery tomorrow.  Tell me.  I -- we need to know.  It is no

 4   problem.  If you want to tell me privately, tell me.  Complete

 5   answers, open and honest answers works for everybody's benefit.

 6           Now, with that stated, Ms. Wright will call the case for

 7   the day.

 8           THE DEPUTY CLERK:  Yes, sir.

 9           The Court now calls for trial the matter of Keith

10   Edwards, as guardian and conservator for Jerry Blasingame v.

11   Officer J. Grubbs and the City of Atlanta, Civil Action No.

12   1:19-CV-2047-SCJ.

13           THE COURT:  Mr. Johnson, how does the plaintiff

14   announce?

15           MR. JOHNSON:  Good morning, Judge.  Vern Johnson on

16   behalf of plaintiff, co-counsel Ayanna Hatchett on behalf of

17   plaintiff, Darren Tobin co-counsel on behalf of plaintiff, and Mr.

18   Edwards, Your Honor, at the second table, conservator on behalf of

19   plaintiff.  Thank you, and good morning.

20           THE COURT:  All right.  And how does Mr. Dearing and

21   Ms. Miller, how do the defendants announce?

22           MS. MILLER:  Thank you, Your Honor.  For the defendants

23   John Grubbs and the City of Atlanta, I'm Staci Miller, and I'm

24   joined by my colleagues James Dearing and Ms. Hermise Pierre.

25           THE COURT:  Okay.  Both sides announce ready for this
```

1 case.

2          At this time, Mr. Johnson, I will allow you to very

3 briefly introduce yourself and who will be working with you in

4 this case.  Followed by Ms. Miller will introduce herself and who

5 will be working with her in the case.

6          MR. JOHNSON:  Thank you, Judge.

7          Good morning, ladies and gentlemen.  As I told you, my

8 name is Vern Johnson.  I'm with the law firm of Johnson Law in

9 Detroit, Michigan.  I work there along with Ayanna Hatchett also

10 from the Johnson Law in Detroit, Michigan.  And we're very

11 fortunate to have Mr. Darren Tobin, who is a local lawyer here in

12 Atlanta, what we call our local counsel.

13          I told you about Mr. Edwards, our client and

14 conservator.  You'll hear more about that later.  We also have at

15 counsel table Mr. Anthony Cairo.  Mr. Anthony Cairo is an IT

16 technical guru, I'm not.  So he will help us with the computer and

17 exhibits.  And also from our firm Mr. Steve Hnat, H-N-A-T, who

18 will assist us, likewise, in the trial process.

19          Judge, I think I've got everybody.

20          THE COURT:  Thank you, Mr. Johnson.

21          MS. Miller?

22          Ms MILLER:  Yes, Your Honor.

23          Good morning, my name is Staci Miller.  I'm one of the

24 defense attorneys for the defendant the City of Atlanta and

25 Officer John Grubbs.  I have joined with me, Mr. James Dearing.

1  He's one of our outside counsel for the defendant.  And Hermise

2  Pierre who is counsel for the defendant, as well.  We also have

3  Chandler Davis who is our paralegal, and also Charletta Cartledge

4  who is our legal secretary.

5           THE COURT:  Thank you, Ms. Miller.

6           There is sound -- ladies and gentlemen, we're going to

7  hold off for one second, and we're going to reboot the sound and

8  pick it back up in just a minute.

9           Let's try this.  I'm accused of having a big mouth.  So

10  we're going to see how it works.  Can you all hear me back in the

11  back?  Okay, if you can't hear me, raise your hand.  Okay?

12           I'm going to tell you what this case is about and a

13  brief overview.  This is a civil case.  To help you follow the

14  evidence, I will summarize the parties' positions.

15           Plaintiff, Keith Edwards, as guardian and conservator

16  for Jerry Blasingame, plaintiff, is suing Officer John Grubbs and

17  the City of Atlanta for violating Jerry Blasingame's Fourth

18  Amendment right to be free from excessive or unreasonable force.

19           Plaintiff alleges that Jerry Blasingame suffered

20  physical, mental, and emotional injuries as a result of the

21  defendant Grubbs Tasing him.  Plaintiff claims that defendant

22  Grubbs used his TASER®, constituted excessive force and caused

23  injury to Jerry Blasingame.

24           Additionally, plaintiff alleges that Jerry Blasingame's

25  injuries were caused by defendant City of Atlanta's policies,

1   protocols, and procedures regarding the training and supervision

2   of its officer.

3          Defendant Grubbs and defendant City of Atlanta claimed

4   that their actions were taken in good faith and were reasonable

5   under the circumstances.  Defendants assert that the actions did

6   not violate plaintiff's Constitutional rights.

7          Furthermore, defendants contend that the defendant

8   Grubbs was properly trained by defendant City of Atlanta, and that

9   his actions were appropriate and in accordance with said training.

10  Defendants claim Grubbs' actions were appropriate and reasonable.

11         Now, with that stated, ladies and gentlemen, I want to

12  give you-all instructions on what we call voir dire.  As I

13  indicated to you, in about 20 minutes I'm going to be asking you

14  questions and the lawyers will ask you questions.  But this charge

15  I'm going to give you kind of gives you an indication on how we do

16  voir dire and what is expected of you.

17         The parties, the plaintiff and the defendant in this

18  case -- defendants in this case, have a right to have this case

19  tried by qualified, fair, and impartial jurors.  A qualified and

20  impartial jury is one that is responsible and capable and that

21  will without fear, favor, advice, prejudice, sympathy, or passion,

22  objectively hear and decide the issues to be tried, and render

23  this verdict solely on the evidence presented at this trial and

24  the law applicable to the case given you by the Court.

25         A court cannot assume, without making inquiries, that

1   the jury is qualified and will be impartial.  The inquiries we're

2   about to make to establish that we have a qualified and impartial

3   jury are known as the voir dire examination.  It is a time-honored

4   process by which the qualifications and partiality of the jurors

5   may be determined.

6          Now, members of the jury, its purpose is to develop the

7   truth about the juror's competency, his or her frame of mind, and

8   the ability to do his or her sworn duty in accordance with the

9   juror's oath.  Your answers to the question will enable me to

10  determine whether a juror should be excused for cause, either on

11  my motion, or upon the motion of either party.  Your answers will

12  also allow counsel to make intelligent use of their preemptory

13  challenges.  Preemptory challenges are challenges which the law

14  gives each party to exercise without giving any reason.

15         Now, members of the jury, it is important that your

16  answers to the questions that I ask and the attorneys ask be

17  complete and truthful.  Each of you must disclose upon a juror's

18  question, any and all matters which might tend to disqualify you

19  for any reason from sitting on this case.

20         While a sweep of the questions may be brought, your

21  further duty is to answer honestly and conscientiously to the real

22  implications of the questions and to make your answers as full and

23  complete as possible under the circumstances.

24         False or misleading answers may result in a seating of a

25  juror who the Court might have discharged for cause, or who

1  counsel may have stricken through the exercise of a preemptory

2  challenge, and this could result in a miscarriage of justice.

3       Consider each question very carefully, and do not wait

4  until after you have been selected and sworn as a juror to

5  disclose something that you ought to make known when a question is

6  asked, or when a question suggests some other reason you should be

7  disqualified.

8       Although, some questions will be addressed to all of you

9  collectively, you must consider them as though they asked you

10  individually.  You may also give your answers properly, as I

11  indicated earlier at the bench.

12       Now, ladies and gentlemen, the last thing I will tell

13  you before we move into the questions, we're going to start off by

14  questioning the people in the box, the jury box first.  But for

15  those of you sitting out there, listen to what is being asked,

16  because everybody is going to be asked just about the same

17  question.  And you can be thinking about the answer of what the

18  question is about.

19       If juror one is asked questions, juror two, I can assure

20  you, the questions are not going to be too much different than you

21  got from juror one.  There may be some questions that juror one

22  may give answers to that no one else will be asked, but listen and

23  pay attention to the questions.

24       Now we'll start by asking all 30 of you-all the

25  following questions:

 1          Does any member of the panel know Ms. Ayanna Hatchett,

 2   Darren Michael Tobin, or Vernon Johnson?  If so, please raise your

 3   hand.

 4          This juror has a matter that needs to be taken of.  It

 5   has nothing to do with you-all.

 6          There is no response.

 7          Does any member of the panel know any employees of or

 8   has any -- well, I'll ask her questions on each of these when she

 9   comes back.

10          Does any member of the panel know any employees of or

11   has any member of the panel or their immediate family worked for

12   or been represented by the law firm of Johnson Law, PIC, or Tobin

13   Injury Law?  If so, please raise your hand.

14          Does any member of the panel know Staci Miller, or James

15   Dearing, Jr., or Hermise Pierre?

16          There is no response.

17          Does any member of the panel know any employees of or

18   has any member of the panel or their immediate family worked for

19   the City of Atlanta Law Department?

20          There is no response.

21          Does any member of the panel know Mr. Keith Edwards or

22   Mr. Jerry Blasingame?

23          There is no response.

24          Does anyone know the defendants in this case, Officer

25   John Grubbs?

1           Mr. Grubbs, can you stand up briefly?  And, of course,

2    the City of Atlanta is the other defendant in this case.

3           There is no response.

4           Does anyone know any of the following individuals who

5    may be witnesses in this case?  I'm going to ask the plaintiff's

6    attorney to read out any potential witness you might call, and the

7    defense counsel read out any potential witness you may call.  You

8    may proceed first, Mr. Johnson.

9           MR. JOHNSON:  Thank you, Judge.

10          Attorney Keith Edwards, Alesia Blasingame, Letitia Knox,

11   Officer John Grubbs, Officer Keith Shelley, paramedic Theresa

12   Cuevas, Sergeant La'Wanda Giles, Officer Julio Reyes, Jr., Officer

13   Patrick Fite, F-I-T-E, Officer Michael Banja, B-A-N-J-A, Sergeant

14   Aaron Zorn, Z-O-R-N, Sergeant Zachary Kramer, Sergeant Stephen

15   Stuart, Lieutenant Harajin Zelanaj, Z-E-L-A-N-A-J, Celeste Murphy,

16   Erica Shield, Chief Derrick Shubaum, Amanda Noble, Miriam Cameron,

17   Herman Taylor, Steve McCallum, Karen Williams, Becky Rodriguez,

18   Catherine Stewart, Dr. David Zapata, Dr. Kenisha Williams, Dr.

19   Padella Gustavo, G-U-S-T-A-V-O, Dr. Jonathan Nguyen, N-G-U-Y-E-N,

20   Thomas Tiderington, Andrew Scott, Dr. Michael Thomson, Jan

21   Roughan, R-O-U-G-H-A-N, Dr. Thomas Burns, Dr. Todd Antin,

22   A-N-T-I-N, Dr. Lawrence Miller, Dr. Michael Wilson, Dr. Jerry

23   Smith, and potentially Katrina Floyd.

24          Thank you, Judge.

25          THE COURT:  Does anyone know any of those names that

1  have been read out by Mr. Johnson?  If so, raise your hand.

2          Let the record indicate there was no response.

3          Mr. Dearing?

4          MR. DEARING:  Yes, Your Honor.

5          Some of the names we may repeat.  Michael Banja, John

6  Grubbs, Patrick Fite, or Haranjin Zelanaj, Julio Reyes, Scott

7  Hernanez, Steve McCallum.

8          THE COURT:  Thank you, Mr. Dearing.

9          Let the record reflect there is no response.

10          If you are selected to sit on this case, will you all be

11  able to render a verdict solely on the evidence presented at trial

12  and in the context of law that I will give to you in my

13  instructions?  If not, raise your hand.  Basically, will you

14  follow the instructions of the law that I will give you?

15          Let the record reflect no one raised their hand.

16          Is there any member of the panel who has any special

17  disability or problem that would make serving as a member of this

18  jury difficult or impossible?  If so, please raise your hand.

19          Let the record reflect no one raised their hand.

20          Does any jury hold any belief, religious or otherwise,

21  that discourages or prevents jury service?

22          There is no response.

23          Have you formed or expressed any opinion as to which of

24  the parties are to prevail in this case?

25          There is no response.

 1          THE COURT:  Have you any wish or desires of which of the

 2    parties ought to prevail in this case?

 3          There is no response.

 4          They appear statutorily qualified.

 5          Before we proceed, I need to see Mr. Johnson and

 6    Ms. Miller over here one second.

 7          (The following was held at sidebar.)

 8          THE COURT:  Juror No. 3 told us this morning that she

 9    has stomach problems.  We have already seen it happen.  I'm going

10    to excuse her for two reasons.  I don't know what kind of stomach

11    problems she has.  It might be a bullet, and I don't want to put

12    the bullet in the courtroom.

13          Any objections from the plaintiff?

14          MR. JOHNSON:  No objection.

15          THE COURT:  Any objection from the defendants?

16          MS. MILLER:  No, Your Honor.

17          THE COURT:  All right.  Give me a second, and let me

18    tell her.

19          (A discussion is held off the record.)

20          (End of sidebar.)

21          THE COURT:  Ladies and gentlemen of the jury, each one

22    of you-all have a sheet in your hand.  That sheet has eight

23    questions on it.  What's going to happen, Ms. Wright is going to

24    call your name.  I'm going to ask you to stand up.  You'll be

25    given the mic and you don't have to read the questions out, you

```
 1    can start answering them.  The lawyers have the questions in front
 2    of them.  Answer the questions, once you finished, sit back down
 3    and then pass the mic to the next person that Ms. Wright names.
 4    Any questions about that?
 5              Once all 13 of you-all are questioned, the lawyers,
 6    starting with plaintiff's attorneys have the right to ask
 7    questions -- 20 minutes -- and then the defense attorney, 30
 8    minutes, have the right to ask questions.  Okay.
 9              MR. JOHNSON:  Thank you.
10              THE COURT:  You may proceed, Ms. Wright.
11              THE DEPUTY CLERK:  Kristen David.
12              PROSPECTIVE JUROR:  I currently work for GEMA/Homeland
13    Security.
14              THE COURT:  Let me say this, when you are talking, you
15    can take your mask off.
16              PROSPECTIVE JUROR:  I'm a critical infrastructure
17    planner for GEMA/Homeland Security.  Before that job I was a
18    college student at Savannah State University.  I'm not married.  I
19    live in Fulton County, Atlanta.  Been there for 16 years.  I have
20    a bachelor's degree in Homeland Security and emergency management.
21    No, to the organizations.  I have never been on a jury before.
22    And, no, none of my family have legal training.
23              THE COURT:  Thank you, ma'am.
24              THE DEPUTY CLERK:  Thomas Cuthbert.
25              PROSPECTIVE JUROR:  I'm the chief technology officer at
```

1   Emrgy, Inc., in Atlanta, Georgia.  Prior to that I was chief

2   technology officer at General Electric in Atlanta, Georgia.  My

3   spouse is an engineer.  I have been living in Marietta, Cobb

4   County for the last 12 years.  I have a master's degree in systems

5   engineering.  I'm a -- belong to the Catholic church and I'm a

6   Democrat.  I have never been on a jury before.  And I have

7   received some legal training in IP and patent law.

8              THE COURT:  Thank you, sir.

9              THE DEPUTY CLERK:  Rachel Morin.

10             PROSPECTIVE JUROR:  My present occupation is I'm a

11  senior director of operations for Cardlyitics.  My husband is a

12  creative director.  I live in the City of Atlanta in DeKalb

13  County.  I've lived there for seven years.  I have a bachelor's

14  degree in finance.  I do not belong to any organizations.  I have

15  never been on a jury before, and I have not received any legal

16  training.

17             THE COURT:  Thank you.

18             THE DEPUTY CLERK:  Jesse Kinney.

19             PROSPECTIVE JUROR:  I'm a -- suppose a dog handler for

20  MSA Security.  Before that I was a police officer for inter-county

21  police department.  My wife is a medical assistant.  I live in

22  Locust Grove, which is in Henry County.  I've been there for about

23  five years.  High school.  Don't belonged to any organizations.

24  Never been on a jury, and I have some legal training and my mother

25  is a paralegal.

1          THE COURT:  Thank you.

2          THE DEPUTY CLERK:  Crystal Pulido.

3          PROSPECTIVE JUROR:  My current occupation is a clinical

4    supervisor for Emory Pulmonary.  I've been there for ten years.

5    I'm not married.  Been in Fulton County for 20.  I have an

6    associate's degree.  Don't belong to any of the political parties

7    or religious organizations.  Never been on a jury before.  And

8    nobody in my family has any legal training.

9          THE COURT:  Thank you.

10          THE DEPUTY CLERK:  Kimberly Johnson.

11          PROSPECTIVE JUROR:  My current occupation is in public

12    health.  I work for the Fulton County Board of Health in Fulton

13    County.  I've been there for eight-and-a-half years.  My

14    previously employment was in sales for about 15 years.  Currently

15    not married.  I reside in Kennesaw, Georgia.  I've been living in

16    Cobb County for the last 38 years.  My educational background is,

17    I'm undergrad in psychology and human services, master in public

18    health.  I do not belong to any social, political, or religious

19    organizations.  I have never been on a jury before.  And I do not

20    have any legal training or family members.

21          THE COURT:  Thank you.

22          THE DEPUTY CLERK:  We'll go next to Ashley McClure,

23    obviously.

24          PROSPECTIVE JUROR:  I'm an architect, self-employed at

25    my own company.  Previously I was at Gensler as an architect as

```
 1  well.  My wife's occupation is a user experience designer.  I live
 2  in Decatur in DeKalb County.  I've been there for about 11 years.
 3  I have a dual bachelor degree in architecture and architectural
 4  interior.  I'm a member of the AIA -- American Institute of
 5  Architects as well as Trinity Anglican Mission, which is a church.
 6  I have been selected for jury duty before, but the trial was
 7  settled before it actually happened.  And I have no legal
 8  training.
 9            THE COURT:  Thank you.
10            THE DEPUTY CLERK:  Kira Kelly.
11            PROSPECTIVE JUROR:  I'm a project operations manager for
12  The Beam Team Construction out of Alpharetta.  I've been there for
13  about three-and-a-half years.  My spouse is a director of
14  operations.  We live in Woodstock in Cherokee County.  I've lived
15  there about 28 years.  I've had some college but chose to go a
16  different path.  I am a member of non-denomination church in
17  Cherokee County.  I have never been on a jury before.  None of my
18  family members have any legal training.
19            THE COURT:  Thank you.
20            THE DEPUTY CLERK:  Erica Green.
21            PROSPECTIVE JUROR:  Currently unemployed.  My previous
22  job was a customer service representative.  I am married.  I
23  reside in Decatur, DeKalb County.  Been there for six years.  My
24  educational background is accounting.  No social or religious
25  organizations.  I've never been on a jury.  And I have not
```

 1 | received any legal training.

 2 |             THE COURT:  Thank you.

 3 |             THE DEPUTY CLERK:  Erin Studstill.

 4 |             PROSPECTIVE JUROR:  I'm a VP of operations at

 5 | MarketLauncher.  I've been there for nine years.  My husband owns

 6 | a heavy civil construction company.  I live in Locust Grove in

 7 | Henry County and have lived there for the last five years.  I have

 8 | a bachelor's degree in business management.  I'm a member of

 9 | Turning Point Church, as well as I serve on the Patriot parent

10 | board of my kid's school.  I've never been on a jury before and I

11 | do not have any legal training.

12 |             THE COURT:  Thank you.

13 |             THE DEPUTY CLERK:  Daniel Avenick.

14 |             PROSPECTIVE JUROR:  Good morning.  I work at Coca-Cola

15 | in strategy, in M & A work.  I'm not married, live in DeKalb

16 | County, Atlanta.  MBA.  For social groups, just some military

17 | veterans association stuff, because I'm a veteran myself.  I've

18 | not been on a jury and some legal training, mostly around M & A

19 | and patent law.

20 |             THE COURT:  Thank you.

21 |             THE DEPUTY CLERK:  Heidi Evans.

22 |             PROSPECTIVE JUROR:  I'm the director of an early

23 | intervention program for infants and toddlers who are deaf or

24 | blind.  I work for -- the agency is called Georgia PINES, it's

25 | part of the Department of Education of Georgia.  I have had that

```
 1   job for four years.  Before that I was a teacher.  My husband is a

 2   database administer.  We live in Kennesaw, Cobb, been there

 3   25-plus years.  I hold a Ph.D. in education.  I'm unaffiliated.  I

 4   have been on a jury before.  And we did reach a verdict, it was a

 5   civil case, and neither me nor my family have any legal training.

 6            THE COURT:  And Ralph Hayes.

 7            PROSPECTIVE JUROR:  I am currently senior vice president

 8   of McGriff Insurance Services which is a wholly-owned division of

 9   Truist Financial Corporation.  I operate as a commercial lines

10   insurance broker and agency manager for Eastern South Georgia.  I

11   worked in this job for over 30 years.  I am married.  My wife is a

12   homemaker.  I live in Covington, Georgia, Newton County, Georgia.

13   I lived there for over 20 years.

14            I have a BBA in risk management insurance from the

15   University of Georgia.  I do belong to Church 213, a contemporary

16   Baptist church in Covington, Georgia.  And also a long-term member

17   of the Conyers Kiwanis Club.  I have never been on the jury

18   before, and no one or myself in my family have received any legal

19   training.

20            THE COURT:  Thank you.  Mr. Johnson, you have 20 minutes

21   and you can proceed with your questions.

22            MR. JOHNSON:  Thank you, Judge.

23            Good morning again.  First day of trial, I have to

24   apologize because I thought this was a blue suit when I started

25   this morning at 5 a.m., so forgive me.  Folks from Detroit do know
```

1  how to dress and do know a suit.  So I mean no disrespect to the

2  Court, counselor, or you folks but what I thought was blue was

3  clearly one of each.  If you see me wearing the same pants

4  tomorrow, you will forgive me, I hope.  Thank you, good morning.

5           Your Honor, can I follow up with the preliminary?

6           THE COURT:  Yes, yes.

7           MR. JOHNSON:  I appreciate the Court.  Thank you.

8           (Whereupon, a brief discussion off the record.)

9           MR. JOHNSON:  I've never been accused of not being able

10  to hear me.  This is the first.  Thank you, Ms. Wright.  I

11  appreciate it.

12           Good morning, Ms. David.  How are you?

13           PROSPECTIVE JUROR:  Good.

14           MR. JOHNSON:  I'm well, ma'am.  Thank you.  Critical

15  planner.  Tell me about it, if you would please, what that means,

16  ma'am.

17           PROSPECTIVE JUROR:  I'm Kristen David.  So I'm a

18  critical infrastructure in key research planner for GEMA/Homeland

19  Security.  So basically we go and do assessments of critical

20  infrastructure around the state.

21           MR. JOHNSON:  Does that mean computers, security,

22  device?

23           PROSPECTIVE JUROR:  Critical infrastructure as far as,

24  if the thing shut down, then our day-to-day lives would be

25  impacted.  So churches, schools, banks, stuff like that.

 1          MR. JOHNSON:  I did hear Homeland Security.

 2          PROSPECTIVE JUROR:  Um-hum.

 3          MR. JOHNSON:  Did I hear you that you have a BA in that?

 4          PROSPECTIVE JUROR:  Yes.  I have a bachelor's in

 5  Homeland Security.

 6          MR. JOHNSON:  Thank you.  Did you have any police

 7  training at all as part of that?

 8          PROSPECTIVE JUROR:  No, not at all.

 9          MR. JOHNSON:  Okay.  So anything to do with what a

10  police officer does out in the street or so forth?

11          PROSPECTIVE JUROR:  No training.

12          MR. JOHNSON:  I appreciate that.  Thank you for

13  answering my question.  Appreciate it.  Thank you.

14          PROSPECTIVE JUROR:  Thank you.

15          MR. JOHNSON:  Mr. Cuthbert, good morning, sir.

16          PROSPECTIVE JUROR:  My name is Thomas Cuthbert.

17          MR. JOHNSON:  Good morning, sir.  Chief tech officer, I

18  saw that.  Second company I heard was GE, so obviously that piqued

19  my interest.  Tell me what a chief tech officer is, if you would,

20  please.

21          PROSPECTIVE JUROR:  I'm responsible for all engineering

22  in the company.

23          MR. JOHNSON:  When you worked for GE, tell me what you

24  were primarily responsible for, please.

25          PROSPECTIVE JUROR:  My last role with GE as CTO was

 1   responsible for all engineering and battery energy storage

 2   systems.

 3            MR. JOHNSON:  Everything from autos to airplanes to

 4   what?

 5            PROSPECTIVE JUROR:  No, this is specifically for

 6   renewable energy.  So taking solar energy, storing that, and

 7   dispatching that.

 8            MR. JOHNSON:  Thank you, sir.  In your current position,

 9   a company is Emrgy.  E-M --

10            PROSPECTIVE JUROR:  Emrgy.

11            MR. JOHNSON:  Pardon me.  Will you tell me, since I'm

12   not from Atlanta.

13            PROSPECTIVE JUROR:  This is a small startup in Atlanta.

14   We special in hydropower energy renewable systems.

15            MR. JOHNSON:  Water rushes through dams, et cetera?

16            PROSPECTIVE JUROR:  Actually it's in water canals.  So

17   moving water through water infrastructure.

18            MR. JOHNSON:  Thank you, sir.  And your wife is likely

19   also an engineer?

20            PROSPECTIVE JUROR:  Correct.

21            MR. JOHNSON:  Your spouse, what does she do?

22            PROSPECTIVE JUROR:  She's an engineer for Chick-fil-A.

23            MR. JOHNSON:  Thank you very much.  I appreciate it.

24   Ms. Morin, good morning.

25            PROSPECTIVE JUROR:  My name is Rachel Morin.

1              MR. JOHNSON:  How are you?

2              PROSPECTIVE JUROR:  Okay.

3              MR. JOHNSON:  Senior director of operations for

4    Cardlyitics.  Can you kindly tell me what your company does,

5    please, ma'am?

6              PROSPECTIVE JUROR:  It's a financial technology company

7    working with banks to power their offer programs.

8              MR. JOHNSON:  Thank you.  In terms of being in

9    finance -- I think I can read my chicken scratch.  Okay, so you're

10   the numbers person?

11             PROSPECTIVE JUROR:  Not really.

12             MR. JOHNSON:  Not really.  Your current job if you would

13   help me to better understand on a day-to-day basis, what do you

14   do?

15             PROSPECTIVE JUROR:  Sure.  I'm responsible for ensuring

16   that all campaigns running through my company get out on time and

17   correctly.

18             MR. JOHNSON:  As the senior director, you are in charge

19   of specifically what?

20             PROSPECTIVE JUROR:  I'm in charge of execution and

21   delivery.

22             MR. JOHNSON:  Does that mean you have a number of people

23   that report to you, ma'am?

24             PROSPECTIVE JUROR:  Correct.

25             MR. JOHNSON:  Got it.  Thank you very much.  I

1    appreciate it.

2         Mr. Kinney, good morning.

3         PROSPECTIVE JUROR:  My name is Jesse Kinney.

4         MR. JOHNSON:  How are you today?

5         PROSPECTIVE JUROR:  Yes, sir.

6         MR. JOHNSON:  K-9 handler, I get, obviously.  You told

7    us you were a police officer.  I did not understand the

8    municipality.  Would you help me better understand that?

9         PROSPECTIVE JUROR:  Okay.  Henry County Police

10   Department.

11        MR. JOHNSON:  You went through the police academy?

12        PROSPECTIVE JUROR:  Yes.

13        MR. JOHNSON:  What academy?

14        PROSPECTIVE JUROR:  The Central Georgia Academy.

15        MR. JOHNSON:  And then you went directly to that.  Is

16   that a city?  Is it a county?

17        PROSPECTIVE JUROR:  It's a county.  There's very few

18   amount of counties in the State of Georgia that have county police

19   officers.  Henry County is one of them.

20        MR. JOHNSON:  So is that police officer versus a sheriff

21   deputy?

22        PROSPECTIVE JUROR:  Yes.

23        MR. JOHNSON:  Okay, good.  Can you help me understand,

24   were you a patrol officer on the street?

25        PROSPECTIVE JUROR:  I was a patrol officer there, and

1  also did military police work when I was in the Army, so.

2          MR. JOHNSON:  Thank you for your service.  I appreciate

3  that.  In terms of your training, obviously, we're going to be

4  talking about training with Officer Grubbs in this particular case

5  in the City of Atlanta.  But at least, in terms of use of force

6  training, you've had that?

7          PROSPECTIVE JUROR:  Yes.

8          MR. JOHNSON:  Obviously with TASERS®, we'll talk about

9  the full technical name later, you had that?

10          PROSPECTIVE JUROR:  Yes.

11          MR. JOHNSON:  Body -- on body cameras?

12          PROSPECTIVE JUROR:  Yes.

13          MR. JOHNSON:  So those are all things you're going to be

14  pretty familiar with?

15          PROSPECTIVE JUROR:  Yes.

16          MR. JOHNSON:  Your current job, if you'd help me to

17  better understand, K-9 handler in your case, tell me what you do

18  with your canine --

19          PROSPECTIVE JUROR:  I'm an explosive detective dog

20  handler for the -- MSA Security.  We search a lot of the mail

21  going out, anything air cargo, certified, anything like that.  We

22  also have the contract for State Farm Arena.  I'm one of three

23  right now that can work at the airport.  So it's been rough doing

24  this.

25          MR. JOHNSON:  I'm sure it has.  Thank you for what

1  you're doing.  We all seen the folks at the airport with dogs.  So

2  are you pretty much at the cargo end of it --

3           PROSPECTIVE JUROR:  Yeah.

4           MR. JOHNSON:  -- as opposed to one with the passengers?

5           PROSPECTIVE JUROR:  Every bit of priority mail that

6  comes out of the City of Atlanta that flies out of

7  Hartsfield-Jackson, I either have searched or somebody that works

8  with me, have searched.

9           MR. JOHNSON:  Mr. Kinney, in this case, we're obviously

10  going to be talking about what our side claims is excessive force,

11  and the other side, of course, says not.  You've heard of those

12  terms?

13           PROSPECTIVE JUROR:  Yes.

14           MR. JOHNSON:  All right.  You've had training in that?

15           PROSPECTIVE JUROR:  Yes.

16           MR. JOHNSON:  In force -- I should say.  Hopefully not

17  training in excessive force.  You know the difference, right?

18           PROSPECTIVE JUROR:  Yes.

19           MR. JOHNSON:  Here's my question to you.  In view of the

20  fact that you have had similar training and were obviously going

21  to have a police officer on the other side, do you think that this

22  is a case that's not necessarily one that fits you, and what you

23  bring into the room?

24           PROSPECTIVE JUROR:  Probably not.

25           MR. JOHNSON:  Is it fair to say that perhaps -- forgive

1  the sports analogies, it's how I grew up.  You know what a 40-yard

2  line is?

3          PROSPECTIVE JUROR:  Yes.

4          MR. JOHNSON:  I said 40.  50-yard line at a football

5  game is right in the middle.  You're already starting, in fairness

6  to your background, maybe already toward the officer and the City?

7          PROSPECTIVE JUROR:  Probably.

8          MR. JOHNSON:  And in essence, make you kind of biased

9  without even meaning to be against my client and what happened,

10 whatever it is that happened?

11         PROSPECTIVE JUROR:  I guess, yes.

12         THE COURT:  So you're saying that if you're chosen to

13 sit on this jury, you cannot listen to the evidence, to the charge

14 of the law given by the Court, and render a verdict based on that?

15         PROSPECTIVE JUROR:  Yes, I could, sir.  I still would be

16 able to listen to the facts.  But my background with being a law

17 enforcement officer of having to use force to make arrests, like

18 that, I know it's kind of hard to go against -- go against that,

19 but it isn't like my mind couldn't be changed based on the facts

20 of the case.

21         THE COURT:  What I need to know, are you starting off

22 impartial against the plaintiff?

23         PROSPECTIVE JUROR:  No, sir.  Not necessarily.

24         THE COURT:  I mean partial against the plaintiff.

25         PROSPECTIVE JUROR:  No, sir.

1        THE COURT:  At this point in time, could you describe

2   yourself as being fair and impartial?

3        PROSPECTIVE JUROR:  Yes, sir.  Listening to the facts of

4   the case, I would be fair and impartial.

5        THE COURT:  When you say to Mr. Johnson, when you start

6   off on the other side of the 50-yard line, what does that mean?

7        PROSPECTIVE JUROR:  For me, that means I know what force

8   is, I know what to expect.

9        THE COURT:  Even though you have been trained, everybody

10   comes in this courtroom with a certain amount of knowledge.

11        PROSPECTIVE JUROR:  Yes, sir.

12        THE COURT:  What I need to know is very important to me

13   and very important for the parties, three things:  One, can you be

14   fair and impartial?

15        PROSPECTIVE JUROR:  Yes, sir.

16        THE COURT:  Two, have you made your mind up regarding

17   this case?

18        PROSPECTIVE JUROR:  No, sir.

19        THE COURT:  And three, can you render a verdict based on

20   -- I understand what you were trained to do but can you render a

21   verdict based on what you hear in this courtroom?

22        PROSPECTIVE JUROR:  Yes, sir.

23        THE COURT:  Go ahead, Mr. Johnson.

24        MR. JOHNSON:  Thank you.  I asked you if, starting off,

25   without meaning to be, you think you would be biased in favor of

 1  the officer, without even hearing the evidence and you did tell me

 2  yes, correct?

 3          PROSPECTIVE JUROR:  That's true.  I misheard the

 4  question.

 5          MR. JOHNSON:  Okay.

 6          THE COURT:  So you're not biased?

 7          PROSPECTIVE JUROR:  No, sir.

 8          MR. JOHNSON:  Certainly, your training and experience,

 9  would you agree that would affect the way you would be able to

10  hear the evidence, and already, because you kind of know what the

11  officer is going through and so forth, as opposed to necessarily

12  from my client's perspective, sir?

13          PROSPECTIVE JUROR:  Can you elaborate on that?

14          MR. JOHNSON:  Sure.  Do you think because of your

15  training that you would, in essence, if you will, be pro-police

16  officer in a situation, as opposed to being right down the middle

17  not having done either side of this case?

18          PROSPECTIVE JUROR:  No, not necessarily.

19          MR. JOHNSON:  Okay.

20          THE COURT:  I want to make sure -- this is very

21  important to the plaintiffs and the defendants.  The question Mr.

22  Johnson asked you, he's not trying to put you on the spot but it

23  is very important.  He needs to know and I need to know, and again

24  that as you are standing right there, you have made your mind up

25  and you could be -- you know you got training, you're a past

```
 1   police officer -- you're still in law enforcement -- you could be
 2   just as fair to the plaintiff in this case at this point in time.
 3   As you hear evidence, it's not going to change it one way or
 4   another, you could be just as fair to the plaintiff in this case
 5   as you could to the defendants?
 6              PROSPECTIVE JUROR:  Yes, sir.
 7              MR. JOHNSON:  Thank you.
 8              PROSPECTIVE JUROR:  Good, thank you.
 9              MR. JOHNSON:  Ms. Pulido, good morning.  How are you?
10              PROSPECTIVE JUROR:  Good, thank you.
11              Crystal Pulido.
12              MR. JOHNSON:  Thank you.  Good morning.  Pulmonary -- I
13   know pulmonary means lungs.
14              PROSPECTIVE JUROR:  Yes.
15              MR. JOHNSON:  I might have got the wrong pants, but I
16   got lungs.  Are you a registered nurse?
17              PROSPECTIVE JUROR:  No, I'm not.
18              MR. JOHNSON:  Could you help me to better understand
19   what you do?
20              PROSPECTIVE JUROR:  Sure.  I just recently took a
21   position as a -- it's an administrative supervisor helping
22   covering the office when the clinical managers are out.
23              MR. JOHNSON:  And the office is pulmonology clinic or
24   doctors or doctor, if you will, that specialize in the care of
25   lungs?
```

1           PROSPECTIVE JUROR:  Correct.

2           MR. JOHNSON:  In this case you're going to hear about

3   Grady Hospital and so forth.  Any connection with Grady?

4           PROSPECTIVE JUROR:  Emory is affiliated.  That is where

5   a lot of our fellows train.  They come over from Grady to Emory as

6   fellows.

7           MR. JOHNSON:  Obviously we probably read too many names

8   of the witnesses, but none of the doctors kind of popped out at

9   you?

10          PROSPECTIVE JUROR:  No, sir.

11          MR. JOHNSON:  Thank you, ma'am.  With respect to -- you

12  said you have an associate's degree in what?  Let me better

13  understand that.

14          PROSPECTIVE JUROR:  It was -- I was going to be a nurse.

15  So I started out on a slow path to see if I was going to like it

16  because it is really expensive.

17          MR. JOHNSON:  Yes, it is.

18          PROSPECTIVE JUROR:  I started to be an MA.  So the

19  school that I went to closed.  So I was kind of stuck.  So I -- we

20  went back and went into the administrative side of it.

21          MR. JOHNSON:  Got it.  So in this case, if we're talking

22  about endotracheal tubes and all sorts of medical stuff,

23  obviously, you have some familiarity with that?

24          PROSPECTIVE JUROR:  Correct.

25          MR. JOHNSON:  Would you be able to kind of -- kind of

 1   exactly what Judge Jones said to Mr. Kinney, would you be able to

 2   set that aside and listen to the evidence, in terms of what

 3   exactly my client has gone through and his medical conditions, as

 4   opposed to using your knowledge, probably firsthand, from what you

 5   know at the office?

 6            PROSPECTIVE JUROR:  Correct, yes.

 7            MR. JOHNSON:  I appreciate that.  Thank you very much.

 8   Ms. Johnson, good morning.

 9            PROSPECTIVE JUROR:  Good morning.

10            MR. JOHNSON:  Thank you very much.  How are you today?

11            PROSPECTIVE JUROR:  Very well, thank you.  Kimberly

12   Johnson.

13            MR. JOHNSON:  Pleasure to meet you.  We're not related

14   as far as you know, right?

15            PROSPECTIVE JUROR:  No.

16            MR. JOHNSON:  Okay.  Public health.  Can you help me

17   better understand what your current job is exactly?

18            PROSPECTIVE JUROR:  Yes, I work for the Fulton County

19   Board of Health.  I deal with communicable diseases, so sexually

20   transmitted diseases.

21            MR. JOHNSON:  Okay, and you obviously have a master's in

22   that you said, correct?

23            PROSPECTIVE JUROR:  Correct.

24            MR. JOHNSON:  Your undergraduate degree was in

25   psychology and I didn't hear what the other was.

1          PROSPECTIVE JUROR:  Human services.

2          MR. JOHNSON:  Thank you, ma'am.  Relative to -- I want

3   to make sure in terms of medical, and I understand the difference,

4   but I don't think we're talking about anything from your end but

5   in terms of the medicine stuff, if there is something that, in

6   your experience you know about, in terms of disease process and

7   injuries and so forth, would you be able to listen to the evidence

8   in this case and base your verdict on what you hear in the

9   evidence, reading in the evidence as opposed to what you know

10  firsthand from what you do for a living?

11         PROSPECTIVE JUROR:  Yes.

12         MR. JOHNSON:  Thank you, ma'am, I appreciate it.  Thank

13  you.  Thank you very much, sir.

14         Mr. McClure, how are you, sir?

15         PROSPECTIVE JUROR:  I'm good.  Ashley McClure.

16         MR. JOHNSON:  Pleasure to see you.  Thank you.

17  Architect, architect, and architect, I think I wrote that down.  I

18  think you're an architect?

19         PROSPECTIVE JUROR:  That's right.

20         MR. JOHNSON:  What do you build, what do you design?

21         PROSPECTIVE JUROR:  I just started my own firm.

22         MR. JOHNSON:  Congratulations.

23         PROSPECTIVE JUROR:  Hopefully residential restaurant

24  work and commercial office interiors, would be kind of my focus.

25         MR. JOHNSON:  In terms of, obviously, you have a BA in

1  architecture as well, right, sir?

2          PROSPECTIVE JUROR:  Correct.

3          MR. JOHNSON:  In terms of your experience, no

4  interaction or no knowledge about police or police procedures, or

5  anything like that?

6          PROSPECTIVE JUROR:  No, no.

7          MR. JOHNSON:  I appreciate that.  Thank you very much,

8  sir.

9          Ms. Kelly, good morning.

10         PROSPECTIVE JUROR:  Good morning.  Kira Kelly.

11         MR. JOHNSON:  Construction manager if I read my chicken

12  scratch right.

13         PROSPECTIVE JUROR:  Operations manager for a

14  construction team.

15         MR. JOHNSON:  I was close.  What do you do in

16  particular?

17         PROSPECTIVE JUROR:  So I manage the team that runs

18  basically all of the administration for the project.

19         MR. JOHNSON:  Okay.  In your company, how many people do

20  you have in your company?

21         PROSPECTIVE JUROR:  Company-wide, we have over 600.

22         MR. JOHNSON:  A big operation.

23         PROSPECTIVE JUROR:  Yeah.

24         MR. JOHNSON:  Your spouse, something with director of

25  ops as well.  You guys have director of ops all down.

1          PROSPECTIVE JUROR:  We do.

2          MR. JOHNSON:  Congratulations.  Some college.

3          PROSPECTIVE JUROR:  Yes.

4          MR. JOHNSON:  You said another path.

5          PROSPECTIVE JUROR:  Just went into the work force.

6          MR. JOHNSON:  Good for you.  Did it the hard way.

7          PROSPECTIVE JUROR:  Or easier, depending.

8          MR. JOHNSON:  I appreciate it.  Thank you very much

9   ma'am.  It's a pleasure.

10          PROSPECTIVE JUROR:  Sure.

11          MR. JOHNSON:  Ms. Green, good morning.

12          PROSPECTIVE JUROR:  Hi.

13          MR. JOHNSON:  How are you?

14          PROSPECTIVE JUROR:  I'm okay.

15          MR. JOHNSON:  I wrote down construction representative,

16   your last job, did I read that right?

17          PROSPECTIVE JUROR:  Customer service representative.  I

18   was way off on that one, sorry.

19          MR. JOHNSON:  Customer service meaning what?  Can you

20   tell me exactly what you did your last time being full-time

21   employed?

22          PROSPECTIVE JUROR:  Sure.  It was supporting customers

23   in making their flight reservations as well as account management.

24          MR. JOHNSON:  Thank you.  It looks like you have a

25   background in accounting, correct?

```
 1              PROSPECTIVE JUROR:  Yes.

 2              MR. JOHNSON:  Are you currently -- tell me what you're

 3    doing, you said you're currently unemployed?

 4              PROSPECTIVE JUROR:  Um-hum.

 5              MR. JOHNSON:  Can you tell me, are you out there and

 6    looking for something or you have an interest in some particular

 7    area that you're looking at right now?

 8              PROSPECTIVE JUROR:  At some point I plan to venture back

 9    into the field.

10              MR. JOHNSON:  What do you do -- pardon me for

11    interrupting.  What did you want to do?

12              PROSPECTIVE JUROR:  No problem.  My background is

13    accounting.  I'm a certified public accountant.

14              MR. JOHNSON:  You're a CPA?

15              PROSPECTIVE JUROR:  I'm a CPA.  Most of my career, I

16    spent about almost 15 years working.  The majority of it has been

17    in finance.  I am certified in accounting.  I started out doing

18    accounting.

19              MR. JOHNSON:  You didn't mention that CPA thing.  That's

20    big time.  Can you help me understand the terms of your

21    background?

22              PROSPECTIVE JUROR:  Sorry.

23              MR. JOHNSON:  What were you doing in terms -- how were

24    you utilizing your CPA?

25              PROSPECTIVE JUROR:  I'm not utilizing it now.  I was
```

1  when I was working in the field.  The majority of my field has

2  been supporting the media industry.

3          MR. JOHNSON:  What industry?

4          PROSPECTIVE JUROR:  Media.

5          MR. JOHNSON:  Okay.  Like?

6          PROSPECTIVE JUROR:  Turner Broadcasting, before it

7  became Warner Media.  The majority of my career was there.  And

8  then I worked for The Weather Channel.

9          MR. JOHNSON:  Okay.

10          PROSPECTIVE JUROR:  Contracted there, let me say that.

11  Through an agency.  And then, also, I supported a financial

12  technology company.

13          MR. JOHNSON:  Thank you very much, ma'am.  I appreciate

14  it.

15          Ms. Studstill.

16          PROSPECTIVE JUROR:  Good morning.  Erin Studstill.

17          MR. JOHNSON:  VP ops.  We have a lot of the ops.  What

18  are you ops of?

19          PROSPECTIVE JUROR:  MarketLauncher.  We're a lead

20  generation firm so we partner with sales teams to provide leads.

21          MR. JOHNSON:  For what industries?

22          PROSPECTIVE JUROR:  All industries.  All business to

23  business, high dollar, long-term sales.

24          MR. JOHNSON:  Okay.  Thank you.  I think you said your

25  husband owns a construction company as well?

1              PROSPECTIVE JUROR:  Correct.

2              MR. JOHNSON:  Business management in terms of your BA?

3              PROSPECTIVE JUROR:  That's right.  BS, but yeah.

4              MR. JOHNSON:  I'm sorry.  I wrote down BA, sorry.  Thank

5    you, thank you.  Again, no experience with police so far?

6              PROSPECTIVE JUROR:  No.  I mean some speeding tickets.

7              MR. JOHNSON:  We won't talk about that.  I appreciate

8    it.  I only have a couple of minutes.  I don't mean any disrespect

9    to who I don't get to.  Forgive me.  Mr. Avenick.

10             PROSPECTIVE JUROR:  Good morning.

11             MR. JOHNSON:  How are you?

12             PROSPECTIVE JUROR:  Well.

13             MR. JOHNSON:  What do you do for Coke?

14             PROSPECTIVE JUROR:  Strategy and M and A.  Mostly on the

15   supply chain side.

16             MR. JOHNSON:  M and A, merger and acquisitions?

17             PROSPECTIVE JUROR:  Correct.  Like new partnerships,

18   production outsourcing.  Those types of things.

19             MR. JOHNSON:  I think I wrote down MBA, correct?

20             PROSPECTIVE JUROR:  Yup.

21             MR. JOHNSON:  Military background?

22             PROSPECTIVE JUROR:  Yes.

23             MR. JOHNSON:  Thank you, sir.  Thank you for your

24   service.  What branch?

25             PROSPECTIVE JUROR:  Army.

 1            MR. JOHNSON:  What did you do for your job when you

 2   worked in the Army?

 3            PROSPECTIVE JUROR:  I was an infantry officer.

 4            MR. JOHNSON:  In terms of your organization I did hear

 5   about, you said you're working with vets, I believe, correct?

 6            PROSPECTIVE JUROR:  Yes.

 7            MR. JOHNSON:  What are you doing?

 8            PROSPECTIVE JUROR:  I led the veterans group at

 9   Coca-Cola so we have just similar associations with similar

10   professional veterans groups.

11            MR. JOHNSON:  Any -- in addition to military training,

12   no specific law enforcement training?

13            PROSPECTIVE JUROR:  No.

14            MR. JOHNSON:  Thank you very much, sir.

15            THE COURT:  Mr. Johnson, your 20 minutes is up.

16            MR. JOHNSON:  Thanks, Judge.  I apologize to the

17   remaining two.

18            THE COURT:  Thank you, Mr. Johnson.

19            Mr. Dearing or Ms. Miller?

20            MS. MILLER:  Good morning again, everyone.  My opposing

21   counsel here, Mr. Johnson, really warmed you up with some

22   background questions.  I'm going to ask questions that are a

23   little bit more specific and I am going to move a little more

24   quickly, because we only have 20 minutes, but I think that is

25   enough time.  I'm going to ask questions a little bit differently.

1              THE COURT:  Stop the clock.  Mr. Johnson, and

2    Ms. Miller.  Ms. Miller.

3              (Whereupon, the following was held at sidebar out of the

4    presence of the jury.)

5              THE COURT:  Excuse me.  You-all asked for 30 minutes

6    because you have two defendants and you said you only had 20.  Do

7    you remember they had two defendants makes it 30, and I said yeah.

8              MR. JOHNSON:  I guess I missed that, because I think I

9    should have the amount of time, Judge.

10             THE COURT:  You only have one defendant.

11             MR. JOHNSON:  I understand but it's two different

12   defendants and two different theories.

13             THE COURT:  Then let's go 20 minutes each, then.

14             It will be 20.

15             (End of sidebar.)

16             MS. MILLER:  As I was saying, I will ask questions a

17   little bit differently.  I will ask you to raise your hand if you

18   answer in the affirmatively -- in the affirmative to my question

19   and then I'll follow up with more questions for you.

20             The first question, please raise your hand if you or a

21   member of your family or close friend has ever had a bad,

22   unpleasant -- bad or unpleasant experiences with a law enforcement

23   officer.  Many, all right.  I have Juror Number Four, Ms. Morin.

24   Can you tell us about that experience, please?

25             PROSPECTIVE JUROR:  Sure.  I'm Rachel Morin.  My

 1  husband, he has been multiple times searched, pulled over, things

 2  like that, where there was no warrant.

 3          MS. MILLER:  And was that in the City of Atlanta?

 4          PROSPECTIVE JUROR:  It was not.

 5          MS. MILLER:  And when I asked the question, is that the

 6  only experience you're thinking of, is the experiences with your

 7  husband?

 8          PROSPECTIVE JUROR:  Correct.

 9          MS. MILLER:  Thank you.  The next question -- I'm sorry,

10  go ahead.  You are No. 14.

11          PROSPECTIVE JUROR:  Back last August, we had a situation

12  in my family where there was a date rape drug situation in a

13  municipality in Florida, that we were very frustrated with the

14  police.  Would not look at video evidence and we had to physically

15  get the video evidence ourselves to get an arrest made.  So it was

16  a very frustrating situation dealing with the police department

17  there.  Ralph Dean Hayes.

18          MS. MILLER:  Thank you, Mr. Hayes.  You said this was in

19  Florida?

20          PROSPECTIVE JUROR:  Yes, ma'am.

21          MS. MILLER:  And is that the experience -- the only

22  experience that you're thinking of when I asked that question?

23          PROSPECTIVE JUROR:  Yes.

24          MS. MILLER:  Please raise your hand if you have ever

25  expressed an opinion in conversations with other persons

 1   concerning police officers and Constitutional rights?

 2           (No response.)

 3           Please raise your hands if you believe that police

 4   officers lack compassion for others?

 5           (No response.)

 6           Please raise your hand if, in the event that the

 7   defendant -- the defendants did not violate the law, you could not

 8   return a verdict in favor of the defense?

 9           (No response.)

10           Please raise your hands if as a result of coverage in

11   the media about the City of Atlanta, the City of Atlanta Police

12   Department or any City of Atlanta officer, you have formed an

13   opinion about the City of Atlanta and its police department?

14           (No response.)

15           Please raise your hand if you have previously been

16   arrested?

17           Ever?

18           Yes, sir.

19           PROSPECTIVE JUROR:  Yeah, Ralph Dean Hayes.  Don't think

20   it's pertinent -- Ralph Dean Hayes don't want to perjure myself

21   but I was arrested for DUI in 1989.

22           MS. MILLER:  Thank you, Mr. Hayes, for that answer.  Was

23   it in the City of Atlanta?

24           PROSPECTIVE JUROR:  No, ma'am, it was in Athens.

25           PROSPECTIVE JUROR:  Kimberly Johnson.  I was arrested

 1  probably maybe about 20 years ago.  It was domestic.  Me and my

 2  little brother were fighting.

 3          MS. MILLER:  Was that in the City of Atlanta?

 4          PROSPECTIVE JUROR:  No.  It was in Cobb County.

 5          MS. MILLER:  Thank you, Ms. Johnson.  Please raise your

 6  hands if your job requires you to work with law enforcement

 7  officers.

 8          PROSPECTIVE JUROR:  Kristen David.

 9          MS. MILLER:  Ms. David, how does your job require you to

10  work with law enforcement officers?

11          PROSPECTIVE JUROR:  Usually I only see them if I have

12  training in Forsyth County.

13          MS. MILLER:  And what is your involvement with the

14  officers?

15          PROSPECTIVE JUROR:  We just have class together.

16          MS. MILLER:  Thank you, ma'am.

17          PROSPECTIVE JUROR:  Jesse Kinney.  When we work State

18  Farm arena, APD has officers working there as well.

19          MS. MILLER:  And when you work at State Farm arena, what

20  is your involvement with the officers there?

21          PROSPECTIVE JUROR:  We just very -- it's very little or

22  unless there is something going on if we found a package or

23  something is happening, or we need to search certain parts of the

24  arena, the officers will follow with us.

25          MS. MILLER:  Thank you, Mr. Kinney.

1            PROSPECTIVE JUROR:  Ralph Dean Hayes.  In my capacity as

2   insurance broker and risk management consultant for municipalities

3   and public entities, I will be involved with the safety and loss

4   control programs, including the standard operating procedures for

5   the police departments.

6            MS. MILLER:  And Mr. Hayes, have you ever had the

7   opportunity to work with the Atlanta Police Department?

8            PROSPECTIVE JUROR:  No, ma'am, just municipalities in

9   the suburban area.

10           MS. MILLER:  Thank you.

11           Please raise your hand if you have been involved in or

12  been subject to what is or was, in your opinion, unfair treatment

13  by the government.

14           (No response.)

15           Please raise your hand if you or a family member or a

16  close friend has ever had an unpleasant experience with an

17  official with the City of Atlanta.

18           (No response.)

19           Please raise your hand if you do not believe that the

20  Court system is fair.

21           (No response.)

22           Please raise your hand if there is anything that you

23  have heard so far about this case that makes you feel

24  uncomfortable sitting as a juror on this particular case.

25           (No response.)

1          Please raise your hand if you believe that people should

2 be arrested for low-level offenses, even if the punishment

3 includes arrest.

4          I see a few confused faces.  So raise your

5 hands -- actually I'll ask it in the negative, I think that will

6 be easier.  If you do not believe that people should be arrested

7 for low-level offenses.

8          PROSPECTIVE JUROR:  Rachel Morin.

9          MS. MILLER:  Ms. Morin, can you explain your answer?

10          PROSPECTIVE JUROR:  Sure.  I don't believe that

11 low-level offenses should warrant being arrested.

12          MS. MILLER:  Okay.  And just so I'm clear, even if the

13 offenses -- arrestable offense -- if it is a low-level offense you

14 believe that the person should not be arrested?

15          PROSPECTIVE JUROR:  Correct.  I mean I think it depends

16 on the circumstances, but yes.

17          MS. MILLER:  Thank you, Ms. Morin.

18          Please raise your hands if you have negative feelings

19 against the City of Atlanta or police officers, such that you

20 would begin this trial leaning towards the plaintiff's favor.

21          (No response.)

22          And please raise your hands if you or a family member, a

23 close friend has ever held a job in any government agency.

24          PROSPECTIVE JUROR:  Kristin David.  I work for GEMA.

25          MS. MILLER:  Thank you, Ms. David.

 1            PROSPECTIVE JUROR:  Jesse Kinney.  I was a police

 2   officer for Henry County P.D.

 3            PROSPECTIVE JUROR:  Fulton County government as well as

 4   the State of Georgia.

 5            MS. MILLER:  Thank you.

 6            PROSPECTIVE JUROR:  Heidi Evans, I work for the Georgia

 7   Department of Education.

 8            PROSPECTIVE JUROR:  Ralph Dean Hayes, have numerous

 9   friends that are public officials at local and state level.

10            MS. MILLER:  Those are all my questions.  Thank you.

11            THE COURT:  Thank you, Ms. Miller.

12            Ladies and gentlemen, Ms. Wright is going -- the 13 of

13   you-all of some instructions before you will go.  When you come

14   out of the box, they will call the name of the other jurors.

15            THE DEPUTY CLERK:  Those of you in the jury box if you

16   would leave your questionnaires in your seat.  You can exit out.

17   If you need to visit the lavatories or stretch your legs, that's

18   fine, just come back in and have a seat on the benches when you're

19   ready.  The second panel, when we get them moved out of the jury

20   box, I'll start calling you up like we did earlier out in the

21   hall, so...

22            You can have a seat in the first chair.  This gentleman

23   has something he would like to disclose.

24            THE COURT:  All right.  What is it, sir?

25            THE DEPUTY CLERK:  Would you tell us your name, please.

 1           PROSPECTIVE JUROR:  Your Honor, Dan Avenick.  I wanted

 2    to disclose that you mentioned earlier if someone has travel

 3    coming up, or something like that.  I have work travel each of the

 4    next three weeks, including Monday, international travel to Munich

 5    and two weeks --

 6           THE COURT:  Monday the 22nd, you have travel?

 7           PROSPECTIVE JUROR:  Monday coming up, yes, in Chicago.

 8    I'm also the sole custodian of my daughter.  I have childcare

 9    responsibilities as well.  Just to disclose.

10           THE COURT:  The travel.  Is this something that was set

11    that you have to be there?

12           PROSPECTIVE JUROR:  It's work travel on Monday, yes,

13    Your Honor.

14           THE COURT:  Who do you work for?

15           PROSPECTIVE JUROR:  Coca-Cola, Your Honor.

16           THE COURT:  You are the only person at Coca-Cola that

17    can do this?

18           PROSPECTIVE JUROR:  It's debatable, Your Honor.

19           THE COURT:  All right.  Any question, Mr. Johnson,

20    Ms. Miller for this?

21           MR. JOHNSON:  No, Judge.  Thank you.

22           THE COURT:  Ms. Miller?

23           MS. MILLER:  No, Your Honor.

24           THE COURT:  Thank you, sir.  All right.

25           MR. JOHNSON:  Judge, can I have a one-minute break to

1  run down the hall real quick?

2         THE COURT:  Yes, sir.  Mr. Johnson, let's all take a

3  five-minute break, so you don't have to -- we'll take a

4  five-minute break right here.  We'll start back at 5 to 11.

5         MR. JOHNSON:  Thank you, Judge.  Appreciate it.

6         (Whereupon, a break was taken at 10:50 a.m.)

7         THE COURT:  Ladies and gentlemen, again the same

8  instruction I gave the last panel.  When your name is called, if

9  you will stand up.  You don't have to read out the question on the

10  paper you start answering.  Once you start answering your

11  question, Ms. Wright will call the next juror and you hand the mic

12  to the next juror.

13         THE DEPUTY CLERK:  Kelly McClendon.

14         PROSPECTIVE JUROR:  Good morning.  I'm Kelly McClendon.

15  I'm a licensed practical nurse.  I work with medically fragile

16  children in their homes.  I've been doing this for 14 years.  I've

17  been a practical nurse for 16.  I'm married to a diesel mechanic.

18  I live in Stockbridge, Georgia, in Rockdale County.  I've been

19  there for seven years.  My license is my background.  My

20  educational background.  I do not belong to any social, civic,

21  political organizations.  Never been on a jury before.  And I do

22  not have any legal training, neither have my family.

23         THE DEPUTY CLERK:  Christina Miller.

24         PROSPECTIVE JUROR:  Yes, Christina Miller.  Good

25  morning.  I am an assistant division chief with the Veterans

 1   Affairs Veteran Benefits Administration, and I've been there for

 2   about 15 years.  I'm married.  My husband is a physician.  I

 3   reside in the City of Atlanta, Fulton County, and have been there

 4   for -- since 2004.  18 years.  I have a bachelor's degree in

 5   psychology and a master's degree in rehabilitation counseling.  No

 6   organizations.  I have been on a jury before.  It was for Fulton

 7   County and we did reach a verdict.  And me, nor my family, have

 8   received any legal training.

 9           THE COURT:  Thank you.

10           THE DEPUTY CLERK:  Angela Rhodes.

11           PROSPECTIVE JUROR:  Angela Rhodes.  My present

12   occupation is a grandma and a caregiver.  My husband and I provide

13   part-time care to his aging mother, my aging mother, and I babysit

14   my two grandchildren several days a week.

15           THE COURT:  Very important jobs.

16           PROSPECTIVE JUROR:  Thank you.  I am married.  My

17   husband is mostly retired.  He was a general manager of a car

18   dealership.  We live in Braselton which is in Gwinnett County and

19   we've been there for 13 years.  I have some college.  Do not

20   belong to any social, political, or religious organizations.  I

21   have served on a jury before.  It was maybe 20, 25 years ago, a

22   divorce.  We did reach a settlement.  And myself nor any of my

23   family have never received any legal training.

24           THE COURT:  Thank you.

25           THE DEPUTY CLERK:  Walter Latimore.

1              PROSPECTIVE JUROR:  Walter Latimore.  I'm a forklift

2   operator at Still Lumber.  I've been there for 30-some years.  I'm

3   married.  My wife is a school nutrition.  I've been a regular of

4   Newton County for 53 years.  High school education.  I do not

5   belong to social organization.  Served on a jury probably

6   about -- I didn't serve.  I was called to be on a jury but never

7   was -- was selected.  And no legal counsel.

8              THE COURT:  Thank you.

9              PROSPECTIVE JUROR:  Also Judge, I missed an appointment

10  day -- I was to go to the doctor today.  I'm recovering from

11  cancer, I had colon cancer this year.  I got a port inside my

12  shoulder and I have to clean it, but I thought I had jury today.

13             THE COURT:  Do you have another appointment rescheduled?

14             PROSPECTIVE JUROR:  I'm going to try to reschedule.  I

15  don't know when I got to go get back for a physical and things

16  like that.

17             THE COURT:  Can you give them a call -- that's

18  important.  You need to be there.

19             PROSPECTIVE JUROR:  I called them and I left a message.

20  So I went on call and I'll reschedule.

21             THE COURT:  It's probably going to be rescheduled this

22  week.

23             PROSPECTIVE JUROR:  Probably next week.

24             THE COURT:  First part of next week?

25             PROSPECTIVE JUROR:  They usually do them on Wednesday.

1  But I know sometimes.

2          THE COURT:  The lawyers and I will get back with you.

3  But that's important.  That's important.  All right.

4          PROSPECTIVE JUROR:  All right.  Thanks.

5          THE DEPUTY CLERK:  Ken Martasin.

6          PROSPECTIVE JUROR:  My name is Ken Martasin.  I own my

7  own business, Peach State Promotions.  Yeah, I've had the job or

8  owned my company for 25 years.  I'm single.  I live in Alpharetta,

9  which is in Fulton County.  I've lived there for five years.  I

10  have a high school education.  I'm a -- been a Rotarian since

11  1996.  I was on a jury once for counterfeit checks in Cobb County.

12  And I have no legal training.

13          THE DEPUTY CLERK:  Kabongo Mfuamba.

14          PROSPECTIVE JUROR:  My name is Kabongo Mfuamba.  I work

15  for Gwinnett Public Schools as a custodian for ten years.  I'm

16  married to Rosa Mfuamba.  She's working for Coca-Cola Company as a

17  customer service representative.  I live in Gwinnett County,

18  Grayson, Gwinnett County.  I have a bachelor degree in business

19  administration.  I'm a member of Gwinnett International Church.

20  Never been on a jury.  No legal training.

21          THE COURT:  Thank you.

22          THE DEPUTY CLERK:  Mr. Panangiotis Chronis.

23          PROSPECTIVE JUROR:  Good morning.  My name is

24  Panangiotis Chronis.  I work for Lockheed Martin.  I'm a quality

25  engineer for supply work management department.  I have this job

1  for ten years.  I'm married.  My spouse, she's working as a sales

2  person.  I live in Woodstock, Cherokee County for the last seven

3  years.  I have an associate's degree.  I don't belong to any

4  organizations.  I've been called for jury duty but wasn't a juror

5  before and I have no legal training.

6          THE COURT:  Thank you.

7          THE DEPUTY CLERK:  Indira Lee.

8          PROSPECTIVE JUROR:  My name is Indira Lee.  I am a

9  warehouse associate at Amazon.  I worked there for a year.  Before

10  that I was merchandizing associate at Macy's.  I'm not married.  I

11  live in Lithia Springs, Douglas County for 22 years.  I have some

12  college.  I don't belong to any of these organizations.  I've not

13  served on a jury before.  And none of my family members have any

14  legal training, nor do I.  And I do have -- I have an appointment

15  -- a doctor's appointment at 2 that is hard to come by, and I'm,

16  like, in pain.

17          THE COURT:  2 o'clock today?

18          PROSPECTIVE JUROR:  Yes.  And I didn't know I was going

19  to get summoned today.  That's all.  Thank you.

20          THE DEPUTY CLERK:  Mr. Alex.

21          PROSPECTIVE JUROR:  My name is Byju Alex.  Currently I

22  work as a senior software engineer at General Motors.  And I'm

23  working there for the last eight years.  Married.  My wife is a

24  senior director for revenue cycle at Emory University Hospital.

25          MR. DEARING:  I'm sorry.  I didn't hear your answer.

1    You said your wife --

2           PROSPECTIVE JUROR:  Yes, she's a senior director for

3    revenue cycle at Emory University Hospital.

4           MR. DEARING:  Thank you.

5           PROSPECTIVE JUROR:  I live in Alpharetta, Fulton County

6    for 18 years.  My education -- I have a master's in computer

7    science.  I belong to Saint Thomas Orthodox Church, Atlanta, and

8    I'm committee member -- building committee member.  I've never

9    been on jury duty before.  I never received any legal training.

10          THE COURT:  Thank you.

11          PROSPECTIVE JUROR:  Thank you.

12          THE COURT:  Ms. Leggett.

13          PROSPECTIVE JUROR:  Good morning.  My name is Kandrain

14   Leggett and I'm a counselor with Community Team Coalition, and

15   it's an outward bound program.  I work with youth teens.  I've had

16   this job for like a year, and before that I was at Clayton County

17   Public Schools.  I am married.  He's a truck driver.  I live in

18   Hampton, Georgia, for nine years.  I have a bachelor's in

19   scientology.  I belong to Elizabeth Baptist Church.  Never been on

20   a jury before, and no legal training nor my family.

21          THE COURT:  Thank you.

22          THE DEPUTY CLERK:  Nanci Davis.

23          PROSPECTIVE JUROR:  Hi.  My name is Nanci Davis.  My

24   present occupation is a -- I work with Marietta DHR as a leasing

25   agent.  I've been there for 25 years.  I am married.  My husband

 1   is a salesman at Campers Inn.  And I live in White, Georgia, in

 2   Cherokee County for 45 years.  And my educational background, I am

 3   in children's ministry.  I work with VBS and so forth in the

 4   Southern Baptist.  I've never been on a jury, and we have had no

 5   legal training.

 6           THE COURT:  Thank you.

 7           THE DEPUTY CLERK:  Robert O'Neil.

 8           PROSPECTIVE JUROR:  I'm Dave O'Neil -- I'm Dave O'Neil.

 9   I've been retired for 24 years.  Prior to that I was a university

10   professor at Georgia State University.  After I retired from

11   there, I worked the a world champions Atlanta Braves for 22 years.

12   Just had to get that one in.  I'm married.  I've been married to

13   the same wonderful lady for 63 years.  She was an office manager

14   prior to her retirement.  I've lived in DeKalb County for over 50

15   years.  I do have a Ph.D. from -- in mathematics and computer

16   education.  I am on the board of directors of a great organization

17   called the American Cribbage Congress.  If any of you play that

18   game, you probably know about that.  I've never been on a jury

19   before, and I've had no legal training.

20           THE COURT:  Thank you, sir.

21           THE DEPUTY CLERK:  Margaret Wise.

22           PROSPECTIVE JUROR:  Margaret Wise.  I'm chief revenue

23   officer for ClickDimensions.  I held that position for two years.

24   Prior to that I was chief revenue officer for Arke Systems for

25   six-and-a-half years.  I am married.  My husband owns a business,

1  an IT consulting company.  I live in Dunwoody, and have been a

2  DeKalb resident for 22 years.  I have an MBA with a concentration

3  in finance.  I belong to the local parish of our Catholic church.

4  I have never served on a jury and I have no legal training, nor

5  does my family.

6        THE COURT:  Thank you.

7        THE DEPUTY CLERK:  Sabrina Ashwell.

8        PROSPECTIVE JUROR:  I'm Sabrina Ashwell.  I am retired.

9  The company I used to work for -- well I'm a 9-11 survivor.  I

10 worked at the One World Trade Center at that time so I retired

11 early.  I was married for 24 years.  My husband was a CPA.  I live

12 in DeKalb County now.  I've lived there now for ten years.  I have

13 a BFA, a bachelor of fine arts.  I've never served on a jury

14 before.  And, yes, I do have legal training.  I worked for

15 Clifford Chance Rogers & Wells for 27 years.

16        THE COURT:  Thank you.

17        THE DEPUTY CLERK:  Kevin Dwyer.

18        PROSPECTIVE JUROR:  Kevin Dwyer.  I'm a mortgage loan

19 officer with South State Bank and my wife is a lawyer.  I live in

20 Atlanta, Georgia.  It's been probably over 20 years.  I have a

21 bachelor's in business from there, Georgia.  And I'm a member of

22 the North Point Community church.  Never been on a jury before,

23 and I don't have any legal training.  But, yes, I do have several

24 family members that do.

25        THE COURT:  Thank you.

```
 1              THE DEPUTY CLERK:  Leslie Wilson.

 2              PROSPECTIVE JUROR:  Leslie Wilson.  I have worked for

 3    Verizon for 24 years.  My current year is retail sales specialist

 4    for the last year.  Prior to that, I was a business and government

 5    services coordinator.  I am not married.  I live in Sandy Springs

 6    which is in Fulton County.  I've lived there for 8 years.  I do

 7    not have a college degree, just a high school degree.  I am not a

 8    member of any organizations.  I have served on a jury before.  It

 9    was a civil jury in Connecticut, and we did reach a verdict.  And

10    I do not have any legal training.

11              THE COURT:  Thank you.  Mr. Johnson, you can proceed

12    with your questions.

13              MR. JOHNSON:  Judge, can we briefly approach?

14              THE COURT:  Yes.

15              MR. JOHNSON:  Thank you.

16              (The following was held at sidebar.)

17              MR. JOHNSON:  I apologize.  I'm lost.  I don't

18    understand what we're doing right now, and I apologize.  I just

19    never had it this way.  I'm not trying to be critical --

20              THE COURT:  You're getting ready to ask your questions

21    to the jury.

22              MR. JOHNSON:  Do I have another 20 minutes?

23              THE COURT:  You have another 20 minutes.

24              MR. JOHNSON:  Okay.  I just want to make sure.  Thank

25    you, Judge.
```

1          (End of sidebar.)

2          MR. JOHNSON:  Good morning.  I guess I would like to

3    start with lawsuits.  You-all know, Judge already told you, this

4    is an excessive force lawsuit against the City of Atlanta and

5    Officer Grubbs.  And my question to you-all, first of all is, when

6    you heard that this was a lawsuit, I know a lot of folks think

7    there are way too many.  Any of you have any negative feelings or

8    think there are too many lawsuits right now in our county, against

9    police officers and cities, as a result of alleged police

10   misconduct?

11          (No response.)

12          There's been, of course, a lot of things in the news

13   about lawsuits relative to police officers.  And I want to know,

14   do any of you folks feel -- if you do please just let me know --

15   that the jury verdicts are excessive, and should be limited, no

16   matter what the jury decides the damages are?

17          Does anyone feel that way?

18          (No response.)

19          No response.  Thank you.

20          In the event that any one of you have been involved in a

21   lawsuit in your own lives, have any of you had anything to do with

22   a civil lawsuit like this for personal injury, or some other type

23   matter where this was a request for money damages?

24          (No response.)

25          Thank you.

1          THE COURT:  State your name.

2          PROSPECTIVE JUROR:  Leslie Wilson.

3          MR. JOHNSON:  Good morning.  How are you?

4          PROSPECTIVE JUROR:  I was a party to a car accident.  I

5   was the injured party.

6          MR. JOHNSON:  You were the injured party.  So did you

7   actually have a lawsuit filed on your behalf?

8          PROSPECTIVE JUROR:  Yes.

9          MR. JOHNSON:  Did that ultimately settle?

10          PROSPECTIVE JUROR:  It settled prior to going to trial.

11          MR. JOHNSON:  Sorry to hear about that.  Is there

12   anything about that process that you feel would somehow interfere

13   with your ability to listen to the evidence from our witness stand

14   and be fair to both sides in this case, ma'am?

15          PROSPECTIVE JUROR:  No, I feel like I could be fair.

16          MR. JOHNSON:  Thank you very much, ma'am.

17          Anybody else with lawsuits?  Thank you.

18          I'm going to go back to -- I know we had a couple of

19   folks.  Mr. Dwyer, I know that your wife is an attorney; correct?

20          PROSPECTIVE JUROR:  Good morning.

21          MR. JOHNSON:  Good morning, sir.  What type of law does

22   your wife practice to the best of your knowledge?

23          PROSPECTIVE JUROR:  Real estate.

24          MR. JOHNSON:  Okay.  You said you also have folks that

25   you know pretty well I'm sure, lawyers tend to hang out with

 1  lawyers for obvious reason.  Anyone that you know or hang out that

 2  does personal injury at all?

 3          PROSPECTIVE JUROR:  Yes, my dad.

 4          MR. JOHNSON:  Does he work here in town?

 5          PROSPECTIVE JUROR:  He works here in Atlanta.

 6          MR. JOHNSON:  What firm is he with?

 7          PROSPECTIVE JUROR:  He's with his own.  Just Dwyer Law.

 8          MR. JOHNSON:  What type of work does he do, to the best

 9  of your knowledge?

10          PROSPECTIVE JUROR:  Personal injury and med mal.

11          MR. JOHNSON:  Well, you can ask Mike.  He's growing up

12  with a plaintiff.  He's a plaintiff attorney.

13          PROSPECTIVE JUROR:  That's correct.

14          MR. JOHNSON:  Represents folks who are injured?  Yes.

15          PROSPECTIVE JUROR:  Yes.

16          MR. JOHNSON:  You're good.  Anything about that, here is

17  a big broad question.  From whatever you've learned in your family

18  and growing up and so forth, coming up with a family like that,

19  are you able to set that aside and listen to the facts and the

20  evidence in this case, and be right down the middle on that

21  50-yard line, fair to both sides?

22          PROSPECTIVE JUROR:  Yes.

23          MR. JOHNSON:  Do you have any leanings one way or

24  another, that either side should know about in this case?

25          PROSPECTIVE JUROR:  In this case?  No.

 1            MR. JOHNSON:  Thank you, sir.  You could be fair to

 2    both, you think?

 3            PROSPECTIVE JUROR:  Um-hum.

 4            MR. JOHNSON:  Yes.

 5            PROSPECTIVE JUROR:  Yes.

 6            MR. JOHNSON:  I appreciate you.  Thank you very much.

 7    Kevin Dwyer.

 8            And Ms. Ashwell?  I'm so sorry to hear -- good morning.

 9            PROSPECTIVE JUROR:  Ashwell.

10            MR. JOHNSON:  So sorry to hear about you involved in the

11    9-11.  My thought to.  Were you part of that legal claim and

12    process after that?

13            PROSPECTIVE JUROR:  No, I wasn't.

14            MR. JOHNSON:  The fact that you didn't make a claim, are

15    you in any way -- what's the word I want to use -- is it because

16    you chose not to because of any particular feelings that you have

17    that that's not a fair or an okay process to engage in?

18            PROSPECTIVE JUROR:  Hypothetically.

19            MR. JOHNSON:  I actually asked one good question.

20            PROSPECTIVE JUROR:  Yeah, that is a good question.  To

21    be honest with you, it was never offered to us.  It was only

22    offered to the police officers and the fire department but we were

23    never given that option.

24            MR. JOHNSON:  Okay.  The fact that you were not, does

25    that in any way affect your ability in this case to be fair to

 1  both sides?

 2          PROSPECTIVE JUROR:  Yes, sure.

 3          MR. JOHNSON:  It does affect your ability?

 4          PROSPECTIVE JUROR:  Oh, no, no, no.  It doesn't affect

 5  my decision.  I never thought about it.

 6          MR. JOHNSON:  Let me see if I can stumble across another

 7  good question.  Do you think you could be good -- not good -- fair

 8  to both sides in this case, irrespective of what you went through?

 9          PROSPECTIVE JUROR:  Yes, I can.

10          MR. JOHNSON:  Thank you, ma'am.  Do you have legal

11  training as well or folks in your family?

12          PROSPECTIVE JUROR:  Oh, yes, I do.

13          MR. JOHNSON:  Could you tell us a little bit about that.

14          PROSPECTIVE JUROR:  I've done paralegal work.  I've done

15  litigation, secretarial work, word processing, proofreading, you

16  name it.

17          MR. JOHNSON:  So all those boxes back there and blowups,

18  you've seen them done?

19          PROSPECTIVE JUROR:  Running to the courts, trying to get

20  them filed before 5 o'clock.  Been there, done that.

21          MR. JOHNSON:  Well, we appreciate you on both sides as

22  you can tell.  A lot of work in this case.  The firm I think, I

23  wrote Collin down.  Did I get that right?

24          PROSPECTIVE JUROR:  No, you didn't.  Clifford Chance

25  Rogers & Wells.

```
 1              MR. JOHNSON:  What kind of work do they do, ma'am?

 2              PROSPECTIVE JUROR:  Litigation, acquisitions, merger,

 3  wills, estates, trust, that type of thing.

 4              MR. JOHNSON:  Not personal injury?

 5              PROSPECTIVE JUROR:  Not really, um-hum.

 6              MR. JOHNSON:  Again, anything -- are you able to --

 7  obviously you have a great deal of knowledge in that area.  Are

 8  you able to set that aside and listen to the evidence and be fair

 9  to both sides in this case, knowing that we all went through all

10  that?

11              PROSPECTIVE JUROR:  Yeah, yeah.

12              MR. JOHNSON:  Any concerns at all from your end on that,

13  ma'am?

14              PROSPECTIVE JUROR:  No, no concerns about that.

15              MR. JOHNSON:  Anything else that you have a concern

16  about?  I'm sensing a little hesitancy and I want you to tell me

17  what you're feeling and thinking.

18              PROSPECTIVE JUROR:  I have to be a little honest here.

19              MR. JOHNSON:  I would hope a lot.

20              PROSPECTIVE JUROR:  I've lived in Atlanta for ten years

21  now, and your police department is always in the news.  So, you

22  know, I'm going to try, but even this morning you got accused, one

23  of your police officers of --

24              THE COURT:  Hold on, hold on, ma'am.  You made the

25  statement.
```

 1            PROSPECTIVE JUROR:  Yeah.

 2            THE COURT:  I don't want you to go into a lot of detail.

 3            PROSPECTIVE JUROR:  Okay.  So I'm a little -- a little

 4    bias.  I'm not too comfortable with this.

 5            MR. JOHNSON:  Okay.  Just to be clear then, in terms of

 6    Atlanta without going anymore, I used that 50-yard line analogy.

 7    So forgive my sports predilections, but are you feeling without

 8    even knowing any evidence in this case that you're already kind of

 9    leaning against -- not the City of Atlanta?

10            PROSPECTIVE JUROR:  I am.

11            MR. JOHNSON:  The Judge asked a question of a gentleman

12    earlier, "Will you be able to set that aside," and "say okay, I

13    heard about that stuff, but that has nothing to do with what is

14    going on in this courtroom."  Will you be able to do that if that

15    is what the Judge's instruction is to you, ma'am?

16            PROSPECTIVE JUROR:  If that is what your instruction is,

17    I will try.

18            THE COURT:  Here's the key.  What Mr. Johnson points out

19    is very important.  I need to know, Mr. Johnson needs to know, and

20    the attorneys for the City of Atlanta needs to know starting off

21    right now, are you impartial?

22            PROSPECTIVE JUROR:  I'm not sure.

23            THE COURT:  Okay.  And my next question is following Mr.

24    Johnson's question, can you listen to the evidence in this case,

25    and the charge I will give you, and render a verdict based on the

 1  evidence in this case, or is your opinion so set that you can't do

 2  that?

 3          PROSPECTIVE JUROR:  I will listen to the evidence.

 4          THE COURT:  Will you render a verdict based on the

 5  evidence?

 6          PROSPECTIVE JUROR:  Yes.

 7          THE COURT:  And you can set aside any opinions you have

 8  formed about the police department in Atlanta?

 9          PROSPECTIVE JUROR:  I'm not sure.

10          THE COURT:  Okay.

11          PROSPECTIVE JUROR:  I'm not sure.

12          THE COURT:  Okay.  Thank you, ma'am.

13          MR. JOHNSON:  Thank you, ma'am.

14          Folks, in this case, my client, Mr. Blasingame, was in

15  the area of 75/85 northbound ramp from I-20 eastbound.  And it's

16  not easy to find -- I found out yesterday when I tried to find

17  that particular location.  But it's an area nearby that is in

18  between a couple of the expressways, of course.  You're going to

19  hear evidence if you sit with our jury that my client was

20  ultimately accused of being a panhandler.

21          MR. DEARING:  Your Honor --

22          THE COURT:  Hold on, hold on, hold on.

23          MR. DEARING:  Your Honor, may we approach the bench,

24  please?

25          THE COURT:  Yes.

```
 1              (Whereupon, the following was held at sidebar out of the
 2    presence of the jury.)
 3              THE COURT:  You're telling them what the case is about.
 4    That is your opinion.  Just ask that question.
 5              MR. JOHNSON:  Okay, Judge, but you have to know or have
 6    some idea --
 7              THE COURT:  You told them.  Just ask the question.
 8              (End of sidebar.)
 9              MR. JOHNSON:  Does anybody have a negative experience or
10    opinion about panhandlers?
11              Ms. McClendon?
12              PROSPECTIVE JUROR:  Yes.  Kelly McClendon.  When you say
13    negative experience -- like, are you -- what's the
14    question-question?  As far as my personal -- I've had several
15    experiences with panhandlers.  Some, a lot negative, so.
16              MR. JOHNSON:  Can you tell me a little bit about that?
17              PROSPECTIVE JUROR:  Me and my children going into a
18    restaurant, someone come up asking for money, asking for -- I
19    don't want to say a handout, but basically.  But instead it was to
20    get food, but instead I said, "Let me buy you some food," and he
21    went off like he didn't want the food.  He just wanted the money.
22    So I've had several experiences, you know, in that type of
23    situation.
24              MR. JOHNSON:  Understood.  Thank you for your honesty,
25    ma'am.  I take it that caused you concern for your safety?
```

1        PROSPECTIVE JUROR:  Yes, yes and my children.

2        MR. JOHNSON:  Exactly.  Understood.  So my question to

3   you is, if in this case, if you hear evidence that my client was

4   panhandling at the time that he was ultimately having experience

5   with Officer Grubbs, is that something, because of your --

6        PROSPECTIVE JUROR:  No, I would need to know the details

7   of the case.

8        MR. JOHNSON:  Let me finish.  I think you're going to

9   give me the same answer.  Would you be able to set aside that

10  negative, understandable experience that you had, and then listen

11  to the facts and circumstances of this case, and judge it solely

12  on the facts and circumstances of this case?

13       PROSPECTIVE JUROR:  Yes, with the details -- if the

14  details are completely clear.  I should be able to.

15       MR. JOHNSON:  I appreciate you.  Thank you, ma'am.

16  Anybody else have negative experiences with folks panhandling,

17  begging for money, coming into this courtroom?  In particular,

18  negative experience that we should understand.  So I can ask you

19  the same set of questions, to be fair, so we all know.  No?  Thank

20  you.

21       I told you where this happened.  Are any of you folks

22  experienced or are you generally familiar with that general area

23  of the roadway and that surrounding area?  So we all understand

24  that those are and those aren't.  I think I see a couple of hands.

25  Yes, ma'am.

```
 1              PROSPECTIVE JUROR:  Christina Miller.

 2              MR. JOHNSON:  Thank you, Ms. Miller.

 3              PROSPECTIVE JUROR:  I think you said I-75/85 northbound

 4    ramp from I-20?

 5              MR. JOHNSON:  Yes, ma'am, I did.

 6              PROSPECTIVE JUROR:  I live in Grant Park which is right

 7    there.  I drive by it all the time.

 8              MR. JOHNSON:  You know exactly where it is.

 9              PROSPECTIVE JUROR:  Yeah.

10              MR. JOHNSON:  I'll take it from your familiarity of that

11    area --

12              PROSPECTIVE JUROR:  That area.

13              MR. JOHNSON:  -- will you be able to kind of set aside

14    what you know and what you've seen, and listen to what the facts

15    and circumstances were on the day that we're going to be talking

16    about, July 10 on 2018, as opposed to your own experience?

17              PROSPECTIVE JUROR:  Certainly, yes.

18              MR. JOHNSON:  I appreciate you.  Thank you so much.

19    Anybody else?  I thought I saw a couple of nodders out here.

20    Anybody familiar with that?  You are, sir?  Thank you very much,

21    sir.

22              PROSPECTIVE JUROR:  Ken Martasin.

23              MR. JOHNSON:  Good morning, Mr. Martasin.  Can you tell

24    me your generally familiarity with that area?

25              PROSPECTIVE JUROR:  I used to own a house in Grant Park.
```

1          MR. JOHNSON:  So likewise, I'm going to ask you.  Did

2    you have negative experience with panhandlers when you were in

3    that area?

4          PROSPECTIVE JUROR:  No, it was a long time ago, but,

5    yeah, back in 1980.

6          MR. JOHNSON:  So we don't have to worry about you having

7    some experience and not having the ability to set it aside.  You

8    can set it aside and listen to the evidence?

9          PROSPECTIVE JUROR:  Absolutely.

10         MR. JOHNSON:  I appreciate your honesty.  Thank you,

11   sir.  Anybody else generally familiar with that area?  Thank you.

12         Does anybody believe that the credibility of a police

13   officer should be judged the same way as we judge the credibility

14   or believability with any other witness, or does anybody think as

15   a police officer, that because he or she is a police officer, they

16   should be believed more?

17         No response, thank you.

18         Do any of you folks have family, friends, your own

19   experiences in education, training, or experience in law

20   enforcement?

21         No response.  Thank you.

22         Do you folks believe that if a person is in the process

23   of being arrested or arrested, that they should not be able to sue

24   a police officer or municipality if that officer utilized illegal

25   or excessive force?

1          Anybody believe that that should not be able to be

2  allowed?  Mr. Latimore?  I'd be happy to repeat the question.

3  Thank you for asking.  Do you believe that if someone is in the

4  process of being arrested and if the officer utilized excessive

5  force, more force than they should have, under the law that they

6  should be allowed to sue?

7          PROSPECTIVE JUROR:  Yes.

8          MR. JOHNSON:  Thank you very much.  Anybody else feel

9  the opposite; that they should not be allowed to?

10          I'm going to ask you about positive experiences with

11  police officers.  Have -- by a show of hands, is everybody and

12  everybody at least once in their lifetime had a pretty good

13  experience with a police officer?  I would hope.  Counsel is

14  probably going to ask you about negative interaction.  I want to

15  ask you about positive.

16          Since the overwhelming majority, if not all of you, have

17  had positive experiences with a police officer, will you be able

18  to listen to the evidence here, about a not so positive

19  interaction with a police officer, and judge it fairly, or do you

20  think because you had a one or more positive experiences that you

21  won't be able to do that?  Anybody here believe that applies to

22  them?

23          Thank you, Judge.  Thank you.

24          THE COURT:  Thank you, Mr. Johnson.  Ms. Miller?

25          MS. MILLER:  Good morning again, everyone.  As I told

 1  your colleagues, I ask my questions just a little bit differently.

 2  I'll ask you to raise your hand so I can identify if you answer

 3  affirmatively to any of the questions.  And then we can ask those

 4  one-on-one questions after you have responded.

 5          Please raise your hands if you, a family member or a

 6  close friend has ever had a negative experience with a police

 7  officer.

 8          PROSPECTIVE JUROR:  Kelly McClendon.  My first cousin

 9  was shot and killed during a psychotic break in Zachary,

10  Louisiana, due to the inexperienced training of the police

11  officers.

12          MS. MILLER:  I'm sorry to hear that, Ms. McClendon.  You

13  said that was in Louisiana?

14          PROSPECTIVE JUROR:  Yes.

15          MS. MILLER:  Have you had any negative experiences in

16  the City of Atlanta?

17          PROSPECTIVE JUROR:  I hate to say it like this.  I try

18  not to have any experience with police officers in any county.

19          MS. MILLER:  I understand.  Me, too.

20          PROSPECTIVE JUROR:  So no, I try not to go to Atlanta.

21          THE COURT:  The fact that you have a family member that

22  was killed by a police officer, are you going to be able to be

23  fair and impartial in this case, put that aside and render a

24  verdict based on the evidence you hear in this case and the charge

25  of law that I give you?

```
 1              PROSPECTIVE JUROR:  I should be able to with the details

 2    of the case.  I should.

 3              THE COURT:  Okay.

 4              MS. MILLER:  Thank you, Ms. McClendon.  Any others?

 5              Please raise your hand if you believe that police

 6    officers lack compassion for others.

 7              (No response.)

 8              Please raise your hands if, in the event that you find

 9    that the defendants did not violate the law, you could not return

10    a verdict for the defendants based upon what you've heard here so

11    far.

12              (No response.)

13              Please raise your hand if you believe that people should

14    not be arrested for low-level offenses.

15              Yes.

16              PROSPECTIVE JUROR:  Sabrina Ashwell.  It depends on what

17    the low-level offenses.  Something like a traffic ticket or

18    something like that, I don't think they should be arrested.  Is

19    that what we're referring to?

20              MS. MILLER:  Yes, ma'am.  Thank you.  Thank you,

21    Ms. Ashwell.

22              THE COURT:  She's done.

23              MS. MILLER:  Any others?  Please raise your hands if, as

24    a result of media coverage of any case involving the City of

25    Atlanta, its police officers, or its officials, you have formed an
```

 1  opinion about the City of Atlanta Police Department.

 2          Ms. McClendon.

 3          PROSPECTIVE JUROR:  I don't want to say I formed an

 4  opinion on the entire police, but I do -- I can say I'm very

 5  opinionated whenever it comes to a lot of the cases that I am

 6  seeing in the media.  I have a Black son and a Black husband, so

 7  with that being said, you know, it's very nerve-racking just

 8  leaving the house at times.

 9          MS. MILLER:  Thank you, Ms. McClendon.  Do you believe

10  you could still be fair and impartial to both sides in this

11  particular case?

12          PROSPECTIVE JUROR:  Umm, should be.

13          THE COURT:  I think -- I think Ms. Ashley has already

14  indicated her opinion there.

15          PROSPECTIVE JUROR:  Yeah.

16          THE COURT:  I think you have that down.

17          MS. MILLER:  Yes, thank you.

18          Please raise your hand if you have ever been arrested?

19          PROSPECTIVE JUROR:  Ken Martasin, DUI.

20          THE COURT:  And Mr. Martasin, was that DUI in the City

21  of Atlanta?

22          PROSPECTIVE JUROR:  Yes.

23          MS. MILLER:  If you recall, were you arrested by a City

24  of Atlanta police officer?

25          PROSPECTIVE JUROR:  It was a long time ago, but I

1 believe so, yes.

2          MS. MILLER:  Thank you.

3          PROSPECTIVE JUROR:  Walter Latimore.  About 25 years

4 ago, I was arrested.  I was arrested for misconduct, or whatever

5 you call it.

6          MS. MILLER:  And was that arrest in the City of Atlanta?

7          PROSPECTIVE JUROR:  Newton County.

8          MS. MILLER:  Thank you, Mr. Latimore.

9          Was there one other hand?

10          Please raise your hand if you, a family member, or a

11 close friend has ever had an unpleasant experience with a City of

12 Atlanta official.

13          (No response.)

14          Please raise your hand if you do not believe that our

15 court system is fair.

16          PROSPECTIVE JUROR:  Nanci Davis.  Umm, according to the

17 Court, I had a brother murdered in 1995, and upon arriving at my

18 mom's home, she found my brother had been murdered.  He came to

19 check some pipes at her home, and someone was there robbing her

20 home.  And the Cherokee County police came, they would not call in

21 GBI even though my mother assured them it was nothing to do with,

22 you know, anything other than the robbery, but they murdered my

23 brother.

24          The gentlemen was a -- well, he's not a gentleman, but

25 he was an ex-Green Beret that had been dishonorably discharged and

1  had a couple of other murders on his book, I guess, that he had

2  gotten away with.  They would not even go question this person

3  that we thought did it.  They sort of put on the news media that

4  it was a drug deal gone wrong, and my mother lived there alone.

5  So there were no drugs involved.

6         They did not do fingerprinting, even though there was

7  blood everywhere, the gentlemen cut him really bad.  They did not

8  do fingerprinting.  They did not search the premises for any sort

9  of evidence, and three months later, we hired a private detective

10 in Cherokee County that went and questioned this guy.  Finds out

11 that -- they did arrest him for a domestic abuse because he was

12 threatening his girlfriend to kill her if she told.

13        He had his 16-year-old daughter in the car.  So the car

14 had been towed.  The police knew the car was down there at the

15 time my brother was murdered.  When my mom got home, she passed

16 it.  They didn't do any sort of searching.  Any sort of anything

17 there.  Three months later, we did find out that the guy had

18 murdered my brother, he was arrested.

19        We had a two-year lengthy trial because we had no

20 evidence for a long time and his daughter finally broke and told

21 that where the knife was he killed him with.  He had thrown it in

22 a pond.  They did retrieve that.  But my mother's health went from

23 a normally healthy person.  I was expecting through the trial, and

24 I feel like our family was let down through the media first.  I

25 mean they put it out -- I don't have a whole lot of hope in the

1  justice system now, because of how our country is being

2  railroaded, and you know, stealing elections and so forth.

3          So I have no confidence whatsoever in the jury system --

4  not juries, but in the court system.

5          MS. MILLER:  Thank you, Ms. Davis, for that very honest

6  answer and I'm definitely sorry to hear what happened to your

7  brother.

8          PROSPECTIVE JUROR:  Thank you.

9          MS. MILLER:  Please raise your hand if your job requires

10  you to work with law enforcement officers or agencies.

11          PROSPECTIVE JUROR:  Kandrain Leggett.  In the schools.

12  So we have SR officers that we work with.

13          MS. MILLER:  And is that in Atlanta public schools --

14  no, Clayton County?

15          PROSPECTIVE JUROR:  Yes.

16          MS. MILLER:  Have you ever had the opportunity to work

17  with any Atlanta police officers?

18          PROSPECTIVE JUROR:  Yes.

19          MS. MILLER:  And how was your experience working with

20  those officers?

21          PROSPECTIVE JUROR:  It was fine.  I worked with the YMCA

22  and we had a program for the juvenile youth, so the officers would

23  come in and speak with the youth.  So it was a positive

24  experience.

25          MS. MILLER:  Okay.  Thank you.

1          PROSPECTIVE JUROR:  Byju Alex.  I work for the GM

2    defense.   I support the plants.  I work with the defense.

3          MS. MILLER:  What kind of interaction have you had with

4    law enforcement officers?

5          PROSPECTIVE JUROR:  We have applications, we have to

6    install in different sites --

7          THE COURT:  Could you speak a little louder?

8          PROSPECTIVE JUROR:  Sure.  So I'm working in the

9    automobile -- GM automobile sections and we have a contract with

10   the defense.  So I had to work with the defense to implement

11   applications for their plants.

12         MS. MILLER:  Have you ever had an opportunity to work

13   with the City of Atlanta police officer?

14         PROSPECTIVE JUROR:  No.

15         MS. MILLER:  Thank you.

16         Have you, a family member, or a close friend ever held a

17   job in a governmental agency?  If so, please raise your hand.

18         PROSPECTIVE JUROR:  Christina Miller.  I work for the

19   Veterans Affairs.

20         MS. MILLER:  Thank you, Ms. Miller.

21         PROSPECTIVE JUROR:  Kevin Dwyer.  My wife worked for the

22   juvenile court, judge's office.

23         MS. MILLER:  What county was that in, Mr. Dwyer?

24         PROSPECTIVE JUROR:  Fulton County.

25         MS. MILLER:  Thank you.

1          PROSPECTIVE JUROR:  Ken Martasin.  Being Rotarian in my

2    club, we've got a lot of judges, attorneys.  I know State

3    Representative Mark Hamilton, Senator Jack Murphy, I know the

4    sheriff of Forsyth County, Ron Freeman.  I probably have to write

5    them down.  But mainly in the Forsyth County area.

6          MS. MILLER:  Thank you.

7          Please raise your hands if there is anything about this

8    case that you have heard so far that would make you feel

9    uncomfortable sitting as a juror for this particular case.

10          (No response.)

11          Thank you, that's all my questions.

12          THE COURT:  Ladies and gentlemen of the jury, I have to

13    allow the lawyers -- I have to take a matter up, first of all,

14    with the lawyers outside of you-all's presence, and then I have to

15    give them 15 minutes to look at their notes to select the jury.

16    It is now roughly 11:50.  I'm going to excuse all of you-all

17    until 12:15.  I ask you-all to come back in the courtroom

18    at 12:15.  Sixteen of you-all, have a seat back out in the

19    audience, because we'll select eight jurors to hear his case.

20    Those eight jurors will need to come to the jury box.  So again,

21    at 12:15 -- well, let's say 12:10, I ask everybody to be back in

22    the courtroom, sitting out in the audience.  At that time, the

23    lawyers will select eight jurors to hear this case.  Thank you

24    all.

25          (Whereupon, the jury pool is excused at 11:53 a.m.)

```
 1            THE COURT:  Okay.  First of all, for your consideration,
 2   I have removed Juror No. 3, Ms. Tiktinsky.  She's not to be
 3   considered.  I'm also going to excuse No. 18, Walter James
 4   Latimore.  This gentlemen has cancer.  He had a cancer treatment
 5   set for today.  I gave him credit, he really wanted to be here.
 6   He rescheduled it.  But he's got a problem with his schedule next
 7   week.  This case is definitely going to be going on next week.
 8   I'm not going to ask him to reschedule his cancer treatment.  So
 9   No. 18 is being excused.  If there is any objection to that, I'll
10   hear from it right now.
11            MR. DEARING:  No objection from the defense, Your Honor.
12            MR. JOHNSON:  No objection, Your Honor.
13            THE COURT:  All right.  At this time, as far as the
14   plaintiff is concerned, are there any challenges for cause?
15            MR. JOHNSON:  Yes, Judge.  Do you want to hear all of
16   them at once, or one at a time?
17            THE COURT:  One at a time.
18            MR. JOHNSON:  Okay.  Sorry, Judge, I've got to find
19   them.
20            THE COURT:  Let's start with No. 5, Jesse Kinney.
21            MR. JOHNSON:  Yes, Judge.
22            THE COURT:  Let me say this.  Mr. Kinney gave two
23   conflicting answers.  Mr. Dearing and Ms. Miller, I can very easy
24   keep him if you feel very comfortable.  However, I have plenty of
25   jurors.  He answered one way to Mr. Johnson, and then he answered
```

 1   another way with me.  Case law says let him serve, this'll

 2   probably be okay, but if I have plenty of jurors, Mr. Dearing, why

 3   do I need to take a chance?

 4           MR. DEARING:  No objection to that, Your Honor.

 5           THE COURT:  Mr. Kinney is removed for cause.

 6           MR. JOHNSON:  Thank you, Counsel.

 7           THE COURT:  Anyone else?

 8           MR. JOHNSON:  Well, clearly Ms. Ashwell talked her way

 9   out of it.

10           THE COURT:  Number 28?

11           MR. JOHNSON:  To be fair, going the other way, but it

12   doesn't matter, because she answered my question but I think she

13   should be excused as well.

14           THE COURT:  I think you're right.  Any objection, Mr.

15   Dearing?

16           MR. DEARING:  No, none at all, Your Honor.

17           THE COURT:  Didn't think so.  All right.  Who else, Mr.

18   Johnson?

19           MR. JOHNSON:  I believe that's it for plaintiff.  Thank

20   you, Your Honor.

21           THE COURT:  Mr. Dearing or Ms. Miller?

22           MR. DEARING:  Yes, Your Honor.  For the defense, Your

23   Honor, we would ask that Juror No. 4 be stricken for cause.

24           THE COURT:  Why?

25           MR. DEARING:  Rachel Ann Morin.  When she was asked

 1  whether or not she believed that there should be any arrest for

 2  any type of offense, any low-level offense, she said no.  She said

 3  that she had bad experiences with officers.  Her spouse had been

 4  pulled over numerous times for -- it sounds like she was going

 5  into talking about illegal searches or problematic searches.

 6          THE COURT:  Mr. Dearing, the problem with that situation

 7  is that a person can believe that a person should not be arrested

 8  for low-level offenses.  That does not necessary disqualify

 9  people.  I have had drug cases where people tell me, they don't

10  think anybody charged with marijuana should be charged.  That

11  don't disqualify them.  A bad experience with a police officer.

12          I don't think -- I asked her the key question, "Can you

13  render a verdict after -- being fair and impartial and render a

14  verdict after hearing the evidence and the charge of the law," and

15  she said, "Yes."

16          MR. DEARING:  Well, Your Honor, I don't mean to cut you

17  off.

18          THE COURT:  No, no.  Go ahead.

19          MR. DEARING:  Your Honor, a lot of questions that are

20  asked, obviously, there was a great deal of hesitation in her

21  voice.  And the problem that she has, I mean, this case is going

22  to be based upon a low-level arrest, an arrest for something a lot

23  less than a shoot-out.  And I think if she -- if her position is

24  already that the City is wrong from the start, I don't think she's

25  going to be able to be fair and impartial, with regard to any

1   other action that the City would take in a situation like that.

2          THE COURT:  Let me say this, Mr. Dearing.  Ms. Miller

3   had her up and questioned her, and she could have followed up on

4   the line that she is saying.  That did not happen.  I asked her

5   the question.  She asked, she could be fair and impartial.  The

6   fact that she believed that people shouldn't be arrested for

7   low-level offenses, that is her opinion.  As you and I know, you

8   can be arrested for jaywalking.

9          MR. DEARING:  And also, very quickly, the question did

10  come up -- I think Ms. Miller did ask her to explain to some

11  degree the experiences that she and her spouse had.  And I believe

12  she said she had been pulled over several times by the police and

13  Ms. Miller asked her whether or not it was the City of Atlanta.

14  Even though she said it was not in the City of Atlanta, there was

15  just the degree of hesitation in her voice.

16         And I think she's conflating the two, and we would ask

17  that the Court strike her for cause.  We just don't feel that she

18  is able at this point -- based on the answers that she gave.  Even

19  though she artfully answered your question, Your Honor, I don't

20  believe she would be fair and impartial.

21         THE COURT:  Thank you, Mr. Dearing.

22         Mr. Johnson?

23         MR. JOHNSON:  There was absolutely no question asked

24  about bias, unfairness like we did with the other two witnesses

25  the Court now granted the cause request.  So I believe that should

1    be denied.  Thank you, Judge.

2          THE COURT:  I'm going to allow Ms. Morin to stand.  I

3    will note your exception, Mr. Dearing, but I'm not going to move

4    on that.  Who else, Mr. Dearing?

5          MR. DEARING:  I believe that's it, Your Honor.  Thank

6    you.

7          THE COURT:  One second.  Let me tell you what I have.

8    Let me ask you-all one question.  Based on the fact you-all raised

9    this, I think you're all thinking the same way I'm thinking.

10   No. 22, Ms. Lee, says she has a doctor appointment for two

11   o'clock today.  I didn't take her as the same manner that I took

12   the one, Mr. Latimore.  Especially since she told me she

13   didn't -- she didn't know if she was going to be here today.  They

14   knew this at least a week ago.  So I'm not of the mind to remove

15   her, but I want to be fair and bring it up.  Since you-all didn't

16   bring it up, I think you-all are thinking the same way I'm

17   thinking.  Mr. Johnson?  You don't have to say anything.

18         MR. JOHNSON:  Right.  For once, I shouldn't -- I get

19   where some folks are just intimidated and don't want to do

20   anything and don't know how it works.  I kind of got the

21   impression that was her.  I do agree with Your Honor, I think that

22   it's hopefully something we can work through.  Help her

23   understand, make a call, what have you.  But I agree with Your

24   Honor.  Thank you.

25         THE COURT:  Mr. Dearing?

 1           MR. DEARING:  Absolutely, Your Honor.  We have no

 2  problem if she is removed.  We have no problem.

 3           THE COURT:  If she what?

 4           MR. DEARING:  If she be removed from the jury pool.

 5           THE COURT:  I didn't think about removing her.  Mr.

 6  Johnson, did you ask to remove her?

 7           MR. JOHNSON:  I did not.  I thought I heard the Court

 8  say you were not inclined to.

 9           THE COURT:  No, I'm not of mind to remove her.  Listen,

10  here is my concern.  Mr. Latimore, No. 28, indicated his situation

11  and I -- you know, one of the things I have to do as judge, I have

12  to make a decision.  There is no question in my mind, here is a

13  man that gave up his cancer treatment today to be here, and

14  remember Ms. Lee, she's telling me she didn't know she had to be

15  here today present.

16           THE DEPUTY CLERK:  She knew she was the panel but they

17  get called every night by the jury department.  So she wouldn't

18  have known until 2 o'clock yesterday.

19           MR. DEARING:  Your Honor, obviously --

20           THE COURT:  I don't think we'll get to her.  You-all are

21  going to have -- each side gets three strikes apiece.  There'll

22  be 8 jurors, that's 14.  So you're going to have like the first

23  15.  Tell you, she's No. 22.

24           MR. DEARING:  Yeah, Your Honor.  That's fine.

25           THE COURT:  Okay, it is 12 o'clock.  At 12:15, I will be

1  back in here.  What happens when I'm out, Ms. Wright will explain

2  to you-all the selection mechanism and how it is done.  Mr.

3  Johnson?

4          MR. JOHNSON:  Judge, I'm sorry.  I have a format

5  question.  Will the Court help me to better understand.  We have

6  six, perhaps --

7          THE COURT:  No, you-all have three each.  Six total.

8  You have three strikes and the defense has three strikes.

9          THE DEPUTY CLERK:  We're choosing between jurors between

10 No. 1 and No. 16 with the exception of No. 3 and No. 5, who have

11 been removed for cause.

12         MR. JOHNSON:  May I remind the Court, please, on

13 July 13, 2022, when we had the final pretrial conference, the

14 Court told us at that time that both sets, two clients, and you

15 argued and you gave both sides six.

16         THE COURT:  All right.  Six and six.  He's right.  I

17 forgot.  So that's still 12.  So the first 20.

18         THE DEPUTY CLERK:  So 1 through 24, exclusive of the

19 individuals who have been stricken which is No. 3, No. 5, and

20 No. 18.

21         THE COURT:  And, Mr. Dearing, No. 22 is going to be in

22 the mix.  So are you still asking that 22 be removed?

23         MR. DEARING:  I did, Your Honor.

24         THE COURT:  Mr. Johnson?

25         No. 22 did not know until last night that she had to be

 1  there.  I thought they were giving her more of a warning.  She has
 2  a 2 o'clock doctor's appointment.
 3          MR. JOHNSON:  Is the Court -- I didn't hear what the
 4  Court says.
 5          THE COURT:  My feeling is originally, I thought she knew
 6  more until today that she had to be here.  Ms. Wright indicated
 7  they did not know until last night that they had to be here.
 8          MR. JOHNSON:  I got it.
 9          THE COURT:  So my feeling has somewhat changed.  She
10  didn't have enough time to change her 2 o'clock doctor's
11  appointment.
12          MR. JOHNSON:  The Court is now inclined, though, to let
13  her go?
14          THE COURT:  Yes.
15          MR. JOHNSON:  No objection, Judge.
16          THE COURT:  No. 22 is removed.
17          THE DEPUTY CLERK:  So we'll be choosing between 21 and
18  25.
19          THE COURT:  All right.  It is 12:05.  At 12:20 we'll be
20  back in here.  Ricky, let the jurors know they don't have to be
21  back until 12:20 and Ms. Wright will explain to you-all the
22  selection mechanism for selecting jurors back and forth.  I tried
23  the cases with the City of Atlanta.  They know how it is done.
24  Mr. Tobin, I don't think I've tried a case with you before.
25          MR. TOBIN:  No, Your Honor, but I heard of your

 1  excellent reputation.  Thank you.

 2          THE COURT:  Right.  Ms. Wright is going to explain to

 3  you-all the selection.

 4          (Whereupon, a break was taken at 12:04 p.m.)

 5          THE COURT:  Okay.

 6          MR. JOHNSON:  Just for clarification, 1 through 24 was

 7  struck?

 8          THE DEPUTY CLERK:  1 through 24 was struck, with the

 9  exception of four who was within that range who have been stricken

10  already.

11          MR. TOBIN:  Thank you.

12          THE COURT:  All right.  You can bring the jury in.  You

13  can start, Ms. Wright.

14          Ladies and gentlemen, the lawyers are now going through

15  the process of selecting eight jurors to hear this case, eight of

16  you-all to hear this case.  It is what we call a silent selection.

17          Can I see the attorneys up here?

18          (Whereupon, the following was held at sidebar out of the

19  presence of the jury.)

20          THE COURT:  Two matters.  I don't think it matters.

21  You-all did remember this is the gentleman who is supposed to be

22  going out of town on the 22nd?  Everybody remembered that;

23  correct?

24          MR. JOHNSON:  Right.

25          THE COURT:  From the plaintiffs, are there any motions

1  or challenges coming from the jury selection?

2  MR. DEARING:  No, Your Honor.

3  THE COURT:  From the defense, any motions or challenges

4  to the jury selection?

5  MR. DEARING:  I'm sorry.  All the jurors that they

6  struck are white.  It's just a pattern.  Ours are evenly split.

7  There is --

8  THE COURT:  You have a Batson challenge?

9  MR. DEARING:  Absolutely, Judge.

10  THE COURT:  All right.

11  MR. JOHNSON:  We're going with the first Batson?

12  THE COURT:  It's a Batson --

13  MR. JOHNSON:  It's not a protected group, so it does not

14  apply.

15  THE COURT:  It's the other case -- I'm trying to

16  remember off the top of my head.  They can challenge it.  They can

17  do that.

18  Let's go through the reasoning.  The first strike is the

19  plaintiffs.  All right.  That was Mr. Hayes.

20  MR. JOHNSON:  Mr. Hayes?  Sorry.

21  THE COURT:  All right.  First of all, let me say this.

22  The Court finds that the peremptory challenge has been established

23  on striking all white jurors by the plaintiffs is challenged by

24  the defendants.  The first person is Mr. Hayes, No. 14.  Why did

25  you strike him?

 1          MR. JOHNSON:  Well, he's a municipal commercial

 2   insurance agent who deals with police agencies.  A member of the

 3   Baptist church, Kiwanis Club.  So, yeah, as a risk manager.  Not

 4   close.

 5          THE COURT:  That's good enough.

 6          MR. JOHNSON:  Thanks, Judge.

 7          THE COURT:  No. 19.  Why did you strike No. 19?

 8          MR. JOHNSON:  I need a name.  Sorry, Judge.

 9          THE COURT:  Mr. Kenneth Martasin.

10          MR. JOHNSON:  Martasin, Rotary club, self-employed, and

11   when I was asking him questions, I did not care for his answers to

12   me or toward me.  So I felt that Mr. Martasin, as a self-employed,

13   would be extremely difficult to deal with in terms of damages in

14   this case.

15          MR. TOBIN:  Your Honor, he said he knows a lot of law

16   enforcement officers.  He was a Forsyth sheriff and he knows a lot

17   of law enforcement officers.

18          THE COURT:  He also has lunch with the Forsyth sheriff

19   county sheriff --

20          MR. TOBIN:  Yes.

21          THE COURT:  No. 9?

22          MR. JOHNSON:  Ms. Kelly.  Ms. Kelly being a director of

23   operations construction manager, Judge, we felt in terms of her

24   answers, that she directs people, she's going to be a

25   control-oriented person, and I tend to strike the strongest people

1   that I feel are on the jury.  And I thought that Ms. Kelly was, at

2   the time, the strongest person on the jury and her time.  So that

3   was my number one reason for her.

4           THE COURT:  Okay, you struck her --

5           MR. JOHNSON:  She was going to lean that jury.  That was

6   going to be my foreperson.

7           MR. DEARING:  Your Honor --

8           THE COURT:  He has to go through first.  No. 11

9   Studstill.

10          MR. JOHNSON:  Studstill, yet again, vice president of

11  operations.  Operations people in general are very rigid and

12  they're managerial people that, I'm guessing, would be much like

13  Ms. Kelly, No. 9, extremely critical of a panhandler and a person

14  not working.  So I thought that Ms. Studstill as well as -- with

15  her bachelor of science in management, she was obviously on a

16  school board, Turning Point church.

17          She's one of the few that had multiple organizations

18  that I would be very concerned that she would be extremely

19  conservative, especially on a liability for her, but my concern in

20  damages.

21          THE COURT:  No. 2, Mr. Cuthbert.

22          MR. JOHNSON:  I'm sorry, Judge?

23          THE COURT:  No. 2, Thomas Cuthbert.

24          MR. JOHNSON:  Again, engineer, highly scrutinized

25  person.  Master's in systems engineering, very scrutinized, very

1 strict, very -- in our opinion, would be a very controlling person
2 that we were concerned would be critical of our client being an
3 unemployed person on the street, so...  Chief technology officer,
4 again, folks of high management.

5          THE COURT:  And the last one you struck is No. 12,
6 Mr. -- I think I know why you struck No. 12.

7          MR. JOHNSON:  Mr. Avenick had a lot going on and clearly
8 wanted to get off this jury.  I don't think he had enough to get
9 off this jury, but being a single dad, as I know as a person
10 being --

11          THE COURT:  This gentlemen said he was traveling the
12 22nd --

13          MR. JOHNSON:  Yeah, and he had multiple trips, is what
14 he said.  But he kind of backed it down.  But I was concerned he
15 wasn't going to be able to focus on the case.  Thank you, Judge.

16          THE COURT:  Okay.  Mr. Dearing?

17          MR. DEARING:  Your Honor, with regard to -- Your Honor,
18 for example, No. 11, I would like to start with.  With regard to
19 No. 11, the question started out asking these people would they be
20 fair, could they be fair.  And now Mr. Johnson is essentially
21 saying that if someone has an engineering or a technology degree,
22 that all of a sudden they can't be fair.

23          And I think he's doing that to -- to link them
24 altogether because they're all white and I think he believes that
25 the white jurors will be less sympathetic to his client, because

 1   he was a panhandler.  Your Honor, as I said, No. 11, No. 14, they

 2   all --

 3            THE COURT:  No. 14?

 4            MR. DEARING:  No. 11, No. 2, they're just educated

 5   individuals.  They didn't give any indication that they could not

 6   be fair based on the occupation of the plaintiff in this case.  I

 7   just don't see how he can justify some of those strikes,

 8   particularly No. 14 -- excuse me, Your Honor.  Particularly No. 11

 9   is just -- I don't understand that one, Your Honor.  I don't

10   understand several of them, but certainly not 11.

11            THE COURT:  Okay.  The reasons I've heard Mr. Johnson

12   give is race-neutral reasons.  They don't have to be

13   reasons that -- he has formed an opinion, he and his team, how

14   they think they will be.  That's why we have voir dire.  I can't

15   find anywhere where he removed them strictly because they were

16   white.  I understand the defendant, Mr. Grubbs, in particular is a

17   Black male, and that the victim in this case, Mr. Blasingame is a

18   Black male.  So I understand Mr. Grubbs' position.  But as you and

19   I both know, if he gives race-neutral reasons, I can't say based

20   on what he said that he struck them because they were white, then

21   I have to allow them to remain.  I know you disagree, and I note

22   your exception.

23            MR. JOHNSON:  Judge, this is one of the most offensive

24   things I have ever been accused of in 36 years.

25            THE COURT:  We'll deal with it later.  I got people

1  waiting out here.  I will give you a chance to state --

2          MR. JOHNSON:  Thank you.  I hope so. Thank you.

3          (End of sidebar.)

4          THE COURT:  When your name is called, come and have a

5  seat in the jury box.

6          THE DEPUTY CLERK:  Kristin David, Kimberly Johnson,

7  Ashley McClure, Heidi Evans, Christina Miller, Panagiotis Chronis,

8  Byju Alex, and Kandrain Leggett.

9          THE COURT:  Okay.  If the eight of you-all can stand and

10 raise your right hand.  Ms. Wright is going to administer an oath

11 to you.

12         (Whereupon, the jury is sworn.)

13         THE COURT:  To the remainder jurors, thank you all for

14 being here this morning -- this afternoon.  This case, as I

15 indicated, is going to take the rest of this week and going into

16 next week.  I will not be seeing any of you-all again.  I thank

17 you for being here.  I ask you to go back upstairs to the 22nd

18 floor, and they will give you instruction as to what to do.  My

19 guess is that your jury service will be complete.  I would rather

20 Ms. Moses tell you that.

21         Thank you-all for doing your duty as citizens, and have

22 a great rest of the week.

23         (Whereupon, the jury pool was excused.)

24         THE COURT:  To the eight of you-all, there is a lot of

25 instruction I need to give you-all.  I'm going to give you some

1  brief instructions right now -- the lunch room closes at what

2  time?  At 1:30, okay.  I want you to have an opportunity to eat

3  some lunch.  You have just been sworn in for this case.  This

4  means you can't discuss this case with anyone until I tell you you

5  can.  You can't talk about it among yourselves.

6       So from here on out, when you go to lunch today, you

7  can't talk about the case per Judge Jones.  You cannot discuss

8  this case amongst yourselves until I tell you you can do that in

9  deliberations.  I want you to go to lunch.

10       Let me tell you, there are no places in this immediate

11  area where you can leave here -- we're going to give you an hour

12  for lunch -- but there is no place in this immediate area where

13  you can leave and go eat lunch, and properly digest the food and

14  be back here in an hour.  This is the problem -- not a problem, it

15  is where we're located.

16       I recommend you go downstairs to the cafeteria and eat

17  lunch downstairs.  I eat lunch there.  I brought my lunch today,

18  because during jury trials, I usually bring my lunch.  Tomorrow,

19  if you want to bring your lunch, you can.  There is a refrigerator

20  upstairs on the 22nd floor.  You can stick your food there, the

21  lunch break, go upstairs and get it, you can eat it there.  Bring

22  it to the jury room, eat it, or take it to the cafeteria.

23       But today, unless you brought your lunch today, I'm

24  highly recommending you go downstairs to the cafeteria and eat

25  lunch there.  If you think you can leave and go to a place

1    somewhere near here and be back in an hour, more power to you.

2           But you're going to be one of the fastest people eating

3    known to mankind.  I don't need sick jurors that did not digest

4    their food properly.  But again, the main thing, Ricky is going to

5    show you-all how to leave here, go out, and come back in.  We're

6    going to start back at 1:45 with the opening.

7           I'm going to give you instruction at 1:45 and then you

8    will hear opening instructions from the lawyers.  Any questions?

9    See you at 1:45.

10          (Whereupon, the jury was excused at 12:45 p.m.)

11          THE COURT:  Now, let me -- what's going to happen is

12   they come back, I'm going to read through the instructions to them

13   and each one of you will have 45 minutes for the opening statement

14   and then plaintiff can call his first witness.

15          Now, let me say this to, Mr. Johnson.  I'm going to

16   allow you to put on the record what you want to put on the record.

17   I've tried cases with Mr. Dearing before.  I don't think he meant

18   to say anything offensive against you.  You've been trying cases

19   for a while.  Okay?  You-all have.  Certain things lawyers have to

20   do, as you know.  I don't think Mr. Dearing has meant to try to

21   say you did anything that would be looked upon as not being

22   proper.  But as a lawyer, you know this, you-all know this,

23   lawyers have to do what they think is in the best interest of

24   their client.  Me saying that, I'll allow you to put on the record

25   anything you want to put on the record.

 1          MR. JOHNSON:  I said what I needed to say at the

 2    sidebar.  I stand by it.  I'm ready to move on.

 3          THE COURT:  All right.  That's all I can ask from

 4    you-all.  Again, you-all have been getting along so far.  So I am

 5    assuming that's going to continue.  See you-all at 1:45.

 6          (Whereupon, a break was taken at 12:45 p.m.)

 7          THE COURT:  I hope everybody had a good lunch.  I'm

 8    going to give the preliminary instructions.  Then we'll have

 9    opening statements by the plaintiff followed by the defendant.

10    And then the plaintiff will call its first witness.

11          Do both sides invoke the rule of sequestration in this

12    case?

13          MR. JOHNSON:  Yes, Judge.

14          MR. DEARING:  Yes, Judge.

15          THE COURT:  It is your responsibility of keeping all of

16    the witnesses outside and instruct them not to discuss the case

17    amongst themselves.

18          MR. DEARING:  Just an announcement, Your Honor.  Michael

19    Banja is here.  Officer Banja is our city rep.

20          THE COURT:  Okay.  Any objections?

21          MR. JOHNSON:  No objections.

22          THE COURT:  All right.  Then he is excepted from the

23    rule.

24          Okay.  If there is nothing else, bring the jury out.

25          MR. JOHNSON:  Judge, I was going to introduce Letitia

1   Knox, who is our client's daughter.  But since the Court is

2   granting, obviously, a motion for sequestration, I guess that is

3   going to be impossible to do.  So I guess I will wait until I call

4   her then?

5            THE COURT:  You want to introduce her to the jury?

6            MR. JOHNSON:  It's part of my opening statements today,

7   so they know who she is, but, yeah.

8            THE COURT:  No.

9            MR. JOHNSON:  Thank you, Judge.

10           (Whereupon, the jury was seated at 1:49 p.m.)

11           THE COURT:  You-all can be seated.

12           Ladies and gentlemen of the jury, before we get started,

13   I have some clear instructions I have to give you regarding your

14   duty as jurors and procedures that we will be following during the

15   course of this trial.

16           Let me say, I hope all you-all had a good lunch, and I

17   hope nobody had any problems.  Did everybody get to eat something

18   for lunch?

19           Okay, all right.  As stated, members of the jury, now

20   that you have been sworn, I need to explain some basic principles

21   about a civil trial and your duty as jurors.  These are

22   preliminary instructions.  I will give you more detailed

23   instructions at the end of the trial.

24           Now, what is the duty of the jury?  It is your duty to

25   listen to the evidence and decide what happened and apply the law

1  to the facts.  It is my job to provide you with the law you must

2  apply, and you must follow the law even if you disagree with it.

3        Now, what is evidence?  You must decide the case only on

4  the evidence presented in the courtroom.  Evidence comes in many

5  forms.  It can be testimony about what someone saw, heard, or

6  smelled.  It can be an exhibit or a photograph.  It can be

7  someone's opinion.  Some evidence may prove a fact indirectly.

8  Let's say a witness saw wet grass outside, and people were walking

9  into the courthouse carrying wet umbrellas.  This may be indirect

10 evidence that it rained, even though the witness didn't personally

11 see it rain.

12        Now, indirect evidence like this is also called

13 circumstantial evidence.  Simply, a chain of circumstances that

14 likely proves a fact.

15        Now, members of the jury, as far as the law is

16 concerned, it makes no difference whether evidence is direct or

17 indirect.  You may choose to believe or disbelieve either kind.

18 Your job is to give each piece of evidence whatever weight you

19 think it deserves.

20        Now, what is not evidence?  During the trial, you will

21 hear certain things that are not evidence and you must not

22 consider them.  First, the lawyers' statements and arguments

23 aren't evidence.  In their opening statements and closing

24 arguments, the lawyers will discuss the case.  Their remarks may

25 help you follow each side's argument and presentation of evidence,

1  but the remarks themselves aren't evidence and shouldn't play a

2  role in your deliberations.

3       Second, the lawyers questions and objections aren't

4  evidence.  Only the witness' answers are evidence.  Don't decide

5  something is true just because a lawyer's questions suggested that

6  it is.  For example, a lawyer may ask a witness:  You saw Mr.

7  Jones hit his sister, didn't you?  That question is not evidence

8  of what the witness saw or what Mr. Jones did unless the witness

9  agrees with it.

10      Now, members of the jury, there are rules of evidence

11 that control what the Court can receive into evidence.  When a

12 lawyer asks a witness a question or presents an exhibit, the

13 opposing lawyer may object if he thinks the rules of evidence

14 don't permit it.  If I overrule the objection, then the witness

15 may have answered the question or the Court may receive the

16 exhibit.  If I sustain the objection, then the witness cannot

17 answer the question and the Court will not receive the exhibit.

18 When I sustain an objection to a question, you must ignore the

19 question and not guess what the answer might have been.

20      Now, ladies and gentlemen, sometimes I may disallow

21 evidence.  This is also called striking evidence.  In order --

22 excuse me.  In order for you to disregard and ignore it, this

23 means that you must not consider that evidence when you are

24 deciding this case.  I may allow some evidence for only a limited

25 purpose.  When I instruct you to omit an item of evidence for a

1  limited purpose, you must consider it only for that purpose and no

2  other.

3        Let's talk about the credibility of witnesses.  To reach

4  a verdict, you may have to decide which testimony to believe and

5  which testimony not to believe.  You may believe everything a

6  witness says, part of it, or none of it.  When considering a

7  witness' testimony, you may take into account the following:  The

8  witness' opportunity and ability to see, hear, or know the things

9  that the witness is testifying about; the witness' memory; the

10 witness' manner while testifying; any interest the witness has in

11 the outcome of the case; any bias or prejudice the witness may

12 have; any other evidence that contradicts the witness' testimony;

13 the reasonableness of the witness' testimony in light of all of

14 the evidence; and any other factors affecting believability.

15        Now, members of the jury, at the end of the trial, I

16 will give you additional guidelines to determine a witness'

17 credibility.

18        Burden of proof:  The plaintiff has the burden of proof

19 of proving this case by what is called a preponderance of the

20 evidence.  That means plaintiffs must prove that, in light of all

21 of the evidence, what it claims is more likely true than not.  So

22 if you could put the evidence in front of every plaintiff, and the

23 evidence in favor of the defendants on opposite sides of a

24 balancing scale, plaintiff needs to make the scales tilt to their

25 side.  If plaintiffs fail to make this burden, you must find in

1    favor of the defendant.

2         To decide what any fact has been proved by a

3    preponderance of the evidence, you may, unless I instruct you

4    otherwise, consider the testimony of all of the witnesses,

5    regardless of who called them and all of the exhibits the Court

6    allowed, regardless of who produced them.  After considering all

7    of the evidence, if you decide a claim or fact that is more likely

8    true than not, then a claim or fact has been proved by a

9    preponderance of the evidence.

10        Now, let's talk about the conduct of you, the jury.

11   While serving on the jury, you may not talk with anyone about

12   anything related to the case.  You may tell people that you are a

13   juror and give them information about when you must be in court.

14   But you must not discuss anything about the case itself with

15   anyone.  You shouldn't even talk about the case with each other

16   until you begin your deliberations.

17        You want to make sure that you heard everything, all of

18   the evidence, the lawyers' closing arguments, and my instructions

19   on the law before you begin deliberating.  You should keep an open

20   mind until the end of the trial.  Premature discussions may lead

21   to a premature decision.

22        Now, members of the jury, in this age of technology, I

23   want to emphasize that in addition of not talking face to face

24   with anyone about the case, you must not communicate with anyone

25   about the case in any other means.  This includes e-mails, text

1  messages, Internet, including social networking, websites such as

2  Facebook, Snapchat, Instagram, or Twitter.  You also shouldn't

3  Google or search online or offline for any information about the

4  case, the parties, or the law.  Don't read or listen to any news

5  about the case, visit any places related to this case, or research

6  any fact, issue, or law related to this case.

7          Now, members of the jury, the law forbids the jurors to

8  talk to anyone else about the case and forbids anyone else to talk

9  to the jurors about the case.

10         Now, members of the jury, during the course of voir

11 dire, some locations were mentioned in this trial, and some of

12 y'all may travel home doing I-85, or 285, or 75.  You are not to

13 stop and try to make a determination what happened or locations.

14 Whatever you have been doing, however you been living, where you

15 living, when you drive home or you drive to any of those areas or

16 the next, as long as this case is in proceeding, you are not to

17 stop and do any kind of research or investigation.  You just drive

18 to your location and do it -- go with that.

19         Now, members of the jury, the law forbids jurors to talk

20 to anyone else about the case.  And it's very important that you

21 understand why these rules exist and why they're so important.

22 You must base your decision only on the testimony and other

23 evidence presented in the courtroom.  It is not fair to the

24 parties if you base your decision, in any way, on information you

25 acquired outside of the courtroom.  For example, the law often

1   uses words and phrases in special ways.  So it's important that

2   any definitions you hear come only from me and not from any other

3   source.  Only you jurors can decide a verdict in this case.  The

4   law sees only you as fair, and only you have promised to be fair

5   and no one else is so qualified.

6          Now, during the course of this trial, ladies and

7   gentlemen of the jury, if you wish, you may take notes to help you

8   remember what witnesses said.  If you do take notes, please don't

9   share them with anyone until you go into the jury room to decide

10  the case.  Don't let note-taking distract you from carefully

11  listening to and observing the witnesses.  When you leave the

12  courtroom, you should leave your notes hidden from view in the

13  jury room.  Do not leave them sitting in the chairs in the jury

14  box.

15         Whether or not you take notes, you should rely on your

16  own memory of the testimony.  Your notes are there only to help

17  your memory.  They're not entitled to greater weight than your

18  memory or impressions about the testimony.

19         Now, ladies and gentlemen, we have a court reporter here

20  and this court reporter is taking down what is being said during

21  the course of this trial.  However, you will not have a transcript

22  with you when you start deliberations in this case.  Therefore,

23  you are to take notes and your eight collective minds has to

24  remember what was said and what was not said during the course of

25  the trial.

1          Now the course of the trial, let's walk through it.

2    First, each side may make an opening statement, but they don't

3    have to.  Remember, an opening statement is not evidence and it is

4    not supposed to be argumentative.  It is just an outline of what

5    that party intends to prove.

6          Next, the plaintiff presents their witnesses and asks

7    them questions.  After plaintiff questions the witness, the

8    defendant may ask the witnesses questions.  This is called

9    cross-examining the witness.  Then the defendant will present his

10   witnesses, and the plaintiff may cross-examine them.  You should

11   base your decision on all of the evidence regardless of which

12   party presented it.  After all of the evidence is in, the parties

13   and lawyers will present their closing arguments to summarize and

14   interpret the evidence for you.  And I then will come and give you

15   instructions on the law and then instruct you to go into the jury

16   room.

17          Now, just a couple of administrative things.  We will

18   start the case each morning at 9 o'clock.  That means you are

19   going to need to be in the jury room at 8:45.  9 o'clock, we will

20   have the bailiff bring you out, and the lawyers representing the

21   parties in the case will talk about it at that point in time.  We

22   usually take a break around 10:15 or 10:30 each morning.  If you

23   need to take a break before that, all you need to do is raise your

24   hand and suggest you need a break and we will stop at an

25   appropriate point and allow you to take a break.

1          This is not a test of endurance in trying the case.  At

2    12:30 each day we will break for lunch.  We will have one hour for

3    lunch from 12:30 to 1:30.  Unless there is a witness I'm trying to

4    finish, I usually stop at 12:30.  But if there is a witness, I

5    think in about ten minutes we'll finish him, we may stop at 12:40.

6          As I told you before, you can bring your lunch and leave

7    it in the refrigerators upstairs on the 22nd floor, and you can

8    retrieve it at lunchtime, eat it up there, eat it in the jury

9    room, or eat it in the cafeteria, or you can go to the cafeteria

10   and eat.  I think you got a general idea.  We were trying to have

11   a menu ready each day of what they will be serving.

12          Again, I do not advise it, I highly say you shouldn't

13   try it, but if you think you can leave the courthouse and go and

14   eat something and be back here in the hour, then that's your

15   prerogative.  We will start back each day at 1:30, we'll take a

16   break around 3:15 or 3:30 each afternoon.  But again, if you need

17   a break before then, let me know.

18          I usually stop at 5 o'clock each day, unless there is a

19   witness I'm trying to finish or the lawyers indicate this witness

20   cannot be back the next day, we will go from there.  We're Monday

21   through Friday, there is no weekend court.  So the ten days,

22   Saturday and Sunday you're off.  Again, I can't emphasize to you

23   enough, you are not to talk about this case with anyone until I

24   can tell you you can do so.

25          Now, you're getting ready to hear the opening statements

```
 1  from the lawyers.  As I indicated earlier, what the lawyers say is
 2  very, very important and you should pay close attention to what
 3  they say in opening statements, even take notes if you think you
 4  should be.  However, what the lawyers say in opening statements is
 5  not evidence.  The evidence will come from the witnesses who
 6  testify on the witness stand and the exhibits I allow in during
 7  the course of the trial.
 8          But what the lawyer says is very important, because
 9  lawyers, they are painting a map for you, an outline of what the
10  case is about and help you follow the case easier.  Again, you
11  should pay very close attention to what they say in opening
12  statements.
13          Mr. Johnson, I see a number of boards.  Are you going to
14  be using those in your opening statements?
15          MR. JOHNSON:  Certainly not all of them.
16          THE COURT:  What you're not going to use, turn them
17  around the other way, because they have not been admitted into
18  evidence yet.
19          MR. JOHNSON:  Yes, sir.
20          THE COURT:  Thank you, Mr. Johnson.  With that, Mr.
21  Johnson, you have 45 minutes for your opening statement.
22          MR. JOHNSON:  Thank you, Judge.
23          THE COURT:  Let me say, you've already met him, but I'll
24  introduce him again.  This is Mr. Vern Johnson, one of the counsel
25  for the plaintiff.
```

1          MR. JOHNSON:  Good afternoon, ladies and gentlemen.

2          I'm showing you proposed Exhibit 42.  Because Jerry

3    Blasingame is not here and I wanted you folks to see Jerry

4    Blasingame, because even though I'm going to talk about the

5    plaintiff being Mr. Keith Edwards -- I'll explain to you his role

6    shortly -- the events of July 10, 2018, involved Jerry Blasingame,

7    my client.  So although Jerry is not here, he has a really good

8    reason for not being here.

9          Exhibit 43 please, proposed Exhibit 43, please.  Because

10   on July 10, 2018, after Officer Grubbs unnecessarily used illegal

11   excessive force, Jerry Blasingame was tased in the back while he

12   was running away from the officer -- we'll get into the facts

13   shortly -- running downhill, and had not committed any severe

14   crime.

15         He was suspected of panhandling, suspected only,

16   according to Officer Grubbs, the one and only officer who Tased my

17   client and, therefore, we believe the evidence will show the most

18   important person in terms of what he knew and what he saw and what

19   he didn't, and what he testified to and what he will testify to,

20   here before you folks in trial is that he suspected that Jerry

21   Blasingame was panhandling along the I-75/I-85 roadway there,

22   which according to law is against the law.  But as a result of

23   those TASERS® probes going into Jerry Blasingame's back as he was

24   running away from the officer, not assaulting the officer, Officer

25   Grubbs will admit he, Jerry, never said a single word to him.

1 Didn't yell at him, didn't swear at him, didn't threaten him, was

2 unarmed, but he was trying to get away.

3       And when those two probes went into Jerry's back, it did

4 what it was supposed to do when Officer Grubbs pulled the trigger

5 of the Taser X2, which you will hear a lot about, and it did what

6 this thing called an uncontrollable fault.  That is what it's

7 supposed to do.  Talk about contractures, your muscles lock up and

8 you're supposed to fall straight down.

9       What you're going to hear, ladies and gentlemen, in this

10 case is the painstaking training of Officer Banja, who is here,

11 he's going to talk about his TASER® training on Grubbs and others,

12 you're going to hear from Officer Reyes who is going to hear about

13 the painstaking training where he taught these officers how to

14 utilize and, therefore, how to avoid making mistakes with

15 body-worn cameras -- BWC cameras -- which we will talk about,

16 because guess what was not on that day.

17       Officer Grubbs did not have his mandatory body-worn

18 camera working that day, in direct violation of the training that

19 he received from Officer Reyes who is going to be here with us

20 later on today, and not only that, but you're going to hear from

21 two of our experts in police policies and procedures.  Mr. Tom

22 Tiderington from Plymouth, Michigan -- Plymouth Township, actually

23 -- where he is a police chief, and Andrew Scott who is a former

24 police chief down in Southern Florida.

25       And you will hear about their repeated violations, not

1  just of the camera policy, but of the TASER® policy and the

2  training that you're going to hear from Officer Banja, Officer

3  Banja of these officers, how they're trained to take into

4  consideration where someone might fall, because if you're going to

5  zap them, the goal is to make them fall or at least to be down

6  where they can get handcuffed.  That's the goal.

7       So when you're running away from somebody with a TASER®,

8  Atlanta Police Department policy and procedures which Officer

9  Banja will tell you about -- if not today, tomorrow -- says,

10  "Don't shoot it, don't use it."  Why?  Because it increases

11  somebody's speed and, therefore, when they fall, they can get

12  seriously injured or even killed.

13       Their own policies and procedures in Atlanta, Officer

14  Banja will tell you, "Don't Tase the elderly.  Don't Tase the

15  frail, physically frail."  Why?  Because bad things can happen to

16  them, meaning, usually the heart.  Okay?  But also other bad

17  things, like obviously, when elderly folks fall, we all know and

18  the evidence will prove they can get more injured than the younger

19  folks.  And then interject, of course, the speed of running,

20  interject the elevated height of going down a hill that some

21  estimate in this case, you will hear from the witness stand, they

22  estimate between 35- and 45-degree angle going up to down in this

23  case, going from 75, 85, down to the I-20 eastbound, if you will,

24  on-ramps.  You folks will see those pictures.  We'll show them to

25  you.  Without question, there is a hill and incline.

1          You're not going to hear -- not just from Officer Banja

2    about the training he provided to Grubbs and others within

3    Atlanta, but also that the TASER® international folks, the folks

4    that actually make the TASERS®, they have a PowerPoint that

5    Officer Banja uses, and you are going to see in the PowerPoint how

6    they specifically warn against tasing the elderly, tasing people

7    who are running, tasing people on an elevated surface, because of

8    the concern and the foreseeability -- you're going to hear about

9    that term, foreseeability.  The likelihood that somebody can get

10   injured, seriously injured or killed.

11          And that's just from their witnesses.  You're going to

12   hear what ultimately will be unrebutted, in other words, not

13   contradicted evidence that Jerry Blasingame, from the date of this

14   incident, July 10, 2018, was rendered a quadriplegic.  He fell so

15   hard and so far that he went down the hill, it appears,

16   head-first.

17          He broke more bones in your face than most of us even

18   know that we have and we will go through the medical records and

19   show you those painful severe fractures of zygomatic arch, the

20   orbit, his nose, his occiput, he had skull fractures, he had brain

21   bleed.  His cervical vertebrae on the model that I have in front

22   of you is the white, the number one vertebra starting at the top,

23   going down one, two, three, his third through the fifth vertebrae

24   they thought, in Grady Hospital when they obviously examined him

25   with MRI and CAT scans, that he had defects.  In other words, that

1   he had acute injury there and, in particular, they found on the

2   MRI, what you're going to hear about is a signal, a T-signal which

3   is a bad signal, and what that tells you is spinal cord injury is

4   likely.

5          But Jerry Blasingame was unconscious, so he couldn't

6   really describe for them what he could feel and what he couldn't.

7   And you're going to see the medical records and hear from medical

8   experts on that diagnosis, and ultimately what happened the next

9   day on the 11th, they went in and did surgery.  They did what is

10   called -- they got rid of the disc because the disc was

11   obliterated or broken so badly they had to take it out.  They put

12   in a new disc, we'll show you the X-rays, so you will see what a

13   cage looks like -- some of them may already know that -- plates,

14   screws, bone fusion, but, unfortunately, for Jerry Blasingame, the

15   true damage, the worse damage of all -- can't much be worse than,

16   you think, traumatic brain injury and injury to C3 to C5 -- but

17   the spinal cord injury which ultimately, therefore, caused him not

18   to be able to utilize functionally his arms and his legs.

19          You will hear the evidence, again, pretty much

20   unrebutted, when I say pretty much, plaintiff you'll hear from the

21   jury -- excuse me -- you're the jury.  From the witness stand,

22   sorry -- you'll hear from the witness stand that you can hire an

23   expert in cases like this in various things, and one of the things

24   that you will hear is our experts -- we call them police policies

25   and procedures or police misconduct experts.  I told you about our

 1  two.  City of Atlanta has none.  Zero.  No one.  And we'll tell

 2  you why what we believe the evidence will prove.  Because it's not

 3  supportable.

 4        Damage experts.  We went and hired folks from both the

 5  Atlanta area and world -- and national-wide, I'll call it experts

 6  in various areas, so that you folks would not only just see the

 7  thousands and thousands of pages of medical records, because who

 8  wants to look through those, but unfortunately it's our burden,

 9  just like Judge Jones just told you, our burden to prove just how

10  badly Jerry is injured and how much pain around how much suffering

11  he has been forced to endure since July 10 of 2018.

12        Because at the end of this case, as I'll explain a

13  little bit more later, one of the things that you folks have to

14  consider is whether Jerry suffered compensatory damages.  We'll

15  certainly talk about the millions and millions of dollars of

16  medical bills to date which is somewhere pretty close at this

17  point close to four million bucks, and all of the medical bills in

18  the future to take care of him until he dies which our experts,

19  our economic expert, Dr. Thomson, our life-care planning expert.

20        Nurse Jan Roughan, who is a life care planner who went

21  to school and has a degree in figuring out what people's likely

22  course of medical needs will be for the rest of their life.

23  You'll hear directly from the doctors who have examined Jerry and

24  his medical records, and they're all going to opine to the same

25  thing.  He needs this care as a result of being Tasered and then

1   falling, sustaining these injuries, which are life-changing, 100

2   percent disabling.

3        Not only will he not get better, but sadly you will hear

4   from that witness stand and medical expert after medical expert

5   will tell you that over the course of time, just as we all know in

6   life, things get worse with age.  And it will get worse for Jerry,

7   more and more difficult.  Which is hard to believe when you have a

8   traumatic brain injury.  You're a quadriplegic.  You've got a PEG

9   feeding tube into you since the day you got to the hospital.

10  You've got no ability to care for yourself.  You can't even roll

11  over in bed.  They have to roll you over so you don't sustain,

12  grow, horrible decubitus ulcers which he has had.

13       You'll see where he has been in and out of the hospital

14  with that, upper urinary tract infections, more things than anyone

15  would ever wish on anyone, but all those things Jerry has still

16  survived, he still fought, and still fights every single day.  You

17  are not going to hear him testify as a result of his injuries,

18  because he is a protected person.  And we're very lucky to have

19  Mr. Keith Edwards who has been appointed by a probate judge not in

20  Atlanta, but here in Georgia, to serve as Jerry's next friend and

21  conservator.  And Mr. Edwards will explain to you what that means.

22       But under the law, it is his job to take care of Jerry.

23  And you're going to hear from Mr. Edwards very briefly, maybe

24  today, not for sure, quickly tomorrow, on what that job entails.

25  And you're going to hear from Mr. Edwards that in the event that

1   you folks award money, it's going to be his job to go through the

2   court system to care for that money.  That money won't go to

3   anybody else.  It doesn't go to Mr. Edwards, as I will explain to

4   you, it goes into a trust that he takes care of, with the aid of a

5   probate judge.

6          You are going to see a very short video, we call it a

7   day in the life video, of Mr. Blasingame.  There will be no sound,

8   no testimony, but you will just get a glimpse of what he goes

9   through living every single day in this body that, unfortunately,

10  he doesn't control any more.  You're going to hear from the

11  experts the profound impact that that has on him like it would

12  anybody, to basically be a prisoner in your own body, to feel the

13  pain, the discomfort every single day, all day, no matter what

14  drugs they give you, with no hope of really ever getting better.

15         And at this point, because he was originally here

16  obviously, at Grady Hospital in Atlanta for about two-and-a-half

17  months, then transferred to a care facility here in town for

18  approximately, I believe it was about a year and a half, and now

19  he is up in the -- one of the border towns that's near

20  Chattanooga, Tennessee.  That's the biggest city.  It's called

21  Safe Haven, you'll hear, if not from those folks, you'll certainly

22  see their medical records.  And we'll have the medical experts

23  review that with you, so you folks can see what his current status

24  is now, where he's been, where he's come from and where he's going

25  to.

1         And you are going to hear from a couple of young ladies

2    that although they're not biological daughters, they call

3    themselves Jerry's daughters and they're not biologically

4    connected, either.  You are going to hear from them how their goal

5    and their dream is that their dad, which is what they call him,

6    can come back to Atlanta and be in a top-notch facility here.  So

7    that he can get the best of care that he deserves, and that they

8    can be closer to him.  You'll hear that from those ladies later on

9    in this case.

10         Let's talk for a moment -- what I would like to do is

11   tell you what the evidence is going to show, talking about Mr.

12   Edwards being -- pardon me -- I told you about Mr. Edwards being

13   the conservator and Jerry Blasingame is currently 69 years of age.

14   Date of birth January 29, 1953.  He was an Atlanta resident,

15   originally from Athens, and you're going to hear that he was

16   homeless.  So I can't give you an address as of the date of July

17   10, 2018.

18         On that date about 2:30, at 75/85 northbound ramp,

19   Jerry -- you will hear from Officer Grubbs and his partner,

20   Officer Shelley, they were in a patrol car, they rolled up on

21   75/85, and they saw Jerry on the side of the road, that would be

22   what I would call the left lane or the fast lane.  Officer Grubbs

23   testified in his deposition and, therefore, the evidence will be

24   that he will testify at the time of trial, that when he first saw

25   Jerry Blasingame, Jerry was not actually in the roadway itself,

1  but he was on the shoulder, in between a metal guardian --

2  guardrail and what we call fog line, a yellow line.  That would be

3  one is the left-hand lane that aligns the left-hand side by the

4  driver's side.

5       It appeared to him that Jerry was begging for money,

6  panhandling what he will testify to, but he admitted in his

7  deposition, therefore he will testify likewise at the time of

8  trial, he did not see Jerry get any money from anybody, he did not

9  see Jerry running in and out of traffic, he didn't see Jerry

10  engaging in any type of weird or suspicious behavior that he

11  thought was dangerous to Jerry or anybody else.  Other than, he

12  was there and not supposed to be there, of course, because it

13  could be dangerous.

14       So Officer Grubbs will tell you that, did I see him

15  panhandling, answer, no, but I was inquiring, we had a phone call.

16  We had a radio dispatch about a suspicious person.  So we were

17  following him up and to see what is going on and that's when we

18  saw him.  He didn't know at the time that it was Jerry Blasingame,

19  but it was.  Officer Shelley is going to tell you that he thought

20  he saw Jerry in the roadway just off into the left-hand lane.  He

21  thinks he saw Jerry get a dollar from somebody.

22       You folks get to decide how the officer who Tased my

23  client never saw any of that and the other officer who was driving

24  the car, going down the road, did see it, but that's what the

25  Judge just told you folks about -- you get to judge credibility.

1  Either way, you can find that he was panhandling, this is your
2  decision either way.  But what you're going to hear from this
3  witness stand, from every single police officer that gets up
4  there, that gets asked this question, whether they're an expert or
5  not, they are trained on what's called use of force.
6          They are training about a law that's called deadly force
7  law, less lethal or less than lethal, and all those will force --
8  all of those terms will be explained to you.  You are going to
9  hear about deescalation.  You're going to hear about just talking
10 to somebody.
11         You're going to hear about TASERs and cameras.  But all
12 of that was within Officer Grubbs' control that day.  And when
13 Jerry took off running, he was evading arrest, no question about
14 that.  But he wasn't going to be arrested according to Officer
15 Grubbs.  He just wanted to talk to him and investigate, but then
16 Jerry ran.  Officer Grubbs said he told him to stop, that he is a
17 police officer, and you will see the pictures, it says "police."
18 I don't think you're going to have much difficulty that, did Jerry
19 Blasingame know these were cops?  Yeah, he probably did, but that
20 will be for you to decide.
21         And Jerry ran up the side of the road, not across
22 traffic, not in front of cars, the evidence will prove, along the
23 side of the road.  And what you're going to find out in this case,
24 the evidence will show, that there was a pathway at the time,
25 there were shrubs that were between the upper portion of the road,

1  75/85 and then there is a hill and shrubs that then go down to

2  I-20 eastbound.

3       And clearly what you will see in the photographs, and

4  the evidence will prove, this path had been utilized by folks for

5  quite some time.  It wouldn't surprise me that folks like Jerry.

6  But you folks get to make that call.  According to Officer Grubbs,

7  the 65-year-old man, who, by the way, when EMS rolled up,

8  Paramedic Cuevas, C-U-E-V-A-S, who will be here -- not today,

9  probably tomorrow, she wrote down he was a 75-year-old man.  And

10 when I showed you the photograph of Jerry Blasingame before -- now

11 that I'm 60, everybody is young -- but the fact of the matter is,

12 yeah, he looked like he would be elderly, I get called that, so I

13 would say it is fair for me to say he gets called that.  Why is

14 that important?  Why are we going to fight about whether Officer

15 Grubbs knew he was elderly or not?

16      Because he knows that the policy and procedures of this

17 department say don't Tase the elderly.  Why?  Because of this

18 case.  Because of the bad that can happen.  Why would you tase

19 people running away from you?  Because of what happened in this

20 case.  They know and know it can happen.  It increases the

21 likelihood of serious injury and/or harm, including death.  Those

22 very words I asked Officer Grubbs in his deposition and he will

23 admit the same here on the witness stand, here in front of you

24 folks that he knew the reason why those things are in the training

25 manual not being allowed, is because that it could increase the

1   likelihood of serious injury or death, but yet, he did it anyway.

2           Jerry got into this wooded section by way of the path.

3   Officer Grubbs said he hurdled, a 65-year-old man hurdled, okay

4   hurdled.  I don't think that's what you're going to find that he

5   hurdled it, but that's what we have.  And at that point in time,

6   no threats, unarmed, never felt in danger of his life, according

7   to Officer Grubbs' own admission.

8           He then says at that point -- he Grubbs -- testimony

9   will prove, that Jerry -- which one of the versions I'm going to

10  tell you about.  One, on the videos we'll show you what we do

11  have, it is a TASER® video, he told somebody after the incident

12  where Jerry is laying on the ground bleeding and unconscious and

13  barely breathing, that "When Jerry got over the hurdle, he grabbed

14  at me."  Those were his words.

15          He never told that to Ms. Cuevas, the paramedic, at

16  least that was her testimony and I'm guessing she will testify

17  same here at trial, that when she got there, all she knew about

18  is, that Jerry was running away because Officer Grubbs said he

19  Tased him and that's how and when he fell down the hill and struck

20  his head, clearly his face, told you about rib fractures, brain

21  injury, shoving his head back and pinching, if you will, that

22  cervical vertebra, an area of his spinal cord I told you about.

23          All of the medical experts will agree, including the one

24  and only medical expert that the defense has hired, a

25  neurosurgeon, a doctor from Emory, who I know he is a huge time

1   guy and I certainly stipulate that he is well-qualified in his

2   opinion in this case because Jerry needs 24-hour-a-day care, 365,

3   has needed it since July 10, 2018, and needs it now and will need

4   it for the rest of his life.  And yeah, I agree with plaintiff's

5   expert who is Dr. Antin, a neuropsychology expert, that Jerry has

6   -- likely has a brain injury that still, of course, affects him

7   even today.  That's it.  That's their one and only expert.

8        When they got to the guardrail, when Officer Grubbs now

9   said Jerry ran or if we look at his report that was signed a week

10  after the event, because on July 10th, the day of, he was placed

11  on administrative leave immediately while they investigated --

12  according to their own records, that you folks will hear about,

13  the potential excessive force that he utilized.  Mainly, in his

14  report that he then authored several days later, it doesn't say

15  Jerry grabbed at him, by the way, never touched him, and again

16  Grubbs admitted that even when Jerry did that, which I will argue

17  later, and we will talk about that later, whether that is credible

18  or not, he, Grubbs, was never afraid and that's not why he tased

19  him.

20       In his report, he says that Jerry used a swinging motion

21  towards him.  At his deposition, I asked him and, therefore, I

22  believe he will testify likewise the same at trial, that Jerry

23  moved his arm towards him as if he was trying to create space and

24  then turned his back to the officer and then Jerry ran down the

25  hill.  And that's when the officer claims he tased Jerry.

1          Officer Grubbs testified that he remained on the

2     roadside of the guardrail through the woods.  We think that the

3     evidence will prove otherwise.  We think that Officer Grubbs was

4     over that rail, chasing Jerry, and the TASER® video which we'll

5     show you, if not today, likely tomorrow, we believe 100 percent

6     proves that, being yet another issue and problem with the

7     credibility of Officer Grubbs' testimony.

8          Officer Grubbs admits and therefore will admit here at

9     trial that he knew there was a hill there, and yet in the video,

10    he told somebody I didn't know there was a hill there.  Well, he's

11    a police officer in this area.  He says he is extremely familiar

12    with this entire area, he might not have known about this pathway

13    but what he really was saying, something I don't know at the

14    bottom of this pathway, there is a great big metal box that sits

15    on top of a cement pad.

16         And that's the thing that, Jerry, when he came flying

17    down the hill after being tased smashed his head and his face

18    into.  And you folks are going to see the blood.  I'm not going to

19    show you that right now but I am going to go through it, so you

20    can see the severity and you can hear from the medical folks about

21    the velocity that he apparently had, causing these extensive

22    injuries that we discussed.  Without any question there is a hill.

23    You can see there is a hill.  And when we show the videos after

24    the fact that were turned on -- I will mention that here in a

25    couple of minutes -- you can see the elevation because Officer

1  Shelley and Officer Grubbs go back and forth, up and down the

2  hill, you can see when they're going up the hill back where

3  Officer Grubbs was, you can see the difficulty of what it is and

4  you can see them come down, likewise when we run downhill a right

5  bit, or jog a little bit, you can see how they're picking up

6  speed.  No question there is a hill.  Exhibit 39, please, proposed

7  Exhibit 39, please.

8       You will see -- you will see proposed Exhibit 39

9  photographs -- this is a photograph taken right next to the box

10 that I just told you about.  And you can see behind this nice lady

11 that helped us out, that the shrubs at this point had been

12 completely mowed down and eliminated.  So that's not how it looked

13 on the day of, folks.  But this is the exact area and you can see

14 the elevation.  And, again, in the fire report, in the EMS run

15 sheet, you're going to hear and see that they estimated the angle

16 was some say 30- to 40-degree angle.  Other folks say 35- to

17 40-degree angle.

18       If we think about 90-degree angle and 45 degrees was

19 right down the middle.  It was a significant slope and should have

20 been enough to warn Officer Grubbs that serious injury or death

21 could happen if he were to Tase somebody that is not threatening

22 him, running away from him.

23       Thank you.  We're going to start the evidence today

24 with -- with Officer Reyes and the reason why is because a number

25 of things that we think the evidence will abundantly make clear to

1  you.  Officer Reyes gave a deposition in this case, and we'll

2  explain all that to you, what it means.  He swore to tell the

3  truth and did it separately but then he comes to trial, he

4  testifies live at trial.  I think he will testify consistently

5  what he told us under oath.

6          He testified in this case, well over a year ago now, he

7  admitted, to his credit, that Officer Grubbs broke, violated, at

8  least three different training policies and procedures relative to

9  body-worn cameras.  He said, one, Officer Reyes in this case when

10  we asked about what we call hypothetical, I want you to assume

11  that Officer Grubbs testified in his deposition and will testify

12  here at trial, that at the time that this run came up, his body

13  camera -- body-worn camera, BWC, was off because some period of

14  time before that -- he couldn't give me an exact time, but half

15  hour, 45 minutes later, an hour -- something previous in the day

16  he was at the jail, went to the restroom, and he didn't want

17  anybody to see him use the restroom with his body-worn camera.

18  That was what he told me.

19          Now, mind you he told us that in his deposition, Grubbs,

20  under oath.  And what you're going to find out here, and I think

21  what Officer Reyes will testify to, and we'll see shortly, is that

22  that is a hundred percent untrue.  There is this thing called a

23  download.  And we have it now.  In fact, Officer Reyes was the one

24  --  it's called a device audit trail.  It's proposed Exhibit 35.

25  And I'm going to go right through it with Officer Reyes.  So you

 1  folks can see on when the camera was turned on for the first time

 2  that day on July 10 at 12:35, because it says, "On.  Camera

 3  powered on using power switch."

 4        And then it goes through various things, and I'm going

 5  to explain to you how the whole thing works.  Actually I won't,

 6  Officer Reyes will.  You're going to hear 12:35, the camera was

 7  off, and then you're going to hear that the camera came right back

 8  on five minutes later at 12:40, and then you're going to hear from

 9  Officer Reyes that the only other time this camera was turned off,

10  was at or immediately after this incident.

11        Officer Reyes will explain to you that when the camera

12  is on, it doesn't mean it's actively recording, it's called

13  buffering and the City of Atlanta set up their cameras so that if

14  it's in buffering mode, it's not actually recording and saved, but

15  it is actually recording in a weird way without sound.  And then

16  when you push an event button that I will show you when he's on

17  the stand, a great big circle, right in the middle.  You push the

18  event button, it actually starts the camera doing a live camera

19  like we're all used to, with sound, but it does something

20  incredibly cool.  It also gets the last two minutes before the

21  event button is pushed on.

22        That's why Officer Reyes will tell you when the officers

23  first put it on in the morning, including bathroom breaks, we tell

24  them, you leave it on in buffering mode.  We tell them, in fact,

25  he testified, he trained Officer Grubbs, and told him, "you leave

1   it on in the bathroom."  Why?  Because, first of all, it's up here

2   and it's not seeing bad things.

3        Secondly, if it's in buffering mode, unless you push the

4   event button while you're in the bathroom, it never gets kept.  It

5   is never recorded.

6        And what if something happened in the bathroom?  What if

7   something happened immediately after the bathroom?  What is

8   supposed to happen is the event button is pushed so it can record.

9        Officer Reyes, not me, their own witness will tell you

10  that Officer Grubbs broke their policy when he turned off his

11  camera in the bathroom, which at this point I don't know that he

12  really did.  Because that audit trail, Exhibit 35, says that that

13  camera was on since 12:35 when this incident happened, two hours

14  later, about 12:36 to 12:38 (sic).

15       Officer Reyes, we believe will tell you what that means

16  then is, that Officer Grubbs' testimony about it being off and

17  being off at the time is wrong.  That it was in buffering mode.

18  And then when we see, according to Exhibit -- proposed Exhibit 35

19  that the event button was pushed --  excuse me, event button was

20  held and ultimately was powered off at 2:36, two hours later and

21  then it's powered back on, and the first thing you can see is the

22  aftermath and Jerry down at the electrical box.

23       Mr. Reyes, Officer Reyes we believe will testify just

24  like he did in his deposition that they train the officer, ladies

25  and gentlemen, to know if the camera is in buffering mode and then

1  there is an incident or something and you actually power it off,

2  turn it off, turn it from off; two different buttons.  One is on

3  top and one is in the middle.  He'll explain all of this to you in

4  about an hour from now.

5          Officer Reyes will testify in front of you, that police

6  officers like Officer Grubbs are trained to know that if it's

7  buffering and then you turn it off, you're erasing what just

8  happened and it's not there.  And that's the reason why we don't

9  have what really happened here.  And what the evidence will prove

10 anyway is that Officer Grubbs was trying to prevent Jerry from

11 running away, for whatever reason.  And what does he say in this

12 case?

13         "Oh, I admit I wasn't afraid.  I didn't do it because of

14 the swinging, grabbing.  I didn't do it for any of those reasons I

15 saw him going down the hill, and I thought he was going to run

16 into traffic.  I was worried about him," he testified.  Worried

17 about him?  So you Tase an old man running away from you who

18 didn't hurt you, didn't threaten you.  You are not even supposed

19 to use your TASER in that, at all.  Let him go, you can chase him,

20 you can do all sorts of things, but that's not what he did.

21         Officer Grubbs testified, "I did it to protect him,"

22 Jerry, "and potentially traffic."  And what you're going to see,

23 ladies and gentlemen, is he from where he did this, Jerry was 25

24 feet away from a traffic lane.  He didn't run in traffic above

25 75/85.  What do you mean he's going to run into traffic?  Where is

1   the evidence for that?  They're going to claim it is an exigent

2   circumstance.  That means an emergency circumstance that they had

3   to Tase Jerry or that was what was going to happen.  And we're

4   going to prove through our experts, Chief Tiderington as well as

5   Chief Scott, that that is just not accurate.

6          We are going to show to you and prove to you one more

7   thing.  Not just that Officer Grubbs utilized the excessive force,

8   but that the City of Atlanta when it had the opportunity to do the

9   right thing and investigate this fairly and openly and

10  objectively, and you're going to hear about how it is an objective

11  standard.  It's not just what Officer Grubbs' says happened, but

12  when you look at all of the facts objectively, what was supposed

13  to happen.  And you're going to hear from our experts in this case

14  that, objectively, an officer in Officer Grubbs' situation would

15  absolutely have known this is wrong, don't do it, it is illegal,

16  it is excessive force.  And, boy, this guy could get really hurt

17  if things went wrong, and he did.

18         You're also going to hear from our experts which the

19  City of Atlanta had the chance to independently evaluate and look

20  at all of the facts and circumstances, and discipline Officer

21  Grubbs to, if you will, prove a point to him, let alone the other

22  officers in the department, you can't do this and get away with

23  it.  You're not above the law.  You're not allowed to use your

24  power.  You need to do what we train you to do in words, and if

25  you don't we're going to discipline you.

1          There are all sorts of different things to discipline:

2   Written reprimands, retraining, and in this case, what you're

3   going to hear is, when Officer Grubbs was off, on suspension less

4   than a month later or so, he and his supervisor went to my

5   client's intensive care unit room, where he's lying in this

6   quadriplegic state and served him with two tickets; one for

7   obstructing, in other words running away from the police, and two,

8   being pandering.  They were dismissed by the prosecutor.  Never

9   even come about.

10         You are going to hear that despite the fact that the

11  internal affairs had never cleared Officer Grubbs through January

12  of 2019, that is the earliest part of the next year, Officer

13  Grubbs was returned to full duty without reprimand, without

14  anything, while the internal affairs investigation, quote,

15  continued.  You're going to hear that the internal affairs

16  investigation continued into 2020.

17         And only through this case, apparently, that Officer

18  Grubbs or anybody know, that the internal affairs ended their

19  investigation and cleared Officer Grubbs in June of 2020.  And

20  when I say that, I took Officer Grubbs' deposition in January of

21  2021.  He didn't even know the status of the internal affairs

22  investigation.  And I said to him, "how does that teach you how to

23  be a better cop and make sure you're not utilizing excessive

24  force?"  He goes, "you know what, I agree with you."  To his

25  credit, "I agree with you, Johnson, this isn't a very good way to

1   do this." So he was cleared; he didn't know -- now we know, he

2   was cleared. So no, no discipline whatsoever for not having his

3   camera on. No discipline whatsoever, like Officer Reyes says he

4   should have, for not explaining in his police report why his

5   camera wasn't on, and no discipline whatsoever for allegedly

6   turning off in the bathroom, which we're now going to find out was

7   completely nonsensical. Anyway.

8          No discipline whatsoever for the violation of the TASER®

9   policy in the areas that I shared with you that he wasn't engaged

10  in a hand-to-hand combat where he needed to go from utilizing

11  hands and so forth, and then go to the TASER® instead of the

12  baton, or instead of pepper spray. He started -- he started with

13  a TASER® to somebody who is elderly, running away, running

14  downhill, against all of the policies and procedures and yet the

15  evidence will show that they did not discipline him one iota.

16         We believe that the evidence will prove, ladies and

17  gentlemen, that that shows a custom or a pattern that the City of

18  Atlanta has engaged in that shows, not just Officer Grubbs, but

19  other officers. We know what the words say in the policy but you

20  don't have to follow it, we'll take care of it.

21         And we think the evidence will prove to you that one of

22  the major reasons why they did that is because of why you folks

23  are in this courtroom today, because they knew about this lawsuit.

24  They knew how badly injured he was, and they knew how much it cost

25  to take care of him, now and for the rest of his life, and instead

1  of accepting responsibility, the evidence will prove that they

2  stepped away.

3        We are going to show you the medical bills.  We're going

4  to put them in evidence so you see.  So when I tell you that the

5  Grady Hospital medical bills total -- I looked at it just before

6  1.99 -- 2 million bucks, when you see the intermediate-level care

7  facility where Jerry was here in town for a year and a half, I

8  didn't have that, so we're going to find that out together but the

9  bill where he's currently at, at Safe Haven, that's basically

10 about a million bucks a year.  We will put those into evidence.

11 You will see that.

12       And then when we talk about future damages and the

13 future medical bills of 17 million bucks, that's their projection,

14 you'll see there is no expert from the defense.  There is no life

15 care planner.  There is no economist.  There is no one there to

16 dispute those bills at all.  Unrebutted testimony.  And what also

17 will go unrebutted is from the medical experts of the horrible,

18 ongoing, 24-hour per day, seven days a week, now for four years,

19 suffering.  That no one wants to think about or hear about.

20       But Jerry has gone through every single day, all day,

21 all night.  Waking up multiple times, because he is, of course,

22 miserable.  And knowing that that's what it will be for the rest

23 of his life.  And hearing from the experts how, unfortunately, not

24 only will it not get better, but it will only get worse by this

25 thing called chronic pain, and related problems with quadriplegia

1  that probably many of you know, but we need to talk about.  So you

2  folks know if you award compensatory damages for conscious pain

3  and suffering, how to go about doing that.  So yes, ladies and

4  gentlemen, at the end of this case --

5          THE COURT:  Thank you, Mr. Johnson.

6          MR. JOHNSON:  Thank you, Judge.

7          THE COURT:  The next person you will hear representing

8  the defendant is Mr. Dearing.

9          MR. DEARING:  May it please the Court, counsel, members

10  of the jury.  Let me introduce myself again.  I'm James Dearing.

11  I represent the City of Atlanta and Officer Grubbs along with

12  Staci Miller and other team.  I think you-all were introduced to

13  them a little bit earlier.

14          Let me start off by doing something that I guess,

15  stereotypically, lawyers won't do.  Let me be clear.  Let me be

16  honest.  Let me be as straightforward as possible.  Jerry

17  Blasingame was horribly injured on July 10, 2018.  We don't

18  dispute that.  In fact, for us to sit up here and talk about it in

19  any other way, I think we would lose credibility.  You guys would

20  cut us off, and rightfully so.

21          So we're not going to spend any time talking about that.

22  Those facts Mr. Johnson will want to talk more about.  We

23  acknowledge those facts.  And as I said, I think Mr. Johnson will

24  spend a lot of time talking about those things.  And let me just

25  say this, that if your minds are going to be made up in this case

```
 1  based upon the injury that Mr. Blasingame suffered, if you are
 2  moved by that solely, then I think that I'll just pack most of my
 3  stuff up and will sit quietly until the appropriate time to speak
 4  again.
 5          But I'm betting that your minds are going to ask other
 6  questions.  You're going to need more information.  You're going
 7  to want to know what happened.  It's just like a gunshot wound.
 8  Someone will show you someone being shot by a police officer.  And
 9  any talk about the nature of the wound but they don't know and
10  they don't talk necessarily about how it happened.  What happened
11  that day.  And that is really what this case is about.
12          It's really about accountability.  It's really about
13  accountability.  What happened that day?  What was going on
14  between these participants that resulted in a horrible injury?  We
15  submit that the facts are very simple and it will tell a simple
16  story.  There is nothing magical.  I'm not The Amazing Kreskin.
17  I'm probably aging myself.
18          I'm over 60, so everyone is young to me as well.  The
19  facts of the case are very simple.  Mr. -- Mr. Blasingame was
20  on I-20.  He was on the connector.  So for the purposes of what
21  we're talking about, all of the action --
22          MR. JOHNSON:  Thank you, sir, I appreciate it.
23          MR. DEARING:  All of the action took place in this lower
24  part of this -- where the access roads and the accident took
25  place.  That's where all of this took place.  At the time it was a
```

1   heavily wooded area, heavily foliage and Mr. Blasingame was there.

2           Now, at the time, around 2:30 Officer Shelley and

3   Officer Grubbs -- Officer Grubbs was the passenger.  They were

4   driving in a vehicle.  Officer Shelley was driving.  Officer

5   Grubbs was the passenger.  They came along that situation.

6           They came along, up on that ramp and they were down in

7   that area and they saw Mr. Blasingame, and they, based upon their

8   understanding, and being police officers and seeing that type of

9   behavior before, they actually decided we need to move this guy

10  off of the expressway.  He's up on the expressway where traffic is

11  going back and forth on I-20.  This was 2:30 in the day.  So they

12  decided to get his attention.

13          They stop the car in the gore, sort of in the "V," and

14  Officer Shelley still driving.  Officer Grubbs gets out of the car

15  and he tries to get Mr. Blasingame's attention.  And the testimony

16  will be, he said, "Hey man.  Hey, hey, sir.  Can you come here,

17  sir?  Let me talk to you.  Come here."

18          Mr. Blasingame did not respond positively to that.  And,

19  in fact, I think Officer Grubbs will tell you when he first

20  approached Mr. Blasingame, he didn't know how old Mr. Blasingame

21  was, because contrary to what Mr. Johnson says is about this

22  picture, he's trying to give you the impression that Mr.

23  Blasingame was, you know, this tottering old man, just up on the

24  expressway.  Mr. Blasingame ran.  Officer Grubbs didn't know how

25  old he was, he didn't have any idea.  But he knew that he was

1   mobile and he could get away.

2           And instead of running down the ramp, he ran against the

3   traffic, still in the same side in the little -- the lane.  The

4   sort of emergency lane.  And as Mr. Blasingame is doing this,

5   Officer Grubbs pursues.  He goes to try to get him.  He

6   approaches, he gets close to him.  And Mr. Blasingame tries to

7   hop -- there is a little railing there.  You'll see the

8   photographs later on.  He tries to hop a rail and get into the

9   bushes so he can get away.

10          And, in fact, Officer Grubbs tries to grab him, trying

11  to make contact with him.  And Mr. Blasingame slaps his hand away

12  or he tries to get away.  Certainly, at this point, Officer Grubbs

13  did not stop at that moment in time and say, wow, this is an older

14  gentleman.  Maybe I shouldn't pursue him.  He just knew this guy

15  was running, and was trying to get away, he was trying to get to a

16  path.  As I said, it is a heavily wooded area, and I think Mr.

17  Blasingame knew where he was going to run.  He was going to try to

18  get away from him.

19          When he does that, Officer Grubbs deploys his TASER® and

20  Officer Grubbs is right-handed, and the TASER®, you will hear, is

21  placed on the opposite hand, his support side.  So instead of it

22  being on this side with the firearm, so he really won't make a

23  mistake, it is placed on the other side, support hand on his left

24  side.  He pulls his TASER® and deploys the darts into Mr.

25  Blasingame's back.  And the testimony you will hear, Mr. Johnson

 1  was very good in trying to create this fiction that deploying the

 2  darts in the back, it illustrates a sinister intent.

 3       You will hear testimony that that is the place where the

 4  officers are encouraged to deploy darts, if they are going to do

 5  it, so you won't hit vital organs in the front.  It's usually in

 6  the back because it is a larger area.  It is a preferable place to

 7  actually fire the darts and that's what happened.  So he falls --

 8  Mr. Blasingame falls.  You will hear testimony from Officer Grubbs

 9  that he didn't know exactly where he fell.  He knew that he was in

10  the bushes someplace.  He didn't know exactly where he was.  He

11  didn't know that there was a steep incline.

12       But what he did know is this:  He knew that in addition

13  to being up on the expressway where Mr. Blasingame was, where cars

14  are going back and forth, he also knew that there were other ramps

15  in the direction that he was running.  So in other words, there

16  were other cars that were coming by, that could possibly go that

17  route that Mr. Blasingame could run into, if he got through the

18  bushes.  Small point.  Small point, but an important one.  Because

19  what it does, it shows you that Officer Grubbs had a reason for

20  deploying those darts.

21       He didn't just go up there and say I'm just going to

22  just fire this TASER® and that's that.  He's up on the expressway

23  on a busy interstate, chasing a guy who was panhandling -- we'll

24  talk about that in a second -- who was panhandling and who decided

25  he didn't want to greet or meet the police officer, nor comply

```
 1   with his orders to stop and come here, and stop and talk to me.
 2           Unfortunately, Mr. Blasingame did fall down a slight
 3   incline into what, I guess you could probably best describe it as
 4   almost a refrigerator-size, a large freezer-size power box that's
 5   mounted on about an 8-inch -- about an 8-inch concrete foundation.
 6   No one knew it was there, no one knew exactly where it was, but
 7   that's what happened.  That's what happened.
 8           This was not just some random decision by an officer to
 9   just give chase and fire a TASER®.  They were up on the
10   expressway, cars are going by, cars are going one way, he's
11   running, Mr. Blasingame is running in the opposite direction, then
12   he tries to get away.  That's what we're dealing with.
13           Now, those are the simple facts.  Those are the facts.
14   Now, Mr. Johnson is going to, throughout this case -- it is no
15   secret, he told us.  He's going to lay on the body cam stuff that
16   that must show a sinister intent.  To suggest that Officer Grubbs,
17   from the very beginning of this case, decided that he was going to
18   do something like that and plan to take his body cam off, happened
19   to see Mr. Blasingame on the expressway, and lo and behold, the
20   opportunity comes.
21           And now he gets the chance to deploy TASER® darts into
22   someone and hey, by the way, I don't have my camera on.  That's
23   what he wants you to believe.  It's a red herring.  It's a red
24   herring.  In law what that means is, something seems to have
25   importance, but it doesn't, to the central issue of the case.  It
```

1   is important to have your body camera on.  Don't -- don't -- don't

2   leave here with the impression that I'm saying that's not

3   important.  I want them to have the body camera on.  I want the

4   officers -- he didn't that time.

5          But there is no evidence to show that there was anything

6   sinister about what he was doing.  He made a mistake.  He didn't

7   have his body cam on.  We're not going to bore the jury and insult

8   your intelligence and play games about whether it was really on,

9   but he didn't -- no, it was not on, the way he's told to have his

10  body cam on.  He'll tell you why.  It's up to you to believe

11  whether or not you think it's a legitimate reason.

12         But that's not going to be argued.  What this all means,

13  though, ladies and gentlemen, is that you have to make certain

14  decisions.  And the questions that you are going to have to answer

15  are to me very, very, very simple in a way.  First -- the first

16  question you're going to ask yourselves, did the police officer

17  have a reason to even stop Mr. Blasingame?  Did he have probable

18  cause?  Let me tell you what I think about that.

19         Mr. Johnson will leave you with the impression that they

20  were, you know -- Officer Grubbs and Officer Shelley, they're a

21  couple of cowboys, and they're up on the expressway just bothering

22  people, just, you know, flexing their muscles as police officers

23  and they had no reason to really bother this man.  He wasn't doing

24  anything serious.  He wasn't -- it wasn't an armed robbery.  It

25  wasn't a murder in progress.  Let me tell you something.

1          Every -- each, I guess the best way -- each baseball

2    game doesn't end in a home run.  Everything isn't a home run.

3    Everything isn't a touchdown in football.  In other words, being a

4    police officer sometimes means doing the little things.  It's not

5    always gun battles and wrestling people to the ground.  Sometimes

6    it's maintaining traffic, making sure that people can -- they

7    don't walk across the street on the wrong side.

8          Because without those types of police, that type of

9    policing, really where would we be?  Could we drive any place,

10   could we walk across the street without fear we will be run over?

11   So the implication that Officer Grubbs -- John Grubbs is a bully,

12   that he's just a bully, is just misplaced.  It's misplaced.  He

13   was being a police officer that day.  He was doing his job.

14   Sometimes the job isn't exciting.  Sometimes you have to actually

15   get people off of the expressway who are on the expressway

16   panhandling.

17          I mean, that's not something I'm sure that, when Officer

18   Grubbs retires, you know, what is your greatest accomplishment,

19   removing a panhandler.  That isn't going to be a thing that people

20   want to talk about, but that is an important part of his job.

21   That is something that has to be done every day.  Those mundane,

22   small things mean something.  That's what he was doing that day.

23          You are going to have to ask yourself whether or not

24   they had probable cause or reason to believe that he was

25   committing a crime.  And what was the crime that he was

1    committing?  Mr. Davis can you -- what was the crime?  Because

2    that's sort of been lost.  Remember during the questions we were

3    asking during the jury selection, you know, whether or not a

4    small -- a small, minor offense deserves police attention as

5    opposed to just major offenses.  Remember that question?  This is

6    what he was guilty of.

7              MR. JOHNSON:  Excuse me, Judge.  I object to "guilty."

8    He wasn't found guilty of anything.

9              MR. DEARING:  This is what the officers believe that he

10   was doing.

11             THE COURT:  This is what the officers believe he was

12   doing.  Ladies and gentlemen, nobody found them guilty.

13             MR. DEARING:  Thank you.  "No person shall stand in the

14   roadway for the purpose of soliciting a ride."  Further down, "no

15   person shall stand on a highway for the purpose of soliciting

16   employment, business, or contributions from the occupant of any

17   vehicle.  No person shall stand on or in the proximity to a street

18   or highway for the purpose of soliciting the watching or guarding

19   of any vehicle while parked, or about to be parked, on the street

20   or highway."

21             That's -- that's what they believe that he was doing.

22   That's what they believe that he was doing.  He's up on the

23   connector, would reasonable people believe that is what he was

24   doing?  Would a reasonable officer believe that possibly this

25   needs some attention?  Was it appropriate?  Was it something that

1  the officer may have stopped?  I think so.

2        The TASER®.  Any time a weapon is involved in any type

3  of situation, it's always very, very serious.  The officer had

4  other weapons that were afforded to him that day.  He had his gun,

5  he had his baton, a baton that you snap out.  I'm afraid of those

6  just looking at them.  They look pretty awesome.  Pepper spray.

7  And he has medical tape.

8        He chose a less lethal -- a less lethal instrument to

9  stop Mr. Blasingame.  Was he trained on using it?  You will hear

10  from Officer Banja a little later on maybe today, maybe tomorrow,

11  that the officers were trained, tested, they had to meet certain

12  requirements, they give them yearly recertifications on TASERS®.

13  So the City of Atlanta takes it very seriously.  The City of

14  Atlanta is a blue ribbon police department.  It's certified by

15  some of the finest law enforcement oversite bodies in this

16  country.

17        They train their officers.  They train their officers.

18  He was trained.  He was trained on how to use the TASER®.  He used

19  it appropriately.  Is it unfortunate that he had to use the

20  TASER®?  Absolutely.  We all, in hindsight, wish that none of this

21  had happened.  But that's where we are.  Is the City to blame for

22  anything?  I don't know.  I don't think so.  I think with the

23  training, I think what we have is a situation where an officer was

24  doing what he was supposed to do, what he was taught to do, and he

25  did it.  And unfortunately, Mr. Blasingame was hurt.

1          Now, I think as I said before, that if the pure nature
2  of the injury is going to be the deciding factor, that Mr. Miller
3  and Ms. Pierre, we would all sit down and stop talking, but I
4  think one question you're going to ask yourself is this:  Did Mr.
5  Blasingame play any role in his injury?  It's a horrible thing to
6  think, but did he play any part in being injured?  Did his running
7  when the officer said don't run, did that play any part?  How
8  about this?

9          How about him trying to get to a pathway that he
10  probably knew about, and the officer didn't know about
11  necessarily, did that have anything to do with him being injured?
12  I think when you look at it that way, I think other questions are
13  going to come to your mind.  And let me just tell you, by asking
14  these questions about me imposing these questions does not mean
15  that we are not without compassion.  But now that we're here, now
16  that we're here, we're dealing with accountability.  I mean, this
17  is not a plaything now.  We can't be soft and we can't not say
18  things that might be important.  We have to say what we're dealing
19  with and what's on the table.  Okay?  Ask yourself those
20  questions.

21          Let me talk to you very briefly, finally about jury
22  selection.  Jury selection, in my mind, is the most imperfect yet
23  perfect way of finding people that will decide cases for you, to
24  help you render a verdict.  Remember when we were asking you
25  questions, staring at you really hard, looking at every time you

1  say something, writing down stuff, I feel like it's almost like a

2  6th grade thing, when I was constantly in trouble and I was

3  wondering who was watching what I was doing.

4          We're watching, we're trying to get reactions.  We're

5  trying to find out how you're answering those questions and then

6  you're selected for the jury.  That's not really true.  That's not

7  true.  Anybody tells you the reason you were selected for this

8  jury -- they're not being honest.  The reason you were selected

9  for this jury is because we got rid of the people that we didn't

10 quite feel were right for the jury.  Nothing bad.

11         MR. JOHNSON:  Sorry, Judge.  I object.  This is nothing

12 to do with the evidence.  This is Mr. Dearing on jury selection.

13 It has nothing to do with evidence.

14         THE COURT:  I think I'll give him a chance to finish his

15 sentence.  I'm going to overrule that.  You may proceed.

16         MR. DEARING:  Thank you, Your Honor.

17         You were selected based on your responses to our

18 questions.  And you're here sort of as the best that we have, the

19 cream of the crop, based on your ability to render fair and

20 impartial verdict -- a fair and impartial verdict.  Okay?  That

21 means I expect that you-all will be the most analytical,

22 questioning, doubtful, doubting, highly scrutinizing everything

23 about this case.  That's the job that you-all have this case in

24 our minds -- and Ms. Miller may disagree, but I hope she will

25 agree with me -- this case is really about what happened from the

1  moment those police officers saw Mr. Blasingame, in the time that

2  Mr. Blasingame was tased.  All the other stuff after that, we

3  don't doubt that he was injured.

4         We're talking about why they were there, what they were

5  doing, whether or not they did it properly.  Accountability.

6  That's what this case is about.  It's about accountability.  We're

7  not running from and we're not without compassion.  I think what

8  happened to Mr. Blasingame is very sad.  It's very sad.  But we're

9  not responsible for it.  They're not going to be able to lay that

10 at our feet, and us accept that without offering you an

11 explanation of what happened that day.  I hope that I haven't

12 bored you too much.  I appreciate your time.  I appreciate your

13 patience.  You will be hearing from all of us on our team at some

14 point here and there.  Thank you.

15        THE COURT:  Ladies and gentlemen of the jury, before we

16 hear the first witness, I'm going to give everybody a ten-minute

17 break.  I have it is roughly 3:12.  So at 3:25, be back, y'all, in

18 the courtroom and you will hear your first witness from the

19 plaintiff.

20        (Whereupon, the jury is excused at 3:13 p.m.)

21        THE COURT:  We'll have a ten-minute break.  And, Mr.

22 Johnson, have your first witness to start at 3:25.

23        MR. JOHNSON:  Yes, Judge.

24        THE COURT:  Thank you.

25        (Whereupon, a break was taken at 3:13 p.m.)

1          THE COURT:  Mr. Johnson, do you have your first witness

2    ready?

3          MR. JOHNSON:  Yes, Judge.

4          THE COURT:  Call him up.

5          All right.  You can bring the jury out.

6          (Whereupon, the jury was seated at 3:26 p.m.)

7          THE COURT:  You-all may be seated.  Sir, if you will

8    remain standing, Ms. Wright is going to give you an oath.

9                              ******

10                        JULIO REYES, JR.,

11          having been duly sworn, testified as follows:

12                              ******

13          THE DEPUTY CLERK:  Thank you.  Have a seat if you could.

14    Please state and spell your name for the record.

15          THE WITNESS:  My name is Julio Reyes, Jr.  J-U-L-I-O

16    R-E-Y-E-S.

17          THE DEPUTY CLERK:  Thank you.

18          THE COURT:  You may proceed, Mr. Johnson.

19          MR. JOHNSON:  Thank you, Judge.

20    DIRECT EXAMINATION

21    BY MR. JOHNSON:

22    **Q.**  Good afternoon, Mr. Reyes.

23    **A.**  Sir.

24    **Q.**  Mr. Reyes, you currently are employed by the City of Atlanta

25    in the police department?

**A.**  Yes, sir.

**Q.**  And you've been employed there for how many years ballpark?

**A.**  Coming around 24 years, nine months.

**Q.**  And your current assignment is where, please, sir?

**A.**  I'm assigned to the body-worn camera unit.

**Q.**  We're going to talk today about BWC?

**A.**  That is colloquial BWC, body-worn camera.

**Q.**  And body-worn camera is something that obviously you're personally familiar with?

**A.**  Yes, sir.

**Q.**  And I'll take it at some point in time you began to be a trainer of some of the folks at APD on body-worn cameras?

**A.**  Yes, sir.

**Q.**  So tell us, if you would, please, Mr. Reyes, just in terms of what we're going to be talking about, I think body cams kind of came into being here in Atlanta sometime I think in the, what, 2017 time frame?

**A.**  The department first started outfitting personnel with the body-worn cameras --

**Q.**  Yes, sir.

**A.**  --  in November 2016.

**Q.**  Thank you, sir.

       And then did that continue until 2017?

**A.**  Yes.

**Q.**  And by the time that we're going to be talking about in this

1  particular case, on July 10, 2018, I'll take it you are familiar

2  that Officer Grubbs had, in fact, a body-worn camera?

3  **A.**  Yes, sir.

4  **Q.**  Pursuant to policies and procedures of Atlanta Police

5  Department?

6  **A.**  Yes, sir.

7  **Q.**  Okay.  Can you tell the Court and jury, please, Mr. Reyes, how

8  did you personally become familiar with body-worn cameras?

9  **A.**  I was coming back from extended medical leave and I was at the

10  current time assigned to -- when I came back, I was assigned

11  temporarily what was then known as the video integration center,

12  the VIC, and two, three weeks into my assignment, I got a call

13  from then Sergeant Blue who was, at the time, the main

14  administrator for the body-worn camera project for the department,

15  saying I'd been assigned over there.  They needed help, and I

16  was -- and I was a free hand, so...

17  **Q.**  And approximately that was when, sir?

18  **A.**  That was approximately October of 2016.

19  **Q.**  Okay.  And was there, in fact, a policy and procedure in

20  writing for APD at that time?

21  **A.**  When I first initially got assigned, I cannot recall.  I do

22  remember my first initial meetings with Sergeant Blue regarding

23  duties and responsibilities I would have for the body-worn camera

24  project is that the policies were being kind of developed.

25  **Q.**  Right.

**A.** They, being the department, was seeking our input and asking us to reach out to other departments or other entities to see if there was any, you know, practices or policies.  You know, best practices, even though it's a relatively new technology per se at the time.

**Q.** I didn't mean to turn my back to you.  Forgive me.

**A.** No, no.

**Q.** In terms of the policy and procedures, since you are our first witness at trial, I would like you, if you would, kindly tell the Court and jury when -- we're going to start talking about Exhibit 26, the Atlanta Police Department policy manual on body-worn cameras.  Tell the Court and jury what it means.

**A.** So commonly known as -- within the Atlanta Police Department are SOPs, or standard operating procedures which are basic guidelines, rules on procedures, policies, duties, responsibilities for all personnel.

One of those being, for the body-worn cameras APD.SOP.3133 which governs and guides the proper use and care of the body-worn camera and related technologies.  And that entails when to record, how to use the body camera, what responsibilities the sworn personnel have with each of the video files they create, and so forth.

**Q.** You told the Court and jury that you've been on the force for 24-plus years now?

**A.** Yes.

**Q.**  In terms of your training, for example, with TASERS, you've had that training yourself, have you not?

**A.**  No, I have not.  That I was on medical leave at the time.  Due to my medical condition, I'm not eligible or I'm not currently able to go through TASER training.

**Q.**  I apologize to hear about that.  Relative to training -- use of force training, we're not going to talk a whole lot about it, but obviously as part of your duties as a police officer, you're familiar with the use of force training as well that APD has?

**A.**  Yes.

**Q.**  Do you do any use of force training yourself?

**A.**  No, I'm not a use of force instructor.

**Q.**  So in terms of when you got familiar in October and November of 2016 with body cameras, did you find them to be pretty complicated?

**A.**  Initially for me, it was a completely new technology that obviously I had never been familiar with.

**Q.**  Right.

**A.**  Ever used.  Prior to me going on leave -- medical leave, I had become aware that body cameras were coming down the line eventually.  By the time I returned, there they were.  So it was thrown into the deep end of the pool and learn about it as much as I could as fast as I could.

**Q.**  No better way to learn but to do it yourself, right?

**A.**  Do it until you learn it, yes, sir.

1  **Q.**  And you did that?

2  **A.**  I did.

3  **Q.**  Did they send you -- they being, sorry, City of Atlanta -- did

4  they send you for any particular outside training, Mr. Reyes?

5  **A.**  The department actually brought in AXON.  They're the vendor

6  and the developer, manufacturer of the body-worn camera and

7  related technology.  They brought instructors from AXON to the

8  Atlanta police training academy for a train the trainer course on

9  use of the body camera, and being the Evidence.com administrator,

10  which is the web-based evidence platform.

11  **Q.**  So AXON is the folks that make the body cam that we're

12  ultimately going to be talking about?

13  **A.**  Yes, sir.

14  **Q.**  And when the instructor from AXON came to Atlanta, could you

15  give us a ballpark year that that happened?

16  **A.**  2016.

17  **Q.**  Okay.  Did you attend that?

18  **A.**  I did.

19  **Q.**  Did other officers attend that?

20  **A.**  Yes.

21  **Q.**  Okay.  And as part of you attending that, did you learn more

22  about -- that you knew before going to that?

23  **A.**  Yes.  Just from a practical standpoint, having a product in my

24  hand and being able to physically -- I am kind of a do-it-yourself

25  learner instead of reading it in a manual.

**Q.**  Yes, sir.

**A.**  So for me, that's how I absorb the knowledge more effectively.

**Q.**  Kind of like with anything, right?  With our phones, with computers.  Doing it and seeing it in your hands is the best way to learn it.

**A.**  It is for me.  I can't speak for others but I know there's different types of learning.  But for me, that was how I learned -- that's how my curve kind of accelerated, in terms of learning it initially.

MR. JOHNSON:  Thank you.  May I approach, Judge?

THE COURT:  Yes.

BY MR. JOHNSON:

**Q.**  Officer Reyes, I'm going to hand you proposed Exhibit 26. It's the SOP you mentioned for the City of Atlanta for body-worn cameras.  Would you kindly -- I think we're on agreement for Exhibit 26.  I move for admission, please.

MS. PIERRE: No objection.

THE COURT:  26 is admitted without objection.

(Plaintiff's Exhibit No. 26 was marked for identification.)

MR. JOHNSON:  Thank you.

BY MR. JOHNSON:

**Q.**  While you are thumbing through that, Officer Reyes, does that look like kind of what you were telling the jury about the written policy, the SOP?

1  **A.**  Yes, and this -- reviewing it initially off the cover page.

2  That was the policy that was in effect at the time of the

3  incident.

4  **Q.**  Thank you.  So Exhibit 26 that we have now admitted into

5  evidence, is the controlling SOP for July 10, 2018, and Officer

6  Grubbs?

7  **A.**  Yes.

8  **Q.**  Okay.  Thank you.  Did you take part in any sections or any

9  part of this Exhibit 26 SOP, sir?

10  **A.**  The one part I can specifically remember that I did have

11  meetings with Sergeant Blue about and I provided feedback on, was

12  specifically about Section 4.8 and 4.8.1 which is on page 6.

13  Which was alining the retention schedule for video evidence to

14  have it in-line with state guidelines.

15  **Q.**  Okay.

16  **A.**  I remember Sergeant Blue specifically asking me to look that

17  up.

18  **Q.**  And then you provided --

19  **A.**  I provided input, yes.

20  **Q.**  Just so the jury knows what you mean without necessarily going

21  and reading all 4.8 and 4.8.1, relative to how you go about

22  storing what is on the body-worn camera after the fact; correct?

23  **A.**  Yes, sir, and for how long the department is required to keep

24  it in storage.

25  **Q.**  Right.  So -- and since you gave input into that, apparently

1  you make a recommendation, then was it Sergeant Blue then that

2  said that it was a good idea and implement it as part of this SOP?

3  **A.**  I just provided the input upon her asking me if there were any

4  state guidelines, or any sort of guidelines, period, that would

5  govern this and/or to also -- and I remember that that was also in

6  line with providing what's called retention categories within the

7  actual Evidence.com storage management system.

8  **Q.**  All right.

9  **A.**  That's part of the added metadata that sworn personnel are

10  required to add to every video they create.  And those retention

11  categories then align with how long the videos are supposed to be

12  kept per the state guidelines.

13  **Q.**  And what is metadata, please, sir?

14  **A.**  The metadata that I'm specifically speaking of is sworn

15  personnel -- every person who creates a video file through the

16  body-worn camera is required to add -- tag it with an APD case

17  number, a 9-digit Atlanta police case number.  And an appropriate

18  retention category based upon the type of incident or interaction

19  that occurred through the video, through the body-worn camera.

20  **Q.**  So the goal would be tag it with a case number so somebody

21  would know this particular video goes with that particular case

22  number?

23  **A.**  Exactly.

24  **Q.**  And then the retention category where someone literally names

25  it something, so that when they're looking for it they know what's

1   on that particular video?

2   **A.**   From a visual standpoint, yes.  But more importantly, the

3   retention category is then aligned with how long that video will

4   be stored in the system per the minimum requirements required by

5   the state.

6   **Q.**   Got it.  And then with respect to the retention categories and

7   how long it needs to be retained, there are categories

8   under 4.8.1; correct?

9   **A.**   Those are just the types of incidents --

10  **Q.**   Yes, sir.

11  **A.**   -- that outline how long those types of incident have to be

12  retained.  But those aren't the actual retention categories.

13  **Q.**   Got it.  So in this case, Officer Reyes, back in, I think it

14  was March -- no, April of 2021, Solomon Radner -- Mr. Radner, a

15  lawyer in my office took your deposition.  Do you recall that?

16  **A.**   I do.

17  **Q.**   And obviously, you were sworn to tell the truth at that time,

18  correct, sir?

19  **A.**   Yes.

20  **Q.**   I know you take that oath very seriously and you did your best

21  and told the truth, true?

22  **A.**   Yes, sir.

23  **Q.**   Just like you're doing today?

24  **A.**   Yes, sir.

25  **Q.**   Thank you, sir.

1      When -- in terms of -- let me ask a different question.

2      In terms of that deposition, I just want to ask you, did you

3  know that when we asked the City to give us the person, if you

4  will, with the most knowledge about body-worn cameras and

5  retention policies, and so forth -- are you aware that City of

6  Atlanta identified you, and that's how we got to you and took your

7  deposition back in April of '21?

8  **A.**  I was knowledgeable that I was identified as a person to

9  cooperate and assist in the deposition in the case.  As far as the

10 particulars of being the person most knowledgeable, I was not made

11 aware of that specific point, per se.

12 **Q.**  Well, let me ask it this way.  In terms of you today, you're

13 here, you acknowledge, you have particular knowledge in these

14 policies and procedures and the actual use of body-worn cameras?

15 **A.**  Yes, sir.

16 **Q.**  Hence, you've not only been involved since the beginning but

17 you've actually trained folks?

18 **A.**  Yes, sir.

19 **Q.**  And that training obviously started in October, actually

20 November 2016.  Did you train APD officers in 2017?

21 **A.**  I did.

22 **Q.**  2018?

23 **A.**  Yes.

24 **Q.**  Without belaboring the point, every year until now?

25 **A.**  Yes.

1    **Q.**  So to say that you're firsthand familiar with these is an

2    understatement; right?

3    **A.**  You could say that, sir.  Yeah.

4    **Q.**  Thank you.  Relative to Officer Grubbs, can you tell us are

5    you aware of what training he first received relative to the use

6    why -- policies and procedures, the use, in general, of body-worn

7    cameras?

8    **A.**  He would have received the initial body-worn camera training

9    which is a four-hour block of training, and that was part of the

10   phased roll-out of the body-worn cameras.  All personnel weren't

11   assigned body cameras at once.  It was based upon work assignment

12   at the time and we brought, basically, clusters of personnel in

13   for training.  At his appointed time he would have come in for the

14   four-hour block of training on the proper use of body-worn camera

15   and related duties and responsibilities around it.

16   **Q.**  Do you have an approximate time of when that occurred?

17   **A.**  I believe at the time Officer Grubbs was assigned to zone

18   five, and my recollection is that zone five personnel were trained

19   in August of 2017.

20   **Q.**  So August to December 4 and another seven.  So 11 months

21   before July of 2018.

22   **A.**  That would be the calendar time frame.

23   **Q.**  Okay.  And as far as -- once they got body cams, Officer

24   Grubbs -- and other officers but we'll focus on him, please -- and

25   he got this training as of August 2017, was he expected at that

1  time, from your perspective --

2          MS. PIERRE:  Objection.  Mischaracterizes the evidence.

3  He said he had the training October 2017, not August 2017.

4          THE COURT:  Is that correct, officer?

5          THE WITNESS:  I'm sorry?

6          THE COURT:  Is that correct, was it October of 2017?

7  BY MR. JOHNSON:

8  **Q.**  I heard you say August.

9  **A.**  It's August, instead of October.  I'm looking back on his

10 evidence files records in Evidence.com.

11 **Q.**  Yes.

12 **A.**  If he was assigned to zone five at the time, zone five would

13 have been trained in and around August of 2017.  I can't speak to

14 an exact date of when he was trained, and that's just based upon

15 the evidence that exists in Evidence.com.  But due to previous

16 retention category policies, certain video evidence has fallen

17 off.  So there is no way we can recall those evidence files to see

18 what his original training.

19          THE COURT:  So August, not October?

20          THE WITNESS:  I believe it was August of 2017.

21          MS. PIERRE:  I stand corrected, Your Honor.

22 BY MR. JOHNSON:

23 **Q.**  When an officer like Grubbs, whenever he got his training, the

24 year before this incident in 2017, once they completed it, were

25 they then expected to follow Exhibit 26 in the standard operating

1  written policies and procedures?

2  **A.**   Yes.

3  **Q.**   Were they expected to follow the training that they actually

4  got?

5  **A.**   Yes.

6  **Q.**   I've given you Exhibit 26 and I just want to call your

7  attention on the first page, and I apologize if you mentioned

8  this.  The effective date.  Could you kindly throw on Exhibit 26

9  please.  The effective date being December 16, 2017.  I just want

10 you to tell the jury, so when they read this they know what that

11 means, please?

12 **A.**   The policy was signed by chief of police on December 14, 2017,

13 to be effective the next day, December 15, 2017, meaning that all

14 of the rules and procedures and everything contained in this

15 policy is to be followed from that effective date 2015 --

16 December 15, 2017, going forward, up until any time as the policy

17 may be revised again.

18 **Q.**   With respect to standard operating procedures, Mr. Reyes, the

19 officers with APD, are they expected to know all of them?

20 **A.**   Yes.

21 **Q.**   I don't mean just body-worn camera now.  I'm talking about use

22 of force, TASER®, et cetera?

23 **A.**   Yes.

24 **Q.**   But all of them, correct?

25 **A.**   Yes.

1  **Q.**  So if anybody is trying to suggest to this courtroom that

2  violating body-worn camera policies may not be as important as

3  other things, as a trainer of body-worn cameras, do you look at it

4  that way?

5  **A.**  No.  All of the policies are -- are important.  They're there

6  for a purpose, and they have to be followed accordingly.  My

7  approach as a trainer is, there is no one policy that is more

8  important than another.  They're all important.  And they're all

9  of our responsibility to make sure that we're knowledgeable of

10  them and follow them.  And that's what we're responsibile for when

11  we sign off on the policies.

12  **Q.**  That's exactly what Officer Grubbs would have had to have done

13  part of his training; correct?

14  **A.**  Yes, sir.

15  **Q.**  To sign off means what?  Tell the jury if you would, please,

16  sir?

17  **A.**  Acknowledge receipt of the policy and that you're responsible

18  for everything that the policy contains, and that that -- signing

19  off when you attend the -- if you attend training, obviously you

20  sign in, sign out, and that documents your attendance, and that

21  documents that you are signing and affirming that you're

22  responsible for all of the training and information that you see

23  in the training session, up -- including, standard operating

24  procedures.

25  **Q.**  Thank you, sir.  I'm going to -- may I approach, please,

1   Judge?

2          THE COURT:  Yes.

3          MR. JOHNSON:  I'm going to hand you what is proposed

4   Exhibit 35.  I don't believe there is any disputes.  So I'm moving

5   for admission of Exhibit 35, Your Honor.  It's the device audit

6   trail AXON body 2, serial number X81209416.

7          MS. PIERRE:  Your Honor, we haven't seen it yet, if Mr.

8   Johnson could show it to us.

9          THE COURT:  Let the defense see it first.

10          MR. JOHNSON:  I was told that they had.  I apologize.  I

11   thought we exchanged all exhibits.

12          MS. PIERRE:  Thank you.

13          MR. JOHNSON:  You're welcome.  May I, Judge?

14          THE COURT:  Yes, you may approach.

15          Hold on one second.  Any objections to 35?

16          MS. PIERRE:  No objection, Your Honor.

17          THE COURT:  35 is admitted without objection.

18          MR. JOHNSON:  Thank you.

19          (Plaintiff's Exhibit No. 35 was marked for

20   identification.)

21   BY MR. JOHNSON:

22   Q.  Exhibit 35, would you show the first page.  35, please.

23   Kindly show the first page, if you would, please, sir.

24          THE COURT:  What is 35 again?  What is 35?

25          MR. JOHNSON:  35 is, Judge, the device audit trail for

1   AXON body 2.

2            THE COURT:  Thank you.

3   BY MR. JOHNSON:

4   **Q.**  You're welcome.  Would you kindly tell the Court and jury, Mr.

5   Reyes, what is that document Exhibit 35.

6   **A.**  So this is the device audit trail.  Every body-worn camera

7   records a record of its operational use.  When it's powered on,

8   when it's powered off.  Every time a recording is started or

9   stopped, buttons are pushed, when it's charging, when it's

10  uploading video.  So anything that happens with the body-worn

11  camera, with the device, is recorded on a permanent audio trail.

12      Which is then downloadable by any user that has the requisite

13  permissions in their user role to do so.  And that is what this

14  document is, is this is basically the operational record of this

15  particular body-worn camera.

16  **Q.**  On the first page, bottom right, if you look, Mr. Reyes, you

17  see where I call it Bates stamp.  I think I'm dating myself,

18  B-A-T-E-S, Bates stamp.  It is a thing we used to use.  Now the

19  computer does it.  Page number 441, is that the same page that you

20  have?

21  **A.**  On here, on the screen?

22  **Q.**  If you don't mind, look at the one that is on the desk.

23  **A.**  All right.

24  **Q.**  Thank you, sir.  I apologize to you.  I just want to make sure

25  we're talking apples to apple.  Bottom right corner?

1  **A.**   441?

2  **Q.**   Yes, sir.

3     Okay.  If you would kindly look at that first page, which

4  is 441.  I want you to explain to the jury --

5  **A.**   Okay.

6  **Q.**   -- do you see where it says 11/2/17?

7  **A.**   Eleven -- I do.

8  **Q.**   Okay.  You just told the Court and jury about how body-worn

9  cameras kind of came in in November of 2017.  And this document,

10 at least on this first page, it's exactly November of 2017; right?

11 **A.**   Right.

12 **Q.**   So on the first page where it says, "Model AXON body 2"?

13 **A.**   Yes.

14 **Q.**   Is that just a particular type of AXON --

15 **A.**   That's the model of the body camera.  So AXON body 2 is the

16 model.  Yes.

17 **Q.**   The serial number that I read into the record -- we don't need

18 to do it again -- to the best of your knowledge is that the serial

19 number of the body-worn camera that, ultimately, Officer Grubbs

20 was wearing on 7/10/2018?

21 **A.**   To my knowledge, yes.

22 **Q.**   Thank you.  So if somebody -- well, in fact let me ask you

23 this.  As part of your duties with Atlanta Police Department, if

24 you were trying to figure out somebody's patterns of usage, let's

25 say, on body-worn camera; do they use it, do they not use it, do

1    they turn it on, do they turn it off when they're not supposed to,

2    things like that -- Exhibit 35, is that a great place to look?

3    **A.**   That would be a place to look.

4    **Q.**   In fact, are you aware in certain cases that someone like

5    yourself or others may be asked to do that very thing?  To go back

6    and look at every single entry on somebody's body-worn camera to

7    see what they have done as a matter of practice and habit,

8    routine?

9    **A.**   Yes.

10   **Q.**   Was that ever done for Grubbs here?

11   **A.**   To my knowledge, no.

12   **Q.**   Why not?

13   **A.**   I have no idea.

14   **Q.**   If somebody from Atlanta really wanted to figure out whether

15   it was a mistake or not, or intentional or not, about what

16   happened with this body camera on July 10, 2018, one of the best

17   sources of information for someone from Atlanta to do that would

18   be right here in Exhibit 35, wouldn't it?

19   **A.**   Yes, sir.

20   **Q.**   No one ever asked you to do that, did they?

21   **A.**   To my knowledge, no.

22   **Q.**   If anyone had asked you to do it, you would have done it?

23   **A.**   Yes, sir.

24   **Q.**   Who is your supervisor?

25   **A.**   My supervisor is currently Sergeant Aaron Brown.

1  **Q.** Is there someone -- Ulhis, U-L-H-I-S, or something like --

2  **A.** Sergeant Ulhis is another supervisor in the body-worn camera

3  unit.

4  **Q.** Who -- if this -- we're going to be done -- this -- let me do

5  it again.  Sorry.

6     If somebody from the City of Atlanta, whether it's internal

7  affairs or anybody wanted to look at Grubbs' history -- Officer

8  Grubbs history on the use or not of his body camera, who would be

9  the likely person that would say, hey, let's pull -- run

10 Exhibit 35 and let's look at it, and see what it tells us?

11 **A.** Well, Sergeant Ulhis isn't -- is responsible for the

12 compliance, currently the compliance administrator for the

13 body-worn camera unit for the department.  So he would be the

14 point of contact.

15 **Q.** Compliance means what, please?

16 **A.** Make sure that people are following the standard operating

17 procedure for body-worn cameras.

18 **Q.** And would he be the person then -- I think what I hear you

19 saying -- pardon me, let me rephrase my question.  If anybody

20 asked for such a study like that, is it Sergeant Ulhis?

21 **A.** Sergeant Ulhis would be contacted by any entity.

22 **Q.** Have you ever spoken to him as to whether that's been done in

23 this case?

24 **A.** No.

25 **Q.** If Sergeant Ulhis -- does he know you're here today?

**A.**   Yes.

**Q.**   So if Sergeant Ulhis would have done that study on Exhibit 35 to figure out a usage, what would you call that type of report, so I'm using your terminology?

**A.**   I'm sorry?

**Q.**   What would you call it, somebody wanted to go in and look at this Exhibit 35, and look at the usage patterns and practices of an officer?  What do you call that?

**A.**   We colloquially would call it an audit deep dive or an audit study.

**Q.**   If Sergeant Ulhis had either done himself or knew about an audit study or a deep dive for Grubbs in Exhibit 35, you would know about that, wouldn't you?

**A.**   I can't say either way that I would or not.

**Q.**   Okay.  But to be clear for the jury, you're not aware, here we are four years-plus after this incident, agreed?

**A.**   Yes.

**Q.**   And you know from even questions asked at your deposition, but obviously, you know we're here in trial, right, sir?

**A.**   Right.  Yes, sir.

**Q.**   And you know one of the major issues in this case is why Officer Grubbs didn't have body-worn camera on?  You're aware of that, aren't you?

**A.**   Yes, sir.

**Q.**   And you're telling this jury that despite knowing that, and do

1  you know without belaboring the point that my client, according to

2  counsel even in his opening statement is seriously injured in this

3  case, quadriplegic, living his life in a home, are you aware of

4  that generally without knowing specifics?

5  **A.**  Yes, sir.

6  **Q.**  Okay, serious case, right, sir?

7  **A.**  Yes, sir.

8  **Q.**  Can you tell this jury, do you, as someone familiar with these

9  policies and procedures, believe that looking at this very thing,

10  and doing a deep dive audit study would be an excellent thing for

11  somebody to do, as opposed to not doing it, in this case?

12  **A.**  No, sir.

13  **Q.**  Do you have an explanation of why this hasn't been done?

14  **A.**  I do not.

15  **Q.**  If anybody from internal affairs when they were investigating

16  this before they closed it in June of 2020, nearly -- just shy of

17  two years after the fact, if anybody from internal affairs said,

18  hey, we would like this done -- this being audit study, deep dive

19  on body-worn camera -- is that typically a request that would be

20  granted?

21  **A.**  Yes, sir.

22  **Q.**  If someone is truly investigating this and one of the major

23  issue would be body-worn camera, can you think of a good reason --

24  I can think of many bad reasons -- can you think of a good reason

25  why somebody wouldn't want to know those answers?

1  **A.**  I can't think of any --

2          MS. PIERRE:  Objection.  It calls for speculation.

3          THE COURT:  That's not speculation.  He can say why he

4  can't think of any or not.  He's not saying what it is.

5  Overruled.

6  BY MR. JOHNSON:

7  **Q.**  The best evidence in this case for whether before this

8  incident Officer Grubbs had any type of issues, had problems where

9  he didn't use his camera, et cetera, would be likely answered by

10  that study; agreed?

11  **A.**  It would help in determining.

12  **Q.**  Has anyone from Sergeant Ulhis or any of your supervisors ever

13  told you why, if this is available to the City in a big case that

14  is going to trial in front of a federal jury, why that wasn't

15  done?

16  **A.**  No.

17  **Q.**  To be fair, it should have been done, shouldn't it, by the

18  City?

19  **A.**  I can't speak to whether the decision-making process on that.

20  **Q.**  If you were the head guy, the hot shot, the boss, you would

21  have done that?

22  **A.**  I would have yeah, with my knowledge of the devices and how

23  the system work, yes.

24  **Q.**  The Axon body 2, as part of implementation, putting them in

25  use, you folks -- I'm sure got some types of an owner's manual

1  from Axon 2?

2  **A.**  Yes, there is a user guide.

3  **Q.**  Yes?

4  **A.**  And a user guide, we'll call it a cheat sheet for, you know,

5  for the operational usage of the camera.  What the buttons do,

6  what the lights do, what they mean and all that, yes, sir.

7  **Q.**  Was that document shared with the officers such as Officer

8  Grubbs so that they knew what the manufacturer thought was

9  important?

10  **A.**  Yes, those are usually provided in training.

11  **Q.**  And relative to this case, and you looked at that manual in

12  terms of the locations of buttons and so forth?

13  **A.**  Yes, sir.

14  **Q.**  So you're familiar, through personal knowledge of that?

15  **A.**  Yes, sir.

16          MR. JOHNSON:  Ms. Hatchett, do we have this marked, the

17  Axon body 2?

18          MS. HATCHETT:  We do not.

19          MR. JOHNSON:  Never mind then.  Anthony, will you please

20  put up the photograph of Officer Grubbs after the incident. It is

21  40.

22  BY MR. JOHNSON:

23  **Q.**  I'm going to show you proposed Exhibit 40.  I'll just tell you

24  it is a photograph that was taken after Officer Grubbs on this

25  incident on 7/10/18 showing his uniform.

 1          MR. JOHNSON:  I move for admission of Exhibit 40.

 2  Sorry, Judge.  I should have done that before I put it on.

 3          THE COURT:  Yeah, don't show it.

 4          MR. JOHNSON:  I apologize.  It is me.

 5          THE COURT:  Any objection?

 6          MS. PIERRE:  No objection.

 7          MR. JOHNSON:  Thank you, Judge.

 8          THE COURT:  It is admitted without objection.

 9          (Plaintiff's Exhibit No. 40 was marked for

10  identification.)

11          MR. JOHNSON:  Thank you, Judge.  I apologize to the

12  Court and counsel.

13  BY MR. JOHNSON:

14  Q.  Assuming this was Officer Grubbs on 7/10/18, do you recognize

15  him at least?  Do you, sir?

16  A.  No, sir.

17  Q.  Do you know Officer Grubbs?

18  A.  I do not.

19  Q.  You can see him in the courtroom, though; right?

20  A.  Yes, sir.

21  Q.  All right.  If you look over the "O" of "Police" in

22  Exhibit 40, would you tell the Court and jury what that is?

23  A.  That is known as what is called the AXON flex mount.  That is

24  just the magnetic mount that secures to the back of the body-worn

25  camera, and then through the use of the magnets, secures it to the

1  uniform shirt or garment so that the body-worn cameras can be

2  worn.

3  **Q.**  Thank you for enlarging that now for the jury.

4      You're familiar with, obviously, how that worked; correct,

5  sir?

6  **A.**  Yes, sir.

7          MR. JOHNSON:  Judge, for demonstrative purposes, may I

8  show the jury a picture from the AXON manual 2 so I can just

9  identify buttons?

10          MS. PIERRE:  Your Honor, can we look at it first?

11          THE COURT:  Yes.

12          MS. PIERRE:  No objection.

13          THE COURT:  Ladies and gentlemen of the jury, what you

14  are going to see from Mr. Johnson is not evidence.  It's going to

15  show you how something looks.  It's not admitted into evidence.

16  It's just to show you how something looks, okay.

17  BY MR. JOHNSON:

18  **Q.**  Are you generally familiar with this?

19  **A.**  Yes, sir.

20  **Q.**  Would you kindly tell the jury -- sorry, Officer Reyes.

21  Officer Reyes, would you tell the Court and jury what this is.  I

22  know you are a long ways away.  Can you see it?

23  **A.**  I can see it, sir.  That is a diagram of the AXON body 2

24  body-worn camera.  Going from the top left that is a top view.

25  I'm sorry.  Yes, that is a -- yes, top view.  On the top right of

1  the diagram, that is a bottom view of the device.  And then the

2  main diagram in the bottom center is the front view of the

3  body-worn camera as you're looking at the device itself.

4  **Q.**  The device that is being depicted here for demonstrative

5  purposes, is that the identical, if you will, layout of the

6  body-worn camera that is in Exhibit 40 that Officer Grubbs was

7  wearing on the night of the incident?

8  **A.**  That would have been the model of the body-worn camera, yes.

9  **Q.**  So would you kindly tell the Court and jury where it says, "On

10  off indicator," and it has a red button, correct?

11  **A.**  Yes, sir.  It is a flip tab -- or a switch tab.  Yes, sir.

12  **Q.**  The switch I see kind of, almost like a pot on top of a -- I

13  should say a lid on top of a pot that has a little -- kind of a --

14  I'll call it the nipple on the top?

15  **A.**  It's got some ridges on it so that your finger can catch it.

16  It is a toggle on-and-off switch.  It slides back and forth and

17  clicks into place.

18  **Q.**  Okay.  And if you will, the toggle switch on the top, if it's

19  in the position that it is in, in this demonstration, is that on

20  or off?

21  **A.**  The device is powered on.

22  **Q.**  That's on.  Okay.  And then if it's slid over at least to the

23  right in this diagram where it is currently red, what's that?

24  **A.**  The device has been completely powered off.

25  **Q.**  Okay.  And is the actual underside of this on/off -- is it

1  red?

2  **A.**  Yes, that's a visual indicator that the device is on, powered

3  on so that anybody viewing the body camera can identify it as

4  being on, if they knew, obviously, what to look for.

5  **Q.**  In other words, if I have the toggle switch on, and I have it

6  in the "on" position, I can see red, that tells me that it's on?

7  **A.**  From that position it would be a little hard.  But from the

8  top of the body camera, there is an operational LED light that

9  comes on when the device is powered on.  And that flashes green to

10  indicate that the power device is powered on.

11  **Q.**  That allows an officer if he or she is looking down to see the

12  light being green means on?

13  **A.**  Yes.

14  **Q.**  And then if the toggle switch is turned off, what is the color

15  on the other side?

16  **A.**  Black.  There is no color.  Yeah.

17  **Q.**  And then if it's slid off, or at least in the diagram over to

18  the right, what's the color of the LED light from the top view?

19  **A.**  The LED light is off.  There is no light flashing.

20  **Q.**  So all of this is designed, of course, to help someone know

21  whether it's on or off?

22  **A.**  Yes, the device provides haptic and visual feedback during its

23  operation.

24  **Q.**  This large circled button in the middle says, "An event

25  button."  Will you tell the Court and jury what the event button

1  is, please.

2  **A.**  The event button is the button this is used to either start or

3  stop a recording.

4  **Q.**  Okay.  If the camera is off, it's not recording at all?

5  **A.**  Yes, sir.  Correct.

6  **Q.**  Off is off?

7  **A.**  Off is off.

8  **Q.**  If the camera is on, like it is in this demonstrative aid,

9  it's in buffering mode?

10 **A.**  Yes, sir.  Its -- then powers on and is in buffering mode.

11 **Q.**  Tell the Court and jury what buffering mode means.

12 **A.**  Buffering is the body-worn camera, at that time, when powered

13 on, is actually recording in continuous time loops.

14 Default -- the default setting for buffering for the body-worn

15 camera is 30 seconds, configurable all the way up to two minutes.

16 When the camera is buffering, it is constantly recording in those

17 continuous time loop cycles, depending on what the settings are

18 but it is not saving that video at any time.  It will only save

19 buffered video whenever -- what we will colloquially refer to as

20 an active recording is started, via pushing the event button.

21 **Q.**  Okay.  So if the camera is on and in buffering mode, it is

22 recording?

23 **A.**  Yes, but not saving.

24 **Q.**  Not saved.  Is there sound?

25 **A.**  For the buffered video?

1  **Q.**  Yes.

2  **A.**  When it is saved and attached to the recording, no.  There is

3  no sound for the buffered video portion.

4  **Q.**  If the event button is pushed to go to a live recording, how

5  long does somebody have to have their thumb finger, what have you,

6  pushing on that button to make it go live as well?

7  **A.**  It is a deliberate double press of the event button to start

8  to record.  So it is a press, press.

9  **Q.**  "Press, press" meaning press twice?

10  **A.**  Yes.

11  **Q.**  Thank you.  That's designed to try to eliminate there being

12  accidental events?

13  **A.**  Yeah, to prevent an inadvertent action.  So it is a deliberate

14  action, a conscious action.

15  **Q.**  So I'm going to keep with the camera on in buffering mode on

16  for now.  Okay?

17  **A.**  Yes, sir.

18  **Q.**  Thank you, sir.  So now if we event press, event press a

19  second time, it goes to a live recording; correct?

20  **A.**  Yes, sir.

21  **Q.**  With sound?

22  **A.**  Yes, sir.  Saving sound of the video recording going forward.

23  **Q.**  And then somehow through the magic of modern technology that I

24  doubt you'll ever help me to truly understand, it goes back and

25  gets what was in that buffering mode for two minutes?

1  **A.**  Depending on what the setting is, it could be two minutes.  We

2  currently had it set at two minutes when we originally started the

3  program.  The setting was at 30 seconds at some point which I do

4  not recall.  We were directed to change the setting to two minutes

5  of buffering.  But yes, that is the basic concept.

6  **Q.**  So as of July 10, 2018, camera on, buffering mode, are you

7  with me?

8  **A.**  Yes.

9  **Q.**  Event press, event press, live recording with sound as

10  of 7/10/18, how long -- how far back would it go into in buffering

11  mode to record?

12  **A.**  I can't recall what we had the setting in at that time, but it

13  would have captured that setting of whatever we had.  It's

14  configured 30 seconds, one minute, or two minutes.

15  **Q.**  30 seconds?

16  **A.**  Yeah.

17  **Q.**  One minute?

18  **A.**  Yeah, or two minutes.  Those are the settings.  For buffered

19  video.

20  **Q.**  And who decides how long those go back?

21  **A.**  That decision is made by the command staff.

22  **Q.**  Not an individual officer?

23  **A.**  No, no.

24  **Q.**  So whatever Officer Grubbs was set at that day wasn't by him,

25  it was by somebody else who made that decision?

**A.**   Yeah.   The assistant administrator that would actually have to change the setting, and that would be done so at the directive of a commander.

**Q.**   So tell the Court and jury -- let me finish this scenario, please.   Sorry.

Once an event is done, what does the officer have to do to press the event button in order to make that live recording stop?

**A.**   The officer would press and hold the event button for approximately three to five seconds.   And then the officer would also get visual and haptic feedback.   The device will beep.   The device will vibrate, and the operational LED would go from flashing red, back to flashing green.

**Q.**   Okay.   Sorry about that.   So three to five seconds the officer has to hold the event button down?

**A.**   Press and hold, yes.

**Q.**   Press and hold.   Thank you.   I'll write it down.   And press and hold, if it's done for three to five seconds, stops the live recording?

**A.**   Yes, sir.

**Q.**   And it doesn't turn the camera off?

**A.**   It does not turn the camera off.   The camera goes back to buffering mode.

**Q.**   To buffering mode.   Got it.   And then once the three to five seconds is up and it goes from live recording to buffer mode again, tell me, the LED light then goes from on to off?

1  **A.**   No, so when the device is powered on and buffering, the LED

2  light at the top is flashing green to indicate buffering mode.

3  When an event -- when a live recording is started --

4  **Q.**   Yes, sir.

5  **A.**   -- that LED then turns to flashing red.  And then when the

6  recording is stopped and goes back to buffering mode, the

7  operational LED at the top of the device will go back to flashing

8  green.

9  **Q.**   Okay.  And, of course, when it's off, you said it is just the

10 cover is off, you know --

11 **A.**   Yes, sir.

12 **Q.**   Got it.  Okay.  Tell the Court and jury, if the camera is in

13 the buffering mode -- let's start again.  The camera is on --

14 **A.**   Yes, sir.

15 **Q.**   -- in buffering mode.  And then instead of pushing the event

16 button, one were to use the toggle switch and turn it off, what

17 happens?

18 **A.**   The device is powered off and the device is off.

19 Nothing -- the device won't do anything while it's off.  Nothing

20 can be done to the device while it's off.

21 **Q.**   And if it's in buffer and then powered off, what happens to

22 the 30 seconds, 60 seconds, or two minutes depending on what it's

23 set at, what happens to that -- I'm going to call it film and date

24 myself, sorry -- what happens to that evidence once it's powered

25 off?

1  **A.**  So buffering will stop, obviously.  So the buffering cycle

2  will not start again on its timed loop until the device is powered

3  back on.  Whatever buffered video was saved per a previous live

4  recording is attached to that live recording and is saved to that

5  video.  So that is not going to be lost.

6  **Q.**  So my question is this:  If it's buffer mode powered off, the

7  30, 60 minutes -- 30, 60, two minutes of buffering mode, is it

8  erased or not?

9  **A.**  Well, it's stopped.  Yeah.  You can't go back.

10  **Q.**  So much for all intents and purposes, if something significant

11  happened while somebody went from buffer to toggle off, within the

12  time frame, 30, 60, or two minutes, it would be lost forever?

13  **A.**  It's lost.

14  **Q.**  It would be destroyed?

15  **A.**  It's lost.

16  **Q.**  And you as a trainer, you taught people, including Officer

17  Grubbs, if you're in buffer, don't power off because whatever

18  happened in buffer gets erased, didn't you?

19  **A.**  Yes.

20  **Q.**  In fact, you told and trained people, including Officer Grubbs

21  that if they did that, it could, in fact, destroy vital evidence,

22  didn't you?

23  **A.**  Okay.  Well, we train them that they are in danger of them

24  forgetting to turn their device back on, which puts them in

25  violation of policy.  If that occurs, no matter what button they

1  push, if the device is powered off, the device won't do anything.

2  Also too, they loose the benefit if they even remember or if they

3  remember to turn the device back on, and then press the event

4  button, no buffered cycle has had a chance to build back up.

5  **Q.**  As of July 10, 2018, in terms of the training that you

6  provided through Officer Grubbs, you yourself, let alone APD,

7  Officer Grubbs had all of this information so far that we've

8  shared with the jury, didn't he?

9  **A.**  To my knowledge, yes.

10  **Q.**  And I'll take it in terms of the destroying the evidence or in

11  other words, going from buffer to power off, erasing forever

12  whatever was in the buffer mode.  You specifically talked about

13  that very thing as part of your training, didn't you?

14  **A.**  Yes.

15  **Q.**  It is so important to you that you pointed that out, didn't

16  you?

17  **A.**  Yes.

18  **Q.**  You know for a fact that one of the things that, in terms of

19  body-worn cameras that can happen is, there can be situations

20  where body-worn cameras, obviously, could end up helping a police

21  officer in a situation like this; true?

22  **A.**  Yes.

23  **Q.**  And if it shows something bad for the police officer, it could

24  hurt a police officer, couldn't it?

25  **A.**  Yes.

1  **Q.**  Okay.  I mean in terms of hurt, in terms of damaging evidence,

2  do you understand?

3  **A.**  I do.

4  **Q.**  So when you were training an officer like Officer Grubbs, were

5  you the only one training them about this buffer-to-power-off

6  situation or were other folks doing it, too?

7  **A.**  I had other members of the unit assist in training.

8  **Q.**  So since we have the toggle switch up here from "on" to "off"

9  and event button in a whole different location, you would agree

10 with me, Mr. Reyes, that somebody going from buffer to power off,

11 it shouldn't happen under most scenarios by accident, shouldn't

12 it?

13 **A.**  It shouldn't happen.

14 **Q.**  In fact, it certainly, as an experienced trainer in body-worn

15 cameras, if there is a critical event like this one where somebody

16 in the line of duty, like Officer Grubbs, went from buffer to

17 power off, no question about it that violates the SOP, standard

18 operating procedures, does it?

19 **A.**  Yes.

20 **Q.**  It violates your training, doesn't it?

21 **A.**  Yes.

22 **Q.**  Not even a close call, is it?

23 **A.**  No.

24 **Q.**  Not something to be taken lightly under any scenario, but

25 especially when somebody is so seriously injured and almost died;

1    agreed?

2    **A.**   Agreed.

3    **Q.**   And no question that one of the things that a reasonable

4    person on behalf of the City of Atlanta, whether it's a

5    supervisor, internal affairs person, or somebody else that is a

6    body-worn camera expert, one of the things that you'd have to

7    consider in looking at this very instance of what happened here

8    is, hey, perhaps Grubbs intentionally powered off to erase this

9    event?

10            MS. PIERRE:  Objection.  Calls for speculation.

11            THE COURT:  That is speculating, Mr. Johnson.  You have

12   to give him more foundation for him to answer that question.

13   BY MR. JOHNSON:

14   **Q.**   You have trained officers, including Officer Grubbs, that when

15   you go from buffer to power off in the middle of a workday since

16   it's never supposed to happen, don't do that, guys and gals,

17   because we might have to look at whether that was intentional,

18   true?

19   **A.**   Yes.

20   **Q.**   You told them that?

21   **A.**   We've given examples of that in training, yes.

22   **Q.**   So if -- and Officer Grubbs said, "I didn't know if I went

23   from buffer to power off it would erase what was there," you would

24   say from your perspective, Officer Grubbs, I trained that?

25            MS. PIERRE:  Objection.  Calls for speculation.

1          MR. JOHNSON:  Not at all.

2          THE COURT:  Here's the question, is it possible it could

3   have been turned off intentionally?  Is it possible?

4          THE WITNESS:  It's possible.

5          THE COURT:  But do you know enough about a situation to

6   say he did it intentionally?

7          THE WITNESS:  I can't speak to that, no, sir.

8   BY MR. JOHNSON:

9   **Q.**  Well, who can?

10  **A.**  Officer Grubbs.

11  **Q.**  Okay.  All right.  Other than him, since he is the one

12  involved in the incident.  In your experience you would agree,

13  just like Exhibit 35, Mr. Reyes, that somebody from the City of

14  Atlanta with knowledge and training in body-worn camera,

15  absolutely in this particular situation should look into that very

16  question whether Grubbs did that intentionally, shouldn't they

17  have?

18  **A.**  I believe so, yes.

19  **Q.**  And, in fact, you were the head person -- that is exactly what

20  you would have done?

21  **A.**  I would have looked at it to see if there was a pattern, yes.

22  **Q.**  And have you done that?

23  **A.**  I have not, no.

24  **Q.**  Has anybody asked you to do that?

25  **A.**  To my knowledge, no.

**Q.**  Has anybody that you are familiar with done that, like a supervisor or anybody else other than you?

**A.**  To my knowledge, no.

**Q.**  And my question to you is, here we are at trial and what we've already talked about is a serious case.  If there is an issue as to whether this is intentional conduct or not, can you think of a good reason, not a bad one, a good reason for it not being done here?

**A.**  I can't think of any.

**Q.**  If somebody from internal affairs after nearly two years of looking into this, do you think that is something that -- have you seen that other folks, in other situations where they're investigating officers and conduct, but especially use of force, where they've actually done studies like that?

        MS. PIERRE:  Objection.  It calls for speculation.

        THE COURT:  It is speculating, Mr. Johnson.

        MR. JOHNSON:  I'm not even done with my question.  How do you know it's speculative?

        THE COURT:  But you've already asked two questions what somebody in internal affairs could have done.

        MR. JOHNSON:  Yes, Judge.

BY MR. JOHNSON:

**Q.**  Are you familiar with other situations where somebody has looked into Exhibit 35 and usage to see if there is a pattern --

        THE COURT:  Hold on.  Let him finish his question.

1          MS. PIERRE:  Yes, sir.

2   BY MR. JOHNSON:

3   **Q.**  -- if there is a pattern and practice of somebody violating

4   the policies by turning off their camera in the middle of the day

5   during an event?

6          MS. PIERRE:  Objection.  It calls for speculation.

7          THE COURT:  How does that call for speculation?  The

8   question is does he know of anyone in internal affairs who looked

9   into it.  That is not speculating.  He either knows or he don't

10  know.

11         MS. PIERRE:  Your Honor, it also goes to relevance.

12         MR. JOHNSON:  This goes to the whole Monell -- Monell

13  claim, Judge.  That's exactly what we are talking about.

14         THE COURT:  Exactly.  A Monell claim.  You're basing the

15  argument that he didn't follow policy set by the City of Atlanta.

16  You're not saying City of Atlanta didn't have a proper policy.  I

17  think he still can answer that question.  It's not speculating.

18  He either knows or doesn't know whether or not anyone from the

19  City of Atlanta asked these questions.  He's not asking -- the

20  first part was speculation, but now he got more of a direct

21  question.  So I'll allow that.

22  BY MR. JOHNSON:

23  **Q.**  Do you remember the question?

24  **A.**  Can you rephrase it for me?

25  **Q.**  I'll try to remember.

1   Are you aware of other situations, not this one, where folks,

2  whether it's internal affairs or folks in the body-worn camera end

3  of things, looked at the usage like in Exhibit 35 of somebody,

4  just try to gain some insight as to whether the officer may have

5  intentionally deleted evidence by going from buffer to off in a

6  situation?

7  **A.**  Yes.

8        THE COURT:  Well, let me ask you this question.  You

9  said -- maybe I didn't understand the question.  You're saying you

10 know somebody in the City of Atlanta that looked into it?

11       THE WITNESS:  Not of this specific incident, but I'm

12 aware of other instances, officers, where I or other members of

13 the body-worn camera team were asked to look into an audit trail

14 to see if there was a pattern --

15       THE COURT:  You have to lay more foundation.  You have

16 to be able to show the relationship here.  He is saying another

17 case.  I need to know what happened in the other case where they

18 looked into it.  Whereas you're saying here, they did look into

19 it.

20 BY MR. JOHNSON:

21 **Q.**  Are you aware of any other, one or more, use of force

22 investigations where one way or another, the body camera end of

23 it, about buffer to power off came into play where they

24 investigated that aspect?

25       THE COURT:  Similar to this case.  A situation similar

1  to this case.

2          THE WITNESS:  I'm not aware of a situation similar to

3  this case and I'm not even aware of a specific use of force.  I

4  can only speak to -- I know I had been asked previously to, you

5  know, either look at somebody's device audit trail or something

6  regarding --

7          THE COURT:  Getting back to the question.  Are you

8  familiar with another case where the City of Atlanta did these

9  things that Mr. Johnson talked about that are similar to this

10  case?

11          THE WITNESS:  No, I'm not.

12          THE COURT:  Okay.

13  BY MR. JOHNSON:

14  Q.  Without any question, sir, while Officer Grubbs was on duty in

15  the middle of the day at 2:30 p.m. on the day of this incident, he

16  absolutely violated this policy if he went from buffer to off;

17  correct?

18  A.  Yes.

19  Q.  The policies and procedures in Exhibit 26 specifically require

20  that when he goes on duty, he shall wear the camera, correct,

21  No. 2?

22  A.  Yes.

23  Q.  And they should leave it in buffer mode the entire day?

24  A.  Yes, throughout the course of their tour of duty.

25  Q.  Correct.  And it goes from buffer then, or to event, like you

1  already outlined?

2  **A.**   Yes, sir.

3  **Q.**   And back to buffer?

4  **A.**   Yes, sir.

5  **Q.**   But not off until the end of the shift?

6  **A.**   Yes, sir.

7  **Q.**   Plain and simple, that's the rule we just read --

8  **A.**   Yes, sir.

9  **Q.**   We did about two pages; right?

10 **A.**   Yes, sir.

11 **Q.**   All right.  The start of shift, if the jury wants to know,

12 that's the 4.2; correct, sir?

13 **A.**   Let me find it.

14 **Q.**   Yep.  It's page 3 of 10?

15 **A.**   Yes, sir.  Thank you.

16 **Q.**   4.2.3, "shall," shall means must; right?

17 **A.**   Yes.

18 **Q.**   "Place it in normal buffering mode and shall remain in the

19 normal buffering mode unless the employee has the BWC in the event

20 recording mode."  We just covered that, right?

21 **A.**   Yes, sir.

22 **Q.**   Thank you.  4.3.1, "Law enforcement officers must use their

23 BWC or other camera devices during the lawful performance of their

24 duties to observe, videotape, et cetera."  Correct?

25 **A.**   Yes, sir.

1  **Q.**  That would apply to if you were investigating my client

2  panhandling, that would require him to record that, wouldn't it?

3  **A.**  Yes, sir.

4  **Q.**  If you would, please, take a look at 4.3.6.  Officers that are

5  responding to an incident who have BWCs, likewise as they pull up,

6  are supposed to hit the event button and record; right?

7  **A.**  Yes, per this policy, yes.

8  **Q.**  Thank you.  4.3.9, please.  "Employees are permitted to access

9  and review either video stored on their BWC, or the employee's

10  video uploaded to the Atlanta Police Department approved storage

11  network with the exception of all use of force incidents.  See

12  section 4.9.3."  Did I read that right?

13  **A.**  Yes, sir.

14  **Q.**  What does that mean?

15  **A.**  They cannot view or access, look at the video that recorded

16  the use of force incident.

17  **Q.**  Designed in part to make sure that they do a report that's

18  based on their memory as opposed to going in looking at the video

19  and then kind of modifying; right?

20  **A.**  Yes, sir.

21  **Q.**  I mean, it's a true, good, solid investigative technique,

22  isn't it?

23  **A.**  Yes, sir.

24  **Q.**  All right.  And likewise, no one should look at the body cam

25  and then tell that officer involved in a use of force incident

1  what they saw; agreed?

2  **A.**  Agreed.

3  **Q.**  4.5 tampering with a BWC.  Would you kindly turn to that.

4  What does tampering mean?

5  **A.**  Altering, destroying, modifying the device in any such manner

6  as in to any sort of condition other than how you received the

7  body camera.

8  **Q.**  Do you believe -- well, tampering with a BWC, meaning

9  physically the camera itself or any part of that thing?

10  **A.**  Yes, sir.

11  **Q.**  Okay.  If we look at 4.5.3, employee shall not interfere or

12  intentionally block the ability of the BWC to record an encounter,

13  right?

14  **A.**  Yes, sir.

15  **Q.**  It would defeat the purpose of having a camera?

16  **A.**  Yes.

17  **Q.**  4.5.4.  The intentional destroying or altering of any

18  evidentiary recording produced from the BWC, by any employee,

19  shall be treated as a violation of OCGA 16-10-94, tampering with

20  evidence.  Did I read that right so far?

21  **A.**  Yes, sir.

22  **Q.**  Yes, sir.  OCGA 16-10-94, interference with government

23  property.  APD Standard Operating Procedure .2010, "Truthfulness."

24  Section 4.1.3.  And subject to disciplinary and/or criminal

25  prosecutions.  Did I read that right?

**A.**   Yes.

**Q.**   If Officer Grubbs or any officer, for that matter, had his camera in buffering mode and then powered it off to intentionally delete the interaction that he had with my client, this section tells us what is supposed to happen; agreed?

**A.**   Agreed.

**Q.**   He could be criminally prosecuted for that, couldn't he, if it's true?

**A.**   If it's true, per that subsection, yes.

**Q.**   Certainly it would be important for somebody from the City of Atlanta, if they're truly interested in getting to the truth of what exactly happened, to figure out and try to form some type of an opinion one way or another as to whether that happened here; right?

**A.**   I believe so, yes, sir.

**Q.**   Would you kindly look on Exhibit 35 and start at page 982.  So if you wouldn't mind, I know that is a big stack.

**A.**   Okay.

**Q.**   It's the bottom.  If you want me to come up and do it for you.

**A.**   If you could.  Because these pages aren't really numbered well or if I'm just looking at it wrong.

              MR. JOHNSON:  May I, Judge?

              THE COURT:  Yes.

BY MR. JOHNSON:

**Q.**   Sorry about that.

1          MR. JOHNSON:  You're sure right.  Let me grab these two

2   pages.

3          THE COURT:  Is that part of one exhibit?

4          MR. JOHNSON:  Exhibit 35, Judge.

5          Can you put up page 982, please, Anthony --

6          THE COURT:  Wait a minute.  Hold on.  Hold on.  You're

7   getting another part to put with the exhibit?

8          MR. JOHNSON:  It's two of the pages of this Exhibit,

9   Judge, 982.  I have a copy, if you want a hard copy.  It's already

10  in evidence.

11         THE COURT:  But you admitted it with a different copy.

12         MS. MILLER:  Your Honor, can we have a side bar?

13         MR. JOHNSON:  I have the entire thing that I gave the

14  witness.

15         THE COURT:  And you're replacing two of the pages?

16         MR. JOHNSON:  I'm not replacing anything.  I just went

17  to the two pages I want to talk about that I can't find, in front

18  of the jury, because I was trying to move it on.

19         MS. MILLER:  The Exhibit 35 that we have has six pages.

20  And so this stack had medical records and a lot of other different

21  stuff.  We're not sure what is going on here.

22         THE COURT:  That's why I raised it.

23         MR. JOHNSON:  Exhibit 35, Judge, is the entire stack

24  because I didn't want to hear that I cherry-picked and just picked

25  the two days.  What Ms. Hatchett has done is on the excerpted

1  records, she simply made a quicker -- if the Court looks at this.

2  It is 982.

3          THE COURT:  My concern is that the Court has put it into

4  evidence as 35.

5          MR. JOHNSON:  This is 35, Judge.

6          THE COURT:  You just took --

7          THE WITNESS:  I left it up there.  This is my copy.

8          THE COURT:  Ladies and gentlemen, I ask you to step

9  outside to the jury room briefly, please.

10          (Whereupon, the jury is excused at 4:35 p.m.)

11          THE COURT:  Y'all can be seated.  All right.  Tell me

12  what you just did.  You put in Exhibit 35 --

13          MR. JOHNSON:  Yes, sir.

14          THE COURT:  -- it was submitted without objection.  You

15  just took two or three pages from there.

16          MR. JOHNSON:  I did not.

17          THE COURT:  You did not?

18          MR. JOHNSON:  I couldn't find it when I was looking up

19  there, Judge.  I am now going to give the witness pages 983

20  and 984 from Exhibit 35.  So that he doesn't have to thumb through

21  and I have to thumb through in front of the jury.

22          THE COURT:  He's just giving a shorter version of what

23  is already in the packet.

24          MR. JOHNSON:  Correct.

25          MS. MILLER:  Your Honor, so the issue that we have is

 1 that we don't have a physical copy.  Plaintiffs didn't provide

 2 that with us.  What they provided is a link.

 3         THE COURT:  Ms. Miller, it is too late now.  You

 4 admitted without objection.

 5         MS. MILLER:  Yes, Your Honor.  But Exhibit 35 only has

 6 these six pages.

 7         THE COURT:  Ms. Miller, first off, you can't object.

 8 Ms. Pierre has to object, she's the lead attorney on this.

 9         Ms. Pierre, you did not object when I asked you if 35

10 could come in.  You said, "no objection."  So, in other words,

11 you're all saying now you don't have it all.  That is why you

12 asked us, "Judge, let me see it."  So I let them see it.  You-all

13 looked at something.

14         Then I asked again, I said, "Any objection to 35," you

15 said, "No objection."  So now y' all are saying you don't have

16 anything.  I think it's too late.  I'll hear from you, but...

17         MS. PIERRE:  Your Honor, can we ask for clarification as

18 to what is actually Exhibit 35?

19         THE COURT:  You're kidding.

20         MR. JOHNSON:  Exhibit 35, Judge?  If I can respond or

21 not?

22         THE COURT:  Well, what were you all looking at a few

23 minutes ago?

24         MS. MILLER:  Yes, Your Honor.  We looked at the -- I'm

25 sorry.  Your Honor, we looked at the entire package but now Mr.

1  Johnson is saying this is Exhibit 35 with six pages.

2          THE COURT:  No, he said -- what he is saying is rather

3  than make this witness to go all the way through this whole

4  packet, he says those pages are in that packet.  He just made it

5  shorter by taking out those three pages to get to it quicker.

6          MS. PIERRE:  We understand, Your Honor.

7          THE COURT:  All right.  We're all on the same page as

8  Ms. Pierre?

9          MS. PIERRE:  Yes, Your Honor.

10          THE COURT:  All right.  Bring the jury back out.

11          (Whereupon, the jury is seated.)

12          THE COURT:  You-all can be seated.

13          MR. JOHNSON:  Can I have one quick second, Judge?

14  Sorry.

15          THE COURT:  Yes.

16          MR. JOHNSON:  I apologize.

17          THE COURT:  You may proceed, Mr. Johnson.

18          MR. JOHNSON:  Thank you.

19  BY MR. JOHNSON:

20  Q.  I'm going to call to your attention, please, Mr. Reyes, an

21  Exhibit 65 which is the entire report, page 1622 through 1625.

22  Hopefully that will make it easier.  I apologize for keeping you

23  waiting, or, Judge, thank you.

24      On the first page 1622, do you see where it goes from

25  July 9, 2018, to July 10, 2018?

1  **A.**   Yes, sir.

2  **Q.**   And the first entry on July 10, 2018 -- if you can go ahead

3  and put that up, please.

4     Can you tell the Court and jury how you know that is July 10,

5  2018?  In other words, it's a new shift?

6  **A.**   Yeah, the audit trail dictates the -- it time dates and stamps

7  every action or interaction that the device undertakes.

8  **Q.**   So if we look at the last entry of July 9, just so everyone

9  knows how it works, Officer Reyes, at 13 -- item number 13043,

10  that's the left-hand column?  Work over to the right, 7/9/18

11  at 3:47:38 -- 4:16 p.m.  Are you with me?

12  **A.**   On July 9?

13  **Q.**   Yes, sir.  What is the last July 9th entry on yours?

14  **A.**   On mine, it is line item 16892, July 9, 2018, at 8:55 p.m.,

15  device connected to data port power.

16        MR. JOHNSON:  Okay.  Take it off.  Thank you.

17  BY MR. JOHNSON:

18  **Q.**   On July 10, what is the first entry?  Time, please.

19  **A.**   That's line item 16893, July 10, 2018, 9 a.m. device

20  disconnected from data port power.

21  **Q.**   What does that mean?

22  **A.**   That it was disconnected from the docking stations which is

23  the primary way that the body cameras are charged and how it

24  uploads video evidence into cloud storage.

25  **Q.**   Is it turned on?

1 **A.**  The next item 616894, July 10, 2018, at 12:40 p.m., the camera

2 is powered on using the power switch.

3 **Q.**  And the time?

4 **A.**  That occurred at 12:40 p.m.

5 **Q.**  Officer Reyes, are you aware that on March 10, 2021, actually

6 ran the device audit trail for Mr. Grubbs on that date?

7 **A.**  I believe I was.

8 **Q.**  Can you tell the Court and jury why, on March 10, 2021, were

9 you asked by -- let me ask it differently -- anybody from internal

10 affairs to do that?

11 **A.**  No, sir.

12 **Q.**  Were you asked by counsel to do that?

13 **A.**  Yes, sir.

14 **Q.**  So the City of Atlanta, in particular the lawyers for Officer

15 Grubbs and the City itself, asked you 3/10/21 to do that?

16 **A.**  I believe that would have been the date.  Yes, sir.

17 **Q.**  And if I remind you, your deposition was April 6, 2021, that

18 would be about a month before we took your deposition?

19 **A.**  Yes, sir.

20 **Q.**  All right.  Can you help me to understand?  Were you the first

21 person to do this, to the best of your knowledge?

22 **A.**  I can't speak if I was the first person.  I just know that I

23 did it at that date.  I don't know if I was the first person to do

24 it or the only person to do it.

25 **Q.**  Well, is the system equipped -- I'm sure it is -- that every

1  time someone goes into look at it, you know who went in to look at

2  it and when?

3  **A.**  For the device audit trail?

4  **Q.**  Yes, sir.

5  **A.**  No.

6  **Q.**  Really?

7  **A.**  Right.  It would not be logged on the device audit trail, I

8  believe.  But it will be logged on the user's audit trail.

9  **Q.**  Okay.

10         MR. JOHNSON:  May I approach, please, Your Honor?

11         THE COURT:  Yes.

12  BY MR. JOHNSON:

13  **Q.**  I'm going to hand you what we propose to be Exhibit 35A, which

14  are snippets, et cetera, if you will, we call it excerpt records

15  from this audit trail, same AXON body 2, same serial number that

16  says that you ran on March 10, 2021.

17  **A.**  Right.

18  **Q.**  Okay.  That's what we were given at or about the time of your

19  deposition.  Do you remember talking about that with Mr. Radner?

20  **A.**  Yes.

21  **Q.**  You've reviewed your deposition, correct?

22  **A.**  Yes, sir.

23  **Q.**  Before trial?

24  **A.**  Yes, sir.

25  **Q.**  And you saw him asking questions about this document to you,

 1  generally speaking?

 2  **A.**   Yes, sir.

 3  **Q.**   All right.  Here is my question.  In Exhibit 35, the whole

 4  audit trail -- device audit trail for this body-worn camera, if

 5  July 10 starts on page 1626, and has different times than what you

 6  and I are currently discussing, do you have an explanation for why

 7  if you ran this on Grubbs camera, and gave us snippets, why it

 8  would be different than the entire Exhibit 35, the whole thing?

 9  **A.**   I'm not quite understanding your question, sir.

10  **Q.**   Okay.  If I showed you --

11          MR. JOHNSON:  May I approach, Judge?

12          THE COURT:  Yes.

13  BY MR. JOHNSON:

14  **Q.**   I'm going to show you, of Exhibit 65, page 1621 through 1628,

15  and if I'm looking at the first entry on Exhibit 35A --

16  **A.**   Right.

17  **Q.**   -- for July 10, 2018, it's at 12:35:01 camera powered on using

18  power switch on?

19  **A.**   July 10?

20  **Q.**   That's page 982.  Exhibit 35 the first July 10 entry for

21  whatever reason, this is page number 1629, is at 6:29:23, 2:08

22  p.m.?

23  **A.**   Can you walk me through which documents you're talking about

24  among these stack of documents here?  Because what I'm seeing here

25  is, I have two packets of paper for an audit trail for one device.

 1  **Q.**  Yes, sir.

 2  **A.**  35A is a completely different audit trail for a different

 3  audit device.

 4          THE COURT:  Hold on.  We have an objection.

 5          MS. PIERRE:  Your Honor, I'm requesting a side bar.

 6          THE COURT:  Okay.  What is it?  Can you just tell me

 7  what it is?  I asked what it is.

 8          MS. PIERRE:  There are two separate audit trails.  One

 9  is for Officer Grubbs and one is for Officer Shelley.  So

10  that -- that will be misinformation.

11          THE COURT:  All right.

12          MS. PIERRE:  We want to just clarify that.

13          THE COURT:  I agree.  That needs to be clarified.  Which

14  is which?  Do you know, sir?

15          THE WITNESS:  Offhand looking at this device, this

16  device number -- Exhibit 35A which lists device number X81208873

17  was a device that was assigned to Officer Grubbs.

18  BY MR. JOHNSON:

19  **Q.**  Okay.

20  **A.**  These two packets here list device -- a separate

21  device X81209416.  Based upon looking at the packet, it doesn't

22  say who the device was assigned to, because I don't have the

23  entire audit trail for this device.  This is a completely

24  different device.

25          THE COURT:  I want to make sure the jury gets this

```
 1  straight.  The last two documents you held in your hand, you don't
 2  know who that was assigned to?
 3          THE WITNESS:  Not looking at these packets of papers,
 4  no, sir.
 5          THE COURT:  You can't say it was Officer Grubbs or
 6  Officer Shelley or Officer Jones?
 7          THE WITNESS:  Right.
 8          THE COURT:  The only one you can say it is Officer
 9  Grubbs is 35A?
10          THE WITNESS:  Yes, because that is on the first page on
11  one of the first few items in 35A.
12          THE COURT:  So the testimony you have given regarding
13  record 35, is that pertinent to Officer Grubbs?
14          THE WITNESS:  I don't know.
15          MR. JOHNSON:  May I, Judge?
16          THE COURT:  Yes.
17          MR. JOHNSON:  Thank you.
18  BY MR. JOHNSON:
19  Q.  If we ask for the entire printout for Officer Grubbs and we
20  got Exhibit 35 which turns out to be Officer's -- Shelley's
21  camera, obviously we wouldn't know one from another; right?
22  A.  You would look for either the beginning of the
23  audit -- depending on how the body camera went and how it was
24  assigned, you could look on the audit trail to see who the device
25  was assigned to at a certain point in time, and then see that as
```

1  one of the line items in the device audit trail.

2      You match that up with what the serial number is for that

3  device --

4  **Q.**  Yes, sir I get it.  So my question to you is, if we didn't ask

5  for Shelley's entire printout, but we asked for Grubbs and got

6  Shelley's if this is what happened here, certainly, nothing you

7  knew about; correct?

8  **A.**  If you're only receiving partial information on any audit

9  trail --

10         THE COURT:  That's not the question he's asking you.

11  Say it again, Mr. Johnson.

12         MR. JOHNSON:  Sure.

13  MR. JOHNSON:

14  **Q.**  If the intention here was to give us the entire printout on

15  Grubbs, 35A, but we only got partial and the full printout goes to

16  Shelley, okay, are you aware -- did you do one for Shelley, too?

17  **A.**  I believe I did, yes.

18  **Q.**  Just so you know, I didn't know that.  So Exhibit 35 says it

19  was run by you on the same day, March 10, 2021 as well, true?

20  **A.**  Yes.

21  **Q.**  So if it turns out to be that Exhibit 35 is for Shelley --

22  which I didn't know, and I apologize -- this document, just not

23  35, could be run for Officer Grubbs just like we've talked about;

24  true?

25  **A.**  Yes.

1  **Q.**  I mean, it exists if someone wanted to push the button?

2  **A.**  Yes, an audit trail exists for every device.

3  **Q.**  Now let's deal with 35A.  Put it up, please, Anthony.  Excuse

4  me, not yet.

5          MR. JOHNSON:  Your Honor, I move for admission of 35A.

6  For right now I'm going to be dealing with pages 982.

7          THE COURT:  Let me ask you a question, Mr. Johnson, and

8  Ms. Pierre.  If 35 is Officer Shelley, is Shelley even relevant?

9          MS. PIERRE:  Well, not if --

10          THE COURT:  In other words, is there any evidence --

11  there have been questions about 35, testimony about 35, but if 35

12  is Shelley -- is it relevant now?  No.  I'll answer the question.

13  35 is not relevant.  It should be removed.  It should be struck.

14  35A sounds like it is relevant.  35 doesn't sound like it's

15  relevant at all.

16          I need to tell the jury how much consideration they

17  should give to 35, and right now I'm saying none.  Is there a

18  disagreement with that, Mr. Johnson, Ms. Pierre?

19          MS. PIERRE:  No, Your Honor.

20          MR. JOHNSON: Well, let me ask -- sorry, Judge.

21          THE COURT:  Go ahead.

22  BY MR. JOHNSON:

23  **Q.**  Let's get right to it.  In Exhibit 35A --

24          THE COURT:  I'm talking about 35 now.  How much

25  relevance should this jury give 35?

1          MR. JOHNSON:  Well, I think a lot.

2          THE COURT:  Why?

3          MR. JOHNSON:  Because it could exist.  We've asked for

4   it and should have gotten it.

5          THE COURT:  I'm talking about 35.  We're saying 35

6   belongs to Officer Shelley.

7          MR. JOHNSON:  Correct, because that's what we've asked

8   for.

9          THE COURT:  Why is it relevant?

10         MR. JOHNSON:  What is relevant is that it could be done

11  and it should be done, and it should be here, Judge.

12         THE COURT:  That doesn't make 35 relevant.  The jury has

13  to consider relevant evidence.  In other words, I understand you

14  got 35.

15         MR. JOHNSON:  Yes, Judge.

16         THE COURT:  And I understand you didn't know what you

17  were getting when you got it.  I'm not holding you responsible for

18  that.

19         MR. JOHNSON:  Thank you.

20         THE COURT:  What I am saying is that the jury has to

21  consider what is relevant and what I'm hearing right now, 35 is

22  not relevant.  35A is relevant.

23         MR. JOHNSON:  I agree, but I would just ask the Court

24  then if the City's position is that 35 is not Officer Grubbs' --

25         THE COURT:  That's what I'm hearing.  We know 35 is not

 1  Officer Grubbs -- wait a minute.  We don't know that.  Let's ask

 2  the question.

 3          MR. JOHNSON:  Thank you.

 4          THE COURT:  Officer Reyes, can you say Exhibit 35

 5  pertains to Officer Grubbs?

 6          THE WITNESS:  I can't determine 35 -- without having the

 7  full packet in front of me, no, I can't determine.

 8          THE COURT:  In that case, I can't say whether the

 9  testimony he's given to this jury and to me, to -- I'm saying 35

10  and the testimony was related to Officer Grubbs and to this

11  officer's honesty, I appreciate it, I can't accept it.

12          So 35, unless you can give me a reason, Mr. Johnson, I'm

13  going to tell the jury to disregard everything they heard

14  about 35.  35A, you are saying that 35A is Officer Grubbs?

15          THE WITNESS:  Yes, per this first page in the audit

16  trail, I can determine that it was assigned to Officer Grubbs.

17          THE COURT:  Tell me why 35 is relevant.

18          MR. JOHNSON:  What I want, Your Honor, to be relevant

19  are the questions about 35, not necessarily the physical

20  Exhibit 35, but that it could have been done, it should have been

21  done, and we still don't have it for Grubbs and we're here at

22  trial.  So I need to have it done right now.  If that's the

23  position of the City.  That is not the same.

24          MS. PIERRE:  Your Honor, they have what they asked for

25  Officer Grubbs.  As far as Exhibit 35, if the questions are

 1 referencing Exhibit 35 and Exhibit 35 is not relevant, then so are

 2 the questions.

 3          THE COURT:  All right.  Here is my ruling.  If the

 4 questions was asked dealing with Exhibit 35 is not relevant.  If

 5 the question was asked in general, should you not -- I can't

 6 remember all the questions you asked to check things.  I think

 7 that is relevant.  But any questions, ladies and gentlemen of the

 8 jury, that was asked directly involving Exhibit 35, that is not

 9 relevant.

10          I know this may be a little confusing.  So if any

11 questions, raise your hand.  If you-all understand it, we'll

12 proceed on right now.

13          A JUROR:  Are we talking about two different documents?

14          THE COURT:  Yes.  One more time.  Not the fault of Mr.

15 Johnson.  He thought Exhibit 35 was pertaining to Officer Grubbs.

16 Through the testimony now has come out, Officer Reyes is saying,

17 no, that's -- he said, he cannot say it is pertaining to Officer

18 Grubbs.  So at this point in time I'm telling you-all, any direct

19 questions that came -- regarding Exhibit 35, you are to disregard.

20          However, Mr. Johnson did ask him questions about

21 procedures in general that should or should not have been done,

22 those would be relevant.  And I can't make it any more specific

23 than that, because I can't really comment any more on the

24 evidence.

25          All of you are nodding your head, so I assume -- okay,

 1  we've got it.

 2          Now, you-all look at these exhibits closer, both sides,

 3  before you start offering them and accepting them.  We probably

 4  spent 35 minutes on an exhibit that is not even relevant.  Go

 5  ahead.

 6          MR. JOHNSON:  Judge, I would ask the Court -- an order

 7  that I get the device audit trail for what the City claims to be

 8  Mr. Grubbs' if -- since that is obviously what I've asked for and

 9  I --

10          MS. MILLER:  He already has it --

11          MR. JOHNSON:  May I finish, please?

12          THE COURT:  Let him finish.

13          MR. JOHNSON:  Thank you.

14          Since that's, obviously, what I asked for, what we

15  prepared for, and what we were asking questions of Mr. Reyes

16  about.

17          THE COURT:  We'll deal with that after the jury leaves

18  today.  Let's go ahead with questions.

19  BY MR. JOHNSON:

20  **Q.**  Mr. Reyes, can you tell me what is the best document that you

21  can think of or place for us to go, so between the City and us, we

22  can figure out serial number which one belonged to Shelley and

23  which one belonged to Grubbs?

24  **A.**  It would -- from these documents here?

25  **Q.**  Anywhere.

**A.**  It would be the device audit show for the device that was

assigned, and if you're talking about a specific incident, you can

then go to the video file itself at Evidence.com, determine what

device recorded that evidence and who was assigned to it at that

point, and then you can run the audit trail for that device.

**Q.**  So we happen to have, of course, the body-worn camera of

Officer Grubbs that was started after this event.  You've seen

that, correct?

**A.**  Yes.

**Q.**  On the day of the incident, obviously, with my client being

down by the electrical box, correct?

**A.**  No, I've not seen the video, no.  I have not reviewed the

video, no.

**Q.**  So my question is, if we were to start to play that video

right now which is something we have, would that give you the

information on the serial number so we know which one belongs to

Officer Grubbs?

**A.**  Yes.

**Q.**  Okay.

          THE COURT:  Let's stop it right here for the day.

          Ladies and gentlemen of the jury, you had a full day.

You're going to have a full day tomorrow.  We're going to start at

9 o'clock in the morning.  Again, I need you in the jury room

at 8:45.  I will outline the schedule we're going to be going on

for the rest of the trial.  Are there any questions from any of

 1  you-all at this time?  Thank you for being here.  See you in the

 2  morning at 9:00.

 3          (Whereupon, the jury was excused at 5 p.m.)

 4          THE COURT:  Officer Reyes, tonight do not discuss this

 5  case with anyone.  You be back here tomorrow morning to start your

 6  testimony back at 9 o'clock.  Between that time, the lawyers, you

 7  can talk to the lawyers, but they can't -- I prefer if none of the

 8  lawyers even talk to him, to be quite frank with you.

 9          MR. JOHNSON:  Thank you, Judge.

10          THE COURT:  So nobody talks to him.  You talk to nobody

11  about this case.  You be back here tomorrow morning at 9 o'clock.

12          THE WITNESS:  Yes, sir.

13          THE COURT:  The rest of you-all take a seat.  I need to

14  take up a matter with you guys on this 35.

15          You can go, Officer Reyes.

16          THE WITNESS:  Yes, sir.

17          MR. JOHNSON:  Thank you, Officer Reyes.  See you

18  tomorrow.

19          (Whereupon, the witness was excused at 5:01 p.m.)

20          THE COURT:  Mr. Johnson, there is something the Court

21  needs to ask you.  Are you -- the way your testimony is going, I

22  mean, your questioning is going, you're saying to this jury -- I'm

23  interpreting it to mean is that there is a possibility that

24  Officer Grubbs turned off his camera intentionally.

25          MR. JOHNSON:  Correct.

1          THE COURT:  Is that -- are you alleging that as well for

2   Officer Shelley?  Shelley is an officer that was on the scene;

3   right?

4          MS. PIERRE:  Yes, Your Honor.

5          THE COURT:  Are you saying Shelley -- the reason I'm

6   asking, if you are also alleging that for Shelley, then 35 also

7   might become relevant.  From the questioning, though, the way I'm

8   hearing it, it's like you're going that way.  It looks like you're

9   going to Grubbs turned his off.  All your questions -- you never

10  asked one question for the past hour and a half about Shelley at

11  all.

12         MR. JOHNSON:  Right, I'll get there.  But correct.  The

13  answer to your question is, we know that Officer Shelley did shut

14  off his camera, he shut off his camera while he was speaking with

15  the paramedic, which --

16         THE COURT:  I understand before you -- the event had

17  occurred.  I'm saying --

18         MR. JOHNSON:  After the event, but before the event had

19  finished and Officer Reyes talked about that being a violation in

20  his deposition.  So I could go that way.  I might.  I might not.

21  I just need to know what I'm dealing with in terms of the audit

22  trail, Judge.

23         THE COURT:  Well, I need to know.  I just told the jury

24  to disregard what is in 35, because all your questions have

25  pertained to Officer Grubbs.

1          MR. JOHNSON:  Correct.

2          THE COURT:  If you're saying you've got further

3  questioning for this officer that this is going to go in, to say

4  that Officer Shelley possibly turned his off intentionally, they

5  should have investigated Shelley as well, we've got something else

6  that might make it relevant.

7          MR. JOHNSON:  And it's something that was discussed with

8  Mr. Reyes before.

9          THE COURT:  Here is my question.  Is that what you're

10  going to go towards or into with Officer Reyes?

11          MR. JOHNSON:  I planned on it.  Yes, sir.

12          THE COURT:  Okay.  Well, then you have -- then we need

13  to correct it then.  They did not give you bad information,

14  because that's the impression you left with this jury that said

15  Atlanta gave you bad information.  So I need to correct that

16  tomorrow.  If I say it is relevant, I have to correct that they

17  did not give you bad information.  They gave you information on

18  Shelley which you said you needed or will need.

19          MR. JOHNSON:  Judge, here is where I'm at.  Exhibit

20  35A -- proposed Exhibit 35A when we took this gentleman's

21  deposition, this is what was produced.  Three pages.  And then we

22  shared that with our experts, of course, we find out that we

23  should have gotten this.  Exhibit 35, only for the right TASER®.

24  So we asked in follow-up for the entire printout of the device

25  audit trail for Officer Grubbs.  I don't know.  I don't remember

 1  asking for Shelley, but if that's what is going on -- I'm not

 2  saying it is intentional, but obviously, we need to get to the

 3  bottom of it and someone needs to know which is whose, right?

 4          THE COURT:  I think we're talking about two different

 5  things.  I'm going to get into 35A.  What you're saying is two

 6  different things.  You're saying we really didn't ask for Shelley.

 7          MR. JOHNSON:  I just said that I don't know that I did.

 8  I'm being honest with you.

 9          THE COURT:  Where is the interrogatories request?  That

10  will tell whether you asked or not.  Because you're saying two

11  different things.  You're saying we're probably going to say

12  Shelley turned his off intentionally, too.  And you said we didn't

13  ask for Shelley, we asked for Grubbs.  That is entirely two

14  different things.  I want to do 35A.  I'm not disagreeing with

15  you.  You probably should have gotten all that you asked for in

16  35A.  I'm just trying to tell you what to do with 35 at this

17  point.

18          MR. JOHNSON:  May I go off and get this exhibit?

19          THE COURT:  Hold on, Mr. Tobin.  I may have to call the

20  judges in Coweta County.  You're going to be in Coweta County.

21  Don't worry.  I assure you of that.

22          MR. JOHNSON:  I didn't hear the Court.

23          THE COURT:  I was saying to Mr. Tobin, jokingly, he

24  indicated he has a trial in Coweta County, Georgia, on the 29th

25  and 30th.  I was joking and saying, "I don't know, I may have to

 1  call the Superior Court and say that, 'I assure you, he's going to

 2  be in Coweta County on the 29th and 30th.'"  I can't guarantee too

 3  many things, but I can guarantee you that.  I don't want you

 4  sweating that out.

 5         MS. PIERRE:  Your Honor, can I be heard?

 6         THE COURT:  Yes, ma'am.

 7         MS. PIERRE:  It appears Mr. Johnson mixed up both of

 8  those audit trails.  They have different Bates number.  We

 9  provided them with everything that they asked for.  There is a

10  reason why we have Bates label so documents can be identified.

11  For example, when they provided us with the documents to review,

12  there were two medical records that were attached to the bottom of

13  Exhibit 35.  I want the record to be clear the mix-ups is on their

14  part.

15         THE COURT:  You're saying the City of Atlanta gave the

16  plaintiffs everything they asked for?

17         MS. PIERRE:  Yes, Your Honor.

18         MR. JOHNSON:  That's blatantly not true.  We'll learn

19  during trial there are a number of things we never received that

20  we've asked for.  They claim they did; we don't.  But we'll be

21  talking about it when it arises --

22         THE COURT:  Let's deal with 35 now.  Can you look and

23  see if you have for Grubbs?  Maybe I shouldn't have let Reyes go.

24         MR. JOHNSON:  I was told 35A is Grubbs, Judge.

25         THE COURT:  You also thought 35 was Grubbs.

1          MR. JOHNSON:  But the witness said it, too.  To be fair,

2     the witness didn't pick up on it either.  Before we start blaming

3     Johnson, the witness said it.

4          THE COURT:  I'm not blaming Johnson --

5          MR. JOHNSON:  Well, sister counsel has.

6          THE COURT:  There is nothing for me to order them to

7     give you.  They said they've already given it to you.

8          MR. JOHNSON:  Well, they stipulated to the entry of it

9     after we laid the foundation that it was Grubbs' TASER®.  I'm not

10    blaming anybody but I'm not going to sit here and get blamed if it

11    is not just me.

12         THE COURT:  There is nothing for me to order them to

13    give you, if they've already given it to you.  Is that what you're

14    telling me, Ms. Pierre?

15         MS. PIERRE:  Yes, Your Honor.  We had also provided the

16    exhibit list as well.

17         MR. JOHNSON:  Judge, I am telling you, Ms. Hatchett can

18    confirm.  We do not have a full audit trail for -- which is 35A --

19    X81208873.  The full audit trail that we have -- which is 35 -- is

20    X81209416.  So all we really need the City to do is tell us which

21    is which, let's get it right and move on.

22         THE COURT:  They said they sent it to you.

23         MR. JOHNSON:  They didn't.

24         MS. PIERRE:  Your Honor, we have no issues with showing

25    them again.  We can show it again.

1          MR. JOHNSON:  I want the full audit trail, please, for

2    Grubbs.  Thank you.

3          THE COURT:  At this point in time, I'm not ordering

4    anything.  Obviously you-all can show him that you have already

5    given it to him.

6          MS. PIERRE:  Yes, Your Honor.

7          THE COURT:  All right.  Anything else?

8          MS. PIERRE:  Nothing further, Your Honor.

9          THE COURT:  Nothing still showed me that what he

10   requested this of Officer Shelley.  If he requested it for Officer

11   Shelley and Mr. Johnson's position now is that he's also saying

12   Officer Shelley, possibly intentionally, turned off his camera,

13   then that might make it relevant.

14         MS. HATCHETT:  I'm looking for that now, Your Honor.

15         THE COURT:  Okay.

16         MS. MILLER:  Yes, Your Honor.  May I approach and show

17   you where it is?  It is in their fourth request for production of

18   documents.

19         THE COURT:  What does it say?  There is a request of

20   Officer Shelley?

21         MS. MILLER:  Yes, Your Honor.

22         THE COURT:  In that case, then, tomorrow then, Mr.

23   Johnson, it is your position that you're going to question this

24   witness about a possibility of Officer Shelley intentionally

25   turning off his camera as well?

1          MR. JOHNSON:  Yes.

2          THE COURT:  If he does that, then it becomes relevant.

3   35 becomes relevant.  If he stands in his place as an officer of

4   the Court and he's saying he's going to -- that he requested that

5   because he's going to do the same thing with Officer Shelley that

6   he's doing with Officer Grubbs.

7          MR. JOHNSON:  Only as it pertains with the discussion

8   for EMS, so the Court knows.  Your Honor, I would still like to

9   address the full printout.

10          THE COURT:  All right.  Thank you, you-all.  You have

11   something else?

12          MR. JOHNSON:  Yes.  I don't have the full printout  for

13   X812088173.  I have --

14          MS. MILLER:  Mr. Johnson?

15          MR. JOHNSON:  Yes.

16          MS. MILLER:  Officer Grubbs' audit trail is Blasingame

17   COA 441 through 1006.  Shelley's device audit trail is Blasingame

18   COA 1007 through 1665.  Those are the documents that you have and

19   you had mixed them up in some kind of way to include Shelley with

20   Grubbs.  We have, right here, the document that we received from

21   you-all, Exhibit 35 goes from 441 to 1006.

22          THE COURT:  Do they acknowledge receiving that in some

23   way?

24          MS. MILLER:  This is what they gave us.  And so --

25          MR. JOHNSON:  Excuse me.

1          MS. HATCHETT:  We just gave them that today when you

2     asked for that full thing, we handed them that copy that said

3     Exhibit 35.

4          MR. JOHNSON:  Exhibit 35.  Show me the full audit trail

5     for Grubbs.

6          MS. MILLER:  This is it.  441 through 1006.  You

7     mentioned something 1626, or some other number, that started with

8     a 16, that is Shelley's.  So somehow you or your team put that

9     document in the wrong file, and that's what we're trying to get to

10    the bottom of.

11         THE COURT:  So Mr. Johnson gave you what is in your hand

12    which is the audit trail for Officer Grubbs?

13         MS. MILLER:  Yes.

14         MR. JOHNSON:  Is that Exhibit 35?

15         MS. MILLER:  Yes.

16         MR. JOHNSON:  That's Exhibit 35 that counsel has just

17    told is not Officer Grubbs.  It's Officer Shelley's.

18         MS. MILLER:  No, no, Mr. Johnson.  I want to be very

19    clear --

20         MR. JOHNSON:  That's what you said in front of the jury.

21    Yes, you did.

22         MS. MILLER:  When you asked Reyes about a document, it

23    started with 16 something.  I don't know what the number was.

24    That is not part of 35.  So that is not Exhibit 35.  As I said

25    before, There's a mix-up and we're trying to get to the bottom of

1   it.

2           MR. JOHNSON:  Thank you.  Why don't we try talking to

3   one another, and not blaming each other.  Is that cool?

4           MS. MILLER:  That's absolutely fine.  Whatever the 16

5   number was, that is Shelley.

6           THE COURT:  Hold on.  Hold on.  Talk to me.

7           MS. MILLER:  Yes.

8           THE COURT:  What you have in your hand is Officer

9   Grubbs' audit trail?

10          MS. MILLER:  Yes, Your Honor.

11          THE COURT:  You received that from Mr. Johnson today?

12          MS. MILLER:  Yes, Your Honor.

13          THE COURT:  And you-all gave to Mr. Johnson earlier?

14          MS. MILLER:  Yes, Your Honor.

15          THE COURT:  I'm trying to figure out which one is 35.

16  Is 35 the other one that Officer Reyes had up here?

17          MS. MILLER:  That is what we're confused about.  This is

18  what we received as 35.  But when he started asking questions he

19  referred to Bates number 16 something.  That is a separate exhibit

20  and that is Shelley.  So we don't know how that page got into

21  whatever he was showing Reyes because it's not in this file.

22          THE COURT:  This is simple.  Do you-all have an extra

23  copy of what you got in your hand?

24          MS. MILLER:  Do we have an extra copy?

25          THE COURT:  You said you got that from Mr. Johnson.  Mr.

1   Johnson needs to put that into evidence.

2           MS. MILLER:  Yes, Your Honor.

3           THE COURT:  That should be 35A.  The three pages you

4   have and that should be put together for 35A for Officer Grubbs

5   in -- if Mr. Reyes identified that as Officer Grubbs tomorrow.

6   And then the other 35, Shelley is going to be still 35, I'm going

7   to tell the jury, well -- you're telling me as an officer of this

8   Court you're going to ask questions about Shelley turning them

9   off.

10          If so, I'm going to tell the jury 35 becomes relevant

11  because there is going to be questioning about Shelley.  But I

12  don't want to tell the jury that if you are not going to do that.

13          MR. JOHNSON:  I understand.  What I would like to do is

14  confer.  I still don't get what's going on, very candidly.  But

15  the fact of the matter is, I will be happy to clean the whole

16  thing up and take full responsibility tomorrow.

17          THE COURT:  I'm not trying to put responsibility or

18  blame on anybody.  I'm just trying to make it clear for this jury.

19  It is to your advantage and their advantage.

20          MR. JOHNSON:  I'll tell the Court this.  Since I'm only

21  concerned about Shelley turning it off while he's talking to EMS

22  I'll probably just put in the day of 7/10, probably.  So I don't

23  need -- whatever the exhibit is going to be for Shelley's

24  download, his audit trail, I don't need all of that, Judge.

25  That's not what I'm trying --

1              THE COURT:  Thank you.

2              MR. JOHNSON:  I apologize to the Court.

3              THE COURT:  You don't need to apologize.  You don't need

4    to apologize, Ms. Pierre doesn't need to apologize.  These things

5    happen in trials.  I don't want to say it's no big deal, it is

6    important.

7              MR. JOHNSON:  It is important.  I apologize.

8              THE COURT:  I just want the jury to have a clear

9    understanding of what is what.

10             MR. JOHNSON:  Yes, Judge.

11             MS. MILLER:  Can it be also made clear to the jury that

12   the City of Atlanta has not withheld anything?

13             THE COURT:  I think you have to do that, Mr. Johnson.

14             MR. JOHNSON:  I promise I will once I figure it out

15   myself.

16             MR. DEARING:  Your Honor, it should come from --

17             THE COURT:  It will be coming from me.

18             MR. JOHNSON:  Well, I will do it as well.

19             THE COURT:  You should do it, but it will be coming from

20   me.  I will see you all in the morning at 9.  Have a good evening,

21   everybody.

22             (Whereupon, the trial concluded at 5:16 p.m.)

23

24

25

1                        C E R T I F I C A T E

2

3    UNITED STATES DISTRICT COURT

4    NORTHERN DISTRICT OF GEORGIA

5

6        I do hereby certify that the foregoing pages are a true and

7    correct transcript of the proceedings taken down by me in the case

8    aforesaid.

9        This the 22nd of September, 2022.

10

11

12

13

14                        /s/Viola S. Zborowski _____
                          VIOLA S. ZBOROWSKI,
15                        RDR, FAPR, CMR, CRR, RPR, CRC
                          OFFICIAL COURT REPORTER TO
16                        THE HONORABLE STEVE C. JONES

17

18

19

20

21

22

23

24

25