**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA**

KEITH EDWARDS as Guardian and
Conservator for JERRY BLASINGAME,    .
.
    Plaintiff,    .
.
.
.    Case No. 1:19-cv-2047-SCJ
v.    .
.
OFFICER J. GRUBBS, #6416,    .
 and CITY OF ATLANTA/    .
ATLANTA POLICE DEPARTMENT    .
.
.
    Defendants.    .

---

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR RELIEF
FROM JUDGMENT OR, IN THE ALTERNATIVE, REMITTITUR OF
PUNITIVE DAMAGES AWARD**

---

Now Comes Plaintiff, Keith Edwards, as Guardian and Conservator for Jerry Blasingame, by and through his counsel, Johnson Law, PLC, in response to what Officer Grubbs has styled as a motion for relief from judgment. Regardless of the label Defendant has affixed to this motion, it is a motion for remittitur pursuant to either Fed. R. Civ. P. 50 or 59 that has been untimely filed. Not only is this motion fatally tardy, but it is also filed at a time where this Court lacks jurisdiction over the issues raised by virtue of Defendant's appeal that is currently pending in the 11th Circuit. Consequently, this motion should be denied on procedural grounds.

1

Moreover, had this motion been timely filed while this Court had jurisdiction over the questions presented, it would nonetheless be without merit. The jury's award of punitive damages in this case was supported by the evidence and is not legally or constitutionally suspect when viewed against the backdrop of the controlling authority. As a result, Plaintiff respectfully requests this Honorable Court deny Defendant's motion in all regards.

## STATEMENT OF FACTS

This case arises from the defendants' use of excessive force against then 65-year-old. Jerry Blasingame ("Mr. Blasingame"). In trial, Defendant Officer Jon Grubbs ("Grubbs") and his then partner Officer Keith Shelly ("Shelley") agreed that when this ill-fated encounter began on July 10, 2018, Mr. Blasingame was seen along the shoulder, not crossing the roadway (contrary to what Grubbs previously claimed) (Tr. Trans. pp 770-771, 1087). The officers were in the area of Windsor Street on I-20 to investigate panhandling. Shelley drove and Grubbs was in the passenger seat of their patrol car. Grubbs described in his report and on the stand that Mr. Blasingame began to run along the shoulder of the highway when he and his partner initially pulled up. Yet, Grubbs took off across two lanes of traffic to chase after Mr. Blasingame along the shoulder (Tr. Trans. pp 770-771, 1087). Neither Shelley nor Grubbs ever called in the pursuit (Tr. Trans. pp 840, 1127-1128).

2

In fact, the first radio communication received from Shelley or Grubbs was *after* Mr. Blasingame had been tased and injured.

Further down, Mr. Blasingame crossed over a guardrail that bordered the shoulder at the top of a hill. As Mr. Blasingame began to descend the hill, Grubbs deployed his taser into Mr. Blasingame's back, without providing any verbal warning and while admitting that Blasingame posed no threat (Tr. Trans. pp 1065, 1089). The taser predictably forced his body to fall forward down the hill. Mr. Blasingame's fall was unfortunately broken when his head slammed into the concrete that platformed a utility box at the bottom of the hill, resulting in him being a quadriparetic.  As explained at trial, when someone is struck with a taser, their arms and legs "lock up" and you are prevented from protecting yourself from a fall.  (Tr. Trans. p 1150.) Thus, Plaintiff was helpless as he fell down the incline.

After finding Mr. Blasingame unresponsive, Grubbs turned his body worn camera (BWC) off, which erased the two minutes captured in buffering mode (Plaintiff's trial exhibit 35A, pgs. 0982-0986). Thus, no footage of the tasing was recovered from his body camera. While Grubbs and his partner each testified that they were not told in training that toggling the switch off would delete the stored footage. Julio Rayis, the City's Rule 30(b)(6) witness testified that such training was provided to officers and that Grubbs's conduct amounted to a policy violation (Tr. Trans. pp 255-260).

Though Defendant seemingly concedes the severity of Mr. Blasingame's damages, trial testimony confirmed that Mr. Blasingame experiences pain daily (Tr. Trans. p 1212). He suffers from chronic pain, depression and suffered a traumatic brain injury (Tr. Trans. p 1232). Those issues are unlikely to ever improve (Tr. Trans. 1233). He is reliant on using both a trach and a feeding tube, and that is unlikely to ever change (Tr. Trans. p 1306). In short, Mr. Blasingame will live in a facility as a quadriparetic for the remainder of his life and will suffer for the entirety of it. Defendant does not argue otherwise.

Trial began in this case on Wednesday, August 17, 2022, and continued through Friday, August 26, 2022, when the jury reached their verdict. Of the seven days it took for the parties to put in their proofs, Plaintiff took four days on the issue of liability alone. Plaintiff established through his unrebutted experts, Dr. Andrew Scott and former chief of police (Plaintiffs trial exhibit 60) and Chief Tom Tiderington (Plaintiffs trial exhibit 64), that Defendant Grubbs was unreasonable in his use of lethal force, without warning, on an elderly, fleeing, non-violent, non-felon who posed no threat (Tr. Trans, pp 456, 1147-1148)

At the close of proofs, the parties proceeded to their closing arguments. During Plaintiff's closing, counsel explicitly addressed both compensatory and punitive damages (while only punitive damages are challenged in this motion, compensatory damages are relevant to the applicable analysis as will be discussed

4

in the argument section of this response). First, counsel began by asking for the jury to award Mr. Blasingame $22 million for past and future economic damages, in the form of medical bills already incurred as well as those that would be incurred in the future. Plaintiff then addressed non-economic damages, asking the jury to award Mr. Blasingame $10 million per year, *from each Defendant*, for the prior four years of pain and suffering. Turning to future non-economic damages, Plaintiff likewise requested $10 million per year, *from each Defendant*, for each and every year the jury believed Mr. Blasingame would be alive in the future. Counsel informed the jury that it was for them to decide how long into the future Mr. Blasingame should be awarded damages, while noting that some evidence at trial suggested a period of eight years would be proper while other evidence from the CDC indicated that 14 years would be proper. Using those ranges, that indicates that Plaintiff requested a range of roughly $160 to $280 million in future non-economic damages. Then, lastly, Plaintiff requested $50 million in punitive damages as to Defendant Grubbs. In doing so, Plaintiff informed the jury of the applicable standard and argued that Defendant Grubbs showed reckless disregard for Mr. Blasingame and that his ill intent was evident in the destruction of the body cam footage that captured the relevant events. Thus, in total, Plaintiff argued for an award in the range of $312 million to $432 million. (Tr. Trans. pp 1576-1581.)

Defendants then had their opportunity for their closing argument. The Court will see that in that closing argument, Defendants did not try to diminish the damages, either economic or non-economic, suffered by Mr. Blasingame. Instead, consider the following passage:

> Should Mr. Blasingame be awarded -- I think it was $100 million for the actions that he engaged in that day? If we were only to look at the consequences and the injuries, maybe. However, if we look at the actions and the consequences, I believe that you will agree with me that he should not. [Tr. Trans. p 1593.]

After Defendant's admission that $100 million was not an unreasonable sum when considering the nature of the damages suffered, counsel argued that such an award would be improper *not because it was monetarily excessive* but because Grubbs did not act unreasonably. Contrast that admission with the present motion, in which Defendant asserts that the $20 million compensatory damage award relative to Grubbs is more than adequate to cover Mr. Blasingame's damages and deter future wrongdoing (despite the fact that the medical expenses alone exceed that sum). Defendants did not address the subject of punitive damages during their closing.

Following closing arguments, this Court instructed the jurors prior to deliberations. Included in those instructions were thorough descriptions of both compensatory and punitive damages. The Court began by telling the jury that "[i]f you find that Jerry Blasingame has proved more than a minimal physical injury, then you must consider his claims for compensatory and punitive damages." (Tr. Trans.

p 1608.) This Court then proceeded to explain the nature, purpose and propriety of compensatory damages. Thus, the jury understood what those damages were designed to do. (Tr. Trans. pp 1608-1609.)

Following the instructions on compensatory damages, the Court instructed the jury on punitive damages. It stated that "Now, ladies and gentlemen of the jury, if you find for plaintiff and find that the defendant Officer Grubbs acted with malice or reckless indifference to Jerry Blasingame's federally-protected rights, the law allows you in your discretion to award plaintiff punitive damages as a punishment for defendant Officer Grubbs and as a deterrent to others." (Tr. Trans. p 1609.) The Court then proceeded to explain that Plaintiff had the burden of proof on punitive damages and also explained the concepts of malice and reckless indifference for the jury so they understood the standard to apply. (Tr. Trans. pp 1609-1610.) Taken together, this was a jury that understood what each category of damages was designed to do, understood Plaintiff had the burden, and knew what Plaintiff had to legally prove to sustain that burden.

The jury was then released the deliberate. The first question on the jury verdict form asked the jurors whether "Jerry Blasingame was subjected to excessive or unreasonable force by Defendant Officer Jon Grubbs?" The jury unanimously responded "yes." Question 7 asked the jury whether it found, by a preponderance of the evidence, "That Plaintiff has proved that an official policy or custom of the City

7

of Atlanta was the moving force behind Jerry Blasingame's injuries?" Again, the jury unanimously answered "yes." The jury awarded Plaintiff $60 million in compensatory damages against the City of Atlanta. The jury also found that Mr. Blasingame was "subjected to excessive or unreasonable force by Defendant Officer Jon Grubbs" and accordingly awarded $20 million each in both compensatory and punitive damages against Grubbs.  In total, the jury therefore awarded Plaintiff $100 million- a fraction of the sum requested by Plaintiff and the exact sum that Defense counsel provided to the jury.

Subsequently, Defendants renewed their motion for Judgment as a Matter of Law regarding Plaintiffs' claims against both the City of Atlanta and Defendant Grubbs. This Court ultimately granted the motion as it related to the City's liability (a ruling which is at issue in Plaintiff's pending motions for relief from order pursuant to Fed. R. Civ. P. 60(b)) and denied the motion as it related to Defendant Grubbs.  The Court entered its judgment, consistent with those rulings, on September 22, 2022.  On the same day, Defendant Grubbs filed his claim of appeal to the 11th Circuit.  At the time of this writing, that appeal remains pending.

Now, Defendant Grubbs files this motion, which purports to be pursuant to Fed. R. Civ. P. 60. As is detailed below, this motion is actually governed by the standards found in Fed. R. Civ. P. 50 and 59 and is fatally tardy.  Additionally, the motion was filed after this Court was divested of jurisdiction by the filing of

Defendant's notice of appeal. And finally, while this motion should be denied on each of those procedural grounds without regard to the substance of Defendant's argument, it is likewise apparent that there is no merit to Defendant's argument. This motion must be denied in all regards.

## LEGAL STANDARD

As is explained below, despite Defendant's title of this motion, the 11th Circuit's controlling precedent, this motion is governed by Fed. R. Civ. P. 50 and Fed. R. Civ. P. 59.

## LAW AND ARGUMENT

I.    **Defendant's motion was not timely filed and is not properly before this Court**

Defendant's motion is untimely. While Defendant has styled its motion as being brought pursuant to Fed. R. Civ. P. 60, he has not cited to a single 11th Circuit opinion that applies that rule to the arguments presented in this motion. Instead, it is apparent that there are two different rules that Defendant could have proceeded under but that he failed to timely do so.

Defendant's motion contends that the award of punitive damages was excessive and unconstitutional and is thus subject to remittitur. In other words, Defendant is asking this Court to amend the judgment it entered on September 22, 2022, in order to reduce the size of the punitive damages the jury awarded Plaintiff. Fed. R. Civ. P. 59(e) provides that "[a] motion to alter or amend a judgment must be filed no later

9

than 28 days after the entry of the judgment."  Thus, Defendant had until October 20, 2022, to timely file this motion. The motion was not filed until December 23, 2022, which was more than two months after the applicable deadline.

That Defendant claims his motion is proper pursuant to Fed. R. Civ. P. 60 is of no import. As the 11th Circuit has explained, "[i]n determining whether a motion is brought under Rule 59, we look beyond the form of the motion to the substance of the relief requested. Where the motion requests a substantive change in the district court's judgment or otherwise questions its substantive correctness, the motion is a Rule 59 motion, regardless of its label." *Gulf Power Co v Coalsales II, LLC*, 522 F App'x 699, 709 n 15 (11th Cir, 2013) (quoting *Yost v. Stout*, 607 F.3d 1239, 1243 (10th Cir. 2010) (citations and internal quotation marks omitted)). Here, Defendant is asking for this Court to substantively change the judgment by striking $20 million from it.

Plaintiff acknowledges that one portion of Defendant's argument alleges that the punitive damage award at issue in this motion is unconstitutional.  The 11th Circuit has held that when there is an argument that a judgment must be reduced to comply with constitutional limits, the District Court's authority derives from Fed. R. Civ. P. 50, instead of the typical avenue of Fed. R. Civ P. 59.  *Johansen v. Combustion Eng'g, Inc*, 170 F.3d 1320, 1331 (11th Cir., 1999).  As the Court will see, the cited portion of *Johansen* leaves no question that remittitur is typically governed by Rule

59, but that Rule 50 controls where the argument is premised on constitutional principles. The distinction in the present case does not solve Defendant's timeliness problem, however, as Fed. R. Civ. P. 50(b) likewise provides that any post-trial motion under that rule must be filed within 28 days of the judgment.

All of the arguments contained in Defendant's motion are controlled by either Rule 50 or Rule 59 and each of those rules imposes a 28-day deadline on the moving party. This motion was due no later than October 20, 2022, and was unquestionably untimely by more than two months. Defendant has presented no authority to the contrary. The motion must be denied.

II.    **This Court lacks jurisdiction over the issues presented in this motion**

Not only is Defendant's motion untimely, but it was also filed after this Court ceased having jurisdiction over this matter. As the 11th Circuit has explained, "'[t]he filing of a notice of appeal is an event of jurisdictional significance — it confers jurisdiction on the court of appeals and divests the district court of its control over the aspects of the case involved in the appeal.'" *United States v. Tovar-Rico*, 61 F.3d 1529, 1532 (11th Cir. 1995) (quoting *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58, 103 S. Ct. 400, 402, 74 L. Ed. 2d 225 (1982)). Consequently, "the district court is divested of jurisdiction to take any action with regard to the matter except in aid of the appeal." *Shewchun v. United States*, 797 F.2d 941, 942 (11th Cir. 1986) (internal quotation marks omitted).

11

As is explained above, Defendant had 28 days following the entry of judgment to file a motion under either Rule 50 or Rule 59 and he elected not to do so. Instead, on the same day that the judgment was entered, September 22, 2022, Defendant instead chose to file his notice of appeal. Recall, Defendants had already filed post-trial motions relative to the verdicts entered against both the City of Atlanta and Defendant Grubbs (which made no argument regarding the propriety of punitive damages). Once this Court vacated the award of $60 million in compensatory damages entered against the City and denied the motion relative to Defendant Grubbs, Defendant appealed, as was his prerogative. He cannot, however, maintain an appeal in the 11th Circuit (as he is currently doing) while at the same time attacking the substance of the judgment in this Court. And again, like with the argument above regarding timeliness, Defendant offers this Court no authority to establish that jurisdiction is proper. Instead, it places this motion in front of the Court with total silence regarding the glaring procedural issues that exist here.

Because this Court does not have jurisdiction over the substance of this matter while the appeal is pending, this motion must be denied for reasons beyond its untimeliness.

III.    **<u>Defendant is not entitled to any reduction of the jury's punitive damage award to Plaintiff</u>**

As is demonstrated above, Defendant has filed an untimely motion in a court divested of jurisdiction. This motion should be denied accordingly. For the sake of

completeness, however, Plaintiff will address the substance of Defendant's contention that the punitive damage award against Defendant Grubbs was excessive and unconstitutional.

At the outset, it must be noted that Defendant's motion is devoid of any reference to the jury instructions provided in this case. "The 'rule' -- indeed, the premise upon which the system of jury trials functions under the American judicial system -- is that juries can be trusted to follow the trial court's instructions." *Parker v Randolph*, 442 U.S. 62, 75 n 7; 99 S. Ct. 2132; 60 L. Ed 2.d 713, 724 (1979). This jury was thoroughly instructed regarding the law of damages and there is no argument that those instructions were incorrect, nor is there an effort to show that the jury disregarded those instructions. Instead, Defendant's argument is, at its heart, a mere disagreement with the jury's conclusion.

## A. The punitive damage award is not excessive

As the 5th Circuit has previously stated in an opinion binding upon this Court,

> In order for an award to be reduced, "the verdict must be so gross or inordinately large as to be contrary to right reason." *Machado v. States Marine-Isthmian Agency, Inc*., 411 F.2d 584, 586 (5th Cir. 1969). The Court "will not disturb an award unless there is a clear showing that the verdict is excessive as a matter of law." *Anderson v. Eagle Motor Lines, Inc*., 423 F.2d 81, 85 (5th Cir. 1970). The award, in order to be overturned must be "grossly excessive" or "shocking to the conscience." *La-Forest v. Autoridad de las Fuentes Fluviales*, 536 F.2d 443 (1st Cir.1976). [*Del Casal v. Eastern Airlines, Inc*., 634 F.2d 295 (5th Cir. Unit B 1981).]

In alleging that the punitive damage award at issue in this motion must be reduced

13

under the high standard standard set forth above, Defendant argues that the award should be reduced for three reasons, which will be discussed in turn below.

### 1. The compensatory damages award is not a sufficient deterrent

Defendant first contends that this Court should examine whether the compensatory damage award, by itself, is sufficient to deter future conduct like that which injured Mr. Blasingame. Defendant directs this Court to the Supreme Court's statement that "It should be presumed a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence." *State Farm Mut Automobile Ins Co v Campbell*, 538 US 408, 419; 123 S Ct 1513; 155 L Ed 2d 585, 602 (2003).

The presumption of the sufficiency of compensatory damages described by the Supreme Court has been overcome in this case already, by Defendant's own admission. Defendant's motion to this Court admits that Plaintiff's medical expenses alone exceeded $20 million, which does not account for any of the pain and suffering that Mr. Blasingame has experienced and will continue to experience for the remainder of his life. It was for that reason that defense counsel stated in closing arguments that $100 million might be a fair assessment of damages in this case *if* liability was proper. The jury determined liability was proper, and that

14

determination is not at issue in this motion.

Inviting this Court to reduce this judgment by an additional $20 million, leaving only $20 million remaining in total, completely eliminates the voice of this community, which determined that the punitive damage award was necessary to deter future acts like these. Notably, that jury made that determination even when it believed that Mr. Blasingame would be receiving $80 million in compensatory damages. There is no reason to believe that a compensatory damage award of $20 million would have any deterring effect where the Defendant himself knows that the damage he caused was far in excess of the ultimate judgment. That is particularly true when dealing with a Defendant who is still on the force and who incurred no significant discipline from the City for his unconstitutional conduct.

Defendant's reference to *Simmons v Bradshaw*, Case No. 14-80425-CIV (S.D. Fla. 2016) when making this argument is particularly troubling, and counsel does not use that term cavalierly. In *Simmons*, the Plaintiff was awarded more than $23 million after being shot multiple times by an officer. Defendant cites that case and claims that because the Plaintiff in that case did not get punitive damages, Mr. Blasingame should not either. In support of that claim, Defendant directs this Court to two documents from the case- the second amended complaint (Doc. 37) and the jury verdict form (Doc 287). That verdict form does not contain the word punitive anywhere within it. Not a single piece of evidence provided to this Court shows that

15

the Plaintiff in *Simmons* asked the jury for punitive damages at trial or that the Defendant in that case engaged in the type of conduct that legally supports a punitive damages award. Defendant, *the moving party*, has done nothing to show that *Simmons* is analogous to this case beyond the fact that the Plaintiffs in both cases suffered similar diagnoses.  Indeed, when the case went to the 11th Circuit (which was not addressing remittitur), the Court stated that "[m]ost of the facts giving rise to this case are hotly disputed." *Simmons v Bradshaw*, 879 F3d 1157, 1160 (11th Cir., 2018).

### 2.  The punitive damages were not the result of passion and prejudice

When arguing that this award was the product of passion and prejudice, Defendant contends that such a conclusion is inescapable because Plaintiff "only identified approximately $22 million for past and future economic damages plus a request for pain and suffering" but the jury then awarded a sum far higher than that. That is nowhere near an accurate description of what occurred. As described in the statement of facts, Plaintiff requested far more in damages than what the jury awarded, including a request for $50 million in punitive damages. The total sum of the verdict- $100 million- was a number provided to the jury by *Defendant,* not Plaintiff.  If this was a jury so driven by passion and prejudice when computing damages, why did the jury defer to the Defendant's valuation of the case and reject Plaintiff's valuation?

Defendant also broadly points to the fact that the jury was shown a day in the life video and photos that depicted the aftermath of Mr. Blasingame's injuries. Defendant makes no argument that such evidence was improperly admissible or was irrelevant. Nor does Defendant take issue with how the jury was instructed regarding what it may and may not consider when assessing damages. Mr. Blasingame's life was destroyed completely and forever by these events and everyone in the Courtroom knew it- not because of passion or prejudice or anger but because it was the reality of this case. That Defendant Grubbs was untruthful regarding the circumstances of the tasing and then destroyed the video evidence of his conduct was a basis for the jury to conclude that a punitive damage award was proper to deter future similar conduct.

### 3. The award is not excessive when considering other cases

Defendant next argues that the punitive damages must be reversed when considering other comparable cases. One striking feature of this section is the way in which Defendant characterizes the facts of the present case. When reading Defendant's account of these events, he simply deployed his taser in a reasonable manner and then aided Mr. Blasingame when he was unexpectedly injured. Yet, recall the jury instructions. The jury was told that punitive damages could only be awarded if Defendant acted with malice or reckless indifference. The jury already rejected Defendant's account that he continues to advance here, after two weeks of

17

trial and testimony from numerous witnesses, including Defendant Grubbs.

Not only does Defendant misrepresent the facts of this case, but he also provides misleading or incomplete accounts of other cases. For example, Defendant directs this Court to the outcome in *Sarah Dozier v City of Atlanta*, which settled for $4.9 million.[1] Punitive damages were not at issue in that case because the case never went to trial. Mr. Blasingame did not have that luxury. Defendant was not offering him millions of dollars to compensate him for his injuries and forced him to look to a jury for his remedy. That was Defendants' choice.

Defendant likewise cites to the outcome in *Jennings v Fuller*, ___F Supp 3d___; 2017 U.S. Dist. LEXIS 77945 (ED Mich, May 23, 2017), in which the jury awarded the Plaintiff $17.63 million in compensatory damages and $19 million in punitive damages. Those awards were reduced by the District Court-after a timely filed motion- to $5 million and $6 million, respectively. Yet, the Defendants in *Jennings* did not render the Plaintiff a quadriparetic. Instead, that opinion reflects that the Plaintiff never had a surgery as a result of his injuries, underwent minimal physical therapy and returned to living his life. This jury was attempting to deter a far different consequence than the *Jennings* jury.

---

[1] It should be noted that in *Dozier*, the Defendant officers were engaged in unquestionably criminal conduct, resulting in multiple prison sentences. Despite that, to the best of Plaintiff's information, the City of Atlanta paid the settlement, as opposed to the officers. Yet here, where Officer Grubbs was never disciplined or charged, the City of Atlanta continues to take the position that it need not indemnify Grubbs despite insisting he acted reasonably. A notable contrast.

18

That there are not a multitude of comparable cases where police officers have rendered homeless men quadriparetics and then destroyed the evidence of their conduct afterwards should not be a basis for reducing this punitive damage award. There are other instances where public officials have been subject to large punitive damage awards that were not reduced.   For example, in *Reeves v. Town of Cottageville*, #2:12-cv-02765, U.S. Dist Ct., (D.S.C. Oct. 21, 2014), a jury awarded a Plaintiff in an excessive force case $7.5 million in compensatory damages and $90 million in punitive damages ($60 million against the city and $30 million against the officer) (Doc. 164). The case was settled for a confidential sum without those awards ever being reduced (Doc. 205).

As Defendant's brief acknowledges (albeit in a footnote), in *S.T. v. Isbell*, No. 2:09cv616-MHT (M.D. Ala. 2010), the jury awarded the minor Plaintiff $10 million in compensatory damages and $10 million in punitive damages. While there are no trial transcripts or extensive opinions to analogize the facts of that case, the damage awards were not reduced in any way in that case.  Counsel did view the complaint in that matter, which is 9 pages in length and contains very little description of the Defendant's specific conduct or the nature of the Plaintiff's injuries.  Again, it is Defendant's burden in this motion to show that relief is warranted and *S.T. v. Isbell* fails to accomplish that.

In *Estate of Moreland v Dieter*, 395 F3d 747 (7th Cir., 2005), the 7th Circuit

affirmed $27.5 million in punitive damages in an excessive force case where there were $29 million in compensatory damages. In doing so, the Court stated that "[t]he defendants have not identified a single appellate case questioning the constitutionality of a punitive damages award that is a fraction of the underlying compensatory damages award. Nor have we." *Id*. at 757. The same is true here.

**B. The punitive damage award is not unconstitutional**

Lastly, Defendant argues that the punitive damage award is unconstitutional. In assessing punitive damage awards in the face of a constitutional challenge, courts are to analyze three "guideposts": (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. *State Farm Mut. Auto. Ins. Co. v Campbell*, 538 U.S. 408, 418 (2003). Defendant does not argue that there is a disparity between the size of the punitive damage award and the harm suffered (which is guidepost 2), and there is thus no dispute that the ratio between the compensatory and punitive damages is constitutional. Plaintiff will address guideposts 1 and 3 below.

**1. Defendant's conduct was reprehensible**

When assessing the reasonableness of a punitive damages award, the reprehensibility guidepost is the "most important." *State Farm* at 419. Indeed, the

20

reprehensibility of a defendant's conduct is "the most important indicium" of a punitive damages award's reasonableness. *BMW of N. Am. v. Gore*, 517 U.S. 559, 575 (1996); State Farm, 538 U.S. 408, 419 (2003); see also *Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1283 (11th Cir. 2008); *Action Marine Inc. v. Con'l Carbon, Inc.,* 481 F.3d 1302, 1318(11th Cir. 2007).

In making the reprehensibility determination per *State Farm*, courts are instructed to consider the following five factors: 1) the harm caused was physical as opposed to economic; 2) the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; 3) the target of the conduct was financially vulnerable; 4) the conduct involved repeated actions or was an isolated incident; and 5) the harm was the result of intentional malice, trickery, or deceit, or mere accident. *Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1283 (11th Cir.2008)(citing *U.S. E.E.O.C. v. W&O, Inc.*, 213 F.3d 600, 614-615 (11th Cir. 2000)). "Reprehensibility grows more likely as more factors are present." *Sepulved*a v. Burnside, 432 F. App'x 860, 865 (11th Cir.2011) (*citing State Farm*, supra at 419). Defendant, despite being the moving party who has the high burden in this motion, addressed *zero* of the reprehensibility factors in its brief despite *Gore* emphasizing that it is the most important consideration at issue.

For consideration of the first reprehensibility factor, whether "the harm caused was physical as opposed to economic," *State Farm, Supra* at 419, the Eleventh

Circuit held in *Goldsmith*, 513 F.3d at 1283, that psychological harm suffices to support a finding of physical harm. Here, there is no contest as to the severity of Plaintiff's physical injuries and the mental anguish he has suffered as a result. Trial was replete with testimony as to the daily suffering Plaintiff has experienced from the time of this tasing and how he will never improve.

The second factor, whether the "tortious conduct evinced an indifference to or reckless disregard of the health or safety of others," *State Farm, Supra* at 419, weighs in Plaintiff's favor. When evaluating this second factor, courts consider "the possible harm to other victims that might have resulted if similar future behavior were not deterred." *TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 460 (1993). Testimony demonstrated that Defendant Grubbs, by disregarding training on the environmental factors that impact the reasonableness of taser usage, was indifferent toward Mr. Blasingame's safety and health. Further, there is no record evidence of any corrective action; in fact, Defendant continues to dispute that he acted unreasonably despite the overwhelming evidence to the contrary.

Similarly, the third factor in assessing reprehensibility, "whether the target of the conduct had a financial vulnerability," *State Farm, Supra* at 419, weighs in Plaintiff's favor. Mr. Blasingame was a homeless man relegated to relying on the charity of others to survive.

The fourth reprehensibility factor, whether "the conduct involved repeated

22

actions or was an isolated incident," *State Farm, Supra* at 419, also potentially weighs in Plaintiff's favor. Evidence adduced at trial demonstrated that Defendant had been trained on how to use his body camera and that the City of Atlanta had determined that its officers were failing to record interactions with the public, as required by policy. Defendant Grubbs perpetuated that department wide conduct.

The final factor, whether "the harm was the result of intentional malice, trickery, or deceit, or mere accident," *State Farm, Supra* at 419, also favors Plaintiff. Defendant Grubbs' actions were not a "mere accident," *State Farm*, supra at 419 (*citing Gore*, supra at 576—77) as he consciously elected to use the force that he did. Moreover, he then engaged in deceit and trickery by toggling his body worn camera off and destroying the footage of his conduct.

Again, reprehensibility is the most important factor in assessing the reasonableness of this award, and an award is more likely to be affirmed as the reprehensibility factors weighing in Plaintiff's favor increase. Here, each factor weighs in Plaintiff's favor.

### 2. The difference between the award and the civil penalties available

The remaining guidepost asks the deciding Court to consider the size of the punitive damage award compared to the civil or criminal penalties available under the law. Defendant curiously asserts that under Georgia law, the punitive damages in this case should be capped at $250,000. Yet, this action was not brought pursuant

23

to Georgia law and those caps are inapplicable to this 1983 action, which seeks a remedy for a violation of a right under the United States Constitution. Defendant has offered zero authority for the notion that a state law cap on damages should have any relevance to analyzing the propriety of a damages awarded in an action under federal law.

As the 1st Circuit has stated when discussing this guidepost, "[i]n drafting section 1983, Congress did not make any reference to the quantum of damages. We may, therefore, consider awards in similar cases to help determine if particular punitive damages in a given case appear excessive." *Casillas-Diaz v Officer Romualdo Palau*, 463 F3d 77, 86 (1st Cir., 2006). As is provided above, there have been other 1983 cases with similar or higher punitive damage awards than the present case which were never subject to reduction. Defendant has failed to make any showing that this guidepost favors a reduction.

### CONCLUSION

Defendant's motion must be denied on its face because it is untimely, brought pursuant to the wrong authority and filed in a court that has been divested of jurisdiction. Beyond that, the motion is also devoid of substantive merit. Yes, the punitive damage award in this case was significant, but it was a fraction of the compensatory damages awarded (as opposed to a multiple of the compensatory damages, like those that traditionally draw constitutional scrutiny). This jury, upon

24

being properly instructed, concluded that punitive damages were appropriate and necessary to deter future similar conduct.  When considering the reprehensibility of the conduct at issue as well as punitive damage awards that have been permitted in other cases against public employees who have inflicted serious physical harm, the jury's award of punitive damages was proper and is not subject to any reduction.

Respectfully submitted,

**JOHNSON LAW, PLC**

By: */s/ Vernon R. Johnson*
VERNON (VEN) R. JOHNSON
AYANNA D. HATCHETT
Attorneys for Plaintiff
535 Griswold, Suite 2600
Detroit, MI 48226
(313) 324.8300
vjohnson@venjohnsonlaw.com
ahatchett@venjohnsonlaw.com

TOBIN INJURY LAW
By: */s/  Darren M. Tobin*
DARREN M. TOBIN
Attorney for Plaintiff
(404) 587.8423
darren@tobininjury.com

Date: January 27, 2023

**CERTIFICATE OF SERVICE**

Undersigned hereby states that on January 27, 2023, she caused the foregoing document to be filed electronically with the United States District Court and that a copy of said document was sent to all parties having appeared in this matter, through their counsel of record, via the Court's CM/ECF electronic filing system.

*/s/ LIZA DODSON*
*LIZA DODSON*